IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

NETLIST, INC.,                    (  CAUSE NO. 2:21-CV-463-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD., (
et al.,                           )  MARSHALL, TEXAS
                                  (  NOVEMBER 4, 2022
          Defendants.             )  9:00 A.M.
_____


_____

MARKMAN HEARING

BEFORE THE HONORABLE ROY PAYNE
UNITED STATES MAGISTRATE JUDGE

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                        A P P E A R A N C E S

 2          FOR THE PLAINTIFF:     IRELL & MANELLA, LLP -
                                   LOS ANGELES
 3                                 1800 AVENUE OF THE STARS
                                   SUITE 900
 4                                 LOS ANGELES, CA 90067-4276
                                   (310) 203-7096
 5                                 BY:  MR. JASON SHEASBY
                                        MS. ANNITA ZHONG
 6                                      MR. MICHAEL TEZYAN

 7                                 McKOOL SMITH, P.C. - MARSHALL
                                   104 E. HOUSTON ST., SUITE 300
 8                                 MARSHALL, TEXAS  75670
                                   (903) 923-9000
 9                                 BY: MS. JENNIFER TRUELOVE

10          FOR THE DEFENDANTS:    FISH & RICHARDSON, PC -
                                   WASHINGTON DC
11                                 1000 MAINE AVE. SW, SUITE 1000
                                   WASHINGTON, D.C.  20024
12                                 (202) 783-5070
                                   BY:  MR. MICHAEL McKEON
13
                                   FISH & RICHARDSON, PC -
14                                 SAN DIEGO
                                   12860 EL CAMINO REAL, STE. 400
15                                 SAN DIEGO, CA 92130
                                   (858) 678-5070
16                                 BY:  MR. FRANCIS ALBERT
                                        MR. JEFF BURTON
17
                                   FISH & RICHARDSON P.C. -
18                                 DALLAS
                                   1717 MAIN STREET, SUITE 5000
19                                 DALLAS, TEXAS  75201
                                   (214) 747-5070
20                                 BY:  MR. MATTHEW COLVIN

21                                 GILLAM & SMITH, LLP
                                   303 SOUTH WASHINGTON AVENUE
22                                 MARSHALL, TEXAS  75670
                                   (903) 934-8450
23                                 BY:  MS. MELISSA SMITH

24          OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                   100 E. HOUSTON STREET
25                                 MARSHALL, TEXAS  75670
                                   (903) 923-7464
```

1          THE COURT:  Good morning.  Please be seated.

2      For the record, we're here for the claim construction

3  hearing in Netlist versus Samsung, which is Case No. 2:21-463

4  on our docket.

5      Would counsel state their appearances for the record?

6          MS. TRUELOVE:  Good morning, Your Honor.  Jennifer

7  Truelove for Plaintiff Netlist.  With me today and who will be

8  presenting is Mr. Jason Sheasby, his colleague Annita Zhong,

9  and Michael Tezyan.  We also have with us today some corporate

10 representatives, Jayson Sohi, Tobin Hobbs, and Jamie Zheng.

11 We are ready to proceed.

12         THE COURT:  All right.  Thank you, Ms. Truelove.

13         MS. SMITH:  Good morning, Your Honor.  Melissa Smith

14 on behalf of SamSUNG.  I'm joined this morning by Mr. Mike

15 McKeon, Mr. Matt Colvin, Dr. Frank Albert, Mr. Jeff Burton.

16 And then, Your Honor, we also have two corporate

17 representatives from Samsung today--Young-Jun Choi, as well as

18 Won-Jin Lee.  And Your Honor, we're ready to proceed.

19         THE COURT:  All right.  Thank you, Ms. Smith.

20     I will also point out for the record that earlier this

21 morning we distributed to counsel for both sides a set of

22 preliminary constructions of the disputed terms.  The purpose

23 of issuing those preliminary constructions is not to deter

24 either side from taking whatever positions they think are

25 appropriate on these terms; rather, the preliminary

1   constructions are designed to let you know where the Court is

2   after the initial review of the briefing and the record so

3   that you can focus your arguments where you think the Court

4   may have most gone astray.  I do reserve the right to amend

5   these preliminary constructions, and not uncommonly do alter

6   them based on the arguments received at this hearing, so I

7   hope that you will take them in that spirit.

8        I'd like to hear the arguments on a term-by-term basis,

9   but I'm happy to take them in whatever order counsel think is

10  most productive and to group them if counsel think that would

11  be efficient.

12       And I will note also that a variety of these preliminary

13  constructions have notes on them.  Those notes are not part of

14  the official construction; they're designed to let you know

15  what will be reflected in the order that issues so that even

16  though it might say 'plain and ordinary meaning', there will

17  be further discussion in the order that issues designed to

18  govern the way the experts handle these terms.  So I just

19  wanted to let you know that's what those parenthetical notes

20  are intended to communicate.

21       Having said that, I'll turn it over first to counsel for

22  Plaintiff.

23       Good morning, Mr. Sheasby.

24           MR. SHEASBY:  Good morning, Your Honor.  May it

25  please the Court.

1          On term A, we will stand on the papers because the Court

2     has preliminarily adopted our construction, and perhaps

3     Samsung would appreciate the opportunity to argue on that one.

4               THE COURT:  All right.

5               MR. McKEON:  Good morning.  Mike McKeon for Samsung.

6     Always a pleasure to appear before you.

7          So I do want to make just a few points on the first term,

8     the 'dual buck converter' term.  And one thing I want to

9     emphasize, and maybe we didn't do as good a job in our brief

10    as we should have in this, but this term 'dual buck converter'

11    that appears in dependent claims, it shows here on slide 7 a

12    depiction of what that physically looks like in the patent and

13    it's depicted in figure 16.

14         This term is not a term of art--'dual buck converter'.

15    'Buck converter' is.  That's why no one's disputing that term.

16    But 'dual buck converter' doesn't have a common, ordinary,

17    understood meaning, and that's why, you know, we think it's

18    appropriate in this case to look to the specification to get

19    guidance on that.  And when you do that, what you see here is

20    in figure 16 and the corresponding description at column 29 of

21    the patent, starting at line 46, which really defines and

22    gives meaning to what this term, which has no understood

23    meaning in the art, what it means in the context of the

24    patent.  And what we see here is that when we talk about the

25    dual buck converter, we have these two voltages coming out.

1    No one, of course, disputes that.  It's two voltages coming

2    out.  But one voltage that comes out is different, distinct

3    from the other voltage comes out.

4        And the explanation here in the patent is -- again, at

5    column 29, is that you have the 2.5 voltage coming out, and in

6    the context of the embodiment, it's going to a particular

7    device in the whole system, an isolation device; whereas, the

8    second voltage is a reduced voltage, and that's going to the

9    -- a separate and distinct device--FPGA.  And so we have these

10   two voltages coming out, but the voltages are different.

11       And, in fact, if we go to slide 9 here in our

12   presentation, what we see here if you look at all the buck

13   converters, they all actually have different values at the

14   output.  And why is that?  Because the patent describes in

15   quite detail that we want to drive different types of

16   components in the system, and these different components are

17   going to have different voltage requirements.  And the logic

18   here, Your Honor, is, Well, if I had two components that only

19   needed 1.8 volts, well, then I just need one output of a buck

20   converter that I can send to both of those components.  So I

21   don't need -- if I have a buck converter with a dual output,

22   it would be superfluous, completely redundant, unnecessary to

23   have them be the same voltage.

24       And we see the descriptions in the specification here at

25   column 29, you know, quoting here at line 33, you know, "an

1    appropriate amount of powering for the various components."

2    And the way the system is defined in the patent, and

3    particularly the buck converters, in every instance -- there's

4    not a single instance where we have a different value or a

5    same value coming out not only within the dual buck converter,

6    but actually across the buck converters, because again, that

7    would be superfluous; you wouldn't need to do that.

8         One final point, Your Honor, is there is a claim in the

9    patent where we talk about a first and third buck converters

10   are configured to operate as a dual buck converter, and the

11   point here is that when -- if I had these separate buck

12   converters that had these separate values in the independent

13   claim and I bring them together in the dependent claim, then

14   they're going to have -- retain their separate values and --

15   when they're combined as a dual buck converter.  And again,

16   it -- you know, it would make no sense as a matter of logic or

17   as a matter of the technology as described in this patent to

18   have them be the same value because you would just have one

19   output then that would go to the different components.

20            THE COURT:  You know, Mr. McKeon, that sounds like a

21   good argument to me for the system having the capability to

22   have a different value out of each buck converter, but where

23   do you derive a requirement that it can only be different

24   values?

25            MR. McKEON:  I would say, Your Honor, when the

1    disclosure is limiting in that way, when THE -- to describe

2    the embodiment -- and again, this is not a term of art.  When

3    they describe 'dual buck converter' in the patent, it's only

4    described this way.  And I do concede, Your Honor, looking at

5    the claim language itself, you know, if you want to take the

6    most broadest view of the claim language itself, your proposed

7    construction in the preliminary is, you know, within that

8    logic.  But if you look at the specification and one of

9    ordinary skill in the art is thinking, What about the dual

10   buck converter, I'm going to have to go to the specification,

11   and when you have it consistently and uniquely defined in this

12   way, then, you know, we think that's limiting, and that's

13   really the source of our point here, our argument here.

14          THE COURT:  You know, I would quibble with your use

15   of the word 'defined'.  I don't see it defined in the

16   specification at all.

17          MR. McKEON:  What I would say, Your Honor, we rely

18   on cases like *Bell Atlantic* where you have these -- you know,

19   defined by implication.  You're absolutely right, Your Honor;

20   it's not defined in the sense that 'dual buck converter' is

21   herein defined as X, Y, and Z, and that's definitely the case,

22   Your Honor.  But when you have a description of a component

23   that has no ordinary meaning in the art and it's the only

24   description of it, then you have to define it by implication,

25   and we think that's really what's going on here in the context

1    of this term.

2            THE COURT:  And let me back up and question a

3    premise you have on the screen right now, which is that the

4    first buck converter and the third buck converter must involve

5    different voltage amplitudes.  Is that just an implicit

6    characteristic as you see it, or is there something in the

7    specification that you think requires that?

8            MR. McKEON:  Again, Your Honor, going back to the --

9    sort of the main foundation of our argument, which is the only

10   disclosure is that they have -- all have separate values

11   coming out.  And again, it would be superfluous if I was to

12   have -- if these were all the same values, to be superfluous

13   you would just need one output and you could drive as many

14   different components in the system as you wanted to with that

15   one value.  The point is that these difference components that

16   are in the system require different values.

17       And that is why we have these -- you know, you have these

18   -- this one voltage coming into all these buck converters, you

19   have one voltage coming in at 1110 or, alternatively, 1112.

20   That's value coming in.  One value is coming in.  And these

21   different buck converters are going to downscale that value,

22   it's actually five volts coming in, and they're each going to

23   down-tick the value to the appropriate level and they're all

24   going to have different values.  And if you had a system where

25   they could be the same, then you wouldn't need these different

1    buck converters.

2       And we just think with the term 'dual buck converter',

3    particularly because it's not defined in the art, you know,

4    you're going to have to be stuck with you what you disclosed

5    to the public in your patent.  And that's the main point and

6    premise of the argument, Your Honor.

7          THE COURT:  All right.  Thank you, Mr. McKeon.

8          MS. SMITH:  Your Honor, may I pass up some slides,

9    please?

10         THE COURT:  Sure.

11         MS. SMITH:  Thank you.

12         THE COURT:  Thank you, Ms. Smith.

13    Go ahead Mr. Sheasby.

14       MR. SHEASBY:  Thank you, Your Honor.

15    I think the basic premise of the argument is that two

16    separate components cannot demand the same value on the

17    module, and that is absolutely inconsistent with the patent.

18    This is the '918 Patent, 29, 18 through 64, and this is an

19    object lesson in why there may be lots of reasons to have

20    separate circuits delivering the same voltage.

21    So in this example the DRAM, flash, and controller all

22    require 1.8 volts, and there is an option of them being

23    supplied over a single line, 1102.  But then if you go down to

24    the bottom of that same passage, it makes clear that an

25    independent voltage can be used to supply the DRAM and flash.

1    And, of course, those DRAM and flashes still require the same

2    1.8 volts; they're just being supplied independently.  And so

3    the basic premise that each of the wires has to, in effect,

4    supply a different voltage is not in the specification itself.

5         The dual buck converter, there is no evidence that that's

6    a specialized term of art or a term that was coined by the

7    patent owner in this case.  The purpose of the figure 16

8    embodiment is to note that you can use lots of different types

9    of power management tools.  You can use buck converters, you

10   can use dual buck converters, you can use buck and burst

11   converters, but there's no requirement or -- there's no

12   requirement or standard that each of those has to deliver a

13   different voltage.  For example, we know in the preferred

14   embodiment that the voltage 1122 is outputting 1.8 volts, but,

15   in the alternative, there can be a separate for DRAMs, flash,

16   and FPGA, but we know in the alternative embodiment there

17   could be an independent voltage.

18        Thank you, Your Honor.

19        THE COURT:  And Mr. Sheasby, is there a reason that

20   you can articulate why a dual buck converter would have the

21   same voltage coming out on both lines?

22        MR. SHEASBY:  There is, Your Honor, and I can

23   explain it.  There is two reasons.

24        If you go to slide 66.

25        In particular in FPGA--and you can look at this from the

1   specification itself--the FPGA operates not just at one

2   voltage; it can operate at multiple voltages at different

3   particular times.  And that's talked about in the

4   specification.  If you ran the core of the FPGA, you would

5   operate at one voltage; if you ran other elements of the FPGA,

6   you'd operate at another voltage.  And so, for example, this

7   is talking about FPGAs that operate across voltage ranges that

8   start from 1 and go up to 2.5 volts.

9        And so the reason for the dual buck converter having the

10  capability of doing different voltages, but not requirement,

11  is that it's not an assumption that the voltage demand for a

12  given component will stay the same throughout the operating

13  cycle.  And the specification in particular talks about the

14  FPGA operating at different voltages in different events.

15                 THE COURT:  All right.

16                 MR. SHEASBY:  Thank you, Your Honor.

17                 THE COURT:  Thank you, Mr. Sheasby.

18                 MR. McKEON:  Your Honor, I think you got the

19  argument, so with that, we rest.

20                 THE COURT:  All right, then.  Thank you, Mr. McKeon.

21       And we can take the next term.

22                 MR. SHEASBY:  Your Honor, I think for B, C, and D we

23  will stand on our briefing.

24                 THE COURT:  All right.

25                 MR. McKEON:  Ms. Andrews, can we have the slides?

1           All right.  'Pre-regulated input voltage', Your Honor.

2    So, I mean, the dispute here, of course, as Your Honor knows

3    reviewing the briefs is, you know, whether this regulated

4    voltage needs to be generated on the memory module itself.

5    That's really the crux of the dispute here.  And, you know,

6    I'll note that their proposal, of course, modulated input

7    voltage.  And the thing about their proposal, Your Honor, it

8    takes out the word 'pre-regulated'.  'Pre-regulated' must mean

9    something.  You know, 'pre-regulated input voltage'.  And if

10   you just say 'modulated input voltage', what does that -- that

11   really changes the character of what 'pre-regulated input

12   voltage' is.

13          And we think from the context of the disclosure in the

14   patent, and also the claims, is that the pre-regulated

15   voltage, it comes from the input voltage, the source of it,

16   but the key is that it's actually done on the module.  And, of

17   course, the pre-regulated voltages serve to be an input into

18   the buck converters we just talked about.

19          And this is where the language appears in the claim.  And

20   just take a second, Your Honor, if I can, to walk through --

21   sort of piece together how the claim operates in these

22   different elements.  Of course, we have that printed circuit

23   board.  And we had this input voltage.  That comes in and that

24   is going to this power element.  And the power element is what

25   is generating on the actual module, on the circuit board, it's

1    generating the pre-regulated input voltage which, in turn,

2    goes to the buck converters and, of course, is an output and

3    that goes to another component.  So the patent is very clear

4    in its description how these all relate, and we -- you know,

5    we think the claim is very consistent with that.

6        And the disclosure here, Your Honor, is also very clear

7    on this.  And what we've highlighted here in this red, these

8    are the two power elements, and both take that input in and

9    what they're doing is they're cranking that up to a higher

10   level and they're pre-regulating the voltage.  And what are

11   they pre-regulating the voltage for?  Well, they're

12   pre-regulating it to be inputs into the buck converters we

13   talked about.  And then the buck converters, in turn, will

14   down -- you know, down shift the voltage.  But the

15   pre-regulated voltage is something that's generated on the

16   power module because it's tied directly to the buck

17   converters.  They're the inputs to the buck converters.  And,

18   of course, we see that in the disclosure how they're all tied

19   together.

20           Now, there's an argument made by our capable counsel

21   here on the other side about figure 12, and I just want to

22   quickly respond to that.  Now, figure 12 is a different

23   configuration, and then what I have here on the slide is

24   figure 12 and this power source 1080.  And the argument that

25   was made is, Well, what if you take the figure 12 power source

1    and you could bring it into figure 16.  And there is

2    disclosure in the patent that says that, but it has nothing to

3    do with the pre-regulation.  I mean, the figure 12 doesn't

4    even talk about pre-regulated voltage.

5        And the reason why counsel points out figure 12 is

6    because there is actually a section in connection with

7    describing figure 12 that says 1080, this power source, can be

8    off the module.  It says that for figure 12.  And they cite to

9    that and say, Okay, Your Honor, therefore, you shouldn't have

10   that requirement.  But Your Honor, I think the point there is

11   that actually the fact that it says it for figure 12 and does

12   not say it for figure 16 I think is quite telling.  I mean,

13   they -- when they want to have clarity around where these

14   different components could be and where these signals are

15   generated, they gave you the option of figure 12, but they

16   specifically did not do that in figure 16.

17       And figure 16, of course, is very important because

18   that's where the pre-regulated voltage term is applicable.

19   The pre-regulated voltage is the green here on the right, and

20   that's coming from the power sources, and it's generated on

21   the board, and it's tied directly to the buck converters.  And

22   the way they've construed it, Your Honor, and I fear the way

23   that your preliminary -- the scope of your preliminary is

24   that, you know, this pre-regulated voltage can be generated,

25   you know, systems away, and as long as it ends up into the

1    buck converters that's all that matters.  And we just think,

2    Your Honor, that's a step too far given the context of this

3    term as it's used in the patent, and also, you know, the

4    pre-regulation.  That's a term in the claim.  And I fear, Your

5    Honor, that your construction just removes that.  And what

6    meaning does that have in the context of this claim and this

7    patent--pre-regulated voltage.  And we feel, Your Honor, that,

8    you know, it's got to be tied directly to those buck

9    converters and it's got to be generated on the module.

10        And with that, Your Honor, I'll save --

11            THE COURT:  I guess my initial read on this is that

12   while pre-regulated voltage is a limitation of the claim that

13   has to be met, the claim as it's written is agnostic as to

14   where that occurs.  And I understand that there is an

15   embodiment which is displayed in figure 16 that would support

16   your understanding of it, but my difficulty is in finding that

17   that embodiment has to be read into the claim.

18            MR. McKEON:  And Your Honor, that's obviously a

19   great question, and what I would say to that is, you know,

20   again, I would just -- I would hang my hooks onto that

21   'pre-regulated' term.  But if you look at the way the claims

22   set up, you've got this input voltage coming in and it's

23   coming in from these edge connections, and the edge

24   connections are on the module.  So I have the input voltage

25   coming from the edge connections and then I'm generating these

1    pre-regulated input voltages.  They're pre-regulated input

2    voltages, and these input voltages, where do they come from?

3    They don't just fall from the sky.  They came in through the

4    edge connection.  So the input voltages are on the board.  And

5    when they make the pre-regulated input voltages, I'm doing

6    that on the board because they're coming from what came in

7    through the edge connection.

8          So I think the claim itself really gives you the

9    structure of how these voltages are related, and it's tied

10   directly back to figure 16.  So they're coming in from the

11   edge.  That's a structural limitation there.  The input

12   voltages are coming into the edge, and then they go into the

13   power circuit, and they are pre-regulated, and that's all on

14   the board.  And, you know, the pre-regulated input voltages,

15   again, they are not just falling from the sky; they're coming

16   -- they're generated on the board, and the source of them, you

17   know, is what's coming into those edge connections.  That's

18   the source of that power.  And so the claim itself is what

19   really puts that structure together there, and I think, you

20   know, when you look at the patent it really brings it home.

21               THE COURT:  All right.

22               MR. McKEON:  Thank you, Your Honor.

23               THE COURT:  Thank you, Mr. McKeon.

24               MS. ZHONG:  Can we switch?  Thank you very much.

25               THE COURT:  And Ms. Zhong, if you can pull that mic

1    down to you.  I want to make sure I can hear you.  Thank you.

2         MS. ZHONG:  Can you hear me now?

3         THE COURT:  Yes.

4         MS. ZHONG:  Thank you, Your Honor.

5    So why don't we start with slide No. 72.

6         Let's start with the claim language.  And Your Honor has

7    pointed out there is really no connection between the

8    pre-regulated input voltage and the input voltage that's

9    received from the edge connection.  As Samsung's counsel has

10   pointed out, the pre-regulated input voltage is an input for

11   the buck converters, and there is a separate input voltage

12   from the portion received at the edge connections.  The claim

13   otherwise does not place any restrictions on the two terms.

14        And then if we go to figure 16 that the counsel has hang

15   its hat on, if you look at figure 16, it's not a memory

16   module.  What it says is a power module.  The power module can

17   be part of the memory module or it can be off the memory

18   module.  So think about when it's off the module there is a

19   memory module, there is a separate connector where the power

20   module is actually connected to the memory module.  So figure

21   16, the caption of it, the description in column 9, lines 39

22   to 41, says figure 16 is a power module illustrating a power

23   module.  It's not illustrating the memory module.  That power

24   module can be part of the memory module as shown in, for

25   example, figure 12, 13, and 14 illustrated on the same PCB, or

1    as described in the specification for figure 12, it can be off

2    module.

3        So Your Honor got it right--the pre-regulated voltage

4    need not be generated on the same PCB as the memory.  They can

5    be off module.  The patent the inventors anticipated and

6    described both possibilities, and that's in, for example,

7    column 26, lines 26 through 35.

8        So in column 26 through 35, they contemplated both having

9    the second power module 1080 on the same PCB as a memory

10   module as the rest of the memory or it's to be off.  And the

11   power module is exactly the same.

12       If Your Honor doesn't have any additional questions, we

13   will rest on the paper at this time.

14             THE COURT:  All right.  Thank you, Ms. Zhong.

15             MR. McKEON:  Your Honor, a quick response to that?

16             THE COURT:  Certainly.

17             MR. McKEON:  And again, Your Honor, I just want to

18   emphasize, the description regarding having the power module,

19   you know, removed from the memory module, that's in column 26

20   with connection with figure 12, and then -- and counsel cited

21   that, you know, being at line 30.  And the point is that

22   description does not appear anywhere in connection with figure

23   16, and the claims here are clearly directed at figure 16.  If

24   you're talking about buck converters and all that, that's

25   figure 16.  That's -- the only disclosure of the system is

1   figure 16.  And the fact that that same description that

2   counsel pointed to is not anywhere near figure 16 description

3   really tells -- I think tells the reader and one of ordinary

4   skill in the art that this is a different configuration of

5   figure 12.  And with respect to figure 16 description, what

6   the claim corresponds to, these are done on the module.  And

7   again, the word -- the 'pre-regulated' language I think

8   supports that.

9       With that, Your Honor, unless you have any questions, we

10  can turn to the next term.

11          THE COURT:  All right.  Thank you, Mr. McKeon.

12          MR. SHEASBY:  Mr. McKeon, I already said I was going

13  to rest on -- just to make it more efficient, the next three

14  I'm going to rest on.

15          MR. McKEON:  Thank you.

16          THE COURT:  All right.  So I'll hear from the

17  Defendant on anything on the C and D terms.

18          MR. McKEON:  Thank you.

19      On this one, Your Honor, if I may -- so 'first',

20  'second', 'third', and 'fourth'.  And I think the issue here,

21  Your Honor, is what is 'distinct'.  And as Your Honor -- you

22  know, the case law is clear that, you know, these need to be

23  distinct.  So we're having an issue about what is 'distinct'.

24  And I think, you know, were -- the construction, as Your Honor

25  put in the preliminary, 'distinct' is just physically

1    separate; it's distinct, and in our -- we're going further

2    than that; we're saying yes, you've got to have that, but you

3    also -- in the context of this patent and this art, 'distinct'

4    also needs to be distinct in value.  So, you know, separate

5    and then distinct in terms of the values.

6         And on this point, Your Honor, there's a case

7    *Alexsam/Cigna* case that we cite in the brief, and the issue

8    there was the first database distinct from the second

9    database.  And this is one of your decisions, Your Honor.  And

10   what you held there, you know, you held they have to be

11   distinct consistent with the case law, but then you said, you

12   know, you're not going to get into the issue about what that

13   means in the context of that dispute.  You felt that was

14   something the jury should decide.  And what we would invite

15   here, Your Honor, is this same result.  Let 'distinct' -- we

16   all agree they have to be distinct, and there's no dispute

17   about that.  And what we would invite, Your Honor, is sort of

18   following the logic of the *Alexsam* case and let's let the jury

19   decide the context of this patent and technology--you know,

20   what does it mean to be distinct.  And I think that's

21   something that our experts are going to get up there and talk

22   about and that's something that the jury can ultimately decide

23   in the context of this technology and this patent.

24             THE COURT:  You know, in the *Alexsam* case, what we

25   were concerned about was the issue there you have a single

1   database and one side wants to draw lines and partition it

2   into allegedly multiple databases, and that was the fact issue

3   that was involved with whether they were distinct.  I don't

4   see that there's a similar issue here with these first through

5   fourth voltages, but --

6           MR. McKEON:  Yeah.  I mean, I guess, Your Honor, the

7   -- I mean, I would say the logic applies equally and, you

8   know, so I get the line-drawing point is it a distinct debate

9   as different in nature, but fundamentally, you know, whether

10  the voltages first, second, and third are distinct in the

11  context of this technology, you know, ultimately that's the

12  question at hand here, and I think that was -- I think that's

13  best left to the jury in this context, following the same

14  logic.

15          THE COURT:  Well, I just wanted to make sure that it

16  was clear that the position that I'm taking at this point is

17  that you are right, they have to be distinct, but I'm not

18  agreeing that being distinct means they have to have different

19  amplitudes, and that's what I guess to a certain extent you

20  were talking about before.  I understand that may be the

21  highest and best use of this system, but the question is do

22  the claims require it, and that's what I'm struggling with.

23          MR. McKEON:  Yeah.  And I -- that is certainly the

24  debate, Your Honor, and that's why, you know, I invite the

25  Court to, you know, use the same logic that you did in the

1    *Alexsam* case here and let the jury decide whether in this

2    context wha*t* we see here on slide 16 and whether these are

3    distinct, you know, in the context of an accused system or

4    not, and let that just -- the jury decide that ultimately, and

5    leave it at distinct, that will be part of the construction,

6    and then the jury can take it from there.

7              THE COURT:  All right.  I understand the argument.

8              MR. McKEON:  Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. McKeon.

10             MR. SHEASBY:  So we start with the claim language

11   the Federal Circuit requires.  If you look at the claims, it

12   recites one or more regulated voltages, so multiple regulated

13   voltages through the fourth.  And then -- that's claim 23 of

14   the '918.  And then in dependent claim 29 it makes clear that

15   those regulated voltages can actually have the same amount.

16             THE COURT:  Mr. Sheasby, you're a bit taller than

17   your co-counsel.  If you could adjust that mic that would

18   help.  Thank you.

19             MR. SHEASBY:  Not in personality, Your Honor; only

20   in height.

21         You asked this question, which is why would two separate

22   lines give the same voltage, and I gave you one example from

23   the specification that the FPGA operates in different states

24   and, therefore, requires different voltages.  There's another

25   example.  So if you look at this specification '918, 29, 18

1    through 64, it talks about the wire, the rail for the voltage

2    being provided at 1.8 volts for two amps for 60 seconds.  And,

3    of course, what we know from electrical engineering is that

4    voltage is only one aspect of what triggers the load that's

5    placed on a circuit.

6         So the analogy that Doctor Zhong gave to me yesterday was

7    the following:  There's a reason why you don't plug in a power

8    strip and plug in four microwaves all at 110 volts into the

9    same circuit, and the reason for that is that you'll short the

10    circuit because the load will be too great.  And what this

11    passage is speaking about is the fact that one circuit--this

12    is 1122--is going to provide 1.8 volts, but it's going to

13    provide it two amps for 60 seconds.  But you may need the same

14    voltage but different amps and a different load for another

15    circuit, and that's why the specification expressly describes

16    the voltages as being able to be independent even though

17    they're the same amount, because voltage is only one of the

18    three parameters that describe how you feed the modules that

19    you're dealing where.

20         If you go to slide 57.

21         This is another example that we look at.  This is

22    from --

23         Slide 56.

24         This is from PNC -- from Samsung's own papers.  This is

25    Exhibit 30 to our reply at papers 15 and 30.  And they

1    acknowledge this as well, that separate voltages can have the

2    same amplitudes.

3         So this is I don't think anything esoteric or funny.

4    This is a basic element of electrical engineering, which is

5    that you may want different rails or different pipes all

6    differing the same voltages because voltage is only one of the

7    parameters that is contributing to the load you need to feed

8    from those circuits.

9         I'll rest on that, Your Honor, unless you have any

10   questions.

11             THE COURT:  All right.  Thank you, Mr. Sheasby.

12             MR. SHEASBY:  Thank you, Your Honor.

13             MR. McKEON:  Just a brief response, Your Honor?

14             THE COURT:  Certainly.

15             MR. McKEON:  Just for the record, and we do take

16   issue with the description that the specification discloses

17   using the same voltage in these different components and, you

18   know, Mr. Sheasby pointed to some extrinsic evidence Samsung

19   documents regarding how their systems -- well, I guess it's a

20   JESD bag.  But the point is in the specification there's no

21   disclosure of that in the specification.

22             THE COURT:  Well, I guess the question is, what I

23   understand from the Plaintiff's argument is that they're

24   saying that's a reason why it would make sense for the

25   capability to have different voltages but not a requirement.

1   And if you want to rebut the argument that it would be useful

2   to be able to have the same voltages from the different

3   circuits, then tell me about it, but that is what I'm

4   struggling with--just because the embodiment shows separate

5   voltages, does that make it a limitation.

6           MR. McKEON:  And I would say yes, Your Honor, in

7   this context.  I mean, again, there is just no disclosure

8   where you have it -- they'd have the -- they would be the

9   same.  And then, of course, in the context of the patent,

10  where you have these various buck converters, they're going to

11  different places, and there's no disclosure that you would

12  have -- that a particular FPGA in one system would have the

13  same voltage as an FPGA in another part of the system.

14  There's no disclosure on that.  And yes, you can have

15  different FPGAs, but there's no disclosure that they would

16  necessarily have the same voltage.

17      And maybe in a real-world system you would have

18  situations where that would be the case, but we're limited to

19  what we've got here in the patent documents.  And when you

20  have this disclosure that's very specific in terms of the

21  different values of these signals and nothing else, then, you

22  know, we think that's limiting.

23          THE COURT:  All right.  I do understand the

24  argument.  Thank you.

25          MR. McKEON:  Thank you, Your Honor.

1          MR. SHEASBY:  Your Honor, we'll rest on -- I think I

2     just referred Your Honor to the passage 29, 33 through 64

3     which talks about a flash and DRAM, two separate components

4     both at 1.8 volts, and we disclosed them being fed by separate

5     independent lines.

6          And with that, as to term E we'll rest as well, if my

7     brother would like to argue that in the first instance.

8          Term E.  Did you want to argue term E?

9          MR. McKEON:  Your Honor, we're going to rest for D,

10     E, and F.  We will rest on the papers.

11          MR. SHEASBY:  So with Your Honor's permission, we

12     will argue F.

13          THE COURT:  All right.  Go ahead.

14          MR. SHEASBY:  Thank you, Your Honor.

15          MS. ZHONG:  Slide No. 80, please.

16          It's our position that the memory module should be

17     limiting because it provides the antecedent basis for the test

18     in the body.  That's consistent throughout the claims.  For

19     example, claim No. 1, the preamble says a memory module, and

20     that provides the antecedent basis for the end of the memory

21     module at the end of the first limitation.  There is

22     well-established case law that says if the -- a term that's

23     appearing in the preamble provides the antecedent basis for

24     the text in the body, then that particular phrase should be

25     considered unlimiting.

1      And with that I will rest.

2          THE COURT:  You know, it can be limiting because it

3   provides antecedent basis, but this certainly looks like

4   nothing more than a statement of an intended use of the

5   device.  Does it provide any other meaning to it other than

6   the intended use?

7          MS. ZHONG:  Well, it requires -- if Your Honor looks

8   at --

9      Let's go back to claim No. -- slide 81.

10     The first limitation is, A printed circuit board having

11  interface configured to fit into a slot, and that interface is

12  required to include a plurality of edge connections, to couple

13  power, data, address and control signals between the memory

14  module and the host system.  So that provides a context.

15     There is an interface -- think about the DEM.  There is a

16  bunch of gold fingers on the edge.  And that gold edge, those

17  gold fingers are supposed to provide power data and control

18  signals between the host and that memory module, like the DEM

19  board.  So it provides a context of it--what is that interface

20  coupling.  So the memory module provides that context.  It's

21  not an intended use.  It provides -- defines a physical

22  structure where the interface needs to couple the signals

23  with.

24         THE COURT:  So you're saying without the preamble

25  being limiting, it does not -- the claim does not define a

1    complete apparatus?

2         MS. ZHONG:  Well, it makes clear that the printed

3    circuit board -- the interface on that printed circuit board

4    is providing the -- is coupling the signals between the host

5    and that system.  So everything else -- for example, the

6    voltage conversion, the plurality of the component coupled to

7    that is part of the memory module between which -- and the

8    host system the interface is providing the conduit, or like

9    the pass way for the signals.  So it does provide the context.

10        THE COURT:  So you're saying that if we don't

11   construe the preamble as limiting, the claim will not be

12   clear as to what the -- whether the device is the memory

13   module that's referred to at the end of the first limitation?

14        MS. ZHONG:  That's correct.  For example, whether

15   the voltage conversion circuit needs to be part of the memory

16   module or not, then it's not going to be clear.

17        THE COURT:  All right.  Thank you, Ms. Zhong.

18        MR. McKEON:  Okay.  All right.  So Your Honor, just

19   where you started, I mean, this really is intended use.  The

20   point is here you have this printed circuit board, and the

21   printed circuit board is doing various things and it's just

22   doing this coupling between these other things.  These other

23   things aren't part of -- it doesn't indicate here specifically

24   that they're part of what the printed circuit board is doing.

25        And I think the case that we think is on point here, Your

1    Honor, is, you know, your ruling in the *Sol IP* case where we

2    had the same situation where we had a reference to the

3    wireless communication system that was in the preamble, and

4    Your Honor, you know, the same logic really that applies here

5    is that it really doesn't overcome that presumption that, you

6    know, it's not limiting.  And you don't -- it's not really

7    part of the claim and part of the system that's claimed.  Even

8    though it is, in fact, referenced, you know, within the body

9    of the claim, it's not really doing anything, and particularly

10   in the case we have here which is really an intended use

11   situation.

12             THE COURT:  Well, the argument I'm hearing from the

13   Plaintiff is that it may not be clear that the memory module

14   identified at the end of the first limitation is the device

15   itself, the claimed device.  Do you believe that it is clear

16   that the memory module within the first limitation is the

17   overall device even if the preamble is not limiting?

18             MR. McKEON:  Well, I think what's required is that

19   the printed circuit board do these things.  Right?  It has the

20   plurality of edge connections configured to couple power,

21   data, and address and control signals.  And the point there is

22   the coupling that it's performing, this thing you hold in your

23   hand, the coupling it's performing is between the memory

24   module and the host system.

25             And, you know, the host system here has no antecedent

1   either.  I mean, it doesn't --- I mean, that particular term

2   doesn't have any antecedent.  The point, though, is -- well, I

3   guess it does.  I take that back, Your Honor.  It's up in the

4   other -- in the top here.

5       But the point is that these two separate modules and the

6   system for the host system, they're outside of what we're

7   talking about here.  And the only thing that the printed

8   circuit board is doing, it's making sure that these power,

9   data, address and control signals, that it's coupling between

10  these two systems.  And so I don't --

11          THE COURT:  Well, the PCB that's claimed in the

12  first limitation is claimed as part of the memory module,

13  isn't it?

14          MR. McKEON:  Well, it's a comprising term.  Right?

15  So it would include -- you know, it would include memory --

16  the memory module will have a PCB, a voltage conversion

17  circuit, and a plurality of components.  That's how you'd read

18  the claim, for sure.

19          THE COURT:  Well, I guess what I'm hearing from the

20  Plaintiff is the concern that if the preamble is not limiting,

21  that first limitation could be read as referring to a memory

22  module that is not part of the device that's claimed; that it

23  is just referring to a connection between some unclaimed

24  device, the memory module, and the host system.

25          MR. McKEON:  I -- yeah, Your Honor.  I don't -- I

1    guess I don't agree with the argument.  I mean, the point is

2    here you have the memory module, and it's not like the

3    antecedent goes away and is irrelevant.  You know, it still

4    guides your -- how this claim operates.  It's clearly -- the

5    memory module that is at issue here is the one that the

6    printed circuit board is sitting on, but doesn't mean -- it

7    doesn't mean that all of the sudden the memory module is a

8    requirement of the claim.  It's just saying that between the

9    memory module that the printed circuit board is sitting on and

10   the host system, that's where these -- this connection is

11   occurring, between those two things.

12         THE COURT:  What difference do you see it would make

13   if we construe the preamble as limiting?

14         MR. McKEON:  Well, I mean, in terms of how it

15   impacts the case, Your Honor, I -- you know, it's not clear

16   the scope of the impact that it would have.  But, you know,

17   for just ordinary rules of claim construction here, I think

18   this is a situation where we wouldn't want that to be limiting

19   based on the fact that this is really, you know, an intended

20   use situation.  And despite the fact that the memory module is

21   referenced in the text of the body of the claim, you know,

22   it's not limiting in the context here.

23         THE COURT:  I guess what I'm going to have to figure

24   out is whether I think that the preamble gives life or meaning

25   to the claim in view of the argument that the memory module in

1    the limitation could be understood to be something other than

2    the claimed device.  But anyway, I'll -- I will look at that

3    further.

4            MR. McKEON:  Okay.  Thank you, Your Honor.

5            THE COURT:  Thank you, Mr. McKeon.

6            MS. ZHONG:  Your Honor, just one clarification.  The

7    reason we want to make sure that the memory module is limiting

8    is to make sure that each of the claimed elements, printed

9    circuit board, voltage conversion circuit, and a plurality of

10   the components, we want to make sure these are all part of the

11   memory module.  Without that, there could be confusion.  And

12   it doesn't seem that Samsung's counsel disagrees with it.  We

13   want that.  We just want the clarity so there is no argument

14   down the road.

15           THE COURT:  All right.  I understand that position.

16   Thank you.

17       That takes us to the 'array die' term.

18       And I can tell you, Mr. Sheasby, that the basis of this

19   construction is the prosecution history disclaimer argument,

20   in case that wasn't clear.

21           MR. SHEASBY:  Understood, Your Honor.  And let me go

22   straight there.

23       So this is the passage from the prosecution history, and

24   it does, indeed, say that Rajan merely discloses DRAM circuits

25   206A through D, which are different from the array dies.  And

1    I understand that Your Honor has concluded that that is a

2    disclaimer.  The issue that I have is that -- we understand

3    that -- does Your Honor intend to give anymore guidance as to

4    what the DRAM circuits are that is excluded, or will that be

5    for the experts to analyze?

6            THE COURT:  That would be for the experts.  I do not

7    intend to try and define what DRAM circuits that are

8    disclaimed.

9            MR. SHEASBY:  I understand, Your Honor.

10        With that clarification, there's no need for any

11   additional argument.  Thank you, Your Honor.

12           THE COURT:  All right.  Thank you.

13           MR. COLVIN:  Your Honor, Samsung will rest on the

14   papers for that term as well.

15           THE COURT:  All right.  Thank you, Mr. Colvin.

16           MR. SHEASBY:  Your Honor, we will rest as to H on

17   the papers.

18           THE COURT:  All right.

19           MR. COLVIN:  Samsung will also rest on the papers,

20   Your Honor.

21           THE COURT:  Thank you, Mr. Colvin.

22           MR. SHEASBY:  And I believe that I, J, and K are all

23   the adoption of our positions, and so if Samsung wants to

24   argue those I'll allow them, obviously.  So we don't have to

25   jump up so often.  I won't allow you to do anything.  You can

1    do whatever you want.  My point is that I won't sit up here,

2    and let you guys do what you want.

3                THE COURT:  All right.

4        Doctor Albert.

5                DOCTOR ALBERT:  Good morning, Your Honor.  Frank

6    Albert for Samsung.

7            The first term here, term I, 'before receiving the input

8    C/A signals corresponding to the memory read operation', and

9    Samsung's proposed construction is 'during one or more

10   previous memory operations'.  What we believe is this provides

11   clarity to the term, it is based on admissions made by Netlist

12   during the prosecution, as well as the clarity provided by the

13   specification.

14           Let's take a look at the claim here.  So the highlighted

15   portion here is the actual claim language that we're

16   discussing, 'before receiving the input C/A signals

17   corresponding to the memory read operations at the module

18   control device'.  It's 'before receiving' that is the thrust

19   of the attention here.  That portion of the claim relates back

20   to an earlier part of the claim, 'receiving at the module

21   control device input C/A signals corresponding to the memory

22   read operation'.

23           The second half of the construction, the thrust of the

24   discussion here is determining the first pre-determined amount

25   based at least on signals received at the first data buffer.

1   So really the question is when is it linked between -- when is

2   it that determining the pre-determined amount, when does it

3   actually happen; what does 'before receiving the input signals

4   corresponding to the memory read operation at the memory

5   module' mean in the context of this claim, this patent, this

6   prosecution history.

7       So if you look to the patent, figure 18 provides a good

8   illustration of that.  We start off with steps 1810 and 1820.

9   There's a previous write operation.  You can see that in

10  1820--'receiving a write strobe signal'.  And then based on

11  that previous memory operation, a pre-determined amount of

12  delay is generated.  It says right there in 1830, 'generating

13  a delay signal according to the time interval'.

14      Now, later on when we receive a read signal in 1860 and

15  1870, that read signal, there's going to be a delay in the

16  read strobe here at 1880 based on that pre-determined amount

17  that was determined earlier during that previous memory

18  operation.

19      Now, if you look to the specification, over and over and

20  over again is the determining that pre-determined amount

21  that's linked to that previous memory operation.  Here we have

22  some examples.  Patent -- '506 Patent at 4, 9 to 19, single

23  alignment circuits that determine during the write operation

24  the time interval.  Again, the time interval is used during

25  subsequent read operation to time transmission of the read

1    data to the memory controller.  Another example --

2         THE COURT:  Mr. Albert, the passage that you just

3    read starts with "Further, in one embodiment".  Why should I

4    take that as a limitation?

5         DOCTOR ALBERT:  It's not just this embodiment, Your

6    Honor.  It's over and over and over again in the patent.  And

7    if you look to the prosecution history as well, they actually

8    explain, further explain what this means.  So let me -- I

9    could fly by these other slides, Your Honor.  These are just

10   additional examples of time and time again where the patent

11   talks about determining that time, that delay time based on

12   the prior write operation, prior memory operation.  And Your

13   Honor is very familiar with, you know, the law on consistent

14   description in the specification helping to construe the

15   patent and the claim terms.

16       I mentioned the prosecution history, Your Honor, and

17   here's what I'm getting at.  There were claims that were

18   allowed--claim 2 is an example of that--where the allowed

19   subject matter read before the memory read operation; very

20   similar to the language that we have here--before the memory

21   read operation.  And there was notice of allowance.  Claims

22   were going to issue.  After that notice of allowance, the

23   patentee went back to the Patent Office and changed the claim

24   language, changed 'before the memory read operation' to

25   'during one or more previous operations'.  It did that for

1   claim 2, 3, 4, 5; did it over and over and over and over

2   again.

3        And in the remarks corresponding to that amendment, the

4   patentee said that this change, this changing from--I'll go

5   back--'before the memory read operation' to 'during one or

6   more previous operations', that's not a big change.  It said

7   specifically, "...have been amended to address minor issues of

8   clarity and correct grammatical errors.  No new matter has

9   been added."  The patentee there is saying that these two

10  terms, they mean the same thing.

11        THE COURT:  And, of course, we're not construing

12  either of those terms.

13        DOCTOR ALBERT:  And I will get to that, Your Honor.

14  Very good question.  I had that very same question when I was

15  going through these materials myself.

16        And just to go back to the amendment, of course, the --

17  this change wasn't changing the scope because the Patent

18  Office doesn't allow that.  The rules for patent examination

19  say that you can make a post-allowance amendment, but you

20  can't change the scope.  So we know that the Patent Office

21  determined that the scope for this change would have been

22  equivalent.

23        Now, we're talking about one or more previous memory

24  operations versus one or more previous operations.  Now,

25  Netlist in this case, that was one of the terms that we were

1    seeking to construe.  There actually is an agreement for this

2    patent, "'one or more previous operations' means 'one or more

3    previous memory operations'."

4        So getting to Your Honor's question, the claim language

5    that we're seeking to construe here, and I'll come back to it,

6    'before receiving the input C/A signals corresponding'--again,

7    these are corresponding to the memory read operation.  Again,

8    going back to that prosecution history, the memory read

9    operation -- 'before the memory read operation' was equivalent

10   to 'during one or more previous memory operations'.

11       So we have equivalent language here in the claim 'before

12   receiving the input C/A signals corresponding to the memory

13   read operation' when Netlist has already agreed to the Patent

14   Office that before--I'll just go back to it--"'before the

15   memory read operation' means 'during one or more previous

16   operations'," which in this case Netlist has agreed in -- you

17   see this in the joint claim construction chart "'one or more

18   previous operations' means 'one or more previous memory

19   operations'."

20       And so with that, Your Honor, I will pass the podium

21   unless Your Honor has any questions.

22            THE COURT:  Doesn't that equivalence depend on the

23   context of each claim?  I mean, to the extent that there's an

24   agreement, isn't it an agreement that in those claims the

25   claim scope wasn't altered by the different language?

1      DOCTOR ALBERT:  Well, we can go back to the claim

2  language itself that was purported to be equivalence, to

3  answer your question.  "'Before the memory read operation' is

4  replaced with 'during one or more previous operations'."

5  Again, the language that is being swapped out as equivalent

6  starts with that memory operation.

7      THE COURT:  What is there that is unclear about the

8  language that you're seeking to construe?  It seems very

9  specific to me.

10      DOCTOR ALBERT:  Yes, Your Honor.

11   So the ambiguity here is when this time interval is

12  determined.  And here the patent is very clear that that time

13  interval is determined during a previous memory operation.  We

14  see it time and time and time again.  And then in the

15  prosecution history the two terms are equated as equivalence.

16   So we believe there should be no ambiguity; but to the

17  extent Netlist wants to come in here and claim that's not what

18  this means, that it means something else, then we would take

19  issue with that.

20      THE COURT:  All right.  Thank you.

21      DOCTOR ALBERT:  Thank you, Your Honor.

22      MS. ZHONG:  Slide No. 41, please.

23   Counsel mentioned that based on the prosecution history

24  we should be limited to construing the term to the -- the

25  'before' term to 'during one or more previous memory

1    operations'.  One thing they forgot to mention in claim 15 is

2    not one of the ones that's actually been amended.  Claim 15

3    retained its original language--"before receiving the input

4    command address signals corresponding to the memory read

5    operation at the memory module control device, determining the

6    first pre-determined amount based at least on signals received

7    by the first data buffer."  The claim is not amended.

8         Whatever we said about the other claims simply does not

9    apply here.  There is no reason, as Your Honor has pointed

10   out, there is no ambiguity as to when the step needs to

11   happen.  The only limitation in the original claim is before

12   the receiving step this happens.  It can happen during one or

13   more previous operations, and -- but it doesn't have to.  And

14   whether in that particular case the one or more previous

15   operations constitutes what Samsung believes to be a memory

16   operation is also not at issue here.

17        What Samsung really is trying to do is trying to bring in

18   their interpretation of the memory operation into this term.

19   That's not -- really there is no basis in either the claim

20   language itself or the prosecution history.

21        So Your Honor has got it right.  It should be construed

22   by its plain and ordinary meaning, which is as the claim says.

23        With this we rest.

24             THE COURT:  All right.  Thank you, Ms. Zhong.

25             DOCTOR ALBERT:  Just a very quick remark, Your

1    Honor.  That claim 15 wasn't amended is of no moment.  What

2    matters here, Your Honor, is that during prosecution they

3    told the Patent Office that these terms, this language was

4    equivalence.  Netlist can't take that back and say now it's

5    not equivalence; now -- we meant it for the other claims as

6    equivalent, but we don't mean it for this claim.

7            THE COURT:  Why isn't their statement limited to

8    the claims that they were talking about and the claims they

9    were amending?

10           DOCTOR ALBERT:  It just doesn't work that way, Your

11   Honor.  When you say to the Patent Office this language,

12   wherever it is used, this language is the same, no -- the

13   claims were amended to address minor issues of clarity, so

14   this language that they took before, they changed it to

15   something else to address minor issues of clarity, it means

16   the same thing.  Now, we find that same language in the claims

17   that are -- in the claim that we're talking about here.

18       So yes, they didn't amend this specific claim, but the

19   arguments that they made regarding the language, the common

20   language for this claim, the claim 14 as issued, claim 15

21   during the prosecution, would still apply; otherwise, their

22   statement to the Patent Office wouldn't be true.

23           THE COURT:  Their statement to the Patent Office was

24   that the scope of those amended claims was -- had no new

25   matter added.  Right?  I fail to see how you can just assume

1    that the same thing would have been true for any other place

2    that language appears.

3              DOCTOR ALBERT:  Fair question, Your Honor, and I

4    appreciate the insight there.  The -- if you're asking the

5    question for these claims why hasn't there been new matter

6    added, for all these other claims that were amended why has

7    there not been new matter added if you change the language,

8    the only way that could be true is if those -- that new

9    language didn't increase the scope, didn't change the scope

10   of that claim so, therefore, that language was equivalence.

11             THE COURT:  Okay.

12             DOCTOR ALBERT:  And so for claim 15, we find that

13   same language in there.  Yes, they didn't make the argument

14   regarding claim 15--very good insight, Your Honor, we

15   appreciate that--but they did make the argument with regards

16   to the language that is found in claim 15, as issued claim 14.

17             THE COURT:  Except that it's not the same language.

18             DOCTOR ALBERT:  It includes broader language, but it

19   includes the same -- references the same memory read

20   operation.

21             THE COURT:  You have a tough argument, but you've

22   made it well.  Thank you.

23             DOCTOR ALBERT:  Thank you, Your Honor.  I appreciate

24   the attention.

25             THE COURT:  Sure.

1          DOCTOR ALBERT:  So we'll move on now to the drive

2     terms.

3          THE COURT:  All right.

4          DOCTOR ALBERT:  The core dispute with regards to

5     these drive terms is whether the buffer as described in the

6     '339 Patent requires switching between different data pass.

7     Sometimes that's colloquially referred to as a fork in the

8     road where the buffer is -- has outputs to different memory

9     devices and it could switch between groups of memory devices,

10    kind of like a fork in the road.

11         And so here we have in the proposed construction the idea

12    is expressed by activating certain groups of memory devices

13    while at the same time deactivating other devices.  You select

14    between one group and another group.  And we're talking about

15    a number of claims here, but they all have this drive concept,

16    it's built into this very large claim -- you know, very large

17    limitation.  I apologize for that, Your Honor.  We didn't

18    write the claim; we just have to try to figure out what it

19    means.  But here we have this idea that you have this logic

20    configurable to control the data path seen in claim 1.  It

21    actively drives the section of the data from a first side to

22    a second side.  So the question is, for this patent with this

23    prosecution, what does that -- what do those drive terms mean?

24    Does it include that fork in the road?

25         If you look to the '339 Patent, these data buffers are

1    really to accomplish two things, and the first is "to

2    electrically couple only the enabled memory devices to the

3    memory controller"--and so here I've got this highlighted in

4    yellow on the left--"by using the data transmission

5    circuits"--that's also called the buffer--"to electrically

6    couple only the enabled memory devices to the memory

7    controller."  Now why is it doing that?  It says it right

8    there at the top--"to reduce the memory device loads seen by

9    the system memory controller."

10         So their idea was that memory -- that loads were a

11   problem, and to address that problem, they would isolate and

12   couple -- isolate some groups of memory devices; couple other

13   groups.

14         So you move onto the second function is "to electrically

15   isolate the other memory devices which are not performing the

16   memory operation"--and here I've got it highlighted in pink on

17   the lower left--"and to isolate"--excuse me--"electrically

18   isolate the other memory devices 412 from the memory

19   controller."  So this idea --

20              THE COURT:  All of that is described as 'desirably

21   achieved in certain embodiments'.  Right?

22              DOCTOR ALBERT:  Well, there are no other

23   embodiments, Your Honor.  And there is a dispute about that,

24   and I will go through that.

25              THE COURT:  Okay.

1            DOCTOR ALBERT:  The reason, the basis, the

2     motivation behind this coupling and isolation and switching

3     between the two paths is to reduce the device loads.  And as

4     Your Honor is well aware that this problem to be solved is an

5     important consideration in claim construction.

6          So here I have an illustration of figure 5, and I'll walk

7     through that.  That shows exactly how this is described in the

8     patents--excuse me--in the '339 Patent.  And the core concept

9     from figure 5 is this path A and path B.  Here I've got that

10    highlighted in figure 5.  The text is, "Whereby the control

11    logic circuitry selects either path A or path B to direct the

12    data."  So you can send the data one way or you can send the

13    data a different way.  You're selecting between the paths.

14    The selection that the patent is talking about is the

15    selection between two different paths.  And going back again,

16    that selection is to address the problem of the device memory

17    loads.

18         So going back to figure 5, it goes on, "When the control

19    logic circuitry receives, for example, an enable A signal."

20    So I've got this enable A signal that turns on this top A

21    path.  The top A path has a tristate buffer.  It's labeled

22    504.  That's enabled and actively drives the data value on its

23    output, while the second tristate buffer 506--so I have marked

24    out in red--is disabled with its in output a high impedance

25    condition.  So you have a selection between a path A and a

1    path B.

2         So here we just have that illustration.  In this state

3    the data transmission circuit allow it is data here from --

4    you know, from the 420 line to go up through the tristate

5    buffer and onto Y1, which is that path A.

6         Here is just another figure showing the same idea.  Here

7    we have a -- the buffers are transmission circuits 416 kind of

8    in the left middle just to the left of the highlighting, and

9    they in path A are connected to two sets of memory devices.

10   They're not connected to all memory devices; they're connected

11   to two sets.  So you've got this path A that connects to this

12   we'll call ranks A and C.

13        Now, the patent also talks about the alternative if you

14   want to go down path B.  So if you enable B, then what you're

15   going to have there is that the tristate buffer A that was

16   previously activated and turned on, that is closed.  Path B

17   becomes open; path A becomes closed.  And now here the data is

18   directed to that path B terminal Y2.  And that, again, is

19   illustrated in a different figure in figure 3A.  Instead of

20   the A and C ranks being activated, the B and D ranks are

21   activated.

22        So you've got this idea between a path A and a path B

23   where some memory devices are accessed in path A and some are

24   accessed in path B.  Again, it's to implement this idea that

25   they have this problem they are trying to solve of reducing

1     the load.  This was their solution to the problem that the

2     named inventors perceived.

3          There's a similar description on the receive side.  If

4     you -- receiving data from the memory elements into that Y1

5     and Y2 terminals, then the patent has a way to deal with that,

6     and that is this multiplexer 508--I've got that

7     highlighted--and what the patent does is it says, Well, I've

8     got this two different inputs; I'm going to select -- selects

9     one route to it's output.  So again, we have two paths, the

10    selection -- this concept of selection between two different

11    paths.

12         And going through the patent, time and time again the

13    patent is talking about the selection selectively allowing or

14    inhibiting the data paths.  Here we have some examples.  '339

15    8, 41 through 53 references the module control signals by

16    selecting or allowing the data transmission between the system

17    memory controller, column 339--excuse me--column 10, 64

18    through 11:4 it's discussing these load reducing switching

19    circuits.  So again, we see that switching language to

20    describe reducing the load by switching the paths between a

21    path A or path B or group A and group B with this idea of this

22    selectively switching between the paths is referenced over and

23    over again in the patents.

24         Here we got it again at 11:35 to 44 discussing "data

25    transmission circuit selectively switches between two or more

1    memory devices."  15:33 through 38, it switches a single data

2    line between the memory controller and the memory device.

3    Again, switching, switching, switching.  It is talking about

4    that concept over and over again.  '339, 17:30 to 44 talks

5    about enabling the proper data pass between the system memory

6    controller and the targeted or selected memory devices.

7         That right there is enough, Your Honor.  The consistent

8    and uniform description of the patent with the idea of the

9    switching illustrates the concept of the -- what these claims

10    are meant to cover; what these claims do cover by enabling the

11    data paths, according to the claim language; by driving the

12    signal from one side to the other, according to the claim

13    language.

14         But the patentee also distinguished prior art during

15    prosecution.  One of the pieces of prior art was this prior

16    art Ellsberry, and it says, "Ellsberry does not

17    disclose"--this is what Netlist said during

18    prosecution--"disabling data paths in its memory bank

19    switches.  The claimed invention allows controlling of the

20    data paths between the memory devices and the bus interface."

21    They go on to say, "On the contrary, Ellsberry teaches away

22    from switching the data paths in its memory banks."  Again,

23    very -- you know, this same language is repeated over and over

24    again in the specification--switching the data paths.

25         So we have, again, going back to that claim language of

1    driving the different data paths and selecting and switching

2    between those data paths again all comes back to reducing --

3    this is this solution for -- that the patentee chose to

4    implement their -- the solution to the perceived problem of

5    load on the system.

6        Now, there is a dispute about whether the specification

7    actually does disclose an alternative embodiment, whether

8    there is a reference to an embodiment where there isn't a

9    switching between data paths.  And Netlist makes a -- puts

10   this in the brief.  This is -- I have the language that

11   Netlist put in their brief, and the bolded and italicized

12   section is the same language that Netlist bolded and

13   italicized in their brief, I believe.  What they didn't do,

14   however, is point Your Honor to the highlighted portions which

15   I'd like to discuss.

16       So this language, "One or more of the data transmission

17   circuits 416 in accordance with an embodiment of the

18   disclosure is operatively coupled to one or more of the data

19   lines 452 connected to one or more memory devices in each of

20   the ranks."  Now, Netlist makes a big deal about the

21   recitation of the one saying, Well, that's the idea, there is

22   no fork; that there can be no fork if there's only one, but

23   that's not what -- where this sentence ends, because this

24   sentence ends with "in each of the ranks A, B, C, D."  And if

25   I have a data line to a device, memory device, but for each

1    rank that's going to be multiple data lines, that's going to

2    be multiple paths.

3         And it repeats it again down below, but then it

4    specifically references figure 3 as an illustration of this

5    concept.  And Your Honor, we already saw figure 3.  I showed

6    it to you just a few minutes ago, but here is figure 3 again

7    where I've repeated the highlighting from my earlier slides

8    where we don't see in figure 3 a single line, a single

9    straight line embodiment, as Netlist has coined the phrase,

10   but a -- again, a fork-in-the-road embodiment where it goes to

11   one group for one path and another group for another path.  So

12   this language that Netlist places so much stock into is really

13   just an illustration again of figure 3A which shows the fork

14   in the road.

15        So what does Netlist then do?  Netlist then takes this

16   concept, this single word out of context and says, Well, if it

17   does mean one, then we can just change all of the figures to

18   have a straight line embodiment.  And this was kind of strange

19   to us because I've never seen this in a brief, but they've

20   taken figures and erased portions of the figures to say,

21   *Voila*, there is your straight line embodiment; there is your

22   no fork in the road?  But what they've done is they've erased

23   and deleted parts of the figure that describe the fork in the

24   road.  So they did it here for figure 4, they did it for

25   figure 3, they blacked out this -- the other prong of the fork

1    to claim that there is now a -- not a fork in the road here.

2    But the figures themselves describe this fork-in-the-road

3    concept; the patent specifically describes this

4    fork-in-the-road concept.  And it's very uniform in that

5    description about that switching between the data paths.

6        This was in their reply brief, a reference to 16:38

7    through 45.  "In yet another embodiment, the multiplexer and

8    the read buffer operations may be split over two tristate

9    buffers, one to enable the value of Y1 and another to enable

10   the value from Y2."  And sometimes they claim the tristate

11   buffers can operate independently and, therefore, that somehow

12   shows the straight line embodiments.

13       And so what I have here on the right--I'll be very

14   clear--this was our attempt to try to put into a picture what

15   was described, but we didn't see a picture in the brief so

16   this is our attempt to replace the multiplexer with these two

17   red tristate buffers.  So what I have here in red is not in

18   the patent; it's an attempt to illustrate the replacement of

19   the multiplexer that's described in the specification as

20   another possibility.

21       And Netlist says, Well, if those two tristate buffers

22   operate independently, then that would be a straight line

23   embodiment because you'd have independent operation.  And

24   there's two things that are wrong with that that we saw in

25   their reply brief is that, one, we -- the patent doesn't

1    describe 'independent operation' of these replacement tristate

2    buffers; it just mentions that you can do it in -- you know,

3    in some way.  It doesn't describe 'independent operation'.  Go

4    through the patent; it's going to be nothing that describes

5    that.

6         And you wouldn't do it that way because that wouldn't

7    work.  If you had these two tristate buffers and you were

8    operating them independently, both of them are receiving

9    memory read operations--or sorry--data from the memory devices

10   through this Y1 and Y2, if they are single lines, you know,

11   single straight line embodiments, what's going to happen is

12   that that independent operation--again, not in the

13   patent--would cause that data to merge onto the same line and

14   crash together.  That's not a product or an idea that you'd

15   want to implement.

16        So the patent doesn't describe this independent

17   operation.  Netlist says that you could do it independently,

18   but that's not described in the patent.  So again, this is

19   another thing that Netlist pointed to as somehow describing an

20   alternative embodiment that it could be a straight line

21   configuration or not a fork in the road, but the point here is

22   it doesn't disclose that, and the way Netlist argues they

23   would work would cause the system problems.

24        Netlist put a lot of stock into two prior ITC cases, the

25   1023 investigation, 1089 investigation, arguing that, Well,

1     for the 1023 investigation that that involved different claim

2     language and that claim language isn't involved here; so even

3     though the 1023 found that those claims required a

4     fork-in-the-road implementation, that same exact claim

5     language is not found in this case.  The claim language that

6     was issued there was this 'selectively isolate selectively

7     allow' language.  But again, that's the same language,

8     'selectively', that was repeated over and over in the

9     specification but also in the prosecution in -- for this

10    patent.

11        And then for the 1089 investigation, the -- that was a

12    bit of a strange posture, Your Honor, because the ALJ decides

13    an issue and then the commission gets to review it.  And here

14    the ALJ reviewed the fork issue, found for those claims didn't

15    require a fork, but the commission reversed the infringement

16    finding, and it did that on this term 'receive' which required

17    that all of the--excuse me--that -- and built into this

18    'receive' concept was this idea that not all of the memory

19    elements could receive the memory operations.  In other words,

20    some would receive it, some would not, and because the

21    products in that case, all of them received the memory

22    operations, there is no infringement.

23        So again, we have the split between some devices having

24    some access, access -- memory operations grouped between a

25    different set of devices.  And so, again, the commission

1    didn't use the word 'fork in the road' to specifically

2    implement its decision, but built into that concept, built

3    into that decision and that concept was this fork-in-the-road

4    idea.

5        But again, we're not relying -- we're not saying that

6    these two cases are controlling.  We're asking the Court to

7    look at the facts of this case, the claim language of this

8    case where the claim language discusses the driving of the

9    data, activating the pass, and the prosecution history of this

10   case which describes the selection that was used to circumvent

11   the prior art.

12           THE COURT:  Mr. Albert, can you go back to your

13   slide with figure 5 from the patent; not the modified version,

14   but the actual version?

15       The fork in the road that you're describing is the place

16   where path A and path B split off at the top of figure 5

17   there.  Is that right?

18           DOCTOR ALBERT:  That's exactly right, Your Honor.

19   So we'd have the two paths, path A and path B going -- and

20   they would go through different terminals, Y1 and Y2.

21           THE COURT:  Do you contend that you cannot drive a

22   signal along path A without disabling path B?  In other words,

23   are you taking the position that it's not electrically

24   possible to do that?

25           DOCTOR ALBERT:  Well, that's -- the patent doesn't

1   describe a dual operation of both path A and path B.

2           THE COURT:  I know.  My question is a different

3   question.  Do you contend that you cannot drive a signal along

4   path A without disabling path B?

5           DOCTOR ALBERT:  Not with this circuit as disclosed

6   in the '339.  Now --

7           THE COURT:  I don't know what that means.

8           DOCTOR ALBERT:  Engineers are very bright, and you

9   can certainly create a different circuit with a different

10  disclosure that could drive different pins at the same time,

11  but that's not the disclosure or the circuit we are discussing

12  here.  The disclosure for this circuit would be in either path

13  A or path B.

14          THE COURT:  All right.  And my question is do you

15  contend that you cannot drive a signal along path A of this

16  circuit without disabling path B.

17          DOCTOR ALBERT:  Yes, that is the way that the patent

18  describes the path A path B operation.

19          THE COURT:  All right.  So you're answering about

20  your interpretation of the disclosure in the specification and

21  I'm asking about the figure as it appears there, but

22  anyway --

23          DOCTOR ALBERT:  To put a finer point on that, Your

24  Honor--I don't mean to duck your question--the -- if you look

25  to see, there is a control going into the tristate buffers

1    that we have -- you know, 430 goes into 502, and then that

2    controls the different tristate buffers.  The way that this

3    circuit operates, the way that this circuit -- this particular

4    circuit with this control scheme operates is that you would

5    not be able to drive it onto path A and path B because of that

6    control circuit.  Now, if we took out parts of the figure

7    where there wasn't that control and put something else in,

8    then, you know, maybe it might be possible, but I'm -- we're

9    not seeing it with this control circuit.

10           THE COURT:  All right.  Mr. Albert, let me go ahead

11   and take the morning recess now.  We'll come back and hear if

12   you have additional remarks and then the response.

13           DOCTOR ALBERT:  Thank you, Your Honor.

14           THE COURT:  Thank you.

15                     (Brief recess.)

16           THE COURT:  Thank you.  Please be seated.

17      Mr. Albert, do you have anything further on this term?

18           DOCTOR ALBERT:  Nothing further on this term, Your

19   Honor.

20           THE COURT:  All right.  Thank you, sir.

21           MS. ZHONG:  So the counsel has argued at length

22   focusing on the full rank embodiment of the '339 Patent.  What

23   the counsel fails to mention is that the specification is very

24   clear.  Even though the description is with respect to four

25   ranks, embodiments with less than four ranks, including two

1    ranks per memory record 402, 402 prime may be employed.  And

2    why is that important?  It is important because if you only

3    have two ranks, a single path is sufficient.

4         For example, if we look at figures 3A, there are two 452

5    lines--one 452 connecting the purple colored 416, which is a

6    data buffer, to ranks A and C.  There is a second one that we

7    have grayed out that's connecting data buffer 416 to the two

8    other ranks B and D.  But if you only have two ranks, A and C,

9    a single pass is needed, so there is no need for the fork in

10   the road.  That's a straight line configuration there.  And if

11   we don't have a second line, disabling the second line just

12   doesn't make any sense.  And the claim does not require that

13   there be four ranks with two different paths.

14        And why do we know that the two ranks is actually

15   contemplated by the invention?  Let's go back to what the

16   counsel said.  The purpose of this invention is load

17   reduction.  If Your Honor take a look at figure 2A, figure 2A

18   as described in columns 5, lines 44 to 64, that's a prior art

19   configuration with two ranks.  And in particular, in column 5,

20   lines 45 to 48, the inventors described that with respect to

21   the two-rank operation there is a load problem.  Sorry.  I got

22   the lines wrong.  The lines that's relevant to the load

23   reduction starts actually column 5, lines 59.

24        So with respect to two-rank, they say, "Therefore, during

25   a write operation, the system memory controller 220 sees all

1    the memory devices 212 as its load, the other data lines 250."

2    That is, it sees two ranks of memory modules.

3        And what does our invention do?  Regardless of the number

4    of ranks, the invention allows you to -- the memory controller

5    to see a single rank.  Where is that disclosed?  That's

6    disclosed, for example, in column 14, starting at line 59.  It

7    says, "To reduce a memory device load seen by the system

8    memory controller 420, e.g., during a write operation, the

9    data transmission circuit 416 of certain embodiment is

10   configured to be recognized by the system memory controller

11   420 as a single memory load."

12       So even for two-rank, it used to be in a prior art, the

13   memory module sees two ranks of memories and now it sees as a

14   single load, a single rank.  So there is load reduction there

15   for two-rank.  And for the two-rank, as I show on screen here,

16   a single line is sufficient.  You don't need to have a second

17   -- what they call the fork in the road.  Without the fork in

18   the road, disabling the second path, as they suggest, is just

19   not justified.

20       Now, I understood that counsel said during prosecution we

21   were talking about selecting or switching the pass on and off.

22   I think it's a misunderstanding of what we were actually

23   saying.

24       So let's look at column -- slide No. 10.

25       The argument is actually saying the data passing

```
 1   Ellsberry switches 206/208 are opened by default.  What our
 2   claim is really requiring is that that particular path is
 3   turned on during a specific time period, and when the data
 4   passes on the operation -- the write data or read data is
 5   passed on the data pass are then turned off.  So when the
 6   counsel is talking about switching on, selecting on and off,
 7   they're not talking about switching between different paths;
 8   they're talking about a single path A is switched on during
 9   specific time period.  So they're talking about temporal
10   turning on and off, not physical, spatial turning on from --
11   switching from one pass to another.  So that was a complete
12   misrepresentation of what we argued during prosecution.
13         With respect to Your Honor's question regarding figure
14   No. 5 --
15         Maybe slide No. 18, please.
16         Figure No. 5, Your Honor asked whether in this particular
17   embodiment it has to be the case that the second pass is
18   turned off.  Our understanding is that it doesn't have to be.
19   It can be turned on as in prior art.  You can use, for
20   example, a technique called data masking for the write path
21   and the data can be sent and only be selected -- only received
22   -- the useful data is only received by the memory device
23   that's intended to receive the data where the write -- so the
24   data pass can be open, like both can be on at the same time.
25               THE COURT:  Would that serve the goals of the
```

1    invention in this patent?

2            MS. ZHONG:  So if you do that, I think you do see

3    some load reduction, not as much, so instead of, like,

4    reducing the load from four loads to one load, you may be

5    reducing it from four loads to two loads.

6            THE COURT:  All right.

7            MS. ZHONG:  Okay.  Does Your Honor have additional

8    questions?  If not, we will rest.

9            THE COURT:  I think I understand your position on

10   it.  Thank you.

11       Mr. Albert, if you want to respond, you may.

12           DOCTOR ALBERT:  Thank you, Your Honor.

13       Just a couple of points here.

14       With regards to the point about the possibility of a

15   two-rank system and the argument that, Well, the patent in

16   this invention could have been implemented not using this fork

17   in the road with two ranks, I kept hearing 'could have',

18   'didn't have to be', 'could have been implemented'.  That's

19   not what the specification says.  When the specification

20   implements this invention, it is always with that fork in the

21   road.  And in order to be able to concoct a straight line

22   embodiment without a fork in the road, Netlist has had to

23   alter the figures in the patent, which is telling.

24       So this idea that you could have done something

25   differently, that -- Your Honor, that is the case with every

1    single patent that falls in front of you--that you could have

2    done things differently.  The question before this Court is

3    what was disclosed in this specification and this prosecution

4    history.  And this prosecution history, again, Netlist in its

5    briefing, you know, put big emphasis on that 'switching'

6    language in the ITC case, and that same language is found in

7    the prosecution history--switching of the data lines.

8         So with that, unless Your Honor has any further

9    questions.

10          THE COURT:  You know, Mr. Albert, one of the

11   problems that this proposed construction faces is the fact

12   that you're construing one word with what is probably 200

13   words.  I am -- I don't know that I've ever seen a more

14   elaborate proposed construction for a single term.

15          DOCTOR ALBERT:  And I'm glad Your Honor asked that

16   question because, unfortunately, this is a byproduct of

17   repeated litigation by Netlist.  Netlist asserted these

18   patents in this family against similar technology, was found

19   not to infringe, got continuations repeated, and there's been

20   this serial continuing prosecution for these patents to make

21   longer and longer claims, more complicated claims for this

22   simple idea that there is a fork in the road.

23        So what we have here is not just the word 'drive' that's

24   being construed, Your Honor, because it's not just 'drive' in

25   the abstract; it's 'drive' -- let me just take claim 1, for

1    example.  This whole phrase, this complicated phrase that

2    Netlist has put in their patent all goes to this concept of

3    the fork in the road of this switching.  It starts with the

4    buffer, including the logic configurable to control the data

5    path.  Again, we saw in the specification that that path A

6    control and that path B control, splitting the two paths, the

7    path that the data would ultimately follow and switching

8    between the one group of memory versus the other group of

9    memory, that's built into this phrase as well as other

10   portions of this claim.

11       It goes on to say that the data path is enabled.

12   Enabled.  So we're enabling and disabling data paths.  So

13   we're -- we have that logic to control the data path, just

14   like that path A and path B embodiment that we saw in the spec

15   that was repeated over and over and over again, the only way

16   that the control is described.

17       And then it talks about driving the data from one side of

18   the buffer to the other side of the buffer.  And again, the

19   only way the patent describes that driving, that -- from one

20   side to the other is with this fork in the road.  You drive it

21   from, you know, one group or the other group.

22       And then it talks about the -- again, the tristate

23   buffers.  I showed those to you in figure 5 where you enable

24   path A, you are enabling the path A tristate buffer and

25   correspondingly disabling because of that control circuitry

1    the path B.

2         So it's not just a single word that's been construed,

3    Your Honor; it's the entire collection of this language.  Very

4    complicated, we understand, but it's really results of this

5    continuing serial application that Netlist has undergone.

6              THE COURT:  All right.  Thank you, Mr. Albert.

7              DOCTOR ALBERT:  With that, we will rest on the

8    papers for 'module controller', the next term, Your Honor.

9              THE COURT:  All right.

10             MR. SHEASBY:  Your Honor, Mr. Tezyan was going to

11   argue that term, and I would like to represent to the Court

12   that he was awesome when we went through it yesterday and it

13   would have been his first argument.  So if we could get

14   judicial notice of that, I would appreciate it.

15             THE COURT:  All right.  We'll direct that his

16   remarks be placed in the record.

17             MR. SHEASBY:  Can I have the elmo, Madam Courtroom

18   Deputy?

19        So this is the last term that we are arguing, and the

20   attention is -- and I appreciate the Court's indulgence by not

21   just saying 'plain and ordinary meaning', but actually wading

22   into the dispute.  And I think everyone agrees, if you go back

23   and look at the specification, the portion of the

24   specification that guides this is column 50, lines 60, *et seq*,

25   to column 16, lines 5.  And the only point I will make, Your

1    Honor, is in that section I have highlighted the relevant time

2    period.  The latency is not just the moment that it starts;

3    it's also the moment that it stops as well.

4         In the construction as given in a time period where the

5    start of -- wherein the start of the time period depends on at

6    least the latency parameter, it would create significant

7    difficulty in applying the claim during the infringement phase

8    of the case if the back end of the latency period was not

9    defined.

10        And so consistent with column 15, we would ask that the

11   language -- in fact, we'd be comfortable with the language

12   directly from there where it says "from the moment the memory

13   controller starts to it stops".  If we could just use that

14   exact language, we would appreciate it, because it is going to

15   create confusion at the time period in the subsequent case.

16   And I think that a period of time has a beginning and an end.

17   I don't think that's in dispute.  And the latency controls

18   both the beginning and the end of that time period, and we'd

19   like to make that clear based on the specification that I just

20   read, Your Honor.

21             THE COURT:  All right.

22             DOCTOR ALBERT:  Admittedly, Your Honor, I don't know

23   what to make of that.  I don't know what's being proposed by

24   Netlist at this point, and I don't know what the dispute is

25   given the statements.

1        THE COURT:  It's my understanding of their statement

2   that they are still seeking duration, but that they feel they

3   can get there if the construction includes both the start and

4   the end.

5        DOCTOR ALBERT:  And here, Your Honor, perhaps a

6   little bit of clarity as to our understanding would be helpful

7   here.

8      So if you look at the claim language, 'time period in

9   accordance with a latency parameter', Your Honor's

10  construction follows that 'a time period wherein the start of

11  the time period depends on at least a latency parameter'.

12  That was different than Netlist had sought, which is the start

13  and duration depending on a latency parameter.  So my

14  understanding of the tentative was that the 'and the

15  duration' was excluded from the construction.

16       THE COURT:  That was a correct understanding.

17       DOCTOR ALBERT:  And so as Your Honor distinctly

18  tuned into here, the specification discusses latency

19  parameter, discusses latency, and talks about latency is a

20  delay time--right?--something that elapses between one event

21  and another.  And Netlist's original construction -- I don't

22  quite know if that's what their getting at right now, but

23  their original construction was not just a delay time--which,

24  you know, you could also call that a duration, a duration of a

25  delay--they wanted a construction of a latency parameter to

1    include the duration of delay--you know, that delay time--but

2    also a second duration, and that's where we have issue with.

3         So we -- Your Honor correctly and keenly tuned into the

4    real issue here that latency is that delay time, as is

5    described in the specification, and the -- it requires no

6    further construction than that.  The patent itself says that

7    this is a known thing in the field.  Patent -- I couldn't tell

8    whether counsel was saying that the specific description in

9    the patent was an expressed definition that changed the

10   meaning in the field, that differed from the meaning in the

11   field, but the patent acknowledges that this is a known

12   parameter and then goes on to describe it as a delay, and just

13   like Your Honor's construction of a time period where the

14   start of the period depends at least on a latency parameter.

15        THE COURT:  I think what we're really construing is

16   what 'time period in accordance with' means here, because I

17   agree with you that there seems to be agreement about what the

18   latency parameter itself is.

19        DOCTOR ALBERT:  And the original dispute that -- as

20   I understood it from the briefing, Your Honor, was Netlist

21   seemed to be trying to redefine the term 'in accordance with',

22   which didn't argue in the brief that 'in accordance with' had

23   a very specific meaning, but that was the implication of their

24   argument.

25        You know, based on the Court's construction, you know, we

1    don't have any further points here.

2         I would just go on to say, Your Honor, that, you know,

3    there is an IPR outstanding on this issue, as Your Honor may

4    know.  After the briefing finished, the institution decision

5    came out instituting on all claims.  And the Patent Office

6    sided with Samsung's construction here, which would be

7    consistent with Your Honor's construction that it -- the

8    time period of that starts based on the latency parameter.

9         So with that and, you know, barring further clarification

10   from Netlist counsel as to whether they mean something other

11   than what Your Honor has written down, we have no further

12   points here.

13             THE COURT:  All right.  Thank you, Mr. Albert.

14             MR. SHEASBY:  Your Honor, I wrote down what counsel

15   said is he, quote, elapses between one time and another as the

16   period, and we agree with that.  What we're trying to make

17   clear, and we understand that our proposed construction had

18   issues with sort of second latency period or things like that,

19   that was not our intention.  Our point is that the latency

20   period is between two moments.  It's not just -- it doesn't

21   just control when the period -- the latency parameter doesn't

22   just control when the period starts; it also controls where

23   the period ends, of necessity.  And I think if 15, line 61

24   through 65, which is the same passage that they quote in their

25   brief--they just allied part of that--makes it clear that the

1    period from when it starts to when it ends, and that's the

2    only request we would make consistent with the specification,

3    Your Honor.

4           THE COURT:  Well, if the latency parameter is clear,

5    why doesn't 'using it to set the start time' resolve the whole

6    thing?

7           MR. SHEASBY:  Because it -- using it -- they will

8    take the position that 'using a latency parameter to set the

9    start time doesn't mean that the latency parameter controls

10   the end time.  So they -- their position technically will be

11   that they're not necessarily linked, they're not inherently

12   linked; you can start one -- you can have it start it but not

13   have it when it ends.

14       And so our position is in the specification to latency

15   period, in column 15, lines 61 through 65 makes clear that the

16   latency period is not just the beginning, it's the end.  And

17   I'll read that into the record.  "The column addressed strobe

18   latency"--that's what we're referring to here; I think both

19   parties agree on that--"is the delay time which elapses

20   between the moment the memory controller informs the memory

21   module to access a particular column in a selected rank or row

22   and the moment the data from the particular column is on the

23   output pins of the selected rank or row."

24       And so the latency parameter controls the entire

25   period--not just when it starts, but when it ends.  And

1    Samsung will take the position that it's not inherent, that

2    when it starts -- controlling when it starts means you're

3    controlling when it ends.

4         THE COURT:  All right.

5         MR. SHEASBY:  Thank you, Your Honor.

6         THE COURT:  Thank you.

7         DOCTOR ALBERT:  Your Honor, as I understand,

8    Netlist's position is just a rephrasing of their prior

9    construction a time period with the start of the time period

10   and the duration of the time period depends on at least the

11   latency parameter.

12        THE COURT:  Mr. Albert, can you describe your

13   position through the use of figure 6?  I saw that you had a

14   slide on that a little earlier.

15        DOCTOR ALBERT:  Yes.  So figure 6 is instructive,

16   Your Honor, because there are -- the patent describes

17   'latency', and with regards to figure 6, the patent also

18   describes these time periods 601, 602, 603.  The patent uses

19   different language for that -- to describe latency and the

20   periods.  It doesn't link the two together like Netlist's

21   construction is now linking.

22      Latency is just a delay of time.  It's found in their

23   own dictionary definition they cited.  It's a delay time.

24   We agree it's a delay time.  But that's not the crux of the

25   issue, because the crux of the issue is that the -- as Your

1   Honor pointed out with Netlist's -- the dispute really seems

2   to be now is the language period 'in accordance with', and

3   what does that mean; how narrow is that term.  And Your Honor

4   correctly pointed out that 'in accordance' means it could be

5   dependent on the start time.

6       Now, does 'in accordance' mean, as Netlist seems to now

7   imply, that every variable has to be defined for that period

8   for 'in accordance'?  No.  That's not what 'in accordance'

9   means.  And if you actually look at the patent, 'in accordance

10  with' is used throughout the patent to describe various

11  things, including some of the figures, which don't have all of

12  the description from the specification.  'In accordance with'

13  is -- in the patent is used as a general term.  It could be

14  used as 'depend on', just like Your Honor has found.

15      So with that, with the evidence in the record, we believe

16  Your Honor has gotten this one correct.

17              THE COURT:  The claim language in claim 1 that talks

18  about the latency parameter refers to the path -- data path

19  being enabled for a first time period in accordance with the

20  latency parameter.  So is your understanding of the plain

21  meaning of that that the latency parameter determines when it

22  starts, but the claim does not dictate when that enablement of

23  the path ends?

24              DOCTOR ALBERT:  Yes, Your Honor, that would be

25  sufficient.  And that's -- again, that's exactly what the

1    Patent Office just found in its institution decision regarding

2    these claims.

3              THE COURT:  All right.

4              DOCTOR ALBERT:  And I can put that language up, Your

5    Honor.  "On this record we are sufficiently persuaded by

6    Petitioner's argument that enabling the data path for a time

7    period that starts based on the latency parameter. The patent

8    owner does not sufficiently address whether claim language

9    require latency to relate to the duration of the time periods

10   during which the data is driven rather than the start of the

11   time period."

12             THE COURT:  Thank you.

13             MR. SHEASBY:  And I'll just make the point that the

14   duration thing is obviously -- the use of the word

15   'duration' is obviously inartful, but I think if you look at

16   the claim language, the latency parameter is controlling the

17   first time period and that first time period is the beginning

18   -- includes the beginning and end of the period.

19        So I think from the claim language itself, it's required

20   that the latency parameter control both the first and -- the

21   beginning and the end.  And I'll read that into the record.

22   "A latency parameter to actively drive the respective

23   byte-wise section of the end bit wide write data associated

24   with the memory operation from the first side to the second

25   side during the first time period."  From the first side to

1    the second side, from the beginning, the moment of the

2    beginning to the moment at the end, Your Honor.  Thank you.

3              THE COURT:  And is it your understanding of latency,

4    as used here, that it's talking about something that's

5    inherent in the system; some number of clock cycles that is

6    programmed in?

7              MR. SHEASBY:  Yes.  So it's not inherent in the

8    system.  You have to program it in.  Or it's based on -- I

9    think the tristate buffer is what actually does it, which

10   actually delays it so that you get -- you're delaying both the

11   start and the end so that you're not having a collision with

12   -- in figure 6 it's depicting it in one cycle, but there's no

13   magic to it being in just one cycle.  The write process could

14   take two cycles, for example, and when it took two cycles

15   you'd want to make sure that the alternative tristate buffer

16   didn't start until the end; not just that it didn't start

17   after the beginning.

18             THE COURT:  All right.

19             MR. SHEASBY:  That's why it says from the moment --

20   this is not -- that's right.  This is not active.  The

21   language they put up 15:61 through 66 says it--"from the

22   moment the memory controller informs the memory module to

23   begin the process until the moment the process is completed."

24   That's the whole point--the latency controls that entire

25   period.

1          THE COURT:  All right.  Thank you.

2          DOCTOR ALBERT:  Just one final point here.

3      It seems like Netlist is now arguing for an express

4  definition of 'latency parameter' from the specification, but

5  I'll point out that the language that they're pointing to is

6  not latency parameter generally; it's a specific type of

7  latency, column address strobe latency, which is a different

8  term.  That is a -- that's different language, different term.

9  'Latency' can be backed out from here.  It is a delay time.

10          THE COURT:  So do you contend that when the claim

11  refers to 'latency parameter', it's not referring to the

12  'column address strobe latency' that's described in the

13  specification?

14          DOCTOR ALBERT:  This is one example of 'latency',

15  and the examples of -- the example that has been chosen here

16  for 'latency' is a particular type of latency--'column address

17  strobe'.

18      Now, Netlist has offered other evidence about what

19  'latency' means that is different that's not dependent on this

20  'column address strobe latency', but to read this specific

21  example of 'latency', a term that is known, into this

22  construction, we don't believe that's proper.  But the general

23  idea of 'latency' is known.  We believe that plain meaning

24  controls.  We also see that Your Honor's construction is

25  consistent with that.

1          THE COURT:  All right.

2          MR. SHEASBY:  And I'll just point out for the

3  record, this is Docket 82, page 29, it's 15:61 through 16:6,

4  that Samsung in briefing used to describe the meaning of

5  'latency', and that's the CAS latency passage that is up on

6  the screen right now.  So I believe there has been some drift

7  between what was represented on papers and what was just

8  represented now.

9      Thank you, Your Honor.

10         THE COURT:  All right.  Thank you.

11     Well, I take it there are no further arguments on these

12  terms.  Is that right?

13         MR. McKEON:  Nothing from Samsung, Your Honor.

14  Thank you.

15         THE COURT:  All right.

16         MR. SHEASBY:  Nothing from the Plaintiff, Your

17  Honor.  Thank you for your time today.

18         THE COURT:  All right.  The arguments have been

19  helpful, and I will further consider them and try to get out a

20  claim construction order promptly.

21     So with that, thank you.  And we're adjourned.

22                   (End of hearing.)

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts               11/07/2022

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25