# EXHIBIT B

JASON C. LO, SBN 219030
  jlo@gibsondunn.com
MATTHEW BENJAMIN (*pro hac vice*)
  mbenjamin@gibsondunn.com
RAYMOND A. LAMAGNA, SBN 244821
  rlamagna@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

JASON SHEASBY, SBN 205455
  jsheasby@irell.com
IRELL & MANELLA LLP
1800 Ave. of the Stars
Los Angeles, CA 90067
Telephone: 310.203.7096
Facsimile: 310.203.7199

Attorneys for Plaintiff Netlist Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>      v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>                    Defendant. | CASE NO. 8:20-cv-993-MCS (ADS)<br><br>**NETLIST INC.'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN RESPONSE TO DEFENDANT'S STATEMENT OF ADDITIONAL MATERIAL FACTS** |

Plaintiff Netlist Inc. ("Netlist") hereby submits its Statement of Genuine Disputes of Material Fact in response to Defendant Samsung's Statement of Additional Material Facts.  With the exception of Nos. 62, 67, 68, 69, and 71 below, Defendant's additional alleged SUF below are verbatim repeats of Defendant's alleged Statement of Undisputed Facts ("SUF") submitted by Defendant in support of Defendant's own opening Motion for Summary Judgment.  Netlist has thus responded here by repeating its response to Samsung's prior assertion of these same alleged facts (*see* Dkt. 171-1).

| Defendant's Alleged Additional Undisputed Facts and Supporting Evidence | Plaintiff's Response |
|---|---|
| 1. In early 2015, Netlist approached Samsung to discuss a strategic partnership involving joint development of a product based on a new standard called NVDIMM-P and licensing of Netlist's patents.<br><br>Dkt. 150-1 (Declaration of Joyce J. Choi in Support of Samsung's Motion for Summary Judgment ("Choi Decl.")) ¶ 15, Exh. 14 at RFA No. 18. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 9.<br><br>Disputed but immaterial.  Samsung initiated the discussion that led to the JDLA.<br><br>Evidence:<br>• Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 61:22-62:16 ("they came to us to discuss patents") |

|   |   |
|---|---|
| 1 | There were also multiple aspects to a |
| 2 | strategic partnership discussed in early |
| 3 | 2015, including joint development, |
| 4 | financing, license to patents, supply of |
| 5 | products to Netlist. |
| 6 | |
| 7 | Evidence: |
| 8 | • Dkt. 144-3 [Netlist MSJ Ex. 3] |
| 9 | (NL108668-69) (May 18, 2015 |
| 10 | Technology Partnership and IP |
| 11 | Cooperation Agreement). |
| 12 | • Dkt. 171-12, Ex. 84 to 8-30-21 |
| 13 | LaMagna Decl. (Chuck Hong |
| 14 | Dep. Tr.) at 43:19-44:17. |
| 15 | |
| 16 | Defendant's cited supporting evidence |
| 17 | does not support the fact. Netlist's |
| 18 | interrogatory response simply states |
| 19 | that "in 2015, it informed Samsung that |
| 20 | Netlist is the owner and assignee of |
| 21 | standard essential patents as shown in, |
| 22 | for example, NL107804 and its |
| 23 | attachment." |
| 24 | |
| 25 | Evidence: |
| 26 | • Dkt. 150-3 [Samsung MSJ Ex. |
| 27 | 14] at p. 13, RFA No. 18. |
| 28 | |

| | |
|---|---|
| 2. The NVDIMM-P-related product was a "game changer" according to Chuck Hong and, based on presentation materials, was designed to take market share in a $15 billion industry.<br><br>Choi Decl. ¶ 8, Exh. 7 at 139:7-25; ¶ 17, Exh. 16 at SEC008159. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 10.<br><br>Undisputed that the NVDIMM-P related product discussed in the cited testimony was intended to be a "game changer."<br><br>Disputed as to the characterization that the NVDIMM-P related product "was" a game changer because it never became a product. (i.e., it was expected to become a game changer).<br><br>Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 139:7-25. |
| 3. At that time, Netlist also raised a licensing component and the potential that Samsung would be subject to an injunction for infringement of Netlist's patents. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 11.<br><br>Disputed. |

| 1  | Choi Decl. ¶ 18, Exh. 17 at NL107807; | First, Samsung is the one that raised a |
| 2  | ¶ 8, Exh. 7 at 42:4-14. | licensing component. |
| 3  | | |
| 4  | | Evidence: |
| 5  | | • Dkt. 171-12, Ex. 84 to 8-30-21 |
| 6  | | LaMagna Decl. (Chuck Hong |
| 7  | | Dep. Tr.) at 61:22-62:16 ("they |
| 8  | | came to us to discuss patents"). |
| 9  | | |
| 10 | | Second, Netlist never threatened |
| 11 | | Samsung with an infringement claim or |
| 12 | | an injunction. |
| 13 | | |
| 14 | | Evidence: |
| 15 | | • Dkt. 171-12, Ex. 84 to 8-30-21 |
| 16 | | LaMagna Decl. (Chuck Hong |
| 17 | | Dep. Tr.) at 45:20-24 ("Q: "[D]o |
| 18 | | you recall ever mentioning the |
| 19 | | potential that Samsung might be |
| 20 | | infringing [Netlist's] patent? A: |
| 21 | | No, no.") |
| 22 | | |
| 23 | | Defendant's cited supporting evidence |
| 24 | | does not support the alleged fact. The |
| 25 | | cited testimony of Chuck Hong does |
| 26 | | not reference any claim of infringement |
| 27 | | by Samsung of Netlist's patents (the |
| 28 | | |

| | discussion of litigation and infringement concerns allegations directed to Hynix). |
|---|---|
| | Evidence: |
| | • Dkt. 151-1 [Samsung MSJ Ex. 17 (NL107804-809) at NL107807. |
| | • Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 42:4-14 (testifying that the April 2015 proposal was for "the patent license" and for "other components of an overall strategic relationship with Samsung."). |
| 4. Netlist's first proposal to Samsung in April 2015 focused on the cash consideration, and did not mention a long term supply agreement. ("Q Now, at least on this proposal, Netlist didn't list supply as a component of the deal; correct? A Yes, it's not here.")<br><br>Choi Decl. ¶ 18, Exh. 17 at NL107807; ¶ 8, Exh. 7 at 51:3-52:18. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 22.<br><br>Undisputed that the document does not mention a long-term supply agreement, but also immaterial.<br><br>Disputed that Netlist's proposal to Samsung in April 2015 focused on any |

| | |
|---|---|
| | one item. |
| | Also disputed as to the materiality of the April 2015 proposal given that the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 151-1 [Samsung MSJ Ex. 17] (NL107804) at NL107807. |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 5. When Netlist sent Samsung the first draft of the term sheet on April 21, 2015, Netlist proposed, as part of the "Joint development and marketing" for the "Technology Collaboration," that Samsung supply NAND and DRAM product. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 23. |
| | Undisputed that the document contains a section header titled "Technology Collaboration," which contains |

| | |
|---|---|
| Choi Decl. ¶ 23, Exh. 22; ¶ 24, Exh. 23 at § II. | reference to "joint development and marketing," but immaterial. |
| | Disputed as to the materiality of the April 2015 proposal given that the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| | Disputed that as to the characterization that supply of NAND and DRAM products are "as part of" the joint development and marketing. The cited document merely lists examples of possible options ("Joint development and marketing *(TBD) – i.e.*, Samsung supplies Netlist HV ASIC controller, |

| | |
|---|---|
| | Flash and DRAM; Samsung includes HV in its product roadmap."). Evidence: • Dkt. 151-1 [Samsung MSJ Ex. 23] (NL100004) at § II. |
| 6. In Netlist's June 9, 2015 revision to the term sheet, under the heading "Technology Collaboration," Netlist proposed: "Raw Materials: Samsung will supply NAND, DRAM on mutually agreed terms." Choi Decl. ¶ 25, Exh. 24, § II.5. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 23. Undisputed but immaterial. The JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."), so what the earlier term sheets stated is not material. Evidence: |

| | |
|---|---|
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 7. Netlist CEO Chuck Hong testified that "Technology Collaboration" in Netlist's revised term sheet referred to the parties' joint efforts to standardize NVDIMM-P, and that "Raw Materials" referred to various DRAM and NAND flash components necessary to support the NVDIMM-P commercialization.<br><br>Choi Decl. ¶ 8, Exh. 7 at 91:4-17; 92:4-12. See also 101:25-102:7 ("Q. And so those were raw materials that were provided in connection with commercialization of the dash P product; correct? A. That's correct.") | This alleged fact is a repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, Nos. 25 and 26 combined.<br><br>Disputed to the extent that Defendant's statement implies that Chuck Hong testified that the proposed "technology collaboration" was limited exclusively to "efforts to standardize NVDIMM-P" as opposed to the inclusion of such efforts.<br><br>While Chuck Hong testified that NVDIMM-P standardization certainly fell under the parties' proposed collaboration, he did not testify that this would be the only thing that would be covered by the Technology Collaboration.<br><br>To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that |

Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P."

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24.

In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation history are not worded to be limited to NVDIMM-P).
- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:19-22 (testifying

that "the supply commitment was never about NVDIMM-P");
220:3-221:3 (testifying that it was never his understanding that the supply provision was to be limited to NVDIMM-P)

- *See also* Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:6-11 (testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"; this "was clearly understood, and I believe that is reflected in the JDLA")

In addition, the alleged fact is immaterial because as Mr. Hong testified, after the MOU was signed, the

|   |   |
|---|---|
| 1 | parties engaged in further negotiations |
| 2 | resulting in differences between the |
| 3 | MOU and the JDLA. |
| 4 |   |
| 5 | Evidence: |
| 6 | • Dkt. 171-12, Ex. 84 to 8-30-21 |
| 7 | LaMagna Decl. (Chuck Hong |
| 8 | Dep. Tr.) at 133:1-7. |
| 9 |   |
| 10 | Moreover, the alleged fact is immaterial |
| 11 | because the JDLA contains an |
| 12 | integration clause ("Except as |
| 13 | otherwise stated herein, this Agreement |
| 14 | and all Appendices attached hereto |
| 15 | supersede all prior proposals, consents, |
| 16 | agreements, and discussions, oral or |
| 17 | written, between the Parties relating to |
| 18 | the subject matter of this Agreement."). |
| 19 |   |
| 20 | Evidence: |
| 21 | • Dkt. 148-1 [Samsung MSJ Ex. |
| 22 | 19] (SEC0000001) at |
| 23 | SEC000014. |
| 24 |   |
| 25 | Disputed to the extent that Defendant is |
| 26 | characterizing Chuck Hong's testimony |
| 27 | about "raw materials" as being limited |
| 28 |   |

| | |
|---|---|
| 1 | exclusively to "components necessary |
| 2 | for the parties' joint efforts to |
| 3 | standardize NVDIMM-P" as opposed |
| 4 | to the materials being inclusive of such |
| 5 | components.  Mr. Hong expressly |
| 6 | testified that raw materials included |
| 7 | "DRAM, various DRAMs, and various |
| 8 | NAND Flash components" without |
| 9 | limitation.  He also testified that, "from |
| 10 | day one" Netlist had not ever |
| 11 | "communicate[d] to Samsung that |
| 12 | Samsung's obligation to supply NAND |
| 13 | and DRAM products would be limited |
| 14 | to NVDIMM-P." |
| 15 | |
| 16 | Evidence: |
| 17 | • Dkt. 171-12, Ex. 84 to 8-30-21 |
| 18 | LaMagna Decl. (Chuck Hong |
| 19 | Dep. Tr.) at 92:4-8. |
| 20 | • Dkt. 171-12, Ex. 84 to 8-30-21 |
| 21 | LaMagna Decl. (Chuck Hong |
| 22 | Dep. Tr.) at 238:15-24. |
| 23 | |
| 24 | In fact, Mr. Hong repeatedly testified |
| 25 | that the proposed supply term was not |
| 26 | worded to be limited to NVDIMM-P. |
| 27 | |
| 28 | |

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation history do not contain a reference to NVDIMM-P).

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:19-22 (testifying that "the supply commitment was never about NVDIMM-P"); 220:3-221:3 (testifying that it was never his understanding that the supply provision was to be limited to NVDIMM-P)

- *See also* Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:6-11 (testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't

make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"; this "was clearly understood, and I believe that is reflected in the JDLA")

In addition, it is immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA.

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7.
- Moreover, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all

| | |
|---|---|
| | prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 8. In Netlist's June 25, 2015 updated term sheet, under the heading "Phase 2: Technology Productization," Netlist proposed: "1. Parties will work together to bring an NVDIMM-P product to market. Details of the technical collaboration to be negotiated at a later date" and "Raw Materials: Samsung will supply NAND and DRAM on mutually agreed terms."<br><br>Choi Decl. ¶ 26, Exh. 25 at NL005090, NL005092. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 27.<br><br>Undisputed that the quoted language appears in that order in the term sheet.<br><br>Disputed to the extent that Defendant is implying that the supply language is limited exclusively to the Phase II stage simply because of its order in which the terms are placed under the headers.<br><br>Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P." |

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24.

In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation history do not contain a reference to NVDIMM-P).
- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:19-22 (testifying that "the supply commitment was never about NVDIMM-P"); 220:3-221:3 (testifying that it

was never his understanding that the supply provision was to be limited to NVDIMM-P)

- *See also* Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:6-11 (testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"; this "was clearly understood, and I believe that is reflected in the JDLA")

In addition, it is immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA.

| | |
|---|---|
| | Evidence: |
| | • Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7. |
| | Moreover, it is immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 9. In the drafts leading up to the final and executed MOU, Netlist understood that Samsung's supply obligations would only arise in the event of commercialization of the NVDIMM-P product subject to the parties' joint development but this never occurred. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 29. Disputed. In the cited testimony, Chuck Hong |

| | |
|---|---|
| Choi Decl. ¶ 8, Exh. 7 at 104:6-24. | testified that the proposed supply provision "applies to the dash-P product to the extent it ever got commercialized."<br><br>Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 104:21-24.<br><br>But Mr. Hong does not ever testify that that term applied to NVDIMM-P to the exclusion of components for all other products.<br><br>To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P."<br><br>Evidence:<br>• Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24. |

In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, 228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation history do not contain a reference to NVDIMM-P).
- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:19-22 (testifying that "the supply commitment was never about NVDIMM-P"); 220:3-221:3 (testifying that it was never his understanding that the supply provision was to be limited to NVDIMM-P)
- *See also* Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:6-11

(testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"; this "was clearly understood, and I believe that is reflected in the JDLA")

In addition, it's immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA.

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7.

| | |
|---|---|
| | Moreover, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 10. Netlist CEO Chuck Hong testified that Netlist's intent underlying the MOU was to get Samsung's commitment to supply NAND and DRAM products for the NVDIMM-P product so that Netlist would have sufficient supply if and when it was able to commercialize the technology.<br><br>Choi Decl. ¶ 8, Exh. 7 at 109:9-110:1. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 30.<br><br>Disputed.<br><br>Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant. For example, nowhere in Chuck Hong's deposition testimony cited by Defendant does Mr. Hong testify as to |

Netlist's intent underlying the MOU.

Furthermore, to the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P."

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24.

In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P.

Evidence:

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:19-22 (testifying that "the supply commitment was never about NVDIMM-P"); 220:3-221:3 (testifying that it was never his understanding that

|  | the supply provision was to be limited to NVDIMM-P)
|  | • *See also* Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 222:6-11 (testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"; this "was clearly understood, and I believe that is reflected in the JDLA")
|  | Mr. Hong testified that raw materials for standardization of NVDIMM-P would fall within the supply provision, not that that was the only thing that would be covered by the supply provision.

| | |
|---|---|
| | In addition, it's immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA. |
| | Evidence: |
| | • Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7. |
| | Moreover, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 11. According to Chuck Hong, NVDIMM-P was "industry changing" | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of |

| | |
|---|---|
| technology and Netlist's attempt to standardize a NVDIMM-P product was a significant business opportunity and one that Netlist had invested more than $10 million in engineering costs into.<br><br>Choi Decl. ¶ 8, Exh. 7 at 79:13-80:23, 139:7-141:6. | its opening Motion for Summary Judgment, No. 31.<br><br>Disputed.<br><br>Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant. The document speaks for itself.<br><br>Chuck Hong did not testify that NVDIMM-P was industry changing technology, but that hybriDIMM was a game changing technology and "was supposed to sync up with the dash P." *See* Plaintiff's response and evidence to Samsung's additional SUF No. 2, *supra*, incorporated herein.<br><br>Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 139:10-21, 140:1-19.<br><br>In addition, the quoted material says the HybriDIMM product was "significant," not the attempt to standardize was a |

| | |
|---|---|
| 1 | "significant business opportunity." |
| 2 | |
| 3 | Evidence: |
| 4 | • Dkt. 157-4 [Samsung MSJ Ex. 7] |
| 5 | (Chuck Hong Dep. Tr.) at |
| 6 | 139:12, 80:16. |
| 7 | |
| 8 | Undisputed that Netlist spent $10 |
| 9 | million on engineering costs related to |
| 10 | the parties' joint development. |
| 11 | |
| 12 | Evidence: |
| 13 | • Dkt. 171-12, Ex. 84 to 8-30-21 |
| 14 | LaMagna Decl. (Chuck Hong |
| 15 | Dep. Tr.) at 212:10-14. |
| 16 | |
| 17 | Disputed as to the remainder of the |
| 18 | characterization. Nowhere in the |
| 19 | quoted evidence does it reference |
| 20 | "industry changing." *See also* |
| 21 | Plaintiff's response and evidence to |
| 22 | Samsung's additional SUF No. 2, |
| 23 | *supra*, incorporated herein. |

| | | |
|---|---|---|
| 24 | 12. The MOU reflected both parties' | This alleged fact is a verbatim repeat |
| 25 | intent on the important points of the | of Defendant's alleged SUF in support of |
| 26 | parties' agreement. | its opening Motion for Summary |
| 27 | | Judgment, No. 32. |
| 28 | | |

| | |
|---|---|
| Section 6 of the MOU states in full (emphasis added): | Undisputed that Section 6 of the MOU contains the quoted language. |
| 6. Most Favored Nation (MFN): Netlist will provide Samsung any NVDIMM-P* controller at a price lower than the price Netlist provides to any other buyer. Either party may produce NVDIMM-P controller using its own technology and has no obligation to buy from the other party. Raw Materials: Samsung will provide competitive pricing (i.e. among customers purchasing the same products and similar volumes) for the supply of Samsung NAND and DRAM products. As to the MOU, Chuck Hong again testified in deposition that section 6.2 limited Samsung's supply obligation to the NVDIMM-P development and that this obligation would arise only if and to the extent that the NVDIMM-P product was ever commercialized. | Disputed as to the remaining characterization.<br><br>To the contrary, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P."<br><br>Evidence:<br>• Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24.<br><br>In fact, Mr. Hong repeatedly testified that the proposed supply term was not worded to be limited to NVDIMM-P. |
| Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3-9; ¶ 22, Exh. 21 at NL069668-69. | Evidence:<br>• Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 225:17-19, 227:4-23, |

228:16-229:7, 229:16-230:11, 231:11-21, 232:5-233:2, 234:20-25 (testifying that prior iterations of the supply provision in earlier drafts from the negotiation history do not contain a reference to NVDIMM-P).

- *Id*. at 222:19-22 (testifying that "the supply commitment was never about NVDIMM-P"); 220:3-221:3 (testifying that it was never his understanding that the supply provision was to be limited to NVDIMM-P)

- *See also id*. at 222:6-11 (testifying that "it's not even within the realm of possibility" to limit the supply provision to NVDIMM-P; "[i]t wouldn't make logical sense"); 233:10-22 (testifying that the supply provision was for "all products," and that "it would make no sense" for it to have meant a supply provision confined to raw material for NVDIMM-P"; this "was clearly understood, and I

| | |
|---|---|
| 1 | believe that is reflected in the |
| 2 | JDLA") |
| 3 | |
| 4 | In addition, it's immaterial because as |
| 5 | Mr. Hong testified, after the MOU was |
| 6 | signed, the parties engaged in further |
| 7 | negotiations resulting differences |
| 8 | between the MOU and the JDLA. |
| 9 | |
| 10 | Evidence: |
| 11 | • Dkt. 171-12, Ex. 84 to 8-30-21 |
| 12 | LaMagna Decl. (Chuck Hong |
| 13 | Dep. Tr.) at 133:1-7. |
| 14 | |
| 15 | Moreover, it's immaterial because the |
| 16 | JDLA contains an integration clause |
| 17 | ("Except as otherwise stated herein, this |
| 18 | Agreement and all Appendices attached |
| 19 | hereto supersede all prior proposals, |
| 20 | consents, agreements, and discussions, |
| 21 | oral or written, between the Parties |
| 22 | relating to the subject matter of this |
| 23 | Agreement."). |
| 24 | |
| 25 | Evidence: |
| 26 | • Dkt. 148-1 [Samsung MSJ Ex. |
| 27 | 19] (SEC0000001) at |
| 28 | |

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO. 8:20-CV-993-MCS (ADS)

| | SEC000014. |
|---|---|
| 13. On October 8, 2015, when the parties began drafting the JDLA from the MOU, Samsung proposed the following language to Netlist: | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 33. |
| "6.2 Supply by Samsung. Samsung will supply NAND and DRAM to Netlist on Netlist's request at a competitive price similar to the customers purchasing similar volumes of similar products. For the avoidance of doubt, any of the provisions under this Agreement will not be deemed to require Netlist to purchase any products from Samsung or to require Samsung to supply any products to Netlist." | Undisputed that in the October 8, 2015 draft of the JDLA, the language proposed by Samsung for Section 6.2 was as quoted. Disputed that Samsung drafted this from the MOU. Defendant's cited supporting evidence does not support the fact. |
| Choi Decl. ¶ 27, Exh. 26 at NL049006; ¶ 28, Exh. 27 at NL049012, § 6.2. | In addition, it's immaterial because as Mr. Hong testified, after the MOU was signed, the parties engaged in further negotiations resulting differences between the MOU and the JDLA. |
| | Evidence:<br>• Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 133:1-7. |

| | |
|---|---|
| | Moreover, it's immaterial because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 14. Whitley was Netlist's main contributor to the JDLA.<br><br>Choi Decl. ¶ 8, Exh. 7 at 130:6-24. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 34.<br><br>Disputed. Chuck Hong testified that he did not know whether Mr. Whitley was "overseeing" the negotiation of the JDLA. He was working with outside counsel on the project.<br><br>Mr. Hong testified that Mr. Whitley is "a" main contributor to the JDLA, not |

| | |
|---|---|
| | "the" only main contributor.<br><br>Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 130:13-24. |
| 15. On October 14, 2015, as to the new Section 6.2 of its proposed JDLA, Whitley wrote in bold "Conflicts with MOU" and "Samsung states that nothing in this agreement will 'require Samsung to supply any products to Netlist.' Netlist removed this qualification and returned the language to reflect what was agreed to in the MOU." Samsung agreed to this change.<br><br>Choi Decl. ¶ 29, Exh. 28 at NL045877; ¶ 30, Exh. 29 at NL049026; ¶ 31, Exh. 30 at NL049033; ¶ 32, Exh. 31 at NL118147 and NL118149. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 35.<br><br>Undisputed that the quoted language appears in the document. Disputed as to the characterization.<br><br>The draft agreement was not Netlist's proposed JDLA. Netlist was responding to Samsung's proposed language. Here, Netlist via Mr. Whitley is removing Samsung's prohibition that it would not be required "to supply any products to Netlist."<br><br>Disputed to the extent Samsung is implying that Netlist believe that the supply provision should be limited to NVDIMM-P (as this SUF is cited in |

| | |
|---|---|
| | Samsung's brief). Nowhere does any of the cited material indicate that Netlist or Mr. Whitley were proposing to limit the supply provision to NVDIMM-P. |
| | Also disputed as to the materiality of the statement, because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 16. As expressed by Whitley, it was Netlist's position that the MOU should govern the supply term. As set forth in SUF nos. 20 and 31, the MOU only required that Samsung supply product in | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 36.<br><br>Disputed. |

| | |
|---|---|
| the event that the NVDIMM-P product was ever commercialized.<br><br>Choi Decl. ¶ 29, Exh. 28 at NL045877; ¶ 8, Exh. 7 at 130:6-132:10. | Neither Mr. Whitley nor Netlist has ever taken the position that the MOU and not the final JDLA should govern the parties' obligations.<br><br>Plaintiff understands that reference to "SUF nos. 20 and 31" in alleged additional fact No. 16 refers to Samsung's alleged SUF nos. 20 and 31 asserted in Samsung's Motion for Summary Judgment (not to the additional alleged facts nos. 20 and 31 in this document). Plaintiff previously disputed Samsung's characterization of allege SUF 20 and 31 asserted with Samsung's Motion for Summary Judgment (*see* Dkt. 171-1) and Plaintiff incorporates that prior response as if set forth here. Plaintiff's prior SUF nos. 20 and 31 also appear to be restated and renumbered here as Samsung's additional SUF nos. 26 and 11. Therefore, Plaintiff also incorporates its response to those alleged SUF as if set forth here, along with Plaintiff's response to additional alleged SUF 10. |

|  |  |
|---|---|
|  | Nowhere does any of the cited material indicate that Netlist or Mr. Whitley were proposing to limit the supply provision to NVDIMM-P.<br><br>Also disputed as to the materiality of the statement, because the JDLA contains an integration clause ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement.").<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 17. Netlist wanted Samsung's assurance that it would supply NAND and DRAM to support NVDIMM-P sales if the joint | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 37. |

| | |
|---|---|
| development proved successful, and demand for the product took off. | Disputed. |
| Choi Decl. ¶ 8, Exh. 7 at 80:13-23. | Netlist wanted Samsung's assurance that it would supply NAND and DRAM at Netlist's request, regardless of whether the joint development proved successful or the demand for the product took off, without limitation to NVDIMM-P. |
| | Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC0000006-0007. |
| | Contrary to the statement, Mr. Hong testified that, "from day one" Netlist had not ever "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P." |
| | Evidence:<br>• Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24. |

| | |
|---|---|
| | *See also* Plaintiff's response and evidence to Samsung's alleged additional SUF Nos. 26-27 incorporated herein. |
| 18. During the contract negotiations, Netlist's CFO Gail Sasaki wrote to Samsung: "Both sides understood from the outset that this was a strategic deal, not a financial one. The value that would be transferred and created resided in the patents and the technology."<br><br>Choi Decl. ¶ 33, Exh. 32 at NL048993. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 38.<br><br>Undisputed that the quoted sentence appears in the document. Disputed as to the characterization to the extent Defendant is suggesting that the supply provision was not a strategic consideration to the deal.<br><br>Also disputed that this statement occurred "[d]uring the contract negotiations" to the extent construed to mean the JDLA, as this statement was made related to a different contract with a different entity. This sentence is taken out of context and in an email with a Samsung Semiconductor Industries employee, not a Samsung Electronics employee, about a separate |

| | |
|---|---|
| | negotiation from the JDLA negotiation. The email goes on to state that "*Samsung's top management commented that this was not a financial deal* and that Samsung did not intend to make money using money," and that the terms "now introduced by *Samsung Ventures* are, in fact, those of a financial deal."<br><br>Evidence:<br>• Dkt. 151-2 [Samsung MSJ Ex. 32] (NL048993) at NL048993. |
| 19. On November 12, 2015, after months of negotiations, Samsung and Netlist entered into the JDLA.<br><br>Choi Decl. ¶ 20, Exh. 19 at p.1. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 13.<br><br>Undisputed. |
| 20. The structure and terms of the JDLA reflect that the parties intend "to work together to jointly develop an interface and associated technologies for certain memory modules and promote such interface to standards-setting organizations." | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 14.<br><br>Undisputed that the quoted language appears in the recital to the contract, but disputed that the "structure and terms" |

| | |
|---|---|
| Choi Decl. ¶ 20, Exh. 19 at p.1. | of the JDLA are defined by that recital. The structure in terms of the JDLA on their face contain rights and obligations beyond the subject matter of that recital. *See* Dkt. 148-1 [Samsung MSJ Ex. 19] in *passim*. |
| 21. The "Developed Product" in the JDLA means an NVDIMM-P Product developed by the Parties hereunder pursuant the Statement of Work that meets the Product Specifications.<br><br>Choi Decl. ¶ 20, Exh. 19 at p.2. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 15.<br><br>Undisputed. |
| 22. The JDLA also includes a grant of cross-licenses and a release of threatened claims.<br><br>Choi Decl. ¶ 20, Exh. 19 at p.7, § 7. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 16.<br><br>Undisputed that the JDLA includes a grant of license (Section 8) and a release of claims (Section 7), but disputed as to the characterization of "threatened" claims as no claims were threatened.<br><br>Evidence: |

| | |
|---|---|
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at pp. 7-8, §§ 7-8.<br><br>*See also* Plaintiff's response and evidence to Samsung additional SUF No. 3, supra, incorporated herein. |
| 23. The JDLA states that Netlist was to receive $8 million for non-recurring engineering on the NVDIMM-P development work, and concurrently with the JDLA, provide an additional $15 million convertible loan at 2% interest that allowed Netlist to pay off existing debt with less favorable financial terms.<br><br>Choi Decl. ¶ 20, Exh. 19 at p.5, § 3.1; ¶ 21, Exh. 20 at p.2; ¶ 22, Exh. 21 at NL069669, § II.7. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 17.<br><br>Undisputed that the JDLA states that Netlist was to receive $8 million for in non-recurring engineering fees and that Netlist entered into "an agreement for convertible note financing."<br><br>Disputed as to the characterization—the JDLA does not identify the amount or interest rate of the debt, which was entered into in a separate contact with a separate entity that is not Defendant.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001). |

| | |
|---|---|
| | • Dkt. 151-2 [Samsung MSJ Ex. 72] (NL000341). |
| 24. In addition to its receipt of cash and financing from Samsung, Netlist stood to benefit from the relationship, especially if the parties were able to develop this "game changing" standard for NVDIMM-P and produce a commercially feasible product under this standard.<br><br>Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 33:12-34:6, 79:6-80:23, 139:7-25. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 18.<br><br>Undisputed that in addition to its receipt of cash, Netlist stood to benefit from the relationship defined in the JDLA.<br><br>Disputed that Netlist received financing from Defendant. Netlist receives secured debt financing (a loan) from a different entity.<br><br>Evidence:<br>• *See* Dkt. 151-2 [Samsung MSJ Ex. 72] (NL000341).<br><br>Also disputed as to the characterization imposed by the phrase "especially if." Netlist stood to benefit from the relationship regardless of the joint development, as did Samsung. |

| | |
|---|---|
| | Defendant's cited supporting evidence does not support the fact. Defendant mischaracterizes Chuck Hong's deposition testimony regarding "HybriDIMM," which is what Mr. Hong was referring to by the "game changing" reference. *See also* Plaintiff's response and evidence to Samsung's additional SUF No. 2, *supra*, incorporated herein. |
| 25. The terms of the JDLA seek to implement these objectives, including terms for the collaborative development work in accordance with product specification and development milestones and a Statement of Work (Section 2, Appendices A and B); development costs (Section 3); IPR ownership (Section 4); schedule for standardization and productization (Section 5); supply (Section 6); a mutual release of claims (Section 7); and licensing of intellectual property (Section 8).<br><br>Choi Decl. ¶ 20, Exh. 19 at pp.4-8. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 19.<br><br>Netlist does not dispute the terms of what is written in the JDLA, which contains the various sections described in Defendant's additional SUF No. 25. The document speaks for itself.<br><br>Disputed as to Defendant's reference of "these objectives" which is not defined here. The parties dispute the objective of the JDLA. Plaintiff asserts that one objective of the JDLA was to obtain a supply obligation from Samsung, which |

| | is disputed by Samsung. |
|---|---|
| | Evidence: |
| | • Complaint, Dkt 13, at 4. |
| | • Answer, Dkt. 27 at 2-3. |
| 26. Pursuant to the JDLA, Samsung and Netlist agreed to supply components to each other for the NVDIMM-P product which they had agreed to jointly develop and therefore did not yet exist. Specifically, Section 6.1 states: "Supply by Netlist. Netlist will provide Samsung any NVDIMM-P controller on Samsung's request at a price lower than the price Netlist provides to any other buyer." Section 6.2, the parallel provision, states: "Supply by Samsung. Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (i.e., among customers purchasing similar volumes of similar products)." <br><br> Choi Decl. ¶ 20, Exh. 19 at p.6, §§ 6.1, 6.2. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 20. <br><br> Undisputed that Sections 6.1 and 6.2 of the JDLA contain the language quoted by Defendant. <br><br> Disputed that Section 6.2 is a "parallel" provision to Section 6.1. <br><br> Disputed as to Samsung's characterization and contention that Section 6.2 is limited to components for the NVDIMM-P products.  Nothing in Section 6.2 referring to such a limitation. <br><br> Evidence: <br> • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at § 6.2. |

Samsung's own employees also recognized that the supply obligation was ***not*** limited to components for the NVDIMM-P product.

Evidence:

- Dkt. 142-10 [Netlist MSJ Ex. 23] (SEC000263) (February 2018 email from Yong Hwangbo, "there is an obligation to supply NAND/DRAM at a competitive price if N company makes a request.")
- Dkt. 145-12 [Netlist MSJ Ex. 8] (SEC000315) (February 2018 email from Yong Hwangbo, "there is an obligation to supply NAND/DRAM at a competitive price if N company makes a request.")
- Dkt. 145-11 [Netlist MSJ Ex. 7] (SEC001269) (January 2018 email from Hojung Kim, "Pursuant to the agreement, supply for NAND and DRAM products is necessary if there is a

|  |  |
|---|---|
| 1 | request from Netlist.") |
| 2 |  |
| 3 | Netlist has publicly, over multiple |
| 4 | years, indicated that the Section 6.2 |
| 5 | supply obligation was not limited to |
| 6 | merely components for NVDIMM-P. |
| 7 |  |
| 8 | Evidence: |
| 9 | • *E.g.*, Dkt. 150-4 [Samsung MSJ |
| 10 | Ex. 37] at p.5 ("We also resell |
| 11 | certain Samsung products that |
| 12 | we purchase under the terms of |
| 13 | our JDLA"); p.7 ("we resell |
| 14 | certain Samsung products that |
| 15 | we purchase under the terms of |
| 16 | our JDLA"), p.8 ("[O]ur JDLA |
| 17 | with Samsung contractually |
| 18 | commits Samsung to supply |
| 19 | NAND flash and DRAM |
| 20 | products to us upon our request |
| 21 | at competitive prices.") |
| 22 | • Dkt. 150-2 [Samsung MSJ Ex. 6] |
| 23 | at p.5 ("We have purchased |
| 24 | certain of these products, |
| 25 | including NAND flash and |
| 26 | DRAM products, from Samsung |
| 27 | under the terms of the JDLA."), |
| 28 |  |

p.8 ("We also purchase some of these component products from Samsung under the terms of the JDLA.")

- Dkt. 150-2 [Samsung MSJ Ex. 4] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p. 8 ("We also purchase some of these component products from Samsung under the terms of the JDLA, and from alternative suppliers, for the purpose of resale to customers directly").

- Dkt. 150-4 [Samsung MSJ Ex. 38] at p.5 ("We have purchased certain of these products, including SSDs, NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p.7 ("We also purchase some of these component products from Samsung under the terms of the JDLA").

- *See also* Dkt. 171-13, Ex. 85 to

| | |
|---|---|
| 1 | 8-30-21 LaMagna Decl. (Gail |
| 2 | Sasaki Dep. Tr.) at 305:14-306:3, |
| 3 | 309:1-21 (In connection with the |
| 4 | SEC filings' statements |
| 5 | concerning the absence of long- |
| 6 | term supply contracts, Gail |
| 7 | testified that the statement |
| 8 | appeared in portions of Netlist's |
| 9 | filings concerning "risk factors" |
| 10 | in which its general approach |
| 11 | was to "be[ ] very conservative |
| 12 | to say all the negative things that |
| 13 | [it] would to make sure that |
| 14 | should anything go wrong with |
| 15 | anything" all risks had been fully |
| 16 | disclosed to "the public."). |
| 17 | • Dkt. 171-24, Ex. 96 to 8-30-21 |
| 18 | LaMagna Decl. (Q2 2016 |
| 19 | Earnings Call) ("[T]hat was part |
| 20 | of the partnership and agreement |
| 21 | that we have with Samsung to |
| 22 | have access to their raw materials |
| 23 | as well as their – some of their |
| 24 | selected product lines and we are |
| 25 | seeing the benefit of that."). |
| 26 | • Dkt. 171-25, Ex. 97 to 8-30-21 |
| 27 | LaMagna Decl. (Q3 2016 |
| 28 | |

Earnings Call) ("In our partnership with Samsung, we continue to benefit from the unique access we have . . . to certain Samsung products in the enterprise space. This includes enterprise-grade, high- capacity SSDs and high-density DRAM modules. Product lines [that] Samsung is committed to supporting for the long-term. We have continued to grow the customer base for these products since we began shipments earlier this year.").

- *Id*. ("Further, the Samsung Corporation products provide synergistic value for our own product portfolio and open doors allowing our sales team to establish relationships with OEMs and data center customers.").

- Dkt. 171-26, Ex. 98 to 8-30-21 LaMagna Decl. (Q1 2017 Earnings Call) ("The year-over-year increase in revenue

primarily reflects the multiple benefits of our Joint Development Agreement with Samsung, which added the synergistic Samsung high-end memory products to our product offering.  On a consecutive quarterly basis, product revenue improved by 70%.).

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 238:15-24 (testifying that Netlist never "communicate[d] to Samsung that Samsung's obligation to supply NAND and DRAM products would be limited to NVDIMM-P.")

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 220:3-24, 222:19-223:8, 221:11-14, 238:15-24 (Netlist "absolutely [did] not" understand that the JDLA's supply provisions were "limited to NVDIMM-P" and it would not have executed the JDLA

| | |
|---|---|
| | had that been its understanding because it would not have provided sufficient consideration to Netlist. Nor did Samsung ever state to Netlist that its mandatory supply obligation was "limited to components for making NVDIMM-P products.")<br><br>*See also* Plaintiff's response and evidence to Samsung's addition SUF Nos. 17, 27 here as if incorporated herein. |
| 27. Samsung's supply obligations would only arise if and to the extent that the NVDIMM-P product was commercialized but this never occurred.<br><br>Choi Decl. ¶ 8, Exh. 7 at 31:9-12, 80:13-23, 92:4-12, 109:9-110:1, 116:3-9; ¶ 22, Exh. 21 at NL069668-69. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 21.<br><br>Disputed. Samsung's own employees understood that it had a supply obligation to Netlist, and that this supply obligation was ***not*** dependent on the commercialization of NVDIMM-P. *See* Plaintiff's response to Samsung's additional alleged SUF No. 26, *supra*, incorporated herein. |

|  | Evidence: |
|---|---|
|  | • Dkt. 145-18 [Netlist MSJ Ex. 14] (NL119258) (P.K. Hong's notes from meeting with Samsung in February 2016: "HS mentioned that he is now being **_told to support Netlist and will_**", "HS stated he **_will support any requests_**"; "But the positive note is Samsung **_will support_**") |
|  | • Dkt. 142-10 [Netlist MSJ Ex. 23] (SEC000263) (February 2018 email from Yong Hwangbo, "there is an obligation to supply NAND/DRAM at a competitive price if N company makes a request.") |
|  | • Dkt. 145-12 [Netlist MSJ Ex. 8] (SEC000315) (February 2018 email from Yong Hwangbo, "there is an obligation to supply NAND/DRAM at a competitive price if N company makes a request.") |
|  | • Dkt. 145-11 [Netlist MSJ Ex. 7] (SEC001269) (January 2018 |

| | |
|---|---|
| 1 | email from Hojung Kim, |
| 2 | "Pursuant to the agreement, |
| 3 | supply for NAND and DRAM |
| 4 | products is necessary if there is a |
| 5 | request from Netlist.") |
| 6 | |
| 7 | From "day one," Netlist's position from |
| 8 | 2015 to present has always been that |
| 9 | Section 6.2's supply obligation was not |
| 10 | limited to NVDIMM-P products. *See* |
| 11 | Plaintiff's response and evidence to |
| 12 | Samsung's additional alleged SUF Nos. |
| 13 | 17 and 26 as if incorporated herein. |
| 14 | |
| 15 | Netlist understood that by entering into |
| 16 | the JDLA, it had transitioned from an |
| 17 | "at-will customer . . . into a contractual |
| 18 | supply customer, which means [it] |
| 19 | would go right to the front of the line" |
| 20 | in obtaining the products that Samsung |
| 21 | had for sale and that its requests "must |
| 22 | be filled ahead of everyone" else. |
| 23 | |
| 24 | Evidence: |
| 25 | • *E.g.*, Dkt. 150-4 [Samsung MSJ |
| 26 | Ex. 37] at p.5 ("We also resell |
| 27 | certain Samsung products that |
| 28 | |

| | | |
|---|---|---|
| 1 | | we purchase under the terms of |
| 2 | | our JDLA"); p.7 ("we resell |
| 3 | | certain Samsung products that |
| 4 | | we purchase under the terms of |
| 5 | | our JDLA"), p.8 ("[O]ur JDLA |
| 6 | | with Samsung contractually |
| 7 | | commits Samsung to supply |
| 8 | | NAND flash and DRAM |
| 9 | | products to us upon our request |
| 10 | | at competitive prices.") |
| 11 | | • Dkt. 150-2 [Samsung MSJ Ex. 6] |
| 12 | | at p.5 ("We have purchased |
| 13 | | certain of these products, |
| 14 | | including NAND flash and |
| 15 | | DRAM products, from Samsung |
| 16 | | under the terms of the JDLA."), |
| 17 | | p.8 ("We also purchase some of |
| 18 | | these component products from |
| 19 | | Samsung under the terms of the |
| 20 | | JDLA.") |
| 21 | | • Dkt. 150-2 [Samsung MSJ Ex. 4] |
| 22 | | at p.5 ("We have purchased |
| 23 | | certain of these products, |
| 24 | | including NAND flash and |
| 25 | | DRAM products, from Samsung |
| 26 | | under the terms of the JDLA"), |
| 27 | | p. 8 ("We also purchase some of |
| 28 | | |

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO. 8:20-CV-993-MCS (ADS)

these component products from Samsung under the terms of the JDLA, and from alternative suppliers, for the purpose of resale to customers directly").

- Dkt. 150-4 [Samsung MSJ Ex. 38] at p.5 ("We have purchased certain of these products, including SSDs, NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p.7 ("We also purchase some of these component products from Samsung under the terms of the JDLA").

- *See also* Dkt. 171-13, Ex. 85 to 8-30-21 LaMagna Decl. (Gail Sasaki Dep. Tr.) at 305:14-306:3, 309:1-21 (In connection with the SEC filings' statements concerning the absence of long-term supply contracts, Gail testified that the statement appeared in portions of Netlist's filings concerning "risk factors" in which its general approach was to "be[ ] very conservative

1  to say all the negative things that

2  [it] would to make sure that

3  should anything go wrong with

4  anything" all risks had been fully

5  disclosed to "the public.").

6  • Dkt. 171-24, Ex. 96 to 8-30-21

7    LaMagna Decl. (Q2 2016

8    Earnings Call) ("[T]hat was part

9    of the partnership and agreement

10   that we have with Samsung to

11   have access to their raw materials

12   as well as their – some of their

13   selected product lines and we are

14   seeing the benefit of that.").

15 • Dkt. 171-25, Ex. 97 to 8-30-21

16   LaMagna Decl. (Q3 2016

17   Earnings Call) ("In our

18   partnership with Samsung, we

19   continue to benefit from the

20   unique access we have . . . to

21   certain Samsung products in the

22   enterprise space.  This includes

23   enterprise-grade, high- capacity

24   SSDs and high-density DRAM

25   modules.  Product lines [that]

26   Samsung is committed to

27   supporting for the long-term.

28

We have continued to grow the customer base for these products since we began shipments earlier this year.").

- *Id*. ("Further, the Samsung Corporation products provide synergistic value for our own product portfolio and open doors allowing our sales team to establish relationships with OEMs and data center customers.").

- Dkt. 171-26, Ex. 98 to 8-30-21 LaMagna Decl. (Q1 2017 Earnings Call) ("The year-over-year increase in revenue primarily reflects the multiple benefits of our Joint Development Agreement with Samsung, which added the synergistic Samsung high-end memory products to our product offering. On a consecutive quarterly basis, product revenue improved by 70%.).

- Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong

| | |
|---|---|
| | Dep. Tr.) at 124:5-9 (testifying that "the JDLA represented to move us from a non-customer and bypass the at-will customer . . . and tun us into a contractual supply customer."); 124:13-19 ("contracted customers, their obligations . . . must be filled ahead of everyone".). |
| 28. Netlist received all of the chips it needed to complete the initial phase of the NVDIMM-P product under the JDLA. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 46. |
| Choi Decl. ¶ 8, Exh. 7 at 88:10-89:5. | Disputed. |
| | Defendant's cited supporting evidence does not support the fact. Mr. Chuck Hong did not testify as to this fact. As noted below, the development of the NVDIMM-P product itself was never finished under the JDLA. |
| | Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 139:19-21 ("[D]ash P, again, |

| | | dash P never became a product…"). |
|---|---|---|
| | | Also disputed as immaterial because Section 6.2 of the JDLA is not limited to the completion of the initial phase of the NVDIMM-P product. |
| | | Evidence: |
| | | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at § 6.2. |
| 29. The NVDIMM-P product was never commercialized.<br><br>Choi Decl. ¶ 8, Exh. 7 at 109:21-110:1. | | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 47.<br><br>Undisputed. |
| 30. Netlist disclosed an agreement with SK Hynix on April 5, 2021, stating that contract "entitles Netlist to purchase up to $600,000,000 of SK Hynix memory products during the term . . ."<br><br>Choi Decl. ¶ 34, Exh. 33 at p.2. | | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 40.<br><br>Undisputed. |
| 31. Netlist CEO Chuck Hong's presentation to the Board in November | | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of |

| | |
|---|---|
| 2015, prepared by Netlist CFO Gail Sasaki, describes the technology collaboration and the cross-licensing of patents but makes no mention of Netlist's supposed broad supply agreement.<br><br>Choi Decl. ¶ 35, Exh. 34 at NL117923; ¶ 36, Exh. 35 at p.1. | its opening Motion for Summary Judgment, No. 41.<br><br>Disputed.<br><br>Defendant's cited supporting evidence does not support the fact.  Defendant does not cite to any board presentation, but rather to an email containing draft materials.  Defendant fails to identify supporting evidence for its fact.<br><br>Also disputed as immaterial.  The absence of a specific reference to Samsung's supply obligation in a presentation to Netlist's Board does not negate the existence of Samsung's contractual obligations, as stated in Section 6.2.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at Section 6.2.<br><br>In addition, it's immaterial because the JDLA contains an integration clause |

| | |
|---|---|
| | ("Except as otherwise stated herein, this Agreement and all Appendices attached hereto supersede all prior proposals, consents, agreements, and discussions, oral or written, between the Parties relating to the subject matter of this Agreement."). |
| | Evidence: |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at SEC000014. |
| 32. In its first annual report following the JDLA, Netlist disclosed the risks associated with not having a supply contract:<br><br>"Our ability to fulfill customer orders or produce qualification samples is dependent on a sufficient supply of field programmable gate arrays ("FPGAs"), DRAM ICs and NAND flash, which are essential components of our memory subsystems. There are a relatively small number of suppliers of FPGAs, DRAM ICs and NAND flash, and we purchase from only a subset of these suppliers. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 42.<br><br>Undisputed that the language quoted appears in the cited document.<br><br>Disputed as to the characterization that Netlist disclosed that it did "not hav[e] a supply contract" (*i.e.*, with Samsung), as the quoted language is taken out of context. Samsung quotes only the generalized "risk factors" for the company—carried over from |

| | |
|---|---|
| We have no long-term FPGA, DRAM or NAND flash supply contracts." (emphasis added)<br><br>Choi Decl. ¶ 19, Exh. 18 at p.13. | disclosures made in earlier years (*see* Ex. 3 (2014 10-K) at p. 14, Ex. 73 (2012 10-K) at p. 18, Ex. 74 (2013 10-K) at p. 22)—without regard to the specific disclosures expressly related to the JDLA made in the very same document.<br><br>First, Samsung ignores the express disclosure in the same cited document (Samsung MSJ Ex. 18, which is the same document as Samsung MSJ Ex. 36) that expressly states that Netlist has a supply contract with Samsung:<br><br>"**Further, our JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us on our request at competitive prices**."<br><br>Evidence:<br>• Dkt. 150-3 [Samsung MSJ Ex. 18 (*see also* Ex. 36, same)] at p. 6 (emphasis added).<br><br>Consistently and continuously, for every year since 2015, Netlist likewise |

| | repeatedly represented in other SEC |
| --- | --- |
| 1 | filings that it had a supply contract with |
| 2 | Samsung. |
| 3 | |
| 4 | |
| 5 | Evidence: |
| 6 | • *E.g.*, Dkt. 150-4 [Samsung MSJ |
| 7 | Ex. 37] at p.5 ("We also resell |
| 8 | certain Samsung products that |
| 9 | we purchase under the terms of |
| 10 | our JDLA"); p.7 ("we resell |
| 11 | certain Samsung products that |
| 12 | we purchase under the terms of |
| 13 | our JDLA"), p.8 ("[O]ur JDLA |
| 14 | with Samsung contractually |
| 15 | commits Samsung to supply |
| 16 | NAND flash and DRAM |
| 17 | products to us upon our request |
| 18 | at competitive prices.") |
| 19 | • Dkt. 150-2 [Samsung MSJ Ex. 6] |
| 20 | at p.5 ("We have purchased |
| 21 | certain of these products, |
| 22 | including NAND flash and |
| 23 | DRAM products, from Samsung |
| 24 | under the terms of the JDLA."), |
| 25 | p.8 ("We also purchase some of |
| 26 | these component products from |
| 27 | Samsung under the terms of the |
| 28 | |

JDLA.")

- Dkt. 150-2 [Samsung MSJ Ex. 4] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p. 8 ("We also purchase some of these component products from Samsung under the terms of the JDLA, and from alternative suppliers, for the purpose of resale to customers directly").

- Dkt. 150-4 [Samsung MSJ Ex. 38] at p.5 ("We have purchased certain of these products, including SSDs, NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p.7 ("We also purchase some of these component products from Samsung under the terms of the JDLA").

- *See also* Dkt. 171-13, Ex. 85 to 8-30-21 LaMagna Decl. (Gail Sasaki Dep. Tr.) at 305:14-306:3, 309:1-21 (In connection with the

| | |
|---|---|
| 1 | SEC filings' statements |
| 2 | concerning the absence of long- |
| 3 | term supply contracts, Gail |
| 4 | testified that the statement |
| 5 | appeared in portions of Netlist's |
| 6 | filings concerning "risk factors" |
| 7 | in which its general approach |
| 8 | was to "be[ ] very conservative |
| 9 | to say all the negative things that |
| 10 | [it] would to make sure that |
| 11 | should anything go wrong with |
| 12 | anything" all risks had been fully |
| 13 | disclosed to "the public."). |
| 14 | |
| 15 | And this is consistent with Netlist's |
| 16 | other public statements, such as on |
| 17 | investor earnings calls, when Netlist |
| 18 | repeatedly referenced its agreement |
| 19 | with Samsung, including the fact that |
| 20 | the agreement covered the sale of |
| 21 | NAND and DRAM product without |
| 22 | being limited to components for |
| 23 | NVDIMM-P. |
| 24 | |
| 25 | Evidence: |
| 26 | • Ex. 96 to 8-30-21 LaMagna |
| 27 | Decl. (Q2 2016 Earnings Call) |
| 28 | |

("[T]hat was part of the
partnership and agreement that
we have with Samsung to have
access to their raw materials as
well as their – some of their
selected product lines and we are
seeing the benefit of that.").

- Ex. 97 to 8-30-21 LaMagna
  Decl. (Q3 2016 Earnings Call)
  ("In our partnership with
  Samsung, we continue to benefit
  from the unique access we have .
  . . to certain Samsung products in
  the enterprise space.  This
  includes enterprise-grade, high-
  capacity SSDs and high-density
  DRAM modules.  Product lines
  [that] Samsung is committed to
  supporting for the long-term.
  We have continued to grow the
  customer base for these products
  since we began shipments earlier
  this year.").

- *Id.* ("Further, the Samsung
  Corporation products provide
  synergistic value for our own
  product portfolio and open doors

| | |
|---|---|
| | allowing our sales team to establish relationships with OEMs and data center customers."). |
| | • Ex. 98 to 8-30-21 LaMagna Decl. (Q1 2017 Earnings Call) ("The year-over-year increase in revenue primarily reflects the multiple benefits of our Joint Development Agreement with Samsung, which added the synergistic Samsung high-end memory products to our product offering. On a consecutive quarterly basis, product revenue improved by 70%.). |
| 33. Netlist repeatedly and consistently disclosed the risks associated with not having a long-term supply contract for DRAM and NAND in its annual reports before and after execution of the JDLA, each time stating that Netlist had "no long-term supply contracts" for these products. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 43.<br><br>Undisputed that the language quoted appears in the cited document.<br><br>Disputed as to the characterization that Netlist disclosed that it did "not hav[e] a supply contract" (*i.e.*, with Samsung), |

| | |
|---|---|
| Choi Decl. ¶ 74, Exh. 73 at p.18; ¶ 75, Exh. 74 at p.22; ¶ 4, Exh. 3 at p.14; ¶ 37, Exh. 36 at p.14; ¶ 19, Exh. 18 at p.13;   ¶ 38, Exh. 37 at p.19; ¶ 7, Exh. 6 at p.20; ¶ 5, Exh. 4 at p.22; ¶ 39, Exh. 38 at p.20; ¶ 40, Exh. 39 at p.15. | as the quoted language is taken out of context.  Samsung quotes only the generalized "risk factors" for the company—carried over from disclosures made in earlier years (*see* Ex. 3 (2014 10-K) at p. 14, Ex. 73 (2012 10-K) at p. 18, Ex. 74 (2013 10-K) at p. 22)—without regard to the specific disclosures expressly related to the JDLA made in the same document.<br><br>First, Samsung ignores the express disclosure in the quoted document (Samsung MSJ Ex. 18, which is the same document as Samsung MSJ Ex. 36) that expressly states that Netlist has a supply contract with Samsung: "Further, our JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us on our request at competitive prices."<br><br>Evidence:<br>• Dkt. 150-3 [Samsung MSJ Ex. 18 (*see also* Ex. 36, same)] at p. 6. |

Consistently and continuously, for every year since 2015, Netlist likewise repeatedly represented in other SEC filings that it had a supply contract with Samsung.

Evidence:

- *E.g.*, Dkt. 150-4 [Samsung MSJ Ex. 37] at p.5 ("We also resell certain Samsung products that we purchase under the terms of our JDLA"); p.7 ("we resell certain Samsung products that we purchase under the terms of our JDLA"), p.8 ("[O]ur JDLA with Samsung contractually commits Samsung to supply NAND flash and DRAM products to us upon our request at competitive prices.")
- Dkt. 150-2 [Samsung MSJ Ex. 6] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA."),

p.8 ("We also purchase some of these component products from Samsung under the terms of the JDLA.")

- Dkt. 150-2 [Samsung MSJ Ex. 4 (2018 10-K)] at p.5 ("We have purchased certain of these products, including NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p. 8 ("We also purchase some of these component products from Samsung under the terms of the JDLA, and from alternative suppliers, for the purpose of resale to customers directly").

- Dkt. 150-4 [Samsung MSJ Ex. 38 (2019 10-K)] at p.5 ("We have purchased certain of these products, including SSDs, NAND flash and DRAM products, from Samsung under the terms of the JDLA"), p.7 ("We also purchase some of these component products from Samsung under the terms of the

| | |
|---|---|
| 1 | JDLA"). |
| 2 | • *See also* Dkt. 171-13, Ex. 85 to |
| 3 | 8-30-21 LaMagna Decl. (Gail |
| 4 | Sasaki Dep. Tr.) at 305:14-306:3, |
| 5 | 309:1-21 (In connection with the |
| 6 | SEC filings' statements |
| 7 | concerning the absence of long- |
| 8 | term supply contracts, Gail |
| 9 | testified that the statement |
| 10 | appeared in portions of Netlist's |
| 11 | filings concerning "risk factors" |
| 12 | in which its general approach |
| 13 | was to "be[ ] very conservative |
| 14 | to say all the negative things that |
| 15 | [it] would to make sure that |
| 16 | should anything go wrong with |
| 17 | anything" all risks had been fully |
| 18 | disclosed to "the public.") |
| 19 | |
| 20 | And this is consistent with Netlist's |
| 21 | other public statements, such as on |
| 22 | investor earnings calls, when Netlist |
| 23 | repeatedly referenced its agreement |
| 24 | with Samsung, including the fact that |
| 25 | the agreement covered the sale of |
| 26 | NAND and DRAM product without |
| 27 | being limited to components for |
| 28 | |

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO. 8:20-CV-993-MCS (ADS)

| | |
|---|---|
| 1 | NVDIMM-P. |
| 2 | |
| 3 | Evidence: |
| 4 | • Ex. 96 to 8-30-21 LaMagna |
| 5 | Decl. (Q2 2016 Earnings Call) |
| 6 | ("[T]hat was part of the |
| 7 | partnership and agreement that |
| 8 | we have with Samsung to have |
| 9 | access to their raw materials as |
| 10 | well as their – some of their |
| 11 | selected product lines and we are |
| 12 | seeing the benefit of that."). |
| 13 | • Ex. 97 to 8-30-21 LaMagna |
| 14 | Decl. (Q3 2016 Earnings Call) |
| 15 | ("In our partnership with |
| 16 | Samsung, we continue to benefit |
| 17 | from the unique access we have . |
| 18 | . . to certain Samsung products in |
| 19 | the enterprise space.  This |
| 20 | includes enterprise-grade, high- |
| 21 | capacity SSDs and high-density |
| 22 | DRAM modules.  Product lines |
| 23 | [that] Samsung is committed to |
| 24 | supporting for the long-term. |
| 25 | We have continued to grow the |
| 26 | customer base for these products |
| 27 | since we began shipments earlier |
| 28 | |

this year.").

- *Id*. ("Further, the Samsung Corporation products provide synergistic value for our own product portfolio and open doors allowing our sales team to establish relationships with OEMs and data center customers.").

- Ex. 98 to 8-30-21 LaMagna Decl. (Q1 2017 Earnings Call) ("The year-over-year increase in revenue primarily reflects the multiple benefits of our Joint Development Agreement with Samsung, which added the synergistic Samsung high-end memory products to our product offering. On a consecutive quarterly basis, product revenue improved by 70%.).

Samsung even ignores nearby language in the "risk factors" disclosures in Netlist's statements where Netlist expressly discusses Samsung's supply of products to Netlist under the JDLA.

| | |
|---|---|
| | Evidence:<br><br>• *E.g.*, Dkt. 150-4 [Samsung MSJ Ex. 37] at p. 24 ("we resell certain Samsung products that we purchase under the terms of our JDLA with Samsung")<br><br>• Ex. 6 (2017 10-K) at p. 17 (referring to Samsung's "failure to comply with the terms of the JDLA regarding the supply of these products")<br><br>• Ex. 4 (2018 10-K) at p. 19 (referring to Samsung's "failure to comply with the terms of the JDLA regarding the supply of these products")<br><br>• Dkt. 150-4 [Samsung MSJ Ex. 38 (2019 10-K)] at p. 18 (referring to Samsung's "failure to comply with the terms of the JDLA regarding the supply of these products") |
| 34. A November 2, 2015 press release announcing the JDLA that Netlist was preparing had a headline stating "Netlist and Samsung Announce Strategic | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 44. |

| | |
|---|---|
| Alliance To Commercialize the First Unified Memory-Storage Architecture" and makes no mention of a supply agreement.<br><br>Choi Decl. ¶ 41, Exh. 40 at pp.2-5. | Disputed and immaterial.<br><br>Defendant's cited supporting evidence does not support the fact. Defendant's cited evidence is a draft containing proposed edits in tracked changes. It is not a November 2, 2015 press release. Moreover, the JDLA contains a confidentiality clause whereby Netlist cannot disclose in a press release unless Samsung consents to that disclosure. Here, Defendant offers no evidence that it ever consented to that disclosure. Regardless, it is immaterial because the presence or the absence of a discussion about Section 6.2 in a press release does not negate the existence of Section 6.2 in the contract itself. |
| 35. At a February 21, 2017 meeting, Netlist asked Samsung for a "New Partner Type" relationship that would require Samsung to provide "Product Allocation support for Netlist" and an "Official-Distributor Partnership Agreement." When Netlist made this ask, Samsung told Netlist that the JDLA | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 45.<br><br>Disputed but immaterial.<br><br>Defendant's cited supporting evidence |

| | |
|---|---|
| was not an avenue to support Netlist's standard products.<br><br>Choi Decl. ¶ 17, Exh. 16 at SEC008148, SEC008169; ¶ 42, Exh. 41 at SEC000474; ¶ 43, Exh. 42 at 43:22-45:3. | does not state the characterization ascribed to it by Defendant.<br><br>It is immaterial because the fact that Netlist wanted to discuss a "**new** partner type strategic development and distribution" with Samsung, which would include recognition of Netlist as "an Official-Distributor partner[]" even lower OEM pricing, inventory management by Samsung (instead of Netlist needing to take delivery of all orders), does not mean that Samsung did not have an existing supply obligation under the JDLA. Rather, on the face of the document cited by Samsung, Netlist is seeking additional benefits to what it had in the JDLA.<br><br>Evidence:<br><ul><li>Dkt. 150-3 [Samsung MSJ Ex. 16] (SEC008145) at SEC008170.</li></ul> |
| 36. Netlist has been a customer of Samsung since at least 2001, purchasing over $200 million of products, including NAND and DRAM components. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 1. |

| | |
|---|---|
| Choi Decl. ¶ 2, Exh. 1 at SEC008161; ¶ 3, Exh. 2 at 11:21-12:12, 13:10-20, 14:8-15. | Undisputed but immaterial.<br><br>The fact that Netlist purchased products from Samsung in prior years does not illuminate whether Netlist had a supply obligation that was breached. |
| 37. Both before and after the JDLA and to the present, Samsung has been a significant and continuous supplier of NAND and DRAM to Netlist, as reflected in Netlist's annual reports.<br><br>Choi Decl. ¶ 4, Exh. 3 at p.6; ¶ 5, Exh. 4 at p.8; ¶ 6, Exh. 5 at 294:4-18; ¶ 7, Exh. 6 at F-36; ¶ 3, Exh. 2 at 185:10-186:1, 187:21-188:5. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 2.<br><br>Disputed and immaterial.  It is immaterial because the fact that Samsung and Netlist had an at-will sales relationship prior to the JDLA is immaterial to whether Samsung had a contractual obligation under the JDLA and whether Samsung breached it.<br><br>Also, the amount of products Netlist purchased from Samsung varied dramatically from year to year. Samsung was ***not*** "continuous[ly]" a "significant" supplier of NAND and DRAM to Netlist before the parties entered into the JDLA. |

For example, in the year leading up to the execution of the JDLA, Samsung was a relatively minor supplier for Netlist and did not consistently supply products to Netlist.

Evidence:

- Ex. 75 to the August 30, 2021 LaMagna Declaration ("8-30-21 LaMagna Decl. (Samsung invoices from 2015 prior to signing of the JDLA, totaling $23,343.00)
- Chuck Hong Decl. [Dkt. 145-3], ¶ 8 ("Before the JDLA was signed, Samsung supplied effectively no product to Netlist and the relationship was *ad hoc*.").

To the extent that Samsung's additional SUF No. 37 is read as covering the period during the contract (November 2015 through July 2020), Samsung was also not "continuous[ly]" a "significant" supplier of NAND and

DRAM to Netlist during the breach period because they also periodically cut supply, including setting Netlist's allocation at times to zero. *See* Plaintiff's response and evidence to Samsung's additional alleged SUF No. 49 as if incorporated herein.

Evidence:

- Dkt. 171-4, Ex. 76 to 8-30-21 LaMagna Decl. (Akemann Report), ¶¶ 123, 127, Exhibit 4 (Monthly Samsung Orders)
- Chuck Hong Decl. [Dkt. 145-3], ¶ 10 ("In the quarters after Samsung's zero-allocation decision, Samsung's supply to Netlist of DRAM and NAND dropped by more than two thirds. By the third quarter after this decision, the supply from Samsung trickled to virtually nothing.")

Defendant's cited supporting evidence does not support the alleged fact.

| | |
|---|---|
| | Evidence: |
| | • Dkt. 150-2 [Samsung MSJ Ex. 4] at p.8 indicates that among Netlist's suppliers in 2018, Samsung was the **smallest** supplier. |
| | • Dkt. 151-1 [Samsung MSJ Ex. 5] (Gail Sasaki Dep. Tr.) at 294:4-18 states that Samsung comprised "more than 10% of our total purchases in 2013." |
| | • None of Defendant's exhibits cited covers post-2018 time frame. |
| 38. Netlist also purchased NAND and DRAM products from SK Hynix and Micron, as well as from sellers who purchased the products from the manufacturers for resale.<br><br>Choi Decl. ¶ 4, Exh. 3 at p.6; ¶ 6, Exh. 5 at 194:2-22, 294:4-18; ¶ 3, Exh. 2 at 205:23-206:18, 207:21-208:10. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 3.<br><br>Undisputed but immaterial.<br><br>The fact that Netlist purchased products from other manufacturers when Netlist's customers needed a product specifically manufactured by SK Hynix or Micron, where Samsung's product was not qualified, is immaterial to the |

motion.

Evidence:

- Chuck Hong Decl. [Dkt. 145-3], ¶¶ 6 ("Therefore, a server or storage manufacturer cannot simply replace a Hynix or Micron server memory for a Samsung server memory without re-qualification or, in some cases, a redesign of their server systems. Further, NAND and DRAM sourced in secondary channels from a third party are often of inferior quality compared to those components procured directly from the manufacturer. It would thus be risky to buy Samsung products from a third party without screening those products ahead of manufacturing and shipment."), 7 ("For these reasons, after the JDLA was signed, Netlist attempted to fill its entire requirement for Samsung-qualified NAND and

| | |
|---|---|
| | • DRAM from Samsung."). <br> • Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) 218:17-220:2. |
| 39. The amount of NAND and DRAM product that Samsung can manufacture for sale is limited and demand for its products oftentimes exceeds available supply. <br><br> Choi Decl. ¶ 8, Exh. 7 at 121:24-122:13; Dkt. 89-21 at ¶ 4. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 4. <br><br> Disputed and immaterial. <br><br> There is no allegation of breach based on Netlist's requests for products that exceeded Samsung's manufacturing capacity. Nor is there evidence that Netlist's demand for products "often times" exceeded Samsung's supply. To the extent there was ever a supply constraint, Netlist should have been prioritized over other customers to whom Samsung did not have a supply obligation. <br><br> Evidence: <br> • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001), § 6 <br> • Dkt. 171-5, Ex. 77 to 8-30-21 |

LaMagna Decl. (Harrison Yoo Dep. Tr.) at 68:11-18 (testifying that the allocation for Netlist was moved to Ma Lab)

- Dkt. 171-6, Ex. 78 to 8-30-21 LaMagna Decl. (SEC0003842) ("We should make a decision for Netlist support, then we can utilize Netlist SSD PA for Ma Lab support.")

- Dkt. 142-8 [Netlist MSJ Ex. 21] (SEC116009) ("As of now, we pulled all PAs for Netlist and distributed them to other customers such as Ma Lab.")

- Dkt.170-2, Ex. 79 to 8-30-21 LaMagna Decl. (SEC060292) ("We don't have Q3 PA to support Netlist. All of PA is assigned for Corsair and Ma Labs support.").

While Samsung was scaling back allocation for Netlist, it was increasing allocation for its other customers.

- Dkt. 142-12 [Netlist MSJ Ex. 33] (SEC126794) (Southwest Region

slide deck, titled "JS CHOI Final 3.pptx," in which Samsung projected that Virtium and Smart Modular's forecasts would increase, unlike Netlist's forecasts).

Netlist is one of the few customers that has a supply agreement with Samsung; Samsung does not have a supply agreement with most of its customers.

Evidence:

- Samsung's Interrogatory Response No. 22 ("Excluding individual purchase orders, none of the Similarly Situated Customers currently has an agreement with Samsung that obligates Samsung to supply any quantity of NAND or DRAM products.")
- Ex. 77 to LaMagna Decl. (Harrison Yoo Dep. Tr.) at 13:4-24 (identifying only Ma Lab as a customer other than Netlist with a supply agreement).

| | |
|---|---|
| 40. Due to the nature of the industry, Netlist, like other customers, provides Samsung with forecasts of the amount of product it wishes to purchase, and Samsung lets Netlist know how much product it can allocate to Netlist for purchase.<br><br>Choi Decl. ¶ 9, Exh. 8; ¶ 10, Exh. 9; ¶ 3, Exh. 2 at 35:10-36:13, 37:9-22, 61:25-62:5. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 5.<br><br>Undisputed in part that Netlist submitted forecasts for the amount of products requested. Disputed in part that Netlist submitted the forecasts "due to the nature of the industry." Netlist did so because Samsung demanded that this be the process.<br><br>Evidence:<br>• Dkt. 171-9, Ex. 81 to 8-30-21 LaMagna Decl. (Lane Kim Dep. Tr.) at 27:21-29:23 (testifying about Samsung's forecast and purchase order process).<br>• Dkt. 171-10, Ex. 82 to 8-30-21 LaMagna Decl. (Raymond Jiang Dep. Tr.) at 32:18-33:9 (testifying that in addition to submitting forecasts via email, he would also call Samsung to ask about product availability). |

| | |
|---|---|
| 41. Following these discussions regarding allocations and availability, Netlist issued purchase orders for specific amounts of product that Samsung approved beforehand.<br><br>Choi Decl. ¶ 12, Exh. 11 at 23:23-24:5; ¶ 3, Exh. 2 at 62:6-14; ¶ 13, Exh. 12 at 28:4-25. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 6.<br><br>Disputed.<br><br>Samsung did not engage in "discussions regarding allocations and availability" with Netlist.<br><br>Between November 15, 2015 until Q2 2017, Samsung agreed to allow Netlist to submit purchase orders for amounts commensurate with Netlist's requests.<br><br>Evidence:<br><ul><li>Dkt. 171-9, Ex. 81 to 8-30-21 LaMagna Decl. at (Lane Kim Dep. Tr.) 27:21-29:23 (testifying about forecast and purchase order process).</li><li>P.K. Hong Decl. [Dkt. 145-2], ¶¶ 3-4.</li><li>Chuck Hong Decl. [Dkt. 145-3], ¶ 8.</li></ul> |

| | From Q3 2017 onward, Samsung unliterally determined what it would or would not sell to Netlist (there were no "discussions"). *See* Plaintiff's response and evidence to Samsung's additional alleged SUF No. 49 as if incorporated herein. |
|---|---|
| 42. Samsung accepted and fulfilled some of the purchase orders, put some on backlog, and rejected others, just as it did with other customers. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 7. |
| Choi Decl. ¶ 12, Exh. 11 at 36:8-11; Choi Decl. ¶ 3, Exh. 2 at 45:2-46:8, 62:6-14. | Undisputed that Samsung put "some on backlog, and rejected others." Undisputed but immaterial that Samsung "fulfilled some of the purchase orders." Netlist's claims concern the requests and purchase orders that Samsung ***did not*** fulfill. |
| | Disputed as to the comparison to "other customers." The evidence shows that Samsung treated Netlist worse than other customers, by unilaterally capping and cutting supply. *See* Plaintiff's response and evidence to Samsung's additional alleged SUF No. |

| | |
|---|---|
| | 49 as if incorporated herein. |
| | |
| | In addition, with respect to backlogs, Samsung frequently did not carry over backlog for Netlist. |
| | |
| | Evidence: |
| | • Dkt. 142-3 [Netlist MSJ Ex. 15] (SEC005294) (June 2017 email in which Knuth reports that he convinced Netlist to cancel $2 million in backlog). |
| | |
| | Defendant's cited supporting evidence does not support the fact. |
| | |
| | Evidence: |
| | • Defendant cites to the deposition testimony of Netlist witnesses (Steven Yu and P. K. Hong deposition transcripts, respectively). Neither exhibit speaks to what Samsung did with "other customers." |
| 43. This business protocol—the use of backlogs, forecasts, allocations, and purchases orders—remained the same | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary |

| | |
|---|---|
| throughout the parties' long standing business relationship and even after the JDLA was executed.<br><br>Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 62:6-14; ¶ 14, Exh. 13 at NL004680. | Judgment, No. 8.<br><br>As to the parties' dealings outside of the contract period, those dealings are irrelevant to Samsung's breach during the contract period.<br><br>Disputed as to the "business protocol," which, per Plaintiff's responses to Samsung's additional alleged SUF Nos. 40-42 incorporated herein, is disputed between the parties.<br><br>In particular, during the contract period, the use of backlogs, forecasts, allocations, and purchases orders did not "remain the same." *See* Plaintiff's response and evidence to Samsung's additional alleged SUF Nos. 40-42 as if incorporated herein.<br><br>During the term of the JDLA, in Q2 2017, notwithstanding any historical business protocol, Samsung began to refuse to supply any products to Netlist, regardless of protocol, and/or capped the amount of products that could be |

| | |
|---|---|
| | purchased.  *See* Plaintiff's response and evidence to Samsung's additional alleged SUF No. 49 as if incorporated herein. |
| | Defendant's cited supporting evidence does not support the proposition that the "business protocol . . . ***remained the same*** throughout the parties' longstanding business relationship." |
| 44. After the JDLA, Samsung continued to supply Netlist with NAND and DRAM outside of the joint development context.<br><br>Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 54:24-55:10, 183:3-15, 184:8-20. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 52.<br><br>To the extent this is construed to mean after the JDLA (i.e., after termination July 15, 2020), it is undisputed that Samsung continued to supply Netlist with ***some*** NAND and DRAM products.  But this is immaterial because conduct after the JDLA is not relevant to whether was a breach of the JDLA prior to termination.<br><br>To the extent Defendant is referring to the period after the ***execution*** of the |

| | |
|---|---|
| | JDLA, disputed to the extent it is construed as meaning in compliance with Section 6.2 of the JDLA. |
| | In Q2 2017, Samsung began to refuse to supply any products to Netlist, and/or capped the amount of products that could be purchased. *See* Plaintiff's response and evidence to Samsung's additional alleged SUF Nos. 37 and 45 as if incorporated herein. |
| 45. Samsung's sales to Netlist have continued from 2001 to the present day, according to the same course of dealing that existed before the JDLA, after the JDLA, and continue to this day after Netlist purported to terminate the JDLA and filed this lawsuit.<br><br>Choi Decl. ¶ 21, Exh. 11 at 25:6-25, 201:9-18; ¶ 3, Exh. 2 at 27:21-28:12, 35:23-36:13, 37:18-22, 47:24-50:4, 183:3-15, 184:8-20. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 53.<br><br>Disputed and immaterial.<br><br>The fact that Samsung and Netlist conducted at-will sales transactions prior to or after the JDLA is immaterial to whether Samsung had a contractual obligation under the JDLA and whether Samsung breached it.<br><br>Disputed as to the representation that the "same course of dealing" existed or |

"continued" from 2001 to the present—it did not. For example, in 2015 prior to the signing of the JDLA, Samsung sold close to no products to Netlist.

Evidence:

- Dkt. 171-3, Ex. 75 to 8-30-21 LaMagna Decl. (excerpt of NL117869) (Samsung invoices from 2015 prior to signing of the JDLA, totaling $23,343.00)
- Chuck Hong Decl. [Dkt. 145-3], ¶ 8 ("Before the JDLA was signed, Samsung supplied effectively no product to Netlist and the relationship was *ad hoc*.").

In 2016, Samsung largely supplied Netlist with NAND and DRAM products that Netlist requested.

Evidence:

- P.K. Hong Decl. [Dkt. 145-2], ¶¶ 3-4.
- Chuck Hong Decl. [Dkt. 145-3], ¶ 8.

But starting in Q2 2017 and until the termination of the JDLA, Samsung frequently and repeatedly rejected purchase orders and/or refused to supply products, including by imposing a "zero allocation" on Netlist, in derogation of the supply obligation.

Evidence:
- Dkt. 142-5 [Netlist MSJ Ex. 18] (SEC058105) (May 2017 email from Steven Metz stating that he informed Netlist that "Samsung had zero allocation in Q3 to support Netlist" or Netlist's customers)
- Dkt. 171-15, Ex. 87 to 8-30-21 LaMagna Decl. (NL063129) (April 2017 email from Raymond Jiang to Neal Knuth, in which Samsung refused to supply Netlist with SM863a and PM863a products not because they weren't available, but because Samsung decided to provide them to Ma Labs instead.

1    Jiang emails Knuth, "with lack of
2    support from Samsung, we may
3    end up losing these OEM
4    customers.")

5    • Dkt. 171-16, Ex. 88 to 8-30-21
6    LaMagna Decl. (SEC143892) (In
7    September 2017, Lane Kim
8    instructs Neal Knuth to not ship
9    out $250k of products that Netlist
10   requested in September 2017,
11   even though the products were
12   on hand in the warehouse ready
13   for shipment because of the $1
14   million allocation cap)

15   • Chuck Hong Decl. [Dkt. 145-3],
16   ¶ 8.

17   • Dkt. 145-18 [Netlist MSJ Ex. 14]
18   (NL119258) (PK Hong circulates
19   notes from meeting with
20   Samsung in February 2016: "***HS***
21   ***mentioned that up to a year ago***
22   ***– he was told not to support***
23   ***Netlist***.  He actually was not
24   allowed to visit Netlist.  GAM
25   conflict.  This comes from our
26   VLP business at IBM.  He
27   mentioned that he is now being

28

told to support Netlist and will")

- Dkt. 142-5 [Netlist MSJ Ex. 18] (SEC058105) (in May 2017, Knuth conveyed to Netlist that **Samsung had no support** for Q3 2017; Metz also communicated to Paik Ki Hong that "Samsung had *zero allocation in Q3 to support Netlist and/or the end customers Netlist is currently supporting*")

- Dkt. 145-38 [Netlist MSJ Ex. 34] (NL020770) (January 2018 email from Paik Ki Hong to Steven Metz, "I was just told that Samsung North America had decided to give Netlis*t $0 allocation and no support*. This is a problem . . . We have a JDLA that states Samsung will support Netlist. We have on paper that Samsung will support Netlist with components for NVDIMM.")

- Dkt. 170-3, Ex. 89 to 8-30-21 LaMagna Decl. (SEC000379) at SEC000383 (February 2018

| | |
|---|---|
| 1 | "Southwest Region Weekly |
| 2 | Report" noting, "Netlist backlog |
| 3 | is being addressed and ***sales will*** |
| 4 | ***be little/no moving forward***."); |
| 5 | SEC000387 ("Netlist:  Account |
| 6 | will be closed in 2018"). |
| 7 | • Dkt. 145-39 [Netlist MSJ Ex. 35] |
| 8 | (NL020775) (In February 2018, |
| 9 | Paik Ki Hong emailed Neal |
| 10 | Knuth, "In Jan. '18, Samsung |
| 11 | ***stopped shipments all together***. |
| 12 | ***These drastic changes have*** |
| 13 | ***impacted our business and*** |
| 14 | ***impacted our ability to support*** |
| 15 | ***our customers***.  We need |
| 16 | Samsung to support the forecast |
| 17 | we have included in this email." |
| 18 | • Dkt. 171-18, Ex. 90 to 8-30-21 |
| 19 | LaMagna Decl. (Knuth Dep. Tr.) |
| 20 | at 165:19-24 (testifying that in |
| 21 | February 2018, Samsung had |
| 22 | imposed a zero allocation for |
| 23 | Netlist). |
| 24 | |
| 25 | *See also* Plaintiff's response and |
| 26 | evidence to Samsung's additional |
| 27 | alleged SUF No. 37 incorporated |
| 28 | |

NETLIST INC'S STATEMENT OF GENUINE DISPUTES OF
MATERIAL FACT
CASE NO. 8:20-CV-993-MCS (ADS)

| | |
|---|---|
| | herein. |
| 46. Netlist understood that the JDLA did not guarantee it access to all of the Samsung product it requested, but only the product that Samsung actually agreed to sell.<br><br>Choi Decl. ¶ 3, Exh. 2 at 47:24-50:6, 54:24-55:10, 91:10-93:24, 94:6-21, 183:3-15, 184:8-20; ¶ 53, Exh. 52 at NL002024-2027; ¶ 54, Exh. 53; ¶ 46, Exh. 45; ¶ 49, Exh. 48. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 54.<br><br>Disputed.<br><br>Pursuant to the JDLA, Netlist expected that Samsung would be obligated under the supply provision to "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price," not "only the product that Samsung actually agreed to sell."<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at § 6.2.<br><br>Contrary to Defendant's representation of Mr. Paik Ki Hong's deposition testimony, Mr. Hong in fact testified that Samsung did not fulfill ***Netlist's requests*** for products.<br>• Dkt. 171-11, Ex. 83 to 8-30-21 LaMagna Decl. (Paik Ki Hong |

Dep. Tr.) at 261:23-262:22.

- Paik Ki Hong Decl. [Dkt. 145-2], ¶ 3 ("Samsung agreed to supply NAND and DRAM to Netlist at Netlist's request and at a competitive price.").

- *See also* Dkt. 145-38 [Netlist MSJ Ex. 34] (NL020770) (January 2018 email from P.K. Hong to Steven Metz, "I was just told that Samsung North America had decided to give Netlist $0 allocation and no support. This is a problem . . . ***We have a JDLA that states Samsung will support Netlist***. We have on paper that Samsung will support Netlist with components for NVDIMM.")

Likewise, Netlist's other employees held the same belief.

- Chuck Hong Decl. [Dkt. 145-3], ¶ 5 (the "supply obligation was firm and binding. Netlist and Samsung executed a Joint Development and License

| | |
|---|---|
| | Agreement ("JDLA") in November 2015.") |
| | • Dkt. 171-10, Ex. 82 to 8-30-21 LaMagna Decl. (Raymond Jiang Dep. Tr.) at 206:6-19. |
| | Netlist's reasonable accommodations to Samsung do not prove that Netlist believed that Samsung was only required to sell what it wanted to. |
| | Evidence: |
| | • Choi Decl. ¶ 53, Exh. 52 at NL002024-2027; ¶ 54, Exh. 53 at pp. 1, 2; ¶ 46, Exh. 45; ¶ 49, Exh. 48. |
| | • Dkt. 151-1 [Samsung MSJ Ex. 2] (Paik Ki Hong Dep. Tr.) at 93:22-24 (testifying that Netlist "would submit POs for whatever Samsung told us they could support, ***but it's still a fraction of our request***. To get parts, you have to issue a PO.") |
| 47. Due to Samsung needing lead time for production, Netlist submitted forecasts of its requests, and discussed | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary |

| | |
|---|---|
| with Samsung how much material would be allocated and made available to it.<br><br>Choi Decl. ¶ 3, Exh. 2 at 48:10-12.; ¶ 13, Exh. 12 at 152:5-153:24. | Judgment, No. 55.<br><br>Disputed and immaterial.<br><br>Netlist did not submit forecasts **due to** Samsung needing lead time. Netlist submitted forecasts because that is what Samsung required Netlist to do. Even when Samsung had products in stock, they chose not to ship products to Netlist because of its product allocation cap and/or zero allocation.<br><br>Evidence:<br><ul><li>Dkt. 171-16, Ex. 88 to 8-30-21 LaMagna Decl. (SEC143892) (In September 2017, Lane Kim instructs Neal Knuth to not ship out $250k of products that Netlist requested in September 2017, even though the products were on hand in the warehouse ready for shipment because of the $1 million allocation cap).</li></ul><br>Defendant's cited supporting evidence does not support the fact. Defendant |

|   |   |
|---|---|
| 1 | cites to the deposition transcripts of |
| 2 | Netlist's Chuck Hong and Raymond |
| 3 | Jiang. Neither witness testified as to |
| 4 | Samsung's production schedule or |
| 5 | knowledge regarding Samsung's need |
| 6 | for lead time. |
| 7 |   |
| 8 | Also disputed that the parties |
| 9 | "discussed with Samsung how much |
| 10 | material would be allocated and made |
| 11 | available to it." After Q2 2017, |
| 12 | Samsung unilaterally decided what |
| 13 | product it would sell to Netlist or not. |
| 14 | There was no "discussion." *See* |
| 15 | Plaintiff's response and evidence to |
| 16 | Samsung's additional alleged SUF No. |
| 17 | 45 incorporated herein. |
| 18 |   |
| 19 | Regardless, it is immaterial because |
| 20 | whether we submit forecasts or not, |
| 21 | Samsung still refused to sell Netlist the |
| 22 | requested product and/or did not fulfill |
| 23 | orders placed by Netlist. *See* Plaintiff's |
| 24 | response and evidence to Samsung's |
| 25 | additional alleged SUF Nos. 43 and 45 |
| 26 | as if incorporated herein. |

| | |
|---|---|
| 48. Netlist only submitted purchase orders for specific quantities of product after Samsung indicated that such product would be available. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 56. |
| Choi Decl. ¶ 12, Exh. 11 at 23:23-24:5; ¶ 3, Exh. 2 at 62:6-14, 93:18-24; ¶ 13, Exh. 12 at 154:3-20. | Disputed. |
| | Defendant's cited supporting evidence does not support the fact. Defendant refused orders even when it had products available but were expected to be forthcoming. From time to time, Samsung also took orders for products that were not immediately available and placed Netlist's orders on backlogs. |
| | Evidence: |
| | • Dkt. 171-15, Ex. 87 to 8-30-21 LaMagna Decl. (NL063129) (April 2017 email from Raymond Jiang to Neal Knuth, in which Samsung refused to supply Netlist with SM863a and PM863a products not because they weren't available, but because Samsung decided to provide them to Ma Labs instead. |

| | |
|---|---|
| | Jiang emails Knuth, "with lack of support from Samsung, we may end up losing these OEM customers.") |
| | • Dkt. 171-16, Ex. 88 to 8-30-21 LaMagna Decl. (SEC143892) (In September 2017, Lane Kim instructs Neal Knuth to not ship out $250k of products that Netlist requested in September 2017, even though the products were on hand in the warehouse ready for shipment because of the $1 million allocation cap). |
| | Evidence: |
| | • Paik Ki Hong Depo Tr. 62:8-9 ("*in most cases*, we would issue POs on what Samsung could support.") (emphasis added). |
| 49. Netlist purchased a substantial amount of NAND and DRAM from Samsung in each quarter from November 2015 to the present, although the amounts varied over time. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 58. Undisputed that Samsung sold to Netlist some amount of product in |

| | |
|---|---|
| Choi Decl. ¶ 51, Exh. 50 at F-36, F-34, F-36, F-36, F-36, 77; ¶ 52, Exh. 51; ¶ 3, Exh. 2 at 186:16-188:5; ¶ 7, Exh. 6 at p.8. | every quarter from November 2015 to the present, but immaterial because Netlist's claim is that not that Samsung failed to supply any product—Netlist's claim is that Samsung did not supply Netlist the amount of products requested.

Disputed as to the characterization of "a substantial amount." Starting in Q2 2017, Samsung at times allocated Netlist anywhere from zero to no more than a $1 million per month, which was insubstantial to meet Netlist's product needs.

Evidence:
- Dkt. 171-4, Ex. 76 to 8-30-21 LaMagna Decl. (Akemann Opening Report), ¶ 123 ("from Q2 2017 through July 15, 2020, Netlist only received 48% of units ordered and 67% of dollar volume ordered. And in the period leading up to this lawsuit and Netlist's notice to cure and termination (i.e., from April 1, |

2020 through July 15, 2020), Netlist only received 7% of units ordered and 51% of dollar volume ordered")

- Dkt. 171-6, Ex. 76 to 8-30-21 LaMagna Decl. (Akemann Report), Exhibit 4 (Monthly Samsung Orders)

- Dkt. 171-18, Ex. 90 to 8-30-21 LaMagna Decl. (Knuth Dep. Tr.) at 165:19-24 (testifying that in February 2018, Samsung had imposed a *zero allocation* for Netlist).

- Dkt. 142-15 [Netlist MSJ Ex. 18] (SEC058105) (in May 2017, Knuth conveyed to Netlist that *Samsung had no support* for Q3 2017; Metz also communicated to Paik Ki Hong that "Samsung had *zero allocation in Q3 to support Netlist and/or the end customers Netlist is currently supporting*"; Metz also writes, "Heads up. Since Samsung is nearly 100% of their support, and Revenue this will have a

dramatic impact on their financials and future business.")

- Dkt. 145-38 [Netlist MSJ Ex. 34] (NL020770) (January 2018 email from Paik Ki Hong to Steven Metz, "I was just told that Samsung North America had decided to give Netlist **$0 allocation and no support**. This is a problem . . . We have a JDLA that states Samsung will support Netlist. We have on paper that Samsung will support Netlist with components for NVDIMM.")

- Dkt. 179-3, Ex. 89 to 8-30-21 LaMagna Decl. (SEC000379) at SEC000383 (February 2018 "Southwest Region Weekly Report" noting, "Netlist backlog is being addressed and *sales will be little/no moving forward*."); SEC000387 ("Netlist: Account will be closed in 2018").

- Dkt. 145-39 [Netlist MSJ Ex. 35] (NL020775) (In February 2018, Paik Ki Hong emailed Neal

| | |
|---|---|
| | Knuth, "In Jan. '18, Samsung **stopped shipments all together**. **These drastic changes have impacted our business and impacted our ability to support our customers**.  We need Samsung to support the forecast we have included in this email.") |
| | • Dkt. 152-2 [Samsung MSJ Ex. 58] (NL000078). |
| | *See* Plaintiff's response and evidence to Samsung's additional alleged SUF No. 45 as if incorporated herein. |
| 50. According to their own terms, Netlist's purchase orders superseded any prior agreements or discussions with Samsung, such as forecasts and informal e-mail or oral requests to purchase product.

Choi Decl. ¶ 55, Exh. 54 at pp.3, 6, 9, § 28; ¶ 53, Exh. 52 at NL002029. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 58.

Disputed.

Netlist's purchase orders do not "supersede any prior agreements or discussions with Samsung."  There is nothing in the purchase orders that requires superseding the JDLA or absolves Samsung of its obligation to fulfill Netlist's requests for products. |

| | Section 28 of the cited purchase order (in Samsung MSJ Ex. 54) states the agreement sets forth the entire agreement for the subject matter hereof. The subject matter of the purchase orders is the specific quantity, price, and delivery terms for the products listed in the purchase order. Those terms supplied by the purchase order are not in the JDLA, and therefore there is no tension between the two. The purchase order does not cover the requests for product that Samsung refuses that are then not memorialized in the purchase order to begin with. |
| | |
| | Evidence: |
| | <ul><li>Choi Decl. ¶ 55, Exh. 54 at pp. 3, 6, 9, § 28; ¶ 53, Exh. 52 at NL002029.</li></ul> |
| 51. In 2017, Netlist asked Samsung for Embedded MultiMediaCard (eMMC) supply.<br><br>Choi Decl. ¶ 3, Exh. 2 at 195:10-12. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 61.<br><br>Undisputed. |

| | |
|---|---|
| 52. Samsung does not normally sell eMMC to channel distributors like Netlist, but, after CEO Chuck Hong asked President Jun for support, Samsung agreed to support Netlist's requests.<br><br>Choi Decl. ¶ 11, Exh. 10 at 63:17-64:16, 85:17-87:2. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 62.<br><br>Disputed and immaterial. Whether Samsung "normally" sells EMMC to channel distributors is irrelevant, because Netlist has a supply agreement with Samsung that others do not have.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001), § 6.2.<br><br>Defendant's cited supporting evidence also does not support the fact.<br><br>Evidence:<br>• Dkt. 150-2 [Samsung MSJ Ex. 10] (Harrison Yoo Dep. Tr.) just states that it is "difficult to locate those products," not that Samsung "does not normally sell" eMMC. |

| | |
|---|---|
| 53. Samsung allocated a significant amount of EMMC product to Netlist for 2017, much of which been allocated to another customer.<br><br>Choi Decl. ¶ 11, Exh. 10 at 85:17-87:2. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 63.<br><br>Undisputed that Samsung offered to sell eMMC products to Netlist in 2017.<br><br>Disputed in part as to the characterization of "significant amount."<br><br>Defendant's cited supporting evidence does not support the fact. The deponent cited by Defendant (Samsung MSJ Ex. 10) does not say that it was a "significant" amount nor does he say that "much of" the products were previously allocated to another customer. |
| 54. After purchases orders had been submitted and prices for eMMC dropped unexpectedly in the second half of 2017, Netlist cancelled half of its eMMC order. Netlist CEO Chuck Hong testified that cancelling a purchase order | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 64.<br><br>Undisputed that Netlist cancelled part of the eMMC order but immaterial |

| | |
|---|---|
| constitutes non-performance under the JDLA. | because Netlist's cancellation was not a violation of the JDLA (or of the related purchase order). |
| Choi Decl. ¶ 3, Exh. 2 at 194:8-196:10; ¶ 59, Exh. 58 at NL000091; ¶ 11, Exh. 10 at 85:17-87:2; ¶ 8, Exh. 7 at 164:11-21. | Netlist cancelled part of the eMMC order only after Samsung refused to timely provide product to Netlist at a competitive price as required by Section 6.2. |
| | Evidence: |
| | • Dkt. 152-2 [Samsung MSJ Ex. 58] (NL000078) at NL000091. |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001), § 6.2. |
| | Disputed that Chuck Hong testified that Netlist's cancellation of a purchase order constitutes non-performance under the JDLA. |
| | Chuck Hong testified that ***Samsung's*** cancellation of purchase orders violates the Section 6.2 of the JDLA—Mr. Hong never testified that it was a violation of the JDLA for Netlist to cancel orders, much less to do so after |

| | |
|---|---|
| | Samsung had breached its obligations, e.g., by failing to provide a competitive price or by failing to deliver ordered products.<br><br>Evidence:<br>• Dkt. 157-4 [Samsung MSJ Ex. 7] (Chuck Hong Dep. Tr.) at 164:11-21. |
| 55. Netlist argued in its Korean tax appeal that: "the granting of cross licenses under the [JDLA] is limited to the joint research and development, and hence in cases where Samsung Electronics uses intellectual property rights of [Netlist] in the course of its own research and development, it does not constitute something that can be subject to the [JDLA]."<br><br>Choi Decl. ¶ 60, Exh. 59 at p.4. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 65.<br><br>Netlist does not dispute that the quoted language appears in documents. Disputed to the extent that Samsung characterizes this quote as suggesting that the patent license overall was limited to the parties' "joint research and development."<br><br>The document quoted is a submission to Korean tax authorities describing the applicability of the patent license to conduct with a territorial nexus to the Republic of Korea. Netlist has no |

| | |
|---|---|
| | Korean patents, and therefore no patent coverage as described in the quote.<br><br>Evidence:<br>• Dkt. 171-22, Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶¶ 32-40.<br><br>Disputed as to the materiality of the statement and immaterial. Neither of Samsung's breaches are related to the scope of the licenses granted under the JDLA.<br><br>Evidence:<br>• Complaint, Dkt 13, at 4. |
| 56. The Korean tax tribunal relied on Netlist's position that the license was limited in making its ruling.<br><br>Dkt. 88-7 at p.7. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 66.<br><br>Disputed.<br><br>Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant. Defendant's citation to Dkt. 88-7 at p.7 |

| | | |
|---|---|---|
| 1 | | does not show that the Korean tax |
| 2 | | tribunal *relied* on Netlist's position, but |
| 3 | | is rather a recitation of each party's |
| 4 | | positions. |
| 5 | | |
| 6 | | Evidence: |
| 7 | | • Dkt. 88-7 at p. 7. |
| 8 | | |
| 9 | | Defendant's cited supporting evidence |
| 10 | | does not support the fact. Defendant |
| 11 | | fails to identify any relevant evidentiary |
| 12 | | citation for their claim that "the Korean |
| 13 | | tax tribunal relied on Netlist's position |
| 14 | | that the license was limited in making |
| 15 | | its ruling." |
| 16 | 57. Section 3.2 of the JDLA states, in | This alleged fact is a verbatim repeat of |
| 17 | pertinent part: | Defendant's alleged SUF in support of |
| 18 | "Taxes. . . . To the extent that any | its opening Motion for Summary |
| 19 | withholding taxes are required by | Judgment, No. 68. |
| 20 | applicable law for the payment set forth | |
| 21 | in this Agreement, Samsung may deduct | Disputed as to the characterization of |
| 22 | any applicable withholding taxes due or | the quoted language as "pertinent." |
| 23 | payable under the laws of Korea . . . | Undisputed as to the quoted portion of |
| 24 | provided that Samsung shall pay such | the language from Section 3.2 of the |
| 25 | withholding taxes to the Korean tax | JDLA. |
| 26 | authorities and promptly provide Netlist | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| with a certificate of payment for such withholding tax, as required by applicable law or treaty, and reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes.<br><br>Choi Decl. ¶ 20, Exh. 19 at p.5, § 3.2. | |
| 58. On November 5, 2015, shortly before the JDLA was signed, Samsung sent Netlist a tax form for Netlist to apply for a reduced tax rate as a foreign corporation.<br><br>Choi Decl. ¶ 61, Exh. 60; ¶ 6, Exh. 5 at 140:23-141:22, 143:14-24. ¶ 15, Exh. 14 at RFA No. 17; ¶ 61, Exh. 60 at NL046086-89. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 69.<br><br>Disputed that Samsung sent Netlist a tax form on November 5, 2015. The November 5, 2015 email referenced in the cited document does not attach a tax form.<br><br>Disputed as to the characterization that the tax form was "for Netlist to apply for a reduced tax rate." Samsung sent this form to Netlist on October 29, 2015 (not November 5, 2015), among other documents including a vendor |

| | |
|---|---|
| | registration form, stating that the tax form was among the "necessary documents to remit NRE expenses." This is not factually accurate. The NRE Fees were not subject to taxes in Korea, so Netlist never had a reason to apply for a reduced tax rate.<br><br>Evidence:<br>&bull; Dkt. 171-21, Ex. 93 to 8-30-21 LaMagna Decl. (NL044878), at 1.<br>&bull; Dkt. 171-22, Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), at ¶¶ 22, 32-40. |
| 59. The form indicated that the tax rate on royalties pursuant to a treaty with the US was 16.5%.<br><br>Choi Decl. ¶ 61, Exh. 60 at p. 3; ¶ 15, Exh. 14 at RFA No. 17; ¶ 61, Exh. 60 at NL046086-89. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 70.<br><br>Disputed. The form Samsung sent to Netlist does not indicate any tax rate or the type of income. It was Samsung that instructed Netlist to fill in certain information in the form, which Samsung claimed was one of the "necessary documents to remit NRE |

| | |
|---|---|
| 1 | expenses." |
| 2 | |
| 3 | Evidence: |
| 4 | • Dkt. 150-5 [Samsung MSJ Ex. |
| 5 | 60] (NL046086) at NL046088. |
| 6 | • Dkt. 171-21, Ex. 93 to 8-30-21 |
| 7 | LaMagna Decl. (NL044878), at |
| 8 | 1. |
| 9 | |
| 10 | Regardless, the alleged fact is |
| 11 | immaterial because filling in and |
| 12 | signing the tax form does not transform |
| 13 | untaxable income into taxable income, |
| 14 | nor does filling in a particular |
| 15 | percentage constitute a declaration or a |
| 16 | determination that all or any of the |
| 17 | payment are taxable at that rate. Not all |
| 18 | royalties for patents are taxable in |
| 19 | Korea at a rate of 16.5%, as foreign |
| 20 | patents not registered in Korea are not |
| 21 | taxable in Korea. |
| 22 | |
| 23 | Evidence: |
| 24 | • Dkt. 171-22, Ex. 94 to 8-30-21 |
| 25 | LaMagna Decl. (Kam Report), ¶¶ |
| 26 | 22, 32-40. |
| 27 | |
| 28 | |

| | |
|---|---|
| 60. Netlist CFO Gail Sasaki reviewed, signed, and returned the form to Samsung. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 71. |
| Choi Decl. ¶ 61, Exh. 60 at pp.1, 3; ¶ 6, Exh. 5 at 144:1-145:4. | Undisputed that Ms. Gail Sasaki signed and returned the form to Samsung. |
| 61. According to Netlist's CEO Chuck Hong, Sasaki had the authority to approve and sign such tax form without his approval. In her capacity as Netlist's CFO, Sasaki was expected to consult with a tax expert before executing the form to ensure it was appropriate for Netlist to sign. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 72. |
| | Undisputed that Netlist's CEO stated that Ms. Sasaki had the authority to approve and sign the tax form. |
| Choi Decl. ¶ 8, Exh. 7 at 175:9-176:14. | Disputed that Ms. Gail Sasaki "was expected to consult with a tax expert." |
| | Ms. Sasaki testified that she consulted with tax professionals concerning an earlier version of Choi Exh. 60 [Samsung's Ex. 60 in support of its Motion for Summary Judgment], which at that time did not identify any tax statutes or tax rates, after which Samsung asked her to fill in the very |

1   information on which Samsung now

2   relies. She complied with Samsung's

3   request because this was just one

4   amongst "several other forms" that

5   Samsung asked Netlist to fill out "in the

6   process of setting [Netlist] up as a

7   vendor." Ms. Sasaki "just figured it

8   was something going into a file . . . in

9   [Samsung's] accounting system." She

10  was not told, and did not understand,

11  that rather than a submission that would

12  be made to the Korean tax authorities.

13  She trusted Samsung and "took it on

14  face value what [they] said" as to why

15  she was being asked to provide them

16  with a new version of the form. She

17  thought it "was of no importance" to

18  Netlist and "didn't seem to affect

19  [Netlist] one way or the other."

20

21  Evidence:

22  • Dkt. 171-13, Ex. 85 to 8-30-21

23     LaMagna Decl. (Sasaki Dep. Tr.)

24     at 146:6-20, 147:21-150:13,

25     154:7-24, 155:21-156:8, 157:9-

26     17;

27  • Dkt. 171-21, Ex. 93 to 8-30-21

28

| | |
|---|---|
| | LaMagna Decl. (NL044878), at 1;<br><br>• Dkt. 171-22, Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶ 22. |
| 62. Samsung withheld 16.5% tax and paid it to the Korean National Tax Service because it considered the $8 million as consideration for Netlist's grant of patent licenses, and Korean law requires withholding of payments on such royalties.<br><br>Choi Decl. ¶ 63, Exh. 62 at p.1; ¶ 61, Exh. 60 at p. 3; Dkt. 88-7 at p.4. | Undisputed that Samsung withheld 16.5% from the NRE fees and paid it to the Korean National Tax Service as a purported withholding for taxes.<br><br>Disputed that Samsung believed that the $8 million was for patent royalties, or taxable as such, when the JDLA expressly listed the payment under "Development Costs" and expressly defined it as "non-refundable NRE fees."<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at p. 5, §§ 3, 3.1.<br><br>Also disputed that Korean law required taxes to be withheld from the NRE fees. The NRE fees were not taxable under Korean law, as the Korean Tax |

| | |
|---|---|
| | Tribunal has already found.<br><br>Evidence:<br>• Dkt. 171-22, Ex. 94 to 8-30-21 LaMagna Decl. (Kam Report), ¶¶ 32-40.<br>• Dkt. 144-7, PX-192 (NL108731), at 1, 29. |
| 63. What Netlist wanted was for Samsung to deny that the $8 million was for patent royalties, which Samsung did not believe to be true.<br><br>Choi Decl. ¶ 63, Exh. 62 at p.1; ¶ 61, Exh. 60 at p.3; Dkt. 88-7 at p.4; ¶ 67, Exh. 66 at NL118556; ¶ 6, Exh. 5 at 123:19- 124:24 | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 77.<br><br>Undisputed that Netlist wanted Samsung to accurately represent the provision of the JDLA, including Section 3.1, which provides "Samsung shall pay to Netlist eight million United States dollars (US $8,000,000) as non-refundable NRE fees."<br><br>Disputed that Samsung believed that the $8 million was for patent royalties when the JDLA expressly listed the payment under "Development Costs" and defined it as "non-refundable NRE fees." |

| | Evidence: |
| --- | --- |
| | • Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at p. 5, §§ 3, 3.1. |
| 64. Netlist executives internally discussed whether to provide notice of breach over the tax withholding dispute in March 4, 2016, but decided not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung.<br><br>Choi Decl. ¶ 70, Exh. 69 at p.1; ¶ 6, Exh. 5 at 57:4-64:2. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 84.<br><br>Immaterial, in that the allegation appears directed to Defendant's prior "election of remedies" defense, on which the Court has already ruled.<br><br>Undisputed that individuals at Netlist discussed whether to provide notice of breach.<br><br>Disputed as to the characterization that Netlist decided "not to send a breach notice because it wanted to reap the benefits of its business relationship with Samsung."<br><br>Gail Sasaki specifically testified that, in part, "the breach comes from lack of |

| | cooperation, and [she] was still hopeful that [she] would get cooperation from Samsung," and that she thought Samsung "had not yet breached as [her] recollection was that [Netlist] was still trying to get cooperation." Because of this, the individuals involved in this email chain (who did not have authority to decide this issue) opted not to recommend sending notice at this time.<br><br>Evidence:<br>• Dkt. 171-13, Ex. 85 to 8-30-21 LaMagna Decl. (Sasaki Dep. Tr.) at 67:3-8, 67:17-19. |
|---|---|
| 65. As to the supply claim, Netlist asserts that "starting as early as the second quarter of 2017, Samsung began to refuse and/or cancel orders from Netlist.<br><br>Choi Decl. ¶ 71, Exh. 70 at p.13, ROG No. 8. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 85.<br><br>Undisputed. |
| 66. Instead, Netlist waited to provide notice of alleged breach until May 27, | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary |

| | |
|---|---|
| 2020, more than four years after it first considered doing so.<br><br>Dkt. 18-2 at ¶ 19 (First Amended Complaint); Choi Decl. ¶ 72, Exh. 71. | Judgment, No. 86.<br><br>Disputed.<br><br>Netlist as a company did not consider sending a breach notice in 2016. *See* Plaintiff's response and evidence to Samsung's additional alleged SUF No. 64, *supra*, as if incorporated herein.<br><br>As to Samsung's wrongful withholding and failure to cooperate in the tax return, Netlist made repeated efforts throughout the time period to engage Samsung in cooperation.<br><br>Evidence:<br>• Dkt. 171-23, Ex. 95 to 8-30-21 LaMagna Decl. (NL005043), at NL005043.<br>• Dkt. 150-5 [Samsung MSJ Ex. 62] (NL118609), at NL118609, NL118611-13.<br><br>As to the breach of the supply provision, Netlist does not allege any material breach in 2016. |

| | |
|---|---|
| | After Samsung cut off product supply in Q2 2017, Netlist expended significant effort to try to work through the issues with Samsung.<br><br>Evidence:<br>• Dkt. 171-12, Ex. 84 to 8-30-21 LaMagna Decl. (Chuck Hong Dep. Tr.) at 187:15-188:14.<br>• Chuck Hong Decl. [Dkt. 145-3], ¶ 10.<br><br>Ultimately, Samsung's multiple breaches added up to a point where Netlist had to send an official notice of breach, and when Samsung failed to cure, Netlist terminated the contract. *See* Plaintiff's response and evidence to Samsung's additional alleged SUF No. 64, *supra*, as if incorporated herein. |
| 67. In consideration for the JDLA, Samsung provided a $15 million convertible note that offered the potential that Samsung would take an | Undisputed that a $15 million loan made to Netlist by a separate entity (SVIC) is due December 31, 2021.<br><br>Disputed that the $15 million loan was provided "in consideration for the |

| | |
|---|---|
| equity stake in Netlist. The $15 million note is due December 31, 2021.<br><br>Choi Decl. ¶ 73, Exh. 72 at NL000342 § 4; Choi Decl. ¶ 20, Exh. 19 at p. 1 ("WHEREAS, the Parties are concurrently executing an agreement for convertible note financing")<br><br>For note due date, see Choi Decl. ¶ 73, Exh. 72 at NL000339 § 2. | JDLA." The loan was made under a separate contract for separate consideration—between Netlist and an entity that is not Defendant Samsung.<br><br>Moreover, Samsung's proffered evidence does not indicate that the $15 million loan was in consideration of the JDLA, and simply notes that there is a separate agreement being executed concurrently.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at 1.<br>• Dkt. 151-2 [Samsung MSJ Ex. 72] (NL000341, Promissory Note with third-party entity separately defining consideration for loan). |
| 68. Section 8.1 of the JDLA grants to Netlist and its subsidiaries "a perpetual (subject to Section 13.3), paid-up, worldwide, non-exclusive, non-transferable, non-sublicensable license under Samsung's Licensed Patents to make and have made (subject to Section 8.4) Netlist's Licensed Products, and to | Undisputed.<br><br>(Per Section 8.1 of the JDLA, Samsung, not the JDLA, grants the license to Netlist. But for the purposes of the present motion, the distinction is not material). |

| | |
|---|---|
| use, sell, offer for sale, import, and otherwise transfer or dispose of such products." | |
| Choi Decl. ¶ 20, Exh. 19 at p. 8, § 8.1 | |
| 69. Section 16.7 of the JDLA provides that any amendment "requires the signatures of the authorized representatives of the Parties." | Undisputed. |
| Choi Decl. ¶ 20, Exh. 19 at p.14, § 16.7 | |
| 70. Around the time the JDLA was being negotiated, Netlist was having cash flow issues.<br><br>Choi Decl. ¶ 19, Exh. 18 at F-7. | This alleged fact is a verbatim repeat of Defendant's alleged SUF in support of its opening Motion for Summary Judgment, No. 12.<br><br>Disputed and immaterial.<br><br>Defendant's cited supporting evidence does not state the characterization ascribed to it by Defendant. The document speaks for itself. |
| 71. Chuck Hong's close friend, YH Jun, who had been President of Samsung's memory division, moved to a separate company in 2017. Up until that point, | Undisputed that a Samsung executive named Young Hyun Jun was a friend of Mr. Hong's and left Samsung's memory division sometime in 2017. |

| | |
|---|---|
| Chuck Hong had been able to use this relationship to "push through" certain orders and obtain red-carpet treatment.<br><br>Choi Decl. ¶ 8, Exh. 7 at 119:6-120:7. | Undisputed that Dr. Jun directed Samsung's employees to ensure that Samsung was supplying NAND and DRAM products to Netlist as required under the JDLA.<br><br>Disputed as to the characterization that they were "close" friends or that Netlist obtained "red-carpet" treatment. Neither of those terms are supported by the text quoted by Defendant, and nor is there any evidence that Netlist received any "treatment" while Dr. Jun was at Samsung's memory division that was beyond that required under Section 6.2 of the JDLA.<br><br>Evidence:<br>• Dkt. 148-1 [Samsung MSJ Ex. 19] (SEC0000001) at § 6.2. |

1    Dated: September 6, 2021          GIBSON, DUNN & CRUTCHER LLP

2                                      By: *Raymond LaMagna*
                                       Raymond LaMagna
3                                      333 South Grand Avenue
                                       Los Angeles, CA 90071
4                                      213.229.7101
                                       rlamagna@gibsondunn.com
5
6                                      Attorneys for Plaintiff Netlist Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28