# EXHIBIT C

Notice has been delivered by First Class U.S. Mail
to all counsel (or parties) at their last known address
of record in this action on this date

Date: Oct 14 2021, 5:53 pm

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NETLIST INC.,

                Plaintiff,

          v.

SAMSUNG ELECTRONICS CO., LTD.,

                Defendant.

Case No. 8:20-cv-00993-MCS-ADS

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT AND RELATED APPLICATIONS (ECF NOS. 141, 143, 145–47, 149–50, 169)**

**(PROVISIONALLY FILED UNDER SEAL)**

Plaintiff Netlist Inc. and Defendant Samsung Electronics Co., Ltd., both move for summary judgment. (PMSJ, ECF No. 145; DMSJ, ECF No. 150.)[1] Each party opposes the other's motion and filed a reply in support of its own. (PMSJ Opp'n, ECF No. 168; DMSJ Opp'n, ECF No. 171; PMSJ Reply, ECF No. 178; DMSJ Reply, ECF No. 179.) The Court heard oral argument on September 20, 2021.

## I.    PRELIMINARY ISSUES

Both parties filed applications to seal documents related to the motions. (ECF Nos. 141, 143, 146–47, 149, 169.) The public has a "general right to inspect and copy

---

[1] Where appropriate, the Court cites redacted documents filed on the public docket.

public records and documents, including judicial records and documents." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (internal quotation marks omitted). Consequently, there is a "strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). A party who seeks to seal court documents supporting a dispositive motion bears the burden of overcoming this presumption by presenting "compelling reasons supported by specific factual findings." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (internal quotation marks omitted).

With the following exceptions, the Court grants the applications, which set forth compelling reasons to seal the documents and information the parties designated confidential.

Netlist applied to seal documents in support of its motion pursuant to Samsung's designation of the documents as confidential. (Appl., ECF No. 141.) In response, Samsung agreed to permit some documents to be filed publicly, and some documents to be filed publicly in redacted form. (Choi Decl., ECF No. 163.) Exhibits 15 and 18 may be filed on the public docket subject to Netlist's proposed redactions. Exhibits 16, 33, 43, and 49 may be filed on the public docket subject to Samsung's proposed redactions. Samsung does not address whether there are compelling reasons to seal Exhibits 19–23, 31, 36, 40, 44, 48, and 50–53, so the documents may be filed publicly. C.D. Cal. R. 79-5.2.2(b)(i).

Netlist indicates that its application at ECF No. 143 is "surplus and may be disregarded." (Notice of Errata, ECF No. 160.) The Court denies the application but considers and grants the replacement application at ECF No. 146.

Samsung applied to seal documents in support of its motion pursuant to Netlist's designation of the documents as confidential. (Appl., ECF No. 149.) In response, Netlist agreed to permit some documents to be filed publicly, and some documents to be filed publicly in redacted form. (LaMagna Decl., ECF No. 164.) Exhibits 2, 5, 7, 11–12, 40, 51, 54, 65, and 72 may be filed on the public docket without redaction. Exhibits 13, 32,

and 34 may be filed on the public docket subject to Netlist's proposed redactions.

Netlist applied to seal documents in support of its opposition to Samsung's motion pursuant to Samsung's designation of the documents as confidential. (Appl., ECF No. 169.) In response, Samsung agreed to permit one document to be filed publicly in redacted form. (Choi Decl., ECF No. 177.) Exhibit 79 may be filed on the public docket subject to Samsung's proposed redactions.

The parties' memoranda of points and authorities, statements of uncontroverted facts, and statements of genuine disputes of material fact redact information derived from the documents the Court has determined may be filed on the public docket. The papers also redact quotes from the Court's order denying Samsung's motion for judgment on the pleadings, which is now unsealed on the public docket. The redactions should be removed.

In the interest of judicial economy, the Court has considered the provisionally sealed documents already on file in evaluating the motion. Within seven days, the parties shall (1) file the documents permitted to be sealed under seal, (2) file the documents not permitted to be sealed on the public docket, and (3) submit revised redacted versions of documents containing information the Court declines to seal.

Each party submitted objections to the other's evidence. (Pl.'s Evid. Objs., ECF No. 172; Def.'s Evid. Objs., ECF No. 168-3.) The Court need not resolve most of the objections to decide the motion. To the extent the Court relies on objected-to evidence in this Order, the relevant objections are overruled. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1118–19 (E.D. Cal. 2006) (lamenting overuse of evidentiary objections in motions for summary judgment).

## II.    BACKGROUND

This is a contract dispute between two sophisticated business entities. Netlist is in memory module technology business; Samsung creates and sells memory components and modules. (*E.g.*, PMSJ GDMF ¶¶ 2–3, 6–8, ECF No. 168-1; DMSJ GDMF ¶¶ 1–2, ECF No. 171-1.) On November 12, 2015, the parties entered a Joint

Development and License Agreement. ("JDLA," ECF No. 144-1.) The JDLA obliges Samsung to "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price," (*id.* § 6.2), and to pay Netlist $8 million in nonrefundable, non-recurring engineering ("NRE") fees, (*id.* § 3.1). The agreement permits Samsung to deduct from the NRE fees "any applicable withholding taxes due or payable under the laws of Korea" "[t]o the extent that any withholding taxes are required by applicable law." (*Id.* § 3.2.) Samsung agreed to "reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes." (*Id.*) The JDLA authorizes either party to terminate the agreement upon written notice that the other party is in material breach if the breach is not cured within 30 days from the terminating party's written demand. (*Id.* § 13.2.)

After entering the JDLA, Samsung deducted $1.32 million (16.5%) of the NRE fees to pay to the Korean tax authority. (PMSJ GDMF ¶ 46; DMSJ GDMF ¶ 73.) Samsung responded to Netlist's requests for assistance in seeking a refund, though Samsung referred Netlist to appeal directly to the Korean tax authority, and its arguments before the tax tribunal were adverse to Netlist's interests. (PMSJ GDMF ¶¶ 48–52; DMSJ GDMF ¶¶ 75–77.) The Korean tax authority ultimately determined that the NRE fees were not subject to tax withholding. (PMSJ GDMF ¶ 53; *see* DMSJ GDMF ¶ 78.)

Beginning in 2017, Samsung declined to fulfill all of Netlist's forecasts, requests, and orders for NAND and DRAM products, putting some on backlog and rejecting others. (*E.g.*, PMSJ GDMF ¶¶ 61–66, 74–82, 106–08, 114–18; DMSJ GDMF ¶¶ 7–8.)

On May 27, 2020, Netlist sent a letter to Samsung claiming Samsung materially breached the JDLA. (PMSJ GDMF ¶¶ 125–27.) On July 15, 2020, Netlist sent another letter to Samsung purporting to terminate the JDLA. (PMSJ GDMF ¶¶ 128.)

Netlist asserts three claims: (1) breach of Samsung's NAND and DRAM supply obligation; (2) breach of Samsung's obligations to (a) pay the NRE fees without withholding taxes and (b) reasonably cooperate with Netlist's efforts to recover the

4

withheld amount from the Korean tax authority; and (3) declaratory relief confirming Netlist terminated the JDLA. (FAC ¶¶ 25–41, ECF No. 23.)

## III. LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A fact is material when, under the governing law, the resolution of that fact might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007). To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id*. at 587.

## IV. DISCUSSION

### A. Breach of Supply Obligation

The JDLA is governed by New York law. (JDLA § 14.) To prevail on a breach of contract claim under New York law, a plaintiff must show: (1) the existence of a contract, (2) performance by one party, (3) breach by another party, and (4) damages.

5

*Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000).

In its first claim, Netlist contends Samsung breached the JDLA by failing to fulfill orders for NAND and DRAM products. (FAC ¶¶ 12–14, 26–29.) Netlist seeks partial summary judgment as to liability, with damages to be determined at trial, on the basis that the undisputed facts show the JDLA is an enforceable contract, Netlist performed, and Samsung breached § 6.2 by failing to fulfill NAND and DRAM product orders. (PMSJ 12–18.) Samsung seeks summary judgment in its favor, arguing: (1) the provision should be interpreted as an obligation limited to the supply and pricing of NAND and DRAM products for the NVDIMM-P joint development project; (2) even if § 6.2 is consistent with Netlist's interpretation, the JDLA does not provide a definite supply obligation and is not a valid requirements contract or options contract; (3) Netlist did not perform its obligations under the JDLA; and (4) Netlist should be judicially estopped from asserting its position on the supply obligation. (DMSJ 12–29.)

1.  JDLA § 6.2 Unambiguously Requires Samsung to Supply Products on Netlist's Request at a Competitive Price

The parties advance contrasting interpretations of the obligation at the heart of this claim: "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price (*i.e.*, among customers purchasing similar volumes of similar products)." (JDLA § 6.2.) Each party contends the provision is unambiguous, but the parties advance dramatically contrasting interpretations of the provision. (*E.g.*, PMSJ 15; PMSJ Opp'n 11.)[2]

_____

[2] In its order denying Samsung's motion for judgment on the pleadings, the Court declined to conclude that the provision was an unambiguous term governing price only. (MJOP Order 4–5, ECF No. 120.) Samsung does not advance that interpretation here. Nonetheless, Samsung understands the MJOP Order to have determined that JDLA § 6.2 is ambiguous. (DMSJ Reply 8 (citing MJOP Order 4).) In rejecting Samsung's argument that § 6.2 is an unambiguous price obligation, the Court did not intend to render a decision on whether the provision is ambiguous. The MJOP Order is abrogated to the extent it is inconsistent with this Order.

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere De CIC Et De L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Id.* "Under New York law, . . . the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). The Court must decide whether a provision is ambiguous from within the four corners of the contract; "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *S. Rd. Assocs., LLC v. IBM Corp.*, 4 N.Y.3d 272, 278 (2005) (citation and internal quotation marks omitted); *accord JA Apparel Corp.*, 568 F.3d at 396.

Ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *JA Apparel Corp.*, 568 F.3d at 396 (alteration in original) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)). In contrast, "[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks omitted).

JDLA § 6.2 contains unadorned, straightforward language: "Samsung will supply NAND and DRAM products to Netlist on Netlist's request at a competitive price." The meaning of the provision could not be expressed in any simpler terms. As Netlist argues,

this provision unambiguously creates a mandatory obligation on Samsung to supply certain types of products to Netlist on request. (PMSJ 15 (citing *Zheng v. City of New York*, 19 N.Y.3d 556, 580 (2012)).) The obligation is clear and complete. The Court sees no reason to stray from the obvious meaning of the sophisticated contracting parties' simple, concise language. *See Ashwood Cap., Inc. v. OGT Mgmt., Inc.*, 99 A.D.3d 1, 7 (2012) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. We apply this rule with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople." (internal quotation marks and citations omitted)).

The provision is not reasonably susceptible to a different meaning, including the one Samsung champions. Samsung contends that the provision obliges it to supply products to Netlist only with respect to the parties' NVDIMM-P joint development project. (DMSJ 12.) Samsung's briefs rely almost exclusively on extrinsic evidence to reach this interpretation. (*See, e.g.*, DMSJ 12–24; PMSJ Opp'n 11–22.) But the Court may not examine extrinsic evidence in determining whether the provision is ambiguous. *S. Rd. Assocs.*, 4 N.Y.3d at 278.

The JDLA simply does not support Samsung's preferred reading. At oral argument, Samsung argued that its favored interpretation may be extracted from the preamble's statement of the agreement's goal of joint development, and the scope of certain preceding sections, which are limited to the NVDIMM-P project. If anything, these other components of the contract confirm that § 6.2 is unambiguously unrestricted to the NVDIMM-P joint development project. In light of the purposes stated in the preamble, which extend beyond the NVDIMM-P project, the JDLA contains obligations that pertain specifically to the NVDIMM-P project and generally to the parties' overarching business relationship. For example, JDLA § 2.1 obliges the parties to perform work on the joint development project, and § 5.2 grants Samsung a right of first refusal to acquire Netlist's NVDIMM-P technology, whereas § 7 provides broad

8

releases for conduct predating the agreement, and § 8 governs intellectual property licenses unrestricted to use on the NVDIMM-P development project. The coexistence of project-specific provisions and project-nonspecific provisions signals that the parties intended not to restrict the NAND and DRAM supply obligation to the NVDIMM-P project by omitting any mention of it in § 6.2. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms[,] . . . the inescapable conclusion is that the parties intended the omission.").

Most damaging to Samsung's interpretation is § 6.2's foil, the supply obligation of § 6.1. Whereas § 6.2 obliges Samsung to "supply NAND and DRAM products" to Netlist, § 6.1 obliges Netlist to "provide Samsung any NVDIMM-P controller" technology. (JDLA §§ 6.1–.2.) The parties used language specific to NVDIMM-P when designing Netlist's memory controller supply obligation, but they declined to use language specific to NVDIMM-P in crafting Samsung's memory supply obligation. In other words, these mirror obligations demonstrate that the contracting parties intended not to limit § 6.2 to NVDIMM-P development. Samsung asks the Court to read the NVDIMM-P language from § 6.1 into § 6.2. (DMSJ 15–16.) But New York law counsels the Court to "be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Ashwood Cap.*, 99 A.D.3d at 7 (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)). "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Id.* (alteration in original) (quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001)).

Nothing in the text of the JDLA gives the Court pause about enforcing the § 6.2 according to its unambiguous meaning, especially given that both contracting parties are sophisticated business entities. *See Ashwood Cap.*, 99 A.D.3d at 7. Samsung was obliged to "supply NAND and DRAM products to Netlist on Netlist's request at a competitive price." (JDLA § 6.2.) Samsung does not dispute that it declined to fulfill

all of Netlist's orders for NAND and DRAM products. (*E.g.*, PMSJ GDMF ¶¶ 61–66, 74–82, 106–08, 114–18; DMSJ GDMF ¶¶ 7–8.) There is no genuine dispute that Samsung breached JDLA § 6.2.

 2. The JDLA Is a Valid Contract Sufficiently Definite to Be Enforced

 Thus far, the Court has assumed the JDLA is an enforceable contract. Samsung argues that, if consistent with Netlist's interpretation, the supply provision would render the JDLA insufficiently definite to be enforceable, and the contract would not be a valid options or requirements contract. (DMSJ 26–29; PMSJ Opp'n 22–24.) Netlist disagrees. (DMSJ Opp'n 18–20.)[3]

 "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. N.Y. State Dept. of Transp.*, 93 N.Y.2d 584, 589 (1999) (citation omitted). "[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991) (citation and quotation marks omitted). "Of course, not all terms of a contract need be fixed with absolute certainty"; parties "should be held to their promises and courts should not be pedantic or meticulous in interpreting contract expressions." *Express Indus.*, 93 N.Y.2d at 590 (internal quotation marks and citation omitted). "[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement . . . ." *RES Exhibit Servs., LLC v. Genesis Vision, Inc.*, 155 A.D.3d 1515, 1518 (2017) (internal quotation marks omitted). "Striking down a contract as indefinite and in essence meaningless is at best a last resort." *166 Mamaroneck Ave.*, 78 N.Y.2d at 91 (internal quotation marks and citation omitted).

---

[3] Netlist contends the Court already considered and rejected these arguments in its MJOP Order. (DMSJ Opp'n 18.) Netlist misreads the Court's ruling. (MJOP Order 5 ("[T]he Court declines to decide on this motion whether any of the theories of contract Netlist proposes is valid.").)

The parties are sophisticated business entities, and there is no genuine dispute that extensive negotiations supported a meeting of the minds as to the material terms of the JDLA. (*E.g.*, DMSJ GDMF ¶ 13.) As Samsung notes, JDLA § 6.2 lacks a definite quantity term. But in evaluating the JDLA, Samsung applies doctrines specific to contracts for the sale of goods. (*See, e.g.*, DMSJ 27–29 (citing authorities discussing contracts governed by the Uniform Commercial Code).) The JDLA, and the supply provision therein, is not a contract for the sale of goods. Instead, the agreement establishes a framework for future transactions: Samsung agreed to fulfill Netlist's requests for NAND and DRAM products at a competitive price.[4]

*RES Exhibit Services* provides a persuasive analogy. There, two sophisticated parties entered an agreement under which one party would provide the other services and an exhibit for industry trade shows. The agreement provided that the parties would execute subsequent project authorization forms ("PAFs") that would govern the scope of work. The original agreement did not set forth the price or scope of services, which would be set in the PAFs. 155 A.D.3d at 1515–16, 1518. The appellate court concluded that the agreement was sufficiently definite in its terms to be enforceable. The parties clearly agreed to leave the scope of work and price to be decided later; "the agreement contains no expression by the parties that they did not intend to be bound until each PAF was signed." *Id.* at 1518 (internal quotation marks omitted). Here, the parties clearly contemplated NAND and DRAM product sales to follow the JDLA. Even so, the agreement is sufficiently definite in its articulation of the framework by which the parties would engage in such transactions to be enforceable.

---

[4] Samsung briefly argues that Netlist's post-JDLA purchase orders are new offers that supersede the JDLA. (DMSJ 23; PMSJ Opp'n 24.) This summary argument is too underdeveloped for thorough consideration. *See Hibbs v. HDM Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001). In any event, Samsung's argument would not resolve Netlist's theory of breach, which is predicated on Samsung's obligation to receive and fulfill Netlist's requests, i.e., purchase orders.

1  Tellingly, Samsung focuses exclusively on § 6.2 in its discussion of sufficient
2  definiteness. Samsung does not challenge any other provision of the JDLA for
3  indefiniteness. Were the Court to accept Samsung's argument, the contract—and the
4  releases, the licenses, and the parties' years-long relationship thereunder—would be
5  rendered a nullity. This result would clearly contravene both parties' manifested intents.

6  The contract is sufficiently definite to be enforceable, so there is no reason to
7  consider whether it is a valid requirements or options contract. Samsung does not
8  dispute that the parties agreed to the JDLA. (PMSJ GDMF ¶ 22; DMSJ GDMF ¶ 13.)
9  There is no triable issue as to whether the JDLA is an enforceable contract.

10  3.  Samsung's Challenge to Netlist's Performance Was Not Adequately
11     Discussed at the Prefiling Conference, Is Underdeveloped, and
12     Lacks Merit

13  Samsung contends summary judgment should be entered in its favor because
14  Netlist indisputably breached its obligations under the JDLA by "abandoning" the
15  NVDIMM-P standardization project and canceling purchase orders. (DMSJ 24–25.)

16  Netlist avers that Samsung did not raise this theory before the night it filed its
17  motion, when Samsung amended its interrogatory response at the eleventh hour to
18  include this theory of breach. (DMSJ Opp'n 14–15 & 15 n.6 (indicating Samsung
19  amended its response at 10:57 p.m. the day discovery closed).) At the hearing, counsel
20  for Samsung represented that the parties generally discussed the breach claim, but
21  counsel did not directly respond to the Court's queries about whether counsel presented
22  these theories of nonperformance at the Local Rule 7-3 prefiling conference of counsel.
23  The Court repeatedly warned that counsel must thoroughly discuss issues to be
24  presented in motions at the prefiling conference. (*E.g.*, MJOP Order 5 n.2.) The Court
25  even denied a prior Samsung motion for failure to comply with the prefiling conference
26  requirement. (Order, ECF No. 116.) The rule is designed to prevent nonmoving parties
27  from suffering the sort of unfair surprise Samsung's tactics have created here. *See*
28  *Caldera v. J.M. Smucker Co.*, No. CV 12-4936-GHK (VBKx), 2013 U.S. Dist. LEXIS

183977, at *2 (C.D. Cal. June 3, 2013). The Court denies this component of Samsung's motion for failure to comply with Local Rule 7-3. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002); *e.g.*, *Singer v. Live Nation Worldwide, Inc.*, No. SACV 11-0427 DOC (MLGx), 2012 U.S. Dist. LEXIS 5196, at *3–5 (C.D. Cal. Jan. 13, 2012) (denying motion for summary judgment for failure to comply with C.D. Cal. R. 7-3).

The Court also rejects the argument on the merits. Samsung contends Netlist "never attempted to demonstrate viability of the NVDIMM-P standardization project," (PMSJ GDMF ¶ 129), but its briefs do not identify any contract provision Netlist failed to perform through this conduct. At the hearing, Samsung's counsel argued that Netlist's conduct violated §§ 2 and 5 of the JDLA, the "core purposes" of the agreement, and the implied covenant of good faith and fair dealing. These arguments are not presented in Samsung's briefs. (*See* DMSJ 24–25; PMSJ Opp'n 24–25.) The papers do not provide enough information about the purported breach for the Court to evaluate the nonperformance argument, and the Court declines to consider theories of nonperformance articulated for the first time at oral argument. *See Johnson v. Gruma Corp.*, 614 F.3d 1062, 1069 (9th Cir. 2010); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Netlist's decision to prioritize development of its proprietary technology over NVDIMM-P does not, standing alone, contravene any of its obligations under the JDLA. (*See* PMSJ GDMF ¶ 129.)

Samsung's argument that Netlist breached by canceling supply orders is not supported by the deposition testimony it cites. Netlist's witness testified that Samsung would breach the JDLA if Samsung canceled a purchase order—not that Netlist would breach the JDLA if Netlist canceled a purchase order. (Hong Dep. Tr. 164, ECF No. 157-4.) Even if the deposition testimony were consistent with Samsung's theory, the testimony presents an improper legal conclusion by a lay witness. Fed. R. Evid. 701; *see Torres v. County of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985) (discussing impropriety of testimony containing legal conclusions).

There is no genuine dispute that Netlist performed its obligations under the

1    JDLA. (PMSJ GDMF ¶¶ 129–30.)

2               4.     <u>Judicial Estoppel Does Not Apply</u>

3       Samsung argues that the doctrine of judicial estoppel precludes Netlist from

4 taking its position on the supply provision here given the position it asserted in the

5 proceeding before the Korean tax tribunal. (DMSJ 25–26; PMSJ Opp'n 25–27.)

6 "Judicial estoppel is an equitable doctrine that precludes a party from gaining an

7 advantage by asserting one position, and then later seeking an advantage by taking a

8 clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778,

9 782 (9th Cir. 2001). The Supreme Court has articulated three factors courts may

10 consider in determining whether to apply judicial estoppel:

11            First, a party's later position must be clearly inconsistent with

12            its earlier position. Second, courts regularly inquire whether

13            the party has succeeded in persuading a court to accept that

14            party's earlier position, so that judicial acceptance of an

15            inconsistent position in a later proceeding would create the

16            perception that either the first or the second court was misled.

17            Absent success in a prior proceeding, a party's later

18            inconsistent position introduces no risk of inconsistent court

19            determinations, and thus poses little threat to judicial

20            integrity. A third consideration is whether the party seeking

21            to assert an inconsistent position would derive an unfair

22            advantage or impose an unfair detriment on the opposing

23            party if not estopped.

24 *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (internal quotation marks and

25 citations omitted).

26       The first factor is dispositive here: the doctrine does not apply because Netlist's

27 position in this litigation is not "clearly inconsistent" with its prior position. Netlist

28 argued before the Korean tax authority that "the granting of cross licenses under the

[JDLA] is limited to the joint research and development." (DMSJ GDMF ¶ 65 (alteration in original).) As discussed, the JDLA contains some provisions that are specific to joint development and some that are not. Netlist's prior position on the scope of the patent licenses is immaterial to the breach theory in this litigation and to the reasons the Court will grant summary judgment as to liability.

### 5. Summary

The Court determines that Netlist has established the existence of a contract, its performance of the contract, and Samsung's breach of the supply provision of the contract. Partial summary judgment in Netlist's favor on these elements is appropriate. Damages must be proven at trial. *See McCoy Assocs. v. Nulux, Inc.*, 218 F. Supp. 2d 286, 294 (E.D.N.Y. 2002) (granting summary judgment as to liability for breach of contract claim, "regardless of the certainty of damages").

## B. Breach of NRE Fee Obligations

For the reasons discussed above, Netlist has established the JDLA is an enforceable contract and that it performed its obligations under the JDLA. The Court considers whether there are triable issues of fact as to the two theories of breach in the second claim.

Netlist bases its second claim on JDLA §§ 3.1 and 3.2, which provide that Samsung must pay Netlist nonrefundable NRE fees of $8 million less "withholding taxes . . . required by applicable law." First, Netlist contends that the NRE fees were not taxable in Korea, so withholding 16.5% of the fee violated Samsung's payment obligation under JDLA § 3.1, as qualified by § 3.2. (FAC ¶¶ 15–16, 32.) Second, Netlist asserts Samsung breached its obligation under § 3.2 to "reasonably cooperate with Netlist in any lawful efforts to claim a credit or refund or exemption with respect to any such withholding taxes." (JDLA § 3.2; *see* FAC ¶¶ 17, 32.)

### 1. Breach of NRE Fee Payment Obligation

The parties do not genuinely dispute whether Samsung was required to withhold taxes from the NRE fees. The Korean tax authority concluded that the NRE fees were

not a patent royalty payment subject to tax withholding. (PMSJ GDMF ¶ 53; *see* DMSJ GDMF ¶ 78.) Samsung submits evidence and argument that its position on the taxability of the NRE fees was reasonable and justified, and that Netlist at least implicitly ratified the withholding. (*E.g.*, DMSJ 29–30; PMSJ Opp'n 28–29; DMSJ GDMF ¶¶ 74, 77.) But the reasonableness of Samsung's position is immaterial to whether it breached its obligation; that is, the JDLA leaves no room for Samsung's reasonable misinterpretation of Korean tax law. Samsung was not required by applicable law to withhold; therefore, Samsung breached by withholding. (PMSJ GDMF ¶ 46; DMSJ GDMF ¶ 73.)

The Court will enter summary judgment on the breach element in favor of Netlist on this subclaim.

### 2. Breach of Duty to Reasonably Cooperate

There is a genuine dispute of fact as to whether Samsung fulfilled its obligation to reasonably cooperate with Netlist in recovering the tax withholding. On one hand, Samsung communicated on multiple occasions with Netlist and its tax consultant concerning the tax proceedings and responded to inquiries made by a Korean tax office. (PMSJ GDMF ¶¶ 48, 52; DMSJ GDMF ¶¶ 75–76.) On the other, Samsung declined to take Netlist's preferred position on the withholding, effectively refusing Netlist's consultant's request that Samsung "stick to the factual background" in the tax proceeding. (PMSJ GDMF ¶¶ 49–51; DMSJ GDMF ¶¶ 77.) A reasonable jury could return a verdict on the breach element in either party's favor.

This factual dispute precludes entry of summary judgment.

### 3. Damages

Samsung argues Netlist cannot show any injury it suffered from these purported breaches. (DMSJ 31; PMSJ Opp'n 29.) The Court agrees with Samsung that Netlist's sole evidence supporting damages consists of "[a] conclusory, self-serving affidavit[] lacking detailed facts and any supporting evidence," which in certain circumstances would not suffice to create a genuine issue for trial. *FTC v. Publishing Clearing House*,

1    104 F.3d 1168, 1171 (9th Cir. 1997). (*See* PMSJ GDMF ¶ 54; Def.'s Evid. Objs. 18–
2    19.)

3        Here, however, Samsung provides no authority for the proposition that the Court
4    may deny summary judgment to Netlist as to liability, or enter summary judgment
5    against Netlist, for failure to provide evidence of actual damages. New York law
6    "infer[s] at least nominal damages at the moment of breach." *Kronos, Inc. v. AVX Corp.*,
7    81 N.Y.2d 90, 94 (1993). "Even if it were shown that no actual damages have been
8    sustained, plaintiff would seem entitled to proceed to trial at least on its contract cause
9    of action if only to vindicate its right to nominal damages . . . ." *C.K.S. Ice Cream Co.
10   v. Frusen Gladje Franchise, Inc.*, 172 A.D.2d 206, 208 (1991); *accord McCoy Assocs.*,
11   218 F. Supp. 2d at 294. The Court may not enter summary judgment against Netlist
12   solely because there is no proof of actual injury. *See, e.g.*, *Gould Paper Corp. v.
13   Madisen Corp.*, 614 F. Supp. 2d 485, 490–91 (S.D.N.Y. 2009) (declining to dismiss
14   breach claim at summary judgment because claimant "may be entitled to recover
15   nominal damages"); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 Civ. 762
16   (PAE), 2016 U.S. Dist. LEXIS 71493, at *55–59 (S.D.N.Y. June 1, 2016) (denying
17   summary judgment on breach claim based on availability of nominal damages). The
18   Court rejects Samsung's damages argument.

19                    4.    Summary

20       The Court will enter summary judgment in favor of Netlist as to liability for the
21   first subclaim. The Court denies summary judgment as to the second subclaim.

22   **C.    Declaratory Judgment**

23       Netlist invoked JDLA § 13.2 to terminate the parties' contract, and it now seeks
24   a judicial determination that the termination was effective. (FAC ¶¶ 19–24, 36–41.)

25       Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its
26   jurisdiction . . . any court of the United States . . . may declare the rights and other legal
27   relations of any interested party seeking such declaration." 28 U.S.C. § 2201. For a court
28   to grant declaratory relief under the Declaratory Judgment Act, "[t]he controversy must

be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937). Where an actual controversy exists, "declaratory relief is appropriate (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Eureka Fed. Sav. & Loan Ass'n. v. Am. Cas. Co.*, 873 F.2d 229, 231 (9th Cir. 1989) (internal quotation marks omitted).

Here, a declaratory judgment would clarify the effectiveness of Netlist's termination and confirm the parties' present relationship with respect to the JDLA, relieving the contracting parties from the uncertainty over the issue.

### 1. Netlist Complied with the Termination Term

For the reasons articulated above, the JDLA is an enforceable contract. JDLA § 13.2 reads in relevant part:

> [T]he other Party shall have a right to terminate this Agreement upon written notice to a Party if: [¶] 1) such Party is in material breach of this Agreement and it is not cured within thirty (30) days period [sic] from the other Party's written demand, or as a consequence of the breach the purpose of this Agreement cannot be achieved . . . .

JDLA § 15 provides a method of providing notices to each party. On May 27, 2020, Netlist sent a letter to Samsung in the manner specified in § 15 alleging material breach and demanding Samsung to cure. (PMSJ GDMF ¶ 125.) As discussed, there is no genuine dispute that Samsung breached its obligations to supply NAND and DRAM components on Netlist's request and its obligation to pay the NRE fees without withholding taxes, and that both issues remain uncured. (*See* PMSJ GDMF ¶ 128.) Netlist sent Samsung a letter terminating the JDLA on July 15, 2020. (*Id.*) Netlist's termination comports with the JDLA's termination method.

///

## 2. Samsung's Breaches Were Material

Samsung summarily argues the termination was ineffective because the breaches Netlist identified in its May 27, 2020 letter were not material. (PMSJ Opp'n 30; DMSJ 32.) "Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties." *Bear, Stearns Funding, Inc. v. Interface Grp.—Nev., Inc.*, 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) (quoting *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). Although the question of materiality is generally left to the factfinder, the Court may determine materiality as a matter of law "where the evidence concerning the materiality is clear and substantially uncontradicted." *Morgan Art Found. Ltd. v. Brannan*, No. 18-CV-8231 (AT) (BCM), 2020 U.S. Dist. LEXIS 14043, at *49 (S.D.N.Y. Jan. 28, 2020) (quoting *WILJEFF, LLC v. United Realty Mgmt. Corp.*, 82 A.D.3d 1616, 1617 (2011)); *see also Bear, Stearns*, 361 F. Supp. 2d at 295 (collecting federal authorities construing New York law).

Samsung does not seriously contest materiality. Samsung rests its argument in part on its untenable interpretation of the supply provision in § 6.2. Under the unambiguous meaning of the provision, the term is an integral part of the parties' agreement, one that Netlist valued highly, as demonstrated by its negotiation and post-execution conduct. (*E.g.*, PMSJ GDMF ¶¶ 14–17, 55–59.) Samsung contends the breach of the NRE fee obligation could not be material because Netlist ultimately recovered the fees from the tax authority. (PMSJ Opp'n 30.) But "[t]he time for measuring materiality [is] when the breach occurred." *KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 545 (S.D.N.Y. 2020). At the time of the withholding, Samsung's failure to pay a significant chunk of the NRE fees was material. *See Taub v. Marchesi Di Barolo, S.p.A.*, 480 F. App'x 643, 645 (2d Cir. 2012) ("It is axiomatic that failure to pay is a material breach of a contract.") (citing *Arp Films, Inc. v. Marvel Entm't Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991)).

///

19

### 3. Netlist Did Not Waive Its Right to Terminate

Samsung claims Netlist waived its right to terminate the contract by delaying termination proceedings until years after the initial breaches. (PMSJ Opp'n 30–31; DMSJ 32–33.) Waiver is "the voluntary and intentional relinquishment of a contract right." Under New York law, waiver "must be based on a clear manifestation of intent to relinquish a contractual protection." *Stassa v. Stassa*, 123 A.D.3d 804, 805 (2014) (internal quotation marks omitted).

The JDLA contains a no-waiver provision. (JDLA § 16.2 ("The failure by either Party to enforce any of the terms and conditions of this Agreement shall not constitute a waiver of such Party's right thereafter to enforce that or any other terms and conditions of this Agreement.").) No-waiver clauses are uniformly enforced and highly probative of an intent not to waive. *Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17-cv-01898 (AJN), 2021 U.S. Dist. LEXIS 92559, at *44 (S.D.N.Y. May 14, 2021). In the face of a no-waiver provision, there must be unequivocal evidence that a party "intended for the 'no-waiver' clause to have no effect." *Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015).

At the hearing, the Court asked Samsung to identify evidence showing that Netlist intended to waive the no-waiver provision of the JDLA. Samsung responded that Netlist had not complained about NAND and DRAM supply issues and had not acted on the purported breach for years. (*See* DMSJ GDMF ¶¶ 84–86 (outlining disputed facts concerning Netlist's delay in asserting breach).) These facts might be probative of waiver absent the provision, but they do not evince an "unmistakably manifested" intent to waive the no-waiver provision. *EchoStar Satellite L.L.C. v. ESPN, Inc.*, 79 A.D.3d 614, 617 (2010) (internal quotation marks omitted).

### 4. Summary

A declaratory judgment that Netlist terminated the JDLA would clarify the effectiveness of Netlist's termination and relieve the parties from the uncertainty over the issue. There is no genuine dispute that Netlist completed the termination in the

manner set forth in the JDLA, that the breaches it identified were material, and that it did not waive its right to terminate. Summary judgment in Netlist's favor is appropriate on this claim.

### D. Consequential Damages

The parties' contract disclaims liability for "any special, incidental or consequential damages in connection with or arising out of this agreement," with exceptions not relevant here. (JDLA § 12.5 (emphasis omitted).) Samsung contends that the Court should enter summary judgment barring Netlist from recovering consequential damages. (DMSJ 31–32.) Netlist responds that it may pierce the JDLA's limitation on consequential damages if it shows Samsung engaged in grossly negligent misconduct. (DMSJ Opp'n 22–24.)

Courts may determine on summary judgment that a party cannot recover consequential damages. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010). Express waivers of consequential damages are enforceable under New York law. *See Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 352 (2020); *Int'l Gateway Exch., LLC v. W. Union Fin. Servs., Inc.*, 333 F. Supp. 2d 131, 149 (S.D.N.Y. 2004). New York law permits a party to pierce a contractual limitation on exculpatory and nominal damages clauses in the face of grossly negligent misconduct. *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992). However, the New York Court of Appeals recently clarified that "in a breach of contract case, . . . th[is] public policy rule does not extend to limitations on the remedies available to the non-breaching party." *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 352. This decision forecloses Netlist's argument; the contractual limitation on consequential damages may not be pierced here.

The Court will enter summary judgment precluding Netlist from recovering consequential damages as a remedy for its breach claims.

## V. CONCLUSION

The Court denies the surplus application to seal (ECF No. 141) and grants the other applications to seal (ECF Nos. 143, 146–47, 149, 169) subject to the exceptions

set forth in this Order. Within seven days, the parties shall (1) file the documents permitted to be sealed under seal pursuant to Local Rule 79-5.2.2(c) and (2) submit revised redacted versions of documents containing information the Court declines to seal pursuant to Local Rule 79-5.2.2(a).

The Court grants in part and denies in part the motions for summary judgment (ECF Nos. 145, 150) as follows:

- The Court grants summary judgment in favor of Netlist and against Samsung as to all elements but damages for Netlist's first claim for breach of the supply obligation.

- The Court grants summary judgment in favor of Netlist and against Samsung as to all elements but damages for Netlist's second claim for breach of contract only as to Netlist's theory that Samsung breached by failing to pay the full NRE fees.

- The Court grants summary judgment in favor of Netlist and against Samsung on Netlist's third claim for declaratory relief.

- The Court grants summary judgment in favor of Samsung and against Netlist on Netlist's prayer for consequential damages. Netlist cannot recover consequential damages as a remedy for its claims of breach of contract.

- The motions are denied in all other respects.

The Court provisionally seals this Order. Within seven days of the issuance of this Order, the parties shall file a joint statement as to whether any matter stated in this Order is information that should remain under seal. Thereafter, the Court will determine whether any portions of this Order should be redacted in the version filed on the public docket.

**IT IS SO ORDERED.**

Dated: October 14, 2021

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE