# EXHIBIT D

JASON C. LO, SBN 219030
  jlo@gibsondunn.com
MATTHEW BENJAMIN (pro hac vice)
  mbenjamin@gibsondunn.com
RAYMOND A. LAMAGNA, SBN 244821
  rlamagna@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

JASON SHEASBY, SBN 205455
  jsheasby@irell.com
IRELL & MANELLA LLP
800 Ave. of the Stars
Los Angeles, CA 90067
Telephone: 310.203.7096
Facsimile: 310.203.7199

Attorneys for Plaintiff Netlist Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| NETLIST INC., a Delaware corporation,<br><br>          Plaintiff,<br><br>  v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation,<br><br>          Defendant. | CASE NO. 8:20-cv-993-MCS (ADS)<br><br>**NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

**Page**

FACTS ............................................................................................................3

ARGUMENT ..................................................................................................4

I.    Section 6.2 Is Not Limited To Joint Development Efforts. ...........................4

    A.    Section 6.2 does not contain or impose any such limitation. ........................................................................................4

    B.    Samsung improperly relies on extrinsic evidence, which in any event confirms Netlist's reading of Section 6.2. ........................6

        1.    Samsung misrepresents the parties' pre-execution negotiating history. ..................................................6

        2.    Samsung misrepresents Netlist's post-execution statements. ..........................................................8

        3.    The parties' course of dealing further confirms that Section 6.2 provides an unrestricted mandatory supply obligation. ........................................................10

II.    Samsung Has Never Even Credibly Alleged That Netlist Breached The JDLA—Let Alone Established Breach As A Matter of Law. ........................................................................13

III.    Netlist's Claims Are Not Barred By Judicial Estoppel. ........................16

IV.    Section 6.2 is Binding and Enforceable. ........................................18

V.    Samsung Breached Section 3 Of The JDLA By Improperly Withholding And Failing To Cooperate. .............................................20

    A.    Samsung's withholding was not "required" by Korean law. ..............................................................................20

    B.    Samsung did not "reasonably cooperate" with Netlist. .................22

VI.    Samsung's Bad Faith Allows Netlist To Recover Consequential Damages. ....................................................................22

VII.    Netlist Properly Terminated The JDLA. ........................................24

CONCLUSION...............................................................................................25

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE  ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- i -

# TABLE OF AUTHORITIES

## Cases

*166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*,
   78 N.Y.2d 88 (1991) .......................................................................... 17

*Ally Gargano/MACA Advertising, Ltd. v. Cooke Props., Inc.*,
   1987 WL 126066 (S.D.N.Y. Oct. 13, 1989) ...................................... 22

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ..................................................................... 9, 10

*Beasley v. AZZ, Inc.*,
   2016 WL 8198320 (N.D. Okla. May 11, 2016) ................................ 14

*Ceredo Mortuary Chapel v. United States*,
   29 Fed. Cl. 346 (Fed. Cl. 1993) ....................................................... 18

*Corning Inc. v. VWR Int'l, Inc.*,
   2007 WL 841780 (W.D.N.Y. Mar. 16, 2007) ................................... 18

*CSL Behring, LLC v. Bayer Healthcare, LLC*,
   2019 WL 4451368 (D. Del. Sept. 17, 2019) ..................................... 18

*DeRosa v. Nat'l Envelope Corp.*,
   595 F.3d 99 (2d Cir. 2010) ............................................................... 16

*Edison Elec. Illuminating Co. of Brooklyn v. Thacher*,
   229 N.Y. 172 (1920) ........................................................................ 18

*Embedded Moments, Inc. v. Int'l Silver Co.*,
   648 F. Supp. 187 (E.D.N.Y. 1986) ................................................... 18

*Empire One Telecom., Inc. v. Verizon N.Y., Inc.*,
   888 N.Y.S.2d 714 (Sup. Ct. 2009) ................................................... 21

*Golisano v. Vitoch Interiors Ltd.*,
   54 N.Y.S.3d 244 (App. Div. 2017).................................................... 18

*Graphic Scanning Corp. v. Citibank, NA*,
   499 N.Y.S.2d 712 (App. Div. 1986) ................................................. 22

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- ii -

*Greenfield v. Philles Recs., Inc.*,
    98 N.Y.2d 562 (2002)................................................................................. 4, 5

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) ....................................................................... 16

*Harte v. Ibera, Lineas Aereas de Espana, S.A.*,
    2004 WL 1375119 (S.D.N.Y. June 17, 2004)............................................ 18

*Heyman Cohen & Sons v. M. Lurie Woolen Co.*,
    232 N.Y. 112 (1921)............................................................................. 17, 19

*Ischay v. Barnhart*,
    383 F. Supp. 2d 1199 (C.D. Cal. 2005)................................................ 17, 24

*KLS Diversified Master Fund, L.P. v. McDevitt*,
    507 F. Supp. 3d 508 (S.D.N.Y. 2020) ....................................................... 23

*McKenna v. Case*,
    507 N.Y.S.2d 777 (App. Div. 1986) ........................................................... 22

*Mobil Oil Exploration & Producing Se., Inc. v. United States*,
    530 U.S. 604 (2000) ................................................................................... 23

*Optima Media Grp. Ltd. v. Bloomberg, L.P.*,
    2021 WL 1941878 (S.D.N.Y. May 14, 2021)............................................ 24

*Palm Bay Int'l, Inc. v. Marchesi di Barolo S.p.A.*,
    2010 WL 11629645 (E.D.N.Y. May 10, 2010)......................................... 12

*Phillips-Jones Co. v. Reiling & Schoen*,
    184 N.Y.S. 387 (App. Div. 1920)......................................................... 17, 18

*Reiss v. Fin. Performance Corp.*,
    97 N.Y.2d 195 (2001) ................................................................................... 6

*Rissetto v. Plumbers & Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ........................................................................ 15

*Schron v. Troutman Sanders, LLP*,
    20 N.Y.3d 430 (2013)................................................................................... 6

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- iii -

*Sommer v. Fed. Signal Corp.*,
    79 N.Y.2d 540 (1992) ....................................................................... 21

*Soroof Trading Dev. Co. Ltd. v. GE Microgen Inc.*,
    2013 WL 5827698 (S.D.N.Y. Oct. 30, 2013) ..................................... 22

*Studley v. Nat'l Fuel Gas Supply Corp.*,
    485 N.Y.S.2d 880 (App. Div. 1985) ................................................. 10

### Statutes

35 U.S.C. § 271 ..................................................................................... 16

### Other Authorities

Glen Banks, N.Y. Contract Law § 2:25 ................................................ 17

### Rules

Fed. R. Civ. P. 33 adv. cmte. comments .............................................. 14

Fed. R. Civ. P. 33 ................................................................................. 13

Local Rule 7-18 ............................................................................. 17, 24

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

Samsung's Motion for Summary Judgment (the "Motion") raises a grab bag of meritless arguments in the vain hope of distracting the Court from what is really at issue: the plain, unambiguous language of the parties' contract (the "JDLA"). Some of Samsung's arguments flatly contradict the JDLA. Some improperly rely on flagrantly mischaracterized parol evidence while ignoring inconvenient facts that put the lie to Samsung's fictions. Some contradict positions Samsung took *last month* when moving for judgment on the pleadings. And some improperly seek to resuscitate arguments this Court resolved when denying that same motion. All told, the Motion is just Samsung's latest attempt to rewrite history and the parties' contract.

As set forth in Netlist's cross-motion for partial summary judgment, Netlist and Samsung entered into the JDLA in November 2015, which includes a mandatory supply obligation that Samsung substantially complied with for nearly two years because it knew it was required to do so. Beginning in mid-2017, however, Samsung intentionally and materially breached that supply obligation by maliciously imposing limits on the product it would sell to Netlist, knowingly violating its agreement to supply goods "on Netlist's request." Samsung also failed to make the $8 million payment that it owed to Netlist under the JDLA, wrongfully withholding as "taxes" $1.32 million that *demonstrably* were not owed to the Korean government and then impeding Netlist's efforts to seek a refund of those withheld funds. In an effort to benefit further from its bad-faith breaches, Samsung now raises a host of baseless arguments. None justify granting summary judgment in Samsung's favor.

*First*, Samsung says that its mandatory supply obligation applies only to products necessary for the parties' joint development efforts, not to all products requested by Netlist. This argument finds no support in the unambiguous text of Section 6.2, which does not contain any such express limitation. Indeed, where the parties intended other provisions to be so limited, the drafting so reflected. It is also contrary to what Samsung told this Court about the scope of Section 6.2 *last month*,

in its denied motion for judgment on the pleadings, when Samsung wrongly asserted that Section 6.2 was not even a supply obligation *at all*, but merely a "pricing obligation." Undeterred by the explicit language of Section 6.2, Samsung encourages this Court to disregard that evidence, and instead to bind the parties based on inadmissible extrinsic evidence. But even that extrinsic evidence fails to support Samsung's rewrite of Section 6.2.

*Second*, Samsung says that its breaches of the JDLA should be excused by Netlist's own alleged breaches. Here too, Samsung is weaving new made-for-litigation arguments out of whole cloth. Before August 16, 2021, Samsung had never even accused Netlist of these breaches, including in its responses to Netlist's interrogatories seeking that very information. Samsung has waived any defense based on Netlist's purported breaches, and in any event any such defense is meritless. Indeed, Samsung fails to cite any JDLA provision that Netlist purportedly breached—an understandable failing, given that there was no breach by Netlist.

*Third*, Samsung says that Netlist should be judicially estopped from arguing that its patent licenses provided consideration for Samsung's mandatory supply obligation in light of earlier statements made by Netlist. This argument is irrelevant to any issue presented on summary judgment because Samsung is not arguing that the JDLA is unenforceable for lack of consideration. It is wrong in any event. Samsung received ample consideration under the JDLA, and it has not come close to satisfying the elements of judicial estoppel.

*Fourth*, Samsung once again says that Section 6.2 is void because it is indefinite and the JDLA is neither a requirements contract nor an options contract. The Court has already considered and rejected these very same arguments, and Samsung offers no excuse for improperly raising them again. They also fail (again), because Samsung misapplies black-letter New York contract law.

*Fifth*, Samsung says that it did not violate Section 3 because its withholding of

$1.32 million owed to Netlist was "reasonable." Another strawman. Under the JDLA, Samsung was allowed to withhold only those taxes "required" by Korean law, and the Korean Tax Tribunal has already definitively ruled that Samsung's withholding was improper. The best Samsung can do is to mischaracterize deposition testimony that, like the JDLA itself, simply does not say what Samsung wishes it says.

**Sixth**, Samsung tries to enforce the JDLA's bar on consequential damages, notwithstanding the undisputed evidence of its own bad-faith misconduct. Under New York law, such provisions are not enforceable where a contract is breached in bad faith. That is precisely what has occurred here, and the jury must decide whether Samsung's bad-faith misconduct entitles Netlist to consequential damages.

**Finally**, Samsung improperly tries to resuscitate its already-rejected election of remedies argument by reframing it in the language of waiver. Both this Court's denial of Samsung's motion for judgment on the pleadings and the JDLA's no-waiver provision foreclose this route.

## FACTS

On November 12, 2015, Netlist and Samsung entered into the JDLA, Section 6.2 of which provides that "Samsung will supply NAND and DRAM products to Netlist on Netlist's request." SUF ¶¶ 22, 34. In mid-2017, Samsung began breaching that provision. Among other things, at various times Samsung executives ordered that Netlist's product supply be cut to zero or to arbitrary amounts far below Netlist's requests. *Id.* ¶¶ 82, 85-86, 88, 105. Samsung knew this breached the MOU, as its employees internally circulated the text of Section 6.2 while admitting that "*[p]ursuant to the agreement, supply* for NAND and DRAM products *is necessary* if there is a request from Netlist." *Id.* ¶ 38. Indeed, Joo Sun Choi, one of the Samsung executives who ordered the cut in Netlist's supply, was sent a copy of Section 6.2 and informed that it was "*the part of the agreement*" under which "there is *an obligation*

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 3 -

*to supply* NAND/DRAM" to Netlist. *Id.* ¶ 39. These admissions are irreconcilable with Samsung's positions in this case.

Furthermore, Samsung knew the harm that breaching its mandatory supply obligation would cause to Netlist. For instance, Samsung executives wrote to one another that Netlist "ha[d] no other bread and butter," and that Samsung was "nearly 100% of their support and Revenue," so its actions would "have a dramatic impact on their financials and future business." *Id.* ¶ 82. But rather than express remorse, instead they joked about mistreating Netlist, their putative business partner. *Id.* ¶ 97. In these and other ways, Samsung for years breached the JDLA in bad faith prior to its termination in July 2020. *Id.* ¶ 128.

## ARGUMENT

## I. Section 6.2 Is Not Limited To Joint Development Efforts.

Samsung argues that Netlist's claim for breach of the JDLA's mandatory supply obligation fails because "the supply obligation in Section 6.2 is limited" to only "the supply and pricing of NAND and DRAM products for the [parties'] NVDIMM-P joint development project." Br. 12.[1] But Samsung's latest made-for-litigation argument—which contradicts its prior representation to the Court *last month*—cannot overcome the unambiguous language of Section 6.2, which simply *does not limit* Samsung's supply obligation to the parties' joint development efforts.

### A. Section 6.2 does not contain or impose any such limitation.

As Samsung acknowledges, Section 6.2 is "clear and unambiguous on its face." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002); Dkt. 61 at 16-17. In plain terms, the provision states that "Samsung *will supply* NAND and DRAM products to

---

[1] Citations to "SUF" refer to Netlist's Statement of Undisputed Facts and the evidence cited therein, Dkt. 158-1; "SGDMF" refers to Netlist's Statement of Genuine Disputes of Material Fact and the evidence cited therein, filed herewith; "Br." refer to Samsung's Motion for Summary Judgment, Dkt. 150; and "Choi Ex." refer to exhibits to the Declaration of Joyce J. Choi, Dkt. 150-1. Unless otherwise noted, all emphases are added, and all internal quotation marks, alterations and citations are omitted.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT CASE NO. 8:20-CV-993-MCS (ADS)

- 4 -

Netlist **on Netlist's request.**" It makes no reference to the parties' joint development efforts whatsoever. Nor does the heading of Section 6—"Supply of Components"— suggest in any way that such components are to be supplied only in connection with joint development efforts.

The provision immediately preceding Section 6.2 demonstrates that where the parties intended to limit an obligation to a specific class of products, they knew how to do so. Section 6.1 mentions NVDIMM-P specifically in connection with **Netlist's** obligation to provide certain controller products **to Samsung**. Section 6.2, in contrast, says nothing about NVDIMM-P or any product other than NAND and DRAM. Because Samsung has not identified an ambiguity in Section 6.2, it "must be enforced according to the plain meaning of its terms." *Greenfield*, 98 N.Y.2d at 569.

Samsung's attempt to read a unique implied limitation into Section 6.2 also does not make sense in the broader context of the contract. Notably, Samsung does not argue that the **entire** JDLA relates strictly to the parties' joint development efforts—conveniently, only Section 6.2 is purportedly so limited. Samsung even admits that "the main purpose of the JDLA was patent licensing," which should be construed "broad[ly]." Br. at 26 n.6. Samsung provides **no reason** for the Court to import an implied limitation into Section 6.2 that **concededly** does not exist in other provisions in that same contract—whether it be Section 7 (the parties' mutual release of claims), Section 8 (the grant of patent licenses), or Sections 1 and 13.1 (the term of the contract—including the supply obligation—running through "the expiration of the last to expire of the Licensed Patents"). At bottom, Samsung is simply asking the Court to broadly construe the patent licensing consideration that it received from Netlist, SUF ¶¶ 24, 42, and simultaneously to narrowly construe the mandatory supply obligation consideration that it agreed to provide, *id.* ¶¶ 14-17. There is no basis in the text of the JDLA or otherwise for that self-serving distinction. Samsung is a highly sophisticated company that is capable of drafting agreements spelling out precisely

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 5 -

1    what it intends. It did not include the words it now seeks to read into the JDLA.

2        Besides being wrong, Samsung's argument also contradicts another of

3    Samsung's recent arguments. In its (denied) motion for judgment on the pleadings,

4    Samsung told this Court—**last month**—that Section 6.2 ***was not a supply obligation***

5    ***at all***. Rather, Samsung said that Section 6.2 "is unambiguously a pricing obligation,"

6    with "no supply obligation [] mentioned" therein. Dkt. 61 at 16-17. Samsung did not

7    say anything about any purported limitation to the parties' joint development efforts.

8    Now, after this Court denied Samsung's first attempt to rewrite Section 6.2 as solely

9    a "pricing obligation," it has ginned up a second, equally baseless reinvention.

10       **B.    Samsung improperly relies on extrinsic evidence, which in any**
11       **event confirms Netlist's reading of Section 6.2.**

12       Samsung's interpretation of Section 6.2 contradicts the plain language of the

13   contract, so Samsung relies entirely on extrinsic evidence to manufacture—and

14   purportedly resolve—an ambiguity that does not exist. To begin, "the question of

15   whether an ambiguity exists must be ascertained from the face of [the] agreement

16   without regard to extrinsic evidence," which "is not admissible to create an ambiguity

17   in a written agreement" that is "unambiguous on its face." *Reiss v. Fin. Performance*

18   *Corp.*, 97 N.Y.2d 195, 199 (2001). Because there is no ambiguity in Section 6.2, it is

19   unnecessary to consider extrinsic evidence at all. To the extent it is considered,

20   moreover, it further supports granting summary judgment in favor of Netlist, not

21   Samsung. *Cf.* Dkt. 145 at 15-18.

22       1.    **Samsung misrepresents the parties' pre-execution**
         **negotiating history.**

23       Samsung's discussion of extrinsic evidence begins with a one-sided misreading

24   of a memorandum of understanding (the "MOU") that predated the final executed

25   JDLA by several months and multiple rounds of negotiations.

26       As a threshold matter, the MOU is irrelevant and an improper basis for

27   summary judgment. The MOU makes clear that it was "intended solely as an outline

28

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 6 -

of certain provisions that would need to be negotiated and finalized" thereafter, that it was "not . . . a comprehensive list of all material matters upon which agreement must be reached," and that both parties did not "intend[ ] to be legally bound" by it. Choi Ex. 21 at -68. And in any event, Section 16.7 of the JDLA provides a merger clause establishing that the JDLA "supersede[s] all prior proposals, consents, agreements and discussions . . . between the parties." *See Schron v. Troutman Sanders, LLP*, 20 N.Y.3d 430, 436 (2013) (merger clauses "bar the introduction of extrinsic evidence to vary or contradict the terms of the writing").

Nor does the MOU state that the supply agreement is limited to the joint development project. The relevant language has no such restriction, providing only that "Samsung will supply NAND and DRAM to Netlist on mutually agreed terms." Instead, Samsung's dizzying logic is that (a) because the supply provision in the MOU is listed under the header of "Technology Collaboration," *and* (b) C.K. Hong, Netlist's co-founder and Chief Executive Officer, somehow concedes today that the phrase "Technology Collaboration" is a reference to the parties' joint efforts to standardize an NVDIMM-P product, *therefore* (c) this term in the MOU must be limited *only* to the parties' joint development efforts. *See* Br. 16-19.

But Mr. Hong's testimony was clear: "from day one" Netlist never agreed that "Samsung's obligation to supply NAND and DRAM products would be limited to" the parties' joint development efforts. *See, e.g.*, SGDMF ¶ 25. More importantly, Mr. Hong also explained that *after* the MOU was signed, the parties engaged in further negotiations resulting in "a number of differences" between the MOU and the JDLA. *See, e.g.*, *id.* For instance, the MOU contemplated a "5 year[ ]" contract term, but the parties eventually agreed that the JDLA would last for the life of Netlist's patents. *Compare* Choi Ex. 21 at -70, *and* Choi Ex. 19 § 13.1.

Most critically, *the MOU did not include the key language from Section 6.2*: "Samsung will supply . . . on Netlist's request." *Samsung* drafted that language in

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 7 -

October 2015, **after** the stale MOU on which it now relies. SUF ¶¶ 18-19. The MOU sheds no light on the specific provision at issue, which is not limited to the parties' joint development efforts. Indeed, Mr. Hong testified that he would not have executed the JDLA had that been his understanding as receiving just "a few hundred DRAM chips" for joint development purposes in exchange for the plethora of consideration given to Samsung "wouldn't make sense." SGDMF ¶¶ 20-21. Samsung's distortion of the parties' negotiation history and Mr. Hong's deposition testimony goes nowhere.

### 2. **Samsung misrepresents Netlist's post-execution statements.**

Next, Samsung points to a handful of instances post-dating the JDLA in which Netlist purportedly "admit[ted]" that Section 6.2 does not apply "beyond [the parties'] joint development" efforts. Br. 19. But Samsung again ignores the explicit unambiguous language of Section 6.2 and mischaracterizes the extrinsic evidence.

Samsung relies on out-of-context snippets from Netlist's SEC filings, but it **ignores** the specific disclosures that Netlist **did** make about the JDLA. For example, Netlist's 2015 Annual Report states that the JDLA "contractually commits Samsung to supply NAND flash and DRAM products to [Netlist] on [Netlist's] request at competitive prices." SUF ¶ 59. That specific disclosure makes no mention of joint development and confirms that Netlist regarded Section 6.2 as obligating Samsung to provide product on Netlist's request—which is exactly what Section 6.2 says. And consistent with that disclosure, Netlist repeatedly discussed Samsung's mandatory supply obligation with financial analysts and investors. SGDMF ¶¶ 42-43.

Samsung instead cites references to the absence of "long-term . . . supply contracts"[2] for a variety of products. *Id.* ¶ 42. But the language to which Samsung

---

[2] Samsung makes no attempt to square its (incorrect) argument that Section 6.2 obligated Samsung to supply NAND and DRAM to Netlist "if and to the extent the NVDIMM-P product was commercialized," Br. 15, with its implicit claim that the JDLA was not a "long-term supply contract," *id.* at 19. Even if Samsung were properly interpreting Netlist's SEC filings (which it is not), those filings would not support Samsung's assertion that Section 6.2 relates only to supply in connection with

points is boilerplate that had been in Netlist's disclosure statements for years, *id.* ¶¶ 42-43, which **says nothing about the JDLA or its relationship with Samsung specifically**. As explained by Netlist's Chief Financial Officer, Gail Sasaki, that language appeared in portions of Netlist's filings concerning generic "risk factors," in which Netlist's standard approach was to "be[ ] very conservative" to ensure that investors were aware of all possible risks. *Id.* These statements at issue cannot be removed from the context of the company's conservative approach to disclosing all potential problems that could theoretically result in harm to Netlist—including supply disruptions—nor do they override the disclosures Netlist made specifically describing Samsung's obligations under Section 6.2 of the JDLA.

Next, Samsung relies on a purported management "presentation of the JDLA to [Netlist's] Board of Directors" as evidence of Netlist's contemporaneous understanding of Section 6.2. Br. 20. But that supposed "presentation" is nothing of the sort—in reality, it is just a one-page email to Mr. Hong requesting his input on a draft email to the company's Board and a proposed agenda for an upcoming Board meeting. *See* Choi Ex. 34 (inquiring whether Mr. Hong "agree[s] with the . . . below"). Samsung provides no evidence of Mr. Hong's response, whether the draft email was sent to Netlist's Board, or what was discussed by Netlist's Board in connection with the JDLA. Similarly, Samsung relies on a "November 2, 2015 press release" discussing the JDLA. SGDMF ¶ 44; Br. 20. But what Samsung actually cites is a November 2, 2015 email with the word "draft" in its subject line, attaching an unfinished Word document tentatively dated "November 16, 2015"—two weeks later—replete with proposed edits in track-changes. Choi Ex. 40. Samsung again provides no evidence as to whether this draft document was ever finalized and issued, or what the finished press release actually said. Samsung asserts that these drafts

---

NVDIMM-P. Under Samsung's reading, Section 6.2 would still provide a contingent long-term supply obligation. Samsung's disparate arguments cannot be harmonized.

imply that there was no mandatory supply obligation. Br. 20. Given its burden as the moving party, Samsung cannot rely on non-final drafts that do not say anything about Section 6.2 to prove, as a matter of law on summary judgment, that Section 6.2 means something materially different than what it plainly says. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) ("inferences are to be drawn in [Netlist's] favor").[3]

Samsung also points to documents relating to a February 2017 meeting as proof of Netlist's "continued efforts to obtain a supply agreement in the years following the JDLA." Br. 21. But those documents do not establish what Samsung says. Samsung relies on a number of unexplained phrases ("Official Distributor Partner Agreement," "New Partner Type," and "Product allocation support for Netlist"), but provides no evidence clarifying what any of these quoted terms mean. *See* SGDMF ¶ 45. For instance, Samsung does not describe what an "Official Distributor Partner Agreement" might be, nor how (if at all) it might differ from the parties' relationship under the JDLA.[4] And again, inferences as to what these inconclusive terms mean cannot be drawn in Samsung's favor. *See Anderson*, 477 U.S. at 255.

3. **The parties' course of dealing further confirms that Section 6.2 provides an unrestricted mandatory supply obligation.**

Lastly, Samsung relies on extrinsic evidence concerning the parties' "course of dealing before and after the JDLA" as somehow demonstrating that Netlist understood it was not entitled to "all of the Samsung product it requested." Br. 22. But Samsung's

---

[3] Moreover, the JDLA largely barred Netlist from discussing it in "any press release or other public announcement" "without [Samsung's] approval." Choi Ex. 19 § 16.8. Public statements that had to be approved by Samsung are not a proper basis for inferring tacit admissions as to what Netlist believed.

[4] Similarly, the PowerPoint slide relied on by Samsung equally can be read to say that the JDLA created a "New Partner Type" for one or both of the companies because it combined both a "Strategic Development and Distribution" partnership rather than merely providing for one or the other. Choi Ex. 16 at -70. And, on that same slide, the phrase "Product allocation support" under the heading "Required Samsung support for Netlist" could easily mean that Samsung was required by Section 6.2 to support Netlist by providing it with product allocation in the amount requested by Netlist.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 10 -

1    argument both mischaracterizes the record and addresses irrelevant periods of time

2    during which the JDLA was not in effect.

3          At most, only the parties' conduct during periods when the JDLA governed

4    may be relevant. The parties' dealings before the JDLA's execution in November

5    2015 and following its termination in July 2020 shed no light on either party's

6    understanding of the contract. The authority on which Samsung relies holds that, to

7    the extent extrinsic evidence of the parties' course of conduct is at all taken into

8    account (which it should not be because the JDLA is unambiguous), "the established

9    rule" is that courts may look to the parties' actions when "*performing under*" the

10   contract. *Studley v. Nat'l Fuel Gas Supply Corp.*, 485 N.Y.S.2d 880, 884 (App. Div.

11   1985). The parties' pre- and post-JDLA behavior cannot clarify how they understood

12   an agreement that did not govern their relationship at those times. Accordingly, any

13   extrinsic evidence concerning "the actions of the parties" must focus on the time

14   period "*on and after their signing*" of the JDLA in November 2015, but before its

15   July 2020 termination. *Id.*

16         The record evidence cited by Samsung of the parties' course of dealing during

17   the JDLA establishes only that, throughout their relationship, Netlist provided

18   Samsung with both forecasts and purchase orders. *See* SGDMF ¶¶ 52-53, 55-56. But

19   that is not disputed. Netlist has never alleged that under the JDLA it need not submit

20   forecasts and purchase orders to Samsung in order to request Samsung products.

21   Section 6.2 says nothing whatsoever about *how* Netlist will make requests; rather, it

22   provides that Samsung "*will supply* . . . on Netlist's request." That is the mandatory

23   obligation Samsung breached.

24         Section 6.2 mandated that, beginning in November 2015, Samsung was

25   required to honor Netlist's forecasts and purchase orders. And the parties' course of

26   conduct shifted at that time to account for this change. Prior to the JDLA, the

27   "majority of the time" Samsung failed to provide Netlist with the amount of products

28

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 11 -

that it sought. Choi Ex. 2 at 36:10-13. But for nearly two years after the JDLA, Samsung substantially complied with Section 6.2's mandatory supply obligation as sales to Netlist increased from approximately ***$30,000 in all of 2015*** to ***millions of dollars per month*** in early 2017. SUF ¶¶ 71-73; Choi Ex. 51. Samsung would ascribe this timing to coincidence. Not so. Internally, Samsung recognized at the time that it had "***an obligation to supply***" Netlist because, "***[p]ursuant to the agreement***," doing so was "***necessary*** if there is a request from Netlist." SUF ¶¶ 38-39.

Samsung says that Netlist understood Samsung had no obligation to fulfill Netlist's forecasts and purchase orders even after entering into the JDLA because it was occasionally unable to do so. But its cited evidence demonstrates only that, in light of practical constraints, at times Netlist recognized that Samsung could not do the impossible by supplying products that it did not have available. *See, e.g.*, Choi Ex. 45 at -64, Ex. 53 at -64 (same document, in which Netlist prefaced a request by noting "I know it's insane but want to see try our luck"); Choi Ex. 48 at -53 ("I know [a product] is difficult today"); *cf.* Choi Ex. 7 at 152:14-24 (occasional inability to fulfill requests is a "reality that we must live with").[5] There is ***no*** evidence that Netlist understood Samsung to have ***unilateral unfettered discretion*** to refuse Netlist's requests under Section 6.2 whenever it wanted, even when fulfilling requests was feasible. To the contrary, Netlist understood that by entering into the JDLA it had transitioned from an "at-will customer . . . into a contractual supply customer, which means [it] would go right to the front of the line" in obtaining the products that Samsung had for sale and that its requests "must be filled ahead of" all at-will Samsung customers lacking a similar contractual commitment. SGDMF ¶¶ 20-21.

In mid-2017, however, Samsung executives made a conscious decision to intentionally and materially breach Section 6.2's mandatory supply obligation by

---

[5] Samsung also cites Choi Ex. 52, emails from 2020 that are not evidence of the parties' course of conduct during Samsung's earlier period of substantial compliance.

arbitrarily limiting the amount of product it would sell to Netlist. Samsung itself recognized that the JDLA imposed on it an "obligation to supply" Netlist—Samsung's own contemporaneous words—but it nevertheless refused to sell Netlist more than $500,000 worth of NAND and DRAM per month. SUF ¶¶ 38-39, 76-86. Samsung ignores these facts entirely, referring instead only to instances in which it "*could* not fulfill all of Netlist's orders." Br. 22. But the truth of the matter is Samsung *would* not fulfill Netlist's orders even when it *could* do so, including when product was sitting in Samsung's warehouse available for shipment. SGDMF ¶¶ 48, 53, 55-56. That repeated and willful refusal to supply materially breached Section 6.2.

Lastly, Samsung says that the terms of the purchase orders used throughout the parties' relationship "supersede[s]" the unambiguous language of Section 6.2. Br. 23. But there is no inconsistency between the purchase orders and the contract. The purchase orders' provisions governed the *specific transaction at issue* once a purchase order has been accepted by Samsung. *See e.g.*, Choi Ex. 52 (compiling purchase orders). They did not alter or amend the JDLA's provisions "establish[ing] the broader details of the parties' relationship." *Palm Bay Int'l, Inc. v. Marchesi di Barolo S.p.A.*, 2010 WL 11629645, at *5 (E.D.N.Y. May 10, 2010); *see also* Choi Ex. 19 § 16.7 (amendments to JDLA "require[ ] the signatures of the authorized representatives of the Parties"). Furthermore, nothing in the purchase orders absolved Samsung of liability for breaching Section 6.2 when it declined to accept Netlist's forecasts and effectively forbade Netlist from even issuing a purchase order that Samsung had no intention of fulfilling in the first place, or for failing to fulfill a purchase order that it had accepted. *See, e.g.*, SGDMF ¶¶ 48, 53-56. The terms of the purchase orders are irrelevant for purposes of interpreting Section 6.2, let alone assessing Samsung's liability for breaching Section 6.2.

## II. Samsung Has Never Even Credibly Alleged That Netlist Breached The JDLA—Let Alone Established Breach As A Matter of Law.

Without citing a single provision of the JDLA that Netlist purportedly violated,

Samsung now says it is entitled to summary judgment because Netlist breached the JDLA by "abandon[ing]" the parties' joint development efforts "at some point before 2017" and by cancelling a single purchase order for Embedded MultiMedia Cards. Br. 24. Those eleventh-hour made-for-litigation arguments fall completely flat.

**Before the night its Motion was filed, Samsung never once suggested Netlist breached the JDLA in this manner**—including in response to specific discovery in this litigation to which those allegations would have been responsive. For example, after Samsung pleaded as an affirmative defense that Netlist breached the JDLA, Dkt. 27 at 5, Netlist served Samsung with an interrogatory requiring it to "[d]escribe in detail the basis for and all facts Related to whether Netlist failed to comply with its obligations under the Agreement," Dkt. 145-43 at 19. After initially refusing to provide a substantive answer at all, on July 20, 2021 Samsung amended its response to state only one alleged breach by Netlist: "Netlist's purported termination" of the JDLA. *Id.* at 20. Samsung did not say anything about any alleged abandonment of joint development efforts or cancellation of purchase orders, notwithstanding that interrogatories must be "*answered . . . fully* in writing under oath," Fed. R. Civ. P. 33(b)(3). Samsung invented these newly minted allegations of breach for its Motion.

The Court has already rightly refused to indulge Samsung's untimely bait-and-switch tactics. In denying Samsung's motion for judgment on the pleadings, the Court refused to allow Samsung to raise a new affirmative defense "over seven months after filing its Answer" because the parties had already "expended resources litigating the case without factoring in th[at] defense and its possible impact on the viability of [Netlist's] claims." Dkt. 120 at 7. That same rationale applies even more strongly here, where Samsung first revealed these defenses at the close of fact discovery. Because allowing the Samsung to raise new claims at this late date "would greatly prejudice" Netlist, Samsung should be restricted to arguing only those theories of breach that it timely disclosed. *Beasley v. AZZ, Inc.*, 2016 WL 8198320, at *2 (N.D.

Okla. May 11, 2016) (refusing to allow introduction of claims at trial in light of interrogatory responses); *see also* Fed. R. Civ. P. 33 adv. cmte. comments ("reliance on an [interrogatory] answer may cause such prejudice that the court will hold the answering party bound to his answer").[6] Furthermore, before this litigation began, Samsung ***never*** informed Netlist that it believed Netlist was in breach of the JDLA— let alone provide Netlist with an opportunity to cure any such breaches.

Even if Samsung had timely raised these allegations of breach by Netlist, before or during this litigation (it did not), those allegations fail on the merits. Samsung has not even identified any provision of the JDLA that Netlist purportedly violated. Samsung now says that Netlist "abandoned" a "core component" of the parties' joint development efforts. Br. 24. But the testimony on which it relies suggests only that Netlist somehow shifted its focus from "standardization of the technology" to "a product centered collaboration effort." Choi Ex. 57 at 45:4-48:11. Samsung has not explained why such a shift was barred by the JDLA. To the contrary, Samsung repeatedly states that the JDLA "involved joint development of a 'game-changing' ***product***." *See, e.g.*, Br. 13-14; SGDMF § 1.b. Once again, Samsung cannot keep its story straight, saying in one breath that the intent of the JDLA was to develop a new product, but in the very next breath claiming that Netlist's efforts to develop that very same product somehow breached the JDLA.

Similarly, Samsung has not identified any provision of the JDLA supposedly breached by Netlist's cancellation of a purchase order. Instead, it misrepresents Netlist CEO C.K. Hong's testimony to suggest he admitted that ***either party's*** cancellation of a purchase order would breach the JDLA. Not so: in fact, Mr. Hong testified that

---

[6] Samsung again amended its interrogatory response ***at 10:57 P.M. on August 16, 2021—less than one hour before filing its Motion***—to include these additional theories of breach addressed in its briefing. Amending its interrogatory answer after depositions and document discovery had finished and with only 63 minutes remaining before the close of fact discovery hardly reduces the prejudice to Netlist.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 15 -

the JDLA would be breached "*if Samsung—Samsung cancels*." Choi Ex. 7 at

164:21. That is because Section 6.2 obligated Samsung to supply Netlist with NAND

and DRAM on Netlist's request. There is no parallel provision requiring Netlist to

accept all product that Samsung seeks to provide, nor is there anything in the JDLA

prohibiting Netlist from cancelling a purchase order once it has been placed.[7]

### III. Netlist's Claims Are Not Barred By Judicial Estoppel.

Samsung says that Netlist should not be allowed to argue that the patent license

it granted under the JDLA "provide[s] consideration for a broad[ ] supply obligation"

in light of earlier statements that Netlist made to the Korean Tax Tribunal. Br. 25.

This argument is both irrelevant and wrong.

As an initial matter, the scope of the patent license that Netlist gave Samsung

as consideration has nothing to do with the issues presented on summary judgment.

Netlist provided Samsung with a wide variety of consideration, of which the patent

license was one component. *See* SUF ¶¶ 23, 30-33, 40-41. And, even now, Samsung

does not argue that the patent license it received from Netlist provided no

consideration.

Regardless, judicial estoppel is not appropriate here. That doctrine can preclude

"a party from gaining an advantage by taking one position, and then seeking a second

advantage by taking an *incompatible* position." *Rissetto v. Plumbers & Steamfitters

Local 343*, 94 F.3d 597, 600 (9th Cir. 1996). But there is nothing "clearly

inconsistent," *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir.

2001), as between Netlist's argument here that the JDLA "provide[d] Samsung with

a license to its patents" as one form of consideration, Dkt. 145-3 ¶ 5, and Netlist's

earlier statement to the Korean tax authorities that Samsung's use of Netlist's patented

technologies "in the course of [Samsung's] own research and development" is not

---

[7] To the contrary, the terms of the parties' purchase orders make clear that Netlist was
entitled to alter or cancel its purchase orders even after they were accepted by
Samsung. *See, e.g.*, Choi Ex. 52 §§ 10, 11, 12.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 16 -

licensed by the JDLA. Choi Ex. 59 at 4. The JDLA did not reach Samsung's research and development activities because Samsung is a Korean corporation. Netlist's earlier statement is an accurate reflection of United States patent law, as its United States patents lack extraterritorial reach. *See, e.g.*, 35 U.S.C. § 271(a) ("whoever without authority makes, uses, offers to sell, or sells any patented invention, ***within the United States*** . . . . infringes the patent"). The JDLA therefore did not—and could not— impact Samsung's research and development occurring solely in Korea. There is no inconsistency between Netlist's prior statements and its current position.[8] *Cf. DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 104 (2d Cir. 2010) (judicial estoppel considers "whether the statements can be reconciled, not whether" it is "the only possible construction of [the] statements").

Furthermore, the Ninth Circuit "has restricted the application of judicial estoppel to cases where the court relied on, or accepted, the party's previous inconsistent position." *Hamilton*, 270 F.3d at 783. Samsung cites to the Korean Tax Tribunal's recitation—without endorsement—of the "Argument of the Appellant," Netlist, Dkt. 88-7 at 5, but that does not demonstrate that the Tax Tribunal "relied on" the specific statement at issue. *Hamilton*, 271 F.3d at 783.[9] The Tax Tribunal's "Determination" starts 15 pages later. Dkt. 88-7 at 19.

Nor is Samsung prejudiced by Netlist's argument that its patent license provided consideration to Samsung. Indeed, Samsung has never contended otherwise and acknowledges that it "has consistently taken the position that the main purpose of the JDLA was patent licensing," and "agrees the licenses are broad." Br. 26 n.6. Samsung cannot be prejudiced by Netlist ***agreeing*** with Samsung, and it cannot use judicial estoppel to force a dispute when the parties agree about this issue.

---

[8] By contrast, activities Samsung directed to the United States could give rise to infringement claims. *See, e.g.*, 35 U.S.C. §§ 271(b), (c), (f), (g).

[9] The Tribunal also recited Samsung's arguments while noting Samsung was "difficult to totally trust" because its claims were belied by the record. Dkt. 88-7 at 31.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT CASE NO. 8:20-CV-993-MCS (ADS)

- 17 -

## IV.    Section 6.2 is Binding and Enforceable.

On summary judgment, Samsung raises three arguments as to the validity of Section 6.2: that (1) Section 6.2 is indefinite; (2) the JDLA is not a valid U.C.C. requirements contract; and (3) the JDLA is not an options contract. Br. 26-29. Each argument has already been raised in Samsung's (denied) motion for judgment on the pleadings. *See* Dkt. 61 at 9, 17; Dkt. 107 at 4-7. ***And each has already been rejected by this Court.*** *See* Dkt. 120 at 5. That Samsung cites no evidence other than the text of the JDLA in making these arguments demonstrates that it is simply trying to relitigate pleadings arguments already rejected. In doing so, Samsung ignores both the law of the case doctrine, which prohibits reconsideration of "an issue that has already been decided by the same court . . . in the identical case," *Ischay v. Barnhart*, 383 F. Supp. 2d 1199, 1214 (C.D. Cal. 2005), and Local Rule 7-18. The arguments also (still) fail on the merits. Rather than repeating the ten pages of briefing that Netlist already provided on these exact issues, Netlist now provides a truncated argument and respectfully requests that the Court also consider its prior briefing to be incorporated by reference. *See* Dkt. 88-12 at 10-20.

**Indefiniteness.** Because contracts are "meant to accomplish something," finding them void as indefinite "is at best a last resort" to be applied only where "construction [is] futile." *Heyman Cohen & Sons v. M. Lurie Woolen Co.*, 232 N.Y. 112, 114 (1921); *see also 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991) (similar). Accordingly, "[m]ere indefiniteness as to the exact amount of goods which might be ordered . . . does not destroy the contract, where such amount can be admeasured by an agreed standard of measurement." *Phillips-Jones Co. v. Reiling & Schoen*, 184 N.Y.S. 387, 393 (App. Div. 1920); *see also* Glen Banks, N.Y. Contract Law § 2:25 (contract is not indefinite if it "sets forth within its four corners an agreed methodology for determining the missing term" or "invites recourse to an objective extrinsic event . . . to ascertain the term"). Here, there was a

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 18 -

concrete, definite, and specific agreed-upon standard: under Section 6.2, Samsung was obligated to provide NAND and DRAM in the amount "requested" by Netlist. Such agreements are enforceable. *See, e.g.*, *Edison Elec. Illuminating Co. of Brooklyn v. Thacher*, 229 N.Y. 172, 176 (1920) (quantity determined "from time to time as per orders received"); *Phillips-Jones*, 184 N.Y.S. at 393 (quantity determined by "orders . . . as sent in").

**Requirements Contract.** The Court has already recognized that Netlist has not alleged "that the JDLA is a requirements contract." Dkt. 120 at 5. Samsung nevertheless re-argues that the JDLA is not valid requirements contract, citing case law concerning contracts governed by the Uniform Commercial Code.[10] Br. 28. But to show that the U.C.C. applies, Samsung "ha[s] the burden of establishing that the parties' agreement was ***predominantly*** one for the sale of goods" and the parties' "main objective" was to contract for the provision of such goods. *Golisano v. Vitoch Interiors Ltd.*, 54 N.Y.S.3d 244, 245 (App. Div. 2017). Samsung makes no such argument. Because the JDLA is not so limited, the U.C.C. is inapposite. *See, e.g.*, *Harte v. Ibera, Lineas Aereas de Espana, S.A.*, 2004 WL 1375119, at *1 (S.D.N.Y. June 17, 2004). In any event, the JDLA would pass muster even if the U.C.C. did apply, because it was understood that Netlist would purchase Samsung products exclusively from Samsung, and that purchasing Samsung products on the secondary market was economically irrational. SUF ¶ 60; *cf. Edison Elec.*, 229 N.Y. at 176 (parties' "intention" to enter into exclusive relationship "quite apparent" notwithstanding absence of exclusivity provision in contract); *Ceredo Mortuary Chapel v. United States*, 29 Fed. Cl. 346, 350 (Fed. Cl. 1993) ("Implied rather than

---

[10] *See CSL Behring, LLC v. Bayer Healthcare, LLC*, 2019 WL 4451368, at *2 (D. Del. Sept. 17, 2019); *Corning Inc. v. VWR Int'l, Inc.*, 2007 WL 841780, at *6 (W.D.N.Y. Mar. 16, 2007); *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 191 & n.2 (E.D.N.Y. 1986). *CSL* and *Corning* were also cited for the very same purpose in Samsung's denied motion for judgment on the pleadings. Dkt. 61 at 18.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 19 -

express exclusivity is not unusual in requirements contracts").

**Options Contract.** Samsung argues that the JDLA is not a valid options contract because it does not "have a definite or ascertainable quantity term." Br. 29. That merely repeats the indefiniteness argument, which fails for the reasons discussed above. Moreover, Samsung misreads *Heyman Cohen*, which simply reinforces the commonsense proposition that an options contract must be "supported by [adequate] consideration." 232 N.Y. at 114. Here, the JDLA's mandatory supply obligation is valid and enforceable because Samsung was provided myriad forms of consideration. *See* SUF ¶¶ 23, 30-33, 40-41. *Heyman Cohen*'s discussion of indefiniteness makes no mention of the parties' minimum purchase agreement, finding the contract in question was ***not indefinite*** because, as here, "the implication [was] plain that the buyer [would subsequently] fix the quantity subject only to the proviso that the quantity shall be limited by ability to supply." 232 N.Y. at 114.

## V. Samsung Breached Section 3 Of The JDLA By Improperly Withholding And Failing To Cooperate.

### A. Samsung's withholding was not "required" by Korean law.

Section 3.2 provides that Samsung could withhold only those funds "***required*** . . . by applicable law" from the $8 million owed under the JDLA. But rather than proving it was "required" to withhold any funds, Samsung asserts that it "***reasonably***" deducted $1.32 million in "***applicable*** withholding taxes." Br. 29-30. That argument fails for two independent reasons. First, the Court has already explained that "Netlist claims breach of contract, not a violation of Korean tax law," so even "crediting [Samsung's] argument would not foreclose Netlist's theory of breach." Dkt. 120 at 6. Whether or not Samsung's actions were "reasonable" is simply not the issue; the question is whether Samsung's withholding was "required … by applicable law." And Samsung fails to address the Korean Tax Tribunal ruling confirming that its withholding was ***not "required"*** and thus a breach of Section 3.2. *See* SUF ¶ 53.

Second, Samsung suggests its withholding was reasonable—again,

irrelevantly—because Netlist CFO Gail Sasaki allegedly approved it. *See* Br. 30. That is false. The evidence reflects that Ms. Sasaki merely filled out a form at Samsung's request, not because she agreed that a 16.5% tax should be withheld. As Samsung is well aware, Ms. Sasaki consulted with tax professionals concerning an ***earlier version*** of the form in question that did not identify any tax statutes or rates. It was only after that consultation that ***Samsung asked*** her to fill in the information on which Samsung now relies. Ms. Sasaki did so without consulting again with tax professionals because she believed Samsung was requesting that she fill out the form for Samsung's internal purposes, in order to enroll Netlist as a vendor, rather than as part of a submission that would be made to the Korean tax authorities. Ms. Sasaki trusted Samsung and "took it on face value what [they] said" as to why she was being asked to sign a new version of the form, which she thought would not "affect [Netlist] one way or the other." SGDMF ¶ 72; *see also id.* ¶ 71 (expert report: "filling out the form" does not "constitute a declaration that all sources of income" reflected therein "are taxable").

Samsung now seeks to take advantage of Ms. Sasaki having trusted its representations by twisting around language ***included at Samsung's request*** to disingenuously suggest it reflects what Netlist believed. But the record is clear as to what Ms. Sasaki understood. Samsung's own evidence shows that within hours of learning that Samsung improperly withheld $1,320,000, Ms. Sasaki wrote on November 19, 2015 that this "needs to be corrected. They should have remitted $8M. We don't pay taxes to the Korean government. There should be no withholding of taxes on our behalf." Choi Ex. 61 at -20. Shortly thereafter, Ms. Sasaki wrote to Samsung that she "did not anticipate that there would be withholding" and "respectfully request[ed] that [Samsung] transfer the remaining $1,320,000" to Netlist, going so far as to offer "to indemnify Samsung for any tax liabilities that could be later imposed" in the event that the withholding had been required. SUF ¶ 47.

That Samsung tricked Ms. Sasaki does not make its withholding "reasonable."

Br. 29. In any event, reasonableness is the wrong standard to apply here. The Korean Tax Tribunal has ruled that Samsung's withholding was not required. SUF ¶ 53. Accordingly, Samsung breached Section 3.2. And all Samsung has done, at most, is generate a fact dispute that must be resolved by the jury, not the Court.

### B. Samsung did not "reasonably cooperate" with Netlist.

Samsung says that it "did in fact cooperate" with Netlist's efforts to seek a refund of the wrongfully withheld $1.32 million, just not "the way . . . Netlist wanted." Br. 30. This is sophistry, plain and simple. There is no dispute about the relevant facts. The JDLA provided that Samsung would pay Netlist an $8 million non-recurring engineering fee. SGDMF ¶ 17, SUF ¶ 27. But Samsung *advocated* to the Korean tax authorities—***unnecessarily, inaccurately, and in bad faith***—that the engineering fee was actually a patent licensing royalty and withheld funds from Netlist on that basis. SGDMF ¶¶ 73-74; SUF ¶ 46, 49, 52. Samsung made that unnecessary, incorrect, bad-faith argument to the Korean government over Netlist's express request that Samsung refrain from doing so because it was directly contrary to Netlist's interests, Section 3.1, and applicable tax law. SGDMF ¶¶ 75, 77; SUF ¶¶ 50-51. That is not "cooperation" under any standard or meaning. It is obstruction and breach.

### VI. Samsung's Bad Faith Allows Netlist To Recover Consequential Damages.

Samsung says Section 12.5 of the JDLA bars Netlist from recovering consequential damages (but not other damages). Br. 31-32. But New York's highest court has made clear that "a party may not insulate itself from damages caused by grossly negligent conduct" through "contract clauses purporting to exonerate [the] party from liability and clauses limiting damages." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992). Because Samsung's conduct "smack[s] of intentional wrongdoing" and "evinces a reckless indifference" to Netlist's contractual rights, it cannot rely on Section 12.5 to bar Netlist from seeking consequential damages as a matter of law on summary judgment. *Id.*; *see also*, *e.g.*, *Empire One Telecom., Inc. v. Verizon N.Y., Inc.*, 888 N.Y.S.2d 714, 723 (Sup. Ct. 2009) ("contractual provisions

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 22 -

limiting damages" are not "enforceable as to . . . willful misconduct").[11]

Samsung spent years breaching the JDLA in bad faith prior to Netlist's termination while continuing to reap the benefits of the contract, including its patent license.. *See* Dkt. 145 at 14-21. Beginning in mid-2017, Samsung routinely rejected Netlist's requests to purchase NAND and DRAM and arbitrarily sought to limit Netlist's purchases to as little as $500,000 per month. At the same time, Samsung knew that Section 6.2 constituted a mandatory supply obligation and that the arbitrary cap it had imposed would cause severe harm to Netlist. SUF ¶¶ 38-39. Indeed, Samsung employees *joked and laughed* about the harm they knew they were causing to Netlist—maliciously and spitefully—in internal Samsung emails that never would have seen the light of day but for this lawsuit. *See* SUF ¶¶ 96-97. Other Samsung customers were not treated similarly; rather, Netlist was singled out for punishment. *See, e.g.*, SUF ¶¶ 85-86, 105; SGDMF ¶ 4 (Samsung correspondence about "utilize[ing] Netlist [product allocation] for [another customer's] support" and acknowledging it "pulled all [product allocation] for Netlist and distributed" it to others).

In addition, Samsung improperly withheld nearly 20% of the $8 million non-recurring engineering fee it owed to Netlist and failed to reasonably cooperate with Netlist's attempts to seek a refund. Instead, Samsung actively impeded Netlist's efforts to obtain a refund by falsely claiming that what it knew to be engineering fees

---

[11] *See also*, *e.g.*, *Ally Gargano/MACA Advertising, Ltd. v. Cooke Props., Inc.*, 1987 WL 126066, at *9 (S.D.N.Y. Oct. 13, 1989) (denying summary judgment because triable issue of fact existed as to bad faith or willful misconduct); *Graphic Scanning Corp. v. Citibank, NA*, 499 N.Y.S.2d 712, 715 (App. Div. 1986) (reversing summary judgment); *McKenna v. Case*, 507 N.Y.S.2d 777, 777 (App. Div. 1986) (same). Samsung's own cases demonstrate that whether its conduct was intentional or grossly negligent cannot be decided in its favor on summary judgment under New York law. *See Metro. Life v. Noble Lowndes*, 84 N.Y.2d 430 (1994) (decided at trial); *Sommer*, 79 N.Y.2d at 555 (denying summary judgment); *cf. United States v. Siemens Gov't Techs., Inc.*, 2017 WL 10562969 (C.D. Cal. May 19, 2017) (applying Virginia law).

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT CASE NO. 8:20-CV-993-MCS (ADS)

- 23 -

were actually patent royalties. In light of these undisputed facts, the Court should find that Samsung acted in bad faith in granting partial summary judgment in favor of Netlist. At minimum, however, the jury must decide whether Samsung's bad-faith misconduct entitles Netlist to consequential damages because whether Samsung "engaged in willful or grossly negligent acts involves genuine questions of fact." *Soroof Trading Dev. Co. Ltd. v. GE Microgen Inc.*, 2013 WL 5827698, at *11-12 (S.D.N.Y. Oct. 30, 2013) (denying summary judgment).

## VII.   Netlist Properly Terminated The JDLA.

Netlist was entitled to terminate the JDLA in the event of an uncured or uncurable material breach. SUF ¶ 43. Samsung raises three arguments as to why Netlist failed to properly exercise that right. None have merit.

**First**, Samsung claims that it had "no supply obligation" under Section 6.2 such that its failure to supply NAND and DRAM to Netlist could not have been a "material breach." Br. 32. That simply reiterates its argument as to why there was no breach, which fails for the reasons set forth above. Samsung makes no independent argument that its supply breaches were not material.

**Second**, Samsung argues that its breaches of Sections 3.1 and 3.2 "could not possibly" be material because the Korean Tax Tribunal eventually rejected Samsung's bad-faith arguments and refunded to Netlist the $1.32 million that Samsung had wrongfully withheld. Br. 32; *see also id.* at 31 (arguing "Netlist suffered no injury"). But that confuses two separate concepts: materiality and damages. "Whether [a] breach was . . . material . . . depends on what impact, if any, the breach had ***at the time the breach occurred***." *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 635 (2000). That Netlist ultimately prevailed and obtained a refund of the $1.32 million that Samsung wrongfully withheld five years earlier— notwithstanding Samsung's efforts to impede Netlist from doing so—is irrelevant to the question of materiality. *See, e.g.*, *KLS Diversified Master Fund, L.P. v. McDevitt*,

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 24 -

507 F. Supp. 3d 508, 545 (S.D.N.Y. 2020) (failure to timely pay taxes was material breach notwithstanding subsequent efforts to mitigate damages). In any event, Netlist did suffer damages as a result of Samsung's improper withholding and refusal to cooperate. *See* SUF ¶ 54.

*Third*, Samsung argues that Netlist waived its right to terminate by "intentionally delay[ing]" the termination. Br. 33. That is both untrue and not waiver. Rather, Samsung tries to relitigate the election of remedies argument that it previously raised in its motion for judgment on the pleadings. Dkt. 61 at 22-23. This Court has already rejected Samsung's argument that "Netlist did not promptly seek termination." Dkt. 120 at 7. By changing its verbiage, Samsung is attempting a blatant and improper end-run around the Court's resolution of this very issue. *See Ischay*, 383 F. Supp. 2d at 1214; Local Rule 7-18.

Samsung's waiver argument also fails on the merits. "Under New York law, waiver is the voluntary and intentional relinquishment of a contract right," which "must be based on a clear manifestation of intent" and "is not to be inferred from a doubtful or equivocal act." *Optima Media Grp. Ltd. v. Bloomberg, L.P.*, 2021 WL 1941878, at *13 (S.D.N.Y. May 14, 2021). It has no bearing here because the parties included an express no-waiver of rights provision in their agreement. Choi Ex. 19 § 16.2. New York law "uniformly enforce[s] these types of clauses," which erect a "high burden" that Samsung can overcome only by providing "evidence sufficient to demonstrate that [Netlist] intended for the no-waiver clause to have no effect" here. *Optima*, 2021 WL 1941878, at *14. While a no-waiver clause can itself be waived, a party's "decision not to terminate . . . earlier than when it did" provides no basis from which a court can "infer [an] intention to waive." *Id.* Accordingly, Netlist did not waive its right to terminate the JDLA.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: August 30, 2021

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Jason C. Lo

Jason C. Lo
333 South Grand Avenue
Los Angeles, CA 90071
213.229.7000
jlo@gibsondunn.com

Attorneys for Plaintiff Netlist Inc.

NETLIST INC.'S OPPOSITION TO SAMSUNG ELECTRONICS
CO., LTD.'S MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT
CASE NO. 8:20-CV-993-MCS (ADS)

- 26 -