IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

NETLIST, INC.,                    (  CAUSE NO. 2:21-CV-463-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD., (
et al.,                           )  MARSHALL, TEXAS
                                  (  APRIL 6, 2023
          Defendants.             )  1:30 P.M.
_____


VOLUME 3

_____


PRETRIAL CONFERENCE

BEFORE THE HONORABLE ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                    A P P E A R A N C E S

 2         FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                                 LOS ANGELES
 3                               1800 AVENUE OF THE STARS
                                 SUITE 900
 4                               LOS ANGELES, CA 90067-4276
                                 (310) 203-7096
 5                               BY:  MR. JASON SHEASBY

 6                               McKOOL SMITH, P.C. - MARSHALL
                                 104 E. HOUSTON ST., SUITE 300
 7                               MARSHALL, TEXAS  75670
                                 (903) 923-9000
 8                               BY:  MS. JENNIFER TRUELOVE

 9         FOR THE DEFENDANTS:   FISH & RICHARDSON, PC -
                                 DALLAS
10                               1717 MAIN STREET, SUITE 5000
                                 DALLAS, TEXAS  75201
11                               (214) 747-5070
                                 BY:  MR. MATTHEW COLVIN
12                                    MR. THOMAS REGER

13                               FISH & RICHARDSON, PC -
                                 NEW YORK
14                               7 TIMES SQUARE, 20TH FLOOR
                                 NEW YORK, NEW YORK  10036
15                               (404) 724-2764
                                 BY:  MS. KATHERINE REARDON
16
                                 GILLAM & SMITH, LLP
17                               102 N. COLLEGE, SUITE 800
                                 TYLER, TEXAS  75702
18                               (903) 934-8450
                                  BY:  MR. TRAVIS UNDERWOOD
19
           OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
20                               100 E. HOUSTON STREET
                                 MARSHALL, TEXAS  75670
21                               (903) 923-8546

22

23

24

25
```

1          THE COURT:  Good afternoon.  Please be seated.

2      For the record, we're here for the completion of the

3  pretrial conference in Netlist versus Samsung Electronics, et

4  al., which is our Case No. 2:21-463.  And this is specifically

5  the exhibit hearing in the case.

6      Would counsel state their appearances for the record?

7          MS. TRUELOVE:  Good afternoon, Your Honor.  Jennifer

8  Truelove for Plaintiff Netlist.  With me today is Mr. Jason

9  Sheasby.

10         MR. SHEASBY:  Good afternoon, Your Honor.

11         MS. TRUELOVE:  I have to apologize for not rising.

12  I got my foot caught in my computer cord when I tried to

13  stand.  But other than that mishap, we're ready to proceed

14  today.

15         THE COURT:  All right.  Thank you, Ms. Truelove.

16         MR. UNDERWOOD:  Good afternoon, Your Honor.  Travis

17  Underwood on behalf of the Samsung Defendants.  I'm joined by

18  Ms. Kate Reardon.

19         MS. REARDON:  Good afternoon.

20         MR. UNDERWOOD:  Mr. Tom Reger.

21         MR. REGER:  Good afternoon.

22         MR. UNDERWOOD:  And Mr. Matt Colvin.  And we're

23  ready to proceed.

24         THE COURT:  All right.  Thank you, Mr. Underwood.

25      I have copies of a variety of filings that counsel have

1    made in an effort to gather the objections into buckets, but I

2    am happy to proceed in whatever counsel think is the most

3    efficient manner.  I typically do start with the Defendants'

4    objections to the Plaintiff's exhibits, but if counsel have a

5    better idea I'm open to that.

6              MR. SHEASBY:  Your Honor, I believe that that's what

7    we agreed to between ourselves, that they would start with

8    their objections to our exhibits.

9              THE COURT:  All right.  Thank you, Mr. Sheasby.

10        In that case, I'll hear from Defendants about their

11   objections.

12        Good afternoon, Mr. Reger.

13             MR. REGER:  Hello again, Your Honor.  Tom Reger on

14   behalf of Samsung.

15        May it please the Court?

16             THE COURT:  Yes.

17             MR. REGER:  Your Honor, what we will address first

18   is a filing made by the Plaintiff Proffer No. 1.

19        And if I could have my slides, please.

20        Your Honor, before we get into the specific proffer and

21   the specific exhibits that they are seeking to pre-admit, it's

22   important to set the stage and set the context for that

23   submission to Your Honor.

24        There were two motions in limine filed by Samsung that

25   were granted with respect to certain issues.  So Motion in

1    Limine No. 1 relates to Samsung's alleged failure to supply

2    memory to Netlist.  That was granted.  The second motion in

3    limine was with respect to the alleged value of the supply

4    agreement under the JDLA.

5        Now, to take a step back for a moment, there was a case

6    in the Central District of California between Netlist and

7    Samsung about a joint development and license agreement.  Both

8    sides were represented by counsel.  There was a full case

9    presented, evidence about the allegations of breach --

10            THE COURT:  I have heard about the result of the

11   jury trial in California.

12            MR. REGER:  Understood, Your Honor.  Thank you.

13       So with that context in mind, Your Honor, we moved in

14   limine to keep out argument and evidence regarding Samsung's

15   alleged failure to supply memory to Netlist, which was the

16   basis for that breach of contract action, one of two, but

17   the only one at issue here.  The second motion in limine was

18   with respect to the alleged value of that supply agreement to

19   Netlist.  So it's two different issues.

20       Now, while Judge Gilstrap -- while this Court granted

21   Motion in Limine No. 2, he allowed an exception to allow

22   Defendants--excuse me--to allow the Plaintiff's damages expert

23   Mr. Kennedy to talk about the value of that supply.  Motion in

24   Limine No. 1 was granted without a similar exception.  So

25   while someone may open the door, as it stands, Netlist is

1    wholly precluded from offering any argument or evidence

2    regarding Samsung's failure to supply memory to Netlist.

3         Now, throughout this proffer they suggest that they rely

4    on Motion in Limine No. 2.  They tell Your Honor that the

5    exhibit relates to the value of supply, and then they point to

6    Mr. Kennedy's report as if to suggest that this is somehow

7    outside the prohibition of Motion in Limine No. 2.

8         Now, we are going to walk through the exhibits one by

9    one, but we'll see that the exhibits being presented actually

10   fall within the prohibitions of Samsung's Motion in Limine

11   No. 1 which, again, was granted without exception and without

12   -- it was fully granted, Your Honor.

13        Now, during argument the Court said it would be an active

14   gatekeeper to keep out evidence and argument that would

15   inflame the jury, and pre-admitting these exhibits would

16   create a mess out of an orderly patent infringement case and

17   would run afoul of that gatekeeper role.  If Netlist thinks we

18   opened the door, then the Court will certainly entertain a

19   request from Netlist to use these documents.  But until that

20   point, these are in direct violation of motion in limine

21   No. 1.

22             THE COURT:  So the exhibits that you're objecting to

23   now are the ones that are in the bucket that you've described

24   as Proffer 1?

25             MR. REGER:  Yes, Your Honor.  That was a bucket

1    created by Netlist when they filed a proffer.  That's right,

2    Your Honor.

3              THE COURT:  All right.

4              MR. REGER:  And would you like me to read the

5    exhibits at issue into the record, Your Honor?

6              THE COURT:  I don't know -- have you filed the

7    bucket list?  Is it in the record?  If not, we should probably

8    read it in.

9              MR. REGER:  Your Honor, I believe both parties

10   emailed that bucket list, but I don't believe we've actually

11   filed anything.

12             THE COURT:  All right.  Then I'll note that my

13   understanding of this bucket is Plaintiff's Exhibits 583, 632,

14   1662, 1673, 1779, 585, and 1787.

15        Does that correspond with your understanding, Mr. Reger?

16             MR. REGER:  I believe that's right, Your Honor.

17             MR. SHEASBY:  Your Honor, I think it was 583, not

18   585.

19             THE COURT:  All right.  585 is in a parenthetical,

20   suggesting that perhaps it's attached to the one before.  I

21   don't know.

22        Mr. Reger, do you have your bucket list?

23             MR. REGER:  I do.  Your Honor.  May I --

24             THE COURT:  Yes.

25             MR. REGER:  Your Honor, I understand the confusion.

1    My apologies.  So 585 is an attachment to an email that is

2    subject to this proffer.

3            THE COURT:  So the --

4            MR. REGER:  So it will be considered as part of it,

5    Your Honor.

6            THE COURT:  The email is 1779 and the attachment is

7    585?

8            MR. REGER:  Yes, sir.

9            THE COURT:  All right.  Then do you want to rest at

10   this point and have me hear from the Plaintiff, or do you have

11   something further to offer?

12           MR. REGER:  Your Honor, I was going to walk through

13   the exhibits and explain how the proffer is suggesting that

14   these are part of the exception under Motion in Limine No. 2

15   that the Court granted with respect to Mr. Kennedy and,

16   instead, what I was going to show Your Honor is that these are

17   actually prohibited under Motion in Limine No. 1.  If Your

18   Honor would like, I can walk through one by one.

19           THE COURT:  I think I understand the difference

20   between the two MILs, and so maybe at this point I'll see if

21   Mr. Sheasby can explain how he thinks they fit within it and

22   then I'll let you respond to that.

23           MR. REGER:  Thank you, Your Honor.

24           THE COURT:  Thank you, Mr. Reger.

25           MR. SHEASBY:  Can we switch slides, please?

1          May it please the Court.

2          There are two motions in limine granted in part.  The

3     first one was granted as to improper argument and evidence

4     regarding breach of the supply obligation, which says nothing

5     because Judge Gilstrap didn't decide what was improper or

6     proper; he simply said that he and the Court needed to be a

7     gatekeeper as to the exhibits and a proffer needed to be made,

8     which is exactly what was done.

9          The second motion in limine was denied as to

10    Mr. Kennedy's discussion of the importance of the supply

11    obligation.  Each of the agreements -- each of the documents

12    in this bucket are expressly discussed by Mr. Kennedy in the

13    unstricken portions of his report.

14         But I want to take a step back.  This is JTX 0029,

15    which is in evidence indisputably, and upon termination of the

16    agreement, any licenses and rights that the party has -- that

17    Samsung had to use our patents was terminated and it expired.

18    This is directly on point with cases such as *Mentor Graphics*,

19    851 F.3d 1275, in which the termination of the license

20    agreement and the warnings about what would happen if the

21    license agreement was terminated was direct evidence of

22    willful infringement.  And, in fact, the Federal Circuit

23    reversed the district court who did not allow the fact that a

24    pre-existing license was breached to be used as evidence of

25    willfulness.

```
1            THE COURT:  You know, nobody's talking here about

2    not allowing the Plaintiff to show that a license was

3    terminated.

4            MR. SHEASBY:  That's correct.  So the question is --

5    we agree that the -- one can show that the license is

6    terminated.  The next question is can we show that the license

7    was terminated because of failure of the supply clause.

8    Mr. Kennedy speaks about the fact that the supply clause is an

9    essential element of the consideration for the agreement, and

10   each of the exhibits that he discusses go directly to the

11   issue of the value of supply.

12       If we can have PX 583.

13       This is the material breach letter.  This says in very

14   clear and plain language that the reason for the termination

15   is because of failure of the supply obligation.  To exclude

16   this would be no different than Mentor Graphics.  In Mentor

17   Graphics, the license was lost because EVE was acquired by

18   Synopsys.  The acquisition of EVE by Synopsys, they were

19   warned that if that occurred they would lose any rights and

20   be exposed to patent infringement.  This letter does exactly

21   that--it warns Samsung that if it doesn't change its behavior,

22   if it doesn't stop -- if it doesn't stop its breach and supply

23   product, it will lose its license.

24       And so there's nothing improper or inflammatory about

25   this; it's the basic issue in this case for two reasons.  One,
```

1     it shows the behavior of willfulness, just as it did in *Mentor*

2     *Graphics*; and two, it goes directly to what was the value of

3     this agreement, which is a hotly disputed issue.  For us, and

4     Mr. Kennedy speaks to this, the value of the pre-existing

5     agreement was the supply obligation.

6         This letter makes it more likely than not -- well, let me

7     put it this way.  A juror could conclude based on this letter

8     that it was, in fact, the case that the supply obligation was

9     incredibly important to Netlist; so important that it gave up

10    all of its rights under the agreement in order to bring

11    Samsung to bear for failure to supply.

12        So the question is, is there anything improper or

13    inflammatory about this letter.  It doesn't use colorful

14    language, it doesn't go over the top; it simply states facts,

15    facts that are now undisputed based on the Central District of

16    California decision, and tells Samsung if it doesn't change

17    its behavior there will be a breach.

18             THE COURT:  If you introduce evidence of the finding

19    of the California litigation, why shouldn't Samsung be allowed

20    to introduce the verdict?

21             MR. SHEASBY:  We are not going to introduce any

22    evidence of the finding of the litigation, Your Honor.

23             THE COURT:  But what you're suggesting is that the

24    California court verdict established Netlist's breach claim on

25    that.

1          MR. SHEASBY:  That's exactly what we're not trying

2     to do.  In other words, we make no reference to the Central

3     District of California.  We want none of that to come in.  The

4     only thing we want to be in the record is that there was a

5     notice of material breach and there was an effective

6     termination, full stop.  The --

7          THE COURT:  Explain to me why the notice of breach

8     is relevant to the value of the supply agreement.

9          MR. SHEASBY:  So we speak about the fact that the

10    failure to supply NAND and DRAM was a central element of the

11    agreement for us, and the fact that we were prepared to

12    terminate the agreement based on the fact that it's a central

13    element of the -- the fact that we were able to terminate the

14    agreement shows that it was a central element of the benefit

15    of the bargain for us.

16        Now, to be clear, the jury verdict -- there were two

17    decisions in the Central District of California, Your Honor.

18    One was a finding of material breach and termination on

19    summary judgment coupled with a finding that we were not

20    allowed to seek consequential damages in front of the jury.

21    There was a jury verdict solely on cover damages.

22        We will not dispute and, in fact, our witnesses will

23    admit on direct and on cross examination that we were able to

24    cover all of our supply, that we had no cover damages from

25    doing this, nor are we going to talk about any consequential

1     damages based on this behavior.  This is solely to show two

2     things--one, that the supply agreement was, in fact, a central

3     element of the benefit of the bargain, as evidenced by the

4     contemporary correspondence; and two, under *Mentor Graphics*

5     *versus EVE*, showing that Samsung was given warning that would

6     lose its rights to our patents, it chose to go in a particular

7     direction.  That's the same direction that EVE and Synopsys

8     went inexplicably in *Mentor Graphics*, and the Federal Circuit

9     said that that was evidence of willfulness.

10         So I want to be very clear.  If I utter or I speak or my

11    witness says, Oh, and we weren't able to recover or there's

12    damage to our business and we weren't able to recover, that

13    would be a sword and shield, but purely the fact that there

14    was a license, that we warned them if they didn't continue to

15    supply the license would be terminated, that they chose not to

16    continue to supply and the license was terminated, and that

17    Mr. Kennedy -- and it's a hotly disputed damages issue, that

18    these agreements -- that the supply clause was a central

19    element of the benefit of the bargain.

20             THE COURT:  I believe that the thrust of this

21    evidence will be to show that Samsung breached the JDLA,

22    and that I think has a prejudicial effect that far exceeds

23    whatever probative value it might have in showing the value

24    of the supply agreement, so --

25             MR. SHEASBY:  But how do you engage *Mentor Graphics*,

1    then?

2              THE COURT:  I don't believe that the Federal Circuit

3    has laid down a rule that you're entitled, when you've already

4    litigated a breach of contract case in another court, to bring

5    the breach into this infringement action.  And if you're

6    telling me that that's what *Mentor Graphics* says, I'll take a

7    break right now and go read it.

8              MR. SHEASBY:  Yes, Your Honor.  That's exactly what

9    *Mentor Graphics* says.

10             THE COURT:  All right.  We'll take a break.

11                       (Brief recess.)

12             THE COURT:  Thank you.  Please be seated.

13        Mr. Sheasby, I have the *Mentor Graphics* opinion in front

14   of me.  Please cite me to the part of it that you maintain

15   contains the rule you cited.

16             MR. SHEASBY:  Yes, Your Honor.  It is in two pieces.

17   If you go to page 1281.

18             THE COURT:  All right.

19             MR. SHEASBY:  EVE and Mentor entered into a license

20   agreement.  The license agreement contained a clause that says

21   it would terminate if EVE was acquired.

22             THE COURT:  That was an agreement based on the

23   settlement of an infringement action against EVE?

24             MR. SHEASBY:  That's correct, Your Honor.

25             THE COURT:  All right.

1          MR. SHEASBY:  Then Mentor learned that Synopsys was

2     in negotiations to acquire EVE.  Mentor's CEO warned -- sorry.

3     Mentor's CEO warned Synopsys that if the acquisition went

4     through, EVE would lose its license.  That's also in 1281.

5          I should note for the record that in this case there is

6     testimony that the JDLA was entered into by Samsung --

7          THE COURT:  Mr. Sheasby, just show me where the

8     Federal Circuit said it would be error to exclude the basis

9     for a --

10          MR. SHEASBY:  Yes, Your Honor.

11          THE COURT: -- finding that was litigated in another

12     court.

13          MR. SHEASBY:  So this was 1295.  So at 1295, Mentor

14     did not dispute -- Synopsys did not dispute that the license

15     was terminated.  It was legally terminated.  The district

16     court said that, quote, "Mentor relies on Synopsys'

17     acquisition of amendment which terminated the license and

18     rendered all subsequent sales infringing.  These events

19     occurred after the declaratory judgment was filed but prior to

20     Mentor's counterclaim for infringement.  The alleged acts of

21     infringement are, thus, pre-suit, and there is, accordingly,

22     no basis for excluding Mentor's evidence of willfulness."

23          So in that case the judge excluded Mentor from presenting

24     the evidence that Synopsys was warned --

25          THE COURT:  You know, that is not right.  The judge

 1    excluded Mentor from producing any evidence of willfulness.

 2    Right?

 3              MR. SHEASBY:  The judge did not allow willfulness to

 4    go to the jury.

 5              THE COURT:  That's right.  And that's what got

 6    reversed.

 7              MR. SHEASBY:  Yes, based on Mentor's proffer that

 8    its evidence of willfulness was the warning that the license

 9    would terminate if the agreement --

10              THE COURT:  And where does the Federal Circuit say

11    that was the basis of their ruling?

12              MR. SHEASBY:  Well, that's the only evidence that

13    was presented by Mentor for willfulness in the brief -- in the

14    opinion.

15              THE COURT:  All right.  I'm still looking for where

16    the Federal Circuit announced the rule you laid down.

17              MR. SHEASBY:  Your Honor, that's as close as I can

18    get to our facts.

19              THE COURT:  That's not close enough.

20              MR. SHEASBY:  I understand, Your Honor.

21              THE COURT:  Don't cite me a case and tell me that

22    the Federal Circuit made a holding that you can't show.

23              MR. SHEASBY:  I understand, Your Honor.

24              THE COURT:  All right.

25              MR. SHEASBY:  Your Honor, there are two exhibits

1    that are outside of the -- of that holding that I'd like to

2    show you in bucket 1.

3              THE COURT:  All right.

4              MR. SHEASBY:  This is 1662.

5              THE COURT:  1662.  All right.

6              MR. SHEASBY:  1662 has nothing to do with the breach

7    or termination.  It is a document that discusses the internal

8    valuation of Netlist's patents by Samsung.

9        If we scroll down to page 2.

10       If we look at the bottom, "During dinner with EVP Jibum

11   Kim of Company N"--that's Netlist--"he expressed an opinion

12   that company N's patents is applicable to RDIMM HBM"--those

13   are the two -- two of the three categories of products that

14   are accused of infringement--"as is LRDIMM.  And so we plan to

15   obtain relevant information and review it."

16       So that has nothing to do with the termination or the

17   supply agreement; it's purely relating to their evaluation of

18   the value of our patents.

19             THE COURT:  And is that the only part of 1662 that

20   you can show is relevant?

21             MR. SHEASBY:  That's the only part I would seek to

22   offer.

23             THE COURT:  All right.  So you would have no problem

24   with redacting it down to that.

25             MR. SHEASBY:  That's correct, Your Honor.

1              THE COURT:  All right.

2              MR. SHEASBY:  And then PX 1787.  PX 1787, if we

3      scroll down.  Scroll down more.

4          This is Samsung approaching us for an extension of our --

5      for additional access to our technology.  It's -- this is the

6      email right here, and that they wanted access to our

7      technology relating to controllers and IP.  And, once again,

8      this doesn't have to do with the supply obligation or the

9      breach of the supply obligation; it just shows -- it tends to

10     show that Netlist -- that Samsung viewed our technology as

11     continuously valuable because in 2017 they were asking for

12     additional technology.

13         There are some Samsung witnesses who testified that they

14     were dissatisfied with Samsung's technology -- with Netlist's

15     technology, and this would go to show that, in fact, Samsung

16     viewed Netlist technology as valuable.

17             THE COURT:  And is the technology that is discussed

18     in 1787 a part of the patents-in-suit?

19             MR. SHEASBY:  It is.  Let me explain.  So Samsung

20     hired us to work with them on an NVDIMM product.  That NVDIMM

21     product had on-module power management.  That was what they

22     wanted to integrate into their product.  The on-module power

23     management that they were hoping to integrate into NVDIMM they

24     instead integrated into the DDR5 products.  And the DDR5

25     products are what are at issue in this case.  I can show you

1    the admissions that -- from their witnesses that there is a

2    connection between the NVDIMM.

3           THE COURT:  Well, show me first where there's a

4    reference to that technology in 1787.

5           MR. SHEASBY:  To on-module power management?

6           THE COURT:  Yes.

7           MR. SHEASBY:  It's not that specific, Your Honor.

8    It's purely talking about the extension of NVDIMM, the NVDIMM

9    relationship.  And Samsung is saying that our technology --

10   the reason why they were -- they didn't -- they felt our

11   technology was not good, and this would tend to show that our

12   technology -- this would defend against that by showing our

13   technology was high quality because they were continuing to

14   seek a second phase with us.

15          THE COURT:  And -- all right.  So I'll need to hear

16   from them whether they intend to offer evidence to that

17   effect, but your contention is that if they do, 1787 would

18   tend to refute that.

19          MR. SHEASBY:  Yes, Your Honor.

20          THE COURT:  All right.  Anything else in this

21   bucket, Mr. Sheasby?

22          MR. SHEASBY:  No, Your Honor.

23          THE COURT:  All right.  Thank you.

24          MR. REGER:  Mr. Colvin, can I have slide 9, please?

25          THE COURT:  Go ahead, Mr. Reger.

1          MR. REGER:  Thank you, Your Honor.

2      With respect to PX 1787, your Honor, Samsung will

3  withdraw its objections and focus this argument on the second

4  exhibit, Your Honor.

5          THE COURT:  All right.  Then 1787 will be

6  pre-admitted.

7          MR. REGER:  So with respect to PX 1662, it is

8  important, Your Honor, to look at one of the rulings of this

9  Court just last week.  There was a motion for summary judgment

10  of no willful infringement, and with respect to evidence as it

11  relates to anything that occurred before July 15, 2020, the

12  Court granted that motion.  There is no evidence of willful

13  infringement prior to July 15, 2020.

14      There was one exception to that with respect to HBM

15  foundry products.  None of the evidence, none of -- nowhere in

16  1662 are they talking about HBM foundry products.  In fact,

17  Mr. Sheasby focused his argument on the onboard power

18  management.  He said NVDIMM is onboard power management;

19  therefore, by implication we're talking about DDR5.  DDR5 is a

20  completely different set of products than the HBM foundry that

21  was still considered -- that was still denied with respect to

22  the no willful infringement finding.

23      So this Court has already granted our willfulness motion

24  with respect to DDR5, willfulness prior to July 15, 2020,

25  because we were licensed.

 1          Thank you, Your Honor.

 2               THE COURT:  So Mr. Reger --

 3               MR. REGER:  Yes, sir.

 4               THE COURT:  -- tie that to the portion of 1662 that

 5     Mr. Sheasby is talking about.

 6               MR. REGER:  Yes.

 7          If I could have slide 24, please.

 8          So here, Your Honor, what Mr. Sheasby focused on was the

 9     -- he was going to redact this down to just the bottom

10     screenshot, and what we are talking about here is RDIMM, HBM,

11     Enterprise SSD, and LRDIMM.  As Mr. Sheasby focused on, the

12     NVDIMM talked about the DDR5 and onboard power management.

13     While this does reference HBM, this is not with respect to any

14     HBM foundry products, Your Honor.

15               THE COURT:  And we know that how?

16               MR. REGER:  Your Honor, there is no indication in

17     the record that Samsung offered foundry products at this time.

18               THE COURT:  So what is -- I have heard the potential

19     relevance of this.  What is -- what's the prejudice that

20     arises out of it that would offset that relevance?

21               MR. REGER:  The prejudice, Your Honor, is that this

22     would suggest that Samsung had HBM foundry products on June

23     10th, 2016, when there's no evidence that this meeting related

24     to that.  And just beyond that, Your Honor, there's no

25     evidence that Mr. Kennedy with respect to his damages

1   valuations refer to this.  And that is one of the key

2   indications that -- one of the key things that Netlist relies

3   on to get this entered.

4        If I may -- Your Honor, if I may take a step back.  The

5   original purpose of this exhibit, according to Netlist, was to

6   present it to suggest that Samsung was trying to drive Netlist

7   into bankruptcy and trying to acquire the patents through that

8   bankruptcy.  This Court last week indicated that he was not

9   going to allow that to proceed.  And I believe that this is

10  just a further way to back door that evidence, Your Honor.

11            THE COURT:  What about that particular passage

12  suggests in any way a plot to drive Netlist into bankruptcy?

13            MR. REGER:  Your Honor, to be honest, it doesn't.

14  All I can do is go off what Netlist tells me, Your Honor.  In

15  their proffer to the Court, Netlist suggested that they were

16  going to rely on this document for that purpose.  That's all I

17  can go off of, Your Honor.

18       And I -- well, with respect -- I understand that maybe

19  their primary goal was to get the top half in there and --

20  with respect to the collateral rights, and they have now

21  withdrawn that argument, but that was their indication for the

22  use of this document.

23            THE COURT:  I'm not really focused on what their

24  motivation might be; I'm just trying to determine the

25  relevance of the statement, and it does tend to indicate a

 1      value of that technology.

 2              MR. REGER:  I understand, Your Honor.

 3              THE COURT:  I will pre-admit 1662 as redacted down

 4      to that final bullet point.

 5              MR. REGER:  Thank you, Your Honor.

 6              THE COURT:  Thank you, Mr. Reger.

 7          Otherwise, the exhibits in this bucket are excluded in

 8      the sense that they will not be pre-admitted.

 9          That takes us to No. 2.

10              MR. COLVIN:  Good afternoon, Your Honor.  Matt

11      Colvin for Samsung.

12          Your Honor, we have two exhibits in this Bucket No. 2.

13      These are exhibits PX 1663 and PX 1756.  Both of these relate

14      to the proffer that Netlist provided that's at Docket No. 429.

15          Your Honor, last week during the pretrial conference this

16      Court granted Samsung's MIL No. 3 that excludes reference to

17      the Korean tax tribunal opinion, and what we believe that

18      Netlist is trying to do with these two documents is to

19      introduce or back door documents that are related to that

20      Korean tax tribunal issue, Your Honor.

21          So of these two documents, there are a number of

22      problems.  The first is authenticity.  With respect to 1756,

23      these documents do not show any Samsung witness, no one has

24      authenticated these documents, samsung did not produce them.

25      And we believe that -- let's see.

1        So if we look at 1756, you'll see that the email is from

2   a Michael Kim at PWC.  Now, there's been some notice by

3   Netlist that that was perhaps a consultant for Samsung, but

4   that's not.  PWC was a consultant for Netlist.  And certainly

5   there's no indication on the record that Michael Kim at PWC is

6   a Samsung employee.

7            THE COURT:  Mr. Colvin, let me hear the response to

8   the problem with MIL 3 first, and if we get past that then

9   we'll get into the other evidentiary objections.

10           MR. COLVIN:  Yes, Your Honor.

11           THE COURT:  Thank you.

12           MR. SHEASBY:  Your Honor, this document has nothing

13  to do with MIL No. 3.  This was not the Korean tax tribunal

14  proceeding at all.  There is -- this is a questionnaire that

15  Samsung filled out and sent in to the -- basically the Korean

16  equivalent of the IRS.  After the IRS's ruling, then we

17  appealed.  There was a decision by something called the Korean

18  tax tribunal.  That was a procedure that was later in time.

19  That procedure is out.

20      These documents are simply exchanges between Netlist and

21  Samsung discussing questionnaires that they are providing to

22  the Korean equivalent of the IRS.  They have nothing to do

23  with the ruling of the Korean tax tribunal, which was the

24  basis of whether a payment was a royalty or not.  And these

25  documents, instead, relate directly to notice of the value of

1      the patents.

2          If I can show you that, Your Honor?

3          Milton slide 40.  So PDX 2.

4          This is Samsung forwarding the document directly to us.

5      "We concluded that the patents related to memory modules RDIMM

6      and LRDIMM are going to have value in the future."  This is

7      purely relating to the value of the patent.  I don't think any

8      of these documents relate to the Korean tax tribunal dispute

9      about whether something was a royalty or an NRE, but if there

10     is anything like that, we are redacting them.  This is purely,

11     purely, purely for the purpose of discussing that Netlist --

12     that Samsung viewed the patents as valuable on a going-forward

13     basis.  At the time the agreement was entered into and in

14     2019, the HBM patents had already issued and the applications

15     for the other patents families were pending.

16         If you go to slide 41.  42.

17         This is another example, just praising our proprietary

18     know-how as being a value to Samsung.

19         Slide 63.

20         LRDIMM is accused of infringement in this case, and they

21     talk about us as the company that created LRDIMM technology.

22     And they talk about the fact that they wanted our patents to

23     resolve a patent infringement risk.

24         So I want to be very clear.  I'm behind the eight ball

25     with this Court based on my hyperaggressive reading of *Mentor,*

 1    but this is not that issue.  I am not trying to skirt around

 2    the Korean tax tribunal ruling.  This has nothing to do with

 3    the Korean tax tribunal, this has nothing to do with the

 4    finding of royalty versus NRE; this is -- purely, purely,

 5    purely goes to show that the patents have value.

 6          THE COURT:  Have you addressed the redaction of the

 7    agreements to remove references to the Korean tax service?

 8          MR. SHEASBY:  There is no reference to the Korean

 9    tax service except in the email itself, and we will redact

10    that from the email, Your Honor.  So the document attachment

11    has no reference to the Korean tax service in it.  It's just a

12    plain white document with Q&As.  And I can show, if you go to

13    715, Mr. -- PTX 715.  I'm sorry.  PTX 1756.

14       Yeah.  So it says Dongsuwon Tax Office, and we will --

15    if Your Honor would like, we can remove the reference to the

16    tax office.  But that is not the tax tribunal; that's

17    literally an IRS questionnaire they're filling out.

18          THE COURT:  I guess I'm going to hear about this

19    from Samsung, but this doesn't appear to be from Samsung.

20          MR. SHEASBY:  Scroll down.

21       It actually is from Samsung.  So Samsung sent it to

22    Netlist's accountant and then Netlist received it from its

23    accountant.  So we have someone who can testify to that.  We

24    also examined Indong Kim, who was the Samsung representative

25    about both these documents, he authenticates them and he would

1    -- he is -- he can be a sponsoring witness from them.

2         So the document came from Samsung.  It didn't come from

3    PWC.  We're not saying that PWC authored it or PWC represented

4    Samsung.  This is clear evidence that Samsung drafted this.

5         And, in fact, we can go deeper than that, Your Honor.  If

6    you look at the -- we actually have the evidence, internal

7    evidence showing the author of the document reaching out to

8    the engineers and asking them to fill out the document.  I can

9    show you that email, Your Honor, to establish the authenticity

10   and the fact that they were acting within their authority as

11   Samsung employees, if Your Honor would like.

12        Yes.  Indong Kim and Jung Bae Lee both testified

13   regarding the document.  And if you look at Exhibit 9 to

14   docket to our proffer on 1663 and 15 -- 1756, Your Honor.  So

15   this is not the document we are seeking to admit into

16   evidence, but this is the author of the -- the sender to us

17   asking the engineers to fill in information for the Korean tax

18   office.

19        So we're not going to put this document into evidence;

20   it's purely to show these were done -- this was not some yahoo

21   who's writing stuff up; the actual engineers were doing it.

22        If we pull that down.

23        And I can read from the testimony of Indong Kim and

24   J.B. Lee who both authenticated these documents and testified

25   that they were involved in their -- that Indong Kim testified

1    he was involved in their creation.

2            THE COURT:  All right.  You don't need to read

3    further at this time.

4        Let me hear the response.

5            MR. SHEASBY:  I did also want to flag one other

6    thing because I think there was some accusation.  Willfulness

7    only begins from the period of time of when the agreement was

8    terminated.  That is absolutely the case.  But just like in

9    *WCM Industries* in which knowledge of a pending patent

10   application, knowledge before the period of time in which

11   there could be infringement is relevant to willfulness, the

12   same way here.  Pre-termination, if they were aware that the

13   patents were covering their product such that post-termination

14   they would be infringing, they would be relevant.

15       Thank you, Your Honor.

16           THE COURT:  All right.  Thank you, Mr. Sheasby.

17           MR. COLVIN:  If I could have my slides, ma'am.

18   Thank you.

19       Your Honor, there's still a significant authentication

20   problem here.  So Mr. Sheasby referenced the deposition

21   testimony of Indong Kim.  I've got some of this on the screen

22   here for you, Your Honor.

23       First we'll start at the top left.  "You were involved in

24   providing information to the Korean government regarding a tax

25   treatment dispute between Netlist and Samsung.  Correct?"

1    He says, "No."

2    And if you look at what's -- the other documents -- the

3    other things that are highlighted here, he's simply saying, I

4    don't know what's going on here.

5    If you look in the top right --

6    THE COURT:  Well, didn't he or someone with a

7    similar name from Samsung author the email that forwarded

8    the exhibit as a Samsung document?

9    MR. COLVIN:  Your Honor, if you'd give me just a

10   moment to pull that document.

11   THE COURT:  We're talking about the first email in

12   the 1756 chain.

13   MR. COLVIN:  If I could have the document camera,

14   please.

15   So this is 1756, Your Honor.

16   THE COURT:  Yeah.

17   MR. COLVIN:  And what we see here is -- this is not

18   Indong Kim anywhere on this email, Your Honor.  None of these

19   Samsung employees were ever deposed, they were never asked to

20   be deposed, they don't have testimony in this case.  Now, they

21   could have tried to take their testimony, but they didn't.

22   THE COURT:  Well, authentication simply requires

23   evidence that something is more likely than not what it

24   purports to be.  Is there any doubt that that email is an

25   authentic Samsung email?

```
1            MR. COLVIN:  Your Honor, I don't dispute that the

2    bottom part of that is an authentic Samsung email, but the

3    fact is there's no authentication for the document as a whole.

4    And they're also using this as a vehicle for the attachment,

5    and there's just no authentication of that either, Your Honor.

6            THE COURT:  Doesn't the email from the Samsung

7    employee forward the attachment and say that this is Samsung's

8    answer?

9            MR. COLVIN:  Your Honor, it says, I'm sending you

10   our company's response to the questions from the tax office.

11   And there's no -- it says it's sending the company's response,

12   but there's no indication down here that something is being

13   forwarded.  And if you look over on the back of this page,

14   there's nothing there, Your Honor.

15           THE COURT:  Oh.

16           MR. COLVIN:  And so we had this attachment from

17   Michael Kim at PWC, and it is an attachment.  We see the

18   attachment here, but that doesn't show up on this document

19   from Samsung.

20       And so while there may be some indications on this

21   document that, you know, some people were -- at Samsung were

22   involved in sending something to PWC, we actually don't know.

23   They can't draw the evidentiary line between this.

24       Now, they could have taken the time in discovery to try

25   to prove this up and get testimony from these people, but that
```

1    hasn't happened.  And when you look at the deposition

2    testimony from Indong Kim, and I can show you others from Jung

3    Bae Lee that was also mentioned, they actually can't make the

4    evidentiary leap that's required to authenticate the document,

5    Your Honor.

6            THE COURT:  All right.  I didn't follow the

7    particular chain there very well, so I'll hear more about that

8    one.

9        Tell me about 1663 and the attachment to it.

10           MR. COLVIN:  So for 1663, Your Honor, a few points,

11   if I can continue to scroll here.

12       So with 1663, there are a number of issues.  This does

13   come from a Samsung employee.  That Samsung employee, Byung

14   Jeon, was never deposed.  There's no testimony in this case

15   from that person.  The body of the email is important.  It

16   says, "The attached file of the materials we plan to submit."

17   It never says that these are emails that we submitted--excuse

18   me--that these were materials that were actually submitted to

19   the office and, in fact, Netlist responds back to Samsung and

20   says, Your letter is factually incorrect, and so Netlist can't

21   consent for Samsung to submit this letter.  And so we know

22   that there's something incorrect in this letter that was

23   attached to 1663.  We don't know what it is because there was

24   no testimony about it, Your Honor.

25           THE COURT:  Well, the whole theory of admissions is

1    that they're statements that you made, so you can explain any

2    errors in them.  Why isn't this the same way?  This is

3    something Samsung said.  If it's otherwise relevant, it's

4    up to Samsung to show why it was made.

5              MR. COLVIN:  Your Honor, we think that all of these

6    documents together are documents that were being sent to this

7    tax office.

8         Now, Mr. Sheasby -- I don't mean to side-step your

9    question, Your Honor; I'm just taking the long way there.

10   All of these documents -- and the issues in front of that tax

11   office were the genesis of the Korean tax authority dispute.

12   And so when you take the fact that we can't really explain the

13   full story behind these documents because they are related to

14   the Korean tax authority, directly related to the Korean tax

15   authority issue, when you take that combined with very

16   questionable -- I should say no full authenticity chain for

17   1756, and 1663 having some -- something about it being

18   factually incorrect, we just don't know what, I think when you

19   take all of that together, there is a lot of prejudice around

20   these documents, because we can't fully explain the story

21   without really telling the Korean tax authority.

22             THE COURT:  What does the attachment to 1663 say?

23   That is, after all, what the Plaintiff is trying to admit.

24   I think that's Exhibit 1664.

25             MR. COLVIN:  Your Honor, so 1663 -- I actually don't

1    have the full document on my slides, but it was part of what

2    Mr. Sheasby was showing you earlier.  So this is 1663.  This

3    is the email that we were just looking at.  Well -- and then

4    1663 has sort of a question and answer, question and response

5    from Samsung.  And this is what was planned to submit to the

6    Korean tax authority, but then Netlist said there's a problem.

7    And we don't actually know if this was submitted, we don't

8    know if this was thrown in the trash, we don't know if it was

9    edited, we don't know how it was edited.  That's just not in

10   the record, Your Honor.

11           THE COURT:  I understand.  I'm just trying to

12   determine the admissibility of it.

13       Now, let me ask Mr. Sheasby to indicate what part of that

14   attachment it is arguing the relevance of.

15           MR. SHEASBY:  Yes, Your Honor.

16       If we can have Milton slide 40.  PDX 2, slide 40.

17       So it occurs multiple times in the questionnaire, but the

18   part -- the portion we think is relevant is the portion that

19   talks about the fact that they wanted to enter into the

20   license agreement because they were concerned about the --

21   and wanted to use our patents presently and are on a

22   going-forward basis.  So it's these documents, these pages

23   that -- these discussion of our technology and the need for

24   our patents that we wanted to have that we think is relevant.

25           THE COURT:  There are numbered questions and

1    answers, so what questions and answers by number is it that

2    you're seeking to use?

3         MR. SHEASBY:  Sure.  On 17 -- on 715, it's Question

4    and Answer 1.  And it's the question that begins, "Can you

5    tell us why Samsung Electronics signed the joint development

6    license agreement?"  I don't know the number, but I'll find

7    it, but those are the two questions.  And 1664, it's Question

8    No. 1 and Answer No. 1.

9         And if we can go to slide 63.

10        It's 715.  It's question 1 again, and -- yes, Question

11   No. 1 again.  And I can go through at the break, and I think

12   there are a couple of more instances of it, Your Honor, where

13   it talks about needing our patents.  But it's solely the

14   passages that talk about needing our patents, and then this

15   patent talks about what company created the LRDIMM technology.

16        THE COURT:  So the relevance of this statement at

17   the time it was made, which was -- what's the date of that

18   email?

19        MR. SHEASBY:  2019, Your Honor.

20        THE COURT:  All right.  So what is the relevance

21   that in 2019 they're explaining why they entered the JDLA?

22        MR. SHEASBY:  Sure, Your Honor.

23        So in 2015 an agreement was entered into, the HBM patents

24   which are load reduction patents as well, had already issued,

25   and the other patents were pending applications.  And so just

1   as in WCM, they are telling the Korean government that they

2   entered into --

3       Go back to slide 40.

4       They're telling the Korean government that we entered

5   into the agreement because in the future on a going-forward

6   basis we are concerned about patent infringement risks

7   relating to the patents.  And that would go to show, although

8   it's not dispositive evidence, but it would tend to suggest to

9   a jury that Samsung knew it needed our intellectual property

10  and, therefore, that after the agreement terminated, its

11  continued behavior was willful.

12          THE COURT:  All right.

13          MR. SHEASBY:  These are the products that are

14  accused of infringement in the case, the RDIMM and LRDIMM.

15          THE COURT:  And so is there any reason that you need

16  the reference to why this document was prepared?

17          MR. SHEASBY:  None at all.

18          THE COURT:  All right.  And do you have any answer

19  to the argument that as to the 1756 email from

20  PriceWaterhouseCoopers that there is no showing that the

21  attachment of that is authentic and comes from Samsung?

22          MR. SHEASBY:  Sure.  I have two responses.

23      If we can go to 1756.

24      So I am sending you our company's responses.  This was

25  a forward.  And so they're -- you see how it says 'forward'.

1          Scroll down.

2          See how it says 'forward', Your Honor?  It's forwarding

3     an attachment that says "related questions from the Dongsuwon

4     tax office."  That was in Korean in the same font as used for

5     all their documents.

6          And if you scroll --

7          We translated it into English.

8          If you scroll down.

9          It says, "I'm sending you the company's response to the

10    questions from the Dongsuwon tax office."  So the attachment

11    relates directly to what the subject matter is of the

12    forwarded message of the message from Samsung.

13          Secondly, we asked Indong Kim about this document, and he

14    testified that it was, in fact, Samsung telling the tax office

15    a question examining this exact issue.

16              THE COURT:  Show me the part from his deposition

17    that you would say authenticated that.

18              MR. SHEASBY:  So if you go to 60 through 61, it's

19    Indong Kim, page 61, lines 2 through 5, the Indong Kim

20    deposition.

21          So he was asked about the document.  So he's been shown

22    the file --

23          Scroll down.

24          He said the document doesn't define, and this is the

25    critical passage on the next page.

1        "And Samsung is telling the government that's what

2   Netlist created?"

3        Answer:  "That's what it says."

4        And so this is him having examined the document.  He was

5   actually the 30(b)(6) witness on the JDLA relationship.  He

6   was not just an individual fact relationship.  So when you --

7   when you combine his fact that he acknowledged what the

8   document said coupled with the fact that there was -- it was a

9   forwarded email that had an attachment, we also have people

10  with personal knowledge at Samsung -- at Netlist who have

11  testified and will testify that this is the attachment they

12  received from Samsung.

13            THE COURT:  And so tell me how you can show what

14  document the witness was being shown there.

15            MR. SHEASBY:  Scroll up.  Scroll up.

16      Exhibit 23 is the document that we're debating right now.

17            THE COURT:  And maybe it's not disputed, but I don't

18  have any way to know that Exhibit 23 is the same thing as

19  PX 1756 or 715.

20            MR. SHEASBY:  I can show -- if we'll put it on the

21  elmo, Your Honor.

22            THE COURT:  All right.

23            MR. SHEASBY:  This is Exhibit 23 to the Indong Kim

24  deposition, and it's verbatim to the 1773 [sic].

25            THE COURT:  All right.  Thank you, Mr. Sheasby.

```
 1              MR. COLVIN:  May I respond, Your Honor?

 2              THE COURT:  Yes, sir.

 3              MR. COLVIN:  Your Honor, just a few things to follow

 4    up on that.

 5         The deposition testimony that you were just shown, it

 6    doesn't authenticate the document.  He's being shown the

 7    document and asked if the document says something, and he just

 8    says -- you know, he's basically reading the document.  He's

 9    not authenticating it as though he has some personal knowledge

10    about the document; he's just responding to the document as

11    it's put in front of him.

12         And a few points other there.  So you just heard that

13    when Mr. Sheasby showed you the portions of the document that

14    they were going to use and what they wanted to use them for,

15    that they're using them to try and say that the document is a

16    true and accurate representation of what Samsung believed,

17    but -- and what the parties had agreed, but Samsung said in an

18    email in response to receiving that document that it's

19    factually incorrect.

20              THE COURT:  Netlist said that.  Right.

21              MR. COLVIN:  Netlist said that, Your Honor.  Netlist

22    said the document is factually correct.  We don't know about

23    what.  We don't know how this document was changed or edited

24    before it was submitted or if it was ever submitted.

25              THE COURT:  I don't -- it's not -- it doesn't matter
```

 1    whether it was submitted; what matters is that Samsung said

 2    it.  And I agree with you that authentication is important,

 3    but, you know, if you look at 901, all authentication takes is

 4    evidence sufficient to support a finding that the item is what

 5    the proponent claims it is.

 6        I understand with you that you can create doubt about it,

 7    but I certainly think that the fact that it is attached to

 8    those emails, that it was shown to your 30(b)(6)

 9    representative, and that no statement was made about it

10    not being what it purports to be, I think that's enough to

11    authenticate it.

12        Now, is there -- are there parts of that that you think

13    it is important to exclude?  Certainly there's no reason there

14    has to be any reference to the Korean tax authority in the

15    process.

16             MR. COLVIN:  Your Honor, without having sort of the

17    time to go through the document line by line with the idea of

18    what's important to exclude and what's important to keep out,

19    there may be an exercise we can take up on the break with

20    Mr. Sheasby, but sitting here right now in this moment I

21    can't.

22             THE COURT:  Well, if Samsung wants the rest of it

23    redacted, the only part that I've been shown that appears to

24    be -- have a relevance that's claimed is the Question 1 of

25    each of the two and the answer thereto, and if you want the

1    rest of it redacted, so ordered.  If there's a part of the

2    rest of it that you think is important to show context, that's

3    up to you.

4            MR. COLVIN:  Understood, Your Honor.

5            THE COURT:  All right.  Well, I will pre-admit 1663

6    and 1756 and their attachments, subject to redaction.  If

7    there's a dispute about the redaction, we'll set a time to get

8    back to that.

9            MR. SHEASBY:  And, Your Honor, just one

10   clarification.  I did -- I said I didn't know the question

11   number.  It was Question No. 2 that I was reading from without

12   showing it to you.

13           THE COURT:  Instead of Question 1?

14           MR. SHEASBY:  Question 1 and 2.  I showed both

15   Question 1 and 2.

16           THE COURT:  1 and 2 of which exhibit?

17           MR. SHEASBY:  Of PX 1775, Your Honor.  Sorry.

18   17 -- I'm all over the place.  That was Question 2 of 715.  So

19   Question 1 and 2 of 715.

20           THE COURT:  Okay.  And 715, for the record, is the

21   attachment to 1756.

22           MR. SHEASBY:  Yes.  And if you give me one moment,

23   I'll look at 1663 to see if I didn't miss anything.  It's

24   Question No. 1 in 1663 and it's also Question No. 4.  And I

25   can show you Question No. 4.

```
 1              THE COURT:  It looks like 4 has subparts.  Which
 2    one --
 3              MR. SHEASBY:  4-1.
 4              THE COURT:  Question 4, subpart 1.
 5              MR. SHEASBY:  Thank you, Your Honor.
 6              THE COURT:  All right.  That takes us to the next
 7    bucket.
 8              MS. REARDON:  Good afternoon, Your Honor.  Katherine
 9    Reardon for Samsung.
10         May I proceed?
11              THE COURT:  Yes.
12              MS. REARDON:  Your Honor, the third proffer, Docket
13    No. 430, relates to evidence that Netlist used to intend to
14    show willfulness of the asserted patents.  And at the time of
15    the proffer there were six patents-in-suit, now there are
16    five, and that's the '918 and '054 Patents that are asserted
17    against Samsung's DDR5 products, the '339 Patent, the '506
18    Patent has now been dropped, asserted against DDR4, and the
19    '060 and '160 are asserted against Samsung's HBM products.
20         Now, at the pretrial conference with Judge Gilstrap, the
21    Court found that Samsung was licensed for all of these
22    products up until July 15th, 2020, when the license agreement
23    terminated with one narrow exception, and that is HBM foundry
24    products.  And so the Court said if Netlist could identify an
25    HBM product that's a foundry product, that would not be
```

1    covered by the JDLA, and this would be a fact issue for the

2    jury.

3        So we're going to -- there are a number of documents in

4    Proffer No. 3 that we can walk through, but at a high level,

5    the only patent that is actually identified in any of these

6    documents is the '060 Patent, which is accused against

7    Samsung's HBM products.  But in none of those '060

8    documents--and I can pull one up--does it say anything about

9    foundry products.

10           THE COURT:  Why would it matter whether the

11   documents call out foundry products?

12           MS. REARDON:  Thank you, Your Honor.

13       We think this is prejudicial because it would allow the

14   jury to infer that any HBM -- any old HBM product could be a

15   foundry product, and that's simply not the case.  Netlist has

16   not shown a single piece of evidence with any specificity that

17   says HBM is a foundry product.  And so using this to show

18   pre-July 15th, 2020, knowledge would be prejudicial to Samsung

19   as it relates to the class of HBM products.

20       And I'll also raise, Your Honor, there is an issue

21   separate and apart from the '060 Patent as it relates to the

22   other DDR4 and DDR5 patents, and that is willfulness post-July

23   15th, 2020, which is a question for the jury.  But Netlist is

24   using all of these documents to the extent they disclose

25   related patents--so, for example, the '831 Patent here and the

1    '833 Patent--to show evidence that Samsung had knowledge of

2    related patents and, therefore, Samsung must have willfully

3    infringed patents that issued far later in time as it relates

4    to DDR4 and DDR5.

5              THE COURT:  Well, are you seeking some redaction of

6    the document?

7              MS. REARDON:  We are not seeking redaction, Your

8    Honor.  These are actually just to isolate some of the lines,

9    and Netlist has proposed these redactions as it relates to

10   other patents that are not related, not asserted patents in

11   this case.

12             THE COURT:  I mean, basically what I'm hearing from

13   you is that while there is some relevance of the '060 to HBM

14   products, that you're afraid the jury will not understand the

15   limitations of the document.

16             MS. REARDON:  That's exactly right, Your Honor.

17             THE COURT:  That sounds like a question of advocacy

18   for the lawyers.  Why can't you simply point that out to the

19   jury as opposed to not allowing the Plaintiff to have relevant

20   evidence?

21             MS. REARDON:  Understood, Your Honor.  And we can

22   certainly make -- we can certainly advocate that these are not

23   documents that have any indication about foundry, but, quite

24   frankly, Netlist has continued to blur the lines and simply

25   said that HBM products are foundry products.  We, you know,

 1   produced sales spreadsheets of thousands of different skews of

 2   foundry products--of HBM products, excuse me; that's an

 3   important correction to make in this case--and there is not

 4   one line of that data that Netlist has pointed to and said

 5   that is a foundry product in this case.  Instead, they've

 6   shown documents related to the fact that Samsung has a foundry

 7   business; you know, nothing that relates to the specific skews

 8   that are relevant accused HBM products here.

 9            THE COURT:  You did not move for summary judgment to

10   remove that issue from the case.

11            MS. REARDON:  We did move for summary judgment, Your

12   Honor, of a finding of no willfulness and license as to those

13   products.  They are the specific carve-outs in the license

14   agreement, and the Judge found that that would still be a fact

15   issue based on the fact that Samsung has a foundry business

16   generally, and that's the evidence that Netlist presented at

17   the pretrial conference.

18            THE COURT:  So the claims, in other words, continue

19   in the case is what I'm hearing.

20            MS. REARDON:  Whether or not the HBM -- a single HBM

21   product is a foundry product is a fact issue in this case,

22   yes.

23            THE COURT:  All right.  Well, I understand the

24   argument that there are a lot of HBM products that may not be

25   foundry products, but you're not in a position to say that

1     there are no foundry products that can be HBM products?

2          MS. REARDON:  We're in a position to say that there

3     are no HBM products on the list in this case that are foundry

4     products, and I think we've said that in briefing previously.

5     It is Netlist who has just presented a presentation that we

6     have a foundry business and for --

7          THE COURT:  I'm sorry.  It was Netlist that what?

8          MS. REARDON:  Netlist that has -- that presented

9     evidence at the pretrial conference that Samsung has a foundry

10    business generally.

11         THE COURT:  Okay.  And do you dispute that?

12         MS. REARDON:  We certainly don't dispute that, but

13    that's not an issue that's relevant here because, again, none

14    of the list of products -- HBM products that we've produced in

15    this case, that are accused in this case, are foundry

16    products.  They are Samsung-branded, Samsung-manufactured,

17    Samsung-sold products.

18         THE COURT:  All right.

19         MS. REARDON:  And, Your Honor, just, if I may, with

20    respect to the other patents, the '918, '054, and '339 Patent,

21    the evidence -- the several presentations that are in this

22    group here that Netlist points to, they only recite parent

23    patents or they recite things, if I may, Your Honor, like

24    general -- in this red box here--and apologies it's a little

25    bit hard to see--but general recitations of technology that

1    Netlist contends is covered by its patents.  But this, for

2    example, was presented I believe back in 2014 to Samsung.  The

3    patents I believe weren't filed for years after that.  And so

4    really what they're referencing are, you know, patents --

5    priority patents or family patents from years prior to say

6    that Samsung had notice and willfully infringed the asserted

7    DDR4 and DDR5 patents in this case.

8              THE COURT:  Again, this is -- you're concerned that

9    this document could be given broader effect than it should be?

10             MS. REARDON:  That's exactly right, Your Honor.  And

11   one thing I should point out is that in Netlist's proffer they

12   raise this theory of copying, that they intend to show that we

13   copied -- or that Netlist copied Samsung's -- or that Samsung

14   copied Netlist's inventions, and that's simply not the case.

15   It hasn't been an issue in the case.  There's no evidence of a

16   culture of copying or anything of that nature.  And it's also,

17   you know, using evidence and saying that it's copying evidence

18   is excluded by Court's MIL No. 3, so we think this is highly

19   prejudicial if it's going to be used for that purpose as well.

20             THE COURT:  Well, the MIL already prevents them from

21   making that argument, doesn't it?

22             MS. REARDON:  It does, Your Honor, but I wanted to

23   flag it because it is in Defendants' proffer -- or Netlist's

24   proffer 430.

25             THE COURT:  You're saying that in 430 they refer to

```
 1     these exhibits as evidence of copying?
 2               MS. REARDON:  That's exactly right, Your Honor.
 3               THE COURT:  Do you recall where?
 4               MS. REARDON:  If I may, Your Honor, just --
 5               THE COURT:  You may.
 6               MS. REARDON:  I'll give you the page number.  Your
 7     Honor, it's on both pages 1 and 2 about halfway down on each.
 8               THE COURT:  Help me out.  I don't see a reference to
 9     copying.  Okay.  I see -- under the 3A I see a mention of
10     copying.
11               MS. REARDON:  If I could have the elmo.
12          Apologies, Your Honor.  I'm pulling it up.
13               THE COURT:  I see that reference on page 2.
14               MS. REARDON:  Yes, on page 2, that knowledge of
15     Netlist's patents and pending applications can support finding
16     Samsung's copying effort and willfulness.
17               THE COURT:  All right.
18               MS. REARDON:  Thank you, Your Honor.
19               THE COURT:  Thank you, Ms. Reardon.
20               MR. SHEASBY:  Your Honor, we are not permitted to
21     make an argument of copying without leave of court.  This is
22     part of our proffer.  But whether copying is allowed or not,
23     the documents go to willfulness and knowledge of the patents.
24          Let me give you one example.  This is PX 446.
25          So this was a document that was sent at the request of
```

1    Samsung as an example of patents and products that they cover.

2         And if you scroll to page 2.

3         It flags the '060 Patent, which was the patent at issue,

4    and then parents of the asserted patents which are also

5    pending at the time.  And for the '060, for example, it listed

6    as targeting HBM.

7         And so this would be direct evidence that Samsung was

8    aware of the fact that we contended that our products -- our

9    patents covered HBM.  Just as in *WCM Industries,* even if

10   Samsung was not unlicensed until termination, just as a

11   pending application was not infringement, that pre-issuance

12   knowledge -- or pre-infringement knowledge can go to

13   willfulness post-infringement.

14        But, more importantly, there is a factual dispute as to

15   whether HBM is licensed.  So I think that -- putting aside

16   copying, I think this squarely does show knowledge of the

17   patent and what its covered and can go -- it doesn't prove it,

18   but a jury -- it could lead a jury to conclude that Samsung

19   did have knowledge that our HBM product -- that its HBM

20   product was covered by a patent and that upon termination it

21   would have to cease using that patent or face infringement.

22             THE COURT:  So does this relate to the foundry

23   products issue?

24             MR. SHEASBY:  It does.  So HBM -- we believe that

25   all HBM products are foundry products at issue, Your Honor.

1          THE COURT:  And is that something that your expert

2     has opined?

3          MR. SHEASBY:  It's something that Samsung's fact

4     witnesses have opined on, Your Honor, but our expert also

5     opines on it.  Doctor Brogioli has a second section discussing

6     the fact that HBM products are custom-made by Samsung for

7     nVidia, AMD, and other major customers.  And he uses this

8     document in the unstricken portions of his report, as does Mr.

9     Kennedy and -- as does Mr. Kennedy.

10          THE COURT:  All right.

11          MR. SHEASBY:  And then I think the only other

12     document they showed that they wanted to argue about was

13     PX 464.

14         And if we scroll down, I think -- scroll.

15         The only page we need from this document is --

16         Keep scrolling.  No, that's not the -- 621.  Excuse me.

17     Scroll.  Scroll.  Right there.  Go back.  Blow that up.

18     Actually, keep scrolling.  Sorry.  That's the wrong one.  Keep

19     scrolling.  Let me see if I can go faster and find the page.

20         Actually let's do something.  Let's go to deck 8 from the

21     pretrial conference.  Slide 7.

22         So this is an example of the application of *WCM*.  So this

23     was from 2014.  It says earliest priority date June 2007.

24     That's the priority date of the '918 and '054 Patents that are

25     asserted in this case for on-module intelligent power

1    distribution.

2        So in 2014 before we entered the agreement we told them

3    that we had patents pending on on-module power distribution,

4    and that, in fact, is the patents that have been issued in

5    this case.  This presentation relates to NVDIMM.

6        If you go to the next slide.

7        NVDIMM designs had power management integrated circuits

8    on-module, and so does DDR5, which is what they are now

9    selling.  And so --

10       And if you go down to slide 10.

11       They talk about the fact that it would be helpful in

12   resolving the risk of RDIMM and LRDIMM, which are the -- RDIMM

13   are accused of infringing the '981 [sic] and '054 patents.  So

14   I think both of these documents they presented to -- and I do

15   think these are fairly representative of the category -- well,

16   let me not say that actually.  There may be a couple of others

17   that I should engage if they want to.  But I think on these

18   two documents, they clearly, separate from copying, go to show

19   knowledge of the technology and willfulness, Your Honor.

20       And we know we can't use the word 'copying' without

21   permission.  We think there's enough here to support it, but

22   that obviously is not our determination to make, but from the

23   copying --

24            THE COURT:  The charts that showed the '060 Patent

25   and its relationship to HBM, those have certain parts blacked

1    out.

2            MR. SHEASBY:  Yes.

3            THE COURT:  Is that the way the exhibits will be?

4            MR. SHEASBY:  Yes, Your Honor.  I mean, we'll

5    probably make it prettier.  We'll make it white, not black.

6    But the idea is not to have anything extraneous in front of

7    the jury.

8            THE COURT:  All right.  Thank you, Mr. Sheasby.

9        Ms. Reardon, it appears to me that Netlist has shown some

10   relevance on these documents.  Do you have other objections to

11   their admissibility?

12           MS. REARDON:  I do have other objections, Your

13   Honor, and I'm happy to entertain some of the other exhibits

14   as well that we haven't gone through.  It was just for

15   brevity's sake trying to bunch some together.  But if I may,

16   at Your Honor's discretion, respond to some of what counsel

17   just said.

18           THE COURT:  Yes.

19           MS. REARDON:  So counsel mentioned many times *WCM*

20   *Industries*, and in that case they didn't reach the question of

21   whether knowledge of the patents when they were pending as

22   patent applications was sufficient.  You know, they said they

23   at least knew of the patents when they issued.  And here we're

24   just talking about related patents many years before -- with

25   the exception of the '060 Patent, but many years before the

1    actual patents issued.

2          THE COURT:  Well, this is -- he's arguing relevance.

3    The sufficiency of it to prove the knowledge necessary to

4    prevail on willfulness is a separate issue from whether or not

5    this makes it more likely or not.

6          MS. REARDON:  Sure.  And I think he said as well

7    that their experts on the foundry issue to make the '060

8    references in the chart that we saw relevant, that their

9    experts opined that all HBM products were foundry products.

10   And if you look at Doctor Brogioli's report, who is their

11   expert on the '060 and '160 Patent, there is not one mention

12   of the word 'foundry' if you search his report.  Mr. Kennedy

13   is their damages expert, so he would have no technical basis

14   to understand or opine on whether or not an HBM product was a

15   foundry product.

16         THE COURT:  Well, I think the question of whether it

17   is sufficient evidence is a question for another day, but I do

18   think that it is relevant evidence.

19         MS. REARDON:  Understood, Your Honor.

20         THE COURT:  Tell me about your other objections.

21         MS. REARDON:  Does that mean, Your Honor, you're not

22   interested in hearing about the prejudice arguments?

23         THE COURT:  Well, if you have -- I'm not interested

24   in an argument that just says the jury might misunderstand it.

25         MS. REARDON:  Understood, Your Honor.  And that is

1    one of our primary concerns given the lack of differentiation

2    between HBM generally and HBM foundry or foundry business,

3    which are two very different things.

4            THE COURT:  I think that's something that a jury can

5    understand if it is explained to them.

6            MS. REARDON:  Understood.

7        So if I could have the slides, please.  I seem to be

8    having some trouble.  If we could go back to 41.

9        So, Your Honor, with the exception of the '060 Patent

10   here, there are the references to the '831 Patent and the '833

11   Patent, and this goes to the issues related to the DDR4 and 5

12   patents that we were talking about earlier.  And so these are

13   patents in the priority chain that are not asserted in this

14   case, and Netlist wants to use these references to show that

15   Samsung willfully, intentionally infringed the patents that

16   are asserted in this case, which came much later in time.

17       And those references are also -- well, let me stop there

18   as I move to 586.  And we would ask, Your Honor, that those

19   related patents be -- to the -- the '833 and the '831 be

20   redacted as well, because the only willfulness issue, as you

21   contend is a live issue, is '060.

22           THE COURT:  All right.  I will inquire of that.

23       Is there other objection?

24           MS. REARDON:  If we could -- would you like me to

25   move to the other exhibits in this group?

1          THE COURT:  Any other objections you have in this

2     bucket.

3          MS. REARDON:  No others on this exhibit, Your Honor.

4          THE COURT:  Okay.  Are there other exhibits in this

5     bucket that you have other objections on?

6          MS. REARDON:  There are.

7       If we could go to slide 42, please.

8       So here slide 42 shows PX 586, which is an email between

9     Netlist and Samsung regarding a September 27th, 2019, meeting.

10    It's a technical meeting at the time that Samsung was

11    licensed, and there is no evidence in the record that this

12    meeting even occurred.  So Netlist -- if you look at the

13    subject matter--and I apologize because it's hard to read

14    here--you know, it mentions generally that the teams would

15    like to talk about power management for DDR5 and that's it.

16    There is not a patent listed on this slide.

17      And so if the Court already said that there can't be a

18    finding of willfulness pre-July 15th, 2020, as it relates to

19    the DDR5 -- the '918 and '054 Patents, which is the only thing

20    this exhibit would be related to, then this exhibit should be

21    excluded.  There's no evidence that this is intentional

22    knowledge of Netlist's patents.

23          THE COURT:  All right.

24          MS. REARDON:  And I believe we've already discussed

25    PX 621.

1        But if we can move to slide 45, that's PX 703.

2        And this is a bit of a unique issue, Your Honor.  So

3   PX 703 is a presentation from 2008 that was allegedly sent to

4   Samsung, and there's kind of a procedural issue here even

5   before the substantive issue, and that is PX 703 was produced

6   on November 17th, 2022, and that time frame is important

7   because that became the subject matter of Samsung's motion to

8   exclude.

9        If we could go to the next slide.

10       And here, Your Honor, it's showing that Samsung moved to

11  exclude documents that included PX 703.

12       And if we could go to the next slide.

13       The Court excluded the documents in this range, which

14  again, included PX 703.

15       And at the next slide, we acknowledge -- so the Court

16  granted the motion, and we acknowledge that Netlist wants to

17  use these to show notice and not conception and reduction to

18  practice documents, which was in the Court's order here, but

19  we believe from a procedural perspective that this document

20  was already excluded by the Court's order.

21       And then if we could go to the next slide.

22            THE COURT:  And that was which Exhibit?  703?

23            MS. REARDON:  This is PX 703, yes.

24            THE COURT:  All right.

25            MS. REARDON:  And so here, Your Honor, on the

1   left-hand side is the specific snip or specific slide from

2   PX 703 that Netlist wants to use, and you see here there's no

3   reference to a patent, there's just general discussion of

4   technology, and the asserted patent that they claim this is

5   relevant to is knowledge of willfulness -- is knowledge for

6   purposes of willful infringement the '339 Patent.  That patent

7   was filed nearly 10 years later on March 27th, 2017.

8        And then if we could finally go to the next slide.

9        This should also be excluded because there is no

10   indication in the record that Samsung received this.  It's

11   not produced with a related email correspondence.  There is

12   no evidence that this was transmitted to Samsung.

13             THE COURT:  All right.

14             MS. REARDON:  And then, finally, if we could go to

15   the next slide as it relates to PX 1778 and PX 1320, which is

16   an email and attachment.  Your Honor, I understand your

17   position as to the relevance of the '060 Patent disclosure,

18   which would be on the left-hand side here, but our concern --

19        If we go to the next slide.

20        -- is that Netlist will use this document -- which was a

21   2015 email and presentation.  Again, if you look at the email

22   header here, all internal recipients to Netlist, also labeled

23   attorney/client privileged, and listed as additional slides

24   for Samsung, but no evidence that this was an email to

25   Samsung.  We're concerned that they are going to use this as

 1    prejudicial use of -- as a back door to use this exhibit as

 2    evidence of reduction to practice, which has already been

 3    excluded, and it's prejudicial to introduce this -- all this

 4    conception and reduction to practice discussion simply to

 5    constitute notice of the '060 Patent.

 6        So perhaps this is one that could be redacted, given the

 7    Court's instruction regarding the '060 Patent, but the

 8    remainder of the document we believe to be prejudicial.

 9            THE COURT:  So the part that you're saying would not

10    be redacted is what?

11            MS. REARDON:  If we could go back one slide.

12        It would be the slide on the left that lists kind of the

13    patent vitals of the '060 Patent generally.

14            THE COURT:  All right.

15            MS. REARDON:  And we would stand that the '833 snip,

16    which is, again, a parent patent, that that should be excluded

17    because it is not a basis -- knowledge of the parent patent is

18    not a basis for willfulness.

19            THE COURT:  All right.

20            MS. REARDON:  Thank you, Your Honor.

21            THE COURT:  Thank you, Ms. Reardon.

22            MR. SHEASBY:  PX 446.  Scroll to page 2.

23        So this was sent to Samsung at Samsung's request.

24    *WCM Industries* indicates that knowledge of a pending patent

25    application is a factor, it's not the only factor, but it's a

1    factor that can go to show willfulness.  In this case

2    knowledge of the direct patents in the same family with the

3    same specification would go to show that they're aware that

4    this specification relates specifically to, for example, the

5    DDR4 NVDIMM, which is the product that has on-module power

6    management.

7           So the NVDIMM has on-module power management.  They then

8    transition that in DDR5 to on-module power management, which

9    is now being accused of infringement.  And so it's just not a

10   random connection between throwing the patent out; it's the

11   patent and the covered products as DDR4 NVDIMM.  DDR4 NVDIMM

12   used on-module power management, and then they extended that

13   in DDR5 to on-module power management, and the children of the

14   '833 is what is -- we are asserting against on-module power

15   management.

16          So I think is it on its own dispositive?  No.  But does

17   it tend to show knowledge of the patents what the technology

18   covers?  I think it does, Your Honor.

19               THE COURT:  All right.

20               MR. SHEASBY:  Shall I move on?

21               THE COURT:  Yes.

22               MR. SHEASBY:  Let's go to PX 586.

23          This document is exactly the type of evidence that can go

24   to show the value of our technology, and it is consistent with

25   the previous document.

1          So let me sort of give you the chronology.  In 2007 we

2     filed an application that ultimately issued in 2020 and 2021

3     -- 2021 as the on-module power management patents, the '918,

4     and subsequently the '054.

5          In 2019 there was no possible infringement, not only

6     because the patent hadn't issued but because Samsung had yet

7     to launch a DDR5 product.  What happened was, is they met with

8     us, recognizing that we have important technology in power

9     management IC for DDR5 DIMM.  That's the exact portion of

10    technology that we are accusing of infringement in DDR5.

11         They met with us, they recognized our technology was

12    valuable, our patents issued, they knew our patent -- we had

13    applications pending in this space, and the way we know that

14    we had applications pending in this space is because --

15         If you go to deck 2 from the PTC, slide 7.  Deck 2 from

16    the pretrial conference.  Slide 7.

17         If you'd put it on the elmo, Madam Courtroom Deputy.

18         This is what we showed them in 2014 that says we had

19    on-module power management patents pending that were filed in

20    2017.  So they knew that in 2014 -- and we can actually show

21    it on the screen now so it's clearer.  So this is 2014 us

22    putting them on notice that we had on-module power management.

23    And then if you go to the document they're challenging, which

24    is PX 586, this is them asking us to speak to them about our

25    on-module power management technology for DDR5.  The agreement

1    subsequently terminated.  After the agreement terminated the

2    DDR5 patents issued.  After the DDR5 patents issued, they

3    launched their infringing DDR5 product.

4        So I believe that this does go -- a tendency to show

5    evidence of knowledge and recognition of the importance of our

6    technology and could go to a finding of willfulness, although

7    likely on its own not sufficient.

8        I'll move on, unless Your Honor has any other questions.

9            THE COURT:  Go ahead.

10           MR. SHEASBY:  PX 703.

11       I don't ascribe any ill-will towards --

12       It's at 17.  Page 17.

13       We were very, very careful about complying with the

14   Court's previous order.  There was a colloquy in front of

15   Judge Gilstrap about this exact document.  This document was

16   cited in Doctor Brogioli's report.  He allowed this portion of

17   the report to come in.  And we made clear that the purpose of

18   this was to use to show their motivation to subsequently adopt

19   our technology.  This explicit document was shown to Judge

20   Gilstrap.  He concluded that it was properly in the report,

21   and he did not conclude that it was part of his previous

22   order.

23           THE COURT:  I mean, what they showed me was that he

24   struck the documents that were disclosed or provided on

25   November the 17th, I think it was.

1        MR. SHEASBY:  Your Honor, that is incorrect.  That

2   they -- this document was argued in front of the Court at the

3   pretrial conference, and he overruled the objection, and the

4   document is in Doctor Brogioli's unstricken report.  The

5   reason is this does not show conception and reduction to

6   practice.  This has nothing to do with conception or reduction

7   to practice.  This shows whether the motivation -- I can give

8   you the pin cites of where in the transcript he makes clear

9   that this document can come in.

10       THE COURT:  There is a difference between denying a

11  motion to strike the expert's report and admitting a document,

12  so if you can show me where he -- Judge Gilstrap ruled that

13  this document, Exhibit 703, should be admitted, that would be

14  helpful.

15       MR. SHEASBY:  No, Your Honor, I cannot show that.

16  I am simply responding to the idea that this document was in

17  violation of his previous ruling.  That argument was joined at

18  the motion to strike Brogioli at pretrial transcript day 2,

19  pages 23 to 25, pages 35 and pages 46.  So the question is not

20  whether this is admissible; the question is was -- did this

21  violate the order.  His Honor said it did not.

22      Second step --

23       THE COURT:  The order that you're talking about

24  violating, is that the order that struck the late produced

25  documents?

```
 1            MR. SHEASBY:  It struck -- it didn't strike the

 2   late produced documents; it struck us -- it struck documents

 3   from -- relying on documents for conception and reduction to

 4   practice.  There are many other documents that were produced

 5   at that time and he didn't strike all those documents.  It was

 6   purely targeted at conception and reduction to practice.  He

 7   cited that same order to try to strike Doctor Brogioli's

 8   discussion of this exact document, and His Honor held that the

 9   -- the ruling -- his previous ruling did not apply to this

10   document.

11            THE COURT:  All right.  Well, I will look further at

12   the record on PX 703.  I'll carry it.

13            MR. SHEASBY:  Okay.  And then PX 1778.  Let's scroll

14   down.

15       We have no intention -- so this document was in 2015.

16   This was after -- long after the --

17       Scroll back up.

18       This is long after the filing date of the '060 Patent,

19   and I think they conceded it comes in for that evidence.  It's

20   the last page of this document that I think they're concerned

21   about.

22       Scroll up.  Sorry.  Go up.  Right there.

23       They're concerned about this.  They're suggesting that

24   this was going to be used as a back door conception and

25   reduction to practice document.  That would be impossible.
```

1    It doesn't -- it was -- this document -- this presentation

2    was made in 2015, which was seven years after the priority

3    date -- eight years after the priority date of the '918 and

4    '054 Patents.  And the reason why this is relevant is it talks

5    about our technology on power management, which is exactly

6    what we're citing -- we're asserting against for the '918 and

7    '054 Patents.  And it's in that bottom right-hand box where it

8    says "power control and regulation" and that we have patents

9    on that subject.

10             THE COURT:  All right.

11             MR. SHEASBY:  Thank you, Your Honor.

12             THE COURT:  Thank you, Mr. Sheasby.

13        Ms. Reardon, if you have any brief response, you may.

14             MS. REARDON:  Yes, Your Honor, if I may, just two

15   very quick points.

16        Mr. Sheasby walked us through a chronology of the tale of

17   DDR5 evidence using disclosure and the exhibit that was the

18   reference to the meeting.  That is all evidence of copying.

19   That's exactly -- he walked us through exactly how Netlist

20   intends to use it, and there is nothing more and the evidence

21   he's shown does not suggest that Samsung copied anything at

22   all.  And so we think that allowing the evidence in, if that's

23   the story they're going to tell, is highly prejudicial to

24   Samsung.

25             And then lastly on PX 703 --

1          THE COURT:  Before you move on.

2          MS. REARDON:  Yeah.

3          THE COURT:  It's my understanding that the order

4     preventing them from arguing copying is based on a lack of

5     evidence of copying, and that what he is now saying he wants

6     to use this for is just knowledge of Netlist's patents.  How

7     would it be not relevant to that?

8          MS. REARDON:  Yes, Your Honor.

9       He's saying knowledge of Netlist's patent on the one hand

10    then walking us through evidence that when the parties were

11    under joint development without references to the patents

12    themselves in any of those subsequent documents, that all of

13    that shows copying of the specific patents that are asserted

14    here, and so we think that that is improper and prejudicial to

15    Samsung.

16          THE COURT:  Well, it's my understanding they are not

17    going to make that argument to the jury, but I understand what

18    your concern would be.

19          MS. REARDON:  Yes.  And I think the argument that

20    he's going to make, he's going to present all of that and then

21    approach the bench to say--right?--I'm going to now use the

22    word 'copying'.  Right?  And we don't think that should stand.

23       And lastly, Your Honor, on PX 703, I just wanted to point

24    out as well the lack of foundation.  It's not attached to an

25    email that he was sent to Samsung.  It's not from Samsung's

1   files, so we think 703 should be excluded on that basis as

2   well.

3        And if I may, one very brief last point, Your Honor, the

4   email that he showed you from 2019 from Neal Knuth at Samsung

5   talking about a technical meeting, that has absolutely nothing

6   to do with patents.  There is not a patent mentioned in that

7   email.

8             THE COURT:  I understand there's not a patent

9   mentioned, but there is reference to the technology that

10  Netlist claims is in their patents, isn't there?

11            MS. REARDON:  Yes, Your Honor.  In a general sense

12  it says power management IC for DDR5 DIMM, so very general

13  description of technology that was known and around at the

14  time.

15            THE COURT:  And I think it's their argument that the

16  reason Samsung is reaching out to them to discuss it would be

17  because they have patents in it.  What would be the other

18  reason that Samsung would be seeking a meeting with Netlist

19  about that technology?

20            MS. REARDON:  Your Honor, they were in license at

21  the time but, more importantly, part of the agreement between

22  the parties was joint development related to NVDIMM products.

23  And so they just as easily could have been

24  discussing--right?--that joint development project which

25  seems far more to be the case given the JDLA.

```
 1              THE COURT:  And certainly the Samsung witnesses who

 2     asked for the meeting would be in a position to provide that

 3     information.

 4              MS. REARDON:  So I just want to point out, Your

 5     Honor, no one on -- no Samsung witness on this email and no

 6     Netlist witness on this email were deposed in this case or

 7     will be a witness at trial.

 8              THE COURT:  Okay.

 9              MS. REARDON:  Thank you, Your Honor.

10              THE COURT:  Certainly.

11          Mr. Sheasby, what is your response to the foundational

12     problem with 703, that there doesn't appear to be any way to

13     show that it was actually seen by Samsung?

14              MR. SHEASBY:  PX 703.

15          Yes.  So Dr. C.K. Hong, who is our corporate

16     representative, testified about this document at his

17     deposition, he testified that the meeting happened, and our

18     corporate representative will also testify that the meeting

19     happened.

20              THE COURT:  All right.

21              MR. SHEASBY:  We have email records that establish

22     that the meeting happened.

23              THE COURT:  So there's already deposition testimony

24     on this?

25              MR. SHEASBY:  Yes, Your Honor.
```

1           THE COURT:  All right.  Well, I'm still going to

2    carry the objection to 703 to look further into the argument

3    that it is covered by the order striking production as

4    untimely, but I'll overrule the relevance objections to the

5    other documents in this bucket.

6         And before we move on, we'll take the afternoon recess.

7                    (Brief recess.)

8           THE COURT:  Thank you.  Please be seated.

9         All right.  That takes us to the next bucket.

10          MS. REARDON:  Your Honor, Kate Reardon again for

11   Samsung.

12        If I may proceed?

13          THE COURT:  Yes, Ms. Reardon.  Go ahead.

14          MS. REARDON:  So the next bucket is PX 183, which I

15   believe is the email on PX 184 which is the attachment.  And

16   this is an email produced -- or sent and produced in

17   litigation to Samsung's outside counsel in the CDCAL

18   litigation we were talking about earlier this afternoon

19   attaching a patent list.

20        And so we have a few objections to this, the first being

21   that obviously the Court's standing motions in limine preclude

22   reference to other litigation.  This is obviously a production

23   email from Gibson Dunn to Bird & Marella--Bird & Marella was

24   Samsung's counsel in that case--disclosing their ninth and

25   10th productions of which this patent list appeared.

1          We think that jurors will give it undue weight given that

2     it was produced in litigation, and it will assume that Samsung

3     received all of this information.  And that's a critical

4     point, Your Honor, because this was produced under a

5     protective order in the Central District of California case,

6     and there is no evidence that anyone at Samsung actually

7     received this document, or that its counsel somehow passed it

8     on to Samsung, or that it even could have under the operative

9     protective order there.

10         And we understand that Netlist wants to use this

11    exhibit again to show that Samsung had notice of four of

12    the six asserted patents; four of the five I believe now with

13    one patent out.  But there is, again, no evidence that Samsung

14    would have even received it.

15         And so the concern is that if this document is allowed

16    in, even in a redacted form, that we're going to have to

17    discuss the context in which Samsung received the document,

18    that it was marked confidential, and to receive it would have

19    been in violation of some protective order, and, more

20    importantly, that there's simply no evidence that this was

21    ever sent to Samsung itself.

22         Thank you.

23              THE COURT:  Thank you, Ms. Reardon.

24              MR. SHEASBY:  If we can have PX 183.

25         This is a complicated document.  It's a close question.

1    Substantial portions of it will at a minimum have to be

2    redacted.  The Bird & Marella firm was the firm that

3    subsequently received the licensing letter from Netlist, and

4    we know that -- and so the Bird & Marella firm was the firm

5    that was responsible for whatever license negotiation occurred

6    between Samsung and Netlist, but I concede that this has to

7    go.  The only question is can we have the document in and

8    someone will testify that this document was provided to

9    Samsung's lawyers and it has for four of the six

10   patents-in-suit on it.

11        If we scroll down to the next document.

12        So I'm not going to sort of gaslight the Court.  This

13   is a very close question as to whether it's allowed.  The

14   unstricken portions of Mr. Kennedy's report stop there.  It is

15   in the unstricken portions of Mr. Kennedy's report.  But this

16   was not just -- Bird & Marella was not just litigation

17   counsel; they were licensing counsel as well.  It's close.

18        THE COURT:  I have never allowed correspondence of

19   counsel to be used in evidence against the client, and I don't

20   see why this should be an exception to that.  I'll sustain the

21   objection to 183 and 184.

22        Ms. Reardon, what's next?

23        MR. SHEASBY:  Your Honor, this is -- Your Honor, the

24   second bucket is more of the same as to Proffer No. 1 which

25   the Court already denied.  I did find two other cases, Federal

1    Circuit cases, but they're no closer than *Mentor Graphics.*

2           THE COURT:  All right.  And I don't think that

3    *Mentor Graphics* is talking about our situation at all.

4           MR. SHEASBY:  I understand, Your Honor.  If you

5    don't like *Mentor,* you're not going to like the two other

6    ones.

7           THE COURT:  All right.  I have tremendous regard for

8    the Federal Circuit, and especially Judge Moore, who was the

9    author of *Mentor Graphics*; I just don't think her guidance

10   there helps us.  It doesn't apply.

11          MR. SHEASBY:  She's not returning my phone calls,

12   Your Honor.

13          THE COURT:  That's what she told me, actually.

14      All right.  So the -- 1676 and 1786 are also excluded.

15          MR. COLVIN:  Your Honor, I believe that bucket also

16   included PX 588.

17          THE COURT:  Oh, you're right.

18          MR. SHEASBY:  And, Your Honor, I just wanted to

19   clarify.  Did Your Honor -- obviously Your Honor should take

20   whatever time you need, but did Your Honor have a chance to

21   look at that issue of 706 at the break?  I just --

22          THE COURT:  703.

23          MR. SHEASBY:  703, yes.

24          THE COURT:  No.  I want to look further at the

25   transcript and other rulings regarding that motion to strike,

1    but I will follow that up.

2              MR. SHEASBY:  Thank you, Your Honor.

3              MR. COLVIN:  Your Honor, Bucket 3 is PX 705 and

4    PX 708.  This is a similar story perhaps, Your Honor, to 703.

5    The documents here have Bates ranges that are within those

6    ranges that were noted by the Court as those that Netlist

7    shall be precluded from relying on.  And so that's the first

8    argument, particularly with respect to 705.

9         We have an additional argument with respect to 708, and

10   that's -- we're just not sure how Netlist plans to use 708.

11   It seems to us that it has no relevance.  This is a -- these

12   are meeting minutes from a JEDEC meeting, and Netlist is

13   indicating that they have IP that reads on a proposal that was

14   provided by TI at the time.  This proposal is a DDR4 register

15   ballout, which really isn't anything at issue in this case,

16   and so we're a little bit confused by 708.

17        It also has a Bates number that falls within that range,

18   and so to the extent Netlist is going to use it, we think

19   they're going to use it to try to show reduction to practice,

20   that they have IP that relates to perhaps one of the issues in

21   this case.  But, nevertheless, it has a Bates number within

22   the excluded range, Your Honor.

23             THE COURT:  And while you're up there, Mr. Colvin,

24   tell me -- the reference to reduction to practice, it's my

25   understanding that that argument has been excluded?

 1              MR. COLVIN:  Your Honor, so as part of its ROG

 2     response on conception and reduction to practice, Netlist

 3     provided a large document production.  We asked the Court to

 4     find that that production was late with respect to conception

 5     and reduction to practice because it needed to be provided

 6     earlier.  The Court agreed, and then the Court granted our

 7     motion to strike and said here that I have highlighted on the

 8     screen, "Netlist shall be precluded from relying on its

 9     late-produced products purportedly practicing the asserted

10     patents and its conception and reduction to practice

11     documents."

12          And you'll see on the non-highlighted portion that I have

13     on the screen, "The Court found that Netlist's late disclosure

14     in mid-November of some 30,000 documents with fact discovery

15     closing on December 22nd to be unreasonable."

16          And this is the Bates range, Your Honor, from

17     Netlist_Samsung_EDTX53917 through 86408.  The Bates number on

18     Document 705 is -- ends in 63616, which is in that range, and

19     the Bates number for Document No. 708 is 78119, which is also

20     in that range, Your Honor.  I can provide Your Honor a copy of

21     those documents if you'd like, or put them on the elmo if you

22     want to see the documents themselves.

23              THE COURT:  No, that's all right.  I will have to

24     look further into that and -- at the same time that I'm

25     looking at 703.  What is the other argument as to those?  Is

1    there another argument?

2           MR. COLVIN:  The only other argument would be with

3    respect to 708, we're just not sure what the relevance of this

4    document is at all.

5           THE COURT:  All right.

6           MR. COLVIN:  Certainly we think it should be

7    excluded because of the Bates range, but I suspect

8    Mr. Sheasby's going to have something to say to us about

9    relevance of that document.

10          THE COURT:  All right.  Thank you, Mr. Colvin.

11          MR. SHEASBY:  Yes, Your Honor.

12      We were very careful in complying with the Court's order.

13   These documents have nothing to do with conception and

14   reduction to practice.  They have to do with something quite

15   different.  And to get to that, this is their argument

16   regarding why this relates to behavior within JEDEC.

17      And why don't we go ahead and pull up PX 705.

18      At the pretrial conference, the Court said that it's

19   potentially -- that they argued that technologies and

20   apportionment that should be given to any contributions by

21   the patents in this case need to take into account the JEDEC

22   standards and contributions, companies, including Netlist, and

23   including everyone else makes to those standards.

24      It goes on to say, "The fact that JEDEC was sitting in on

25   meetings"--I'm sorry--"that Netlist was sitting in on meetings

1    at JEDEC and was silent despite its obligations to disclose is

2    highly relevant.  It's relevant to whether Samsung knew about

3    the patents."

4        So these documents have nothing to do with conception and

5    reduction to practice.  This first document, which is DX 705,

6    it purely --

7        Actually Mr. Colvin -- let's go back to Mr. Colvin's

8    slides.  That's probably the easier way to do it.  DX 705.

9            MR. COLVIN:  708?

10           MR. SHEASBY:  708.  Excuse me.

11       So this document is relevant because it shows that

12   Netlist does, in fact, disclose its IP and makes clear that

13   when it has technology reading on patents, reading on proposed

14   technologies, it makes that disclosure clear.

15       So this has nothing to do with conception and reduction

16   to practice; it has to do with the fact that the document --

17   the fact that we disclose our existence of our IP.

18       And may I approach counsel's table briefly, Your Honor?

19           THE COURT:  All right.

20           MR. SHEASBY:  Give me one second.

21           THE COURT:  So what makes it relevant whether

22   Netlist discloses its IP or not?

23           MR. SHEASBY:  I don't think it's relevant at all,

24   Your Honor.  The problem is that they're making it an issue in

25   the case.  And so we lost that on the MIL.  The Court denied

1    our MIL.  The Court is not going to exclude them from

2    discussing whether Netlist discloses its IP or not in JEDEC or

3    sits on its hands.  So I wish it wasn't relevant, and I would

4    like a ruling that it was -- wasn't.

5         If you go to -- so this is -- although this says 708,

6    it's actually 705.  And I can show you another one at 708.

7         If you go to DDX -- PDX 2.49.  Scroll one forward.

8         So this is 708.  So this is us disclosing that we had IP

9    on on-module power management.  They're saying that they were

10   not on notice, so they were led to believe we didn't have IP

11   on on-module power management because we didn't disclose it in

12   JEDEC meetings, and this document, PX 708, says we did

13   disclose that we have fundamental IP on JEDEC meetings.  So

14   this would go to contradict the argument that we sat on our

15   hands or were silent in JEDEC.

16        So if the sat on the hands or silent in JEDEC is coming

17   in these, documents are relevant.  They have nothing to do

18   with conception and reduction to practice.  In fact, this

19   document is three years after the NVDIMM patents were filed.

20   It has nothing to do with the Court's previous ruling.

21        These documents are also -- this document, in addition,

22   was not even produced by Netlist.  The representation to the

23   Court that this was somehow relating to a late-Netlist

24   production, this is a Samsung document that was produced

25   from Samsung's records.  It has nothing to do with conception

1    and reduction to practice, and it has nothing to do with that

2    order that Judge Gilstrap issued that we tried to carefully

3    comply with.

4              THE COURT:  Why are these documents within the Bates

5    range?

6              MR. SHEASBY:  Sam-Net is their Bates range, not our

7    Bates range.

8              THE COURT:  There was an indication that the

9    documents fell within the Bate range that was in the Court's

10   ruling on the motion in limine?

11             MR. SHEASBY:  Yes.  So I don't know why they said

12   that, but that is absolutely not the case as to 708.

13             THE COURT:  All right.

14             MR. SHEASBY:  And the motion in limine did not

15   exclude all the documents in that Bates range.  The motion in

16   limine excluded them for use for conception and reduction to

17   practice, Your Honor.

18             THE COURT:  All right.

19             MR. SHEASBY:  Thank you, Your Honor.

20        But 708 clearly has nothing to do with that order at all.

21   It's not even our production; it's theirs.

22             THE COURT:  All right.

23             MR. COLVIN:  Your Honor, Mr. Sheasby is absolutely

24   correct regarding the Bates range of 708.  I am sorry.  No

25   excuse for that.  I just didn't read the prefix of the Bates

1   range in my notes any better, and I should have.  That's my

2   fault, Your Honor, and I should apologize with that.

3        With respect to the 2008 document, which is Document

4   No. PX 705, and then PX 708 is -- are meeting minutes from

5   2010, both of those relate to information that was subject to

6   a litigation with TI and, of course, that violates MIL 13.

7   And, in fact, this was discussed at the pretrial conference,

8   day 1 transcript, page 217.  Mr. Kennedy, who is their damages

9   expert, refers to statements in these documents and that's

10  out, Your Honor.  Judge Gilstrap struck that from

11  Mr. Kennedy's report.

12       So we don't believe that there's any basis, Your Honor,

13  for that to come in when, as Mr. Kennedy uses it, that has

14  been stricken from his report.

15            THE COURT:  You're saying that relates to 705?

16            MR. COLVIN:  That relates to both of the documents,

17  Your Honor.

18            THE COURT:  All right.

19            MR. SHEASBY:  So, Your Honor, I was at the pretrial

20  conference.  What -- there was a subsequent litigation between

21  Texas Instruments and Netlist.  Reference to that litigation

22  was excluded.  PX 705 makes no reference to a litigation

23  between Netlist and TI.  It makes no reference to anything

24  other than the fact that we disclose when we have IP, which is

25  what they're alleging that we didn't do.

1        As to PX 708, that has nothing to do with Texas

2   Instruments; that has to do with Viking.  There was no lawsuit

3   involving Viking.  It's a completely unrelated matter to Texas

4   Instruments.

5        I should also note that PX 705 is in the -- the

6   unstricken portion is expressly discussed by Mr. Gillingham in

7   his rebuttal report at paragraph 45, and it was not stricken.

8   Mr. Gillingham is one of our experts.  And so that's all I can

9   say about that TI issue --

10            THE COURT:  All right.

11            MR. SHEASBY:  -- is the Document --

12            THE COURT:  I'm going to overrule the objection to

13  PX 708, which I find is relevant.  And I'm going to carry 705

14  along with 703 on the issue of the scope of the order striking

15  certain documents.

16       Which would take us to 1656.

17            MR. COLVIN:  Thank you, Your Honor.  1656.

18       So 1656 is a JEDEC standard to a product and technology

19  that is not at issue in this case at all.  This is a JEDEC

20  standard to what's called the XFM memory device.  At no point

21  is the document relied on nor is there depo testimony about

22  it.

23            THE COURT:  Do you know what the Plaintiff's basis

24  to claim relevance is, or should I hear that from them and

25  give you a chance to respond?

1          MR. COLVIN:  Why don't we hear that from

2     Mr. Sheasby, Your Honor.

3          THE COURT:  All right.  Thank you, Mr. Colvin.

4          MR. SHEASBY:  If you could turn to Plaintiff's 1656,

5     page 21.

6          One of the issues in the case is whether under JEDEC

7     technology an LDO is an example of a converter, and JEDEC

8     considers LDOs to be converters.  You can see that in figure

9     A1.  It shows an example of possible power distribution.

10    Converter indicates a converter such as DCDC or an LDO.

11         And so the only page we need from this document is this

12    one.  It shows that at the time of the work in the field that

13    LDOs were considered converters.  It was -- we examined

14    Mr. -- their -- Mr. McAlexander, their expert on it.  He

15    acknowledged what it was, he acknowledged what it shows, he

16    acknowledged that it's inconsistent with his opinion.  That's

17    the relevance, Your Honor.  And it's a JEDEC standard and,

18    therefore, it would not be hearsay even though they haven't

19    raised a hearsay objection.

20         THE COURT:  All right.

21         MR. COLVIN:  Your Honor, we think because this is a

22    JEDEC standard to a product that is not in this case, it's a

23    JEDEC standard to what I'm showing here on the left, this

24    XFMEXPRESS, and then the accused product on the right, they're

25    completely different.  But because this is a JEDEC standard,

1    we think that taking this one paragraph in this document

2    presents a substantial risk of jury confusion.  Because it's a

3    JEDEC standard, we think a jury's going to see that and just

4    sort of focus on the idea, Oh, this is a JEDEC standard; this

5    must be, you know, very relevant, and the fact is that it's

6    highly prejudicial because it's a JEDEC standard, Your Honor.

7              THE COURT:  Well, what is your response to their

8    argument that it bears upon LDO, which is relevant?

9              MR. COLVIN:  Well, the issues with respect to LDO

10   and converter with respect to the patents and the products at

11   issue, and the fact that there is some other document out here

12   that it speaks to an LDO, Your Honor, we think isn't relevant

13   to the particular issue that's going to be in front of the

14   jury.  What's in front of the jury is a different product

15   that's covered by a different standard.

16       And so by showing them this other standard that talks

17   about LDOs and converters, we think that, again, that has a

18   substantial risk of confusing the jury.  They're going to see

19   JEDEC and they're going to see LDO and converter and they're

20   going to have a difficult time separating that out between,

21   Oh, wait, that was for this other product, that's not part of

22   the case, when everything else they hear is going to be part

23   of the case related to the product that's on the right, Your

24   Honor.

25             THE COURT:  Is the way JEDEC uses LDO relevant to

1       the accused products?

2               MR. COLVIN:  I don't know standing here in front of

3       you, Your Honor, and so I don't want to misrepresent it to

4       you.  Certainly with respect to the product that's at issue,

5       that that can be relevant, but with respect to some other

6       product, I think that would be the distinction.  As far as an

7       LDO is an LDO is an LDO across all JEDEC standards, I don't

8       believe that's a relevant thing, Your Honor.

9               THE COURT:  All right.  Thank you, Mr. Colvin.

10          Whether or not it's sufficient, I believe the Plaintiff

11      has established sufficient relevance, and I'll overrule the

12      objection to 1656.

13              MR. COLVIN:  Thank you, Your Honor.

14          The last one in this group, Group 5, this is PX 1781 and

15      PX 1816.

16          I can make this quick, Your Honor.  I believe it relates

17      to an issue that has already been discussed a bit.  There's a

18      little nuance there, but I suspect Your Honor will be able to

19      grasp that.

20          So we believe that this document is prejudicial because

21      Netlist is going to use it to show that we knew -- Samsung

22      knew of an application to a parent of an asserted patent.

23      We think that that has no relevance in the case.  We think

24      just knowing of the parent of a patent has no relevance to

25      willfulness.  But this goes even one step beyond that and

 1    shows a disclosure made in a JEDEC meeting of an application

 2    of a parent.  And so we think that it's got no relevance to

 3    the case.

 4         And I'll stand on that, Your Honor.

 5              THE COURT:  All right.  Thank you, Mr. Colvin.

 6         I think that if at the end of the trial that's all the

 7    evidence they've put in, you'll have an easy motion, but I'll

 8    overrule the objection to relevance.

 9              MR. SHEASBY:  And just to clarify, 1781 and 1816 are

10    in, Your Honor?

11              THE COURT:  Yes.

12              MR. SHEASBY:  Thank you, Your Honor.

13              THE COURT:  All right.  That -- one other thing I

14    want to say before we move on from the Plaintiff's objections

15    is that some of these were ordered to be redacted.  In the

16    event that counsel are not able to agree on redactions, I'll

17    say that we'll take those up at a hearing on Tuesday of this

18    coming week.  So I would ask counsel to work in the next few

19    days to see if you can agree upon the necessary redactions.

20         Let's go ahead to Plaintiff's objections to the

21    Defendants' exhibits.

22              MR. SHEASBY:  Yes, Your Honor.  DTX 2.

23         Your Honor, DTX 2 is --

24         Can I have the elmo, Ms. Andrews?

25         DTX 2 is the procedures for JEDEC, and the reason why

1    they want this in is because it has reference to the

2    obligation to license under reasonable and non-discriminatory

3    terms in it and if a patent is essential.  That issue is

4    irrelevant in the case because the Court has held that there's

5    no RAND obligation because neither party has described the

6    patents as essential and, therefore, there should be no

7    discussion or reference to a RAND obligation in this document.

8        In addition, this document also relates to a disclosure

9    obligation for essential patents.  Since the patents are not

10   essential, there was no disclosure obligation and, therefore,

11   it would not be relevant for that purpose either.

12       So those are the two bases for relevance that they

13   presented to us.  Both of them are precluded by the Court's

14   order that there's no RAND obligation in this case and there's

15   no essentiality allegation in this case.

16       I will say that there's a third potential theory that

17   they may advance.  There's a discussion of the fact that in

18   the -- well --

19           THE COURT:  Why don't we wait and see if they

20   advance it.

21           MR. SHEASBY:  That's not super productive.  I agree

22   with you.

23           MR. COLVIN:  If I could have my slides, please,

24   Ms. Andrews.

25       Your Honor, so Group 1 here is DTX 2, DTX 8, and DTX 10.

1   DTX 2 and DTX 8 are both JEDEC Manual Organizations and

2   Procedures.  There's a lot in these documents, Your Honor.

3   There is no preclusion by the Court's ruling that we can't

4   rely on manuals of JEDEC.  There's going to be a lot --

5              THE COURT:  Well, what are they relevant to?  Why

6   don't we start there.

7              MR. COLVIN:  Yes, Your Honor.

8        So there's going to be a lot of discussion about JEDEC --

9   how the parties acted at JEDEC.  In fact, we've heard a lot

10  about it already today.  Netlist has already said that they're

11  going to talk about how they disclosed things in JEDEC

12  meetings.  And this JEDEC Manual of Organization and Procedure

13  talks all about that.  It talks about when someone should

14  disclose and when they shouldn't.

15       We're not going to use this to talk about RAND

16  obligations.  The Court has said that that's not something

17  for this trial.  But these manuals are relevant to written

18  description, willfulness, damages, and then some equitable

19  issues.  Both Samsung and Netlist have JEDEC experts that rely

20  on these documents for their opinions.  There's just going to

21  be a lot of discussion in this case about how parties behaved

22  in JEDEC, how parties should behave in JEDEC, and the JEDEC

23  manual is the evidence of how that conduct should happen.

24             THE COURT:  Give me a 'for instance' of something

25  in the manual that you believe is relevant for the jury.

 1          MR. COLVIN:  Your Honor, I've got here on my slide,

 2    this is from Netlist's JEDEC expert report.  It says here, "As

 3    set forth, JEDEC policies dictate 'disclosure of a patent' is

 4    deemed to include all patents claiming priority of a single

 5    filing," and they cite to these JEDEC policy guidelines.  So

 6    there is an example of how one of the experts here is using

 7    these expert reports as evidence to show how a party should

 8    behave.

 9          THE COURT:  Well, I understand that it's in a

10    report.  What is the relevance of it for the jury?

11          MR. COLVIN:  Your Honor, the jury is going to hear a

12    lot in this case about what parties did or did not do --

13          THE COURT:  Show me -- let me interrupt you.  I'm

14    just asking a simple question.  You want to put this manual

15    in.  Show me something in the manual that is relevant to an

16    issue before the jury.  Is there something or -- I'm not in

17    the habit of just us handing the jury various, you know,

18    policy manuals.

19          MR. COLVIN:  If I could have the elmo.

20       So, for instance, Your Honor, we just heard all about

21    meeting minutes.  Here's a whole section about how attendees

22    -- about what the meeting minutes are, what they should do,

23    what they need to show, what they shouldn't show.  There's

24    going to be some issue in this case about, you know, you were

25    at the meeting--what happened?  What did you do?  Well, this

1    shows what the meeting minutes would dictate.  So if the

2    meeting minutes are supposed to capture something and it

3    didn't, well, we can go to this manual as evidence of what

4    the meeting minutes would show.

5           THE COURT:  Like give me a 'for instance'.  I'm

6    still not seeing how that is -- tells the jury anything they

7    need to know.  There are some minutes that reflect that

8    certain things happened.

9           MR. COLVIN:  There is going to be discussion, Your

10   Honor, of ballots.  So I'm going to show you page 18 of this

11   document.  There is a discussion of ballots where parties vote

12   on what should and shouldn't be adopted, and so we have right

13   here a description of what these ballots are all about.  And

14   so this, Your Honor, serves as evidence to support the other

15   evidence of what ballots are all about.

16          THE COURT:  Maybe we're not agreeing.  Is there

17   anything you can show me that you would read to the jury and

18   so they would understand something?  I understand there's a

19   general comment there on ballots, but what does that have to

20   do with an issue the jury's going to need to decide?  I didn't

21   intend this to be a difficult question.

22          MR. COLVIN:  Let me try another page, Your Honor.

23        So we have already heard today about disclosure of

24   patents, and so there's an issue in this case about whether

25   Netlist should have disclosed its patents in meetings.

1    Netlist was sitting in meetings, and there's an issue about

2    should they have disclosed them or not.

3              THE COURT:  This is about potentially essential

4    patents?

5              MR. COLVIN:  Potentially essential patents.

6         Now, there is no dispute in this case, Netlist isn't

7    claiming, and we agree that these patents are not essential,

8    but that's not what this manual says.  It says they have to

9    disclose patents that are potentially essential.  And so

10   there's going to be an argument about whether or not a patent

11   should have been disclosed when Netlist was sitting in the

12   meetings listening to these issues.  And this, Your Honor,

13   shows that they had to disclose potentially essential patents.

14   And we would present that to the jury as Netlist is sitting in

15   a meeting, this is their obligation, and this is the evidence

16   that shows that obligation, Your Honor.

17             THE COURT:  And the disclosure obligation that

18   you're going to contend Netlist violated is in connection with

19   what defense?

20             MR. COLVIN:  Your Honor, we believe that there is

21   a -- hold on.  It's in my notes, Your Honor.

22        If I could have my slides, Ms. Andrews.

23        So it goes -- one thing it would go to would be to

24   damages.  It would go to the technical benefits of the

25   asserted patents.  If Netlist -- if there could be an issue

1    that Netlist should have disclosed its patents, that would

2    mean that its patents wouldn't cover certain things.  That

3    would go to the technical benefits of those asserted patents

4    which they base their damages case around, so that's one

5    relevant issue.  Another relevant issue would be standards

6    estoppel.  If they were supposed to disclose them but they

7    didn't, they shouldn't be able to assert them now.

8              THE COURT:  And is that a defense you're maintaining

9    before the jury?

10             MR. COLVIN:  Your Honor, that's an equitable issue.

11   That would go to the Court, but some of those facts would be

12   developed in front of the jury.

13             THE COURT:  The only way they need to be developed

14   in front of the jury is if they relate to an issue the jury is

15   deciding.  There certainly can be a trial afterwards that has

16   a matter that isn't relevant to the jury, but I'm just not

17   aware of the defense that you're building here.

18             MR. COLVIN:  Well, Your Honor, I would say it's

19   also relevant to willfulness.  If they should have disclosed

20   something at a certain time, if Samsung and Netlist are both

21   in a meeting and the technology is being discussed that

22   relates to our products and Netlist is sitting there and they

23   have a patent that is potentially relevant to the issue,

24   potentially relevant to the standard that our products

25   practice, and they didn't disclose it, that helps us on

1    willfulness, Your Honor.  That's a fact that helps us on

2    willfulness.  If it was potentially relevant, they should have

3    disclosed their patent.  Because they didn't, we could assume

4    that they didn't have a patent that was potentially relevant

5    to this issue, Your Honor.

6        And this particular document, DTX 02 and 08, these

7    manuals, they show that Netlist would have had an obligation

8    to disclose that.  Having failed to meet that obligation,

9    Samsung would be entitled to says in must not have had a

10   patent that was close to this standard; that was potentially

11   reading on this standard.

12           THE COURT:  Is there anything else in this manual

13   that you believe is relevant to the jury?

14           MR. COLVIN:  Your Honor, I certainly think the

15   disclosure issue that I just pointed the Court to is the

16   most relevant thing that is in my mind right now.

17           THE COURT:  All right.

18           MR. SHEASBY:  Your Honor, there is no allegation

19   Samsung presented an interrogatory response on willfulness,

20   non-willfulness, and they also offered a 30(b)(6) witness on

21   the subject.  And neither of them disclose that there was any

22   reliance on what was or was not said at JEDEC.  There is

23   nothing in the record to support the use of this document on

24   -- there's no allegation in the complaint that there was a

25   duty to disclose or a violation of the disclosure obligations,

1    and there is -- they -- their willfulness response

2    interrogatory makes no reference to this theory they're

3    presenting now.  This is just an attempt to try to

4    surreptitious failure to disclose obligation.

5         The patents are not essential.  They're not essential,

6    there's no duty for RAND, and there's no duty for disclosure.

7    Anything else beyond that takes us down a path that is a

8    surreptitious essentiality path, and it's not proper.  What

9    you just heard about we relied on something that was said in a

10   JEDEC meeting, that is nowhere in any interrogatory response

11   and their 30(b)(6) witness on discovery.  If Your Honor

12   doesn't believe me, I can pull up the response for you and

13   show you.

14             THE COURT:  No., I am not questioning that.  Thank

15   you, Mr. Sheasby.

16        Mr. Colvin, I haven't heard anything which leads me to

17   believe that this is relevant, and I am concerned about an

18   attempt to raise issues that are not anywhere pled, so I am

19   not going to pre-admit DX 02.  But you can certainly, if you

20   find based on the testimony that it has some relevance that

21   you can establish, you can seek leave to use it, but at this

22   point I'm going to sustain the objection to it.

23        Which takes us to the objection to DTX 8.

24             MR. SHEASBY:  DTX 8 and 10 rise and fall with the

25   same argument, Your Honor.

1            THE COURT:  All right.  Let me just -- are there any

2   other issues with respect to 8 and 10 that the Defendant wants

3   to raise?

4            MR. COLVIN:  Your Honor, we agree they rise and fall

5   together.

6            THE COURT:  All right.  Then the objections are

7   sustained.

8            MR. SHEASBY:  Can we have DTX 11?

9        Your Honor, there was an invalidity defense that was

10  based on a series of JEDEC materials.  Those JEDEC materials

11  have been excluded by the Court as a basis for invalidity in

12  the motion for summary judgment that the Court heard.  This is

13  Docket 211.  And so given that the Court has excluded these as

14  invalidating references under Docket 211, they would then

15  become uncited or unused prior art and, at a minimum, they

16  would not go into evidence, if they could, in fact, still be

17  properly used for any purpose, which the Judge will decide at

18  trial.  But these have been excluded as prior art references.

19  I believe that we've accurately identified the ones that have

20  been excluded, and they should not come in on that basis.

21            THE COURT:  All right.

22            MR. COLVIN:  Your Honor, I think there's -- there

23  are a lot of documents in this Group 2.  I don't think it's

24  quite fair to lump them all together.

25        With respect to the first bunch in this group, which I'll

1  call DTX 11, DTX 12, DTX 13, and DTX 15, these are all JEDEC

2  meeting minutes, and including a JEDEC published standard

3  which is DTX 15 that show the background of the technology

4  and the state of the art.  All these documents have been

5  stipulated to as far as their authenticity and their

6  non-hearsay status as being produced because they were

7  produced by JEDEC.  And the use of the documents was not

8  precluded by the Court's ruling.  Certainly we can't use these

9  documents for prior art, but we should be able to use them, in

10  fact, to show the state of the art at the time.

11         THE COURT:  You know, the Court, as a rule, does not

12  allow unelected prior art to be used as exhibits to show the

13  state of the art.  Your expert can certainly talk about the

14  state of the art and the background, but the problem of

15  allowing you to use exhibits that otherwise look like prior

16  art is the fact that the jury has no way to know that you're

17  not offering it as invalidating prior art, so the Plaintiff is

18  put in the position of either spending the time to show why

19  these don't invalidate or taking the risk that the jury will

20  think that it's unrebutted prior art.

21     Why would the jury need to have these as exhibits just

22  for the purpose of background?

23         MR. COLVIN:  Well, Your Honor, I think with respect

24  to these documents, I think that for the jury to have them in

25  the room and be able to read, especially because DTX 15 --

 1   DTX 15 is a bit different from 11, 12, and 13.  DTX 15 is an

 2   actual standard, and so I think DTX 15, at a minimum, is

 3   something that the jury should be able to have and to look at

 4   as part of background of the state of the art.

 5       I understand Your Honor's point about, you know, trying

 6   to slip in some of these background exhibits to -- you know,

 7   to start checking boxes for invalidity.  That's not what's

 8   going to happen here, Your Honor.  We're simply going to point

 9   to these documents and say, you know, these documents show

10   what was state of the art at the time and before.

11            THE COURT:  But for the estoppel principle, you

12   would be using these as invalidating prior art.  Is that

13   right?

14            MR. COLVIN:  No, Your Honor.  At no point will we

15   take these documents and say that the patent is obvious in

16   light of these.  At no point will we look at these and will

17   we, you know, draw from them to check a box.

18            THE COURT:  But that's what you intended to do with

19   them, isn't it?

20            MR. COLVIN:  Well, we certainly had an argument for

21   obviousness based on these documents.  We absolutely did, Your

22   Honor.  And the Court said we can't do that and we're not

23   going to.

24            THE COURT:  Well, that's the very reason not to

25   introduce them and let the jury just take them back to the

1    jury room and come up with their own interpretation of them.

2    Your expert can certainly talk about the state of the art, but

3    I will sustain the objection to 11, 12, 13, and 15.  If you

4    want to discuss the others, go ahead.

5            MR. SHEASBY:  And just -- Mr. Colvin is correct.

6    There is at least one that's a different species in this.

7        If I can have -- we can actually use your slide,

8    Mr. Colvin, if that's easier.  We can speed up time.

9            MR. COLVIN:  Do you want to use this group here?

10           MR. SHEASBY:  Sure.  It will speed things up.

11       Okay.  Here we go.  No, wait.  Is this the ballot?  You

12   know what?  It's not -- let's go to DTX 07.  So DTX --

13       Thank you, Ms. Andrews.

14       So DTX 007, this is a document relating to voting on a

15   standard that's used for DDR5 PMICs.  And we were one of the

16   parties that voted for it, and that is fine.  Our concern with

17   this document --

18       If you scroll above; scroll up above.

19       -- is there is this statement that says the sponsor of

20   the document, which is Renaissance, No patent issues on the

21   sponsor's part -- no known patent issues on the sponsor's

22   part.  That's our concern about this document.

23       Let me explain what I mean.  That disclosure, no patent

24   issues on sponsor's part, is a statement as to whether there

25   are any known essential patents for which there are no --

1    there was a declining to grant a RAND obligation.  The concern

2    about this is that they're going to say, Oh, well, that

3    somehow shows that our patent doesn't cover their DDR5 product

4    even though our patent is not essential or related to the

5    standard.

6        It's also -- creates an extreme morass, the reason being

7    is we actually agreed to a RAND obligation if the patents are

8    essential, and so the 'no patent issues on the sponsor's part'

9    is correct even if our patent is essential.  It's because we

10   declared it and agreed to RAND it if it was, in fact,

11   essential.

12       And so the fact that Renaissance says there's no known

13   patent issues is really two things--one, it's a surreptitious

14   disclosure obligation; and two, it goes to a very, very

15   complex issue that relates to RAND obligations, relates to

16   disclosures of patents.  We actually disclosed this family of

17   patents and we agreed to RAND it.  And I can show you that,

18   Your Honor.

19       If we can go to the Milton deck.

20       Give me one moment, Your Honor.  I'll pull it up.

21           THE COURT:  I guess what I'm lacking here is what

22   the Defendants' argument about the relevance is before I can

23   consider your argument about confusion.

24           MR. SHEASBY:  Thank you, Your Honor.  I'll sit down.

25           MR. COLVIN:  Your Honor, so DTX 14 and DTX 7 are in

1   a similar bucket.  These are votes that were taking in the

2   JEDEC meeting regarding power management.  You heard earlier

3   that there's going to be testimony in this trial about onboard

4   power management, and these show that -- how Netlist is voting

5   in these meeting minutes regarding power management.

6        So similar to my argument earlier, Your Honor, that I

7   acknowledged the Court wasn't particularly fond of, we think

8   this goes to Netlist disclosure obligations regarding

9   willfulness and their conduct in front of -- in these JEDEC

10   meetings.  And so that's what this would tend to show.  And so

11   just -- to me the argument is similar to those I made

12   previously with respect to the JEDEC conduct documents.

13             THE COURT:  So I understood your argument before.

14   It was that you or your client would have understood that

15   there must be no Netlist patents in this space because they

16   didn't disclose them in connection with these proceedings?

17             MR. COLVIN:  That's certainly part of it, Your

18   Honor, yes.

19             THE COURT:  And what here would tend to show that?

20             MR. COLVIN:  Your Honor, this is showing that

21   Netlist -- how Netlist is voting with respect to this

22   particular specification, and so this is showing that Netlist

23   is voting 'yes' to this specification, showing that they knew

24   about it, they adopted it, they were recommending it, and that

25   combined with the fact that they didn't disclose their patents

1    as we believe they should have, as being potentially relevant

2    under the JEDEC guidance that we looked at earlier, goes to

3    our defense of willfulness.

4           THE COURT:  And have any of your witnesses or

5    pleadings referred to this as a basis for your belief that

6    there were no patents for you to infringe?

7           MR. COLVIN:  Your Honor, I'm not sure.  I'll have to

8    confer with my colleague on that.  But as I'm standing here in

9    front of you, I can't talk about -- I just don't know about

10   what our witnesses testified to with respect to this

11   particular document, or this theory.  I can sit down and

12   confer and get back to Your Honor, but standing here now I

13   just don't know.  I don't want to make a misrepresentation to

14   the Court.

15          THE COURT:  All right.  Thank you, Mr. Colvin.

16          MR. SHEASBY:  Your Honor, I can make a

17   representation to the Court that the--and I'll pull it up in

18   a moment--the willfulness interrogatory response makes in

19   reference to this allegation, nor does any pleading in the

20   complaint, nor does their 30(b)(6) witness.  And I'm

21   particularly concerned about that language about no known

22   patent issues because it seriously confuses the jury as to

23   what the disclosure obligations are.  He doesn't show it on

24   this page.

25          If we can go back to the PX -- DTX 7.

1       I'm particularly concerned about that no known patent

2   issues language that Renaissance did because it is highly

3   confusing.  It relates to situations in which there is know --

4   there was not a RAND commitment made, and Netlist made a RAND

5   commitment as to this -- as to all of its patents.

6       And so I really think, given its lack of disclosure and

7   the interrogatory response and given this complex -- that it

8   really touches upon a very, very complex issue of disclosure,

9   that it's -- the prejudice outweighs any possible relevance,

10  Your Honor.

11          THE COURT:  Mr. Colvin, I guess my central problem

12  is that given the fact that there is no essential patent here

13  alleged or FRAND -- RAND obligation, it seems to me that this

14  is just an effort to generate a feeling in the jury that

15  Netlist has improperly concealed their patent, when I don't

16  see how that has anything to do with either willfulness or

17  infringement.

18          MR. REGER:  Excuse me, Your Honor.  May I be heard?

19          THE COURT:  Yes.

20          MR. REGER:  Thank you, Your Honor.  Tom Reger on

21  behalf of Samsung.

22      Your Honor, one of the critical issues in this case

23  obviously is damages, and under the *Ericsson v. D-Link* case,

24  we must be able to apportion or at least identify the

25  technical value, the technical footprint of the invention of

1    the patented invention and distinguish that from the

2    standardized technology.

3        There is no dispute at issue in this case that the

4    products, the DDR4/DDR5 products are standard compliance

5    products.  Whether or not the patent is standard essential or

6    not is a separate question.  What we do know is that

7    Mr. Sheasby has asserted that the DDR5 patents are related to

8    onboard PMIC, power management IC.  We also know that the

9    standard includes the onboard PMIC with respect to DDR5.

10       So we must be able -- if we want to properly identify the

11   technical value, the technical footprint of the patent, we

12   have to be able to separate that from the standardized

13   portions of that onboard power management.  And to do that we

14   look at ballots like this that were voted on by the various

15   members.  It shows various contributors of that particular

16   standard.  And it goes to damages with respect to JEDEC

17   contributions that Mr. Sheasby did agree is part of this case.

18       Thank you, Your Honor.

19           THE COURT:  All right.  The ballot issue to me seems

20   to be a different issue than the disclosure issue, and what

21   I've been hearing about is the question of whether or not

22   Netlist made disclosures that Samsung contends were required

23   by JEDEC.

24       The ballot issue you're saying, how does that reflect on

25   the importance of different aspects of the technology?

1          MR. REGER:  A couple of different ways, Your Honor.

2    One, it involves -- it shows that there were a number of

3    different companies involved in that standardized technology.

4    It shows that Hewlett-Packard, IBM, Intel, and others that is

5    consistent with the argument that we have made previously and

6    that we have an expert who is going to be talking about that

7    Netlist in and of itself didn't -- was not the only

8    contributor to the power management integrated circuit onboard

9    with respect to DDR5.  They are not the only ones who came up

10   with that idea, and there were leading contributors, such as

11   Intel.  This supports our -- Mr. Halbert's testimony and his

12   opinions in this case that Intel, for example, was a leading

13   contributor of DDR5.  It also goes -- this is with respect to

14   the dates.  It also confirms Mr. Halbert's testimony with

15   respect to the development process of DDR5.

16          THE COURT:  All right.

17          MR. REGER:  Thank you, Your Honor.

18          THE COURT:  Thank you, Mr. Reger.

19          MR. REGER:  And, Your Honor, in case there was -- I

20   got a little lost there.

21      With respect to that one issue with respect to the

22   patents, no known patent issues on the sponsor's part, we

23   would agree to redact that, Your Honor.

24          THE COURT:  All right.

25          MR. REGER:  Thank you.

1        MR. SHEASBY:  Your Honor, I think if they are going

2   to agree to redact -- so there's the board of directors ballot

3   which references -- and that's DTX 7.

4        THE COURT:  Is that the one that has the line in it?

5        MR. SHEASBY:  Yeah.  That has no relevance to any

6   issue of damages.  This is just people voting for the PMIC

7   power management specification.  This is just people who

8   voted.  So this would only go to a disclosure issue because

9   we were one of the voters.

10       Now, the second issue --

11       THE COURT:  How would this go to a disclosure issue?

12       MR. SHEASBY:  Well, the fact that we voted and -- on

13  this and didn't -- and then the -- sort of the dangling chad

14  on that would be that we didn't tell anyone we had the

15  patents.  So what's the -- so that would be my concern.

16       THE COURT:  This doesn't say you didn't tell anyone.

17       MR. SHEASBY:  It's true, Your Honor.  Listen, if

18  they're going to remove that language, it becomes a much

19  closer call.  There's no doubt about it.

20       THE COURT:  Well, I will overrule the objection if

21  that reference is redacted.

22       MR. SHEASBY:  Thank you, Your Honor.

23       THE COURT:  And as -- so that is 7.

24       What about the other meeting minutes, which are 14, 27,

25  and 28?  If there's objection to those, let me hear it;

1    otherwise it -- I don't think it's improper for them to show

2    who the other industry leaders in this particular niche of

3    technology are.

4              MR. SHEASBY:  Yes, Your Honor.

5         I'll go through them briefly.

6         DTX 14.

7         DTX 14 is -- has no relevance to any issue in this case,

8    as far as we can tell.  It's from 2019.  It doesn't relate to

9    the adoption of any standard.  So our concern about this is we

10   don't know what the relevance of it is.  I doesn't relate to

11   the PMIC issue at all.

12             THE COURT:  All right.  What about 27 and 28?

13             MR. SHEASBY:  Yes, Your Honor.

14        So 27 is from 2011, and it was one of the cited prior art

15   references, and on that basis it should be excluded.

16        And 28, same issue.  It's from 2018.

17             THE COURT:  Can you put those up?  I'm sorry.

18             MR. SHEASBY:  Yes, sir.  So -- yes, Your Honor.  So

19   this is DDX 14.

20             THE COURT:  Right.

21             MR. SHEASBY:  DDX 27.  DTX 27, Mr. Huynh.

22        Same issue with this one.  We have no idea what the

23   relevance of it is, and it's from 2011.

24             THE COURT:  All right.

25             MR. SHEASBY:  And then -- but this isn't -- it has a

1    bunch of technical stuff after this.  It's not just these

2    cover pages.

3         Scroll down.  Keep scrolling to the next page.  Keep

4    scrolling.

5         It's -- it has nothing to do with anything --

6              THE COURT:  All right.  Well, I'll ask them to show

7    me what parts of it they believe are relevant.

8              MR. SHEASBY:  And then DTX 28, same issue, Your

9    Honor; not relevant to any issue in the case.

10        Thank you, Your Honor.

11             THE COURT:  Thank you.

12             MR. REGER:  Can I get the elmo?

13        May it please the Court?

14             THE COURT:  Yes.

15             MR. REGER:  Thank you, Your Honor.

16        The very top, the very first -- I've never done it with

17   my laptop before.  I apologize.

18             MR. SHEASBY:  Do you want us to put it up,

19   Mr. Reger?

20             MR. REGER:  No.  I want to show something on my

21   computer.

22             MR. SHEASBY:  We have it.  Never mind.  I see what

23   you're doing.

24             MR. REGER:  At the very top of the very first

25   exhibit it said JC40, and I believe he indicated, if I heard

 1    him correctly, that this has nothing to do with PMIC or DDR5.

 2    The very first standard that we see under JC40 is the power

 3    management integrated standard, which is the PMIC.  It is

 4    relevant to DDR5.  So the very first exhibit out of the gate

 5    is relevant to issues in this case, relevant to the standards

 6    in this case, Your Honor.

 7         Moreover, with respect to many of these, the Court

 8    expressly allowed these in.  They are -- with respect to

 9    Mr. McAlexander, there was some invalidity arguments that we

10    -- that were disclosed in the rebuttal report.  They tried to

11    strike that, but the Court previously found that they were

12    actually allowed.  And one of the fact issues that the Court

13    indicated is when the PMIC standard was first presented and

14    the development process of it.  And, again, the very first

15    document out of the gate is JC40, which relates to the power

16    management integrated standard.

17         Thank you, Your Honor.

18         THE COURT:  Well, a concern I have, Mr. Reger, is

19    that these are apparently large documents with -- that may

20    have all sorts of irrelevant information, but you have shown

21    me that they also may have relevant information, so what I'm

22    going to do is say that I will overrule the objection to

23    these, but direct that they be redacted.  If the Plaintiff

24    wants to do the work of looking and proposing redactions, the

25    Plaintiff can do so, and if the Defendant does not agree to

1    those, then we'll take them back up at the next hearing.  But

2    I'll overrule the objections to 14, 27, and 28, subject to

3    redaction.

4              MR. REGER:  Thank you, Your Honor.

5         And we will certainly work with the Plaintiff in good

6    faith on any redactions.

7              THE COURT:  All right.  That takes us to Bucket 3.

8              MR. SHEASBY:  Yes, Your Honor.  Give me one second,

9    Your Honor.  I apologize.  I'm sorry, Your Honor.  I've lost

10   my way.  If you'll indulge me for one -- here we go.  No,

11   that's not it.  Here it is.

12        Bucket 3 is parole evidence regarding the joint

13   development agreement.

14        So let's pull it up, DTX 04.

15        So DTX 04 is a term sheet that was sent to Samsung in

16   2015.  That was not the deal that was ultimately done.

17        Let's go to the next page.

18        That's not the deal that was ultimately done.  It talks

19   about $95 million and other issues.  And so our argument is

20   that this is just parole evidence; that there is an agreement

21   in place, the agreement in place is a different deal than this

22   deal, and it shouldn't be -- they shouldn't be letting in

23   evidence other than the actual contract.

24              THE COURT:  The parole evidence doctrine would apply

25   if we were trying to interpret the JDLA.  How does that relate

1     to this case?

2           MR. SHEASBY:  Yeah.  So it's a fair point.  So they

3     are using this to interpret the JDLA.  So this document talks

4     about making a large payment as an NRE, non-recurring

5     engineering fee, and saying that it can be used as a royalty

6     -- as a way of paying royalty, and they're going to use this

7     to say the non-recurring engineering fee in the JDLA that was

8     actually signed was, in fact, a royalty.  So they are, in

9     fact, using this to interpret the 2015 JDLA.  That's what

10    they're doing with the document, Your Honor.

11          THE COURT:  So you're saying that the express terms

12    of the JDLA describe the payment as an engineering fee?

13          MR. SHEASBY:  Yes, Your Honor.

14          THE COURT:  All right.  Thank you.

15       Let me hear from the Plaintiff about the relevance.

16          MS. REARDON:  If I can get access to the slides.

17    Great.

18       May I proceed, Your Honor?

19          THE COURT:  Yes.

20          MS. REARDON:  Your Honor, DTX 4 is an email with

21    an important attachment as the parties were negotiating the

22    agreement that led to the JDLA agreement back in April of

23    2015.  And so you can see here this is an email from Netlist

24    to Samsung enclosing a term sheet.  And I agree the terms that

25    we'll look at are different than what the parties agreed to

1    ultimately.  Right?  But in good faith the parties were

2    negotiating back and forth about what they believe the intent

3    of the agreement was.  And at trial we're going to hear a lot

4    about what the parties were doing when they were meeting and

5    specifically about this April 2015 meeting.  In fact, I

6    believe there is some admitted -- there is an admitted --

7    pre-admitted presentation about an April 2015 meeting.  And as

8    counsel said, the JDLA itself talks about this $8 million

9    payment as a non-recurring engineering fee, but in the

10   attachment --

11        And if I can pull up -- I'll grab DTX 26, if you'll give

12   me just a moment.  I'm sorry, Your Honor.  It's DTX 04.

13        And if I can have the elmo, please.

14        On the attachment there are these yellow post-it notes.

15   So here is a term sheet where the parties are negotiating what

16   the terms of the agreements might be.  And they note -- and

17   these are Netlist's -- this is Netlist's email to Samsung,

18   and in the email Netlist says, Here is the term sheet outline

19   proposed by Netlist, and they state these terms cloak the

20   license and allow the payments to be cast as NRE rather than

21   royalty payments.  And that cloaking language, if we go down

22   further, says it is basically a license agreement cloaked in a

23   stand-down.

24        And so we believe this is relevant to damages and the

25   comparability of the JDLA in a hypothetical negotiation

1    because it's what the parties were negotiating about and what

2    they were -- they believed the $8 million payment would be

3    for.

4              THE COURT:  So you are seeking to use this to alter

5    the terms of the written agreement?

6              MS. REARDON:  I wouldn't say alter the terms of the

7    agreement, per se, but certainly what the intent of the

8    contracting parties is relevant at the hypothetical

9    negotiation.  And this is Netlist's term sheet to Samsung, and

10   so Netlist witnesses have testified about what their intent

11   and what they believe the term sheet to be about.  Samsung's

12   witnesses will testify about what it believed the term sheet

13   would be about.  And I would say Netlist chose not to depose a

14   Samsung witness who could lay the foundation for this document

15   as well.

16             THE COURT:  Well, as far as the foundation goes, I

17   guess you're saying this document was generated by Netlist?

18             MS. REARDON:  That's correct, Your Honor.

19             THE COURT:  All right.

20             MS. REARDON:  Thank you.

21             THE COURT:  Thank you.

22             MR. SHEASBY:  Your Honor, the document is parole

23   evidence.  We actually entered into a license agreement in the

24   JDLA.  We have a term that says NRE, not royalty, and using

25   this document to alter the terms of the contract would be

1    improper.

2            THE COURT:  You know, thinking about that, since

3    this is not an effort to enforce the contract but, rather, the

4    contract is being used to show just as evidence of value, I

5    don't know that the parole evidence doctrine has any

6    application here.

7        Do you have any authority that would suggest that it

8    applies outside an action to enforce the agreement?

9            MR. SHEASBY:  Yeah.  So there actually is an action

10   to enforce the -- this is an action to enforce the contract.

11   There is a license in place and there is a dispute about

12   whether the HBM is covered by that license.  And so I can

13   say that this -- and that's live in front of jury, so there

14   is a dispute about the scope of this contract in this case.

15       The second issue is that there are really inflammatory

16   language--cloak.  There's going to be no dispute that we

17   didn't cloak a license to them.  We literally granted them a

18   license in the JDLA.  And so that type of language is

19   extremely, extremely inflammatory.

20           THE COURT:  Well, was it your language, your

21   client's language?

22           MR. SHEASBY:  So that's a disputed issue.  It's --

23   our client says that it was Samsung's language--not our

24   language--that they told us to put in in a meeting.  The

25   agreement has -- there's a morass associated with the

1   document.  But to be clear, the dispute --

2       If we can pull back up DTX 4.  Scroll down to the second

3   page.  If you blow up the bottom, the bottom three boxes.

4       That bottom thing, that's not -- doesn't even exist.

5   There -- we -- there -- this deal was not the deal that was

6   done.  The deal that was done has an express license in it.

7   And the problem is, is that using this document is done for

8   the exact purpose of derogating what the express terms were.

9   And they are trying to enforce the contract, and that's going

10  to be live in front of the jury as to HBM.

11          THE COURT:  Okay.  You're saying -- tell me again

12  about who's trying to enforce this agreement and how.

13          MR. SHEASBY:  They're saying the agreement applies

14  to HBM, and Judge Gilstrap said there's a question of fact as

15  to whether it applies to HBM.

16          THE COURT:  The agreement was terminated.  Right?

17          MR. SHEASBY:  That's right.  But there's -- but it

18  still -- still the fact they terminated, they are claiming the

19  benefit of it from before termination as to HBM.

20          THE COURT:  All right.  So they're saying that it --

21  when -- before it was terminated it covered HBM.

22          MR. SHEASBY:  Correct.  And we're saying it does

23  not.

24          THE COURT:  But -- all right.  This issue doesn't

25  relate to that scope issue.  That --

1              MR. SHEASBY:  That is absolutely the case.  So the

2    issue that we have is that these terms were not the final

3    terms that were agreed to.  The final terms that were agreed

4    to -- this talks about a $95 million payment, up-front NRE

5    payment that would be used as an effective royalty.  That's

6    not the deal we ultimately had.  The deal we ultimately had

7    was an $8 million NRE with an actual true joint development

8    with a cross license and a covenant not to sue.

9              THE COURT:  Now, do you dispute there will be

10   witnesses on both sides that will be asked about the

11   negotiations that led to the execution of the JDLA?

12             MR. SHEASBY:  I do dispute that, Your Honor.  So

13   this document was sent to one person.  It was then -- this

14   document is between two people, Jung Bae Lee and Jung Bae Kim.

15   Scroll up above.

16        This is from J.B. Kim at Netlist to Jung Bae Lee at

17   Samsung.  Jung Bae Lee is not coming to trial.  Neither is

18   Jibum Kim.  And so these people -- no one at trial who was

19   involved in this email exchange is going to be available to

20   discuss this document.  You are assuming that these two

21   gentlemen did not share this document with others in their

22   respective organizations?

23             MR. SHEASBY:  That's right.  So there is a guy named

24   Hyun-Ki Ji who they have on their list.  Hyun-Ki Ji testified

25   that he has no recollection of the negotiations.

1          So there are dozens of term sheets that could come in.

2    They've cherry-picked one that's an early, early evolution of

3    the deal.  And there's nothing wrong with cherry-picking.

4    That's not a pejorative term; it's the one they think is most

5    valuable.  But this is not the final deal.  The deal is the

6    deal.

7          And talking about a previous deal that was $95 million

8    up-front with a covenant not to sue and no joint development

9    has nothing to do with the relationship the parties actually

10   entered into.  And J.B. Lee is not going to come and testify

11   regarding this document and what Samsung believed it meant and

12   neither is Jibum Kim.

13              THE COURT:  Well, is the JDLA itself going to be in

14   evidence?

15              MR. SHEASBY:  The JDLA is going to be in evidence.

16              THE COURT:  All right.  Thank you.

17          Does the Defendant have any legal argument on the parole

18   evidence issue?

19              MS. REARDON:  Your Honor, I don't have a case in

20   mind, and that's specifically because, you know, this isn't a

21   contract dispute.  We aren't trying to introduce evidence and

22   relitigate the contract because the Court found that there was

23   a contract and it was terminated as of July 15th, 2020, and

24   there is one minor issue as to whether the foundry HBM

25   products were covered by that license.  We're not trying to

1    enforce any contract here or anything like that.

2         If I can point out -- if I could have the slides, please.

3         And it's a little bit difficult to see in this snip of

4    the email, but it says, "Attached is the term sheet outline

5    proposed by Netlist."  And it goes on to say, "We tried to

6    make it simple and address concerns from Samsung," but this is

7    a term sheet sent from Netlist to Samsung.

8         And Mr. Sheasby suggested that no one would be able to

9    talk about this document.  I disagree that Hyun-Ki Ji, who was

10   on our trial witness list, was not knowledgeable on the

11   licensing negotiations and could not talk about this proposal

12   specifically.  He oversaw the negotiations.  He was not

13   deposed in this case.  He was deposed in the CDCAL case,

14   and those transcripts have been made available for depo

15   designations in this case as well.

16        And he also referenced in Mr. Ji bum Kim at Netlist who

17   sent this document who was also not deposed in this case,

18   which is correct, which counsel correctly represented, but his

19   deposition is also in by designation in this case, and he

20   testified that with respect to this document he was doing

21   what I think he called it the folks back at the home office

22   told him to do, and that would be his -- the CEO Mr. Hong who

23   was available in his deposition.

24             THE COURT:  Thank you, Ms. Reardon.

25             MS. REARDON:  Thank you, Your Honor.

```
1              THE COURT:  I'm going to overrule the objection to

2    DTX 4 and 26.  I don't think the parole evidence doctrine

3    applies in the context of this case, and I think that the

4    negotiations that led to the JDLA appear to be sufficiently

5    relevant.  So -- anyway, those objections are overruled.

6         That takes us to DTX 5.

7              MR. SHEASBY:  It's actually DTX 26 is in the

8    same -- is the second document.

9              THE COURT:  That's the email that this was attached

10   to?

11             MR. SHEASBY:  No.  This is this long document that

12   discusses sort of encumbrances and previous --

13             THE COURT:  This is from Samsung?

14             MR. SHEASBY:  It's an exchange between Samsung and

15   Netlist.  So the bottom is -- so the bottom is an email from

16   -- the bottom is Netlist to Samsung, and then above that is

17   Samsung to Netlist.  And they're fighting about lots of

18   different terms, and this strikes us as just a questionable

19   relevance.  It has to do with previously indentures that exist

20   with Silicon Valley Bank and other issues, and we don't see

21   what the relevance of this could be.

22             THE COURT:  Is there something in it that you can

23   point to that is unfairly prejudicial?

24             MR. SHEASBY:  Scroll down.  Scroll up.

25        So I think these things we gave you -- you know, I'll let
```

1    the document in.  It's fine, Your Honor.  I'll going to lose

2    this.  I withdraw my objection.

3              THE COURT:  All right.  No. 26 will be in.

4         So you can move to DTX 5.

5              MR. SHEASBY:  DTX 5 is a communication from our

6    lawyers in the Central District of California case to

7    Samsung's lawyers in the Central District of California case

8    putting them on notice of the need to license our patents.  It

9    has a couple of issues.  One, it's lawyer-to-lawyer.  That,

10   you know -- I think it's a close call.  I know the Court

11   determined that lawyer-to-lawyer is not allowed, is generally

12   not admissible.

13        There's a second issue which refers to three patents

14   that are asserted against Samsung in the District of Delaware.

15   Netlist -- Samsung filed a DJ based on those three patents and

16   we counterclaimed for infringement, and so discussing those

17   three patents is going to inevitably have to lead to an

18   explanation that there's another lawsuit.  I believe the

19   purpose of this document is for them to show -- see, when

20   that he told us they should license, they didn't list the

21   patents-in-suit.  The Court has already ruled as to when they

22   were given notice of the patents-in-suit.

23        Thank you, Your Honor.

24             THE COURT:  All right.  Let me hear from the

25   Defendant.

1          MS. REARDON:  Your Honor, with respect to DTX 05,

2     counsel is correct.  This is relevant to when Samsung did or

3     did not receive notice of the asserted patents.  And counsel

4     -- or in previous arguments it's been suggested that and it

5     seems that Netlist is going to present evidence that they

6     somehow gave us some sort of notice with respect to

7     infringement of certain patents.

8          And so to the extent that they're going to introduce that

9     evidence, we think we should be able to introduce this letter

10    which demonstrates that after the termination of the JDLA,

11    we -- which -- and this letter is dated October 15th, 2020,

12    that the notice that was given was to three wholly separate

13    patents.  And we don't think that the Delaware litigation will

14    be an issue because there is -- and to the extent there is any

15    sentence about it, we would react to it, but I don't believe

16    it references any Delaware litigation.  You know, that would

17    be a subsequent -- that's something subsequent that happened

18    after this letter.  It doesn't say we're -- you know, we're

19    filing a complaint in Delaware.

20          THE COURT:  How does the fact that they gave you

21    notice of infringement of other patents have anything to do

22    with the issues in this case?

23          MS. REARDON:  Yes, Your Honor.

24          Their witnesses have suggested that there was some sort

25    of notice sent to Samsung about infringement of patents

1   following the termination of the JDLA, and the only evidence

2   in the record--that we'd like to get in the record, I guess I

3   should say--but the only evidence that's been presented is

4   this letter--right?--which does not show that there was any

5   notice of infringement of the three asserted patents.

6          THE COURT:  I really don't see how the fact that you

7   got one letter means that there wasn't another letter and that

8   it relates to other litigation which violates another MIL.

9   It's -- and it's not even between the parties; it's between

10  counsel.  I'll sustain the objection to DTX 05.

11         MR. SHEASBY:  DTX 25.

12  DTX 25 --

13  Scroll down.

14     -- is an email exchange between two Samsung employees.

15  One is Craig Orr.  Craig Orr was not disclosed as a witness

16  having knowledge in this case under the Rule 26 disclosure.

17  The other exchanger on this is Jung Bae Lee.  Jung Bae Lee is

18  the president of Samsung.  He's not coming to trial, and he

19  was not deposed or asked about this document.  So --

20         THE COURT:  All right.  It sound like they have a

21  hearsay issue.  If they can get past that, I'll give you a

22  chance to address other issues.

23         MS. REARDON:  Sure, Your Honor.

24     With respect to the hearsay question, we would agree that

25  this is a -- this is entitled to an exception in terms of a

1    present sense impression.  Both Mr. Craig Orr who is -- who

2    recites in the email further down his impressions of the

3    meeting, and Mr. Jung Bae Lee, they are capturing their notes

4    about what took place in that meeting.

5            THE COURT:  You know, present sense impression

6    explicitly excludes look back at history, which is what it

7    sounds like you're describing this to be.  It has to be made

8    while or immediately after the declarant perceived the event.

9            MS. REARDON:  Your Honor, I believe the meeting took

10   place in April of 2015, and these notes were captured right at

11   that same time.

12           THE COURT:  The same month?  That's not my standard.

13   Or while or immediately after.

14           MS. REARDON:  I wish I had a better exact date for

15   you.  But there was I think at least one meeting that was

16   taking place in April, and if you look at Mr. Orr's email

17   specifically, Mr. Jung Bae Lee's email was translated so the

18   date and the capture are missing.

19        But if I could have the elmo, please.

20           THE COURT:  This is hearsay.  I'll sustain the

21   objection.

22           MS. REARDON:  Your Honor, if I may, the only thing I

23   wanted to point out is that Mr. Orr said, "The notes I

24   captured from today's meeting."

25           THE COURT:  Okay.  Same day is still -- present

1   sense impression is about something you're perceiving, and it

2   also has to be relevant.  His impression of the meeting is of

3   questionable value, but in any event.

4        All right.  Go on to 9.

5             MR. SHEASBY:  DTX 9.

6        Samsung's counsel prepared a chart that lists a large

7   number of our patents and the state of the patents, as well as

8   whether they were or were not in litigation.  This was done

9   for an apportionment procedure that Mr. Meyer applied to the

10  SK hynix license agreement.  That apportionment analysis was

11  stricken.

12       So I have a couple of issues.  One this is actually not

13  evidence.  This is a document prepared by Samsung's counsel.

14  Two, it discloses what patents have been in litigation, which

15  creates an issue.  And three, it has no relevance because this

16  was used for bucketing methodology that the Court struck.  If

17  you look at Docket 432 at 4, you'll see where he struck the

18  apportionment analysis that it is based on.

19       Thank you, Your Honor.

20            THE COURT:  All right.  Why isn't this hearsay,

21  Ms. Reardon?

22            MS. REARDON:  Your Honor, this isn't hearsay because

23  it is -- DTX 9 is based on market reports, Netlist's own

24  production of its patent portfolios and information from the

25  European Patent Office.

1           THE COURT:  So is it a market report?

2           MS. REARDON:  It's based on market reports.

3           THE COURT:  That doesn't get you past hearsay.  I

4    can come and say all kinds of stuff based on good sources, but

5    this document itself appears to be hearsay.  It's an

6    out-of-court declaration by your side that is offered for the

7    truth.

8           MS. REARDON:  Understood, Your Honor.

9           THE COURT:  All right.  I'll sustain the objection

10   to 9.

11          MR. SHEASBY:  DTX 1 is unelected prior art, and,

12   therefore, it should not come into evidence.  In fact, it's

13   undisclosed prior art, not just unelected.

14          MR. COLVIN:  Your Honor, DTX 1 was subject to a

15   motion to strike and quite a bit of dialogue in front of the

16   Court at the pretrial conference.  The reason this is relevant

17   and it has nothing to do with prior art is because their

18   technical expert created an argument on -- in his opening

19   report that some feature of our product could be looked at as

20   something that could stand in for the value of their patent,

21   and then their expert took that analysis and used it for his

22   damages case.

23       Our expert Doctor Robins found this reference that rebuts

24   that.  He found several references that rebut it, but this is

25   one of the main ones.  And this shows that what their expert

1    used to value -- to create a technical value for their patent

2    just can't be right because the particular structure that our

3    product uses, which is found nowhere in their patent, is

4    something that came before, and that's shown here in this

5    reference.

6         Now, Judge Gilstrap and I had a big talk at the pretrial

7    conference.  He ordered me to put on Doctor Robins based on my

8    representation to him that we would not use any of this stuff

9    for invalidity purposes.  I'm pretty sure he's going to throw

10   me in jail in I attempt to do that, and we certainly have no

11   intention of getting close to that line.

12        And Mr. Sheasby's right.  This is not disclosed as prior

13   art.  It's got nothing to do with prior art.  This has to do

14   with rebutting a very robust technical benefits section of

15   their expert's report.  So that's how we would use it.  And I

16   can certainly walk Your Honor through the details of that, but

17   it is not prior art, but it is a very important document for

18   us.

19             THE COURT:  Why do you need this in evidence?

20             MR. COLVIN:  Well, we need it in evidence, Your

21   Honor, because a big part of their case is that -- let me just

22   put the document up, Your Honor.  A big part of their case,

23   Your Honor, is that the particular structure that is shown in

24   this patent, and it won't mean much to you, but this is a --

25   just know that there's a structure here that's an important

1    part of our product.  It's not part of their patent.  Their

2    expert says that this structure is a stand-in for the

3    technical value of their patent.  And it's very important for

4    us to be able to show the jury that the structure he points to

5    can't stand in for the value of their patent because it

6    existed many, many years before their patent.

7        And so this -- the jury needs be able to see this

8    evidence, hold this evidence, and take it back to their room

9    when they're deliberating and see that, Boy, that's right;

10   what Netlist's expert Doctor Brogioli said just doesn't work

11   in light of this Shibata reference DX 1.  It's very important

12   for them to be able to hold and to study -- not for prior art.

13   It's got nothing to do with prior art.  This has to do with a

14   structure that we use in our product.

15       And they say that that structure, which again, isn't --

16   there's no pictures like that in their patent.  We're not

17   using it to say that this is -- that their patent should be

18   invalid.  We're using this to say the structure they point to

19   in our product as showing a benefit of their patent just can't

20   be true.

21           MR. SHEASBY:  If I could have DTX 1, please.

22       Your Honor, the document is prior art.  It's dated 2006.

23   They're using the document to claim a practicing the prior art

24   defense, which is what they said.  There's no way a jury is

25   going to be able to parse this finely between something from

1   2006 and them putting it in front of the jury and saying, We

2   practiced this technology from 2006; therefore, we don't

3   infringe or, therefore, Netlist's technology is not valuable.

4        This is -- whatever use can be made of it for damages is

5   something Judge Gilstrap will decide, but having this in front

6   of the jury could do nothing but suggest that our reference --

7   that our patent is invalid.  It is prior art and they're

8   saying they practice the prior art.  That's the argument that

9   he just rehearsed for you, Your Honor.

10       In addition to being an improper argument under Federal

11  Circuit law, it is -- the ability of the jury to parse that

12  from invalidity and other references is not going to be

13  possible.  This is not about whether they can -- there's some

14  purpose to use it.  There's a -- the issue is about whether it

15  should be admitted into evidence.  Just saying prior art is

16  not being used for prior art doesn't solve your problem.

17            THE COURT:  All right.  Thank you.

18       Mr. Colvin, I don't see how this is not a prior art use.

19  You're claiming that the Plaintiff's patent is not entitled to

20  the benefit of this because it's -- you contend that feature's

21  shown in this other patent before it, which is another way of

22  saying that they don't have a valid claim to their patent.

23            MR. COLVIN:  That's not quite it, Your Honor.

24  There's a bit of nuance there that I think is important.

25       In order to infringe their patent, you have to do a bunch

1    of things.  Call it A, B, C, and D.  They take a feature of

2    our product that is not A, B, C, or D, and they say, Based on

3    feature Z, this is how we can assess the value of their

4    patent.  This is how Netlist says, Based on feature Z we can

5    use this valuation of patent.

6              THE COURT:  Why didn't you make that same argument

7    by saying the feature they're claiming is not claimed in their

8    patent?

9              MR. COLVIN:  Your Honor, their expert goes to great

10   lengths to say that -- they map their claims onto part of this

11   feature.  This stair-step feature that is shown in this

12   Shibata reference, this DX 1, is a very specific thing their

13   patent has nothing to do with, yet their expert says this

14   stair-step feature is what is -- is a way to measure the value

15   of their patent.  And we need to be able to say, No, that's

16   not right, because this stair-step feature existed in the

17   prior art.  The stair-step feature came before their patent,

18   which obviously anything that comes before the patent is

19   technically prior art.

20      That doesn't mean we're going to use it to invalidate the

21   patent.  We're absolutely not.  We can't use this to

22   invalidate the patent.  But we need to be able to show the

23   jury, and we need to have the jury to really be able to study

24   and understand this reference so that Netlist can't get away

25   with saying this stair-step feature, which is nowhere in their

1    patent, is somehow a way to value their patent.  This patent,

2    this Shibata reference is how we do that, and it is a central

3    defense in our case, Your Honor.

4            THE COURT:  You know, your use of that patent seems

5    too much to me like an invalidity -- a back door invalidity

6    claim.  You can certainly have your expert identify that the

7    stair-step has been in the art, and if you think that you've

8    developed a basis to argue the proper use of that you can

9    approach and seek leave, but I don't think that that should be

10   pre-admitted, and, therefore, I'm going to sustain the

11   objection to DTX 1 at this time.

12       And that takes us to 17.

13           MR. SHEASBY:  Yes, Your Honor.  So these are a bunch

14   of issues that come together.  They're hearsay publications or

15   articles.  There is no business record foundation laid for any

16   of them.  And in light of that they are inadmissible.

17           THE COURT:  All right.  What is the response to the

18   hearsay objection?

19           MR. COLVIN:  If I can get my slides, Ms. Andrews.

20       Your Honor, these statements are qualified as an

21   exception because they are learned treatises, periodicals, or

22   pamphlets.

23           THE COURT:  You do understand that rule says that

24   learned treatises cannot be used as exhibits for the jury?

25   Are you familiar with that?

1          MR. COLVIN:  I'll take Your Honor's word for that

2     one.

3          THE COURT:  Well, you had it on the screen up there,

4     so I didn't know -- I assume you read it.  I have the glow of

5     a computer here.  I think that you left off of your slide the

6     last sentence of 803 (18) which says if admitted, the

7     statement may be read into evidence but not received as an

8     exhibit.  So is that what you're relying on?

9          MR. COLVIN:  I believe you're right, Your Honor, and

10    in light of that I think we're done.

11         THE COURT:  All right.  Well, I'll sustain the

12    objection, but that doesn't mean you can't seek to use them

13    with your witness in accordance with that provision.

14       I'm going to issue a written order that will confirm what

15    we've done here, but I'll just say that the order will say to

16    gather back here on Tuesday if there are -- if you're unable

17    to agree on the redactions.

18       Is there anything else that we need to try to put on the

19    record?

20         MR. SHEASBY:  Your Honor, I just have about 15

21    minutes on *Mentor* if --

22         THE COURT:  Yes.  I would ask you to just wait for

23    me.  Okay?  I'll be back.

24         MR. SHEASBY:  Thank you for your patience today,

25    Your Honor.

```
1              THE COURT:  All right.  And we'll tell you -- does

2    it make a difference what time on Tuesday?

3              MR. SHEASBY:  Not for Plaintiff.

4              MR. COLVIN:  No, Your Honor.  We'll be here.

5              THE COURT:  All right.  Then we'll probably say

6    1:30.  But anyway.

7         All right.  Thank you.

8                        (End of hearing.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts          04/08/2023

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25