1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF TEXAS
2                          MARSHALL DIVISION

3    NETLIST, INC.,                   (  CAUSE NO. 2:21-CV-463-JRG
                                      )
4            Plaintiff,               (
                                      )
5    vs.                              (
                                      )
6    SAMSUNG ELECTRONICS CO., LTD., (
     et al.,                          )  MARSHALL, TEXAS
7                                     (  APRIL 14, 2023
             Defendants.             )  9:00 A.M.
8    _____

9

10

                              VOLUME 1
11

12

13   _____

                        TRIAL ON THE MERITS
14

              BEFORE THE HONORABLE RODNEY GILSTRAP
15            UNITED STATES CHIEF DISTRICT JUDGE
                          and a jury
16   _____

17

18

19

20

21

22              SHAWN McROBERTS, RMR, CRR
                   100 E. HOUSTON STREET
23              MARSHALL, TEXAS  75670
                      (903) 923-8546
24           shawn_mcroberts@txed.uscourts.gov

25

```
 1                        A P P E A R A N C E S

 2         FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                                 LOS ANGELES
 3                               1800 AVENUE OF THE STARS
                                 SUITE 900
 4                               LOS ANGELES, CA 90067-4276
                                 (310) 203-7096
 5                               BY:  MR. JASON SHEASBY
                                      MS. LISA GLASSER
 6
                                 McKOOL SMITH, P.C. - MARSHALL
 7                               104 E. HOUSTON ST., SUITE 300
                                 MARSHALL, TEXAS  75670
 8                               (903) 923-9000
                                 BY:  MR. SAM BAXTER
 9                                    MS. JENNIFER TRUELOVE
                                      MR. KEVIN BURGESS
10
           FOR THE DEFENDANTS:   FISH & RICHARDSON, PC -
11                               WASHINGTON DC
                                 1000 MAINE AVE. SW, SUITE 1000
12                               WASHINGTON, D.C.  20024
                                 (202) 783-5070
13                               BY:  MR. RUFFIN CORDELL
                                      MR. MICHAEL McKEON
14
                                 GILLAM & SMITH, LLP
15                               303 SOUTH WASHINGTON AVENUE
                                 MARSHALL, TEXAS  75670
16                               (903) 934-8450
                                 BY:  MS. MELISSA SMITH
17
           OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
18                               100 E. HOUSTON STREET
                                 MARSHALL, TEXAS  75670
19                               (903) 923-8546

20

21

22

23

24

25
```

**INDEX**

**EXAMINATION**

| Witness Name | Page |
|---|---|
| SCOTT MILTON | |
| Direct By MR.SHEASBY | 189 |
| Cross By MR. McKEON | 230 |

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
1              THE COURT:  Thank you.  Be seated, please.

2         Good morning, ladies and gentlemen.  Thank you for being

3    here.

4         My name is Rodney Gilstrap, and I am the chief United

5    States district judge for the U.S. District Court for the

6    Eastern District of Texas.  I have lived in Marshall since

7    1981.  I practiced law in and around this community for 30

8    years before I was appointed to the bench here in 2011.

9         They say that confession is good for the soul so I'll

10   start with a confession.  I was not born in Texas, but I got

11   here as quick as I could.  I came to Texas at the ripe old age

12   of 18 to enroll as a freshman at Baylor University in Waco.  I

13   finished my undergraduate degree there, and then I attended

14   and graduated from Baylor law school.

15        I am married.  My wife and I had two grown children.  We

16   lost one about six months ago.  We have several wonderful

17   grandchildren.  My wife owns and operates a retail floral

18   business here in Marshall, and she's done that for more than

19   the last 15 years.

20        Now, I tell you all those things about myself because in

21   a few minutes I'm going to ask each of you to give me the same

22   type information about yourselves, and I think you're entitled

23   to know as much about me as I'm about to find out from each of

24   you-all.

25        We are about to engage in the selection of a jury in a
```

1    civil case involving allegations of patent infringement.  But

2    before we go any further, if you would indulge me for a

3    minute, I'd like to briefly review with you how we came to

4    have our American civil jury trial system.  I think that's

5    important.

6        If you go back in ancient history and if you begin with

7    the first five books of the Old Testament, the Pentateuch, you

8    will find that the ancient Hebrew nation impaneled juries to

9    decide issues of property ownership and property value.

10       The ancient Greeks began using a jury system about 1500

11   BC.  And the ancient Romans, like they did many things,

12   borrowed and copied the jury system from the Greeks, and it

13   was the Romans that brought the jury system across the English

14   channel to what we now know as Great Britain when they

15   conquered that island in the fourth century AD.

16       And having brought the jury system to England, that

17   system became established and flourished and was in place for

18   800 years, until the 12th century when a rather tyrannical

19   king came to the throne of England named King John.  And King

20   John became embroiled in multiple disputes with his nobles and

21   his population, and nearly led that country to the brink of

22   civil war.

23       But those disputes were resolved and civil war was

24   avoided.  One of the primary disputes between King John and

25   his subjects was his efforts to curtail and do away with the

1    right to trial by jury.  But as I say, civil war was avoided,

2    those disputes were resolved, and they were settled by way of

3    a written document that the king and his nobles all executed

4    at a place in England called Runnymede.  That document you may

5    have heard of and studied in history is called the Magna

6    Carta.

7         And so you can see, ladies and gentlemen, that the

8    concept of the jury trial came with our British forefathers

9    who crossed the Atlantic and settled this country in North

10   America and became British subjects in English North America.

11        And the jury system flourished in colonial America under

12   the rule of the British for over a hundred years until another

13   rather tyrannical king came to the throne of the Great

14   Britain, and this time his name was King George the III.  And

15   like King John, King George the III became embroiled in many,

16   many controversies with his subjects, primarily his British

17   subjects living here in North America.

18        And one of the issues that became a problem between the

19   king and his North American subjects was his efforts to

20   curtail the right to trial by jury.

21        In fact, ladies and gentlemen, when Thomas Jefferson sat

22   down and wrote the Declaration of Independence which was a

23   letter to the king explaining all the disputes and issues that

24   existed and that led his colonists to reach the ultimate

25   conclusion that they had no alternative but to separate from

 1    Great Britain and form our own independent nation, the king's

 2    efforts to curtail the right to trial by jury are expressly

 3    called out in the Declaration of Independence by Thomas

 4    Jefferson as one of those problems leading up to the

 5    determination that we would have to become our own independent

 6    country.

 7         And as you know, we did revolt from Great Britain, we did

 8    win the Revolutionary War, and we did become our own

 9    independent nation.  And shortly, thereafter, we developed

10    what is the supreme law of the land, our governing document,

11    the Constitution of the United States.

12         And shortly after its ratification, ten additional

13    amendments or ten amendments to the Constitution were enacted.

14    You know these ten amendments.  You've heard them throughout

15    your time in school as the Bill of Rights.  And if you look at

16    the Bill of Rights, the Seventh Amendment to the U.S.

17    Constitution guarantees the right to trial by jury in a civil

18    case.

19         And the ten amendments that make up the Bill of Rights

20    were all ratified in 1791, ladies and gentlemen.  So since

21    1791, every American citizen has a guaranteed -- a

22    constitutionally-guaranteed right to submit their civil

23    disputes to resolution through a trial by jury.

24         I often tell citizens like yourselves who appear for jury

25    duty this morning that, by being here, you are doing a very

1    real part to uphold our Constitution, and particularly the

2    Seventh Amendment to our Constitution guaranteeing the right

3    to trial by jury in a civil case.

4        I also tell citizens who appear for jury duty as you have

5    this morning that, in my personal opinion, jury service is the

6    second highest form of public service any American can render.

7    In my personal view, the highest form of public service that

8    any American can render to our country are those young men and

9    women that serve in our armed forces.

10       Now, I want you to understand, ladies and gentlemen, that

11   as a part of this jury selection process, the lawyers here

12   representing the parties are going to ask you various

13   questions along the way.  I want you to understand that they

14   are not asking questions that are intended to pry into your

15   personal affairs or to go beyond what is necessary to help us

16   secure a fair and an impartial jury to hear the evidence in

17   this case.

18       But please understand, these are very experienced trial

19   lawyers.  They understand the rules of the Court.  I do not

20   expect them to go beyond what's necessary to question you

21   about your ability to be fair and impartial if you're selected

22   to serve on this jury.

23       Now, I often tell jury panels this, and I'm going to make

24   this clear to you this morning, it is possible that in the

25   process you may be asked a question about your personal

1    background that you find so private and so personal, that

2    you're not comfortable answering it in front of everybody else

3    on the jury panel.

4         Now, that doesn't happen very often, it's a rarity, but

5    it could come up.  If at any place along the way this morning

6    you are asked a question that you feel is so personal, you do

7    not feel comfortable answering it in front of everybody else,

8    you always have the option to say, in response to that

9    question, I'd like to discuss that with Judge Gilstrap.  And

10   if that's your answer, I'll provide an opportunity where you

11   can answer that outside of the presence of everyone else on

12   the panel.

13        But, ladies and gentlemen, I can count on one hand the

14   times that's come up, and I've been on the bench soon to be

15   over 12 years.  So it's a rarity, but I want you to understand

16   that option is out there if it should arise this morning.

17        Now, the trial in this case is going to begin today after

18   the jury's selected, and I anticipate that it will go through

19   all of next week.  My best guess is that we'll end this trial

20   and complete the process a week from today on next Friday.

21   Today is the 14th of April, and so in that case we'd be

22   talking about from now through the 21st of April.

23        Now, if there are any of you on the panel that would have

24   a very serious problem with being present through today and

25   all of next week, I need to know about it.  And when I say

1   serious problem, I'm not talking about merely it's

2   inconvenient to serve on the jury, because, ladies and

3   gentlemen, by its nature jury service is inconvenient.  That's

4   why it's valuable public service.

5       But let me give you an example.  If you have a surgical

6   procedure scheduled for yourself or an immediate family member

7   who is dependent upon you during the next week, that's a

8   reason that I should hear about.  If you have pre-paid,

9   non-refundable tickets to fly across the Atlantic Ocean and

10  can't get your money back, that's something I need to know

11  about.  But mere inconvenience is not a reason.

12      But if there's anybody that feels like there is in your

13  particular circumstances a serious problem with you being able

14  to be available throughout the trial as I've discussed it, I

15  need you to raise your hands and let me make a note of it at

16  this time.  Okay.  I don't see anybody in the jury box.

17      And, sir, I can't see your number.

18          THE PANEL MEMBER:  No. 20.

19          THE COURT:  20?  Thank you, sir.

20      And I guess, ma'am, you're number 21?

21          THE PANEL MEMBER:  Yes, sir.

22          THE COURT:  Okay.  Let me make a note of that.

23      And 23.  Thank you, sir.

24      Anybody else?  20, 21, and 23.

25      All right.  Thank you, ladies and gentlemen.

1          Now, at this time I'm going to call for announcements on

2     the record in the case of Netlist, Inc., versus Samsung

3     Electronics Company, Ltd., Samsung Electronics America, Inc.,

4     and Samsung Semiconductor, Inc.  This is Civil Case No.

5     2:21-CV-463.

6          And, Counsel, as you give your announcements for the

7     members of the panel and the Court, please identify yourselves

8     the members of your trial team, and any corporate

9     representatives that you have with you.

10         What says the Plaintiff?

11              MR. BAXTER:  Thank you, Your Honor.  We are ready.

12         Can I approach the podium for just a second, Your Honor?

13              THE COURT:  Please do, Mr. Baxter.

14              MR. BAXTER:  Your Honor, Sam Baxter from McKool

15    Smith.  And we're ready to proceed, Your Honor.

16         With me today, I have my law partner, Dr. Kevin Burgess,

17    who is right here at the counsel table, and my other law

18    partner, Ms. Jennifer Truelove.  And trying the case with us

19    today will be my friend, Mr. Jason Sheasby, and his partner,

20    Lisa Glasser.

21         And this is our corporate rep, Mr. Scott Milton.  He's

22    the vice president of engineering for Netlist, Your Honor.

23         And we're ready.

24              THE COURT:  All right.  Thank you, Counsel.

25         What says the Defendants?

1            MR. CORDELL:  Good morning, Your Honor.  Ruffin

2     Cordell from Fish & Richardson on behalf of Samsung.  And

3     trying the case with me this morning is my partner, Michael

4     McKeon, and my colleague, Melissa Smith.

5            And our corporate representative from Samsung is Mr.

6     Joseph Calandra.

7            And we're ready to proceed, Your Honor.

8            THE COURT:  All right.  Thank you.

9            Now, ladies and gentlemen, as I've told you, this is a

10    patent case arising under the patent laws of the United

11    States.  And what the Plaintiff Netlist is claiming is that

12    certain of its patents have been infringed by the Samsung

13    Defendants, and Netlist is seeking money damages because of

14    this alleged infringement.  And the Defendants Samsung, they

15    deny that they infringe any of the Plaintiff's patents and

16    they contend that certain of the Plaintiff's patents are

17    invalid.

18           Now, what I've just told you is a very shorthand,

19    thumbnail sketch of what this case is about.  I know you have

20    all seen this morning the video prepared by the Federal

21    Judicial Center about patent infringement and patent trials.

22    And having seen that, you know more about what the evidence is

23    going to be in this case than most people do who appear for

24    jury duty.

25           As I mentioned, the lawyers from both sides will have an

1    opportunity in a few minutes to question the members of the

2    panel to obtain relevant information, to exercise their

3    rights, and help the Court secure a fair and an impartial jury

4    to hear the evidence in this case.

5        I want to make this clear, ladies and gentlemen.  As to

6    any of the questions you're going to be asked this morning,

7    there are no wrong answers.  As long as the answers you give

8    are full, complete, and truthful, there are no wrong answers.

9        And as I mentioned, the lawyers are not here to pry into

10   your personal affairs.  I don't expect that's going to happen.

11   If it should, I won't hesitate to jump in and stop it.  But I

12   don't expect that at all.

13       And you should understand that the lawyers are entitled

14   under our system to ask the questions that they will ask to

15   secure relevant information.  Again, the goal of this process

16   is to secure a fair and an impartial jury to hear the evidence

17   in this case.

18       Before the lawyers begin with any questions they have,

19   there is one thing I want to cover with you and call your

20   attention to because some of the lawyers may ask you about

21   your ability to apply this if you're selected to serve on this

22   jury, and that's what we call the burden of proof.

23       In a patent case, the jury may be called upon to apply

24   two different burdens of proof.  There's a burden of proof

25   known as the preponderance of the evidence.  I'll say that

1    again--the preponderance of the evidence.  And there's a

2    second burden of proof known as clear and convincing

3    evidence--clear and convincing evidence.

4         So when you're responding to any possible questions from

5    the lawyers about the burden of proof, I need to instruct you

6    that when a party has the burden of proof by -- on any claim

7    or defense by a preponderance of the evidence, that means that

8    you, the jury, must be persuaded by the credible and

9    believable evidence that that claim or defense is more

10   probably true than not true.  Let me say that again--more

11   probably true than not true.  This is sometimes talked about

12   as being the greater weight and degree of credible testimony.

13        Let me give you what I hope will be a helpful example.

14   In front of me is our court reporter, Mr. McRoberts.  In front

15   of him, you see a statue, the Lady of Justice.  She's

16   blindfolded.  In her right hand lowered at her right side is

17   the sword of justice.  In her left hand raised above her are

18   the scales of justice.  Those scales are balanced and equal

19   and in exactly the same position, and that's where these

20   parties need to start out in this trial.

21        But over the course of the trial, the Plaintiff is going

22   to put on their evidence, and when they do, think about them

23   putting their evidence on one side of those scales.  And then

24   the Defendants are going to get an opportunity to put on their

25   evidence and think about that evidence as going on the other

1    side of those scales.

2        And when all the evidence is in, if a party has the

3    burden of proof on any issue by a preponderance of the

4    evidence, and looking at those scales with all the evidence on

5    them, if they should tip in favor of the party who has that

6    burden of proof by a preponderance of the evidence, even if

7    they tip ever so slightly, then that party has met the burden

8    of proof of the preponderance of the evidence, more likely

9    true than not true.

10       However, ladies and gentlemen, with regard to this second

11   burden of proof, clear and convincing evidence, that means

12   that you, the jury, must be persuaded by the evidence and

13   arrive at an abiding conviction that the truth of the party's

14   factual contentions are highly probable.  Let me say that

15   again--an abiding conviction that the truth of the party's

16   factual contentions are highly probable.  This second burden

17   of proof, the clear and convincing burden of proof, is a

18   higher burden of proof than the first one I mentioned, the

19   preponderance of the evidence.

20       Let me go back to the same example.  The parties start

21   out equal.  The scales of justice start out equal.  The

22   Plaintiff puts on all their evidence which goes on one side of

23   those scales, the Defendant puts on all their evidence that

24   goes on the other side of those scales, and when all the

25   evidence is in, if the party has the burden of proof on any

1    issue by clear and convincing evidence, then those scales must

2    tip in that party's favor and they must definitely tip.  It's

3    not adequate that they tip ever so slightly.  But if they

4    definitely tip in favor of that party, then that party has met

5    this second burden of proof, the clear and convincing evidence

6    standard.

7         Now, there is a third burden of proof, ladies and

8    gentlemen, that has absolutely no application in this case

9    whatsoever.  You've probably all heard about it in the media

10   and the television and movies, and that's called beyond a

11   reasonable doubt.  Beyond a reasonable doubt is the burden of

12   proof applied in a criminal case.  And as I say, it has

13   absolutely no application whatsoever in a civil case such as

14   this.

15        You should understand that the clear and convincing

16   evidence standard is higher than the preponderance of the

17   evidence standard, but it is not as high as beyond a

18   reasonable doubt.  And you should not confuse clear and

19   convincing evidence with beyond a reasonable doubt.

20        Now, I give you these instructions on these two burdens

21   of proof that will be applied in this trial because it's

22   possible that one or more of the lawyers may ask you about

23   your ability to apply those standards to the evidence if

24   you're selected to serve on this jury.

25        Now, we've reached the point where I'm about to find out

1    from each of you the same kind of information I told you about

2    myself when we started.  Let me explain to you how we're going

3    to do this.

4         We have two court security officers in the room.  They

5    each have a handheld microphone.  We are going to begin with

6    the first member of our panel, Mrs. Snelgrove.  And the

7    Courtroom Deputy is going to bring you a handheld microphone.

8    When you get that microphone, if you'll take it, stand up, use

9    it, and then answer those nine questions.

10        Just a minute, ma'am.  I'm not quite through.

11        Please be sure you hold it up here.  You don't know how

12   many people hold it at their waist.  There are a lot of people

13   here.  I want everybody to hold the microphone close so that

14   we'll get the benefit of it.

15        And then when you've finished, ma'am, if you'll pass the

16   microphone to Panel Member No. 2, he'll stand and answer those

17   same nine questions on the monitors and you have printed

18   copies of.  And we'll go numerically from 1 to 2 to 3 through

19   every member of the panel.

20        And one other thing, ladies and gentlemen.  After you've

21   given me all this information, we'll reach a point later this

22   morning where the lawyers will go to the podium and ask

23   specific questions, and they may ask specific questions of

24   individual members of the panel.  If they do, don't answer it

25   as soon as you hear the question.  Wait until the Court

1    Security Officer brings you the handheld microphone, stand up,

2    hold it close, and then answer the question.

3         We'll do it the same way for any specific questions that

4    follow as we will for these nine standard questions that

5    you're about to answer.

6         So with that, Mrs. Snelgrove, if you'll stand and give us

7    your answer to those nine questions, please.

8              THE PANEL MEMBER:  Good morning.  Hello.  My name is

9    Christia Snelgrove, and I live in Gilmer, Texas.  I have two

10   grown children and two grandkids, young.

11        My place of employment is Pittsburg ISD, and I've worked

12   there 10 months.  Prior to that, I worked at Titus County

13   Memorial Hospital for 16-and-a-half years being an OR

14   attendant, but my -- where I work now is doing custodial work

15   at the primary school.

16        I graduated from high school in 1995 from Gilmer, Texas.

17        My spouse's name is Gary Snelgrove.  His place of

18   employment is East Texas Bridge in Longview, Texas, and he's

19   been there 15-and-a-half years.  And he is a job

20   superintendent.

21        And I do have prior jury services in civil court in this

22   same courthouse.

23             THE COURT:  All right.  Thank you, ma'am.

24        If you'll hand that to Panel Member No. 2, Mr. Pomeroy.

25             THE PANEL MEMBER:  My name is James Pomeroy.  Good

1    morning, everybody.  I have three grown children.

2        I do inspection work for a major gas company.  I work --

3    my employer is BWS Services.  I've worked for them one year

4    now.  Prior to that, I've been in the inspection business for

5    10 years.  I was a welder before that.

6        I have a GED.  I never finished high school.

7        My wife's name is Barbara Pomeroy.  She's a homemaker,

8    and she's done that pretty much all her life that we've been

9    together.

10            THE COURT:  Any prior jury service?

11            THE PANEL MEMBER:  Back in the '70s, I believe, but

12   I couldn't tell you whether it was civil or criminal.

13            THE COURT:  All right.  That's fine.

14            THE PANEL MEMBER:  It's been a long time ago.

15            THE COURT:  Thank you very much.  If you'll hand

16   that to Panel Member No. 3, Ms. Kelso.

17            THE PANEL MEMBER:  Good morning.  My name is Denise

18   Kelso.  I live in Longview, Texas.  I have two grown children

19   one who's in the service.

20        I work at Christus Good Shepherd.  I've been there for

21   nine years, and I'm the senior staffing office assistant,

22   which means if the nurses call in or we're short-staffed, I

23   have to find replacements for them.

24        I have -- I graduated from Austin High School, and I'm

25   not married anymore.

1        And prior jury service, I think it was a civil case for

2    traffic infringement in Lona Vista, Texas.

3              THE COURT:  Thank you very much, Ms. Kelso.

4        Next is No. 4, Mr. Stewart?

5              THE PANEL MEMBER:  Bill or William Stewart.  I'm

6    from Jefferson, Texas.

7        I'm recently retired from the restaurant business where I

8    was -- worked with my wife who worked with me for 38 years.  I

9    was a chef in charge of things in the back.  My wife did the

10   front.  Some college.

11       My wife's name is Sharon.  And we've lived in Jefferson

12   for 38 years.

13       I've had one prior civil jury service.

14             THE COURT:  And where was that and what kind of

15   case?

16             THE PANEL MEMBER:  In Marion County, and that would

17   have been, I guess, around 2010.

18             THE COURT:  All right.  Thank you, Mr. Stewart.

19       Next is No. 5, Mr. Henry.

20             THE PANEL MEMBER:  Good morning.  My name is Bernard

21   Henry, Jr.  I have four children, three adults -- three of

22   them are adults, one 13-year-old.

23       I'm retired Air Force.  I did 21 years.  I have graduated

24   high school in '94.  I have some college.

25       My spouse's name is Trisha Henry.  She's an RN.  She

1    works for the VA Hospital.  She's been there 11 years.

2         And I have no prior jury services.

3              THE COURT:  Thank you, sir.

4         Next is No. 6, Mr. Bounds.

5              THE PANEL MEMBER:  My name is George Bounds.  I've

6    got one grown child, two grandchildren.

7         I work for Thru Tubing Solutions, which is oil field.  I

8    perforate oil and gas wells.  Been there five years.  Before

9    that, I retired from TxDOT.  High school graduate.

10        My spouse's name is Karen, and she's a homemaker.  Been

11   that way over 40 years.

12        And I did a civil jury duty.

13             THE COURT:  What did you do for TxDOT, Mr. Bounds?

14             THE PANEL MEMBER:  I was heavy equipment operator.

15   When I retired, I was a supervisor.

16             THE COURT:  Thank you.

17        No. 7 is next, Mr. Jester.

18             THE PANEL MEMBER:  My name is Hugh Jester.  I live

19   in Atlanta, Texas.  We have two grown -- adult grown children.

20        I work for Graphic Packaging Paper Mill that was

21   International Paper Company until about five years ago.

22             THE COURT:  Could you hold that microphone a little

23   closer?  Thank you.

24             THE PANEL MEMBER:  I worked 40 years there.  I

25   graduated high school at McCloud High School in 1981.

1          My wife's name is Lisa.  She's been a homemaker for 39

2    years.

3          I had one prior criminal case in Cass County.

4          THE COURT:  Thank you very much, sir.

5          Next is No. 8, Mr. Simpson.

6          THE PANEL MEMBER:  Hello.  My name is Kenton

7    Simpson.  I've lived in Longview in Texas for my whole life,

8    52 years.  I have three adult children and a grandchild.

9          I work for Ideal Computers Supreme Plastics, and

10   currently work for Hallsville Independent School District as a

11   computer technician and database administrator for 23 years.

12   I have an Associate's of Science, a couple of years of

13   university.

14         My spouse's name is Kelly Simpson, and she is not

15   employed.  And she stopped working a couple of years ago to

16   take care of the kids.

17         And I have no prior jury service.

18         THE COURT:  All right, sir.  Thank you very much.

19   If you'll hand that to Panel Member No. 9.

20         THE PANEL MEMBER:  Good morning.  My name is Jay

21   Wichlacz.  I've been living in Gilmer for the last six years.

22   Like you, Your Honor, I came to Texas as soon as I could.  I

23   have one child, a nine-year-old son.  He's awesome.

24         Right now I'm a diesel technician working for Stewart &

25   Stevenson.  And prior to that, I was in the United States

1    Army.  I've been there about six years.

2          Education, I have high school graduate, and then I have

3    college classes that I've been taking.

4          My wife's name is Amber Wichlacz.  She's a stay-at-home

5    mom, and she helps us -- I build furniture on the side.

6    That's my personal business.

7                    THE COURT:  Any prior jury duty?

8                    THE PANEL MEMBER:  This is my first time.

9                    THE COURT:  All right.

10                   THE PANEL MEMBER:  Thank you.

11                   THE COURT:  Thank you, sir.

12         No. 10 is next.

13                   THE PANEL MEMBER:  Good morning.  My name is Jaffet

14   Robles.  No children.  Place of my employment is TexMex

15   Construction.  I've been there for seven years.  Education,

16   high school was the extent of my indoctrination, pardon me,

17   education.

18         No -- no spouse, and no prior jury service.

19                   THE COURT:  Thank you very much, sir.

20         Next is No. 11, Mr. Fuller?

21                   THE PANEL MEMBER:  My name is James Fuller.  I'm

22   from Longview, Texas.  I have two grown children.

23         Place of employment is Lowe's.  I've been there 19 years.

24         No spouse.  High school diploma.  Never served on a jury.

25                   THE COURT:  All right.  No. 12 is next.

1          THE PANEL MEMBER:  Good morning.  My name is Richard

2     Storey.  Live in Queen City.  Five children, five

3     grandchildren.

4          Place of employment is Cooper Tire, been there 21 years.

5     My education is a McCloud High School graduate.

6          Spouse's name is Charlotte Storey.  She's a nurse.

7     Actually she works here in Marshall at the jail.  She's a

8     nurse at the jail.

9          I have prior jury.  It was civil, two years ago, right

10    here in this courtroom.

11         THE COURT:  All right, sir.  Thank you very much.

12         Next is No. 13, Mrs. Griffin.

13         THE PANEL MEMBER:  My name is Joanna Griffin, and I

14    live in Naples, Texas.  We have four children and 10

15    grandchildren.

16         I work for Morris County Title Company in Daingerfield

17    doing land searches.  I've worked there about 20 years.

18    Graduated from a college degree, a BA degree.

19         My husband's name is Jimmy Griffin.  He is a physician at

20    East Texas Clinic in Naples, and he's worked there for 40

21    years.

22         And my prior jury duty was the grand jury in Tyler.

23         THE COURT:  All right.  Thank you, ma'am.

24         Next is Mrs. Jordan, No. 14.

25         THE PANEL MEMBER:  Good morning.  My name is Shannon

1    Jordan.  I live in Gilmer, Texas.  I have five adult children,

2    three grandchildren.

3         My place of employment, I work for the state of Texas at

4    the license -- do driver's license.  Worked there about

5    two-and-a-half years.  I graduated high school, have some

6    college.

7         My spouse's name is Mark Jordan.  He works for oil field

8    services, RCW Energy Services.  He is asset manager.  He's

9    been there probably eight, nine years.

10        And I've never served on a jury.

11             THE COURT:  Thank you, ma'am.

12        All right.  Next we'll go to Panel Member No. 15.

13             THE PANEL MEMBER:  My name is John Epting.  I live

14   in Longview, Texas.  I have three grown children.

15        Work for Westlake Chemical.  I've been there 14 years.  I

16   have a high school diploma.

17        My spouse's name is Terry Epting, and she is currently on

18   disability.

19        And I have no prior jury service.

20             THE COURT:  Tell me what you do for Westlake

21   Chemical.

22             THE PANEL MEMBER:  Mechanical inspector.

23             THE COURT:  All right, sir.  Thank you.

24             THE PANEL MEMBER:  Thank you.

25             THE COURT:  Next is No. 16.

1              THE PANEL MEMBER:  My name is Thomas Enloe.  I live

2     outside of Gilmer in the country there for about the last 20

3     years.  I have one son, one grandson.

4         I'm a professional home inspector, self-employed for the

5     last almost 20 years.  Education is high school, some college.

6         Spouse's name is Amy.  She was a -- she is a retired

7     teacher.  It's the reason I'm still working.  And she worked

8     for about 26 years, finished in Gilmer.

9         And I have one previous service, civil service in Gilmer

10    about five years ago.

11             THE COURT:  Thank you, sir.

12        Next is Ms. Foster, No. 17?

13             THE PANEL MEMBER:  My name is Linda Foster.  I live

14    here in Marshall, Texas, the last 55 years.  I have no

15    children.

16        I am retired from Marshall ISD after 28 years service as

17    a teams clerk.  I have graduated from high school.

18        I have no spouse.

19        I have two criminal prior jury selections here in

20    Harrison County.

21             THE COURT:  Thank you, ma'am.

22        Next is No. 18, Mrs. Shed?

23             THE PANEL MEMBER:  Good morning.  My name is Vera

24    Shed, and I have nine grown childrens and about 30-plus

25    grandchildrens.

1        And my place of employment is an individual, Gene Warren,

2    and I am a home-care worker.  And I've been with him for about

3    two years.  And I did graduate high school, and I left

4    college.

5        My spouse is deceased, and I have no prior criminal or

6    civil case.

7            THE COURT:  Thank you, ma'am.

8        Next is No. 19, Mr. Peterson.

9            THE PANEL MEMBER:  My name is Jonathan Peterson.  I

10   live in Big Sandy, Texas.  I don't have any children.

11       I'm a computer programmer at SFG, which is a fulfillment

12   house in Big Sandy.  I've worked at the company for 10 years,

13   but I've been in my position for four.  I have a college

14   bachelor degree in computer information systems.

15       I don't have a spouse, and I've been summoned but never

16   selected before.

17           THE COURT:  Thank you very much.

18       All right.  Next is No. 20, Mr. Garrison?

19           THE PANEL MEMBER:  Yes, sir.  My name is Thomas

20   Garrison.  I live in Marshall, Texas, and I've lived here all

21   53 years.  I have four young children at home.  I have three

22   adult children.

23       I'm a forester, and I graduated 31 years ago.

24       My spouse's name is Maria, and she works at the Master

25   Craft Woodworks, and she's worked there about eight years.

1          And I've had both civil and criminal cases here in

2     Harrison County.

3               THE COURT:  You said you graduated 31 years ago.

4     Was that high school?

5               THE PANEL MEMBER:  Forestry school.

6               THE COURT:  Where was that?

7               THE PANEL MEMBER:  Panola College, and I graduated

8     high school in '88.

9               THE COURT:  Thank you.

10         All right.  Next is No. 21, Mrs. Wells?

11              THE PANEL MEMBER:  Good morning.  My name is Dorothy

12    Wells.  I live in Atlanta, Texas.  I have three kids and eight

13    grandkids.

14         My place of employment, I work Linden -- Focused Care of

15    Linden nursing home.  I'm a cook.  My education, I graduated

16    high school in '78.

17         My spouse is deceased, and I have no civil.

18              THE COURT:  All right.  Thank you, Mrs. Wells.

19         Next is No. 22.

20              THE PANEL MEMBER:  Good morning.  My name is Lori

21    Aksamit.  I've lived in Marshall for about five years.  Before

22    that, I lived in Longview.  No children.

23         I work at Blue Cross Blue Shield of Texas as what's

24    called a provider services specialist, technical specialist.

25    I've worked there for nine years.  I have some college.

1        My husband's name is Michael.  He is retired.  Before

2    that, he worked for FedEx as a driver for about six or seven

3    years.

4        And I have two criminal cases, not in Texas, though, one

5    in New York and one in Arizona.

6            THE COURT:  Thank you very much, ma'am.

7        Next is No. 23, Mr. Allen.

8            THE PANEL MEMBER:  Good morning.

9            THE COURT:  Good morning.

10            THE PANEL MEMBER:  My name is Adrian Allen, Jr.  I

11    live in Cass County, Linden, Texas.  My wife and I have three

12    grown daughters.  The youngest is a naval officer based in

13    Norfolk, Virginia.

14        And my place of employment, I work for TxDOT in

15    Texarkana.  I've been there for 13 years.  My prior job was

16    ALCOA aluminum in Nash, Texas.  And I've worked TxDOT for 13

17    years.

18        My education, I graduated from high school in Linden,

19    Kildare.  I did industrial electrician school at Texarkana

20    College.

21        And my spouse is Cassie Allen.  She is a teacher at

22    Avinger ISD in Avinger, Texas, first and second grade reading.

23            THE COURT:  How long has she taught school, sir?

24            THE PANEL MEMBER:  She's taught school for over

25    30-something years at different schools.

1          THE COURT:  And what did you do for TxDOT or what do

2     you do?

3          THE PANEL MEMBER:  I work in the maintenance and

4     heavy equipment at TxDOT.

5          THE COURT:  All right.  And have you ever had any

6     jury service before?

7          THE PANEL MEMBER:  Yes.  One criminal case in Cass

8     County.

9          THE COURT:  Thank you very much, Mr. Allen.

10        All right.  Next is No. 24, Mr. Pritchett.

11         THE PANEL MEMBER:  My name is Daniel Pritchett.  I

12    live in East Mountain, Texas, been there 20 years.  I have

13    three small children--a nine-year-old, a 12-year-old, and a

14    14-year-old.  They're busy in baseball right now.

15        My place of employment is ABC Auto Parts, and I'm in

16    human resources.  I've been there right at four years.  I have

17    a Bachelor's of Business Administration from LeTourneau

18    University.

19        My wife's name is Julie, and she works for Ameriprise

20    Financial, and she just celebrated her 20th year there.

21        And I have no prior jury service.

22         THE COURT:  All right.  Thank you, Mr. Pritchett.

23        Next is panel member No. 25, Mrs. Taylor.

24         THE PANEL MEMBER:  My name is Debbie Taylor.  I live

25    here in Marshall for almost a year.  Prior to that, we were in

1    Jefferson for 11 years.  I have one child at SFA.

2         I work at Jefferson ISD as a second grade teacher.  I've

3    been there for seven years now.  I've got a Master's degree.

4         Married to Jeff.  He is retired pastor.

5         And I have no prior service.

6              THE COURT:  Thank you, ma'am.

7         No. 26 is next, Mr. Early.

8              THE PANEL MEMBER:  I am John Early from Avinger,

9    Texas.  I have three children, got three grandkids.

10        I'm retired.  I was a rural letter carrier for 30 years

11   for the U.S. Postal Service.  I've got some college.

12        My wife's name is Cindy.  She's a homemaker.

13        And I did serve one time on a grand jury in Cass County.

14             THE COURT:  Thank you very much, sir.

15        Next is No. 27, Mr. Dellinger?

16             THE PANEL MEMBER:  Yes.  My name is Jack Dellinger,

17   and I live outside of Jefferson on Caddo Lake.  I have two

18   adult children.

19        And I'm retired from Cooper Tire & Rubber company in

20   Texarkana.  I was there 32 years and four months and retired

21   in 2020.  I graduated from Atlanta High School in 1981, and I

22   do have some college.

23        My wife's name is Celeste.  She's currently teaching at

24   Texarkana, Arkansas, middle school.  She's in her fourth year

25   there and her 30th year overall.  She has 25 in Texas and

1    retired.

2        And I have been on a jury one time, civil case in this

3    room.

4            THE COURT:  Thank you, sir.

5        All right.  Next is No. 28, Mr. Berg?

6            THE PANEL MEMBER:  My name is Robert Berg.  I live

7    in Hughes Springs, been there for 30 years now.  I have three

8    grown children.

9        I work at C&C Motors in Mt. Pleasant, been there for 29

10   years.  Education background, graduated high school in '79.

11   One year of trade school, graduated in '81.

12       Wife's name is Julie.  Her previous employment was three

13   years at a VA lawyer's office.  She got out of there in 2012,

14   and she's been a homemaker.

15       And no prior jury services.

16           THE COURT:  Thank you, sir.

17       Next is Panel Member No. 29, Miss Robinson.

18           THE PANEL MEMBER:  Good morning.  My name is Tashara

19   Robinson.  I have lived in Marshall all of my life, 37 years.

20   I have three children--a 17-year-old daughter, nine-year-old

21   son, and four-year-old daughter.

22       My place of employment is Wiley College.  I've been there

23   for the past five-and-a-half years as an executive

24   administrative assistant to the student affairs.  My

25   educational background, I am a 2004 graduate of Marshall High

1    School.  And I have an Associate's degree from Kilgore College

2    in child development.

3         I've never married.  And prior jury services is a

4    criminal case back in 2011 in the county courthouse.

5              THE COURT:  Thank you, ma'am.

6         Next is No. 30, Mr. Singletary.

7              THE PANEL MEMBER:  Yes, sir.  My name is Neal

8    Singletary, Longview, Texas.  Two grown children.

9         Self-employed for the last 25 years, supervising the

10   drilling of oil and gas wells for operators.  High school

11   education, graduated 1972.

12        Wife's name is Lisa Singletary.  She's kept books and

13   secretarial stuff for us the last 25 years.

14        And no prior jury service.

15             THE COURT:  All right, sir.  Thank you.

16        No. 31 is next, Mr. Reese?

17             THE PANEL MEMBER:  Yes.  My name is Braden Reese.  I

18   am from Pittsburg, Texas.  I have two small kids.

19        I'm the owner and operator of Apex Construction and Land

20   Management.  Before that, I'm a disabled veteran.  I've been

21   there for about a year.  I've got a high school diploma.

22        My wife's name is McKenzie.  She does logistics and stuff

23   like that for an 18-wheeler company.  She's been there for

24   about five years.

25             And no prior jury services.

```
 1              THE COURT:  Thank you, sir.
 2         Mr. Keith, No. 32, is next.
 3              THE PANEL MEMBER:  Jonathan Keith.  I go by Alex,
 4    live here in Marshall, Texas.  Four children.
 5         I work for Cadence Bank as a financial advisor, been
 6    there about three-and-a-half years.  Bachelor's of Science in
 7    commerce and supply chain management and an MBA with a focus
 8    in finance.
 9         My wife's name is Tiffany.  She's a homemaker besides
10    cleans some RVOs on the side.
11         And then just one prior jury service, criminal case here
12    in Marshall.
13              THE COURT:  Thank you.
14         Last is No. 33, Mrs. Burns?
15              THE PANEL MEMBER:  I'm Verenda Burns.  I live in
16    Pittsburg, Texas.  No children.
17         Retired from Camp County Tax Assessor's Office after 40
18    years.  Graduated from Pittsburg High School, some college.
19         My husband is Dwight Burns.  He's retired from Red River
20    Army Depot as an inspector, 35 years.
21         And I served on grand jury in Camp County.
22              THE COURT:  Thank you, ma'am.
23         Thank you, ladies and gentlemen.
24         Now, I need to say a couple of more things to you before
25    I turn over the questioning to the lawyers.  The jurors who
```

1    are actually selected to serve in this case will serve in the

2    role as the judges of the facts, and the jury selected will

3    make the sole determination in this case about what the facts

4    are.

5         Now, my job as the judge is to rule on questions of law,

6    evidence, and procedure that may arise during the trial, to

7    maintain the decorum of the courtroom, and to oversee an

8    efficient flow of the evidence during the trial.

9         Also I want to say a couple of things to you about our

10   judicial system that hopefully will put things in a proper

11   perspective for everyone.

12        In any jury trial, besides the parties themselves, there

13   are always three groups of participants--the jury, the judge,

14   and the lawyers.  Now, with regard to the lawyers, it's

15   important for each of you to understand that our judicial

16   system is an adversary system, which simply means that during

17   the course of the trial each of the parties will seek to

18   present their respective cases to the jury through their

19   counsel in the very best light possible.

20        And it should be no surprise to any of you that sometimes

21   lawyers are criticized in the public and in the media, but the

22   Court's observed that some of that criticism is a

23   misunderstanding of our adversary system in which the lawyers

24   act as competing advocates representing the parties.

25        And as an advocate, a lawyer is ethically and legally

1    obligated to zealously assert his or her client's position

2    under the rules of our adversary system.  And by presenting

3    the best case possible on behalf of their clients, the lawyers

4    hopefully will enable the jury to better weigh the relevant

5    evidence and determine the truth and arrive at a just verdict

6    based on that evidence.

7         Now, this adversary system of justice has served our

8    nation well for over 200 years, and America's lawyers have

9    always been, are now, and will continue to be an indispensable

10   part of that process.

11        So as we go forward with this trial, even though it's

12   possible that I might occasionally roll my eyes or frown at

13   the lawyers, I'm simply trying to make sure that their

14   advocacy doesn't get outside the bounds of our adversary

15   system.  But you need to keep in mind, ladies and gentlemen,

16   that they are simply doing their jobs, and I think that's

17   important for you to be aware of as we go forward.

18        Also, ladies and gentlemen, as to those of you that are

19   selected on this jury, I can tell you that over the course of

20   the trial, I am going to do my very best not to give you any

21   idea what I think about the evidence in this case, because

22   determining the facts in this case based on the evidence is

23   the jury's job, it's not my job as the judge.    Therefore,

24   any of you that are selected on this jury should not take any

25   expressions or comments or things that you hear or see or

1    think you hear or see as coming from me as something to

2    consider in making the ultimate decision about what the facts

3    are in this case.

4         Now, with that, ladies and gentlemen, we'll proceed to

5    have the attorneys for both sides address the panel make their

6    statements and ask their questions.

7         Mr. Baxter, you may address the panel on behalf of the

8    Plaintiff.  Would you like a warning on your time?

9              MR. BAXTER:  Yes, five and one, Your Honor.

10             THE COURT:  I'll warn you when you have five minutes

11   remaining and one minute remaining.

12             MR. BAXTER:  Thank you, Your Honor.

13             THE COURT:  You may proceed when you're ready.

14             MR. BAXTER:  Thank you, sir.

15        Good morning, ladies and gentlemen.  As the Judge said,

16   my name is Sam Baxter.  I'm a lawyer here in Marshall and I've

17   been practicing law in Marshall in one way or another for the

18   last 50 years.  Before doing this sort of work, I was in the

19   DA's office here, and I was the DA for 15 years.

20        And then I went on the bench for a brief period of time,

21   not like Judge Gilstrap but rather like Judge Morin down the

22   street.  And I did that for a while.  And my creditors asked

23   me to leave public service and pay my bills, and so I've been

24   practicing law ever since.

25        I'm married, and I'm married to Judge Lauren Parish.  And

1    I tell you that because she is the retired senior judge for

2    the district court in Upshur County and Marion County, and

3    some of you are from those neck of the woods and some of you

4    have been in court recently.  She retired only two years ago.

5         So who on the panel knows my wife, Judge Lauren Parish?

6    Anyone?  Been in her court?  All right.

7         I've got four kids, three adopted children.  Andrew from

8    Brazil -- and I want to talk to our Boys and Girls Club

9    representative in the back, Mr. Keith.

10        Mr. Keith, you know Andrew?

11             THE PANEL MEMBER:  I do know Andrew.

12             THE COURT:  Let's wait until you get a microphone

13   and stand up, Mr. Keith.

14             THE PANEL MEMBER:  I do.

15             MR. BAXTER:  Andrew's a joy, isn't he?

16             THE PANEL MEMBER:  He's a funny guy.

17             MR. BAXTER:  He is a funny guy.  He's got a little

18   Asperger's, and he is a little hyper, but he certainly does

19   his best.  Anything about that that would be a problem, Mr.

20   Keith?

21             THE PANEL MEMBER:  No, sir.

22             MR. BAXTER:  All right.  My middle child is Matthew.

23   And while Andrew is Brazilian, Matthew is from Thailand.  He

24   works as a tech supervisor in Dallas.

25        And I have a young daughter, Sophie, that's currently

1    working in Bangkok, although I hope to get her back in the

2    states soon.  She's from India.

3         And I have a stepson named Keyton Boggs who's the

4    percussion leader at the Hallsville High School band.

5    Anybody know Keyton or Mr. Boggs?  Anybody at all?  All right.

6         The Court has said that we could talk for a very brief

7    period of time about what this case is about.  And as you have

8    heard, it's a patent case, but I think you're going to find it

9    very interesting.  And it has to do with memory modules,

10   something we don't talk about every day, but something we use

11   every day.  And they go in data servers, and they're essential

12   for all big companies, all parts of government, for instance,

13   the Department of Defense or Department of State, or us using

14   our computers at home.  The data servers that carry our

15   messages that hook us up to the internet have memory modules.

16        Now, here's the problem with memory modules.  You want

17   them to go fast, you want them to be reliable.  But to go

18   fast, you have to give them more power.  And when you give

19   them more power, it gives off more heat, and that's a problem.

20   If you try to increase the power without doing certain things,

21   you're going to get unreliable data and you're going to lose

22   it.

23        Anybody want to sign up for a computer that loses your

24   data?  Anybody at all?

25        Everybody think it's pretty safe to use your data, put it

1   in the cloud, leave it on your computer, but that it won't be

2   corrupted and it won't be taken from you somehow by the

3   computer?  Anybody think that's important or everybody think

4   that's important?

5        Well, that's what Netlist does.  Netlist has patents, and

6   you're going to hear about six of them I think in this case,

7   that deliver more power and more reliability and more speed,

8   and that's what this case is going to be about.

9        Here are some of the accused products you're going to

10  hear about in this case.  You're going to learn lots of

11  acronyms and lots of initials, but these are memory modules

12  and you'll see these as we go forward in the case.  And

13  there's one particular one called a dual in-line memory

14  module, and that's because it's got pins on both sides.

15       And so anybody have any experience with memory modules?

16  Now, I've got two computer geeks on the jury, and the first

17  one is No. 8, Mr. Simpson.

18       Mr. Simpson, tell me what you know about memory modules

19  and how you work with them and what you do with them.

20            THE PANEL MEMBER:  Well, I mean, primarily they're

21  the main memory that all the processing happens out of.  I

22  reset a set of memory modules in a Dell server here recently

23  because we were having some problems with heat.

24            MR. BAXTER:  With heat.

25            THE PANEL MEMBER:  With heat, yeah.

1          THE COURT:  Mr. Simpson, hold the microphone a

2    little closer.

3          THE PANEL MEMBER:  Anyhow --

4          MR. BAXTER:  All right.  Mr. Simpson, let me tell

5    you why you're a problem to be on this jury, and that is, I'm

6    afraid you're going to be a jury of one, that if I were on the

7    jury with you and I knew you worked in computers and we

8    started talking about memory modules, I'm going to look over

9    at you and say, Mr. Simpson, what do you think?

10         And so my question I guess, Mr. Simpson, I don't want to

11   devoid you of all your knowledge about computers, that's

12   helpful, but do you think you'll be able to listen to the

13   experts and talk in the jury room about what the experts said

14   these memory modules are doing and what the patents require?

15         THE PANEL MEMBER:  Most definitely.

16         MR. BAXTER:  You think you can at least leave some

17   of your past experience here in the courtroom and not take it

18   in the jury room so that you're discussing all the same thing,

19   which is primarily you're talking about the experts'

20   testimony.

21         THE PANEL MEMBER:  Yes, sir.

22         MR. BAXTER:  Have you ever been in court for a

23   computer-related issue of any sort?

24         THE PANEL MEMBER:  No, sir.

25         MR. BAXTER:  Ever testified or had to be deposed

```
 1        about computers at your work site?
 2                 THE PANEL MEMBER:  No.
 3                 MR. BAXTER:  All right.  Thank you, sir.
 4            Now, I've got one more person that's also tech savvy, and
 5        that's Mr. Peterson.
 6            Mr. Peterson, tell me about your experience in computers
 7        and what you do right now.
 8                 THE PANEL MEMBER:  I tend to lean more into the
 9        software, so I'm not too familiar with the hardware.
10                 MR. BAXTER:  All right.  You're a coder?
11                 THE PANEL MEMBER:  Yes, sir.
12                 MR. BAXTER:  All right.  Do you write code?  What
13        kind of code do you write?
14                 THE PANEL MEMBER:  RPG, CL, SQL, stuff like that.
15                 MR. BAXTER:  And for those of us that don't speak
16        computerized, those are languages that you use to code a
17        computer.
18                 THE PANEL MEMBER:  Yes, sir.
19                 MR. BAXTER:  So you and Doctor Burgess could have a
20        conversation about that, but the rest of us couldn't.
21                 THE PANEL MEMBER:  It sounds like he's more
22        hardware.
23                 UNIDENTIFIED PANEL MEMBER:  I'm database engine.
24                 THE PANEL MEMBER:  Oh, okay.  Then yes.
25                 MR. BAXTER:  Okay.  My partner over here, Doctor
```

1    Burgess, has a double E in electrical engineering, a Ph.D. in

2    electrical engineering, and he writes code.  Is that the sort

3    of thing you do?

4               THE PANEL MEMBER:  Yes.  Along those lines, yes.

5               MR. BAXTER:  Any problem about that being in the

6    jury room, Mr. Peterson, and everybody turning to you and

7    saying, okay, explain these memory modules to us?  Is that

8    going to be a problem?

9               THE PANEL MEMBER:  Not from me, no.

10              MR. BAXTER:  Okay.  Thank you, sir.  I appreciate

11   it.

12       Now, the lawyers on the other side are over here at this

13   table.  The lead lawyer is Mr. Ruffin Cordell.  He's from

14   Washington, D. C.  He's with a firm called Fish & Richardson.

15   And his co-counsel is Melissa Smith.  Now, she has an office

16   here in Marshall and appears in this court probably as much or

17   more than anybody else active in the Bar.

18       Anybody perchance know Mr. Cordell by happenstance?  But,

19   more importantly, anybody know Ms. Smith, who has an office

20   here and has practiced here in Marshall for 26 years, she

21   tells me, a long time.  Anybody know Ms. Smith?

22       All right, sir.  You do.  Mr. Stewart, I must say, Mr.

23   Stewart, we're all disappointed that you have retired.

24   Stillwater Animal is a great place to go, and I miss it even

25   now.  But how do you know Ms. Smith?

1          THE PANEL MEMBER:  I only know Ms. Smith through the

2     restaurant.  I think we had one social occasion many years ago

3     at our house, I believe, if I'm not mistaken, but -- so that's

4     it.  I don't -- I wouldn't -- actually it's been ages since

5     I've seen her.  So I probably wouldn't recognize her if I

6     passed her in the street.

7          MR. BAXTER:  All right.  Anything about that, Mr.

8     Stewart, that would be a problem of you sitting in this jury

9     if Ms. Smith is taking a position that's contrary to what we

10    take on our side of the table?

11         THE PANEL MEMBER:  No.

12         MR. BAXTER:  Okay.  No problem at all?

13         THE PANEL MEMBER:  No problem.

14         MR. BAXTER:  All right.  My wife wanted me to get

15    the salmon recipe, but we can talk about that later.

16         THE PANEL MEMBER:  Buy a cookbook.

17         MR. BAXTER:  All right.  Now, who's heard of

18    Samsung?  Is there anybody that hasn't heard of Samsung?

19    Anybody heard of my client, Netlist, before?  Well, you-all

20    know Samsung and none of you know my client.

21         Is that a problem?  Anybody think that just because you

22    know Samsung and you know they make a lot of products, that

23    that's a problem going into this case, that you would not want

24    to find against them?  Anybody at all?

25         Now, Samsung is, I think the evidence is going to be, the

1      largest memory module manufacturer in the world, and of course

2      they make great TVs.  I've got two in my house.  Anybody got

3      Samsung products in their house?  Is that a problem for those

4      of you that have got a TV or a refrigerator, is that a problem

5      for any of you?

6           Anybody ever travel to Korea as a military person or as

7      just as a tourist?  Anybody been to Korea?

8           Anybody does business with Samsung in any way?

9           Is there anyone that's ever worked for Samsung or one of

10     its related companies?

11          Has anyone on this jury panel ever applied for a patent

12     or had a family member or a close friend that applied for a

13     patent?  Anybody at all?  Anybody ever dealt with the Patent

14     Office or know anything about applying for a patent?

15          Who works for a company that owns intellectual

16     property--that is, they own patents?  And let me suggest a

17     few.  Clearly, the paper plant, IP plant, or whatever it is

18     now has patents.  Texas Eastman has a lot of patents.  Is

19     there anybody that off the top of their head know whether

20     their company owns intellectual property or not?

21          Yes, sir.  No. 6, Mr. Bounds.  Who do you work for, sir?

22               THE PANEL MEMBER:  Thru Tubing Solutions.

23               MR. BAXTER:  And do you know what kind of patents

24     they have?

25               THE PANEL MEMBER:  It's on oil tools and stuff like

 1    that.

 2             MR. BAXTER:  Downhole, downhole tools?

 3             THE PANEL MEMBER:  Yes, sir.

 4             MR. BAXTER:  Are you involved in applying for those

 5    in any way whatsoever?

 6             THE PANEL MEMBER:  No, sir.  I helped develop one of

 7    them, but I hadn't --

 8             MR. BAXTER:  Did they name you as an inventor, do

 9    you think?

10             THE PANEL MEMBER:  No.

11             MR. BAXTER:  Okay.  Do you know what the company

12    does, Mr. Bounds, to protect their intellectual property?  If

13    they had a patent on a downhole tool and it was really

14    important to them and they found out that one of their

15    competitors had knocked their product off and was using the

16    very same thing, do you know what they would do to try to

17    enforce their intellectual property rights?

18             THE PANEL MEMBER:  I assume they'd file suit.

19             MR. BAXTER:  Do you know of anything else they can

20    do besides write a nasty letter?

21             THE PANEL MEMBER:  No, sir.

22             MR. BAXTER:  Go hire some lawyer and say, cease and

23    desist or we're going to sue you, and then you have to sue

24    them?  Anything about that, do you think, Mr. Bounds, that's a

25    problem about people coming to court to enforce their

1    intellectual property rights?

2              THE PANEL MEMBER:  No, sir.

3              MR. BAXTER:  Thank you, sir.

4         Does anybody on the panel know of any other way that a

5    company can enforce its intellectual property rights other

6    than applying for a patent, getting a patent, and then going

7    to court if someone takes their property?  Does anybody have a

8    problem with people coming to court over intellectual

9    property?  Anybody at all?

10        Now, one of the questions that you were asked on your

11   questionnaire that you were kind enough to fill out for us

12   before you came to court is about too many lawsuits and too

13   many lawyers.

14        Now, I'm going to stipulate with you there are too many

15   lawsuits and there are too many lawyers.  Now, my colleagues

16   are trying to push me out the door because of age, but there's

17   a whole bunch behind me.

18        Does anybody have a problem with people coming to court

19   to enforce their property rights when they think they've been

20   taken by somebody else?  Anybody at all?

21        Who believes there are too many lawsuits?

22        Ms. Kelso, let me ask you, what kind of lawsuits do you

23   have some sort of objection to?

24              THE COURT:  No. 3.

25              MR. BAXTER:  If you can give her the mic.

1          THE COURT:  And, Counsel, if you'll refer to the

2     number, that will help the CSO.

3          MR. BAXTER:  Thank you, Your Honor.  I appreciate

4     it.

5          THE PANEL MEMBER:  I'm sorry.  I don't like public

6     speaking, so -- I just think that there's just too many

7     lawsuits going on.  Everybody -- every time you turn the

8     corner if -- I do watch the news, it's somebody suing somebody

9     for something else, and it's just -- I don't know.  I just

10    think there's too much of it going on.

11         MR. BAXTER:  Do you think we fall into that bucket

12    of too many lawyers, too many lawsuits, because we are in a

13    patent lawsuit?

14         THE PANEL MEMBER:  I think those are a little bit

15    different than other lawsuits that go on every day.

16         MR. BAXTER:  Okay.  How many people might agree with

17    Ms. Kelso that patent lawsuits just are sort of a different

18    breed of cat; that it's a different kind of case and you would

19    not expect to see too many patent lawsuits or know anything

20    about those?  Does anybody have a contrary opinion?

21         Who else thinks there are too many lawsuits and kind of

22    explain to me what the problem might be?  Who else?

23         Mr. Bounds, you do.  Tell me why you think there are too

24    many of us.

25         THE PANEL MEMBER:  I worked for the government for

1    25 years, and every time we turned around, we had a lawsuit

2    against us.

3              MR. BAXTER:  Okay.  What kind of lawsuits were they?

4              THE PANEL MEMBER:  Wrongful death, stuff like that.

5              MR. BAXTER:  All right.  Anything having to do with

6    people enforcing their property rights?

7              THE PANEL MEMBER:  No.

8              MR. BAXTER:  All right.

9         Anybody else have any problem with a company or an

10   individual enforcing their property rights and coming to court

11   and filing a lawsuit and saying, that's my property and you're

12   trespassing on my property, or you've taken my property, and I

13   want you to stop?  Anybody at all?

14        Now, you heard on the video, I think, that, in fact,

15   patents are property rights, and I think they even showed that

16   you can have boundaries and there are fence lines.  But

17   they're still a property right.  And so does anybody have any

18   problem at all with people protecting their property and

19   trying to tell other people, you can't use it?

20        I mean, if you went off on vacation and came home and

21   found someone had moved into your house and in fact had taken

22   your property, is there any doubt in your mind that all of you

23   would call the sheriff first and call the lawyer second?

24   Anybody have a problem with that at all?  All right.

25             Now, one of the things that Judge Gilstrap told you

1    toward the end of his instructions to you today is that you

2    are the judges of the facts, he does the law.  We try to work

3    within the constraints of what Judge Gilstrap tells us the law

4    is.  But the facts are solely within the providence [sic] of

5    the jury.

6        And along with that goes what I call the credibility of

7    the witnesses.  And you're going to be hearing witnesses

8    giving some contrary opinions that some other person may have

9    given in the court.  And so one of the things you've got to

10   decide is who's the most credible, who do I believe, who is it

11   that I think has done the best job of explaining the facts to

12   me, and I think that person is the most credible.  Is there

13   anybody that has any problems with that at all, that you're

14   going to be the judges of the credibility?

15       Is there anybody that's ever joined an organization

16   that's against lawsuits?  Anybody been a member of someone

17   that says, oh, too many lawsuits, we're going to try to pass

18   laws that cut them down?

19       Who else besides the two gentlemen that I talked to has

20   experience in computers, whether it's working on them, writing

21   code, or knowing how to fix them?  Anybody else besides the

22   two gentlemen that I talked to?

23       Is there anybody that's worked on data servers?  Who in

24   their regular job has to go and sit in front of a computer for

25   long stretches of time?  No. 2 and 3 and 6 and 13 and 14.  And

```
 1   who else out here?  All right.  On the front row, No. 15 and

 2   16.

 3        Of those of you that work with computers in your daily

 4   job, how many of them want the computers to be fast?  Is it

 5   irritating if the computer slows down and you're sitting there

 6   looking at a black screen?

 7        Mrs. Jordan, tell me what you do again, No. 14?

 8             THE PANEL MEMBER:  I work for the State of Texas and

 9   process driver's licenses.

10             MR. BAXTER:  Okay.  I take it that you, in fact, are

11   having to look -- when I come in and I usually don't have the

12   right ID or I'm stumbling around not knowing what I'm doing in

13   getting my driver's license renewed, is that something you've

14   got to click and clack on the computer about?

15             THE PANEL MEMBER:  Yes, sir.  We check paperwork and

16   then process the driver's license or ID.

17             MR. BAXTER:  Do you expect it to be fast?

18             THE PANEL MEMBER:  Yes, sir.

19             MR. BAXTER:  Do you expect it to be reliable?

20             THE PANEL MEMBER:  Yes, sir.

21             MR. BAXTER:  If you were to go into the store and

22   you were either looking for yourself for a new computer or

23   looking for one for the State of Texas and the sign says,

24   super fast computer, $1,000, and the sign next to it says, not

25   nearly as fast, $900 dollars, which one are you going to get?
```

1          THE PANEL MEMBER:  I have no clue.

2          MR. BAXTER:  Okay.  Do you want your computer to be

3    fast?

4          THE PANEL MEMBER:  Right.

5          MR. BAXTER:  Would you pay a little extra for it to

6    be fast instead of slow?

7          THE PANEL MEMBER:  Probably.

8          MR. BAXTER:  Okay.  Is there anybody that disagrees

9    that they want their computer to be fast?  Anybody at all?  Is

10   there anybody that disagrees that you might even in fact pay a

11   little bit more for that computer to be fast and reliable?

12   Would everybody do that?  Is there anybody that wouldn't do

13   that?  They would go, no, slow and creaky and unreliable is

14   good enough for me.  Anybody do that?

15        Now, the Judge talked to you about something that's very

16   important in this case, and that is the burden of proof.  And

17   I want to kind of go over that with you again just for a

18   moment.

19        The first thing that I think he's going to tell you in

20   instructions is that patents that are issued by the Patent

21   Office are presumed to be valid.  And I think he'll tell you

22   that if you're on this jury, that as you go forward in this

23   case, you are to presume the patent to be valid.

24        But then you're going to hear issue about infringement,

25   and the burden on infringement is on the Plaintiff, it's on

1    us, and it's a burden that he delineated to you to be by a

2    preponderance of the evidence.  And if you started out with

3    the scales even, like this, nothing on them, they're exactly

4    balanced, then you have to determine if someone had proven the

5    case to you, I believe Judge Gilstrap is going to tell you

6    that you must be persuaded by the evidence that the claim is

7    more probably true than not true.  And that's the burden that

8    we have to show you that the machines that are sold by Samsung

9    infringe our patents.

10        Is there anybody that thinks they could not follow that

11   instruction from the Judge about a preponderance of the

12   evidence, that that's the burden that the Plaintiffs have, and

13   we gladly accept that, but it just simply has to be more

14   likely true than not, a preponderance of the evidence, one

15   more BB?

16        But he also told you about a different burden of proof

17   that's called clear and convincing.  And one of the things

18   you're going to hear in this case is that Samsung believes and

19   are going to try to prove to you that our patents are invalid.

20   The jury can make that determination.  And even though they've

21   been issued by the Patent Office, and even though they're

22   presumed to be valid, they're going to try to convince you

23   that the patents are invalid.

24        But their burden is much higher.  It's called clear and

25   convincing evidence.  And I think you're going to get an

1    instruction something like it has to be an abiding conviction

2    that the truth of the party's factual contentions are highly

3    probable, so that if you looked on a scale or a ruler, a

4    foot-long ruler, if you got to the six-inch mark and one more

5    mark would be the preponderance of evidence, but way over here

6    at number 11 would be clear and convincing, does anybody have

7    any question about that burden of proof or anybody think they

8    couldn't follow the Court's instructions about the burden of

9    proof?

10             THE COURT:  You have five minutes remaining.

11             MR. BAXTER:  Thank you, Your Honor.

12             THE COURT:  You're welcome.

13             MR. BAXTER:  Let me talk in the last minutes

14   remaining about something that is going to be true in all

15   these cases, and that is, this is a case not only about patent

16   infringement, but it's a case about damages.

17       And at the end of the day, we're going to ask the jury to

18   find that our patents are valid, that they are infringed, and

19   then we're going to ask for money damages because of that

20   infringement.  And you're going to hear experts talk about

21   that.

22       But let me tell you that the number in round numbers that

23   we're going to suggest to the jury that Samsung owes us in

24   this litigation is $400 million.  And that's a lot of money.

25   And I know that some of you on your questionnaire says that

1    damages may be too high.

2         Now, no way I'm going to try to get you committed up this

3    morning to give us $400 million because you haven't heard any

4    evidence.  My question to you is slightly different.  Is there

5    anybody that, as they sit here today, says 400 million?  Why,

6    I could never do that, I don't care what the facts are, that's

7    too much money.

8         Is there anybody that filled out that questionnaire about

9    damages being too high, had reference to a patent case and had

10   reference to numbers like 400 million?  Anybody at all on the

11   first row?

12        Anybody on the second row?  Mrs. Griffin, No. 13, let me

13   ask you, knowing you haven't heard a shred of evidence and

14   knowing that what we said up here today is not evidence, do

15   you feel like that you could listen to the evidence and make

16   up your mind about what the damages are even if it ended up

17   being in the hundreds of millions of dollars?

18             THE PANEL MEMBER:  I think I could do that.

19             MR. BAXTER:  All right.  Would you listen to the

20   damage experts and the rationale about why that much money?

21             THE PANEL MEMBER:  That's what I'd have to listen

22   to.

23             MR. BAXTER:  Okay.  But after you heard that, if you

24   were convinced by a preponderance of the evidence, do you feel

25   like that you could write down on the jury blank $400 million

1    if that's what the evidence showed you?

2              THE PANEL MEMBER:  If that's what it showed me.

3              MR. BAXTER:  Okay.  Is there anybody different from

4    Mrs. Griffin that if you're in the jury room and you have

5    found the patents to be valid and you find that Samsung has

6    infringed our patents and has taken our property, that they

7    would hesitate for a minute, if the evidence showed it, to

8    write in a number in the $400 million range?  Anybody at all?

9         Mr. Enloe, let me get you a microphone.

10             THE COURT:  No. 16.

11             THE PANEL MEMBER:  Yes, sir.

12             MR. BAXTER:  Do you feel like you could that, Mr.

13   Enloe?

14             THE PANEL MEMBER:  That's questionable in my mind.

15             MR. BAXTER:  All right, sir.

16             THE PANEL MEMBER:  That's tough.

17             MR. BAXTER:  It's a big number, isn't it?

18             THE PANEL MEMBER:  It depends on what I hear.

19             MR. BAXTER:  Well, do you go in with the thought

20   that, no, I could never give that kind of money, but maybe

21   they can persuade me, or kind of what's your mindset going in?

22             THE PANEL MEMBER:  I wouldn't go in saying it

23   wouldn't get it.

24             MR. BAXTER:  All right.

25             THE PANEL MEMBER:  But it would seriously need to be

1    proven to me.

2           MR. BAXTER:  Okay.  If, in fact, the testimony was

3    and the evidence was and you were convinced that they had

4    taken the property and that it was our property and it was

5    valid and they were using it and they got enough advantage out

6    of using our property that they made a profit off of it, do

7    you feel like that you could, in fact, give that sort of

8    damage award?

9           THE PANEL MEMBER:  That's the kind of proof I'd have

10   to see.

11          MR. BAXTER:  Okay.

12          THE COURT:  One minute remaining, counsel.

13          MR. BAXTER:  Thank you, Your Honor.

14      Is there anybody --

15      Thank you.  I appreciate that, Mr. Enloe.

16      Anybody disagree with that on the jury panel, that if the

17   evidence is there, that even though that's a large number and

18   probably not a number you thought about before you came to

19   court today, that you, in fact, could give $400 million if

20   that's what the evidence compelled you to do?  Is there

21   anybody that can't do it?

22      Ladies and gentlemen, we look forward to bringing this

23   case to you.  We think you're going to find it to be very

24   interesting.  You're going to learn a lot about modules that

25   you never knew that were in the world before.  And we

1    appreciate your patience and your attention.

2         Thank you, Your Honor.

3              THE COURT:  All right.  Defendants may address the

4    panel.

5         Ms. Smith, would you like a warning on your time?

6              MS. SMITH:  I would, Your Honor.  If I could get

7    five minutes and one minute remaining.

8              THE COURT:  I will warn you when you have five

9    minutes remaining and one minute remaining.  You may address

10   the panel when you are ready.

11             MS. SMITH:  May it please the Court.

12        Good morning, everybody.  And everybody in kind of the

13   back row as well, good morning.

14        By the way of reintroduction, again, my name is Melissa

15   Smith.  And I, along with my colleagues and, more importantly,

16   my friends, Mr. McKeon and Mr. Cordell, we represent Samsung

17   this morning.

18        Now, the most important thing I'm going to do with my 30

19   minutes this morning is to say thank you.  Thank you on behalf

20   of Samsung.  Samsung has a corporate representative here

21   today, Mr. Calandra.  He thanks you.  And thank you on behalf

22   of the 6,000 -- actually over 6,000 Texas Samsung employees

23   that we have here working hard in this state.  We thank you

24   for making some long drives.

25        I kind of poured over your jury questionnaires, and I saw

1    people came from as far as Atlanta and Queen City and Big

2    Sandy.  We thank you for your willingness to share your

3    personal information, both on these questionnaires that you

4    filled out before you got here and also today.

5         And, most importantly, we thank you for taking time to

6    show up and be here for service.  I know and Samsung knows

7    that every minute you spend, every hour you spend in this

8    courtroom, is time away from your work, your family, your

9    friends, and your priorities.  So thank you.

10         Now, His Honor give a little personal information himself

11   before he asked you questions as well as Mr. Baxter, so I'll

12   do the same, I went to the University of Austin undergrad.  I

13   then immediately went, as His Honor did, to Baylor Law School.

14   I graduated from Baylor, and about two days later I moved to

15   Marion County, Jefferson, and started practicing here in

16   Marshall.  That's about 26 years ago.  I've been practicing

17   here in Marshall.  My law firm is called Gillam and Smith.

18   It's that old yellow building.  It sits behind the courthouse

19   that some of you-all drove by on the way to court today.

20         Personally, I think this is on the questionnaire, I am

21   married.  My husband's name is Steven.  He is retired law

22   enforcement.  We have two children.  We've got a little girl

23   who's nine--she's in fourth grade--and a little boy who's 11.

24   He is in sixth grade.  And we spend a lot of time tending to

25   them on my time off.

1      I had one jury service, and that was a criminal case.  It

2  was in Jefferson.  You heard me say I'm married to law

3  enforcement, I'm a lawyer, and in 2000 I knew both attorneys.

4  So I was certain I was not going to serve.  So nobody was more

5  shocked when they called my name.  But it will probably never

6  happen again, but it was a pleasant experience and I wish that

7  for those of you that are chosen.

8      So let's talk a little bit about that.  You know, the

9  initial shock -- after I got over the initial shock of hearing

10  my name called for jury service, I got a little grumpy and I

11  moaned and groaned as some of you may have when you received

12  the summons.  And as His Honor mentioned, I mean, service is

13  certainly inconvenient and it's a sacrifice.

14      So my first question here is, the Judge asked you about

15  serious conflicts, conflicts such as surgeries or pre-paid

16  vacations, and some of you visited with him about those.

17      How many of you would say, by showing of hands, that you

18  just weren't that excited when you got the summons?  Juror No.

19  3, 6, I see a lot of -- too many to list.  I see a lot of

20  hands.  So let me put it this way.  For those of you that just

21  raised your hands, how many of you had a reason other than

22  just kind of inconvenience?

23      Juror No. 6.  Tell me a little bit about that, if you

24  can.

25             THE PANEL MEMBER:  Costs me money.

```
1              MS. SMITH:  All right.  All right.  Costs you money.
2    Money meaning time off work as well?
3              THE PANEL MEMBER:  Yes.  $600 a day.
4              MS. SMITH:  And -- and I hear that often when we
5    meet here.  And I, on behalf of the government, apologize for
6    the juror fee that you'll get if you serve.
7         Mr. Bounds, if you could keep standing.  You said you had
8    some prior civil service.  Is that correct?
9              THE PANEL MEMBER:  Right.
10             MS. SMITH:  Tell me a little bit about that.
11             THE PANEL MEMBER:  It was an oil and gas company
12   against a property owner.
13             MS. SMITH:  Okay.  And was that in this court?
14             THE PANEL MEMBER:  No.  It was district.
15             MS. SMITH:  Okay.  How did it turn out?
16             THE PANEL MEMBER:  They sent it to arbitration.
17             MS. SMITH:  Okay.  Before it went to arbitration,
18   did you -- were you the foreperson or not?
19             THE PANEL MEMBER:  No.  I was just a member.
20             MS. SMITH:  Okay.  Thank you, sir.
21        All right.  Anyone else where a number of you weren't
22   very excited to get the summons, but anyone else have anything
23   to tell me that it rises to the level of more than just
24   inconvenience, you just don't want to be here, don't need to
25   be here?
```

1      All right.  Juror No. 3, Ms. Kelso.  Tell me about that.

2              THE PANEL MEMBER:  Well, in my -- at the hospital I

3      work at, we're a very small department and we work three, four

4      shifts.  So there's someone working opposite with me.

5      Actually we're still trying to hire for that position.  So I

6      actually fill in a lot of hours and work like five, six days a

7      week because we are short-staffed.

8          And so me being here, someone's having to cover my shift,

9      and that's going -- if I get picked, that's going to be hard

10     all week long to cover my shift.

11             MS. SMITH:  You introduced yourself as the person

12     that -- that fills in spots for nurses.  And so when the

13     person that fills in spots for absent nurses isn't there, the

14     system breaks down?  Is that fair to say?

15             THE PANEL MEMBER:  Yeah.  There is not a lot of

16     people that can do what we do --

17             MS. SMITH:  Okay.

18             THE PANEL MEMBER:  -- in our hospital.

19             MS. SMITH:  I appreciate that.  And your son's

20     serving in our military, is he not, right now?

21             THE PANEL MEMBER:  Yes, he is.  He was in the Marine

22     Corps for four years, got out, lived with me for a year, went

23     to Kilgore ENT Fire Academy, decided he missed the military,

24     reenlisted in the Army, and is now a combat medic.

25             MS. SMITH:  Well, we certainly appreciate his

```
 1    service.

 2              THE PANEL MEMBER:  Thank you.

 3              MS. SMITH:  Now, the flip side.  Sometimes, not as

 4    common, not as many hands, but sometimes jurors say, you know,

 5    I've always wanted to do this, I got the summonsed, and I was

 6    excited to be here.  Is there anybody out there that said, you

 7    know, I want to be on a jury, kind of excited?

 8         Juror No. 9.  Tell me about that.  First, tell me how to

 9    say your last name.

10              THE PANEL MEMBER:  Yes.  It's Wichlacz.

11              MS. SMITH:  Wichlacz.

12              THE PANEL MEMBER:  It's Polish.

13              MS. SMITH:  Okay.  Thank you, sir.

14              THE PANEL MEMBER:  I served my country and gave me a

15    great satisfaction.  And just like she was saying, you know,

16    we miss it every day.  So this is a chance that I feel like I

17    can serve justice to people, you know, to the Constitution of

18    the United States and help -- help Americans have their

19    freedom.  So...

20              MS. SMITH:  Well, we certainly, as Judge Gilstrap

21    said, this is the second most important public service.  Your

22    military service came first, of course, and we appreciate

23    that.

24              THE PANEL MEMBER:  Yes, ma'am.

25              MS. SMITH:  Thank you, sir.
```

1          Anybody else?  All right.

2          Now, the Judge reminded us all that both individuals and

3     companies have a right to trial by jury.  And this is a case

4     that you've heard enough about already to know it's a case

5     about two companies fighting amongst themselves about patents.

6          Is there anybody sitting there thinking, you know, this

7     just doesn't really deserve our time in the courtroom?  Maybe

8     companies should compete in the marketplace instead of the

9     courtroom.  Does anyone have that thought?  All right.  Juror

10    No. 1.

11         And my game plan here, I'll tell you, is to try to talk

12    to each one of you for just a minute.

13         So, Mrs. Snelgrove, tell me what you think about that.

14              THE PANEL MEMBER:  Could you repeat the question?

15              MS. SMITH:  Sure.  Sure.  Some people think, you

16    know, companies should compete in the marketplace, not the

17    courtroom.  And others say, you know, it's perfectly fine for

18    companies to bring their squabbles into the courtroom.

19         Which way -- which way do you lean and what --

20              THE PANEL MEMBER:  I think you're right --

21              MS. SMITH:  -- what made you lean one way?

22              THE PANEL MEMBER:  I think you're right coming here

23    because sometimes you can't -- you can't come to agreement

24    when you're in the marketplace, and things get to be where he

25    says-she says and you need to have this take place.  That's

1    what I believe.

2              MS. SMITH:  Thank you, ma'am.  I have one more

3    question for you.

4              THE PANEL MEMBER:  Yes, ma'am.

5              MS. SMITH:  You told His Honor that you had some

6    prior jury service in this court.  Is that correct?

7              THE PANEL MEMBER:  Yes.

8              MS. SMITH:  Tell me about that.

9              THE PANEL MEMBER:  It was between the county

10   commissioner and a person that did not get hired by the county

11   commissioner, and he thought that since he did his campaigning

12   and did a lot of stuff for him to get hired, that he was to be

13   hired by the county commissioner to have a good job.

14             MS. SMITH:  I think I know how it turned out from

15   the way you're -- from the way you're telling the story, but

16   how did it work out?

17             THE PANEL MEMBER:  He was found that he didn't get

18   any -- he was --

19             MS. SMITH:  He was the Plaintiff, and it was a

20   defense verdict?

21             THE PANEL MEMBER:  Right.

22             MS. SMITH:  Okay.

23             THE PANEL MEMBER:  And so he didn't win.  The person

24   that thought he should be able to have that job, he didn't get

25   his money.  He wanted severing, he wanted all the things -- he

1   left his other job thinking that he was going to have what he

2   was promised.  So actually it was against the other person.

3           MS. SMITH:  Okay.  Thank you so much, ma'am.

4       Now, Mr. Baxter visited with you-all about there being

5   too many lawsuits, and that was kind of a common theme we saw

6   across the questionnaires, quite frankly.

7       Is there anybody out there that would agree with the

8   statement, you know, we need more lawsuits to keep companies

9   honest?

10      Juror No. 2, Mr. Pomeroy, tell me what you think about

11  that statement--we need more lawsuits to keep companies

12  honest?

13          THE PANEL MEMBER:  I don't think so.

14          MS. SMITH:  Okay.  Why not?

15          THE PANEL MEMBER:  I think there's enough lawsuits

16  going around as it is.

17          MS. SMITH:  Okay.  Fair enough.  And that's all I

18  have for you, sir.  I appreciate it.

19      All right.  Now, I bet we can agree on this:  We've all

20  been accused by a showing of hands of doing something we

21  didn't actually do.  Everybody been in that situation?  This

22  is aside from lawsuits and litigation and stuff like that.  We

23  agree we've all been accused of doing something we didn't do.

24  Right?

25      You raised your hand first, Juror No. 7, Mr. Jester, and

1   I have not yet spoken with you.  So when you were accused of

2   doing something you didn't do, what did you do?

3              THE PANEL MEMBER:  I was accused of sending a rail

4   car out full of product that was marked empty.

5              MS. SMITH:  Okay.  And that couldn't be -- that was

6   not the truth?

7              THE PANEL MEMBER:  That was not the truth.

8              MS. SMITH:  Okay.  So how did you handle that?

9              THE PANEL MEMBER:  Well, I was -- had to go to the

10  HR department and explain what I did and how I did it, and

11  that the car was empty when I sent it out.

12             MS. SMITH:  And did it escalate from the HR

13  department?

14             THE PANEL MEMBER:  No.

15             MS. SMITH:  Okay.  Had it escalated, would you have

16  head hesitated to go on and defend yourself?

17             THE PANEL MEMBER:  No.

18             MS. SMITH:  And do you fault the company like

19  Samsung for coming in this courtroom and defending itself?

20             THE PANEL MEMBER:  No.

21             MS. SMITH:  I appreciate that, sir.  Thank you.

22        Juror No. 5, Mr. Henry.  I don't think we've heard from

23  you.  You raised your hand a little about being accused with

24  the rest of us of something we didn't do.  Tell us about that.

25             THE PANEL MEMBER:  I didn't raise my hand.  I was

1    scratching my head.

2              MS. SMITH:  I'm sorry.  That's kind of like going to

3    an auction, you know, where you want to sit real still.  So

4    okay.  Well, I apologize.  Have you led a charmed life where

5    you have not been accused of doing something?  I'm talking

6    about taking the last roll of toilet paper and not putting a

7    new one in.

8              THE PANEL MEMBER:  Well, everybody's been accused of

9    something they didn't do, so --

10             MS. SMITH:  That's where I'm heading, Mr. Henry.  So

11   when that happens, do you hesitate to speak up and defend

12   yourself?

13             THE PANEL MEMBER:  No.  You have to defend yourself

14   especially if you know you're innocent of doing it, so --

15             MS. SMITH:  Okay.  And if in Samsung's heart of

16   hearts they think they're not -- they're not infringing, do

17   you blame them for coming in this courtroom and defending

18   themselves?

19             THE PANEL MEMBER:  No, I don't blame them at all.

20             MS. SMITH:  All right.  Thank you, sir.  And I'm

21   sorry for calling on you.

22        All right.  Mr. Baxter gave you an overview of the case,

23   and Judge Gilstrap allows each side to do that--give you an

24   overview of what's to come if you're fortunate enough to get

25   chosen.

1         And there is one thing I can agree on, it might be the

2    only thing with Mr. Baxter, and that's this is a case about

3    memory.  We've heard a little bit about that.  What I'm not

4    going to do is -- is put up the pictures and things and -- and

5    walk you through that.

6         I will tell you that Samsung is going to bring a mountain

7    of evidence, witnesses and experts, to talk about the details

8    better than I can, quite frankly, about the different type of

9    memory products that Samsung designs and makes and

10   manufactures.

11        For this purpose today, what I want your take-away to be

12   is that it is Samsung's position, and make no mistake from

13   this conversation this morning, that it does not, does not,

14   infringe, and that these patents that you're going to hear

15   about are invalid.

16        And so what we heard from Judge Fogel in the patent video

17   and what we heard from Judge Gilstrap is that this is

18   Samsung's opportunity to come and defend itself from these

19   allegations.  So if you're lucky enough to be chosen for this

20   case, you're going to be -- it will be up to you to decide

21   whether Samsung's been wrongfully accused.

22        Now, I want to talk about the order of trial real quick,

23   and I'm going to pick on Mrs. Griffin because -- and I'm going

24   to tell you why I'll pick on you because you said you have

25   four children and 10 grandchildren.  All right, Mrs. Griffin?

1        All right.

2            So in this case, the Plaintiff's always going to go first

3    and they're going to say, there's good lawyers, there's smart

4    lawyers, they're going to say things that make a lot of sense,

5    they're going to show you a lot of things.  And then you have

6    to -- you kind of have to wait and hold your judgment for

7    Samsung to go.  We will always go second.  That's the way the

8    Court has it structured.

9            You know where I'm going with this?

10           So when you -- when you raised your four kids and now

11   you're raising your 10 grandkids, if your household is like

12   mine, something happens, there's a dust-up.  Right?  And there

13   are two of them, and they run as fast as they can to be the

14   first one to tell you what happened.  Is that correct?

15               THE PANEL MEMBER:  Pretty much, yes.

16               MS. SMITH:  You've experienced that?

17               THE PANEL MEMBER:  Yes.

18               MS. SMITH:  And what do you do?  Do you -- do you

19   take the word of the one that gets to you first or do you

20   listen to both sides of the story?

21               THE PANEL MEMBER:  Well, you can't take the first

22   one's word because that one's always the tattletale.

23               MS. SMITH:  I have that kid in any house as well,

24   so -- I do.  So -- and I'm not making light of anything that's

25   going to go on in this courtroom.  But, in the same way, can

1    you hold judgment, can you wait until you hear both sides of

2    the case before -- before you would make a final decision?

3              THE PANEL MEMBER:  I think that's what you have to

4    do.  You have to weigh both sides before the decision is made.

5              MS. SMITH:  Okay.  I appreciate it, Mrs. Griffin.

6    Thank you.

7         Mrs. Jordan, we heard a little bit from you from Mr.

8    Baxter.  You said that you sat -- first off, do you agree with

9    Mrs. Griffin, that it's important to wait to hear from both

10   sides?

11             THE PANEL MEMBER:  Yes, ma'am.

12             MS. SMITH:  You did not raise your hand when

13   you -- when you -- when we were talking about who had -- who

14   was tech savvy, but you did raise your hand and said you spent

15   a ton of time in front of your computer at the driver's

16   license office.  Is that correct?

17             THE PANEL MEMBER:  Yes.

18             MS. SMITH:  Are you doing mostly data entry or is it

19   something beyond that?

20             THE PANEL MEMBER:  It's mostly data entry.  We

21   switch off.  We rotate.  We do drive tests so I'm -- you're

22   outside running around, driving crazy people, and issuing

23   driver's licenses.

24             MS. SMITH:  I have a nine-year-old --

25             THE PANEL MEMBER:  I have a 10-year-old.

1          MS. SMITH:  -- and a 11-year-old.  They're headed

2    your way pretty soon when you talk about crazy people.  I will

3    not be giving them Driver's Ed.

4          All right.  Thank you, ma'am.  I appreciate that.

5          All right.  We saw -- Mr. Baxter asked you-all if you had

6    experience with Samsung products, and we saw a bunch of hands.

7    Can I see that hand again?  Anyone -- refrigerator, phones,

8    everything?  Almost everyone except for Juror No. 7.  Raise

9    your hands again.  I apologize.  And Mr. Robles, Juror No. 10.

10   Juror No. 1.

11         All right.  A little bit different question.  I'm looking

12   for people that might say, you know, Samsung's kind of

13   starting out from behind in this case, because I had a

14   product, and whether it's a warranty issue or another type of

15   issue, it's not doing it for me.  I just don't care for their

16   products.  Is anybody in that situation?  You've had an issue

17   with whether it's an issue with a fridge -- I've got Juror No.

18   30 I'll talk to in a moment.

19         Anyone else that's had an issue with a Samsung product?

20   Okay.  Juror No. 11, Mr. Fuller.  Tell me about that.

21         THE PANEL MEMBER:  Well, I work for Lowe's, and we

22   sell the Samsung products.  So you have to deal with the

23   warranty.  You know, when they come back for warranty or

24   anything like that, sometimes it's hard to deal with getting

25   the warranty taken care of or they want to -- you know, they

```
1    don't want to deal with it and say, well, it's up to the store
2    to do something about it.  Sometimes the store can't do
3    nothing about it.  It's just a warranty to, you know, on all
4    the Samsung parts, sometimes it's hard to get.
5         Sometimes you get out there, you deliver them, set them
6    up, I sell them, you know.  Sometimes they just don't get the
7    cooperation from Samsung that you can get them over the phone,
8    you know, dealing with corporate, you know, different people
9    processes.  It's a big line you got to go through to deal with
10   all that.
11        MS. SMITH:  And I have been -- not necessarily
12   Samsung, but I have been on hold with various, you know,
13   warranty lines and things like that in my life.  So I
14   understand and I appreciate your honesty.
15        You can probably guess my next question.  Because of that
16   experience with Samsung, do you think you might make a better
17   juror on, say, another case where Samsung isn't the Defendant?
18        THE PANEL MEMBER:  I would make a good juror in any
19   case because I deal a lot with Whirlpool, Samsung, all of the
20   big manufacturers.  You can't -- you know, you can't rely on a
21   lot of it.  There's problems with everything.  There's
22   problems with, you know, getting the warranty and all that.
23   Dealing with all of them folks is always a difficult job to
24   do.
25        MS. SMITH:  Okay.  So nothing about that experience
```

1    that you'd carry forward, that every time I stand up in the

2    courtroom and say, I represent Samsung, you kind of think, oh,

3    here they are again, here they go.

4              THE PANEL MEMBER:  Yes, ma'am, because I have to,

5    you know -- not just Samsung but any major corporation like

6    that, I've had to deal with, you know, a lot of that stuff in

7    my 19 years with Lowe's, you know, a retail business.  So I

8    deal with all kinds of different products.

9              MS. SMITH:  Okay.  I appreciate your honesty.  Thank

10   you, sir.

11        And, sir, I have one more question, I apologize, Mr.

12   Fuller.  I'm sorry.  I had one more question.

13             THE PANEL MEMBER:  Yes, ma'am.

14             MS. SMITH:  Did you say -- is there someone in your

15   household that has a patent?

16             THE PANEL MEMBER:  No, ma'am.

17             MS. SMITH:  No.  Okay.  Thank you.

18        All right.  Similar question.  Those of you that don't

19   have a Samsung product now but have had one in the past, is

20   there anybody like that?  Everybody that raised their hand had

21   a product currently has it?  No one's had a Samsung product,

22   doesn't have anymore?  All right.  I don't see any hands.

23        All right.  We heard from Mr. Baxter.  He is married to a

24   judge.  He introduced his partner, Ms. Truelove.  She's

25   married to a lawyer.  And they also work closely with JoAnne

1    Bayliss and Todd Parrish.

2        When you walked into the courtroom today, did anyone

3    recognize Mr. Baxter by showing of hands?  All right.

4        Juror No. 6, Mr. Bounds, tell me about that.

5            THE PANEL MEMBER:  I just remember when he was a DA.

6            MS. SMITH:  All right.

7            THE PANEL MEMBER:  No dealings with him, just --

8            MS. SMITH:  I was going to kind of tiptoe around

9    that next question like how did you know him as a DA.  All

10   right.  Did you vote for him?

11           THE PANEL MEMBER:  I think I did.

12           MS. SMITH:  All right.

13           THE PANEL MEMBER:  It's been a long time.

14           MS. SMITH:  Well, I have never held a public office,

15   and I don't have any lawyers or judges in my family.  I'm the

16   first.  So does Mr. Baxter kind of start out ahead because you

17   knew him --

18           THE PANEL MEMBER:  No.

19           MS. SMITH:  -- as a DA?

20           THE PANEL MEMBER:  No.

21           MS. SMITH:  Thank you, sir.  I appreciate it.

22       Anyone else know Mr. Baxter?  Ms. Truelove, who's sitting

23   at counsel table?  Her husband, Kurt Truelove, who is a lawyer

24   in town?  Mr. Todd Parrish?  I saw some of you come from

25   Gilmer.  Mr. Parrish lives in Gilmer.  Or Ms. JoAnne Bayliss?

1            Mr. Robles, I was actually going to call on you next,

2    Juror No. 10.  So, Mr. Robles, Mr. Baxter used to live in

3    Oakwood Estates.  Did I get that right?

4            THE PANEL MEMBER:  That's right, yes.

5            MS. SMITH:  And I notice Oakwood Estates was the

6    address on your juror questionnaire.  Are you neighbors or

7    were you neighbors?

8            THE PANEL MEMBER:  Yes, yeah.  We're neighbors,

9    yeah.

10           MS. SMITH:  All right.

11           THE PANEL MEMBER:  That's about it.

12           MS. SMITH:  Well, you say, that's about it.  Should

13   it make me nervous if I choose you for this jury and opposing

14   counsel is your neighbor?

15           THE PANEL MEMBER:  Maybe -- maybe the evidence would

16   make me nervous.

17           MS. SMITH:  I'm sorry?

18           THE PANEL MEMBER:  Maybe the evidence, not -- not

19   the relationship.

20           MS. SMITH:  Well, tell me about that.  Why should

21   the evidence make me nervous?

22           THE PANEL MEMBER:  I don't know.  I'm just curious

23   to see what you've got.  It's interesting.

24           MS. SMITH:  Okay.  But nothing about -- you haven't

25   started forming an opinion about the case as we stand here

1    today.

2              THE PANEL MEMBER:  Not currently.

3              MS. SMITH:  Okay.  All right.  What about Ms.

4    Bayliss?  I think she still lives out at Oakwood.  Do you know

5    her?

6              THE PANEL MEMBER:  I'm not sure.

7              MS. SMITH:  Okay.

8              THE PANEL MEMBER:  Haven't heard that name before.

9              MS. SMITH:  Okay.  All right.  Thank you.  Thank

10   you, sir.

11        And I think -- I think Mr. Baxter actually asked this.

12   Nobody had heard of Netlist before coming into the courtroom

13   today.  I see a bunch of heads shaking no.

14        All right.  I've got a question, and I call it my where

15   there's smoke, there's fire question.  Plaintiff filed this

16   lawsuit.  Is there anyone out there thinking, you know, they

17   filed the lawsuit, they paid a couple of hundred bucks, so

18   Samsung must have done something wrong?  Anybody have that

19   thought?  Nobody.

20        All right.  Juror No. 15, Mr. Epting?

21              THE PANEL MEMBER:  Yes, ma'am.

22              MS. SMITH:  All right.  Do you have -- what do you

23   have to say about that statement?  You know, we're here in the

24   courtroom, the Judge just said it's an important case, you

25   know, Samsung must have done something wrong.  Do you think

1    that argument has any merit?

2              THE PANEL MEMBER:  I think so, yes.

3              MS. SMITH:  All right.  Tell me about that.

4              THE PANEL MEMBER:  I mean, why would they -- why

5    they spend money unless they didn't think they were right?

6              MS. SMITH:  So because Samsung is showing up and

7    defending itself, you think --

8              THE PANEL MEMBER:  Same thing.  I mean, they're here

9    because they think they're right.  So --

10             MS. SMITH:  Okay.  Do your thoughts cause you --

11             THE PANEL MEMBER:  No.

12             MS. SMITH:  -- to start out leaning either

13   direction?

14             THE PANEL MEMBER:  No.

15             MS. SMITH:  Okay.  Now, Mr. Epting, you -- you're a

16   mechanical inspector out at Eastman.

17             THE PANEL MEMBER:  Westlake, which is inside

18   Eastman, yes, ma'am.

19             MS. SMITH:  Okay.  I still get them confused.  Mr.

20   Baxter talked about, you know, Eastman having patents and

21   companies having patents and not hesitating to protect them.

22   Westlake's not the only one that has patents in the industry.

23   Right?

24             THE PANEL MEMBER:  Correct.

25             MS. SMITH:  And so, I mean, if one of the other

1    industry competitors accused Westlake of patent infringement,

2    do you think -- do you think that Westlake would stand up if

3    they're -- in their heart of hearts they knew they didn't do

4    it and defend themselves?

5                THE PANEL MEMBER:  Most definitely.

6                MS. SMITH:  You don't think Westlake would hesitate

7    to come into this courtroom, would you?

8                THE PANEL MEMBER:  That's correct.

9                MS. SMITH:  Thank you, sir.  Appreciate it.

10               THE COURT:  Five minutes remaining.

11               MS. SMITH:  Thank you, Your Honor.

12        Now, he waited until the end, but I think what we heard,

13   and I wrote it down, I think we heard that the Plaintiff is

14   going to demand $400 million in this case.  And -- and make no

15   mistake, Samsung has a lot to say about that.  They're going

16   to respond.

17        But somebody said to me once, they said, well, you know,

18   if the Defendant responds and the Defendant talks about

19   damages and challenges the Plaintiff's number, they're

20   admitting that they owe something just by challenging the

21   number.  Does anyone -- does anyone buy into that, see any

22   truth in that?  I see some head nodding.

23        Juror No. 16, I haven't had an opportunity to talk to you

24   yet, Mr. Enloe.

25               THE PANEL MEMBER:  Yes, ma'am.

1          MS. SMITH:  You had some prior civil service, too,

2    didn't you?

3          THE PANEL MEMBER:  Yes, in Gilmer.

4          MS. SMITH:  Civil court in Gilmer?

5          THE PANEL MEMBER:  Actually it was a criminal.

6          MS. SMITH:  Okay.  Okay.  Thank you, sir.

7       Now, I'll give you a hypothetical.  You're out on the

8    courthouse square driving around, going five miles an hour.

9    Right?  You get in a fender bender.  You say, I have the right

10   of way.  The other guy says, I have the right of way.  You're

11   squabbling about that.  But he says -- remember we're going

12   five miles an hour.

13      Keep all these billboards we see around for personal

14   injury lawyers in your head for this.  Okay?

15      He says, you harmed me to the extent of a million

16   dollars.  Would you say -- you've seen the billboards, haven't

17   you?

18          THE PANEL MEMBER:  Yeah.

19          MS. SMITH:  Would you say, you know, I had the right

20   of way, I'm not at fault, but you'd also take issue with that

21   million dollars, wouldn't you?

22          THE PANEL MEMBER:  That I would take the million

23   dollars?

24          MS. SMITH:  You would take issue with him saying --

25          THE PANEL MEMBER:  Oh, yeah.

1          MS. SMITH:  -- in a five-mile-an-hour accident, you

2    owe a million dollars?

3          THE PANEL MEMBER:  Yeah.

4          MS. SMITH:  You see where I'm going with this,

5    because Samsung is going to say, We absolutely don't infringe,

6    and your patents aren't valid, but we're going to spend some

7    time talking about that $400 million number, too.  So you

8    don't fault Samsung for taking issue with that number, do you,

9    sir?

10         THE PANEL MEMBER:  No.  The number's large.  It has

11   to be proven.

12         MS. SMITH:  Thank you, sir.  I appreciate it.

13        And Juror No. 17, I want to talk to you very quickly

14   because I have not yet.  Do you agree with your Juror No. 16,

15   if the number is large they absolutely have to prove it?

16         THE PANEL MEMBER:  Yes.

17         MS. SMITH:  And you don't fault Samsung for taking

18   issue with that number, do you?

19         THE PANEL MEMBER:  No.

20         MS. SMITH:  Okay.  Mr. Baxter -- when we talk about

21   proof, Mr. Baxter talked about the preponderance, and both the

22   Judge and Mr. Baxter agree that it's Plaintiff's burden of

23   proof.  Did you hear both of them agree to that?

24         THE PANEL MEMBER:  Yes.

25         MS. SMITH:  Now, what that means is that the

1    Defendant can come in--and this isn't going to happen; we're

2    going to bring a mountain of evidence--but what it means is I

3    could sit on my hands and do nothing and win the case if

4    Plaintiff didn't meet its burden.

5                THE PANEL MEMBER:  Right.

6                MS. SMITH:  And you take no issue with that?

7                THE PANEL MEMBER:  Correct; not at all.

8                MS. SMITH:  Thank you so much, ma'am.

9                THE PANEL MEMBER:  You're welcome.

10               MS. SMITH:  All right.  The Judge has told me that

11    my time is short, so two more questions.

12        Is there anybody sitting out there thinking, you know,

13    I'm already, for whatever reason -- Ms. Smith didn't ask me

14    the right questions or didn't visit with me long enough.  Is

15    there anyone thinking, I'm already kind of starting to lean

16    towards Netlist in this case?  Do I see a hand?

17               THE COURT:  You have one minute.

18               MS. SMITH:  Thank you, Your Honor.  I have one more

19    question.

20        Is there anybody out there thinking -- and I've tried my

21    hardest to visit with each of you.  Mr. Stewart, I already

22    knew you.  I apologize for not visiting with you further.

23        Is there anybody sitting there thinking, You know, if Ms.

24    Smith just asked me this question--typical lawyer, she didn't

25    ask the right questions--if she just asked me this one

1    question, I'd tell her that I am not the right person for this

2    case?  Anybody have that thought?

3         All right.  I appreciate your time this morning.  Again,

4    thank you on behalf of Samsung, and I look forward to working

5    with the eight of you that are lucky enough to get chosen.

6         Thank you, Your Honor.

7              THE COURT:  All right.  Counsel, approach the bench,

8    please.

9              (The following was had outside the hearing of the

10             jury panel.)

11             MR. BAXTER:  Your Honor --

12             THE COURT:  Ms. Smith, we're waiting.

13        Mr. Baxter, does the Plaintiff have any challenges for

14   cause?

15             MR. BAXTER:  No, Your Honor.

16             THE COURT:  Ms. Smith, does the Defendant have any

17   challenges for cause?

18             MS. SMITH:  No. 12, and that's it, Your Honor.

19             THE COURT:  Okay.  Now, when I asked the panel to

20   begin with about inability to be present during the trial, 20,

21   21, and 23 raised their hands.  During questioning there was

22   some discussion with Ms. Kelso, No. 3, and Mr. Bounds, No. 6,

23   about their difficulties if they were selected and required to

24   serve throughout the trial.  Interestingly, they didn't raise

25   their hands when I asked the question, but it came out in the

1    examination.

2         My intention is to bring Ms. Kelso and Mr. Bounds up and

3    talk about that and make sure there's not something there

4    that's a serious impediment to their willingness or their

5    ability rather to serve.

6         With only one challenge for cause, I don't think we get

7    to 20, 21, or 23.  Does anybody see that differently?

8              MR. BAXTER:  No, Your Honor.

9              THE COURT:  I'm happy to bring them up.  But if we

10   can't reach them, there's no reason to bring them up.  If I

11   were to excuse 3, 6, and 12, that still doesn't get us to 20.

12   Everybody agree?

13             MR. BAXTER:  Yes, Your Honor.

14             MS. SMITH:  That's correct.

15             THE COURT:  Then I'll bring those three.

16             MR. SHEASBY:  Your Honor, I had a point of

17   clarification --

18             THE COURT:  What's that, Mr. Sheasby?

19             MR. SHEASBY:  -- which is if they don't want to

20   indicate that they want a for-cause exclusion, I'm concerned

21   that asking them if they want a for-cause exclusion would

22   motivate them to want a for-cause exclusion.

23             THE COURT:  I'm not sure I understand your question,

24   but I always ask counsel if they have any challenges for

25   cause.

1          MR. SHEASBY:  No, no.  The -- the burden.  I said

2    for cause, but there was two people who didn't indicate they

3    had a burden that would prevent them from serving, and I know

4    -- I thought you were going to call them up and ask them about

5    having a burden from serving.

6          THE COURT:  I intend to call up No. 3 and No. 6

7    because they gave answers that indicated that it might be

8    difficult for them to serve, but those two members of the

9    panel did not raise their hands when I asked about it.  I

10   still intend to bring them up.  I'm disclosing that in case

11   anybody has any objection or problem with that.  I gather

12   nobody has a problem with me talking to those two members.

13         MS. SMITH:  No objection, Your Honor.

14         MR. BAXTER:  No, Your Honor.

15         THE COURT:  Take your seats, please.

16         (The following was had in the presence and hearing

17         of the jury panel.)

18         THE COURT:  Ladies and gentlemen, I'm about to

19   excuse most of you for a recess.  There are a few of you I'm

20   going to ask to stay behind so that I can visit with you here

21   briefly at the bench.

22      Those of you that I don't ask to stay behind, when I

23   excuse you for recess, if you'll exit the courtroom through

24   the double doors in the back.  As you go through those double

25   doors, if you go to the left and go around the corner, you'll

1    find two important things--the water fountain and the

2    restrooms.  So if you need those, they're there.

3         Also, while you're on recess, I'm going to ask that

4    nobody leave the building and nobody go to a different floor.

5    Stay on this floor and stay inside the building, please.

6         Also, while you're on recess, ladies and gentlemen, if

7    you want to talk to somebody on the panel, that's fine.  If my

8    wife were here, she'd talk to a total stranger.  That's just

9    the way she's made.  If it was me, I probably wouldn't talk to

10   anybody.  So it's up to you.  If you want to talk to somebody

11   that's on the panel with you during recess, that's fine.  But

12   don't talk about anything that happened in the courtroom

13   today.

14        Let me make it perfectly clear to you.  You have heard no

15   evidence in this case; none whatsoever.  So talk about the

16   weather, talk about your grandkids, talk about your favorite

17   sports team, talk about whatever you want to talk about, but

18   don't talk about anything that's happened in the courtroom

19   this morning.

20        Now, with that, I'm going to ask these folks to stay

21   behind and not join the rest of the panel at recess, and those

22   are No. 3, Ms. Kelso; No. 6, Mr. Bounds; and No. 12, Mr.

23   Storey.  Everybody else but those three I'm going to excuse

24   for recess.

25        And if those three will just let the folks around them

1    slip by them and leave in just a minute, I'm going to ask the

2    three of you to stay in your seats and I'll talk to you one at

3    a time here at the bench.

4         So with that, ladies and gentlemen, except for those

5    three members of the panel, the rest of the panel is excused

6    for recess.  And if you'll exit through the double doors at

7    this time.

8              (Whereupon, the jury panel left the courtroom.)

9              THE COURT:  All right.  Be seated, please.

10        Counsel, approach the bench.

11        And, Ms. Kelso, would you come up and join us, please?

12             (The following was had at the bench.)

13             THE COURT:  Good morning.

14             THE PANEL MEMBER:  Good morning.

15             THE COURT:  This is the microphone right here,

16   Ms. Kelso.  If you and I can just talk quietly into it.

17        Now, when I started this morning, I asked generally if

18   anybody on the panel would have a serious difficulty in being

19   here during the trial if they were selected, and you didn't

20   raise your hand, but during the questioning there was the

21   discussion about your job and replacing people who didn't show

22   up, and I think you said it would be hard for your employer to

23   fill the gap if you had to serve on this jury.

24        I understand all that, but is there anything that you

25   haven't told me that I need to know that would make it

1    unacceptably difficult for you to serve?  Because everybody is

2    at an inconvenience when they serve, but I want to make sure I

3    don't miss anything.

4        Is there anything else about what was said that relates

5    to whether or not you could be available to serve if selected?

6            THE PANEL MEMBER:  No.  It would just be very hard

7    for them to fill that position for me.

8            THE COURT:  The way I always look at it, it's very

9    hard for the Army to keep somebody from invading my home, and

10   it's very hard for the post office to deliver my mail rain,

11   snow, or dark of night.  So we get a lot of things from the

12   government, and I always look at it, they are entitled to

13   expect a little inconvenience from us when they're called for

14   jury duty.  I just wanted to make sure we covered everything.

15           THE PANEL MEMBER:  Yes.

16           THE COURT:  I'm going to let you join the rest of

17   the crowd outside, Ms. Kelso.  Just don't talk about anything

18   we discussed.

19           THE PANEL MEMBER:  Okay.  Yes, sir.  Thank you.

20           THE COURT:  Thank you.

21           (The panel member left the courtroom.)

22           THE COURT:  I'm not going to excuse Ms. Kelso.

23       Mr. Bounds, would you come up, please?

24           THE PANEL MEMBER:  Yes, sir.

25           THE COURT:  How are you, sir?

```
 1              THE PANEL MEMBER:  I'm great.  You?

 2              THE COURT:  This is our microphone.  If we can just

 3   talk quietly here.

 4       I heard you tell everybody in the room that jury service

 5   is costing you $600 a day.

 6              THE PANEL MEMBER:  Plus I'm the only one that does

 7   what I do where I'm at.

 8              THE COURT:  I understand, sir.  And believe it or

 9   not, there was a point in my life where I was self-employed,

10   and if I wasn't doing it, it wasn't getting done.

11              THE PANEL MEMBER:  You actually did business for me.

12              THE COURT:  Yes, sir.

13       Understanding that, is there anything else about the

14   possibility of you being selected on this jury that I need to

15   know about?

16              THE PANEL MEMBER:  Like I said, I'm just the only

17   one that does what I do at work and, like I said, it's -- you

18   know, it costs me like six grand this week if I was here all

19   week.

20              THE COURT:  Let me ask you this just as honestly as

21   I can, Mr. Bounds.  If you are selected, are you going to

22   spend the whole time in that jury box worrying about what

23   you're not doing, or are you going to be able to listen to

24   the evidence?

25              THE PANEL MEMBER:  I'll listen to the evidence, but
```

1    that don't mean that other stuff still ain't on your mind.

2              THE COURT:  I understand, and that's a fair

3    statement.

4         Mr. Baxter, do you have any questions for Mr. Bounds?

5              MR. BAXTER:  No, Your Honor.

6              THE COURT:  Ms. Smith?

7              MS. SMITH:  No, Your Honor.

8              THE COURT:  Mr. Bounds, I'm going to let you join

9    the rest of the group outside.  Just don't discuss what we

10   talked about in here.  Thank you.

11             (The panel member left the courtroom.)

12             THE COURT:  I'm not going to excuse Mr. Bounds.

13        Mr. Storey, would you come up?

14        How are you, sir?

15             THE PANEL MEMBER:  How are you doing?

16             THE COURT:  Good to see you.

17        This is our microphone.  We're just going to talk quietly

18   here.

19        Mr. Storey, I recall that you served on a jury in this

20   court before.

21             THE PANEL MEMBER:  Yes, sir.

22             THE COURT:  A couple of years ago.

23             THE PANEL MEMBER:  Two years ago.

24             THE COURT:  Right.  And the Defendant in that case

25   was Samsung.  Right?

1            THE PANEL MEMBER:  Yes.

2            THE COURT:  And the jury in that case found against

3    Samsung and awarded a big sum of money.  Right?

4            THE PANEL MEMBER:  Yes.

5            THE COURT:  Are you going to be able to start with a

6    fresh slate in this case if you're selected on this jury and

7    not let what you experienced in that other trial influence you

8    in any way, or are you concerned because of that experience

9    that you might lean a little bit toward the Plaintiff and

10   against Samsung here because you were on the jury that found

11   against them before?

12           THE PANEL MEMBER:  Yes, sir.

13           THE COURT:  You think you might?

14           THE PANEL MEMBER:  I might.

15           THE COURT:  Okay.  Mr. Baxter, do you have any

16   questions of Mr. Storey?

17           MR. BAXTER:  Mr. Storey, you have not heard any

18   facts now and you haven't made up your mind.

19           THE PANEL MEMBER:  I haven't made my mind up, no.

20           MR. BAXTER:  I believe in that case you found some

21   patents invalid, did you not?

22           THE PANEL MEMBER:  Yes.

23           MR. BAXTER:  Okay.  Do you feel like you can start

24   out with both sides being equal and put on our proof and they

25   put on their proof and you listen to all that?

1          THE PANEL MEMBER:  I can start fresh.

2          MR. BAXTER:  Okay.  You think you'll be fair to

3   Samsung just like you were in that other case?

4          THE PANEL MEMBER:  I'll try.

5          THE COURT:  Ms. Smith, do you have any questions?

6          MS. SMITH:  Yes, sir.

7      Good to see you again.

8          THE PANEL MEMBER:  Yes, ma'am.

9          MS. SMITH:  I didn't know -- I was the counsel in

10  that case.  Do you recall that?

11         THE PANEL MEMBER:  Yes, you were, yes.

12         MS. SMITH:  Pleasure to see you.

13      We can't leave our life experiences outside the courtroom

14  when we enter the court, can we?

15         THE PANEL MEMBER:  No.

16         MS. SMITH:  And you bring your life experiences with

17  you when you enter the court.

18         THE COURT:  You-all speak up a little bit, please.

19         MS. SMITH:  One of your life experiences is being

20  involved in that Solas case, which there was a $62 million

21  award.  Does that sound about right?

22         THE PANEL MEMBER:  Yes.

23         MS. SMITH:  Okay.  And if you were chosen in this

24  case, when you go back to deliberate, it would be impossible

25  to leave that experience behind you because you have

1    experience in deliberating on a patent case -- patent

2    infringement case against Samsung.  Correct?

3               THE PANEL MEMBER:  Correct.

4               MS. SMITH:  Thank you, sir.

5               THE COURT:  Let me just ask you this, Mr. Storey.

6    Is there any doubt in your mind you could be completely fair

7    to both sides, or is that prior experience going to make any

8    difference about how you would serve in this case?  You just

9    be as honest with me as you can.

10              THE PANEL MEMBER:  I think it would make a

11   difference because it would be in my mind.

12              THE COURT:  All right, sir.  Thank you for your

13   honesty.  I'm going to let you join the rest of the panel

14   outside.

15              THE PANEL MEMBER:  Yes, sir.

16              THE COURT:  Just don't discuss anything we talked to

17   in here.

18              THE PANEL MEMBER:  Thank you very much.

19              THE COURT:  Thank you very much.

20              MS. SMITH:  Thank you, sir.

21       (The panel member left the courtroom.)

22              THE COURT:  I'm going to grant the Defendants'

23   challenge for cause and excuse Mr. Storey.

24              MS. SMITH:  Thank you, Your Honor.

25              THE COURT:  Okay.  That's one, we're going to seat

```
 1    eight, each side gets four strikes, so we should strike

 2    through 17.  Does anybody disagree?

 3              MR. CORDELL:  That's correct.

 4              THE COURT:  All right.  How long do you need to

 5    strike your list, Counsel?

 6              MR. BAXTER:  About 20 minutes.

 7              MS. SMITH:  That would be wonderful.

 8              THE COURT:  All right.  Have your list to

 9    Ms. Brunson by 20 minutes until 12:00.  Okay?  All right.

10    Thank you.

11              (The following was had in open court.)

12              THE COURT:  While counsel exercise their peremptory

13    challenges, the Court will stand in recess.

14                        (Brief recess.)

15              THE COURT:  Be seated, please.

16         Counsel, approach the bench, please.

17              (The following was had outside the hearing of the

18              jury panel.)

19              THE COURT:  Is there anything I need to take up from

20    either party before I seat the jury?

21              MR. BAXTER:  Not that I know of.

22              MR. CORDELL:  No, Your Honor.  Thank you.

23              THE COURT:  All right.  Then take your places.

24              (The following was had in the presence and hearing

25              of the jury panel.)
```

1           THE COURT:  All right, ladies and gentlemen.  If you

2      will listen as your name is called and come forward to the

3      jury box.

4           Let me explain a little bit about the logistics of this.

5      We're going to seat eight jurors to be the jury in this case.

6      I'll ask that whoever is the first person called, if you'll

7      come forward, enter the front row of the jury box, walk all

8      the way down to the last chair and remain standing in front of

9      the last chair.  Person No. 2, whoever you are, if you will do

10     the same thing--come down, go into the front row of the jury

11     box, walk down and stand in front of the third chair, leave an

12     empty chair between you, and then everyone else will do that.

13          And I want the first four members of the jury on the

14     front row of the jury box and the second four members of the

15     jury on the back row of the jury box.

16          So Juror No. 5, if you'll enter the second row or the

17     back row of the jury box, walk all the way down to the last

18     chair --

19          Not you, sir.  Whoever is the -- you're No. 5 on the

20     panel; you're not No. 5 on the jury.

21          But whoever is the fifth juror called--I'll say it that

22     way--if you'll come forward and enter the second row of the

23     jury box and walk all the way down to the end and stand in

24     front of the last chair, and then juror -- the sixth juror, if

25     you'll do the same thing--stand in front of the third chair

1    from the end and leave a blank chair behind you, the result,

2    ladies and gentlemen, should be the first four jurors are on

3    the front row with a blank chair or an empty chair between

4    each of you, and the second four jurors, 5, 6, 7, and 8, are

5    on the second row with an empty chair between you.

6         And those will be your positions throughout the trial.

7    You'll keep the same chair as we come and go during the

8    process of the trial itself.  And all of you should remain

9    standing until everyone's in the box, and then I'll seat you.

10        So with that I'm going to ask Ms. Brunson, our Courtroom

11   Deputy, to call the names of the eight members of our panel

12   who have been selected to serve as jurors in this case.

13             THE CLERK:  Christia Snelgrove, Denise Kelso,

14   William Stewart, George Bounds, Hugh Jester, Jay Wichlacz,

15   Joanna Griffin, Shannon Jordan.

16             THE COURT:  All right, ladies and gentlemen.  While

17   I have you standing, I'm going to ask Ms. Brunson to

18   administer the oath to you as members of the jury.

19             (Whereupon, the oath was administered by the Clerk.)

20             THE COURT:  Please have a seat.

21        Those of you on the panel who were not selected to serve

22   on the jury, I'm about to excuse you and release you in just a

23   moment.  But before I do that, I want to take a second and

24   tell you personally how much the Court and the Court staff

25   appreciate you being here.

1          Every one of you made a sacrifice to be here this

2     morning.  Every one of you had other places to be and other

3     things to do that were important in your respective lives, and

4     you set that aside and came forward to serve as summonsed to

5     be present for the selection of the jury this morning.

6          Sir, would you hand whoever you have that for or get out

7     of the way?  I'm trying to speak to the panel and you're

8     standing right in front of them.  Thank you.

9          Ladies and gentlemen, the Court recognizes that you've

10    made a real sacrifice to be here, so even though you weren't

11    selected, you've rendered very real and important public

12    service by being here.  And the Court appreciates it, and I'm

13    confident that the parties and counsel and everyone else in

14    the courtroom appreciates it.

15         Without ordinary citizens such as yourselves being

16    willing to step forward and answer the call to jury duty,

17    understanding that it's not convenient, it's not easy, it's

18    not always exciting, but it's necessary, and understanding

19    that, we want you to know that we appreciate and value and

20    recognize the service that you have rendered by being here.

21         Now, as you exit the courtroom through the double doors

22    and you turn to the right to go outside the building, you're

23    going to pass the Clerk's Office.  If you will, make sure that

24    these plastic numbers you have attached to your clothing are

25    turned back into Ms. Clendening, and the Clerk's Office will

1    use them with the next jury.

2         Also, if you need something in writing for an employer

3    to explain why you weren't at work this morning, why you are

4    here, if you need any kind of excuse, if you need any other

5    documentation, Ms. Clendening and the Clerk's Office will be

6    happy to help you.

7         Again, ladies and gentlemen, thank you for your service,

8    and with that, you are excused.

9              (Whereupon, the jury panel left the courtroom.)

10             THE COURT:  Be seated, please.

11        Ladies and gentlemen of the jury, I have some

12   instructions I need to go over with you, and I'm going to

13   release you for lunch in just a few minutes as soon as I go

14   over these instructions.

15        I do want you to understand that I've ordered the Clerk's

16   Office to provide lunch to you each day that you're serving on

17   this jury, so it will be brought to you in the jury room.  You

18   will not need to leave the building and go out into the

19   community and stand in line somewhere or look for something to

20   eat.  That will save us all time and it will make it more

21   convenient on you.  So plan on having lunch provided to you

22   each day that you're here on jury duty by the Clerk's Office.

23        Also, while you're at lunch today, I'd like you to take a

24   moment and make sure that Ms. Clendening has a good working

25   cell phone number for you.  It is possible, though not likely,

1    that we might need to reach you after hours one day or one

2    evening, and she would need a good working cell phone number

3    for that purpose.  Again, it's not likely, but please take a

4    minute while you're on lunch and see that she gets that from

5    you.

6         And also, speaking of cell phones, please don't bring any

7    cell phones back to the courthouse tomorrow.  And if you have

8    them with you today, leave them in the jury room when you come

9    back from lunch.

10        And that dovetails into the next instruction I need to

11   give you.  You are not to discuss this case with anyone.  You

12   are not to communicate with anyone in any way about this case.

13   That is a fundamental, foundational rule in the jury trial

14   system.

15        Now, at the point where you have heard all the evidence

16   and both sides have presented their closing arguments to you

17   and I have given you my final instructions on the law, and at

18   the point I say, "Ladies and gentlemen, you should retire to

19   the jury room and consider your verdict," at that point,

20   ladies and gentlemen, everything turns 180 degrees and you go

21   from not being able to discuss the case with any of the eight

22   of you, or with anyone else anywhere in the world, to being

23   required to discuss the evidence among the eight of you in an

24   effort to reach a unanimous decision about how to answer those

25   questions that are going to be included in the verdict form

1    that I'll send back with you at that time.

2         But until you've heard all the evidence, until you've

3    heard closing arguments from the lawyers and you've heard my

4    final instructions on the law, you must not discuss anything

5    about the case with each other or with anyone else anywhere

6    else.

7         And I can promise you, ladies and gentlemen, that unless

8    you live alone, when you get home tonight, wherever that is,

9    and you walk in the door, the first thing you're going to hear

10   from whoever else is there is, Tell me what happened in

11   federal court in Marshall today.  Don't even try to answer

12   that question because you'll almost unavoidably violate my

13   instruction if you do.  Simply blame it on me.  Say, That very

14   stern federal judge told me not to talk about this case until

15   he released me and the case was over and that's what I'm going

16   to do.  Please just blame it on me.  But don't discuss or

17   communicate about the case with anyone in any way.

18        And when I say don't discuss it, don't communicate about

19   it, I mean that in the broadest possible sense.  Don't talk

20   about it, don't email about it, don't send text messages.  And

21   if any of you are users of social media, don't post anything

22   on Facebook and don't tweet on Twitter and don't use any other

23   social media platform.  Don't communicate about it in any way

24   with anyone.  It's absolutely essential.

25        And let me explain to you the reason that's such an

1    important rule.  Because when you go back in the jury room

2    after all the evidence is presented and you are deliberating

3    on your verdict, which is a set of questions that I'll give

4    you at that time in writing that you're to answer, it is

5    absolutely essential that the only information you have to

6    draw upon in answering those questions is what's presented in

7    this courtroom during this trial from the witnesses who are

8    sworn and testify under oath and are subject to cross

9    examination, and the documents and exhibits that the Court has

10   admitted into evidence under the rules of evidence.  That must

11   be the only evidence that you consider, and you must have no

12   other outside information or influences or information.  And

13   that's why it's fundamental.

14        And if this instruction is ever violated, you need to

15   understand that it risks and jeopardizes the entire

16   proceeding, and there is the possibility that I might have to

17   declare a mistrial and dismiss all of you and select a new

18   jury from a new group of people and start all over again, and

19   there would be literally thousands of hours and many, many

20   thousands of dollars in wasted time and resources by the

21   parties and the Court and the entire process.  So there are

22   huge consequences to this, potentially.

23        So please -- and please be aware, I'm probably going to

24   repeat this instruction over and over during the trial just

25   because it is so essential and fundamental.  Don't communicate

1    with anyone in any way about the case.

2          And as a part of that, you're not to do any outside

3    research, again for the same reason--the only information you

4    should have before you when you answer the questions in the

5    verdict form is the sworn testimony of the witnesses and the

6    exhibits that have been introduced over the course of the

7    trial that the Court has found are admissible under the

8    Federal Rules of Evidence.  That's it.

9          So don't do any outside research.  Don't get on the

10   internet and pull up any of these parties or these lawyers or

11   these concepts or anything.  I mean, don't go to the library

12   and pull a book off the shelf.  Don't get an encyclopedia.

13   Just don't do any research of any kind.  Again, it goes back

14   to that same fundamental principle that the sole universe of

15   the information that you must base your decisions on must come

16   from this courtroom during the trial and nowhere else.

17         Also, ladies and gentlemen -- and I'll explain to you

18   that's why I don't want you to have a cell phone during the

19   trial with you, because it's just a small computer and it's

20   very tempting to say, I didn't understand what that lawyer

21   meant by that; let me Google it real quick.  That's

22   impermissible.  And I'm going to try to keep the temptation

23   away from you by asking you not to bring smartphones, tablets,

24   smartwatches, any kind of device like that that you could

25   access the internet or any research sources from.

1          Now, you're going to see the lawyers using those same

2     kind of electronic devices during the trial, and they're under

3     strict instructions from me to make sure that they don't

4     sound, alarm, ring, or disrupt the process.  But other than

5     that, those are tools of the trade now.

6          When some of us got out of law school, it was a legal pad

7     and pen.  Now it's an iPad and laptop and all kind of

8     electronics devices.  And that's fine, as long as they're

9     silent.  But they have a reason to have them, and don't feel

10    anything negative toward the fact that you may see them with

11    smartphones in their hands that you're not permitted to have,

12    but there's a reason why behind all that.

13         Also, ladies and gentlemen, I don't think this is likely

14    to happen, but it's not outside the realm of possibility and I

15    need to make you aware of it.  It is possible that over the

16    course of this trial some third party, some outside source,

17    could attempt to contact you and influence you about how you

18    might decide the issues in this case.  I don't think that's

19    likely, but there are no unimportant cases that make it to a

20    jury trial in our system, so it's possible.

21         If you should have any contact by anybody that you think

22    is unusual, awkward, improper in any way, if you have any

23    suspicions about anything like that, you should immediately

24    inform Ms. Clendening, she'll let the Court know, and the

25    Court will deal with it.  Again, I don't think it's likely,

1    but I need to tell you it's within the realm of possibility.

2         One more thing, ladies and gentlemen.  During the course

3    of this trial you're going to be coming and going each day.

4    There's one set of steps that come in the front door, and you

5    are invariably going to pass in the hallways and on the

6    sidewalks coming and going, perhaps in the parking lot, one or

7    more of these lawyers, one or more of these witnesses, some of

8    the support teams that are helping each side.

9         When that happens, none of those people are going to

10   speak to you.  They may walk right by you and ignore you.  And

11   when that happens, don't hold that against them and don't

12   think they're being rude.  Understand that those are my

13   instructions to them; because, again, the only source of

14   information that you must have in deciding the issues about

15   the facts in this case must come from the evidence presented

16   over the course of the trial for this courtroom and nowhere

17   else.

18        So if one of these lawyers or one of these paralegals or

19   someone else associated with either or both sides walks right

20   past you and doesn't say, Good morning, doesn't speak, doesn't

21   say, How are you today, they're not friendly and gregarious

22   like most folks in East Texas are, don't hold it against them.

23   Don't think they're being rude.  Understand they're just

24   simply following the Court's instructions and that's the

25   reason behind that.

1          All right.  With those instructions, ladies and

2     gentlemen, I'm going to excuse you for lunch.  We're going to

3     come back about 10 minutes until 1:00, and at that point we'll

4     begin with my preliminary instructions on the law.

5          Following that, you'll hear opening statements from the

6     attorneys for the competing parties.  Let me tell you, opening

7     statements are not opening arguments.  They're intended to

8     give you, the jury, a roadmap of what each side expects the

9     evidence will show.

10         And then after you've heard opening statements from both

11    sides, we'll proceed with the evidence in this case.  As you

12    heard during jury selection, the Plaintiff has the burden of

13    proof, so the Plaintiff goes first.  The Plaintiff will call

14    its witnesses.  Those witnesses will testify.  And then after

15    the Plaintiff's counsel has finished their direct examination

16    of the witness, then Defense counsel will get an opportunity

17    to cross-examine those witnesses.  And when the Plaintiff has

18    called all of the witnesses it intends to present and

19    Defendants have had an opportunity to cross-examine each one,

20    then the Plaintiff will rest what's called the Plaintiff's

21    case in chief.

22         When the Plaintiffs rest the Plaintiff's case in chief,

23    then we will shift to the Defendants' case in chief.  And the

24    Defendants will call their witness and they'll examine them on

25    direct examination.  And after they are finished with their

1    examination of each witness, the Plaintiff's lawyers will get

2    a chance to cross-examine the Defendants' witnesses.  And when

3    the Defendant has called and presented all of its witnesses,

4    then the Defendants will rest the Defendants' case in chief.

5         At that point the Plaintiffs have an opportunity to call

6    what are known as rebuttal witnesses to rebut anything the

7    Defendants have shown.  They are not required to call rebuttal

8    witnesses.  If they choose to, they will call their rebuttal

9    witnesses, who will testify on direct under examination from

10   Plaintiff's counsel and then they'll be subject to cross

11   examination by Defendants' counsel.  If they choose not to

12   call any rebuttal witnesses, then that will complete all the

13   evidence.  If the Plaintiff calls rebuttal witnesses, then

14   when the rebuttal witnesses have completed their testimony,

15   that will complete all the evidence.

16        And when you've heard all the evidence, then the Court

17   will give you its final instructions, sometimes called the

18   Court's charge to the jury.  And then the lawyers for each

19   side will present their closing arguments.

20        And then once each side has presented their closing

21   arguments, that's when I will say, "Ladies and gentlemen of

22   the jury, you may now retire to the jury room to deliberate on

23   your verdict."  And I will send the verdict form back with

24   you, which will be a written document that will have several

25   questions in it that you then must discuss the evidence

1  regarding those questions among yourselves.  Prior to that

2  time, you must not discuss any of the evidence or anything

3  about the trial among the eight of you or with anyone else.

4      Once you've reached a unanimous decision about the

5  questions in the verdict form, then your foreperson that you

6  will select from among yourselves will fill in your unanimous

7  answers to those questions, sign it, date it, and inform the

8  Court Security Officer that you've reached a verdict.  And at

9  that time I'll bring you back into the courtroom and receive

10  your verdict.

11      So that's a very high-level structural explanation of how

12  the trial will go.

13      One other thing I want to mention and then I'll release

14  you for lunch.  In my time on the bench here--as I told you,

15  I'm going on my 12th year now--in my time on the bench, I have

16  had jurors tell me time and time again, Your Honor, we would

17  rather start early and go late each day and be away from our

18  homes and our families and our businesses a shorter number of

19  days than if we start late each morning and quit early each

20  afternoon and it takes twice as many days away from our

21  families and our businesses and our other obligations.  And

22  that's the practice I follow.

23      So we're going to start each morning, ladies and

24  gentlemen, at 8:30.  And I'm going to ask you to plan your

25  travel from your homes back and forth so that you can be

1    assembled in the jury room each morning and ready to come

2    into the courtroom by 8:30.  You ought to plan to check the

3    weather.  You ought to check the driving conditions.  I know

4    some of you have a distance to drive each way between your

5    homes and the courthouse, and you ought to plan to be here

6    about 8:15, get a cup of coffee and a snack before you come in

7    here, and we start at 8:30.  But we're going to try to start

8    at 8:30 each morning.

9         And then we're going to break for lunch each day.  Your

10   lunch will be brought to you.  It will be less than an hour

11   because it's going to be brought right to you.

12        And then we'll go in the afternoon, and typically I don't

13   stop at 5:00 in the afternoon.  Typically I will go closer to

14   6:00, and in rare cases we may go past 6:00.

15        Let me explain it this way.  Some of these witnesses

16   you're going to hear are going to be on the witness stand a

17   long time.  And if we've got a witness who's on the witness

18   stand and they're going to testify for an hour-and-a-half and

19   we get to 6:00 and they've got 10 minutes more to go before

20   they're completely finished and off the witness stand, I'm

21   probably going to let them finish that last 10 minutes and get

22   off the witness stand and start fresh with another witness the

23   next day.

24        So it's not an exact science, but don't plan on us

25   stopping at 4:30 or 5:00 each day.  We'll go later than that.

1    And I'll just have to gauge it each day as to when we stop.

2    But in a general sense, and for those that are in your homes

3    that need to know what your general schedule's going to be

4    during that trial, let them know that you probably won't be

5    leaving the courthouse in Marshall until 5:30 or 6:00 or

6    thereabouts each day.

7         And if we will work those longer days, then we can finish

8    this case next week.  If we start at 10:00 and we stop at 4:00

9    each day and I give you an hour-and-a-half for lunch, it will

10   take us two weeks or three weeks to try this case.  And,

11   again, my experience has been that folks in East Texas would

12   rather have a longer day and be through sooner than stretch

13   this out over twice as long by having a less demanding

14   timetable each day.

15        So that's what I'm planning on and that's what you

16   should plan on, and I just wanted to let you know about that

17   in advance.

18        So with that, ladies and gentlemen, follow all my

19   instructions, including not to discuss anything about the

20   case -- and by the way, you haven't heard any evidence yet.

21   The evidence is going to start when the first witness takes

22   the witness stand.  So you've heard no evidence in this trial.

23        But with all the instructions I've given you, I'm going

24   to excuse you at this time for lunch.  Lunch should be waiting

25   for you in the jury room.

1          And with that, ladies and gentlemen, you're excused.

2               (Whereupon, the jury left the courtroom.)

3               THE COURT:  Be seated, please.

4          Counsel, we met in chambers shortly after 7:00 this

5     morning and had a pretty frank discussion about the level

6     of overnight disputes and problems that you had between each

7     other in preparing your demonstratives and your themes for

8     this trial.  I've had some additional input by email through

9     my staff since then.

10         I need to meet with you over this lunch break and see

11    where you are and see what we can do about getting everything

12    lined out so that we don't have delays and breaks in the

13    evidence and can go forward once lunch is finished and the

14    jury comes back in.

15         Let me see lead and local counsel on both sides in

16    chambers.  And with that, everyone else is excused for lunch.

17         Court stands in recess.

18                    (Lunch recess.)

19              THE COURT:  Be seated.

20         The Court recessed for lunch approximately two hours ago.

21    I told the jury we would reconvene in about 50 minutes.

22    That's been over an hour ago.  All but 15 minutes of that time

23    has been spent with counsel in chambers going around and

24    around and around regarding late-breaking disputes, regarding

25    demonstrative slides, and other matters.

1        The parties have utterly failed to accurately,

2   professionally, and properly meet and confer and submit to the

3   Court a reasonable number of disputes in advance of the jury

4   selection and the beginning of the trial today.  I can't

5   remember more late-breaking, out-of-left-field arguments and

6   disputes.  I just spent a very unenjoyable hour-plus with lead

7   and local counsel in chambers arguing over multiple issues,

8   most of which were not teed up for the Court until today, some

9   as early as 2:00 or 3:00 this morning, some of it as late as

10  on the fly in real time when we were meeting in my office.

11        I'm going to deduct 30 minutes of trial time from both

12  sides.  It's not the Court's fault and it's not the jury's

13  fault that we're an extra hour more or less delayed with this

14  process.

15        Now, I'm going to give the parties some guidance on some

16  of the matters that we left unresolved in chambers.

17        On the parties' competing opening statements, with regard

18  to the damages case, Samsung can tell the jury that it

19  believes a reasonable damages award, if the patents are

20  infringed, and if the patents are valid, which it hotly

21  contests, but if those conditions are met, Samsung can tell

22  the jury they believe the proper damages amount is $8 million.

23        The Plaintiff can tell the jury in opening that they

24  believe the claims are infringed, the patents are valid, and a

25  fair and reasonable royalty award in this case is going to be

1    $404 million.

2         Both counsel can refer to their respective experts as

3    being a source of evidence that the jury will hear from during

4    the trial to support those numbers.  You're not going to argue

5    what the damages experts say.  You're merely going to tell the

6    jury they'll hear from your respective damages experts and

7    they'll see these numbers as the evidence is presented.

8         Mr. Sheasby is not going to mention $2.33 billion, and

9    Mr. Sheasby is not going to use this slide with $1.897 billion

10   on it in opening statement.

11        Sit down, Mr. Sheasby.  I may let you ask any questions

12   when I get through, but I'm certainly not going to let you

13   stand up and interrupt me in the middle of things.

14             MR. SHEASBY:  I'm sorry.

15             THE COURT:  There has been an ongoing challenge for

16   the Court throughout the preparation and development of this

17   trial, and that is how to try this case without it becoming a

18   trial within a trial of what happened in California, with the

19   determination of the JDLA and the alleged breach, all of which

20   is on appeal to the Ninth Circuit now.

21        And I have made it abundantly clear I'm going to do my

22   best to try this case without retrying what happened in the

23   California court, especially given that the determinations by

24   the trial court there are subject to appeal and they're not

25   final.

1        Samsung can say $8 million is fair damages, and Netlist

2   can say fair damages are $4.4 million [sic] and our experts

3   will explain why.  That's all you're going to say in opening

4   on the damages issue, period.

5        And I do not intend -- as I sit here, I do not intend

6   this slippery slope to develop such that we get into why the

7   JDLA was terminated and who terminated it and who was right

8   and who was wrong and all the, as has been said on the record

9   many times in pretrial, who shot John.  That is not relevant

10  here, and it's just an effort to castigate verbally and cast

11  aspersions on the other party.

12       There was a JDLA, the JDLA is no more, it provided

13  license protection during its existence, it does not provide

14  license protection outside its existence, and there is an

15  ongoing dispute even within the period of the JDLA as to

16  whether there were foundry products covered because those

17  foundry products, if they are foundry products, are excluded

18  from the protections and licensure of the JDLA.

19       Now, that's the story that's going to get told.  And I

20  want both sides to clearly understand how the Court intends

21  this trial to go forward.  And woe unto either side if you

22  stray from this guidance in open court without clearing it

23  with me at the bench first, because there are many things both

24  of you have argued about, both of you being Mr. Cordell and

25  Mr. Sheasby, there are many things you've argued about that,

1    once they're said, they can't be unsaid.  And once the dam

2    breaks here, I don't know how we put it back together, and I

3    don't intend for the dam to break, and I have made that

4    consistently clear throughout this trial.

5         So if you have one scintilla of doubt that you're on

6    solid ground, you come see me at the bench before you go there

7    in front of this jury.  Understood.

8              MR. SHEASBY:  Yes, Your Honor.

9              THE COURT:  Understood?

10             MR. CORDELL:  Yes, Your Honor.

11             THE COURT:  Do either of you have any questions of

12   me?

13             MR. SHEASBY:  I do, Your Honor.

14             THE COURT:  Then go to the podium and ask your

15   question, Mr. Sheasby.

16             MR. SHEASBY:  First, I apologize for interrupting

17   Your Honor previously.

18        The question I have is on that slide that you're showing.

19   May I still show that the middle column that talks about the

20   benefit that we think is achieved by the patents without

21   showing the left-hand column?

22             THE COURT:  Let me see if I can be any clearer, Mr.

23   Sheasby.  With regard to your opening statement, what I intend

24   you to say about damages is that the ladies and gentlemen of

25   the jury will hear from Mr. Kennedy, he is an expert witness,

1   he will lay out a logical and believable and fair method by

2   which our damages are $4.4 million [sic].

3             MR. SHEASBY:  Understood, Your Honor.

4             THE COURT:  No more, no less.

5        And you can say the same thing about your expert, Mr.

6   Cordell, and put $8 million at the end of it.

7        And that's what the opening as to damages is going to

8   cover, the totality of it from both of you.  Understood?

9             MR. SHEASBY:  Thank you, Your Honor.

10            MR. CORDELL:  Well, maybe I do have one question,

11  Your Honor.  Our expert actually puts out two of those

12  numbers.  Remember, there are two agreements.  Can I mention

13  both of them or just leave it at that?

14            THE COURT:  Isn't this your slide?  Doesn't it show

15  8 million on one side and 4.4 [sic] on the other?

16            MR. CORDELL:  That's the last one, yes, Your Honor.

17            THE COURT:  Okay.  Then that's what you're going to

18  say.

19       All right.  As I noted, each side has just forfeited 30

20  minutes of trial time.

21       Let's bring in the jury.

22            (Whereupon, the jury entered the courtroom.)

23            THE COURT:  Please be seated, ladies and gentlemen.

24       First of all, let me tell you, members of the jury, I can

25  tell time.  I'm sorry.  I told you 50 minutes, and we're at

1   something over two hours.  Issues have arisen that the Court

2   needed to take up outside your presence, and that's why we've

3   been delayed.  I will do my best to keep closer to the time

4   estimates I give you going forward.

5        Now, I have some preliminary instructions I need to give

6   you, and I'd like you to listen very carefully as I go through

7   these with you.  After I've given you these preliminary

8   instructions, then counsel for the two competing parties will

9   present their opening statements to you.

10       As I told you earlier, opening statements are not

11  arguments and they are not supposed to be argumentative.  They

12  are merely to give you a factual roadmap of what the parties

13  believe that their evidence is going to show you over the

14  course of this trial.

15       Now, you've all been sworn as the members of the jury in

16  this case, and as the jury, you are the sole judges of the

17  facts, and you will decide what the ultimate facts are in this

18  case.  As the Judge, I will give you instructions on the law,

19  I'll decide any questions of law, evidence, or procedure that

20  arise during the trial, and I'll maintain the proper decorum

21  in the courtroom and oversee the efficient flow of the

22  evidence.

23       Let me just make this clear.  The only proper source of

24  instructions on the law from you comes from me, not from the

25  lawyers, not from the parties.  Nothing they tell you should

1    be taken as instructions on the law.

2         Now, at the end of the evidence, I'll give you detailed

3    instructions about the law that you are to apply, and I'll

4    give you a list of questions that you are then to answer.

5    This list of questions is called the verdict form, and your

6    answers to those questions in the verdict form must be

7    unanimous, and your unanimous answers to those several

8    questions will constitute the verdict of the jury in this

9    case.

10        Now, let me briefly touch on what this case centers

11   around.  As you -- this case involves a dispute regarding five

12   separate United States patents.  I know you've all seen the

13   patent video, and I will not cover that material again.

14        As you're aware, patents are either granted or denied by

15   the United States Patent and Trademark Office.  You're going

16   to hear that governmental agency, and the Patent and Trademark

17   Office is an agency of the United States government, you're

18   going to hear them referred to multiple times throughout the

19   trial simply as the Patent Office, you may also hear them

20   referred to as the PTO.  Those are the same thing.

21        Now, a valid United States patent, ladies and gentlemen,

22   gives the holder the right for up to 20 years from the date

23   the patent application is filed to prevent others from making,

24   using, offering to sell, or selling the patented invention

25   within the United States, or from importing it into the United

1    States without the patent holder's permission.

2         A patent is a form of property.  You heard about that

3    during jury selection.  A patent is called intellectual

4    property, and like all other forms of property, a patent can

5    be bought or sold.

6         Now, the violation of a patent holder's rights is called

7    infringement, and a patent holder may seek to enforce a patent

8    against persons it believes to be infringers by filing a

9    lawsuit in a federal court.  And that's what we have before us

10   now.

11        The process of obtaining a patent is called patent

12   prosecution.  To obtain a patent, one must first file an

13   application with the United States Patent and Trademark

14   Office, the PTO.  The PTO employs trained examiners to review

15   the applications that are filed with it.

16        Each application filed with the PTO includes within it

17   something called a specification.  The specification contains

18   a written description of the claimed invention telling what

19   the invention is, how it works, how to make it, and how to use

20   it.  The specification concludes or ends with one or more

21   numbered sentences, and these numbered sentences at the end of

22   the patent are called the patent claims.  And when a patent is

23   granted by the Patent and Trademark Office, it is the claims

24   within the patent that define the boundaries of its protection

25   and give notice to the public of those boundaries.

1          Patent claims, ladies and gentlemen, can exist in two

2     different forms referred to as independent claims or dependent

3     claims.  An independent patent claim does not refer to any

4     other claim within the patent--it is, in fact, independent.

5     And it's not necessary to look at any other claim within the

6     patent to determine what an independent claim covers.

7          On the other hand, a dependent patent claim refers to at

8     least one other claim within the patent, and it includes all

9     of the elements or limitations of that other claim or claims

10    to which it refers, or as we say sometimes from which it

11    depends, as well as the additional elements or limitations set

12    forth within the dependent claim itself.  Therefore, to

13    determine what a dependent patent claim covers, it's necessary

14    to look at both the dependent claim and the other claim or

15    claims to which it refers or, as we say, from which it

16    depends.

17         Now, the claims of the patents-in-suit use the

18    word 'comprising.'  Comprising means including or containing.

19    A claim that includes the word 'comprising' is not limited to

20    the methods or devices having only the elements that are

21    recited in the claim, but it also includes other methods or

22    devices that add additional elements.

23         Let me give you an example.  If a claim recites a table

24    comprising a tabletop, legs, and glue, that claim will cover

25    any table that contains these three structures--a tabletop,

1    legs, and glue--even if it contains other structures such as

2    leaves to expand the size of the tabletop or wheels to go on

3    the ends of the legs.  That's a simple example using the word

4    'comprising' and what it means.  In other words, it can have

5    other features in addition to those that are covered by the

6    patent.

7         Now, after the applicant files his or her application

8    with the PTO, an examiner is assigned by the PTO to review the

9    application and to determine whether or not the claims set

10   forth therein are patentable--that is to say, appropriate for

11   patent protection, and whether or not the specification

12   adequately describes the claimed invention.

13        In examining the application, the examiner reviews

14   certain information about the state of the technology at the

15   time the application was filed.  The PTO searches for and

16   reviews this type of information that was either publicly

17   available or that might have been submitted with the

18   application by the applicant, and this type of information

19   about the state of the technology at the time is called prior

20   art.  The examiner reviews this prior art to determine whether

21   or not the invention set forth in the application is truly an

22   advance over the state of the art at the time.

23        Prior art is defined by law, and I'm going to give you

24   more specific examples about it at a later time, but in

25   general prior art includes information that demonstrates the

1    state of the technology that existed before the claimed

2    invention was made or before the application for a patent was

3    filed with the PTO.

4        A patent contains within it a list of certain prior art

5    that the examiner has considered, and the items on this list

6    are referred to as the cited references.  Now, after the prior

7    art search and examination of the application by the examiner,

8    the examiner informs the applicant in writing of what the

9    examiner's found and whether the examiner considers any claim

10   to be patentable, in which case it would be allowed.  And this

11   writing from the examiner to the applicant is called an office

12   action.

13       Now, if the examiner rejects the claims, the applicant

14   has an opportunity to respond to the examiner to try to

15   persuade the examiner to allow the claims.  The applicant also

16   has the chance to change or amend the claims or to submit new

17   claims.

18       And the papers generated in this back and forth, ladies

19   and gentlemen, between the examiner and the applicant are

20   called the prosecution history.  And this process may go back

21   and forth for some time between the applicant and the examiner

22   until the examiner is ultimately satisfied and the

23   application -- that the application meets the requirements for

24   a patent, and in that case the application issues as a United

25   States patent.  Or, in the alternative, if the examiner

1    ultimately concludes the application should be rejected, then

2    no patent is issued.

3         Sometimes patents are issued after appeals within the PTO

4    or to a court.

5         Now, the fact that the PTO grants a patent does not

6    necessarily mean that any invention claimed in the patent, in

7    fact, deserves the protection of a patent.  While an issued

8    United States patent is presumed to be valid under the law, a

9    person accused of infringement has the right to argue in

10   federal court that a claimed invention in a patent is invalid,

11   and it's your job, ladies and gentlemen, as the jury to

12   consider the evidence presented by the parties and to

13   determine independently and for yourselves whether or not the

14   Defendant has proven that a patent is invalid; in other words,

15   has overcome the presumption of validity that attaches to each

16   issued United States patent.

17        Now, to help you follow the evidence, I'm going to give

18   you a brief summary of the positions of the competing parties.

19        As you know, the party that files or brings a lawsuit is

20   called the plaintiff.  And the Plaintiff in this case is

21   Netlist, Inc., which you'll hear referred to throughout the

22   trial as simply Netlist or the Plaintiff.  And as you also

23   know the party or parties against whom the lawsuit is brought

24   is called the defendant.  In this case there are three

25   Defendants.  They are Samsung Electronics Company, Ltd.,

1    Samsung Electronics America, Inc., and Samsung Semiconductor,

2    Inc.  And you're going to hear these three Samsung entities

3    referred to throughout the trial simply and collectively as

4    Samsung, and you may hear them referred to collectively as the

5    Defendants.

6         Now, as I told you during jury selection, this case

7    involves allegations of patent infringement brought by Netlist

8    against Samsung, and as I've mentioned, there are five

9    separate United States patents at issue in this lawsuit.

10        So that you'll be clear and for the record, the first

11   United States patent at issue in this case is Patent No.

12   10,949,339.  And as you were told earlier, patents are

13   commonly referred to by the last three digits of their patent

14   number.  So this particular patent you'll hear referred to as

15   the '339 Patent.

16        The second patent at issue is United States Patent No.

17   11,016,918, which you'll hear referred to as the '918 Patent.

18        The third patent is United States Patent 11,232,054,

19   which you'll hear referred to as the '054 Patent.

20        The fourth patent at issue is United States Patent

21   No. 8,787,060, which you'll referred to as the '060 Patent.

22        And the fifth and last patent at issue in this case is

23   United States Patent No. 9,318,160, which you'll hear referred

24   to as the '160 Patent.

25        These patents are going to be referred to at various

 1    times throughout the trial collectively as the

 2    patents-in-suit.  You may also hear them referred to as the

 3    asserted patents.  Those terms mean all five of those patents

 4    collectively.  And these patents generally relate to computer

 5    memory technology.

 6         Now, the Plaintiff, Netlist, contends that the Samsung

 7    Defendants are infringing certain claims of the

 8    patents-in-suit by making, using, importing, selling, or

 9    offering for sale in the United States certain products that

10    include its patented technology.  Netlist contends that it's

11    entitled to money damages as a result of that infringement.

12    And Netlist also alleges that Samsung's infringement is

13    willful.

14         The Samsung Defendants deny that they are infringing any

15    of the asserted claims of the patents-in-suit.  They also deny

16    that any infringement has been willful.  And they contend that

17    certain of the asserted claims of the patents-in-suit are

18    invalid as being obvious in the light of prior art, and they

19    also contend that certain of the asserted claims are invalid

20    because the patent's specification does not contain a

21    sufficient written description of the invention.

22         Also, ladies and gentlemen, you need to understand in

23    this case that, prior to this case being filed, the parties

24    here, Netlist and Samsung, had entered into a written

25    agreement between themselves which was called the joint

1    development and license agreement.  And you'll probably hear

2    this referred to during the trial as the JDLA, the joint

3    development and license agreement.  You will see the JDLA and

4    hear about it as a part of this trial.

5        The JDLA provided that each party to it would have a

6    license to use the other party's patents during the existence

7    of the JDLA.  This license within the JDLA applied to all of

8    each party's products except foundry products.  And you will

9    hear about what are and what are not foundry products under

10   the JDLA during this trial.

11       After the JDLA had been in effect for some time between

12   Netlist and Samsung, a dispute developed between them

13   concerning the JDLA and what it required.  This dispute has

14   already been addressed by another court, and that court

15   determined that Samsung no longer had a license to Netlist's

16   patents, including the patents asserted in this case, because

17   the JDLA had been terminated and that that occurred and was

18   effective as of July the 15th, 2020.  In other words, Samsung

19   was licensed to Netlist's patents under the JDLA until July

20   the 15th, 2020, except as to foundry products.

21       And the issue as to the scope of the license granted

22   under the JDLA is an issue in dispute in this case, and you're

23   going to hear about these issues during this trial.

24       Now, I know that there are many new words and many new

25   concepts that have been thrown at you, ladies and gentlemen,

1    since you appeared for jury duty this morning.  The attorneys

2    are going to discuss many of these in their opening

3    statements.  The witnesses are going to help you with their

4    testimony as they go through these concepts and terms.  And

5    the Court's going to help you through my instructions.  So

6    please do not feel overwhelmed at this stage.  I promise you

7    this will all come together as we go through the trial.

8         Now, one of your jobs in this case is to decide whether

9    or not the asserted claims of the patents-in-suit have been

10   infringed.  You'll also be asked to decide whether or not

11   certain of the asserted claims are invalid.  If you decide

12   that any claim of the patents-in-suit has been infringed by

13   the Defendants and is not invalid, then you'll need to decide

14   whether or not that infringement by the Defendants was

15   willful.  You will also need to decide what amount of money

16   damages should be awarded to Plaintiff as compensation for

17   that infringement.

18        Now, my job is to tell you what the law is, to handle

19   rulings on evidence and procedure, and to oversee the conduct

20   of the trial.  In determining the law, ladies and gentlemen,

21   it is specifically my job to determine the meaning of any

22   language from the asserted claims that needs to be

23   interpreted.

24        And I've already determined the meanings of this claim

25   language from the patents-in-suit, and you must accept the

1    meanings and the constructions, they're sometimes called, that

2    I give you as to the meaning of these terms when you decide

3    whether or not a claim has or has not been infringed and when

4    you decide whether or not a claim is or is not invalid.  And

5    you're going to be given a document in a few minutes that

6    reflects these meanings that have already been arrived at by

7    the Court.

8         Now, for any claim language where the Court did not

9    provide you with a definition or a construction, you should

10   apply the plain and ordinary meaning of that language.  But if

11   I have provided you with a definition, you must apply my

12   definition to that claim language throughout the case.

13        However, my interpretation of the language from the

14   claims should not be taken by you as an indication that the

15   Court has any personal opinion regarding the issues of

16   infringement, validity, or any of the other issues in this

17   case.  Those issues are yours to decide alone.

18        And I'll provide you with more detailed instructions on

19   the meaning of the claims before you retire to deliberate and

20   reach your verdict.  In deciding the issues that are before

21   you, you'll be asked to consider specific legal rules, and

22   I'll give you an overview of those rules now, and then at the

23   conclusion of the case I'll give you more detailed

24   instructions.

25        The first issue that you're asked to decide is whether

1    the Defendants, the Samsung Defendants, have infringed any of

2    the asserted claims from the patents-in-suit.

3        Infringement, ladies and gentlemen, is assessed and

4    determined on a claim-by-claim basis.  And Netlist, the

5    Plaintiff, must show by a preponderance of the evidence that a

6    claim has been infringed.  Therefore, there may be

7    infringement as to one claim but no infringement as to another

8    claim.

9        There are also a couple of different ways that a patent

10   can be infringed, and I'll explain the requirements for each

11   of these types of infringement to you in detail at the

12   conclusion of the case, but, in general, a defendant may

13   infringe the asserted patents by making, using, selling, or

14   offering for sale within the United States or importing into

15   the United States a product meeting all of the requirements of

16   a claim from the asserted patents, or that practices all the

17   required steps of a claim.  And I'll provide you, as I say,

18   with more detailed instructions on the requirements for

19   infringement at the conclusion of the case.

20       The second issue that you're asked to decide is whether

21   certain claims from the asserted patents are invalid.

22       Invalidity is a defense to infringement.  Therefore, even

23   though the United States Patent and Trademark Office has

24   allowed the asserted claims and even though an issued United

25   States patent is presumed to be valid, you, the jury, must

1    decide whether those claims are or are not invalid after

2    hearing the evidence presented during this trial.  You may

3    find a patent claim invalid for a number of reasons, including

4    because it claims subject matter that is obvious.

5         For a patent claim to be invalid because it is obvious,

6    the Defendants must show by clear and convincing evidence that

7    the claim would have been obvious to a person of ordinary

8    skill in the field of the technology of the patent at the

9    relevant time.  You'll need to consider a number of questions

10   in deciding whether the invention claimed in the asserted

11   patents is obvious, and I'll provide you with more detailed

12   instructions on these issues at the conclusion of the trial.

13        Now, another way that a claim can be found to be invalid

14   is there may be a lack of an adequate written description.  A

15   patent may be invalid if its specification does not describe

16   the claimed invention with sufficient detail so that one

17   skilled in the art can reasonably conclude that the inventor

18   actually had possession of the invention that they're

19   claiming.

20        You'll need to consider a number of questions in deciding

21   whether the patents-in-suit contain a sufficient written

22   description, and I'll provide you with more detailed

23   instructions on these issues at the conclusion of the case.

24        If you decide that any claim in the patents-in-suit has

25   been infringed and is not invalid, then you'll need to decide

1    whether the Defendants' infringement has been willful.  The

2    Plaintiff has the burden of proof to prove willful

3    infringement by a preponderance of the evidence.  And if you

4    decide that any infringement which you have found was willful,

5    that should not in any way affect any damages that you might

6    award.  The Court will take the issue of willfulness into

7    account later.

8        Further, if you decide that any claims from the

9    patents-in-suit have been infringed and are not invalid, you

10   will need to decide at that time what amount of money damages

11   should be awarded to the Plaintiff to compensate Netlist for

12   that infringement.

13       A damage award in a patent case, ladies and gentlemen,

14   must be adequate to compensate the patent holder for the

15   infringement, and in no event may a damage award be less than

16   what the patent holder would have received if it had been paid

17   a reasonable royalty for the use of its patent.

18       However, the damages that you award, if any, are meant to

19   compensate the patent holder and they are not meant to punish

20   the Defendants.  And you may not include in any damages award

21   that you might make an additional amount as a fine or a

22   penalty above what is necessary to fully compensate the patent

23   holder for the infringement.

24       Additionally, damages cannot be speculative, and the

25   Plaintiff Netlist must prove the amount of its damages for the

1    alleged infringement by a preponderance of the evidence.

2    However, the fact that I'm instructing you on damages now does

3    not mean that Netlist is or is not entitled to recover any

4    damages.

5         Now, you're going to be hearing from a number of

6    witnesses over the course of this trial, and I want you to

7    keep an open mind while you're listening to the evidence and

8    not decide any of the issues until you have heard all the

9    evidence.  And this is important, ladies and gentlemen.  While

10   the witnesses are testifying, remember you, the jury, will

11   have to decide the degree of credibility and believability to

12   allocate to each of the witnesses and to all of the evidence.

13        So while the witnesses are testifying over the course of

14   this trial, you should be thinking about and asking yourselves

15   things like this:  Does the witness impress you as being

16   truthful?  Does he or she have a reason not to tell the truth?

17   Does he or she have any personal interest in the outcome of

18   the case?  Does the witness seem to have a good memory?  Did

19   the witness have an opportunity and ability to observe

20   accurately the things that they've testified about?  Did the

21   witness appear to understand the questions clearly and answer

22   them directly?  And, of course, does the witness' testimony

23   differ from the testimony of other witnesses?  And if it does,

24   how does it differ?  These are some of the kinds of things you

25   should be thinking about while you're listening to each of the

1    witnesses.

2         I also want to talk to you briefly about expert

3    witnesses.  When knowledge of a technical subject may be

4    helpful to the jury, a person who has special training and

5    experience in that particular field, we call them an expert

6    witness, is permitted to testify about his or her opinions on

7    those technical matters.

8         However, ladies and gentlemen, you're not required to

9    accept an expert witness' opinions or any witness' opinions

10   for that matter.  It's up to you to decide whether you believe

11   a witness, whether what they are telling you in your view is

12   correct or incorrect, and whether or not you want to believe

13   it, and to what degree, if any, you want to give it weight.

14        Now, I anticipate that there are going to be expert

15   witnesses testifying in support of each side in this case.

16   But when they do, it will be up to you to listen to their

17   qualifications.  And when they give you an opinion and explain

18   the basis for that opinion, you will have to evaluate what

19   they say, whether you believe it, and to what degree, if any,

20   that you want to give it weight.

21        Remember, ladies and gentlemen, judging and evaluating

22   the credibility and the believability of each and every

23   witness is an important part of your job as the jury in this

24   case.

25        Now, during this trial it's possible that there will be

1    testimony from one or more witnesses that are going to be

2    presented to you through what we call a deposition.  In trials

3    like this, it's difficult to have every witness appear in

4    person live in court at the same time.  So lawyers for each

5    side prior to the trial take the depositions of the witnesses.

6         In a deposition, a court reporter is present, the witness

7    is sworn and placed under oath just as if he or she were in

8    court, and then the witness is asked questions by counsel for

9    both of the parties, and the questions and the answers are

10   recorded and taken down.  Often they are videoed.

11        It's important to know, ladies and gentlemen, that when a

12   deposition witness is presented to you, you're going to be

13   seeing various portions of that overall deposition that had

14   been selected and put together.

15        Let me explain it this way.  In a typical deposition, the

16   witness is questioned for up to seven hours.  Now, with a

17   particular witness, there may be 20 minutes of actual

18   testimony that the lawyers believe is relevant to this case

19   and that you need to hear from this witness by deposition.

20        Rather than play seven hours of recorded video deposition

21   to get 20 minutes' worth of testimony, that 20 minutes which

22   may come in several little segments will be cut out, spliced,

23   and put together, and you will be presented with that 20

24   minutes.  That's a whole lot better than having to listen to

25   seven hours to get 20 minutes.

```
1          But as a part of that, you're going to see splicing;

2     you're going to see little glitches, perhaps; you're going to

3     hear differences in voices.  You're going to see the little

4     irregularities that necessarily come with taking parts of that

5     deposition and putting it together to present to you.  You

6     should not focus on those differences.  You should focus on

7     what the witness says and the answers to the questions that

8     they give.

9          And to that extent, you should try to determine the

10    believability and credibility of that deposition testimony

11    just as if that witness had appeared in person and given you

12    that testimony live from the witness stand.

13         Again, don't be confused with little glitches or gaps or

14    breaks or irregularities.  Focus on the substance of what's

15    presented through these deposition witnesses.

16         A deposition witness is entitled to the same

17    consideration insofar as possible and is to be judged as to

18    its credibility, weight, and otherwise considered by the jury

19    in the same way as if the witness had appeared in open court

20    and testified live from the witness stand.

21         Also, ladies and gentlemen, during the course of the

22    trial you're going to be presented with various documents

23    which the Court has admitted into evidence as exhibits.  Some

24    of these documents are going to have portions of them that

25    have been redacted.  Said another way, there are going to be
```

1    portions that have been blacked out.  Those happen because the

2    Court determined in advance of the trial that those portions

3    you cannot see are not relevant or not important and that you

4    do not need to see them.

5        When you're presented with a document that may have

6    portions of it redacted, don't focus on what's redacted.

7    Don't try to guess what's been blacked out.  Focus on what's

8    there and visible and that you can read and understand.  In

9    other words, focus on the unredacted portions of the document

10   and don't try to guess what has been blacked out per the

11   Court's earlier instruction.

12       Now, over the course of this trial, it's possible that

13   the lawyers are going to raise certain objections from time to

14   time.  And when they do, I will issue rulings on those

15   objections.  You should understand it's the duty of an

16   attorney on each side of the case to object when the other

17   side purports to offer evidence or testimony that the attorney

18   believes is not proper under the rules of the Court, the Rules

19   of Civil Procedure, and the Rules of Evidence.

20       Now, upon me allowing the testimony or other evidence to

21   be produced over the objection of an attorney, the Court does

22   not, unless expressly stated, indicate an opinion as to the

23   weight or effect of that evidence.  As I've said, you, the

24   jury, are the sole judges of the credibility and the

25   believability of all the witnesses and what effect and weight

1    to give to all the evidence.

2         Now, before today through various pretrial hearings that

3    you were not present for, the Court has spent a considerable

4    amount of time with counsel for both of the parties going

5    through a long list of documents that one party or the other

6    party believes should be properly admitted as exhibits in this

7    case.

8         The Court's heard the arguments for why a certain

9    document should be admitted as an exhibit.  The Court's heard

10   the arguments from the other side why that document should not

11   be admitted.  The Court's ruled on those arguments.  That

12   means if you're shown a document in the course of this trial,

13   I have already seen it, heard about it, ruled on it.  And if

14   you're seeing it, it means I have admitted it as an exhibit in

15   this case.

16        And whether you understand this or not, that saved you a

17   lot of time rather than the lawyers presenting it for the

18   first time during the trial, then hearing the objection, then

19   hearing the arguments against the objection, and the back and

20   forth that goes on for some time, ultimately with the Court

21   deciding whether to admit or not admit the document.

22        All that's been done in advance and that saved you a

23   considerable amount of time and it will streamline the trial

24   of this case.  And the Court appreciates the efforts of the

25   lawyers in working with the Court to do that in advance.  But

1    that means when you're shown an exhibit in this case, I've

2    already determined that it's properly admissible or it

3    wouldn't be shown to you in the first place.  And the parties

4    can simply present it, put it in the proper context, and go

5    over it with the witnesses wherever they think it's relevant.

6    And that saved us all a lot of time during this trial.

7         However, it's still possible that there are going to be

8    objections that arise during the trial.  If I should sustain

9    an objection to a question addressed to a witness, then you

10   must disregard the question entirely and you may draw no

11   inference from its wording or speculate about what the witness

12   would have said if I had allowed them to answer the question.

13   On the other hand, if I overrule the objection, then you

14   should consider the question and the answer just as if no

15   objection had been made.

16        As I told you during jury selection, the United

17   States -- the law of the United States allows a district judge

18   such as myself to comment to the jury on the evidence, but

19   provides that the jury can disregard those comments in their

20   entirety because, as I've said, you, the jury, are the sole

21   judges of the facts and you, the jury, are the sole

22   determiners of the credibility and believability of the

23   witnesses and what amount of weight to give to the evidence

24   that's presented.  And even though the law may permit me to

25   comment to you on the evidence, as I told you earlier, I

 1    intend to try very hard not to comment on any of the evidence

 2    or the witnesses throughout the trial.

 3         Now, in front of me is Mr. McRoberts, our court reporter.

 4    He is taking down everything that's said in the courtroom.

 5    And over the course of the trial you may hear me tell people

 6    not to talk at the same time because he can't take down

 7    accurately what two people say when they're talking at the

 8    same time.

 9         But the written transcript of everything that's said

10    during this trial that's created by the court reporter, it's

11    not going to be available to you, ladies and gentlemen, for

12    you to take back into the jury room and review during your

13    deliberations, which means it is important that you rely upon

14    your memory of the evidence over the course of the trial and

15    that you pay close attention to the testimony of all the

16    witnesses and all the exhibits that are offered into evidence.

17         Now, in a moment you're going to each be given a juror

18    notebook.  In this notebook, you're going to find several

19    things.  First of all, you're going to find a copy of each of

20    the five patents-in-suit.  You're going to also find a table

21    or a chart showing the language from the asserted claims that

22    the Court has construed or interpreted, and the construction

23    or definition that the Court has arrived at side by side with

24    the claim language and the construction the Court has reached

25    advising you as to what that claim language means.

1          Behind that, you're going to find a section of tabbed

2    witness pages.  For each witness that might testify in this

3    case, in these notebooks you'll have a single page with a

4    photograph, a head-and-shoulders' photograph, of that witness

5    at the top of the page and their name underneath, and below

6    that, ruled lines if you want to take notes there.

7          The Court's determined that after a trial, while you're

8    deliberating in the jury room, it's very helpful to go back

9    and see a picture of all the various people that have

10   testified over the course of the trial, and that's why those

11   witness pages are going to be in these notebooks.

12         Then behind those witness pages, you're going to find a

13   brand new legal pad that's been three-hole punched and put

14   into the notebook so that you'll have additional space for

15   note-taking if you choose to take notes over the course of the

16   trial.

17         And in the front flap of each notebook, you should find a

18   pen in case you don't have ready access to one for use in

19   taking notes, again if you determine that you want to take

20   notes.  It's up to each juror, ladies and gentlemen, to

21   determine whether they want to take notes over the course of

22   the trial, and if they do, how extensive those notes should

23   be.

24         But remember any notes you take are to aid your memory of

25   the testimony and the evidence produced during the trial.  You

1     still have to rely on your memory of the evidence.  And the

2     notes are only there to refresh and remind you of that

3     testimony that you should be paying close attention to.  And

4     that's the only reason you should be keeping notes.

5          All right.  At this point I'm going to ask our Court

6     Security Officer to distribute these juror notebooks to each

7     of the members of the jury.

8                         (Pause in proceedings.)

9          THE COURT:  I won't go over what's in these

10    notebooks again.  I've already covered that with you.

11         But let me just say this, ladies and gentlemen.  Those

12    notebooks are not to be left lying around over the course of

13    the trial.  They need to be in your control and possession at

14    all times.  They either need to be in your hands here in the

15    courtroom or they need to be on the table in the jury room.

16         And when you leave each day during the course of the

17    trial, I want you to take those notebooks to the jury room and

18    leave them closed on the table there so they'll be with you --

19    or waiting for you, rather, the next morning when you come

20    into the courtroom.

21         Now, there may be times during the trial that we'll take

22    a brief recess or break, and if we're going to be out of the

23    courtroom for a short period of time, I'll simply say, ladies

24    and gentlemen, you may leave your notebooks in your chairs, in

25    which case it's fine, just to simply close them and leave them

1    in your chair because we're not going to be out of the

2    courtroom very long.

3         If it's going to be longer than that, I'll tell you to

4    take them with you when you go into the jury room because they

5    should either be in your possession or they should be in the

6    jury room.  They should not be left just laying around, for

7    lack of a better term.

8         Now, in a moment we're going to hear opening statements

9    from the attorneys representing the competing parties.  And as

10   I've told you, these opening statements are designed to give

11   you, the jury, a roadmap about what each side expects to offer

12   by way of their evidence.

13        And you should remember throughout the trial, ladies and

14   gentlemen, what the lawyers tell you is not evidence.  The

15   evidence is the sworn testimony of the witnesses who will

16   testify under oath from the witness stand, subject to cross

17   examination, and the evidence are those exhibits that the

18   Court has already reviewed, heard argument on, and determined

19   are admissible under the rules of evidence, and is

20   pre-admitted for use during this trial.  That's the evidence.

21        What the lawyers tell you is their impression of what the

22   evidence will be.  And they have a right to point out what

23   they think the evidence is going to show you, but remember,

24   what they tell you is not evidence.

25        Now, after the opening statements, we'll proceed with the

1    Plaintiff's case in chief, as I described to you before lunch,

2    and we'll proceed over the course of the trial with the

3    Defendants' case in chief, any rebuttal case the Plaintiff may

4    put on, my final instructions on the law to you, and closing

5    arguments from the attorneys, after which I'll direct you to

6    retire to the jury room and to deliberate on your verdict.

7         When I give you my final instructions on the law at the

8    close of the evidence, ladies and gentlemen, I'm going to

9    provide that you'll each have a printed copy of those

10   instructions to take with you when you go to the jury room to

11   deliberate on your verdict, because I want you to listen to

12   those instructions and not feel like you need to be compelled

13   to take notes.  So I want you to understand you'll have your

14   own printed copy of those instructions at that time when you

15   retire to the jury room to deliberate on your instructions

16   [sic].

17        Let me repeat my earlier instruction to you that

18   throughout this trial and until I release you as jurors, you

19   are not to communicate with anybody about this case in any

20   way, and you're not to communicate with the eight of

21   yourselves about this case in any way until I direct you to

22   retire to the jury room and deliberate on your verdict.

23        And then when that happens, you become obligated to

24   discuss among the eight of you the evidence that you've heard

25   over the course of the trial in an effort to come to a

1    unanimous agreement about how to answer the questions that are

2    going to be submitted to you in the verdict form.

3        And let me also remind you again, over the course of this

4    trial the lawyers in this case, the witnesses, and anybody

5    associated with either side, is not going to visit with you,

6    not going to speak, not going to be friendly, not going to

7    interact with you.  And that's because they're following my

8    instructions.  Don't take it for rudeness, don't take it for

9    anything negative; they are simply doing what I have

10   instructed them to do.

11       With that, we'll proceed to hear opening statements from

12   the attorneys in the case.

13       Mr. Sheasby, you may present the Plaintiff's opening

14   statement.  Would you like a warning on your time?

15           MR. SHEASBY:  I would, Your Honor.  If I could have

16   a warning with 15 minutes left and with three minutes left, I

17   would appreciate it.

18           THE COURT:  I will warn you when you have 15 minutes

19   remaining and three minutes remaining.

20       You may proceed.

21           MR. SHEASBY:  May it please this Honorable Court.

22       Good afternoon, ladies and gentlemen.  My name is Jason

23   Sheasby, and I speak on behalf of Netlist.

24       I want to begin by echoing what Judge Gilstrap said

25   repeatedly this morning and thanking you for your service.

1    Netlist recognizes that this is sacrifice, it's a personal

2    sacrifice, it's a financial sacrifice.  This case is

3    incredibly important to the future of Netlist.

4         Judge Gilstrap spoke about the right to a trial by jury.

5    He spoke about the fact that our founders created this right.

6    And a lot of folks think about the right to the trial by jury

7    is the right for Plaintiffs just as assuredly the right of

8    Samsung, the Defendant, to have a jury trial.  That's actually

9    not what our founders had in mind when they talked about the

10   right to trial by jury.

11        What our founders had in mind, what the right to the

12   trial by jury is, is that the most important questions in our

13   society, the most important issues in disputes should be

14   decided, will be decided, and can be decided by the citizens

15   of this country.  The right to the trial by jury is your

16   right.  It's your right to weigh in on incredibly important

17   issues that relate to our society, one of which is being

18   decided in this case.

19        Just as the right to the trial by jury is a

20   constitutional right, so are patents enshrined in the

21   Constitution.  When the founders created our original

22   Constitution, they contemplated and made provision for the

23   protection of patent rights, because American innovation,

24   American technology, American patents, is what makes us

25   strong, it makes us competitive, and it makes us safe.

 1          The Plaintiff in this case is Netlist.  Netlist was

 2     founded in 2000 in Orange County, California.  It has 120

 3     employees, and its focus was on innovating in the space of

 4     memory modules.

 5          Memory modules are a strategic asset of this country.

 6     Our air defense system requires memory modules.  Every major

 7     manufacturing facility in the United States requires memory

 8     modules.  The cell system that connects all of our various

 9     states across this continent requires memory modules.  When we

10     go to the hospital and we get a specialized scan to diagnose

11     disease, it requires memory modules.  They are a critical,

12     strategic asset of this country.

13          Netlist's innovation became known to Samsung.  Samsung

14     actually asked its most senior executives to come to the

15     United States, to come to California, and to ask Netlist to

16     collaborate on a design of a product.  The design of that

17     product is not at issue in this case.

18          What Samsung did was it took Netlist's patents and it

19     infringed them.  And the infringement in this case does not

20     relate to any of the behavior from before the termination of

21     the relationship between the parties.  The infringement in

22     this case is about Netlist's [sic] behavior after the

23     agreement terminated.  Netlist took -- Samsung took Netlist's

24     innovation.

25          This trial this week will focus and decide one

1    issue--what are the consequences of violating the law.  Patent

2    right is a property right.  It's a sacred right.  No one can

3    use Netlist's patents without express permission.  Samsung

4    does not have that permission and it now must face the

5    consequences of its behavior.

6        This is some of the major companies, some of the leading

7    technology companies in the world, who have reached out to

8    Netlist and who Netlist has designed and supplied memory

9    modules to.

10        This is Doctor Jung Bae Lee.  He's the president of

11   Samsung memory.  And at the time that Samsung approached

12   Netlist, he was the head of the office that designs and

13   decides what products Samsung will launch.  And he's

14   instructed by the past president of Samsung to reach out and

15   enter into technological collaboration with Netlist.

16        The products at issue in this case, dual in-line memory

17   modules called DIMMs--and Mr. Baxter talked to you about a

18   DIMM; it's plugged in on both sides--high bandwidth memory

19   products, these products are not products that were the

20   subject of our relationship.  These are products in which

21   Samsung unilaterally made a decision to take our intellectual

22   property and to sell infringing products.

23        There is a very powerful tool in federal proceedings, and

24   it's called discovery.  And discovery allows us to collect

25   information, information about what is going on behind the

1    scenes.  So we know that companies, they issue press releases,

2    they have slick commercials, they have press staff.  But

3    sometimes, and especially in federal courts, we are allowed to

4    pull back the curtain and to see what Samsung actually thinks.

5         This is an example of it.  This is PX 1756.  And it's

6    very clear that what I say in this opening is not evidence.

7    These documents are evidence.  And these are Samsung's words

8    from 2019, long before this lawsuit was initiated, in which

9    Samsung candidly admitted that they were focused on obtaining

10   rights to our patents on LRDIMM.

11        You can write this number down.  If you want to see it in

12   deliberations, you will be able to do so.

13        Samsung internally wrote down they wanted our patents on

14   LRDIMM.  One of the products that is accused of infringement

15   in this case is LRDIMM.  My words are not evidence.  What's on

16   the screen in front of you is evidence.

17        This was not once.  This is another example of an

18   internal Samsung document.  You'll notice the reference to

19   company N.  Company N is the internal code word that Samsung

20   used for Netlist.  That will not be disputed.  Samsung

21   witnesses will concede that is the internal code word for

22   Netlist.

23        And, once again, Samsung focuses in this internal

24   document on the fact that it needs our patents on RDIMM and

25   LRDIMM.  RDIMM is one of the other categories of products that

1    Samsung is accused of infringement in this case.  These are

2    Samsung's internal documents.

3              THE COURT:  Mr. Sheasby, I'm happy for you to stand

4    beside the podium, but pull the microphone out because I'm not

5    hearing you as clearly as I want to.

6              MR. SHEASBY:  Thank you very much, Your Honor.

7              THE COURT:  All right.  Please continue.

8              MR. SHEASBY:  The first issue you'll be asked to

9    decide is infringement.  Infringement is an issue on which

10   Netlist bears the burden.  And to meet that burden, we asked

11   independent experts to actually analyze the internal Samsung

12   confidential documents.  They've had access to top secret

13   Samsung information, and that has allowed them to determine

14   whether the patent is infringed.

15        So, for example, we've asked Doctor Mangione who spent

16   many years at UCLA in designing memory control systems at

17   Motorola to examine the first two of our patents.  These are

18   the '918 and '054 Patents.

19        Patents have very long numbers.  They're referred to by

20   the last three digits.  Judge Gilstrap told you that

21   previously, and so I will refer to them as well by the last

22   three digits.

23        I'd like Doctor Mangione to stand and introduce himself.

24        Thank you very much.

25        And what he will analyze is how the '918 and '054 Netlist

1    patents are used by Samsung and Samsung's most advanced memory

2    technology.  It's called DDR5.  And in particular, Samsung

3    uses a form of intelligent power module management.  These

4    modules have very delicate chips on them and very complex and

5    different types of chips.  And if you do not provide the

6    precise amount of power at the precise time, you can actually

7    destroy the module.  And so this technology is what has

8    enabled Samsung to sell incredibly fast modules.  On-module

9    power management is what has led to Samsung's newest, most

10   advanced memory module.

11        Doctor Mangione will show you the claim of the patent.

12   The claim of the patent defines our property right.  He will

13   split it into elements.  And for each element, he will

14   actually show you the internal Samsung documents, the internal

15   admissions of Samsung's engineers, establishing that the claim

16   is met.

17        It is not an accident that Samsung determined to infringe

18   our patents on on-module power management.  Samsung has been

19   fixated on this Netlist technology for years.

20        This is PX 621.  This is a Netlist presentation from

21   2014.  This is a presentation that was found in Samsung's

22   records in this litigation.  On the left-hand side, this is

23   Samsung being put on information that Netlist is pursuing its

24   inventions and is seeking a patent--that's what U.S. patent

25   pending means--on intelligent on-module power management.

1    This is a document from Samsung's internal records.  It's a

2    Netlist document that we found.

3          Why is this important?  It's important because the

4    president of Samsung memory admitted under oath that DDR5 has

5    that exact same design.  DDR5 has power management control

6    on-module, which is exactly the technology that they've been

7    tracking at Netlist since 2014.

8          Samsung was fixated on the innovations of Netlist.  This

9    is a 2019 email.  This is Samsung reaching out to Netlist

10   engineers and asking if we can have a technical meeting so

11   that Netlist engineers can explain how the technology would

12   work for power management for DDR5 DIMM.  This is 2019.

13         In 2022, Samsung launched its infringing DDR5 product

14   with--and you see it down here--management -- power management

15   integrated circuit.  And why did they do that?  Why did they

16   reach out to us and ask us for our technology in 2019?  Why

17   did they launch it in 2022 without permission?

18         They did it because they needed it, because they were

19   desperate for it, because it increased the memory efficiency

20   of their design by 30 percent.  What I say is not evidence.

21   This document is evidence.  Three years after reaching out to

22   our engineers, the infringing technology appears in their

23   products.

24         The second family of patents is also being discussed by

25   Doctor Mangione.

 1        Doctor Mangione, you do not need to stand again for this

 2   one.

 3        That product that's accused of infringement is called a

 4   DDR4 LRDIMM.  LRDIMM stands for load-reduced DIMM.  This is

 5   the teaching from our patents, which is it talks about

 6   load-reduced memory modules, and it actually shows an example

 7   of a load-reduced memory module.  This is Samsung's design

 8   that infringes our technology, the evidence will show.  It's

 9   called a load-reduced dual in-line memory module.  It is not a

10   coincidence that the designs in our patents appear in

11   Samsung's products.

12        We know this because Samsung was internally tracking the

13   innovation at Netlist.  Once again, this is internal, candid

14   information from Samsung stating that Netlist is well-known in

15   the industry as creating LRDIMM technology.  They candidly

16   conceded internally that we created LRDIMM technology.  And in

17   this court they will deny it, they will claim that they do not

18   use our technology, they will claim that we did not invent

19   LRDIMM technology, they will claim that we are entitled to

20   nothing--the exact opposite of what they said candidly in

21   2019.

22        This is another example.  Not only did we create LRDIMM

23   technology, but they focused on the fact that they wanted our

24   technology on LRDIMM.

25        The third family of patents will be discussed by Doctor

1    Brogioli.

2         Doctor Brogioli, would you please stand?

3         Thank you.

4         Doctor Brogioli is a fascinating history.  He's a

5    professor and academic at Rice University in Houston.  He also

6    does something and he did something historically which is he

7    actually designed chips for free-scale semiconductors.  So he

8    has real-world experience designing the types of computer

9    chips that are used in the technology in our world.

10             THE COURT:  You have 15 minutes remaining.

11             MR. SHEASBY:  And this is the product that's accused

12   of infringement in this case.  It's called a high bandwidth

13   memory product.  And you'll see it has a very unique structure

14   in it.  It has something called a TSV in it.  TSV stands for

15   through-silicon vias.  The record will show that Samsung was

16   significantly behind its largest competitor in creating HBM

17   products.  It was years behind.

18        The record will show, we believe, that Samsung was given

19   an asked-for presentation by Netlist.  This is a Netlist

20   document.  This was slides that were ultimately presented to

21   Samsung orally.  And you'll see what it talks about.  This is

22   our patent, the '060 Patent, and it talks about its use for

23   TSV stacked packages.  TSVs are tunnels that run up through

24   the middle of chips so you can stack them extremely high.  It

25   creates extraordinary density in extraordinarily advanced

1   chips.

2       The left-hand side is the document from 2015.  It's a

3   Netlist document.  The right-hand side is the TSV design

4   product that Samsung launched after, after receiving our

5   presentation.  This was not an accident.

6       In fact, Samsung was well aware that our technology

7   covered their HBM products.  This is a 2016 email in which

8   Samsung actually asked us, What products does your technology

9   cover?  This is PX 446.  And we identified the first of the

10  two patent families at issue in this family, and we said that

11  it covered their HBM product.

12      Samsung at no point in time before the initiation of this

13  lawsuit asked permission to use our HBM technology.  Patents

14  are strict liability.

15      Samsung will make a number of excuses to avoid the

16  consequences of behavior.  First, Samsung will seek to

17  diminish Netlist as a company.  We are 120 employees, we are

18  very proud of our size, we are very proud of our achievements.

19      Samsung is an extraordinarily large company.  In fact,

20  you hear Samsung talk about the fact that they have 120,000

21  patents.  You'll also hear them talk about the fact that they

22  have 6,000 jobs in the United States.

23      But there are two facts that I think you need to keep in

24  mind when you hear those statements.  The first is DRAM memory

25  modules are such an important strategic asset, that Samsung

1    declines to design or manufacture them in the United States.

2    They keep careful control of that technology only in Korea.

3         The second fact you should consider, and I believe this

4    will be undisputed, is that Samsung cannot identify a single

5    Samsung patent that covers the products at issue in this case.

6    The reason why Samsung had to use our patents is because

7    Samsung did not have its own advanced technology.  That is why

8    one of the largest electronic companies in the world flies to

9    Orange County, California, and asks to collaborate with

10   Netlist.

11        The second issue, Samsung will say that it does not

12   infringe the patents.  Samsung's corporate representative,

13   however, will admit that he has no basis for explaining why

14   Samsung does not infringe the patents.  In fact, you will hear

15   the deposition testimony of a large number of Samsung

16   engineers, and not a single one of those Samsung engineers

17   will testify under oath that Samsung does not infringe these

18   patents.  The engineers will not defend the theories advanced

19   by the lawyers in this case.

20        Let me give you an example of the theories that will be

21   advanced in this case.  So Samsung has brought its own

22   experts, and they are entitled to be carefully listened to,

23   but they're also -- and you have the power to use your common

24   sense.

25        So one of the issues is that Samsung will say its HBM

1    products use something called a DRAM circuit, and DRAM

2    circuits are not covered by our patent.  In fact, they will

3    bring Doctor Robins who will say that.

4        Well, you see how their products use something called a

5    TSV?  We actually asked their senior engineer and their

6    corporate representative about what a DRAM circuit is.  A DRAM

7    circuit is on the left-hand side, he testified.  It is

8    external connections, external connections which are

9    incredibly slow and inefficient.  And he contrasts that on the

10   right with TSV connections, TSV connections which are fast and

11   innovative, which is the exact design we presented to them in

12   2015.

13       He says--Mr. Kim--the left-hand side is a DRAM circuit,

14   the right-hand side is a TSV connection.  Why is this

15   important?  It's important because Samsung's HBM products use

16   the TSV.  They do not use the DRAM circuit or the external

17   connection.  Mr. Kim testified to that under oath.

18       And so what you will see is you will see experts that

19   Samsung has brought, and those experts will present testimony

20   that contradicts the sworn oath testimony of Samsung's own

21   engineers and the internal documents.  Samsung will say their

22   HBM products have DRAM circuits.  The only folks who agree

23   with that are Samsung's lawyers and its experts.  Its

24   engineers who testify under oath said the exact opposite.

25       Let me give you another example.  Samsung will claim that

1    we use something called LDO circuits.  And LDO circuits are

2    not converters, and Samsung will bring an expert who will

3    testify to that.  But you must keep in mind, Who knows more

4    about Samsung's products than those who actually designed it?

5        Samsung, because it doesn't innovate on its own all the

6    time in this space, actually hired another company called

7    Renaissance to support it in designing the infringing products

8    at issue in this case.  And that engineer who has no skin in

9    the game says candidly that those LDOs are converters.

10   Samsung's experts and their attorneys will say the exact

11   opposite of what Samsung's engineers say.

12       The next issue is they will argue that the patents are

13   invalid.  The patents are presumed valid.  Two issues to keep

14   in mind here.  One, credibility.  This is PX 1756.  This is

15   Samsung internally describing Netlist as having unique

16   proprietary know-how.  And yet in this case they will say our

17   technology is worthless, we're claiming things we didn't

18   create--totally contrary to what they said in 2019.  In fact,

19   Samsung will claim that we didn't even invent LRDIMM

20   technology.

21       Samsung will claim that our technology is old.  But their

22   experts will admit under oath that no one in the world, no one

23   in the world, has designed a product that has each claim of

24   the Netlist patents in it.  No one before Netlist.

25       Samsung will also claim that we're not entitled to our

```
1    invention, and the reason they will say that is the following:
2    Netlist engineers prepare omnibus applications that have many,
3    many different inventions in them, and they file those
4    applications.  The Patent Office has a procedure.  It's a
5    procedure that Samsung uses; it's a procedure that Samsung
6    experts use.  And what that procedure does is it allows you to
7    seek additional patents on your original technology.
8          So, in this situation, this is for the '339 Patent, we
9    formally told the Patent Office that we were filing for a new
10   set of claims, we said those claims existed in that original
11   application we filed in 2009, we would like you to confirm
12   that, and we would like you to issue claims on our new
13   invention.
14         And the Patent Office confirmed it after checking it with
15   analysis.
16         Samsung will tell you there's something wrong with this
17   behavior.  Rules apply to all companies, small and big.
18   Samsung uses continuation practice because continuation
19   practice is how you make sure that the invention that you
20   originally create is protected.
21         The last thing.  Samsung will say our technology is not
22   valuable, they could do it in lots of different ways.  But the
23   record speaks to the opposite.  Two-and-a-half years after
24   reaching out to us in 2019, they launch an infringing design
25   that they tout as having 30 percent power savings.  It's what
```

1    allows them to launch their new technology.

2        We asked Samsung witnesses under oath something very

3    important.  If our technology is not useful, do something

4    else.  What is your alternative that's commercially available

5    and does not use our technology?  Not a single Samsung

6    expert -- single Samsung witness will testify under oath as to

7    any non-infringing commercially-acceptable alternative to our

8    technology.  There may be other alternatives, but if those

9    alternatives are covered by our technology, it is not

10   something that is available to Samsung.

11       This is Kyungsoo Park, who was designated on the presence

12   or absence of acceptable non-infringing alternatives.  He

13   could render no opinion on this subject.

14       The critical value of this technology is depicted in the

15   evidence that I presented to you, the evidence of showing a 30

16   percent power savings, the evidence in which Samsung

17   acknowledges that we created LRDIMM technology, the evidence

18   in which Samsung, having lost the race to its largest

19   competitor, reached out and used our technology to make its

20   HBM products.  And for that behavior, we will ask the jury to

21   award a reasonable royalty of $404 million.

22       And we will do that by presenting the detailed analysis

23   of Mr. David Kennedy.

24       Mr. Kennedy, can you stand?

25       Mr. David Kennedy is an expert in licensing.  Mr. Kennedy

1   has licensed over 200 agreements.  He has powerful real-world

2   experience that makes him understand just how incredibly

3   valuable this technology is to Samsung.

4            THE COURT:  Three minutes remaining.

5            MR. SHEASBY:  What I say is not evidence, but what I

6   show, the words of Samsung witnesses, their candid admissions

7   in their documents, is evidence.  And that evidence speaks

8   loudly and emphatically.

9        When you hear from the Defendants, when you listen to

10  their presentation, think about how many times they show you

11  an actual piece of evidence with an exhibit number.  Think

12  about how many times they show you an actual testimony from

13  their witnesses supporting what they say.

14       This case is incredibly important to Netlist.  We thank

15  you for your attention, and we are in your hands.

16            THE COURT:  All right.  Defendants may present their

17  opening statement to the jury.

18            MR. CORDELL:  May we approach for a moment, Your

19  Honor?

20            THE COURT:  You may approach.

21            (The following was had outside the hearing of the

22            jury.)

23            MR. CORDELL:  So, Your Honor, we have a serious

24  problem.  Mr. Sheasby said at least a half dozen times that

25  Samsung took this technology from Netlist; Samsung was

1    determined to infringe; said Netlist hosted all of the biggest

2    technology companies in the world because they were interested

3    in this technology; and that, critically, Samsung could not go

4    forward without Netlist's advanced technology.

5         That opens the door to the entire JEDEC mess because the

6    reality is Samsung is getting this technology from itself and

7    from JEDEC.  And it's in direct response to the repeated

8    statements that Mr. Sheasby said.

9         He also used a number of exhibits that weren't provided

10   to us, including the one that was --

11             THE COURT:  Are you talking about slides,

12   demonstrative slides?

13             MR. CORDELL:  Slides, correct.  So he had one out of

14   JTX 24 that had 30 percent delta, if you recall in memory

15   between two JEDEC memory generations.  And had I had that

16   slide, I would have pointed it out that makes it impossible

17   for us not to talk about JEDEC because the contrast he was

18   creating was between two successive JEDEC generations, not

19   Samsung products but successive JEDEC generations.

20        So for all of that, Your Honor, I'd like the Court's

21   guidance on what I'm supposed to do, how do I rebut this.

22             MR. SHEASBY:  Your Honor, to be clear, the slide or

23   that exhibit was in the opening decks that were exchanged.  I

24   did show a blow-up of it, which I'm entitled under the slide.

25   I said nothing about JEDEC.  This is another opportunity to

1    inject JEDEC.  Nothing I said was different from what was in

2    my slides this morning.

3                THE COURT:  Let me save you both some time.  I am

4    not persuaded at this juncture that the door has been opened

5    to JEDEC, and I'm not granting leave to go into it.

6                MR. SHEASBY:  Thank you, Your Honor.

7                MR. CORDELL:  May I just ask one more thing?  I

8    don't have that slide.  That slide was earlier produced, but

9    it was not in the production of slides that they said after

10   Your Honor had made rulings.

11               THE COURT:  If you want to use it in your opening,

12   as long as you don't stray from the other guidance I've given

13   you, you have leave to do that.

14               MR. CORDELL:  The problem is I don't have it.  He

15   also used a number of Patent Office slides that they've

16   created that we had never seen before.

17               MR. SHEASBY:  Your Honor, we had an agreement that

18   if it was just the blow-up of a pre-admitted exhibit, we were

19   allowed to use it without exchange.  That was an agreement

20   that's in the pretrial order.

21               MR. CORDELL:  That's not what I saw, Your Honor.

22   What I saw was -- you'll recall the continuation practice

23   slides that he put up where he was characterizing the ability

24   of parties to file continuation applications.  That's what he

25   put up, but those were never provided to us.

1           MR. SHEASBY:  Your Honor, they're in evidence.  I am

2     allowed to comment on the evidence, and we have an express

3     stipulation --

4           THE COURT:  Do you have hard copies of these slides,

5     Mr. Sheasby?

6           MR. SHEASBY:  I do, Your Honor.

7           THE COURT:  Give them to Mr. Cordell.

8           MR. SHEASBY:  All right.

9           THE COURT:  And if Mr. Cordell wants to use one that

10    you've used on the elmo, he can use it.  But that is not a

11    license to talk about JEDEC or anything that I have precluded

12    so far.

13          MR. CORDELL:  But my rebuttal, Your Honor, to the

14    allegation that we took this technology from Netlist is that

15    we collaborated with JEDEC to develop this technology.

16    Nothing was taken from them.  So how do I say that?  It is in

17    the record and we have an expert on JEDEC.

18          MR. SHEASBY:  Your Honor, the expert talks about

19    none of these issues.

20          THE COURT:  You know, I'm not going to answer your

21    question because that would involve me trying to tell you how

22    to practice law.  You can certainly say, Mr. Sheasby says we

23    took this, we did not and our evidence will show you we did

24    not.  But I'm not going to tell you anything more about how

25    you rebut it.

1            MR. CORDELL:  If I can make one more -- have one

2      more --

3            THE COURT:  That's fine, and I'll start billing this

4      time to both of you-all because we're just burning up the

5      clock.

6            MR. CORDELL:  So Your Honor directed that we

7      indicate to the jury that our expert opined that $8 million

8      was the right number, using that last slide in my deck.

9            THE COURT:  Or not using the last slide.  Just based

10     on that last slide.

11           MR. CORDELL:  So here's the issue.  That 8 million

12     comes directly from the JDLA, and that is -- that's a

13     perfectly fine number.  The expert apportioned that down.  So

14     it's not quite a hundred percent accurate to say that his

15     opinion was $8 million because that was for 87 patents.

16           THE COURT:  What do you want to say it is?

17           MR. CORDELL:  Just that that would be an upper

18     bound, I could say.

19           THE COURT:  I don't have any problem with you saying

20     that's an upper bound.  The expert may actually testify to

21     something lower.

22           MR. CORDELL:  Okay.  Thank you.

23           THE COURT:  All right.  Let's go.

24           (The following was had in the presence and hearing

25           of the jury.)

```
 1            THE COURT:  Would you like a warning on your time,
 2   Counsel?
 3            MR. CORDELL:  I would, Your Honor.  Could I have one
 4   at 10 minutes and then at two minutes?
 5            THE COURT:  I'll warn you when you have 10 minutes
 6   remaining and then again when you have two minutes remaining.
 7   You may proceed with Defendants' opening statement.
 8            MR. CORDELL:  Thank you, Your Honor.  May it please
 9   the Court.
10       So, ladies and gentlemen, again I'm Ruffin Cordell, and
11   I'm proud to stand before you on behalf of our client Samsung.
12   And I, again, would like to echo all of Judge Gilstrap's
13   comments about how much we appreciate your service.
14       And I'm right with him on military service being maybe
15   the highest and best piece of civic duty that we have.  I
16   spent a little time in the Marine Corps, but they don't claim
17   me anymore.  But I understand that you-all had other plans for
18   this week, and we really do appreciate your time and your
19   service.
20       And I have to respond to my friend Mr. Baxter because he
21   said something in voir dire this morning that kind of troubled
22   me.  I mean, I've known him for over 20 years, and what did I
23   do to him to have him stand in front of you and accuse me of
24   being from Washington, D.C.?  I'm going to tell my Cajun
25   mother about that because Mr. Baxter knows that I'm not from
```

1    Washington, D.C., but I hail from Louisiana originally.  But

2    I've lived up there for a long time, went up to work for the

3    Patent Office, and live in Alexandria, Virginia, but not

4    Washington, D.C.  Good lord.

5         I've been married for 34 years.  I have three children.

6    I, you know, have never served on a jury.  But, again, I'm

7    very proud to be -- to be in front of you and really

8    appreciate your time and your service.

9         Now, Mr. Sheasby said a lot of things, and I'm going to

10   try to get to them.  But in the short amount of time that I

11   have, I'm going to try to focus on the real issues.  And a

12   couple of things that I'm going to ask you to do, ladies and

13   gentlemen, and Judge Gilstrap asked the same thing which is

14   you've got to keep an open mind.  You've got to hear all the

15   evidence.  You can't hear one side of the story and then

16   conclude that everything is the way that one side says.

17        So I'm going to ask you to bear with me on that and --

18   and try to -- try to go through a lot of what was said and

19   look at it critically.  Look at the evidence that they're

20   pointing to.  Don't tell me that a bunch of companies are

21   beating a path to your door.  Well, that doesn't tell me

22   anything.

23        We're talking about patents in this case.  We're talking

24   about five patents.  We're not talking about things that you

25   sell or people that you might want to have come and work with

1    you for different things.  We're talking about these patents.

2    So any time Mr. Sheasby or me or anybody gets up here and

3    starts talking about other things that don't relate to the

4    patents, a little bell ought to go off.

5         And the question becomes, why are they doing this?  Why

6    are they distracting us?  Why -- you're being asked to do

7    something very difficult, which is to take these patents and

8    take the most complex, highly technically sophisticated

9    technology in the world, these memory devices are cutting

10   edge.  It's not a five-patent kind of thing at all.  It's a

11   10,000-patent kind of thing at all.  It's technology that's

12   been built over decades involving work all over the world.

13        That's the sophisticated technology that we are here to

14   talk about.  And so you're going to be asked to apply these

15   patents to that technology, and that's tough.  But when Mr.

16   Sheasby stands before you and says, you know, we talked to a

17   bunch of low-level engineers and they didn't know much about

18   patents, well, that's not their job, ladies and gentlemen.

19   And you're going to see how hard that is.  So don't be

20   distracted by those kinds of things.  Look at the real

21   evidence.

22        But, you know, this -- this case is about a little more.

23   This case is about one party who, you know, filed patents.

24   Mr. Sheasby is right.  They filed patents at the Patent

25   Office.  But there are rules about the Patent Office.  There

1    are rules and laws that regulate the way that works.  And one

2    of the things that you are required to do is, when you go to

3    file for a patent, you got to write down your ideas.  It's

4    called the written description requirement.

5         His Honor talked a little about it in your preliminary

6    instructions.  You've got to write down your idea because we

7    want to make sure it's yours.  We want to make sure that when

8    you say you invented this on April 14, 2023, you really did.

9    And the way you do that is by writing it down.  And that

10   requirement is very, very important.

11        In this case what you're going to learn happened is that

12   we had these patents.  Here's the '918 and the '054 Patent,

13   two of the patents in this case.  And the title of this

14   invention, the one they put across the face of the patent

15   application, was flash-DRAM hybrid memory module.  Flash-DRAM

16   hybrid memory module.  It's kind of a mouthful.

17        Now, what is that?  Well, you know, Mr. Sheasby said, oh,

18   my God, you know, you use these things in aircraft systems and

19   guidance and everything.  And he's right.  But there are

20   different kinds of memory.  And the kind of memory that is

21   called DRAM, that engineers call DRAM, is the kind of memory

22   that, when you turn the power off, all the data goes away.

23   Your pictures, whatever it is, they go off.  And you may

24   remember that you used to work on a desktop computer and

25   somebody kicked the cord out, the thing would go dark and

1    you'd lose all your work.  It's kind of frustrating.

2        But there's another kind of memory called flash that you

3    see up on the screen, and flash is permanent memory.  When you

4    put information into that memory, it stays, even if you turn

5    off the power.

6        And that is what the inventors for the '918 and the '054

7    Patents came up with.  They came up with a way to put flash

8    and DRAM on the same device.  Now, people had done that

9    before.  That wasn't new.  But they said, you know what, it's

10    taking too long.  So we're going to come up with a new

11    controller that, when the power's about to go out, we're going

12    to take your data out of the DRAM memory, the memory that goes

13    away, and we're going to move it into the permanent memory,

14    the flash.  And that way you don't get frustrated.  Right?

15    Your data doesn't disappear.  That was the whole idea here

16    And they tried to make a product out of it, ladies and

17    gentlemen.

18        But here's the problem.  Nobody wanted it.  Nobody wanted

19    it.  And so Netlist came up with this combination DRAM flash

20    hybrid, and they tried to sell it.

21        Now, you heard a lot from Mr. Sheasby about these

22    documents where there was some collaboration between Samsung

23    and Netlist, and there was, but it was about this product.  It

24    was about this hybrid flash DRAM product that ultimately

25    nobody wanted.  We don't have to even figure out whose fault

1      that was.  It just didn't sell.  It wasn't a big seller.

2          But what did -- what did they do?  Well, they didn't say,

3      okay, you know, our product didn't sell, wasn't that good an

4      idea.  Instead, they used something that Mr. Sheasby brought

5      up right at the end there.  I don't know if you recall it.  He

6      talked about some stuff that can happen at the Patent Office.

7          And it turns out that when you file a patent application,

8      ladies and gentlemen, you go back and forth with the patent

9      examiner a little bit and there's a certain amount of time,

10     and you might run out of time or you might run out of money.

11     There are a lot of things might happen to you, and you might

12     need to kind of extend the process.  And that's called filing

13     a continuation.  And that's okay.  People do it.  Right?  They

14     run out of time.  They have all kinds of issues with it.

15         But what happened in this case?  In this case, they

16     didn't just run out of time and then file one more or even two

17     more.  They filed six continuations, ladies and gentlemen.

18     They kept that patent application in the Patent Office where

19     only Netlist talks to the patent examiner, we're not invited,

20     they don't tell us about it, so it's just Netlist and the

21     patent examiner going back and forth, and they kept it pending

22     for year after year after year.

23         You can see all the highlighted continuations that I have

24     on the screen.  It was filed back in 2007, and the last

25     continuation was in 2018, and the patent ultimately issued in

1    2021.  So what we're talking about there is 13 years of

2    continuations, 13 years.

3         Now, you're not going to be asked if that's okay or not.

4    That's not up to you.  The Patent Office rules govern the way

5    that works.  But here's the problem.  When you file a patent

6    application, you say, that's my idea, I invented this, and I

7    wrote it down.  And, in fact, they require patent applicants

8    to sign a sworn declaration.

9         The one I have up on the screen is from the '918 Patent.

10   And here Mr. Milton, who's sitting at the table there, signed

11   the declaration saying, this is my invention.  And then they

12   filed it off in the Patent Office.

13        The problem is, it didn't stay his invention because his

14   invention, that written description of his invention, was that

15   combination flash DRAM hybrid memory product.  That was his

16   invention.  But instead what happened is that Netlist kept

17   filing continuations and filing continuations and moving away

18   from his invention.

19        And what the law says, ladies and gentlemen, is if you

20   keep moving your patent claims away, ultimately you don't have

21   a written description anymore and the patent is invalid.  And

22   that's what we're going to show you in this case.

23        So when we hear about all the things that Netlist

24   invented and, you know, all the things that -- that Mr.

25   Sheasby was claiming, again, you got to -- you got to look at

1    it with a critical eye.

2       You got to ask them to do one thing that's very important

3    which is to be honest about what they actually invented.  And

4    if they're going to stand before you and ask for all this

5    money, they got to prove that what they actually invented was

6    actually worth something.  And that we don't think they're

7    going to be able to do.  And we think that when you see the

8    evidence, I hope you'll agree with me that that's just not --

9    that's just not fair in this case.

10      So with that, let me tell you just a little bit about

11   Samsung.  You know -- you know a lot about Samsung already.

12   And you know that they have -- they have facilities all over

13   the world.  Mr. Sheasby got a little ahead of himself and

14   talked about some of Samsung's manufacturing, and they do,

15   they have manufacturing all over the world.

16      But, critically, ladies and gentlemen, they have

17   manufacturing right here in Texas.  They have one of the

18   biggest semiconductor factories in the world here in Texas.

19   They make sophisticated microprocessors there.  They're

20   building another one.  They've got 6,000 employees here in the

21   state of Texas.

22      Mr. Sheasby says, well, you know, we asked the engineers,

23   they couldn't tell us how many patents they had.  Well, ladies

24   and gentlemen, Mr. Calandra is here from Samsung and he's

25   going to tell you that they have 120,000 United States

1    patents.  It's ridiculous for them to suggest that Samsung

2    doesn't have patents on its own products.  Just ridiculous.

3         You know that Samsung makes lots and lots of great

4    products.  They make refrigerators and ovens and their

5    award-winning telephones, their cell phones, and their TVs.

6    And Mr. Baxter seems to endorse those, and I agree with them.

7    They make the best TVs in the world.  And they do all of that

8    to make our lives better.  That's -- that's their whole

9    purpose in life.

10        And here's -- here's some of the memory products that

11   they make.  It's not just the three classes of memory that

12   are -- that are talked about in this case.  They make all

13   kinds of memory products because, ladies and gentlemen, we all

14   need them.  Right?  They fit into every part of our lives.

15        And here's that fab that I talked about that's in central

16   Texas where they make the most sophisticated microprocessors

17   in the world, and they're building another one here in Texas.

18   So to the extent that we're going to start throwing bricks

19   about where people are from, Samsung's got some pretty good

20   Texas roots.

21        So let's turn back to those two patents, the '918 and

22   '054.  Let me tell you a little more about them.  So I showed

23   you this.  Remember that title is that flash DRAM

24   hybrid-memory module.  And flash comes from the way the -- the

25   data is programmed.  They used to use an actual flash.  Now

1    it's flashed into the memory.

2        Dram is dynamic random access memory.  You don't really

3    need to know anything more than it's a DRAM.  That's what it

4    is.  It's a particular kind of memory.  It has to be

5    refreshed.  It's a particular kind of circuit.  You heard Mr.

6    Sheasby talk about DRAM circuits.  You're going to hear a lot

7    about that in this case.

8        And as I told you, flash stores data for a long time.

9    DRAM doesn't.  So when the power goes out, DRAM loses whatever

10   data you have and flash keeps it.  So their idea was we're

11   going to move that data from the power -- somebody kicks the

12   cord, we're going to move the data away from the DRAM and into

13   the flash and that way you'll have it when the power comes

14   back.  It's pretty -- pretty straightforward.

15       And that had been done before.  What's shown here on the

16   screen is labeled prior art.  You heard this morning they

17   talked about that we call things that were done before prior

18   art.  We all know that you can't patent something that

19   somebody did before you.  Right?  I'd love to patent the

20   lightbulb.  But I can't patent the lightbulb.  Edison did it a

21   couple of centuries ago.

22       The improvement here, what -- what Mr. Milton and his

23   other inventors talked about, was we're going to come up with

24   a controller.  We're going to come up with a way to quickly

25   move that information, and that way if the power is dying,

1    maybe you'll save more of it, that hybrid flash DRAM.  That's

2    what they came up with.

3         But I've already shown you this.  That's not what they

4    actually ended up with.  That's how they started at the Patent

5    Office, but then we had continuation after continuation after

6    continuation.  They were changing those claims.  They were

7    pulling them in one direction and pushing them in another.

8    And what they ended up with is just not recognizable.

9         The '054 Patent is another continuation built beyond the

10   '918.  So rather than 13 years, it goes almost 15 years in the

11   Patent Office.

12        And, ladies and gentlemen, again, the continuations are

13   part of the rules.  You can file them.  But what you can't do

14   is you can't abandon your invention.  When you told the Patent

15   Office this was your invention, you wrote it down, that

16   written description requirement keeps you honest and keeps you

17   from going off and trying to claim things that you didn't

18   invent.

19        So what I've got up here on the screen is kind of

20   complicated, and I apologize about that, but this gives you a

21   little bit of a flavor of the evidence you're going to see in

22   this case.

23        Our expert is going to take you through that, and I have

24   him here.  Mr. McAlexander is in the room.

25        There he is.

1    And I'll take you through his qualifications in a moment,

2    but he's going to guide you in this process because what we

3    have is the claim before, which was a volatile memory

4    subsystem.  Well, that's a DRAM, ladies and gentlemen.

5    Another volatile memory system, that's a DRAM.  And then we

6    have a non-volatile memory subsystem, that's a flash.  So

7    that's how they started.

8        But then after a bunch of these continuations, where do

9    they end up?  Well, they ended up in the afterside with first,

10   second, and third buck converters, a whole bunch of little

11   teeny circuits inside the part that had nothing to do with

12   moving memory or data from the DRAM over to the flash.  And

13   that, ladies and gentlemen, is ultimately why these patents

14   are invalid.

15       Now, Mr. McAlexander is going to take us through that.

16   He's a wonderful expert.  He's been around this business for

17   40 years.  He started out as a circuit designer, a DRAM

18   circuit designer back at TI, and has really made this kind of

19   work his life's work.  And he has done a mountain of studying,

20   he's looked at documents, he's looked at the depositions, and

21   he's going to take you through this process and help you get

22   to a decision about whether these patents are valid and then,

23   importantly, whether or not they're infringed.

24       Now, we've used that word 'infringement' a lot, but we

25   haven't really talked too much about what that means.  And his

1    Honor had the example of the stool, which I like, but I have

2    my own example.  What does it mean to infringe a patent?

3         Well, let's say Mr. Baxter has a patent on a soccer ball.

4    And the way patents work is that the claims at the end have

5    the elements that tell you what you own.  It's your piece of

6    property.  It's your deed, if you want to call it that.  And

7    his patent on the soccer ball says it's got to be made of

8    leather, it's got to be stitched together, it's got to be

9    filled with compressed air, and it's got to be round.  That's

10   his claim.  That's what the Patent Office gave and that's what

11   he wrote down in his written description and that's what he

12   got out of the patent.

13        Now, I have a football.  And he says, Hey, you're

14   infringing my patent.  I say, no, I'm not.

15        How do we figure that out?  Well, you go through each of

16   the elements and you do a comparison.  So is my football made

17   of leather?  Yes.  Is it stitched together?  Yes.  Is it

18   filled with compressed air, outside of Tom Brady and, you

19   know, New England?  Yes.  But is it round?  No, it's oblong.

20        And so if there's a difference, if there's a missing

21   element, there can be no infringement.  And that's what you're

22   going to be asked to do.  You're going to be asked to look at

23   these patents claims and compare it to the actual technology,

24   not articles, not what people say, not meeting notes, but the

25   actual technology, and you're going to be asked to decide

1    whether or not there's infringement in this case.

2        For the '918 and '054, we think that answer is going to

3    be no.  You already know that the memory that we're talking

4    about here, the DDR5, which is double data rate 5 memory that

5    we're talking about here, is all DRAM.  There's no flash,

6    ladies and gentlemen.  So right away, and you have to kind of

7    wonder, because they -- what they put in their written

8    description was DRAM and flash.  But, now, they're just

9    talking about DRAM.  But that's the written description issue.

10       For infringement, we're going to focus on a couple of

11   different things, and I'm just going to highlight one or two

12   here for you.  And I apologize.  I know this is complicated.

13   But keep in mind, these are some of the most sophisticated

14   devices in the world, and we're going to have to go way down

15   deep because the patents that we're talking about here don't

16   tell you how to make a DRAM.  That's absurd.  They certainly

17   don't tell you how to fabricate one.  They're talking about

18   little bitty circuits buried way down deep.

19       And so one of the little bitty circuits buried way down

20   deep is this notion of a converter circuit.  The claims of the

21   '918 Patent require a converter circuit.  And the converter

22   circuit, it does something very, very particular in that it

23   takes a voltage, and then using some complex circuitry, it

24   changes that voltage level.  That's what it does.

25       What Samsung does is something completely different.  It

1    doesn't use this complicated circuitry.  It uses something

2    that's kind of crude.  It just kind of burns off some power.

3    So it's like taking a light -- light fixture and putting a

4    shade on it.  You're kind of just wasting some -- some light

5    there because it's too bright.  And that's kind of what

6    Samsung does.  And this thing is called an LDO, or linear

7    drop-out regulator.

8         And, again, I apologize about the jargon, but that's what

9    these patents are all about.

10        Mr. McAlexander will tell you the LDO is a little bit

11   like -- like just stepping on the brakes in your car.  You

12   know, the pads hit the rotors and it heats up and you slow

13   down, but whatever energy you had is gone.  You're just --

14   you're just creating some heat.  Whereas, the converter

15   circuit of the patent is something much more sophisticated.

16   It's like, you know, if we have a standard car, you can

17   downshift.  And when you downshift, you could slow the car

18   down, but you also need a transmission that can do that and an

19   engine that can handle it.

20        There's a lot more that goes into having a converter

21   circuit.  You might get some energy back.  Right?  You can

22   recharge your batteries or run your air conditioners as you

23   downshift, but it's two different approaches.  The Samsung

24   approach with an LDO is kind of crude.  It just heats up and

25   throws away the energy.  The converter circuit of the patent

1   is sophisticated, requires a bunch of switching circuitry, and

2   is more difficult.

3            THE COURT:  Ten minutes remaining.

4            MR. CORDELL:  Thank you, Your Honor.

5        So the bottom line is we are going to show you that a

6   converter circuit and an LDO are completely different.  And if

7   there's a missing element, ladies and gentlemen, there can be

8   no infringement.  You can look through this patent until your

9   eyes bleed and you will not see any mention of an LDO.  It

10  talks about a converter circuit but not an LDO.

11       So for those two patents, the '918 and the '054, we are

12  going to ask you to find two things.  We are going to ask that

13  you find they are invalid for failure to comply with the

14  written description requirement.  They should have written

15  that idea down when they filed it in the Patent Office because

16  the claims now, through all those continuations, have moved

17  way off.  They can't maintain validity anymore.

18       We're also going to ask that you find that there's no

19  infringement for the reasons I talked about.

20       Let's go to the '339 quickly.  We have the same problem

21  with -- with the '339 about the written description

22  requirement.  So we'll repeat a lot of that.  But let me talk

23  a little bit more about -- about infringement for the '339

24  because it claims something very particular.

25       So, you know, as information is moving through these

1    chips, we call those data paths, and a data path is a little

2    bit like a road.  And you can have roads that are straight and

3    you can have roads that have a fork in them.  The '339 Patent

4    talks about the fork in the road.  That's what it's all about.

5         It's talking about having two data paths where one is

6    enabled and the other is disabled.  So you got to have two.

7    That's what the '339 is all about.  And, ladies and gentlemen,

8    we just don't have that in the Samsung products.

9         What I've got up on the screen, and, again, I apologize

10   about the complexity and Mr. McAlexander is going to take you

11   through this, but it's a single pathway.  You start at the

12   bottom and you can trace it if you want to.  It goes right up

13   through to the top.  It's one path.  There's no fork in the

14   road, there's no Ts, there's no -- no choices.  It's just

15   straight through.  And this is on the Samsung DDR4 product.

16        But you don't have to take my word for it, ladies and

17   gentlemen, because it turns out that Netlist hired an expert,

18   Doctor Mangione-Smith, and he agrees with us.  He agrees that

19   the Samsung products only have that single pathway.  Well,

20   what do we know?  We got a missing element, single pathway

21   when the claim says it's got to have two pathways, we got to

22   have a first and second, then there can be no infringement.

23        There's another problem with the '339 Patent, and we

24   talked about this and you saw it in the video, you can't

25   patent what somebody else did before.  And it turns out that

1    the idea of the '339 Patent had been done before by a company

2    called Kentron.

3         And we're going to show you a lot about this, and Mr.

4    McAlexander will take you through it, but this idea of a

5    distributed buffer architecture you're going to hear about a

6    lot of, and that was already done by a company called Kentron.

7    And you can't patent what somebody else has already done.

8         So for that, ladies and gentlemen, we're going to ask

9    three things on the '339:  that you're going to -- you're

10   going to find the patent invalid for lack of a written

11   description, you're going to find that there's no infringement

12   because of the fork in the road, and that the patent is

13   invalid because you can't patent what the Kentron folks did

14   before in the QBM system.

15        So now let me turn to the last set of patents, the '060

16   and '106.  Now, this is a little bit different because it

17   still involves, you know, kind of what they did at the Patent

18   Office and whatnot, but it's a little bit different because

19   they ran into a problem.

20        So when they filed the '060 and the '160 Patents, the

21   patent examiner said, un-huh, no thank you; we can't give you

22   a patent because somebody else has done this before.  And what

23   they filed on was this notion that you're going to have

24   multiple die.  They call them die because they take a silicon

25   wafer and they dice them up.  They actually saw them up, using

1    lasers and stuff.  But they -- because they dice them up, they

2    call each individual piece of silicon a die.

3         And they tell us right in the patent that people have

4    been making these for a long time.  They've been putting one

5    on top of the other before.  And Mr. Sheasby went on and on

6    about TSVs.  Well, ladies and gentlemen, in their own patent,

7    this TSV, or the through-silicon via, as it's known, is shown

8    as being prior art.  They did that long before Netlist came

9    along.  So that's not the invention.

10        So the patent examiner said, well, you know, I looked at

11   your claim and I don't think I can let you have this patent

12   because other people like this fellow Rajan stacked these die

13   before, these little pieces of silicon, these were stacked up

14   before.  You can't have the patent.

15        So Netlist said, well, okay, look, we're going to --

16   we're going to say that Rajan has these DRAM die, these little

17   pieces here, you can see they are labeled DRAM, we'll do

18   something else.  Mr. Patent Examiner, we won't cover somebody

19   who's making one of these devices out of DRAM circuits.  So if

20   you use DRAM circuits stacked one on top of the other, then

21   our patent won't apply to you.

22        That's what they told the Patent Office, ladies and

23   gentlemen.  They said, Rajan doesn't disclose the plurality of

24   stacked array dies.  They merely stack DRAM circuits, and they

25   actually called them out by number.  And they said, those are

1     different from array dies.

2          Well, His Honor looked at all of this and came to a

3     conclusion about what the definition of array dies will be in

4     this case.  And it's binding on us all.  It's in your juror

5     notebooks.  And what he said was, an array die has to be

6     something that is different from a DRAM circuit.  I have to

7     live with that definition, Mr. Sheasby has to live with that

8     definition, and all of you do, too.  So they need to show you

9     something that is different from a DRAM circuit.

10         But, ladies and gentlemen, that's not what they did.  So

11    I don't know if you were watching closely, but Mr. Sheasby

12    showed you diagrams like this one on the right-hand side, and

13    what do they point to?  They point to DRAM circuits.  And,

14    ladies and gentlemen, that means that there's no infringement

15    in this case.  They have to show you something that's not a

16    DRAM circuit.  Remember, that was the deal they made with the

17    Patent Office, and that was the definition that Judge Gilstrap

18    gave that term.  And they got to live with that.

19         So we also have Doctor Gabriel Robins, who's here, who is

20    going to help us with these two patents, and he will take you

21    through that in a lot of detail.  He'll take you through

22    the -- the dRAM circuit issue and show you that they are

23    accusing DRAM circuits, and they can't do that.  And that

24    means that there's no infringement.

25         There's another argument that I won't spend a lot of time

1    on, which is that there has to be communication between those

2    layers--right?--those stacked dies.  You can't have

3    communication between all of them.  And it turns out Samsung

4    does have communication between all of them.  And so there's

5    no infringement for that reason as well.

6        So let me -- let me get to the last couple of issues

7    here.  You know, Mr. Sheasby accused of all kinds of things,

8    and he said, oh, you know, Samsung took the technology;

9    samsung was -- was, you know, needed this technology.

10       Ladies and gentlemen, there is no evidence of that, zero

11   evidence.  So if he's going to make a statement like that, he

12   better show you the goods.  Instead, what did he show you?  He

13   showed you this, and he said, aha, look, we found this in --

14   in Samsung's files.

15       But you got to look closely, ladies and gentlemen.  What

16   is this talking about?  Is this talking about the products in

17   this case, the DDR4 and 5 and HBM products?  No.  This is

18   talking about the hybrid DRAM and non-volatile flash memory

19   product.  That was the product the parties were supposed to

20   work together on.  Of course, there are documents like this.

21       And he said, well, you know, they're worried about patent

22   risk.

23                THE COURT:  Two minutes remaining.

24                MR. CORDELL:  And that's true because, you know

25   what?  Samsung doesn't want to get sued.  It's a big company.

1    Neither company wanted to worry about patent risk.  And so

2    that's why they exchanged a patent license.  So that's just

3    good prudent business there.  We don't want to have -- go into

4    a relationship with somebody and give them the chance to sue

5    you.

6        So if I can go back to my slides.

7        You're going to -- you're going to hear more about the

8    joint development at some point.  But keep in mind, ladies and

9    gentlemen, that this was the product that they were talking

10   about here.  So when they show you documents, look carefully

11   at the date because that relationship lasted until July 15,

12   2020, as His Honor pointed out.  So when they're showing you

13   documents before that, well, the parties were working together

14   trying to make this NVDIMM, which is that flash DRAM hybrid

15   product.

16       So, finally, you know, damages is something that we don't

17   like to talk about as defendants because we don't think we

18   infringe, and we think these patents are invalid, and there

19   should be no damages.  But I'm a married man, been for 34

20   years.  People will disagree with me from time to time.  But

21   if you do, you have to be reasonable about it.

22       And we have hired our own damages expert, Mr. Paul Meyer,

23   who is one of the best known damages experts in the country,

24   and he has done a ton of analysis and will be able to explain

25   to you exactly what the damages are.  But the one thing that

1    we can all be clear about is that $8 million is kind of the

2    high water mark, and he's got a lot of analysis as to why it

3    should be less than that.  But $8 million is a reasonable

4    amount of money.

5         What's not a reasonable amount of money, ladies and

6    gentlemen is $404,200,000.  That's just not fair.  That's just

7    not fair.  Just because Samsung is a big company, you can't

8    just take advantage of them.

9         So with that, I'm going to thank you for your time and

10   attention, and we look forward to putting on the case.  And

11   hopefully, you know, that you'll enjoy the week you have with

12   us.  But, again, we really appreciate your time and service.

13   And on behalf of Samsung, I thank you.

14             THE COURT:  Counsel, does either party wish to

15   invoke the Rule?

16             MR. SHEASBY:  Plaintiff wishes to invoke the Rule,

17   Your Honor.

18             THE COURT:  All right.

19             MR. CORDELL:  Yes, sir.

20             THE COURT:  And do I understand that's to exclude

21   experts from the Rule?

22             MR. CORDELL:  Experts are not subject to the Rule is

23   what I understand.

24             MR. SHEASBY:  Agreed, Your Honor.

25             THE COURT:  All right.  Which means for those

1    present, that if you are a fact witness, not an expert

2    witness, and you're not a designated corporate representative

3    representing one of the parties during this trial, then you

4    are to remain outside the courtroom until you are called to

5    testify.

6         And, Counsel, I will rely on you to keep an eye on those

7    behind the bar and let me know if anybody should be out of the

8    room who's not.

9              MR. CORDELL:  We will, Your Honor.

10             THE COURT:  Thank you.

11        Now, ladies and gentlemen of the jury, we're going to

12   take a short recess.  And when we come back, we will hear from

13   the Plaintiff's first witness.  You can simply close your

14   notebooks and leave them in your chairs.  This is one of those

15   times I don't expect us to be out of the room very long.

16        Let me remind you follow all my instructions, including

17   not to discuss anything about the case with each other.  And

18   we'll be back shortly.  Use this opportunity to stretch your

19   legs and get a drink of water.

20        The jury's excused for recess.

21             (Whereupon, the jury left the courtroom.)

22             THE COURT:  We'll keep this to approximately 10

23   minutes.  The Court stands in recess.

24                  (Brief recess.)

25             THE COURT:  Be seated, please.

1          Plaintiffs, are you prepared to call your first witness?

2               MR. SHEASBY:  Plaintiff is prepared to call their

3     first witness, Your Honor.

4               THE COURT:  Let's bring in the jury, please.

5               (Whereupon, the jury entered the courtroom.)

6               THE COURT:  Welcome back, ladies and gentlemen.

7     Please have a seat.

8          Plaintiff, call your first witness.

9               MR. SHEASBY:  Your Honor, Plaintiff Netlist calls

10    Mr. Scott Milton, vice president of research.

11              THE COURT:  Mr. Milton, if you'll come forward and

12    be sworn by the Courtroom Deputy, please.

13              (Whereupon, the oath was administered by the Clerk.)

14              THE COURT:  Please have a seat here, sir, on the

15    witness stand.

16              THE WITNESS:  Thank you, Your Honor.

17              THE COURT:  You are welcome.

18              THE WITNESS:  Does this sound okay?

19              THE COURT:  That's fine.

20              THE WITNESS:  All right.

21              THE COURT:  Mr. Sheasby, you may proceed with direct

22    examination.

23              MR. SHEASBY:  Thank you.

24                        SCOTT MILTON, SWORN,

25    testified under oath as follows:

<u>DIRECT EXAMINATION</u>

BY MR. SHEASBY:

Q.   Good afternoon, Mr. Milton.

A.   Good afternoon, Mr. Sheasby.

Q.   Can you introduce yourself to Judge Gilstrap and the jury, please?

A.   Definitely.  Your Honor, ladies and gentlemen of the jury, my name is Scott Milton, and I am the vice president of engineering at Netlist.  And that is our highest technical position at the company.

Q.   Now, do you have a personal connection to this case separate from your role as the -- an officer of Netlist?

A.   Yes, I do.  I am an inventor on one of the patent families, and I was also the technical interface with Samsung on the JDLA.

Q.   And what is the history of Netlist?

A.   So Netlist was founded in the year 2000.  And at that time there were a couple of very large companies, Samsung and SK hynix, that were really dominant in the memory industry, selling modules and the raw components.

     We at Netlist found that there was some room to innovate in the area of the modules, which is what the raw memory components go on, and we founded a company to -- to do that.

Q.   Can you show us an example of a Netlist module?

A.   Yes.  So it's a little hard to see, but this is an

1    example of one of our DDR5 memory modules, which we talked

2    about earlier.  And this in particular is what we call a VLP,

3    and what that stands for is very low profile.  The standard

4    modules are about an inch-and-a-half.  This one's like .72

5    inches.  But this is an example of a Netlist product.

6    Q.    What patents does Netlist believe Samsung infringes?

7    A.    So we believe that there are three patent families that

8    are being infringed.  The first patent family has to do with

9    on-module power management, and those patents are the '918 and

10   the '054.

11   Q.    What's the second family?

12   A.    The second family has to do with load reduction DIMMs, or

13   called LRDIMMs, and that patent is the '339 Patent.

14   Q.    And what's the third family of patents?

15   A.    So the third family of patents has to do with what were

16   called grouped array dies with TSVs and data ports.  And we'll

17   explain what all that means, and those are the '060 and '160

18   Patents.

19   Q.    And we're referring to patents by their last three

20   digits.  Is that correct?

21   A.    That is correct, sir.

22   Q.    Can you tell us a bit about yourself?

23   A.    Yes.  So I already mentioned, my name is Scott Milton.  I

24   grew up and went to school in Orange County, California, which

25   is very close to where our headquarters is for Netlist.

1    I received my Bachelor's of Science in electrical

2  engineering from UCLA.  I then received a Master's degree in

3  electrical engineering from USC.

4    I started to work at Netlist in 2003.  And throughout the

5  time there, we probably designed, oh, in excess of a hundred

6  different types of memory modules.

7    You know, giving you some more personal information about

8  me, I'm married.  I've got three grown children, and one

9  grandchild that's about a year old.

10  Q.   Congratulations, Mr. Milton.

11  A.   Thank you.

12  Q.   Who led the technology team at Netlist before you?

13  A.   So we have a couple of gentlemen.  The first is Mr. Jay

14  Bhakta.  Jay was actually a founder of Netlist, a very

15  prolific designer, a UCLA alumnae like myself, and in fact a

16  very good friend of mine.  Unfortunately, he passed away from

17  a -- from a sudden heart attack.  But before that, he was

18  actually able to see both of his children work at Netlist for

19  a time.  And, in fact, his son is now a professor of

20  engineering, I believe, at Richmond University.

21  Q.   And who is Doctor Lee?

22  A.   So Doctor Hyun Lee, before he came to Netlist, he was

23  actually a researcher at Bell Labs.  And if you don't know

24  Bell Labs, they actually invented the transistor there and

25  they also hold nine Nobel prizes.  Doctor Lee, unfortunately,

1    had to retire to take care of his sick wife, and in later

2    years I hear that he's become a pastor.

3    Q.   What does this slide depict?

4    A.   Right.  So this slide here shows several of the -- excuse

5    me -- several of the companies that we've sold our memory

6    modules and memory products to.  You can see here

7    Hewlett-Packard, Dell, Apple, IBM, all very big name

8    companies, and we're very proud of the fact that a company our

9    size is both qualified and has sold products to these

10   companies.

11   Q.   Defendants' counsel in opening indicated that no one

12   wanted Netlist products.  Over Netlist's life as a business,

13   about how much product has it sold?

14   A.   So life -- since inception in 2000 until today, I believe

15   we're somewhere north of $1.1 billion in sales.

16   Q.   And counsel for Defendant also suggested that no one

17   wanted your NV products.  How much NV product have you sold?

18   A.   I believe that number's about $30 million.

19   Q.   And have you shipped NV product to Samsung?

20   A.   We did ship some NV product to Samsung.

21   Q.   Where's Netlist headquartered and what is its size?

22   A.   So, as mentioned, we're in southern California, in Irvine

23   specifically.  We've got about 120 folks, and 30 of those are

24   engineers.

25   Q.   At some point in time, did a senior executive from

1    Samsung visit Netlist to propose entering into a joint

2    development agreement?

3    A.    Yes.  So Doctor J.B. Lee visited Netlist in 2015 to

4    discuss a potential partnership.

5    Q.    And what was J.B. Lee's position at the time?

6    A.    At the time he was in charge of Samsung's products

7    determining what products to design and sell.

8    Q.    And what is his position now?

9    A.    Now he is president of Samsung.

10   Q.    And I'm showing you JTX 029.  What is this document?

11   A.    So this is the joint development and license agreement

12   that we signed with Samsung.

13   Q.    Is Netlist bringing infringement claims on any Samsung

14   product that was the subject of the joint development part of

15   the agreement?

16   A.    No, we are not.

17   Q.    And who signed the agreement on behalf of Samsung?

18   A.    That would be Dr. J.B. Lee.

19   Q.    In terms of the investment that was made in this joint

20   development, who invested more money--you or Samsung?

21   A.    The Netlist side invested more money.

22   Q.    Did Samsung contribute any innovation to this project?

23   A.    They did not.  They just reviewed the technology that we

24   showed to them.

25   Q.    Did Samsung's vector group recognize the importance of

1    the Netlist's technology?

2    A.   Yes, they did.

3    Q.   How did that happen?

4    A.   They invested $15 million in the company.

5    Q.   When was that in relationship to when this agreement was

6    signed?

7    A.   It was -- it was after the agreement was signed.

8    Q.   What has Netlist done with that investment subsequent to

9    the termination?

10   A.   We actually repaid it back with interest.

11   Q.   Now, the first family of patents you spoke about were the

12   '918 and '054 Patents.  Is that correct?

13   A.   That's correct, sir.

14          MR. SHEASBY:  Mr. Huynh, if we can have slide 16,

15   please.

16   Q.   (BY MR. SHEASBY)  And these are the two patents.  Is that

17   correct?

18   A.   That is correct, sir.

19   Q.   When were they originally filed and when did the Patent

20   Office make them available to the public to review?

21   A.   So the -- the application was filed, as we see here, on

22   June 2nd, 2008, and the first patent in the family was

23   published in October 30th, 2012.

24          THE COURT:  Mr. Sheasby, pull the microphone a

25   little closer to you, please.

1          MR. SHEASBY:  Yes, Your Honor.

2          THE COURT:  Thank you.

3    Q.   (BY MR. SHEASBY)  So you describe this as intelligent

4    power management, and we're going to have a strict rule to

5    define all your terms.  So please define.

6    A.   Absolutely.  So what we're calling our product or our

7    invention in this case is intelligent on-module power

8    management.  So if we take all those terms and break them

9    down, today's memory modules are, you know -- have a lot of

10   advancements, and all these components that we see here on

11   this module, they all require very precise amounts of power.

12        Now, that power is delivered through what we call

13   voltage.  So each of these components have a voltage

14   requirement that, up until our invention started to be

15   ubiquitous in the industry, those voltages were provided from

16   the server or the system.  If we saw that earlier, the

17   computer essentially would be responsible for providing those

18   voltages.

19        What our idea was is to take that circuitry and move it

20   to the module.  So that's what the on-module part of the

21   invention is.

22        Now, what that allows you to do, in addition to now

23   having a lot of control over what those voltages are so we can

24   provide that precise power, we can actually control it with a

25   controller circuit, and we also have a lot of flexibility

1    because now that the generation of all of those voltages are

2    on the module, if something changes on the module, we can

3    actually make changes to the power delivery on the module and

4    not have to redesign the system.  So, you know, we thought

5    that was a pretty good idea.

6        And the third thing, which is by far not the least, is by

7    having this all in the module, we're able to monitor those

8    voltages and detect problems.  In event of a problem being

9    detected, we can take action on that and move into, you know,

10   a different mode of operation in order to handle like a power

11   fault or something of that nature.

12   Q.   Does the patent expressly describe the strategy of

13   placing the power control on-module?

14   A.   Yes, it does.

15   Q.   I'm going to show you a passage from the patent.  This is

16   column 26, lines 26 through 35.  Can you explain this?

17   A.   Yes, I can.  So if we have the figure, what this shows is

18   that the power supply may be located on the same printed

19   circuit board or it may be located somewhere else, but the --

20   the key point is that it could be in either location.

21   It's -- we're not saying that it has to be one or the other.

22   So part of it could be on a separate board or it could all be

23   on one board.

24   Q.   I'm going to show you another passage from your patent.

25   This is column 27, lines 41 through 58.  Does this depict

1    another aspect of your invention?

2    A.    Yes.  So if you see here, this is -- this is an example

3    of when a fault is detected, the system can, you know, with

4    the controller on the module, we can detect that and take an

5    action.  In this case, the action that we're taking is taking

6    that data from that volatile subsystem and writing it to a

7    non-volatile location, like a disk drive, and that disk drive

8    actually is somewhere else in the system.  It's not in the

9    module in this case.

10   Q.    Does this patent teach that the -- what does this patent

11   teach as to where the flash or non-volatile memory can be?

12   A.    So in this particular case, the non-volatile memory or

13   flash is not on the module.  It's somewhere else in the

14   system.

15   Q.    Now, this describes a state in which the -- the DRAM is

16   not operating.  Is that correct?

17   A.    That's correct.  So a key factor of the invention is, you

18   know, since we're detecting a fault with one of the power

19   rails, that could be the fact that that rail is now off so

20   some of the components are no longer powered.  So we still

21   need to be able to take action in that case, and this is an

22   example of that type of an action.

23   Q.    Is the operable state in which the DRAM is not running a

24   critical feature in your design?

25   A.    That's correct.  You know, another thing that can be done

1    as well is the fact that, once that fault is detected, you may

2    want to know when the system powers up again, what happened.

3    So one of the things that we teach is that in the event of a

4    power fault, we'll actually write some information to

5    non-volatile memory so that when the system powers up, we can

6    read that back and -- and understand one of the voltage rails

7    failed or maybe something else had occurred that caused that

8    failure.

9    Q.   What was your role in the preparation of the patents on

10   which you're an inventor?

11   A.   All right.  So just a little bit on -- on how we develop

12   patents.  So as an engineer working along with my colleagues,

13   we'll come up with -- with ideas as we work to design our

14   products.  And what we'll do is we'll meet with some, you

15   know, professionals in the area.  You know, I myself am not a

16   lawyer.  I don't know all of the details of how you write the

17   final patent.  But what we do provide is all of the technical

18   details.  You know, sometimes that will just be a conversation

19   that we have or maybe it will be a written discussion.  And

20   then those legal professionals will go ahead and write up

21   the -- the specifications and -- and draft the claims.  And

22   then, you know, we'll review that, and then we'll hand it off

23   to them and let them finish up the process.

24   Q.   Do you review the final application?

25   A.   Not usually.  There's not much that I can add at that

1    point.  We've already given all the information that we can

2    provide, and, you know, I really can't provide any other input

3    on, you know, the details of how the patent language is

4    written.

5    Q.   Do you generally review claims before they are presented

6    to the Patent Office?

7    A.   The claims, yes.

8    Q.   Does your patent list the type of memory modules that can

9    be applied to?

10   A.   Yes, it does.

11   Q.   I'm going to show you a passage.  This is column 21,

12   lines 24 through 55 of your patent.  And what are some of the

13   classes of memory modules that your patent teaches that can be

14   applied to?

15   A.   Yes.  So as you can see on the -- on the monitor here,

16   there's three that are listed.  The small-outline, or SO-DIMM,

17   the unbuffered, or UDIMM, and the registered, or RDIMM.

18   Q.   What categories of Samsung products does Netlist believe

19   infringe these patents?

20   A.   We believe that all three categories that are shown here

21   infringe the -- our -- our patent.

22   Q.   So to be specific, what are the three categories of

23   product that Netlist sells?

24   A.   Yes.  So, again, it's the SO-DIMM, the UDIMM, and the

25   RDIMM.

1    Q.   I said Netlist.  But to clarify, what are the three -- I

2    think we both confused each other.  I apologize.

3    A.   Oh, yeah, yeah.  The products that Samsung sells?

4    Q.   Let me re-ask the question, Mr. Milton.

5    A.   Thank you, sir.

6    Q.   What are the three products -- categories of products

7    that Samsung sells that Netlist believes infringe the patent?

8    A.   Yes.  So sorry about that.  But, yes, it's the SO-DIMM,

9    the UDIMM, and the RDIMM.

10   Q.   And the generation of products -- did Samsung ever

11   provide any feedback on the importance of Netlist's on-module

12   intelligent power management inventions?

13   A.   Yes, they did.

14   Q.   And I'm showing you PX 586.  Do you recognize this?

15   A.   I do.

16   Q.   What is PX 586?

17   A.   So this is an email that was sent from Samsung to Netlist

18   requesting a meeting with our technical team to talk about

19   specifically power management IC for DDR5 DIMM.

20   Q.   And what category of -- of memory is Samsung's accused

21   products?

22   A.   The DDR5.

23   Q.   That's Samsung's DDR5 design.

24   A.   That's correct.

25   Q.   Now, were you at the meeting referenced in this email?

1    A.   I was not.

2    Q.   And do notes of this meeting exist?

3    A.   Actually no.  But, you know, the obvious question to ask

4    is, you know, did we have the meeting.  You know, in fact, we

5    were meeting with Samsung fairly regularly so I would assume

6    that this meeting did occur.

7    Q.   Was it common or uncommon for Samsung to discuss module

8    power management with Netlist?

9    A.   It was common.

10   Q.   Did -- are there any awards for patents in the memory

11   module industry?

12   A.   No.  You know, it would be nice if somebody gave us an

13   award, but that's not what happens.  Really the type of

14   recognition that you get for intellectual property in patents

15   is how widely it gets used in the industry.  So the fact that

16   a company the size of Samsung actually came to us to talk

17   about on-module power management is some pretty good

18   recognition in itself.

19   Q.   And did Samsung eventually launch a Samsung design, DDR5

20   module, with on-module power management?

21   A.   Yes, they did.

22   Q.   And is this JTX 24 reflecting that?

23   A.   Yes, sir.

24   Q.   And about how many years is that after Netlist -- Samsung

25   reached out to Netlist?

1    A.    So from 2019 to, I think it was, 2022.

2    Q.    Have you actually examined the products that are accused

3    of infringement in this case?

4    A.    Yes, I have.

5    Q.    Do they have non-volatile memory on them?

6    A.    They do in the power management circuit.  There

7    is -- when I talked previously about having that non-volatile

8    memory in order to save information about a possible fault,

9    that's where that non-volatile memory resides.

10   Q.    And do they have a multichannel -- a memory channel

11   interface on them?

12   A.    Yes, they do.

13   Q.    So I want to show you another document.  This is PX 621.

14   Do you recognize this document?

15   A.    Yes, I do.

16   Q.    What is this document?

17   A.    So this is from a presentation that was provided to

18   Samsung.

19   Q.    And I'm going to show you a page from this document.  I

20   showed it in opening.  It says, intelligent on-module power

21   distribution.  Do you see that?

22   A.    I do.

23   Q.    And at top, it says, seminal patents for NV and memory

24   channel interface?

25   A.    That is correct.

```
1    Q.   How does NV and memory channel interface relate to

2    Samsung's DDR5 products?

3    A.   So, as mentioned, we believe that DDR5, all modules

4    include NV in them, and all modules include the memory channel

5    interface.

6    Q.   And by all modules, you mean all of Samsung's modules?

7    A.   That is correct.

8    Q.   And so if Samsung's Defendant -- the Defendants' counsel

9    was suggesting that this presentation has nothing to do with

10   Samsung's DDR5 designs, do you -- do you agree with that or do

11   you disagree with that?

12   A.   I disagree with that.  You know, the fact of the matter

13   is --

14            MR. McKEON:  Objection, lack of foundation.

15            THE COURT:  Overruled.  Let's continue.  Restate

16   your question, Counsel.

17            MR. SHEASBY:  Sure.

18   Q.   (BY MR. SHEASBY)  Do you believe -- do you agree or

19   disagree with Samsung's counsel when he represented that

20   seminal patents for NV and memory channel interface have

21   nothing to do with Samsung DDR5?

22   A.   Yes, I disagree with that statement.  The reason why I

23   disagree with that statement is because the --

24            THE COURT:  Just a minute, Mr. Milton.  He didn't

25   ask you why you disagreed.
```

```
 1                    THE WITNESS:  Oh.

 2                    THE COURT:  He asked you if you agreed or not.  If

 3     he wants to know why you disagreed, he'll ask you the next

 4     question.

 5                    THE WITNESS:  I'm sorry, Your Honor.

 6                    THE COURT:  That's all right.

 7          Go ahead, Counsel.

 8     Q.   (BY MR. SHEASBY)  Mr. Milton, why do you disagree?

 9     A.   So I disagree because the circuitry that we developed

10     that on-module power management that we use for our NV

11     products is now being used on the DDR5 products.

12     Q.   I want to show you another document.  This is PX 1663.

13     This is a document that was provided to Netlist.  Is that

14     correct?

15     A.   That is correct.

16     Q.   And it's a document prepared by Samsung.  Is that

17     correct?

18     A.   That is correct.

19     Q.   And it refers to Netlist patents related to memory

20     modules RDIMM and LRDIMM.  Do you see that?

21     A.   I do, sir.

22     Q.   What are the two categories of products that are at issue

23     in this case?

24                    MR. McKEON:  Your Honor, I'm going to object.  Lack

25     of foundation that this witness knows anything about this
```

1    email.  He's not on the email.  No foundation laid for that.

2              THE COURT:  What's your response, Mr. Sheasby?

3              MR. SHEASBY:  Well, he was the corporate

4    representative.  He's the corporate representative on this

5    topic, but I'm happy to lay a foundation as well.  He was the

6    30(b)(6) on this.

7              THE COURT:  I'm going to overrule the objection.

8    He's here to speak for Netlist as their corporate

9    representative.

10        And, Mr. McKeon, you can certainly probe this on cross

11   examination, but I'm not going to sustain the objection.

12             MR. McKEON:  Thank you, Your Honor.

13   Q.   (BY MR. SHEASBY)  So just to set the stage, we are

14   looking at PX 1663.  And who prepared PX 1663?

15   A.   That was prepared by Samsung.

16   Q.   And it relates to patent -- it describes Netlist patents

17   related to memory modules RDIMM and LRDIMM.  Do you see that?

18   A.   I do, sir.

19   Q.   And it refers to going forward.  Do you see that?

20   A.   I do.

21   Q.   What are the two categories of products that Netlist

22   believes Samsung is infringing?

23   A.   The RDIMM and the LRDIMM.

24   Q.   Now, did Samsung have to search to find out if Netlist

25   was seeking patents on on-module power management?

```
1    A.   They did not.  We provided that information to them.

2    Q.   And I want to show you this.  Is this an example of how

3    you provided that information?

4    A.   Yes.  Yes, sir.

5    Q.   So this is PX 621.  And what does it say?

6    A.   Well, it says that one of the items is intelligent

7    on-module power management -- or power distribution.  Excuse

8    me.

9    Q.   And I want to show you another presentation document.

10   This is PX 1756.  Who prepared this document?

11   A.   This was also prepared by Samsung.

12   Q.   And what did -- how did Samsung describe your technology?

13   This is from 2019.  Is that correct?

14   A.   Yes, sir.

15   Q.   It's before this lawsuit was filed?

16   A.   Yes, sir.

17   Q.   And how did Samsung describe your technology before this

18   lawsuit was filed?

19   A.   So as underlined, it says that we had unique proprietary

20   know-how.

21   Q.   Are you familiar with how -- with the history of how the

22   '918 and '054 Patents were granted by the United States Patent

23   and Trademark Office?

24   A.   Yes, sir.

25            MR. SHEASBY:  Go to slide 35, Mr. Huynh.
```

1    Q.    (BY MR. SHEASBY)  And you said that these -- their parent

2    was in June 2nd, 2008.  Is that correct?

3    A.    Yes, sir.

4    Q.    Have you heard the term 'priority'?

5    A.    I have.

6    Q.    What does it mean to claim priority in 2008?

7    A.    So what that means is when we created our original

8    application back in 2008, there was a lot of different

9    inventions in there.  And what we're saying is that with the

10   new claims that we filed, that they were actually invented on

11   the date the application was filed.

12   Q.    And has the United States Patent Office granted a number

13   of patents based on that original application filed in 2008?

14   A.    Yes, they have.

15   Q.    And are these an example of some of those patents that

16   have been granted?

17   A.    Yes, that is the case.  If you see here, we've got

18   the -- you know, again, using the last three digits, the '833,

19   the '684, the '186, and now the '918 and '054.

20   Q.    Now, every time you get a new patent, do you get a new

21   term that lasts for 20 years?

22   A.    No.  The way it works, because of the fact we are going

23   back to that original application, you only get 20 years from

24   the date of the application.

25   Q.    So even if you get subsequent patents later on, it's

1    still 20 years from 2008?

2    A.   That is correct.

3    Q.   Do you have personal knowledge about --

4         THE COURT:  Mr. Milton, if you'd like to pour some

5    water, you are certainly free to do that.

6         THE WITNESS:  Thank you, Your Honor.

7         THE COURT:  I see you brought your own.  That's

8    fine, too.

9         Go ahead, Counsel.

10   Q.   (BY MR. SHEASBY)  Do you have personal knowledge about

11   how it was possible to obtain multiple patents based on the

12   patent application Netlist filed in 2007?

13   A.   Yes.

14   Q.   2008, excuse me.

15   A.   Yes, I do.

16   Q.   Can you explain that?

17   A.   Yeah.  So, again, the way it happens is we filed our

18   application back in 2008, and it covered a lot of different

19   topics.  So what we did is we started coming up with claims

20   for the various inventions and then getting patents as we

21   went.

22   Q.   And where did those claims have to be disclosed?

23   A.   They all had to be disclosed in that original

24   application.  The Patent Office doesn't let you just make up

25   new claims that have no basis in the application; they always

1   have to go back to that application.  Otherwise, it's going to

2   have to be a new priority date.

3   Q.   I'm going to show you PX 1816.

4        First off, do you recognize this document?  Yes or no.

5   A.   Yes, I do, sir.

6   Q.   And is this a document from the prosecution history for

7   the '918 Patent?

8   A.   Yes, it is.

9   Q.   And what is the prosecution history?

10  A.   So the prosecution history is the list of all of the

11  office actions and all the activities that surround a

12  particular patent.

13  Q.   And what type of document are we looking at on this page,

14  PX 1816 at page 118 through 120?

15  A.   Yes.  So this is what's called a restriction requirement,

16  and it's the way for the U.S. Patent and Trademark Office to

17  let the prospective inventor know that they've got too many

18  items in their application, that they need to break it up into

19  multiple patents.

20       So what it's saying here is that the claims we had in

21  that original application on power modules were not part --

22  you know, they basically were entitled to their own patent.

23  So they had to be broken out by this particular requirement so

24  that they would have a separate patent from the other

25  inventions that were in that application.

```
 1   Q.   Did the Patent Office recognize the on-module power

 2   management in the patents as a distinct invention exactly?

 3               MR. McKEON:  Objection.  Leading on that one.

 4               THE COURT:  Sustained.  I'll sustain the objection

 5   to leading.

 6               MR. SHEASBY:  Thank you, Your Honor.

 7               THE COURT:  Restate the question in a non-leading

 8   form.

 9               MR. SHEASBY:  Absolutely.

10   Q.   (BY MR. SHEASBY)  What was the Patent Office's views

11   about the on-module power management inventions?

12   A.   Yes.  So by the fact that the Patent Office created this

13   restriction requirement, they were telling us that the

14   on-module power management claims were actually -- had

15   separate utility, meaning they can be used in other places,

16   and that we needed to have a separate patent for them.

17   Q.   And that's what this language is that we're showing on

18   the screen?

19   A.   Yeah.  That's correct.  Where we're saying the "claims 21

20   through 36 drawn to a power module, including a voltage

21   conversion element," all that language is saying that that

22   needs to have its own patent.

23   Q.   Did Netlist ultimately proceed to obtain patents on its

24   unique on-module power management invention?

25   A.   Yes, we did.
```

1    Q.   And how did Netlist do this?

2    A.   So we took the new set of claims along with the

3    application from 2008, presented it to the Patent Office,

4    which they reviewed because, again, you can't just create

5    your claims out of nowhere; they have to be based in the

6    application; the folks at the Patent Office reviewed it and

7    found that we had a valid patent claim.

8    Q.   And I'm looking at page 131 of this patent, this

9    document.  What is this depicting?  What is this showing?

10   A.   So this is showing that we do have that priority date of

11   that June 2nd, 2008.

12   Q.   So that's the priority date you requested.  Is that

13   correct?

14   A.   That is correct.

15   Q.   And did the PTO grant or reject the claims ultimately?

16   A.   We -- they granted us the patent.  Those are the patents

17   we are talking about today, the '918 and the '054.

18   Q.   The next family of patents that you discussed was the

19   '339 families.  Is that correct?

20   A.   That is correct.

21          MR. SHEASBY:  Mr. Huynh, can we turn to slide 43,

22   please?

23   Q.   (BY MR. SHEASBY)  When was the '339 Patent -- parent

24   originally filed?

25   A.   It was originally filed in 2009.

1   Q.   And what does this family relate to?

2   A.   So this family relates to what we call load reduction

3   DIMMs or LRDIMMs.

4   Q.   And is this -- this is the patent itself, JTX 0002?

5   A.   Yes, sir.  That is the '339 Patent.

6   Q.   And I want to show you a passage from it.  So I'm showing

7   two things.  I'm showing figure 3A as well as 7, lines 44

8   through 55.

9   A.   Uh-huh.

10  Q.   What is this figure and the language associated with it

11  depicting?

12  A.   So what this figure is showing is a kind of a

13  representative view of what the load reduction module looks

14  like.  What we see in figure 3A are orange boxes which

15  represent the DRAM components, and then along the bottom edge

16  the blue boxes, those are the buffer devices that provide the

17  isolation or the load reduction.

18  Q.   Now, you need to define a term.  Load reduction, please,

19  Mr. Milton.

20  A.   Right.  So if we go ahead and start from the bottom of

21  this figure--if you'll bear with me I think we'll get

22  there--but at the very bottom we see there something called

23  the system memory controller, and that is the part of the

24  computer system that's responsible for reading and writing to

25  the memory modules.

1          As we proceed up to the modules, what we're showing is

2     that in one memory channel there's actually four of these

3     memory modules or DIMMs that are populated in that channel,

4     and that's denoted by the fact that if you look at the upper

5     right it says 402, and there's four lines going out from that

6     402.  Each one of those is basically a copy of the one that's

7     on top that you see with the all the DRAM and the buffer

8     circuits.

9          And if you can imagine -- you know, if you think about

10    loads as kind of being a weight, so if you have, for example,

11    one of these modules and you didn't have the buffer circuits,

12    you would have four loads on the memory controller.  And as

13    you keep adding more modules, you're adding more loads.  And

14    much like, you know, carrying weights, it makes it much

15    heavier to go fast if you have a lot of weight.

16         So what we came up with was the idea of providing load

17    isolation or load reduction by adding these buffer components,

18    the blue ones on the bottom.  So what that allows us to do is

19    only -- well, it allows the system to see only one load.  So

20    compared here instead of, you know, having -- if you see in

21    the rows there's four DRAMs in the rows -- I'm sorry.  In the

22    columns.  Excuse me.  Instead of having four loads per module,

23    16 loads, now we're only going to have four loads and we can

24    get that higher performance and run at much higher speed.

25    Q.   Does the invention have separate data paths that can be

1    turned on and off?

2              MR. McKEON:  Your Honor, object.  We don't have an

3    expert report, this is not his patent, and we're going way

4    beyond factual testimony here.

5              MR. SHEASBY:  Your Honor, he was the corporate

6    representative on this patent family, he's designed products,

7    and he testified at deposition regarding this exact patent

8    family.

9              THE COURT:  Well, it's not uncommon to have somebody

10   with a technical background that is a fact witness who's not

11   formally an expert but knows a whole lot more than most people

12   off the street, and this gentleman obviously falls in that

13   category.  He is not entitled to give opinion testimony, he's

14   not qualified as an expert, but he certainly has a degree of

15   personal knowledge that exceeds what might otherwise be

16   expected in an ordinary fact witness.

17      At this point I'm going to sustain the objection -- I

18   mean I'm going to overrule the objection, but Mr. Sheasby,

19   you're going to have to hew a careful line not to stray into

20   opinion testimony that only an expert can give.

21             MR. SHEASBY:  Sure.  I understand, Your Honor's

22   instructions, Your Honor.

23             THE COURT:  All right.

24             MR. SHEASBY:  I'll withdraw the question and re-ask.

25             THE COURT:  Let's proceed.

1    Q.   (BY MR. SHEASBY)  In Netlist's technology, does it allow

2    for separate data paths that can be turned on and off?

3    A.   Yes.  So part of -- you know, part of adding these

4    buffers at the bottom of the module necessitates that you have

5    to be able to control them.  You might imagine that if you

6    didn't have a device before and then you add one, there's some

7    additional things that you have to do for the memory

8    controller to be able to interface with the module.  So

9    because of that, we have a control system where --

10            THE COURT:  Let me stop you, Mr. Milton.

11            THE WITNESS:  Yes, sir.

12            THE COURT:  The question was does it have separate

13   data paths, and your answer was yes.

14            THE WITNESS:  Yes.

15            THE COURT:  "So part of -- you know" and then you

16   start into this long explanation, that's not called for by the

17   question.  I guarantee you Mr. Sheasby is capable of asking as

18   many follow-up questions as he needs to get out the

19   information he wants this jury to hear, but you need to

20   respond to his questions and not gratuitously volunteer more

21   than the question calls for.  All right?

22            THE WITNESS:  All right.  I apologize, Your Honor.

23            THE COURT:  Wait for him.  That's his job to know

24   whether to ask the right questions or to not ask the right

25   questions.  So make your answers responsive to his questions,

 1   please.

 2            THE WITNESS:  Very good.  Thank you, Your Honor.

 3            THE COURT:  All right.  Let's go forward,

 4   Mr. Sheasby.

 5   Q.   (BY MR. SHEASBY)  How are the separate data paths

 6   achieved?

 7   A.   So if we're talking to the top module, for example, that

 8   would be the first path, and all of the other modules would be

 9   turned off.  Those paths to those modules are disabled.

10   Q.   And by 'modules', you're meaning those pink boxes in 402.

11   Is that correct?

12   A.   That's correct; the 402 with the four lines going from

13   them.

14   Q.   And I want to show you this.  What does this depict?

15   A.   So this depicts the actual implementation of the load

16   reduction DIMM.  The orange boxes are the same DRAM components

17   that we saw on the previous drawing, but this is actually

18   implemented on the module itself; and, likewise, the blue

19   boxes are those isolation or load reduction devices.

20            MR. SHEASBY:  And this is -- for the record, this is

21   column 7, lines 44 through 55 as well as figure 3D.

22   Q.   (BY MR. SHEASBY)  Is that correct, sir?

23   A.   Yes, sir.

24   Q.   I want to show you a presentation.  This is PX 464.

25   Did Netlist provide this presentation to the now president

1    of Samsung memory, J.B. Lee?

2    A.    Yes, we did.

3    Q.    And when was it provided?

4    A.    In 2015.

5    Q.    And does this patent disclose the patent family that

6    ultimately resulted in the '339 Patent?

7    A.    Yes, it does.

8    Q.    Can you explain the relationship between the 8,417,870

9    patent on this presentation and the '339 Patent?

10   A.    Yes.  The '870 is a parent patent of the '339.

11          MR. SHEASBY:  For the record, this is PX 464.

12   Q.    (BY MR. SHEASBY)  And who was this presentation given to?

13   A.    To Samsung.

14   Q.    And what does this show about the relationship between

15   the '339 and the '870 Patent that was given to Samsung?

16   A.    Yes.  This is showing that the '339 is related and can

17   claim priority back to the '870 Patent.

18   Q.    Now, did Samsung have to search to find Netlist's

19   patents?

20   A.    No, they did not.

21   Q.    Why is that?

22   A.    Because we provided this information to them that shows

23   the products and the patents that we believe relate to them.

24   Q.    And at the top it says 'LRDIMM'.  Is that correct?

25   A.    Yes, sir.

1    Q.   And what product is accused of infringing the '339 Patent

2    family?

3    A.   It is the LRDIMM.

4    Q.   Can you explain how Netlist came to be able to obtain

5    multiple patents on this family?

6    A.   Yes.  Very similar to what we had discussed previously

7    with the on-module power management, with the '870 Patent, we

8    had an original application and that application had multiple

9    inventions in it, and the USPTO asked us to file separate

10   patents for each of those inventions.

11   Q.   And I'm showing you a page from JTX 43 at pages 1 and 80.

12   What is this document?

13   A.   So this is the prosecution history for the patent, the --

14   yeah.  I'm sorry.  For the '339 Patent.

15   Q.   And explain again what a prosecution history is.

16   A.   That's the -- contains all of the information about how

17   the patent is being worked on and leading up to being granted.

18   Q.   And what did Netlist state to the Patent Office about

19   what the priority date of its application was?

20   A.   In the highlighted area on the bottom you can see it's

21   7/16/2009.

22   Q.   Did Samsung make any formal statements in its documents

23   about the importance of Netlist's LRDIMM patents?

24   A.   Yes, they did.

25   Q.   I want to show you this document.  This is PX 1756.  And

```
1    who prepared this document?

2    A.   This was prepared by Samsung.

3    Q.   And what does it state regarding Netlist's LRDIMM

4    technology?

5    A.   So it's stating that Netlist has a -- or is known in the

6    industry to have created a system for LRDIMM technology.

7    Q.   And this is PX 1756.  Is that correct?

8    A.   That is correct, sir.

9    Q.   And did Samsung make statements on whether it planned on

10   using Netlist's LRDIMM patents in these same documents?

11   A.   Yes, they did.

12           THE REPORTER:  I'm showing you another page from

13   1756.  This is page 4.  What did --

14           THE COURT:  Could you slow down, Mr. Sheasby?

15           MR. SHEASBY:  Yes, Your Honor.

16           THE COURT:  You're pretty fast over there.

17           MR. SHEASBY:  Yes, Your Honor.

18           THE COURT:  Thank you.

19   Q.   (BY MR. SHEASBY)  I'm showing you another page from

20   PX 1756.  What is this depicting?

21   A.   So this is stating that for the LRDIMM patents in

22   particular, that Samsung wants to enter into a license

23   agreement so they don't have to pay a separate royalty.

24   Q.   And it's referring to LRDIMM patents.  Is that correct?

25   A.   That is correct, sir.
```

1    Q.   And this is PX 1663.  Is this another Samsung document?

2    A.   Yes, sir.

3    Q.   And what does it say?

4    A.   So here we're talking about we moved ahead to enter into

5    an agreement for technical collaboration to resolve the patent

6    risk related to LRDIMM.

7    Q.   The third family you talked about is the '060 and '160

8    Patents.  Is that correct?

9    A.   That's correct.

10        MR. SHEASBY:  Mr. Huynh, can we have slide 57,

11   please?

12   Q.   (BY MR. SHEASBY)  And these are the two patent families.

13   Is that correct?

14   A.   The two patents in that family, yes.

15   Q.   And this is JTX 5 and 6.  Is that correct?

16   A.   That is correct.

17   Q.   So I want to show you a document.  This is PX 1778.  What

18   is PX 1778?

19   A.   So this document is a description of the '060 Patent that

20   was provided to Samsung.

21   Q.   And was the actual document provided to Samsung or was a

22   presentation given?

23   A.   A presentation was given.

24   Q.   And I want to show you -- so this describes the '060

25   Patent as relating to TSVs.  Is that correct?

1    A.   That is correct.

2    Q.   And now you have to explain in detail what a TSV is.

3    A.   Okay.  So if we look at the screen here, what this is

4    showing is we've got DRAM die, and those DRAM die are made out

5    of silicon.  And the vertical columns there are what we call

6    vias.  They are basically ways to get from one layer to

7    another, and they're going through the silicon.  That's the

8    'through silicon' part, and the 'via' is the path.  And what

9    that is is a way to interconnect those dies together.

10   Q.   And in your research at Netlist, are you now working with

11   HBMs?

12   A.   Yes.

13   Q.   And do you have personal knowledge of the -- I want to

14   show you another document.  So this is the email that PX 1778

15   is attached to, and it says "additional slides for Samsung."

16   Is that correct?

17   A.   Yes, sir.

18   Q.   And was this presentation given to Samsung?

19   A.   Yes, it was.

20   Q.   You have personal knowledge regarding the high bandwidth

21   memory through silicon via market space?

22   A.   Yes.

23   Q.   What was Samsung's position in the market when they asked

24   for a presentation on your technology in April 2015?

25   A.   In 2015, Samsung was behind their biggest competitor

1    SK hynix in this product space.

2    Q.   And when did Samsung launch its HBM product with TSV?

3    A.   When was the -- I'm drawing a blank on the date.

4    Q.   It's okay.  If you don't know, you should just say you

5    don't remember.

6    A.   I don't remember.

7    Q.   No problem at all.

8         And I'm showing you PX 446.  What is this document?

9    A.   This is a document in response to a request to get

10   information on our patents and what products they cover.

11   Q.   And who requested this information?

12   A.   This was requested by Samsung.

13   Q.   And what does this page of the document show?

14   A.   So this page shows that the '060 Patent is related to the

15   HBM product family.

16   Q.   About how many times -- this document's from 2006.  From

17   2006 through the duration of your commercial relationship with

18   Samsung, about how many meetings have you -- did you have with

19   Samsung?

20   A.   We had several.  I mean, I don't know--10, 20.  I --

21   yeah.

22   Q.   At any point in time did Samsung ever claim that its HBM

23   designs were not using your patents?

24   A.   No.

25   Q.   How does Netlist's design work?  And specifically I want

1   to ask you -- that's an open-ended question.

2       There are three elements on this slide.  There is a die

3   interconnect, a data port, and a bypass, and then there's

4   array dies on the right-hand side.

5       So first off, what's the control/master die?

6   A.   So the control/master die down there at the bottom of the

7   stack is responsible for writing the data and reading the data

8   back from the array dies, which are the memory which are

9   located above it.

10  Q.   And then what are die interconnects, what are data ports,

11  and what are bypasses?

12  A.   Yes.  So what we teach in our patent is those TSVs can go

13  through the silicon and either connect to or not connect to

14  those array dies.  When they are not connected, they have

15  what's called a bypass, and when they are connected they hook

16  up to a data port.

17  Q.   And what is the consequence of no data port being

18  presented at a given level?

19  A.   So if the data port is not present, there is no

20  electrical communication, and also the load is greatly

21  reduced.  We talked about load a little previously.  It's a

22  similar concept for the HBM.

23  Q.   And are there unique structures within array dies?

24  A.   Yes.  The ones that we were speaking of --

25  Q.   Mr. Milton, let me --

1    A.   I'm sorry.

2    Q.   What are the unique structures within the array dies?

3    A.   So the unique structures are the TSVs themselves along

4    with the data ports.

5    Q.   So this is a slice -- each of these are the array dies.

6    Is that correct?

7    A.   That is correct.

8    Q.   And so this would be an array die.  Is that correct?

9    A.   That is correct.

10   Q.   And what is within the array die that's unique?

11   A.   So within the array die --

12        MR. McKEON:  I'm going to object.  Now we're

13   getting into the claim construction issues and really going

14   into expert testimony now, and we don't have a report from

15   this witness.

16        THE COURT:  I know you don't have a report because

17   he's not an expert under the rules, but he's not asked -- he's

18   testifying as to what he knows.  He's not offering an opinion.

19   He's not speculating.

20        I don't see a basis for your objection, counsel.  I mean,

21   you've made it several times.  If you can convince me that

22   he's going beyond what his personal knowledge is as the chief

23   technology officer of the Plaintiff and here as their

24   corporate representative, I'm happy to hear from it.  I

25   recognize he's not a traditional expert witness, but I'm not

1    hearing expert testimony in the form of opinions or

2    speculative answers; I'm hearing him talk about what he knows.

3    And as long as he stays within his personal knowledge, I'm

4    going to allow him to testify.

5             MR. McKEON:  Thank you, Your Honor.  I got it.

6    Thank you.

7             THE COURT:  All right.  Let's continue.

8    Q.  (BY MR. SHEASBY)  So just so the record is clear, what

9    are the unique features in array dies?

10   A.  So the unique features in the array dies are the TSVs,

11   the data ports, and the bypasses.

12   Q.  What does Netlist's design enable?

13   A.  So what this enables is the ability to stack more than

14   four high of these array dies.

15   Q.  Are the array dies monolithic?

16   A.  No, the array dies -- the base might be, but in order to

17   make them array dies, you have to ad additional features like

18   the 'through silicon vias' and the microbumps that allow you

19   to connect them together.

20   Q.  So by the base you mean the control die.

21   A.  Correct.

22   Q.  But the array dies, you're -- what did you say regarding

23   whether they are monolithic or not?

24   A.  They need to be processed more than a monolithic

25   component.

1   Q.   Did Netlist's research address the importance of data

2   ports?

3   A.   Yes, they did.  Or yes we did.  Excuse me.

4   Q.   I want to show you a passage from your specification.

5   This is column 6, lines 41 through 45.  What does it describe?

6   A.   So here we're stating the fact that you need a data port

7   in order to have electrical communication.

8   Q.   Have you heard of the phrase 'keep-out zone'?

9   A.   Yes, sir.

10  Q.   Did Netlist contemplate keep-out zones for its

11  technology?

12  A.   Yes.

13  Q.   I'm showing you -- this is column 8, lines 35 through 62.

14  What does this describe?

15  A.   So it's talking about that the TSV may include an

16  insulator or air gap, which is that keep-out.

17  Q.   And then it goes on to talk about stubs.  Do you see

18  that?

19  A.   I do.

20  Q.   And would there still be an electrical connection even

21  when there is no electrical communication?

22  A.   Yes.  There can be a connection, but, as mentioned

23  previously, the loading on the driver would be much less, but

24  there will be no electrical communication, which is actually

25  the transfer of the data.

1    Q.   Why would you create a stub that had an electrical

2    connection but no electrical communication?

3    A.   The reason why that's done is so that you can keep all

4    the array dies the same so you don't have to have custom ones

5    for each level of the stack.

6    Q.   Did you consider using older historical technology when

7    developing your HBM technology?

8    A.   Did we consider it?

9    Q.   Let me withdraw that so -- it's a terrible question.  I

10   withdraw the question and let me re-ask it.

11              THE COURT:  Mr. Sheasby, you don't need to tell us

12   all it's a terrible question; just withdraw it and ask another

13   one.

14   Q.   (BY MR. SHEASBY)  Mr. Milton, I'm showing you PDX 2.69.

15   Do you recognize what this is?

16   A.   Yes, sir.

17   Q.   What is this?

18   A.   So this is a representation of what we're calling a DRAM

19   circuit.  And what you can see here is that the connections

20   are made on the sides of the package as opposed to being in

21   the silicon -- through the silicon.

22   Q.   And how is this different from the technology that you

23   deployed?

24   A.   So we can see here with the comparison on the left we

25   have those connections coming out of the sides externally, and

 1    in the HBM stack we see the 'through silicon vias'.

 2    Q.   Is the internal organization of the DRAM circuits on the

 3    left and the die arrays on the right different as well?

 4    A.   They are different.

 5    Q.   Can a DRAM circuit be used in place of the TSV array

 6    dies?

 7             MR. McKEON:  Your Honor, objection.

 8             THE COURT:  I'll sustain that.  That calls for an

 9    opinion.

10    Q.   (BY MR. SHEASBY)  I want to show you another Passage from

11    your specification.  This is column 5, lines 34 through 40.

12    What does this describe?

13    A.   So this is talking about the fact that with our teachings

14    we can go from the four array dies to eight array dies, maybe

15    even 16 array dies.

16    Q.   Does the patent present any techniques for dealing with

17    testing for defects in these complex products?

18    A.   Yes, it does.

19    Q.   I'm showing you column 17, lines 36 through 49.  What

20    role does this passage relate -- play in testing, if any?

21    A.   Yeah.  So what this talks about is driver sizes, and we

22    teach that you can size the drivers--and that's the electrical

23    component that actually sends the signals--and you can size

24    that driver based on what it needs to do.

25             For the test mode you don't have to test it at the full

1    speed, for example, because you want to see if it has

2    connectivity.  So, as a result, you can use a smaller driver,

3    and what that does for you is reduce the amount of area it

4    takes up on the die as well as reduces power.

5    Q.   And I'm turning to page 4 -- column 4, lines 8 through 16

6    of your specification, and it says you incorporated by

7    reference application 12/422,915.  Do you see that?

8    A.   I do.

9    Q.   First off what does 'incorporation by reference' mean?

10   A.   So what that means, we're taking all of the words in that

11   document and essentially saying that they're in that patent

12   application.

13   Q.   And what does the 12/422,925 application describe?

14   A.   It talks about tests.

15   Q.   Mr. Milton, after termination and before this lawsuit was

16   filed, did Samsung ever approach Netlist and seek permission

17   to use Netlist's patents?

18   A.   They did not.

19             MR. SHEASBY:  I pass the witness, Your Honor.

20             THE COURT:  Cross examination, please.

21             MR. McKEON:  May I begin, Your Honor?

22             THE COURT:  Looks like your team has binders to pass

23   out.

24             MR. McKEON:  Okay.  Thank you.

25             THE COURT:  No, Mr. Sheasby.  It's Defendants' job

1    to put a binder in front of the witness on cross.  Hand that

2    to the Court Security Officer, please.

3         You may approach.

4         Just keep that.  The clerks don't need it.

5         Let's proceed with cross examination, Mr. McKeon.

6                          CROSS EXAMINATION

7    BY MR. McKEON:   ?

8    Q.   Good afternoon, Mr. Milton.  We haven't met.  My name is

9    Mike McKeon, and I represent Samsung.

10   A.   Very nice to meet you, sir.

11   Q.   Nice to meet you.

12        Now, you mentioned that Netlist was founded in 2000.

13   Isn't that right?

14   A.   That's correct, sir.

15   Q.   And it's actually a publicly-traded company.  Isn't that

16   right?

17   A.   That is correct, sir.

18   Q.   Got shareholders.  Isn't that right?

19   A.   Correct.

20   Q.   And you testified about some of the products that Netlist

21   has.  Do you recall that?

22   A.   Yes, sir.

23   Q.   Now, Netlist specializes in hybrid memory.  Correct?

24   A.   That's correct.

25   Q.   And when Netlist uses that term 'hybrid memory', that

1  refers to memory modules that have both DRAM chips and flash

2  memory chips.  Correct?

3  A.    That is correct.

4  Q.    And sometimes you refer to that product as an NVDIMM.

5  Correct?

6  A.    That is one implementation, yes.

7  Q.    It has flash memory chips and DRAM chips.  Correct?

8  A.    It has flash and DRAM, yes.

9  Q.    And Netlist does not make or sell its own DDR4 LRDIMM.

10  Correct?

11  A.    That's a correct statement.  We design for DDR3.

12  Q.    Netlist is now working on a low profile DDR5 product.

13  Isn't that right?

14  A.    That is correct, sir.

15  Q.    Is that the one you showed the jury?

16  A.    Yes, sir.

17  Q.    Okay.  And a low profile DDR5 product is different than

18  the DDR5 DIMM products that are accused of infringement in

19  this case.  Right?

20  A.    It has a different form factor.  That is true.

21  Q.    So it's different.  Correct?

22  A.    In form factor, yes.

23  Q.    And Netlist does not make or sell its own DDR5 RDIMM.

24  Correct?

25  A.    The VLP is an RDIMM, sir.

1    Q.    A DDR5 RDIMM, sir.

2    A.    The VLP is a DDR5 RDIMM.

3    Q.    Okay.  You're talking about the one you just showed the

4    jury.  Is that right, sir?

5    A.    Yes, sir.

6    Q.    Okay.  Is that a product that's on the market today?

7    A.    It's in qualification.

8    Q.    So you don't sell that product today to anybody.  Isn't

9    that right?

10   A.    Not yet.  It's in qualification.

11   Q.    It's in qualification.  But you weren't trying to mislead

12   the jury when you suggested that and showed them the product

13   that you were on the market for that product and selling it

14   and competing with others.  Is that right?

15   A.    That was not my intention.

16   Q.    And Netlist does not make or sell DDR5 UDIMM.  Right?

17   A.    That is a correct statement.

18   Q.    And you don't sell or make DDR5 SO-DIMM.  Is that right?

19   A.    That is a correct statement.

20   Q.    So Netlist does not make or sell any of the types of DDR4

21   or DDR5 products that are accused of infringement in this

22   case.  Correct?

23   A.    I disagree on the RDIMM part because this is, in fact, an

24   RDIMM.

25   Q.    Sir, we just established that that product's not on the

1    market.

2    A.    Oh, okay.  Understood.  Understood.

3    Q.    So listen to my question.

4    A.    Yes, sir.

5    Q.    Netlist today does not make or sell any of the types of

6    DDR4 or DDR5 products that are accused of infringement in this

7    case.  Correct?

8    A.    Okay.  Correct.

9    Q.    And you didn't do that at the time that the complaint was

10   filed accusing Samsung of infringement in this case.  Isn't

11   that right?

12   A.    I'm sorry.  One more time, sir.

13   Q.    You have the same answer to the question about no

14   competition at the time that Netlist filed the lawsuit against

15   Samsung in this case.  Isn't that right?

16   A.    The same answer about no competition?

17   Q.    Correct.

18   A.    I'm sorry.  It must be getting late in the day.  I

19   apologize.  Could you answer -- one more time, sir.

20   Q.    We've already established and you told the members of the

21   jury Netlist does not make or sell any of the types of DDR4 or

22   DDR5 products that are accused of infringement in this case.

23   Correct?

24   A.    That's correct.

25   Q.    And that was true at the time that the complaint for

1    patent infringement was filed in this case.  Isn't that right?

2    A.   Okay.  Correct.

3    Q.   And Netlist also does not make HBM products.  Correct?

4    A.   That is correct.

5    Q.   You don't compete with Samsung in HBM products.  Correct?

6    A.   That is correct.

7    Q.   And we know that HBM products are the products that just

8    have DRAM.  Isn't that right?

9    A.   HBM -- yes, that is correct.

10   Q.   No flash memory.  Isn't that right?

11   A.   On HBM, no.

12   Q.   Right.  And on the products that we went through before,

13   all the DDR4 products and the DDR5 products we mentioned, no

14   flash memory chips in those products, either.  Isn't that

15   right?

16   A.   That's incorrect, sir.

17   Q.   Is there a flash memory chip on those products, sir?

18   A.   There's flash in that product.

19   Q.   Listen to my question, sir.  Is there a flash memory chip

20   in those products?

21   A.   What do you define as a chip?

22   Q.   Sir, a chip you can hold in your hand.

23   A.   You can hold the PMIC, and it has flash in there that you

24   could classify as a chip.

25   Q.   Are you referring to the register in a PMIC chip?  Is

1    that what you're referring to?

2    A.   Not the register.  I'm referring to where that register

3    information gets saved in the event of a power fault

4    condition.

5    Q.   But, sir, that's not saving people's emails, people's

6    videos, people's photographs.  That little thing in the PMIC

7    has nothing to do with saving that.  Isn't that right?

8    A.   It's not saving that, but the information it's saving is

9    critical information about what happened to that module.

10   Q.   Well, let's talk about -- more about the invention.

11   We're going to get back to that in a moment.  Okay?

12        Now, you testified about your invention for the '918 and

13   '054.  Isn't that right?

14   A.   That's true.

15   Q.   You agree Netlist was not the first company to create

16   memory modules.  Correct?

17   A.   That is correct.

18   Q.   You did not invent printed circuit boards.  Right?

19   A.   No, we did not.

20   Q.   Did not invent flash memory.  Correct?

21   A.   Correct.

22   Q.   Did not invent DRAM.  Right?

23   A.   That's correct.

24   Q.   And you didn't invent buck converters.  Isn't that right?

25   A.   That is correct.

1   Q.   Didn't invent converter circuits, either.  Isn't that

2   right?

3   A.   No, we did not.

4   Q.   Didn't invent voltage regulation.  Isn't that right?

5   A.   That's correct.

6   Q.   Voltage regulation been around a long time in products.

7   Isn't that right?

8   A.   Sure.

9   Q.   Now, for Netlist's own products you talked about today,

10  Netlist does not design any of the low-level integrated

11  circuit chips.  Isn't that right?

12  A.   That is correct.

13  Q.   And you believe that what Netlist did, in your invention

14  you took some known chips and materials and you combined them

15  in the way that you think is novel.  Is that right?

16  A.   Absolutely.  Correct, sir.

17  Q.   Now, the patents you discussed today in court, there was

18  five of them.  Isn't that right?

19  A.   That's correct, sir.

20  Q.   But you're only a named inventor on the '918 and '054.

21  Is that right?

22  A.   That is a correct statement, sir.

23  Q.   And the '918 was filed in December of 2020.  Isn't that

24  right?

25  A.   Well, the application was filed in 2008.

1  Q.   Well, the '918 patent, the application, sir, that became

2  the '918 Patent was filed in December of 2020.  Correct?

3  A.   Those claims were filed, but the application was from

4  2008.

5           MR. McKEON:  Let's get the '918 Patent up, please.

6  And let's just see what the '918 Patent -- can we blow up

7  the -- right here.

8  Q.   (BY MR. McKEON)  See, sir, the '918 Patent --

9           MR. McKEON:  If we can get that down a little so I

10  can see the '918 Patent number?  Right there is good.

11  Q.   (BY MR. McKEON)  And you see, sir, that's the '918 Patent

12  you told the jury about.  Isn't that right?

13  A.   That is correct, sir.

14  Q.   Can you tell the jury what it says there right here at

15  22?

16  A.   Yes.  It says filed December 30th, 2020.

17  Q.   Didn't say anything there about filing this in 2008.

18  Isn't that right?

19  A.   Not on that line, sir.

20  Q.   Correct.  That line is the filing date of the '918

21  Patent.  Isn't that right?

22  A.   Right.  And we claim priority back to 2008.

23  Q.   We're going to get to that.

24  A.   Okay.

25  Q.   We're going to get to that.

```
 1        And the '054 Patent -- of course, what we have it up

 2   here, issued in 2021.  Isn't that right?

 3   A.    That is correct, sir.

 4   Q.    And the '054 you mentioned is a continuation of the '918.

 5   Isn't that right?

 6   A.    I believe that is correct, yes.

 7   Q.    And the '054 and '918, they share the same specification.

 8   Isn't that right?

 9   A.    That is correct; the 2008, uh-huh.

10   Q.    The same figures and same disclosure.  Isn't that right?

11   A.    The same figure, same specs, yes.

12   Q.    Okay.  And you just testified that that goes back to

13   2008.  Isn't that right?

14   A.    That's correct, sir.

15   Q.    Okay.  Now, the '054 issued in January of 2022.  Isn't

16   that right?

17   A.    I believe that is correct.

18   Q.    Okay.  We can pull it up.

19        MR. McKEON:  Why don't we get the '054.  This isn't

20   a memory test.

21   Q.    (BY MR. McKEON)  You see there January of 2022.  Isn't

22   that right?

23   A.    Yes, sir.  Yes, sir.

24   Q.    Okay.  And that was just last year.  Right?

25   A.    That is correct.
```

1    Q.   And did you know, sir, that when Samsung was initially

2    sued, the '054 Patent wasn't even in the complaint that was

3    filed?

4    A.   Did I know that?  I don't know that I knew that.

5    Q.   This was actually added -- after the Patent Office issued

6    this, an amendment was made to the complaint and it was added

7    to the complaint.  Did you know that?

8    A.   I did not, but okay.

9    Q.   Now, your understanding of the invention of the '918

10   Patent is you put voltage regulators on memory modules.

11   Correct?

12   A.   That is correct.

13              THE COURT:  Mr. McKeon, would you slow down?

14              MR. McKEON:  Sorry, Your Honor.

15              THE COURT:  Well, just slow down.  Don't apologize;

16   just slow down.

17   Q.   (BY MR. McKEON)  And for the '054 Patent, you understand

18   -- your understanding is that your invention is to trigger

19   signals detected from voltages exceeding or going below a

20   threshold and writing data to non-volatile memory in response

21   to those trigger signals.  Correct?

22   A.   Yes, sir.

23   Q.   And you agree that one of the main focuses of the

24   patents, these two patents, is a memory module that has both

25   flash memory chips and DRAM memory chips.  Isn't that right?

1  A.   I agree that it is a focus of that patent, but there are

2  several inventions embodied in that application.

3  Q.   Let's talk about that.

4          MR. McKEON:  Can we get the '918 Patent back up?

5  Q.   (BY MR. McKEON)  Now, I wrote this down and I wanted to

6  make sure I got it right.  When you were talking to

7  Mr. Sheasby about your '918 Patent, you had indicated to him

8  that, Oh, yes, this is the patent for intelligent on-module

9  power management.  Did I say that right?

10  A.   Yes, sir.

11  Q.   And, sir, what is the title of this patent?

12  A.   The title of the patent is "Flash-DRAM Hybrid Memory

13  Module."

14  Q.   So the title of the patent--right?--that you chose when

15  you filed it with the Patent Office, the title you gave it is

16  "Flash-DRAM Hybrid Memory Module."  You didn't give it

17  'intelligent on-module power management'.  Correct?

18  A.   That's correct.  But --

19  Q.   Sir, if you'll just answer my question because I don't

20  have a lot of time.  All right.

21          THE COURT:  Mr. McKeon, if you think the witness is

22  non-responsive, don't instruct the witness; you raise it with

23  me and I'll deal with whether the witness is non-responsive or

24  not.  Okay?

25          MR. McKEON:  Thank you, Your Honor.  Appreciate

1   that.

2   Q.   (BY MR. McKEON)  So you had the option, you could have --

3   right?  When you filed this in the Patent Office, you could

4   have filed it and called it 'intelligent on-module power

5   management'.  You could have done that.  Isn't that right?

6   A.   We could have, but we believe -- we believe that at DDR5

7   all modules are now hybrid modules.

8          MR. McKEON:  Your Honor, I move to strike that last

9   clause and have you instruct the witness to have him focus on

10  my question.

11         THE COURT:  I'll sustain the objection, if it's

12  non-responsive, after the witness said, "We could have."

13  That's responsive to the question.  But when he says, "We

14  believe," and he goes on for an explanation, you didn't ask

15  for the explanation.

16      So again, limit your answers to the questions called for.

17  Mr. Sheasby's going to get a chance to follow up with

18  additional questions in any area he thinks is necessary.

19  But you need to limit your answers to the questions offered

20  by counsel.  Okay?

21         THE WITNESS:  Thank you, sir -- Your Honor.

22         THE COURT:  Let's continue, Mr. McKeon.

23         MR. McKEON:  Thank you, Your Honor.

24         THE COURT:  I'll strike everything after the

25  responsive answer.

```
1              MR. McKEON:  Thank you, Your Honor.

2         And if we can go down a little in the first page of the

3    patent.

4    Q.   (BY MR. McKEON)  On the first page of this

5    patent--right?--there's a figure on it, and that's a real

6    important figure because it's right on the first page.  Is

7    that right?

8    A.   It's on the first page, yes.

9    Q.   And this is a memory module, sir, that has NAND flash

10   chips and DRAM flash chips.  Is that right?

11   A.   Yes, it does.

12   Q.   And there's nothing in this figure that says or that's

13   titled or saying 'intelligent on-module power management'.

14   Isn't that right?

15   A.   There's nothing in this figure that says that.  Correct.

16   Q.   And just so we're clear, the NAND is here on the left and

17   the DRAM there is on the right at the top, those boxes.  Isn't

18   that right?

19   A.   That is a correct statement.

20   Q.   And the idea behind -- that was disclosed in this patent

21   is that if the power goes out such that the DRAM is no longer

22   powered, then the system here that you designed and disclosed

23   in this patent would react to put the data from the DRAM into

24   the permanent flash.  Isn't that what's going on in your

25   invention here?
```

```
1    A.    That's part of it, but there is more in our application

2    than that.

3    Q.    But when we talk about the hybrid memory--right?--what

4    we're talking about is a system that does what I just

5    described.  Isn't that right?

6    A.    Correct.

7    Q.    And so you need both types.  You need the NAND flash

8    memory and the DRAM to accomplish that.  Isn't that right?

9    A.    Well, that's not entirely correct, because in our patent

10   we actually do talk about applications where the flash is

11   somewhere else in the system.

12   Q.    Okay.  But what we do know is in this figure, and figures

13   we're going to talk about in a minute, here you see the NAND

14   flash chips there.  Right?

15   A.    I do.

16   Q.    That's what you showed in your figure.  Is that right?

17   A.    That is a correct statement.

18   Q.    And we also know the voltage regulator, the power module

19   that you call in this patent, that was used to accomplish this

20   task of if the power goes out in the DRAM, I'm going to

21   quickly go over to the NAND flash.  That was what the voltage

22   regulator of your patent was for.  Correct?

23   A.    And it's now being used on DDR5.  Yes.

24   Q.    Sir, I'm going to move to strike that answer.

25          MR. McKEON:  Your Honor, may I strike that?
```

```
 1                    THE COURT:  Well, you may ask me if you can strike

 2      it.  Don't tell him.

 3                    MR. McKEON:  Your Honor, may I strike --

 4                    THE COURT:  What's the basis for your motion?

 5                    MR. McKEON:  That was not my question and the

 6      witness is not answering my question.

 7                    THE COURT:  Well, the answer was, "And it's now

 8      being used for DDR5.  Yes."  The 'yes' is responsive.  I'll

 9      strike the preceding portion that's non-responsive.

10          Let's proceed.

11                    MR. McKEON:  Thank you, Your Honor.

12      Q.  (BY MR. McKEON)  And now let's look at some of the other

13      figures in your patent, figure 3A.  Okay?  We see --

14                    MR. McKEON:  Can I just have the whole page for now?

15      Thank you Mr. Sayer.

16      Q.  (BY MR. McKEON)  Of course, the figure 1 is the prior

17      art.  Isn't that right, sir?

18      A.  That is correct.

19      Q.  And you didn't invent the concept of moving data between

20      DRAM and non-volatile memory.  Isn't that right?

21      A.  That's correct.

22      Q.  The concept you invented was putting that all on one

23      module.  Is that right?

24      A.  Correct.

25      Q.  And in figure 3A below we, in fact, see that.  We see a
```

1    flash memory chip on the right and a DRAM on the left, and

2    they're all in one module.  Isn't that right, sir?

3    A.    That is what 3A shows, yes.

4    Q.    And we see that in 4B as well, don't we, sir?  Do you see

5    that there?  4B you have the DRAM on the left and the flash

6    memory on the right that's all in one module.  Isn't that

7    right?

8    A.    That is correct.

9    Q.    And we continue on.  We've got figure 3B and 4B here.

10              MR. McKEON:  And we don't need to highlight them,

11   Mr. Sayer.

12   Q.    (BY MR. McKEON)  But do you see the DRAM on the left and

13   flash on the right, in both of these figures they're both on

14   the module.  Isn't that right?

15   A.    In those figures that is correct.

16   Q.    And that's the invention--the hybrid memory invention,

17   the NVDIMM invention.  Correct?

18   A.    Yes.  It has the flash and the DRAM, yes.

19   Q.    And we see that in figure 5B as well.  Right?  We see the

20   DRAM and the flash there.

21              MR. McKEON:  And actually let's go to 5A first.

22   Q.    (BY MR. McKEON)  You see 5A, and you see the DRAM and the

23   flash there.  Isn't that right, sir?

24   A.    Yes, sir.

25   Q.    Okay.  And then, again, it's all on the same module.

1    Isn't that right?

2    A.   Yes, sir.

3    Q.   Okay.  And then let's just do a couple of more and we can

4    move on.

5             MR. McKEON:  Figure 7 and 8A.  Let's go to the next

6    page.

7    Q.   (BY MR. McKEON)  And we see, again, figure 7 and figure

8    8A you got the DRAM and the flash memory chips.  They're all

9    on the module.  Isn't that right?

10   A.   Yes, sir.

11   Q.   And then, finally, in a figure I believe you talked about

12   in your direct, figure 16, and this is the power module that

13   you referred to in your direct.  Isn't that right?

14   A.   That is correct.

15   Q.   All right.  And this is part of the -- what you claim

16   your invention is.  Isn't that right?

17   A.   That is correct.

18   Q.   And in this particular power module that you have here on

19   the right-hand side, it shows you where the voltages are

20   going.  Isn't that right?

21   A.   That's correct.

22   Q.   And, for example, we see we got DRAM and we got flash are

23   two of the chips where the voltage is going.  Isn't that

24   right?

25   A.   That is a correct statement.

1    Q.   And, in fact, it says 'to NVDIMM' there right in the

2    figure.  Is that right?

3    A.   That's what it says in the figure.

4    Q.   And the NVDIMM is the hybrid memory that we talked about

5    with the DRAM and the flash.  Correct?

6    A.   That's correct.

7    Q.   All right.  And let's just go to column 1.  And right

8    here in column 1 we see at the top the flash -- you got,

9    again, the description of the invention here.  What you have

10   is "Flash-DRAM Hybrid Memory Module."  Isn't that right?

11   A.   Yes, I see that.

12   Q.   Okay.  And then now the technical field, which goes down

13   -- the bottom of 1 and the top of 2, and we can just read it

14   together:  "The present disclosure relates generally to

15   computer memory devices and, more particularly, to devices

16   that employ different types of memory devices such as

17   combinations of flash and random access memories."

18        Do you see that?

19   A.   I see that.

20   Q.   So the technical field that you describe in the patent

21   that the public -- when they get this patent and they see,

22   they look at the technical field and they see the combination

23   of flash and DRAM.  Isn't that right?

24   A.   That's what it shows on this page.

25   Q.   All right.  And if you go through more of the figures and

1    the description--we're not going to do that here; the jury's

2    going to have this patent in the jury room in the end of the

3    case--if you go through it, it describes column after column

4    this concept of having the hybrid DRAM and flash memory.

5    Isn't that right?

6    A.   I think that's incorrect.  Every column has that.

7    Q.   Okay.  But the vast proportion of this specification is

8    directed to that invention.  Isn't that right?

9    A.   I guess I have to agree with that, yeah.

10   Q.   And, in fact, a key thing in the NVDIMM is the module has

11   to work with when the system is not providing any power.

12   Isn't that right?

13   A.   That is disclosed in our application.  That's that send

14   mode.

15   Q.   Okay.  Now, I want to talk about the timeline a little

16   here.

17              MR. McKEON:  And if I can get the '918 Patent cover

18   up with the filing data and the related data that's on page 2.

19   Q.   (BY MR. McKEON)  And you provided some testimony in your

20   direct and I have a few follow-ups on that.  All right?

21        So you see on the left here you have the continuation

22   here that's identified is the '918 Patent application; that

23   was filed in December of 2020, is a continuation of the

24   application ending in '416.  Do you see that?

25   A.   Yes, sir.

1    Q.    Okay.  And that was filed in 2018.  Isn't that right?

2    A.    That's what it says, yes.

3    Q.    Okay.  And then, as you have already said today, this

4    kind of goes all the way back down the chain, if you will,

5    down to June 2nd of 2008.  Isn't that right?

6    A.    That is correct.

7    Q.    Okay.  So you have the earliest in 2008 and then you got

8    the '918, and you can kind of look at the 2008 filing, that

9    earliest application, you can kind of look at that as the

10   great-great-great-grandfather of the '918, or grandmother of

11   '918.  Is that right?

12   A.    That's a fair assessment.

13   Q.    And we know that the patent application you filed in

14   2008, that described the flash-DRAM hybrid memory that we've

15   been talking about today.  Is that right?

16   A.    In addition to other things, yes.

17   Q.    And a lot of time elapsed.  In fact, you agree that over

18   12 years elapsed between when you had that original filing and

19   when we had the '918 Patent filed with the Patent Office in

20   2020.  Isn't that right?

21   A.    That is correct.

22   Q.    Now, if we look at the history here, you agree with me

23   that the claims of every -- each of these patents here that

24   have issued, the '833 -- you see the '831 there?

25   A.    Uh-huh.  Yes, sir.

1   Q.   You got the '684.  You got the '186.  Do you see that?

2   A.   I do, sir.

3   Q.   You understand, sir, these are your patents.  Right?

4   A.   Yes, sir.

5   Q.   And you understand that the claims -- the claims in every

6   single one of those patents are claims that require flash

7   memory and DRAM.  You understand that.  Right?

8   A.   I have to tell you, I didn't review all of the claims

9   from all of the patents.

10  Q.   So you don't know one way or the other?

11  A.   Yeah.  I have to say I don't know.  I didn't read all of

12  the claims again from those patents.

13  Q.   Okay.  Well, we looked at them, and I can represent to

14  you that's, in fact, the case.

15       So let me ask you this question.  Is it your view that

16  the first --

17            THE COURT:  Just a minute.

18            MR. SHEASBY:  Your Honor, I object to the colloquy.

19            THE COURT:  Well, if you're objecting to counsel's

20  sidebar where he tells the jury what he's looked at and what

21  he thinks, I'm going to sustain that objection.  He's not here

22  to testify; the witness is.

23            MR. SHEASBY:  Thank you, Your Honor.

24            MR. McKEON:  Thank you, Your Honor.

25            THE COURT:  Let's proceed.

1          MR. McKEON:  Thank you, Your Honor.

2   Q.   (BY MR. McKEON)  Is it your understanding, sir, that the

3   first time in this chain since 2008 that Netlist obtained a

4   patent related to this specification, that contained a claim

5   that did not have both DRAM and flash was the '918 Patent.  It

6   was the first time.  Isn't that right?

7   A.   Again, I -- I didn't review all those claims so --

8   Q.   Okay.  All right.  Well, we can move on.

9          Now.  One thing we know is that the jury understands now

10  already in this case, after a day -- being here for a day,

11  that the claims in these patents are a big deal.  And you

12  agree with that.  Isn't that right?

13  A.   Yes, sir.

14  Q.   In fact, that kind of defines the scope of the invention.

15  The Judge is going to instruct the jury on that.  Right?

16  A.   Well, actually I'm sorry.  You said that the claims are

17  the big deal.  It's the application is what the big deal is,

18  because we can continue to write new claims off of the

19  application because of the fact the application has all the

20  inventions in it.  So I misspoke previously.

21  Q.   Okay.  So you don't have an understanding of what the --

22  the importance or non-importance of claims in patents.  Is

23  that right?

24  A.   No, no, I have a very good understanding of that.

25  What I'm saying is that the claims of any individual patent

1   are -- you know, you can -- you know, as we've seen, we're

2   filing claims on part of the invention that the PTO told us

3   had separate utility, so we're filing claims specifically on

4   that power management.

5   Q.   Sir, you cannot comment on claims or claim language in

6   the patents.  Correct?

7   A.   That's -- I'm not an expert in that area.  That's a true

8   statement.  But the concept of having an application that has

9   multiple inventions, I can comment on that.

10          MR. McKEON:  Your Honor, move to strike the last

11   clause.

12          THE COURT:  Overruled.

13          MR. McKEON:  All right.

14          THE COURT:  Approach the bench, counsel.

15          MR. McKEON:  Thank you.

16          (The following was had outside the hearing of the

17          jury.)

18          THE COURT:  How much more cross do you think you

19   have?

20          MR. McKEON:  I mean, I'm going hopefully another 30

21   minutes, Your Honor.

22          THE COURT:  Then you're going to have some redirect?

23          MR. SHEASBY:  Very short, Your Honor.

24          THE COURT:  I have to stop at 5:30 today.  So he's

25   our corporate rep for the Plaintiff; he'll be here all week.

1    We'll have to pick up with him Monday morning.

2              MR. McKEON:  Okay, Your Honor.

3              THE COURT:  I want to talk with you about deposition

4    designation disputes, but I'll talk with you after the jury

5    leaves.

6              MR. McKEON:  Thank you, Your Honor.

7              (The following was had in the presence and hearing

8              of the jury.)

9              THE COURT:  Ladies and gentlemen, this witness is

10   going to be on the stand for some additional time, and I'm not

11   unaware it's a Friday afternoon and you've been here all day.

12   So even though I told you we might go to 6:00, we're going to

13   stop at 5:30 today and we're going to pick back up with this

14   witness on Monday.  He'll continue the cross examination by

15   the Defendant, and then if the Plaintiff has redirect

16   examination we'll take that up.

17        Let me remind you of all the instructions I've given you,

18   including, first and foremost, don't communicate with anybody

19   about this case.  And I can just promise you, unless you live

20   alone, you're going to get a question when you walk through

21   the door.  Be prepared for it.  Don't answer it.

22        If you will take your notebooks as you leave the

23   courtroom with you to the jury room and leave them closed on

24   the table there so that they'll be waiting for you on Monday.

25   Please plan your travel so that we can plan to start at 8:30

1    Monday morning.  Have a good weekend.  Be careful driving back

2    and forth.

3        And with those instructions the jury's excused until

4    Monday.

5            (Whereupon, the jury left the courtroom.)

6            THE COURT:  Be seated, please.

7        Counsel, including the time that the Court withdrew from

8    both sides, for reasons I've previously stated in the record,

9    there's been a total of 2 hours and 22 minutes of trial time

10   used today with the Plaintiff having a remaining 11 hours and

11   7 minutes and the Defendant having remaining 11 hours and 31

12   minutes.

13       I want to meet with lead and local counsel in chambers

14   after we recess for the weekend.  You've previously submitted

15   a multitude of disputes regarding deposition witnesses who are

16   set to testify after Mr. Milton completes his testimony.

17   We've not had any opportunity to go over those.  I want to

18   give you at least guidance on the amount I've already covered.

19   I will review the rest of your designations over the weekend

20   and try to give you guidance before we begin Monday morning.

21       Let me just say that I expect a different approach to

22   the meet and confer process from both sides.  This has been

23   a trial that's exceeded not only the norms but it's exceeded

24   what's reasonable as far as the level and the degree of

25   disputes.  The--I don't know another way to say it--the

1    pettiness of disputes of things that really make no difference

2    but clog the system and the volume of what you've given me

3    makes it impossible for me to respond to you in a way that

4    keeps this case moving.  That's why we spent an extra hour of

5    time today in the middle of the day that I held you

6    accountable for, and I don't think you want to continue that.

7    So I'm expecting a better level of conduct and a better level

8    of efficiency and professionalism in the meet and confer

9    process between now and Monday.

10         With that, we're going to stand in recess until Monday

11   morning.

12         Let me see lead and local counsel in chambers, please.

13         The Court stands in recess.

14              (The proceedings were concluded at 5:30 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts          04/14/2023

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13    .

14

15

16

17

18

19

20

21

22

23

24

25