IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

NETLIST, INC.,                    (  CAUSE NO. 2:21-CV-463-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,    (
et al.,                           )  MARSHALL, TEXAS
                                  (  APRIL 20, 2023
          Defendants.             )  8:30 A.M.
_____


VOLUME 5


_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS 75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
1                      A P P E A R A N C E S

2        FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                               LOS ANGELES
3                              1800 AVENUE OF THE STARS
                               SUITE 900
4                              LOS ANGELES, CA 90067-4276
                               (310) 203-7096
5                              BY:  MR. JASON SHEASBY
                                    MS. LISA GLASSER
6                                   MR. BEN MANZIN-MONNIN
                                    MR. MICHAEL TEZYAN
7
                               IRELL & MANELLA -
8                              NEWPORT BEACH
                               840 NEWPORT CENTER DRIVE
9                              SUITE 400
                               NEWPORT BEACH, CA 92660
10                             (949) 760-0991
                               BY:  MR. STEPHEN PAYNE
11
                               McKOOL SMITH, P.C. - MARSHALL
12                             104 E. HOUSTON ST., SUITE 300
                               MARSHALL, TEXAS  75670
13                             (903) 923-9000
                               BY:  MR. SAM BAXTER
14                                  MS. JENNIFER TRUELOVE
                                    MR. KEVIN BURGESS
15
         FOR THE DEFENDANTS:   FISH & RICHARDSON, PC -
16                             WASHINGTON DC
                               1000 MAINE AVE. SW, SUITE 1000
17                             WASHINGTON, D.C.  20024
                               (202) 783-5070
18                             BY:  MR. RUFFIN CORDELL
                                    MR. MICHAEL McKEON
19                                  MS. LAUREN DEGNAN

20                             FISH & RICHARDSON, P.C. -
                               DALLAS
21                             1717 MAIN STREET, SUITE 5000
                               DALLAS, TEXAS  75201
22                             (214) 747-5070
                               BY:  MR. MATTHEW COLVIN
23                                  MR. THOMAS REGER

24

25
```

```
 1                                    GILLAM & SMITH, LLP
                                      303 SOUTH WASHINGTON AVENUE
 2                                    MARSHALL, TEXAS  75670
                                      (903) 934-8450
 3                                    BY:  MS. MELISSA SMITH

 4        OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                100 E. HOUSTON STREET
 5                              MARSHALL, TEXAS  75670
                                (903) 923-8546
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## <u>INDEX</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| PAUL MEYER | |
| Direct By MR. REGER ............................................ 1159 | |
| Cross By MR. SHEASBY .......................................... 1177 | |
| Redirect By MR. REGER ......................................... 1216 | |

```
 1              THE COURT:  Be seated, please.
 2         Are the parties prepared to read into the record those
 3    items from the list of pre-admitted exhibits used during
 4    yesterday's portion of the trial?
 5              MS. SMITH:  We are, Your Honor.
 6              THE COURT:  Please proceed.
 7              MS. SMITH:  Thank you.
 8         Yesterday, Your Honor, Samsung used DTX 4, JTX 17, JTX
 9    18, JTX 52, JTX 53, and PX 1662.
10              THE COURT:  All right.  Any objection from
11    Plaintiff?
12              MS. TRUELOVE:  No objection, Your Honor.
13              THE COURT:  Does Plaintiff have a similar rendition
14    to read into the record?
15              MS. TRUELOVE:  We do not, Your Honor.  We did not
16    use any new or additional exhibits yesterday.
17              THE COURT:  All right.  Thank you, Counsel.
18         Is there anything the Court needs to hear from either
19    party on before I bring in the jury?
20              MR. SHEASBY:  Nothing from Plaintiff, Your Honor.
21              MR. CORDELL:  Nothing from Defendants, Your Honor.
22    Thank you.
23              THE COURT:  Let's bring in the jury, please.
24              (Whereupon, the jury entered the courtroom.)
25              THE COURT:  Good morning, members of the jury.
```

1  Welcome back.  It's good to see you.  Please have a seat.

2       We'll continue with the Defendants' case in chief.

3       Defendants, call your next witness.

4            MR. REGER:  Good morning, Your Honor.  Samsung calls

5  Mr. Paul Meyer.

6            THE COURT:  All right.  Mr. Meyer, if you'll come

7  forward and be sworn by the Courtroom Deputy, please.

8            (Whereupon, the oath was administered by the Clerk.)

9            THE COURT:  Please have a seat on the witness stand,

10  sir.

11       All right, Counsel.  You may proceed with direct

12  examination.

13            MR. REGER:  Thank you, Your Honor.

14       Good morning, everyone.

15                         PAUL MEYER, SWORN,

16  testified under oath as follows:

17                         DIRECT EXAMINATION

18  BY MR. REGER:

19  Q.   Good morning, everyone.  Mr. Meyer, could you please

20  introduce yourself?

21  A.   Yes.  My name is Paul Meyer.  I'm a partner at a

22  consulting company called HKA.  It's a global company.

23       I grew up on the East Coast and -- and was in the

24  military family, moved around a good bit.  Ultimately, we

25  settled into Newport News, Virginia; went to school there;

1160

1    went to University of Virginia; met a woman from Virginia,

2    married her.  I've been married almost 40 years.

3         I have two boys.  They both went to University of

4    Virginia.  One played baseball there and played in the minor

5    leagues for a while, the Giants.  I live in California now but

6    still a Virginian.

7    Q.   Mr. Meyer, you mentioned HKA.  What is your role at HKA?

8    A.   I run the intellectual property practice, which is as

9    global, but still I work on client assignments, helping

10   companies either license or work through analyses in

11   situations like this.

12        But it's a group of people that we sort of collaborate on

13   doing those analyses.

14   Q.   Now, is any of your valuation experience used to help

15   companies negotiate real-life licensing deals?

16   A.   Yes.  I don't ultimately make the decision.  But the same

17   types of analyses that I've done for the Court in this case, I

18   do with clients all the time to help them license.  And I've

19   worked for a lot of Fortune 500 companies.  I've worked for

20   smaller companies.

21        But I've helped license whether it's semiconductor or

22   software or computers, but also patents related to household

23   goods, engine parts, aircraft.

24        And I've done some valuation of other intellectual

25   property related to things like NFL logos for NFL teams and

1    whatnot.  So using the same skills to help clients license

2    their technology and patents as I do in situations like this,

3    but I don't make the decisions.

4    Q.   Great.  Now, how many license agreements have you

5    reviewed in the course of your career?

6    A.   Probably over the last 30 years, there's certainly been

7    thousands and -- of all different types, but lots of

8    agreements.

9              MR. REGER:  Your Honor, Samsung offers Mr. Meyer as

10   an expert in the field of patent valuation and damages.

11             THE COURT:  Is there objection?

12             MR. SHEASBY:  No objection, Your Honor.

13             THE COURT:  Without objection, the Court will

14   recognize this witness as an expert in those designated

15   fields.

16        Please continue, Mr. Reger.

17             MR. REGER:  Thank you, Your Honor.

18   Q.   (BY MR. REGER)  Now, Mr. Meyer, as an expert in patent

19   valuation and damages, what are you here to talk about today?

20   A.   I'm here to talk about reasonable royalties and -- and

21   the royalty related to the -- the netlist property, the five

22   patents.  Royalties on that.

23   Q.   And did your analysis to determine a reasonable royalty

24   follow a particular structure?

25   A.   Yes.  We follow what's called *Georgia-Pacific* court case

1   provides 15 factors.  And the most important factor is what's

2   called the hypothetical negotiation, which we had to do

3   because we're obviously in this case where there's no license.

4        So there's no actual negotiation so we actually recreate

5   that.  So these are the factors that set that up in -- in the

6   structure.

7   Q.   Mr. Meyer, in the slide about the hypothetical

8   negotiation, you underlined it, complete information.  Why did

9   you do that?

10  A.   That's right.  So when the parties negotiate, they have

11  all the information, the financial data, prior licenses,

12  strategies of each other, and that's much more complete than

13  an actual negotiation where you can hold some things back.

14       So both sides have everything that's in the record.

15  Q.   So, Mr. Meyer, as part of that, would the parties be

16  aware of the number of product sales that are accused in this

17  case?

18  A.   Oh, absolutely.

19          MR. REGER:  Your Honor, may approach the easel,

20  please?

21          THE COURT:  You may use the easel.

22          MR. REGER:  Thank you.  May I move it close closer?

23          THE COURT:  Yes, you may.  As long as you use it

24  consistent with how it's been used during the trial, you're

25  perfectly fine.

1    MR. REGER:  Thank you, Your Honor.  And I'll try to

2    speak up.

3    THE COURT:  You're the one person I'm not worried

4    about hearing.

5    Q.   (BY MR. REGER)  Mr. Meyer, I put up on the easel DDR4,

6    .61 million; DDR5, 9.33 million; and HBM, 7.63 million.  Does

7    everyone agree that these are the sales numbers for the

8    Samsung products in this case?

9    A.   Yes.  These are the accused sales, and those are in

10   millions.  That .61 is 610,000 units.  So those are units.

11   But that's by the accused products, and everybody agrees.  Mr.

12   Kennedy and I do not dispute the number of units as agreed

13   upon.

14   Q.   So the number of sales for DDR4 for the period of time

15   we're talking about is 610,000.  Is that correct?

16   A.   That's correct.

17   Q.   Okay.  And so what is the total number of units that

18   we're talking about here?

19   A.   It's 17.57 million.  So if you added up that total, it's

20   17.57 million units.  So 17-and-a-half million units total

21   accused.

22   Q.   And what time period are we talking about?

23   A.   So that goes -- it's different for the DDR4 and -5

24   patents than HBM.  And so it comes off December '21 for the

25   first two, and the next one is May of '22, and -- and runs

1    through March of this year.  So it's about 16 months.

2    Q.    Understood.  Now, I have to ask about your slide.

3          The last bullet point says valid and infringed.  Are you

4    telling the jury that the patents are valid and infringed?

5    A.    No.  I'm just making that assumption to do my work.

6    That's their assignment to determine valid and infringed.  But

7    I assume that.  Otherwise, I wouldn't have anything to do.

8    But they have to figure that out on their own.

9    Q.    Okay.  Great.  Now, you had mentioned *Georgia-Pacific*.

10   Is there a *Georgia-Pacific* framework you used?

11   A.    Yes.  It's right here, and I mentioned the 15 factors.  I

12   believe Mr. Kennedy mentioned it also, and No. 15 is the

13   actual hypothetical negotiation.  That's where you bring all

14   the information from all the factors together, determine the

15   royalty.  And that first group is really important, comparable

16   license related.  And then there's some other important ones,

17   including profitability business.  But I checked all these in

18   my analysis.

19   Q.    Now, I'd like to -- the very top one on the top left

20   under comparable license related, No. 1 says deals for the

21   same patents.  Is that the first factor you would look at?

22   A.    Yes.  That's what's called prior licensing, and that's --

23   that's important because when you value something, if there's

24   a prior license, you first want to review that and see if that

25   gives you good information to value what you're doing here.

1   Q.   Now, why do you look for comparable licenses for that

2   first factor?

3   A.   Once again, if in this case Netlist has licensed other

4   companies, it tells you a lot about the value of the patent in

5   this case.

6   Q.   Now, did you find any licenses here to help you value the

7   patents?

8   A.   Yes.   There's two licenses where these five patents have

9   been licensed before by Netlist.

10  Q.   And are those two licenses comparable?

11  A.   Yes, they are.

12  Q.   And how did you use those two comparable agreements?

13  A.   Well, we'll talk about them.   One with hynix, I reviewed

14  that and -- to see if I could match it up to our situation

15  here with the hypothetical negotiation.   And then I've also

16  reviewed the JDLA agreement.

17  Q.   And, Mr. Meyer, what is the most recent comparable

18  agreement we're talking about?

19  A.   So this is the hynix license with Netlist from April 5th

20  of 2021.   So it's about two years ago.

21  Q.   So Netlist signed a real-world agreement with a company

22  called SK hynix.   And I know the jury's heard a little bit

23  about them, but can you tell them, who is SK hynix?

24  A.   Well, it's a large company that -- that basically makes

25  the same types of memory products as -- as Samsung.   So you'll

1  see on this chart that Samsung's the market leader, and hynix

2  is No. 2.  They both sell the -- the same types of parts that

3  you're seeing in this case accused against Samsung, they both

4  sell in the U.S., and they have very similar customers.

5      And so one is No. 1, one is No. 2.  It's like Avis and

6  Hertz.

7  Q.   So what does that tell you about the Netlist agreement

8  with hynix?

9  A.   Well, you want to make certain when you look at a

10  license, did the licensee, hynix, does it match up with

11  Samsung?  So we have really good match-up here.  And so if

12  you're looking to take a license and someone licensed the No.

13  2 player in the market, No. 1 will follow.

14  Q.   Now, what other criteria did you look at in order to know

15  the agreement would be similar to the hypothetical

16  negotiation?

17  A.   Well, I mentioned some of this.  Obviously the licensor

18  who owns the property, Netlist, they're licensing hynix.

19  Hynix is the licensee.

20      The licensed patents are all the Netlist patents,

21  including these five patents in this case, and includes

22  similar products.

23      We have a license fee of $40 million, and we'll talk

24  about this most favored licensee clause where the agreement

25  identifies Samsung to compare to.

1167

```
1    Q.   I want to make sure I heard that.  An agreement between

2    Netlist and SK hynix names Samsung?

3    A.   Yes, as a potential future comparable, and we'll talk

4    about that.

5    Q.   Now, you mentioned that SK hynix paid Netlist $40 million

6    for a patent license.  What did you look at in the agreement

7    to know that?

8    A.   I went to the agreement, and Section 8.1 says the amount

9    is $40 million, U.S. dollars.

10   Q.   Now, besides the agreement, did you look at any other

11   evidence to confirm that the $40 million was paid specifically

12   for the patent license?

13   A.   Yes.  I wanted to make certain that that was the royalty,

14   the license fee.  So I went to what's called the 10-K.  And

15   Netlist, as you have heard, is a public company.  They file

16   their financial data with the government, the SEC.  Everybody

17   in this room can download their financial statements.  I went

18   to those financial statements, and I said, how did Netlist

19   tell the public what this amount was.

20   Q.   And what did Netlist's public 10-K tell you?

21   A.   It tells us that the $40 million is a license fee.  And

22   so you'll see in the top yellow an up-front non-refundable

23   license fee of $40 million recognized for licensing our

24   patents.  And then -- that was important because that's

25   confirmation.
```

1       But I went a little deeper.  And you'll see at the bottom

2   there's a summary there of the revenues and -- on the sales,

3   and one revenue is identified as license fee, $40 million.

4       But, more importantly, it says below that, the $40

5   million as consideration to enter into a license agreement.

6   And then further, because once again this is the reporting to

7   the public, it says, the license fee revenue was recognized

8   when we granted the license of our patents to SK hynix since

9   the performance obligation was satisfied at that point in

10  time, telling me that this is a license fee, it's a royalty.

11  Q.   Now, we heard earlier from Mr. Kennedy about the value of

12  supply in the SK hynix agreement.  Do you recall that?

13  A.   Yes, I do.

14          MR. REGER:  Your Honor, at this point I need to seal

15  the courtroom, please.

16          THE COURT:  All right.  At counsel's request and to

17  protect confidential information, I'll order the courtroom

18  sealed.

19      I'll direct that all persons present who are not subject

20  to the protective order that's been entered in this case

21  should excuse themselves and remain outside the courtroom

22  until it's reopened and unsealed.

23                      (Courtroom sealed.)

24

25

1

2                      (Courtroom unsealed.)

3                (The following was had outside the hearing of the

4            jury.)

5                THE COURT:  What is it, Mr. Sheasby?

6                MR. SHEASBY:  I now intend to impeach him in which

7     he admitted under oath that he didn't take the -- that he

8     can't say that the agreement is comparable or non-comparable.

9            There is a section at the end in which he makes reference

10    to other proceedings which makes it difficult for me to

11    impeach with that, and so I've prepared a redacted version of

12    the testimony for impeachment.

13               MR. REGER:  Your Honor, this is exactly what I

14    previewed earlier.  The only reason why he said he could not

15    was because of the Ninth Circuit appeal.  He has two pages of

16    testimony saying only the litigation causes the uncertainty,

17    only the litigation that we are not allowed to talk about.

18               THE COURT:  Show me that.  Show me where it says,

19    only the litigation causes the uncertainty.

20               MR. REGER:  I'm sorry, Your Honor.

21               THE COURT:  I'm not going to let you do that, Mr.

22    Sheasby.  I think it opens the door to the other litigation,

23    and it's not fair for you to do that.  I mean, I'm not going

24    to let you open the door without them going through it --

25               MR. SHEASBY:  I understand.

1    THE COURT:  -- and we're not going to go through

2  that door.

3    MR. SHEASBY:  I understand.  That's why I

4  approached, Your Honor.

5    THE COURT:  How much longer are you --

6    MR. SHEASBY:  I have about 30 more minutes.

7    THE COURT:  You said 20 in your projection.

8    MR. SHEASBY:  I know.

9    THE COURT:  And you're at 40 now.

10    MR. SHEASBY:  I know.

11    THE COURT:  All right.  Perhaps a little sleight of

12  hand.  We'll see.

13      We're going to take a short recess, and then we'll

14  continue.

15    MR. SHEASBY:  Thank you, Your Honor.

16    MR. REGER:  Thank you, Your Honor.

17      (The following was had in the presence and hearing

18      of the jury.)

19    THE COURT:  Ladies and gentlemen, this witness has

20  got some additional time on the witness stand, and we're going

21  to use this opportunity to take a short recess.

22      Simply close your notebooks, if you will, and leave them

23  in your chairs, follow all my instructions, including not to

24  discuss the case among each other, and we'll proceed as soon

25  as this recess is over.

1210

1    The jury's excused for recess.

2            (Whereupon, the jury left the courtroom.)

3            THE COURT:  All right.  The jury is out of the room.

4    Mr. Cordell, do I understand from earlier discussion you

5    wish to withdraw Document 472, the motion filed overnight

6    regarding PX 1820?

7            MR. CORDELL:  Yes, with the Court's permission.

8            THE COURT:  It's withdrawn.

9    We stand in recess.

10                    (Brief recess.)

11           THE COURT:  Be seated, please.

12           MR. CORDELL:  Your Honor, before we proceed, I'm

13   happy to report that Mr. Sheasby and I have worked out an

14   agreement.  He still hasn't decided whether to use the

15   deposition that we talked about in chambers this morning, but

16   we'll do that and that way we don't have to hunt down Ms. Park

17   and go through -- go through --

18           THE COURT:  This is with regard to Mr. Ji?

19           MR. CORDELL:  Yes, Your Honor.

20           THE COURT:  Well, assuming there's enough time to

21   put him on, we'll cross that bridge when we get there.

22           MR. CORDELL:  Thank you.

23           THE COURT:  Let me give you this information,

24   Counsel.  As of right now, Plaintiff has 53 minutes and a few

25   seconds remaining of designated trial time and the Defendant

1    has 21 minutes.

2         All right.  Are you ready to continue with your

3    cross-examination, Mr. Sheasby?

4              MR. SHEASBY:  I am, Your Honor.

5              THE COURT:  You may return to the podium.

6         Let's bring the jury in, please.

7              (Whereupon, the jury entered the courtroom.)

8              THE COURT:  Please be seated, ladies and gentlemen.

9         We'll continue with the cross-examination of Mr. Paul

10   Meyer by the Plaintiff.

11        Mr. Sheasby, you may continue.

12             MR. SHEASBY:  Thank you, Your Honor.

13        If we could have slide 51, Mr. Huynh.  Five one.

14   Q.   (BY MR. SHEASBY)  So one of the other factors that the

15   *Georgia-Pacific* standard requires we analyze is the

16   technological contribution of the patents and what

17   alternatives existed.  Fair?

18   A.   Fair.  You need to consider the technical advancements.

19   I'd agree with that.

20   Q.   And for the '918 and '054 Patents, this is what Mr.

21   Kennedy felt.  He felt that Samsung was generating $680

22   million in revenue and that the value of Netlist's patents was

23   $196 million.  Correct?

24   A.   I'm not certain exactly how he described it, but I would

25   say that 196 is the piece he's taken out and 681 is my

1  understanding.

2  Q.   And that's the piece he believes in a hypothetical

3  negotiation the parties would agree Netlist gets to keep for

4  the '918 and '054 Patents.  Correct?

5  A.   When you say gets to keep, I don't understand that.

6  Q.   That would be its damages number for these patents.

7  A.   I believe that's what Mr. Kennedy testified to.

8  Q.   And, of course, one of the things that happens in normal

9  negotiations, for example, when you negotiate over a car, you

10 can say to the salesperson, well, I'm going to go down the

11 street and buy from another dealer, if you don't like the

12 price.  Correct?

13 A.   A consumer could do that, yes, sir.

14 Q.   But in this case we know some information about whether

15 Samsung can go down the street.  Fair?

16 A.   Well, I really don't understand that question.  It's not

17 like a hold-up situation.  It is they're negotiating to the

18 technology, the patents.  They're looking for a patent

19 license, sir.

20 Q.   Well, we know something which is we know that Samsung's

21 technical leader and corporate representative on the subject

22 could not identify a single non-infringing alternative to

23 Netlist's technology for the '918 and '054 Patents.  Correct?

24 A.   I'm aware of that testimony.

25 Q.   And Mr. McAlexander also could not identify whether there

1  was a single acceptable non-infringing alternative to

2  Netlist's patents for the '918 and '054 Patents.  Correct?

3  A.   Well, I'm confused between what's on the screen and what

4  you just said, sir.  So I believe you're saying he didn't talk

5  to any Samsung engineers and so, you know, I think he -- that

6  wasn't part of what was doing, but that's the testimony.

7  Q.   Well, the first part of the testimony is he didn't talk

8  to any engineers.  Correct?

9  A.   That's correct.

10  Q.   The second part of his testimony is he didn't identify

11  any acceptable non-infringing alternatives to Netlist's

12  patents.  Correct?

13  A.   Well, that's his testimony.

14  Q.   Now, for the --

15       MR. SHEASBY:  Let's go to slide 60.

16  Q.   (BY MR. SHEASBY)  For the '339 Patents, Mr. Kennedy said

17  that Samsung was going to generate $312 million, and Netlist

18  in the hypothetical negotiation would receive $44 million.

19  Correct?

20  A.   I believe that's his damage number, yes, sir.

21  Q.   And, once again, you can have a negotiation between

22  parties.  That happens in real life.  Correct?

23  A.   Yes.  There's real life and there's the hypothetical.

24  But, yes, they're negotiating.

25  Q.   But in this case we know something important about

1   whether Samsung had any alternatives to the '339 Patent.

2   Correct?

3   A.   Well, I can't -- the way you asked that, we know what the

4   testimony is.  We don't know whether he actually ever

5   endeavored to do it.  But -- so the testimony is what it is.

6   Q.   So he didn't ask a single engineer as to whether there

7   was an alternative to the '339 Patent.

8   A.   Well, that's -- that's what he said.  That's correct.

9   Q.   And he didn't investigate whether there was any

10  alternative.  Correct?

11  A.   That's the testimony, but we don't know if he ever

12  thought he should, like I don't know what his assignment was

13  and what he thought was proper.

14  Q.   If you were facing a $400 million verdict in this case,

15  wouldn't you want to investigate and be able to tell the jury

16  if you had an alternative?

17  A.   Well, what you'd want to do is go look at the prior

18  licensing and understand what your competitors are paying and

19  paying something like -- like they're paying because that's

20  how -- that's how we value things.

21       And so it's not about $400 million.  It's -- that number

22  doesn't have a basis.  It's about going to the comparables and

23  going, what's this teach us about the value of these patents.

24  That's what -- that's what you would do in a hypothetical.

25  Q.   All right.  And to be clear, you're not a licensed

1   negotiation expert.  Correct, sir?

2   A.   I believe I told you I don't say to the public that I am

3   a hypothetical -- no, that I'm a licensed -- patent license

4   negotiating expert.  I have expertise in determining royalties

5   and assisting with negotiations.

6   Q.   And then for the '060 and '160 Patents, Mr. Kennedy

7   believes that Samsung would generate $903 million in revenue.

8   Is that correct?

9   A.   That's the figure, yes, sir.

10  Q.   And the amount that Mr. Kennedy believes would be awarded

11  is $163,700,000.  Correct?

12  A.   That's his damage number, yes, sir.

13  Q.   And we know because Doctor Robins told us that Samsung

14  couldn't identify any other patent by any other party that

15  uses -- that is used by Samsung's products.  Correct?

16  A.   That's his testimony, yes, sir.

17  Q.   And you didn't for the ladies and gentlemen of the jury

18  identify any other alternative that was non-infringing and

19  acceptable for these patents, did you, sir?

20  A.   I did not because I wasn't focused on that.

21         MR. SHEASBY:  I move to strike anything after "I did

22  not."

23         THE COURT:  Overruled.  It's responding to your

24  question.

25  Q.   (BY MR. SHEASBY)  And to be clear, you did not identify a

```
 1    single one of Netlist's -- Samsung's 12,000 memory patents

 2    that cover the products at issue in this case.  Correct?

 3    A.   That's correct.  I'm not a scientist.

 4              MR. SHEASBY:  Pass the witness, Your Honor.

 5              THE COURT:  Redirect by the Defendants?

 6         I assume we have redirect since you've gone back to the

 7    podium, Mr. Reger.

 8              MR. REGER:  Yes, Your Honor.  My apologies.

 9              THE COURT:  Proceed with redirect examination,

10    please.

11              MR. REGER:  Thank you, Your Honor.

12                     REDIRECT EXAMINATION

13    BY MR. REGER:

14    Q.   Mr. Meyer, I know it's been a long morning so I'll be

15    brief.

16         Netlist's counsel asked you extensively about SK hynix's

17    supply.  Do you recall that?

18    A.   Yes, sir.

19    Q.   And he suggested that there was an obligation for hynix

20    to supply products to Netlist.  Do you recall that?

21    A.   Yes, sir.

22    Q.   And you said that's true except for another clause.  Did

23    I hear you correctly?

24    A.   Yes, sir.

25              MR. REGER:  Can I have JX 48, section 5.3, please.
```

1       MR. SHEASBY:  Your Honor, may we approach?

2       THE COURT:  Approach the bench.

3       (The following was had outside the hearing of the

4       jury.)

5       MR. SHEASBY:  There's about to be a MIL violation.

6  They intend to elicit from this witness that there was not a

7  supply obligation to the SK hynix agreement, and Your Honor

8  granted that motion in limine precluding them from arguing

9  that there was not a supply obligation.

10      MR. REGER:  Your Honor, the motion in limine

11 actually was that the supply provision is not enforceable.  We

12 are never making that argument.  The agreement is enforceable

13 and all terms within the agreement are enforceable.

14      MR. SHEASBY:  That was the clear intent of that

15 motion in limine was for them not be able to argue the clause

16 is not enforceable -- the supply clause is not enforceable.

17      MR. REGER:  Your Honor --

18      THE COURT:  Just a moment.

19      MR. REGER:  Understood.

20      THE COURT:  Let me get my notes.

21      MR. REGER:  And, Your Honor --

22      THE COURT:  Tell me how you're going to revisit this

23 topic without implying or saying that the supply obligation

24 was not enforceable.

25      MR. REGER:  Your Honor, there's a section in there

1    saying the supply is not obligated.  There's another section

2    in the agreement that is enforceable.  The entire agreement is

3    enforceable.  We're not saying there is no -- anything is

4    legally unenforceable.

5              THE COURT:  We're talking about the supply

6    obligation provision.

7              MR. REGER:  Yes, Your Honor.  And if anything, Your

8    Honor, I don't believe we are in any way treading on that --

9    that order, but even if we are, Mr. Sheasby clearly opened the

10   door.

11             MR. SHEASBY:  I didn't open the door.  They are

12   forbidden from arguing that the supply agreement is not

13   legally binding.

14             MR. REGER:  And I agree it is legally binding.

15             THE COURT:  Have you got the provision you can show

16   me?

17             MR. REGER:  Not printed out, Your Honor.  I

18   apologize.

19             THE COURT:  Do you have a printed copy?

20             MR. SHEASBY:  I do have a printed copy.

21             THE COURT:  Go get it for me.

22                   (Pause in proceedings.)

23             THE COURT:  Well, here's the provision that calls

24   for supply by SK hynix.  Where are we getting into that is or

25   is not enforceable?

1    MR. REGER:  Your Honor, we're not arguing it's not

2    enforceable.  If you look at section 5.3, it is titled, No

3    Purchase Obligation.  Neither party is forced to sell or buy

4    unless they go through a purchase order process, which Mr.

5    Meyer testified to.

6         MR. SHEASBY:  That is not -- the clear intent of

7    what they're trying to do is to suggest that there was no

8    supply obligation and that's not legally enforceable.  This is

9    the exact subject we argued in front of the Court and the

10   Court denied the MIL on.

11        The reason for that is because Mr. Meyer is not a legal

12   expert.  He can't be interpreting what that clause means.

13   It's the Court to interpret it.  And that was the whole

14   portion of the motion in limine.

15        MR. REGER:  The words 'enforceable' or

16   'unenforceable' are not going to my lips or Mr. Meyer's lips.

17        MR. SHEASBY:  Pardon me.

18        THE COURT:  One at a time.

19        MR. REGER:  But Mr. Meyer will say there's a section

20   called no purchase obligation in section 5.3.  That's all he

21   will say.

22        MR. SHEASBY:  And what he's going to say is saying

23   there's no obligation is tantamount to saying it's not

24   enforceable and not binding.

25        MR. REGER:  As Mr. Sheasby argued earlier, this is

1    an exhibit -- I believe it is a joint exhibit.  And Mr.

2    Sheasby asked him about this.

3            THE COURT:  I'm not going to exclude the use of any

4    provision in the pre-admitted document.  5.1 and 5.3 are in

5    the document.  If they're characterized as legally or not

6    legally enforceable, that's a different thing.  But I'm not

7    going -- as long as you stick to the exact language in the

8    document, I'm not going to exclude that.

9        If Plaintiff wanted the exact language excluded, that

10   should have been a part of the MIL.  The MIL provides that

11   there's not to be a characterization of the supply agreement

12   as not legally binding.  That doesn't negate whatever 5.3 says

13   on the face of it.

14           MR. REGER:  Thank you, Your Honor.

15           THE COURT:  Okay?

16           (The following was had in the presence and hearing

17           of the jury.)

18           THE COURT:  Let's proceed.

19           MR. REGER:  If I can have -- I believe it's JX 48.

20   Show me sections 5.1 and 5.2 first.

21   Q.   (BY MR. REGER)  Now, Mr. Meyer, Netlist's counsel asked

22   you a few questions about section 5.1 and 5.2.  Do you recall

23   that?

24   A.   Yes, sir.

25   Q.   And you had indicated that there was another clause in

1    the agreement.  Did I hear you right?

2    A.    Right.  On supply, yes, there's another clause, yes, sir.

3    Q.    Did Netlist counsel show you that section?

4    A.    No, sir.

5              MR. REGER:  May I have the very next section,

6    please, section 5.3.

7    Q.    (BY MR. REGER)  Mr. Meyer, please just read this

8    provision into the record, please.

9    A.    It says, "5.3.  No purchase obligation.  Nothing in this

10   agreement shall be deemed to require either party to purchase

11   or sell any products from or to the other party unless and

12   until a valid purchase order is issued and accepted pursuant

13   to the terms of the product purchase and supply agreement."

14             MR. REGER:  Thank you, Your Honor.  No further

15   questions.

16             THE COURT:  Further cross-examination?

17             MR. SHEASBY:  No further questions, Your Honor.

18             THE COURT:  All right.  You may step down, Mr.

19   Meyer.

20             THE WITNESS:  Thank you, sir.

21             THE COURT:  You're welcome.

22        Defendants, call your next witness.

23             MR. CORDELL:  Your Honor, at this time, subject to

24   admission of exhibits mentioned today, Defendant rests.

25             THE COURT:  All right.  Defendants have rested their

1222

1    case in chief.

2        Does the Plaintiff have a rebuttal case to put on?

3            MR. SHEASBY:  Your Honor, Plaintiffs respectfully

4    rest their case.

5            THE COURT:  All right.  Both sides rest and close,

6    subject to final instructions and argument to the jury.

7    Correct?

8            MR. SHEASBY:  Yes, Your Honor.

9            MR. CORDELL:  Yes, Your Honor.

10           THE COURT:  All right.  Ladies and gentlemen of the

11   jury, that means you have now heard all the evidence in this

12   case.

13       There are several things procedurally that the Court has

14   to take up with counsel that not only do not require your

15   presence, it would be inappropriate for you to be involved in

16   them.  And these steps need to be completed between counsel

17   for the parties and the Court before I give you my final

18   instructions on the law and counsel present their closing

19   arguments to you.

20       What that means is you're done for the rest of the day.

21   I'm about to excuse you.  It will take us probably until 5:00

22   or so this afternoon to get these other matters handled.  It's

23   my best guess, which means I need you back first thing in the

24   morning at 8:30.

25           And let me say this.  I think we can start at 9:00 in the

1    morning.  I know we're supposed to have bad weather overnight.

2    Let's make it a 30-minute later start in the morning than

3    otherwise.  So take that into account, plan your travel

4    accordingly, but be in the jury room ready to come into the

5    courtroom in advance of 9:00.

6         I also need to tell you, without going into any detail,

7    that the steps the Court needs to take up with the parties is

8    not an exact science.  It's my best guess we'll have

9    everything done and be ready to start with you at 9:00 in the

10   morning.  It may be that we're done and I'm here patting my

11   foot waiting for 9:00 to get here to start it may be you have

12   to wait on me a little bit in the morning.  This is a best

13   estimate.

14        I have done this several times.  I think this is a close

15   estimate, but it's an estimate.  So that being said, you're

16   excused for the rest of the day.  I want you to take your

17   notebooks and leave them closed in the jury room.

18        And I'll also tell you that if you want to wait for

19   lunch, Ms. Clendening has got it ordered and it will be here

20   about 11:30.  If you don't, you don't have to.  That's

21   strictly up to you.

22        But please follow all the instructions I've given you.

23   We are getting very close to being able to conclude this

24   trial, and it would be an absolute travesty if all the time,

25   effort, and resources that have gone into this were put at

1    risk by any member of the jury violating any of these

2    instructions I've given to you.

3         So please be careful and prudent and follow all the

4    instructions.  Don't discuss or communicate about the case

5    with anyone.  Don't discuss or communicate about the case with

6    the eight of yourselves in any way.

7         I anticipate tomorrow I'll be able to begin the day by

8    giving you my final instructions, after which the parties will

9    through their counsel present their closing arguments to you,

10   and that's the point where I'm going to say, "Ladies and

11   gentlemen, you may now retire to the to the jury room and

12   deliberate on your verdict."

13        And those magic words flip the switch to 180 degrees

14   where you go from being prohibited from discussing the

15   evidence in the case with each other to being required to

16   discuss the evidence in the case with each other in an effort

17   to reach a unanimous decision about how to answer the

18   questions that will be included in the verdict form.  So

19   please keep all those instructions in mind.

20        With that, ladies and gentlemen, you're excused until

21   tomorrow morning at 9:00.

22             (Whereupon, the jury left the courtroom.)

23             THE COURT:  Counsel, be seated, please.

24        Just for your information, counsel, the Plaintiff had a

25   remaining 47 minutes and the Defendant had remaining 19

1    minutes of designated trial time at the time each side rested

2    and closed.

3        It's about a quarter after 10:00.  I'd like to take about

4    a two-hour break, and about 2:30 -- not 2:30, 12:30, about

5    12:30 I'd like to have those of you back who are going to

6    present any motions under Rule 50(a) of the Federal Rules of

7    Civil Procedure to the Court.  I'll hear competing motions

8    from both parties at that time.

9        I would ask you to streamline your motions.  I've heard

10   all the evidence.  I know what the issues are.  Sometimes Rule

11   50(a) motions get drawn out unnecessarily because everyone

12   feels they must say every word for the purposes of the record,

13   but I'm certainly prepared to hear your motions and to rule on

14   them.  I would just request that you be as efficient in your

15   presentation as possible.

16       I am happy to hear from trial counsel who've not

17   participated in the trial so far, however you want to staff

18   it.  If you are involved in preparing for closing arguments

19   tomorrow, you're not required to be here this afternoon and

20   you can use that time to prepare your closing arguments.

21       I assume, Mr. Sheasby, you'll close for Plaintiff.  Is

22   that correct?

23            MR. SHEASBY:  Yes, Your Honor.

24            THE COURT:  And I assume, Mr. Cordell, you're going

25   to close for Defendants.

1226

1    MR. CORDELL:  With the Court's permission, yes.

2    THE COURT:  All right.  You gentlemen may use the

3  remainder of the day to prepare for closing arguments

4  tomorrow.  Anyone else on the trial team that needs to be

5  outside of the courtroom is free to do so as long as your

6  sides are adequately staffed when we take up motions under

7  Rule 50(a).

8    Once I have heard and ruled on motions under Rule 50(a),

9  I intend to conduct an informal charge conference, reviewing

10  the most current submission from the parties regarding the

11  proposed final jury instructions and verdict form.  And after

12  I have had an informal and off-the-record opportunity to hear

13  from you on those matters and to probe any areas that the

14  Court believes should be discussed and developed further, then

15  I'll conduct a formal charge conference, at which time either

16  party may make such objections as they believe are necessary.

17    At this point, to be candid with you, I want to see how

18  the rest of the day goes.  If we get too far into the

19  afternoon, I'm reserving the right to do the formal charge

20  conference at 8:00 in the morning.  But I will let you know

21  that once we get into the afternoon today.

22    All right.  Are there any questions or issues that need

23  to be raised before we recess and then I'll see those back at

24  12:30 that are going to participate in Rule 50(a) practice?

25    MR. SHEASBY:  Your Honor, earlier this week you

1227

1    ordered that all demonstratives be shared with the other side,

2    anything that's going to be shown to the jury, and we haven't

3    been able to come to an agreement on exchange of

4    demonstratives for closing.  And so we're going to need Court

5    intervention on that.

6              THE COURT:  All right.  Where are you as far as the

7    discussions that you've had?  You just can't agree on anything

8    which wouldn't surprise me?

9              MR. SHEASBY:  We can't agree on anything.  So

10   there's no agreement to exchange and there's no agreement as

11   to time.

12             THE COURT:  All right.  What's --

13             MR. SHEASBY:  We are willing to exchange, Defendants

14   don't want to exchange in time because there's no agreement on

15   exchange, there's no agreement on time.

16             THE COURT:  What's your position on this, Mr.

17   Cordell?

18             MR. CORDELL:  Our understanding is here, Your Honor,

19   we don't exchange closing demonstratives.  We do opening and

20   we do for witnesses, but for closing the ability to do two

21   things is imperative.  One is to prepare the arguments we

22   think are most important and would like to present those to

23   the jury by the other side first; and then, secondly, it's

24   imperative that we have the ability to respond to what the

25   Plaintiff says in his opening or his first close.

1    The ability to not only respond to the first close but

2    anticipate the second close is difficult.  And if I'm

3    constrained by the slides that I can put together ahead of

4    time, that's an impediment that I'd prefer not to face and,

5    frankly, in this court we don't do that.  We don't exchange

6    closing slides.

7        THE COURT:  Well, you are correct that the typical

8    practice and custom in this court is not to require the

9    exchange of demonstratives.  If the parties agree to it or if

10   they agree to some modified position between those extremes,

11   then I'm happy to hear and, barring some reason that's

12   unforeseen, confirm the parties' agreement and direct that

13   they do that.

14   But barring an agreement, you're not required and I'm not

15   going to require you to exchange demonstratives before

16   closing.

17       MR. SHEASBY:  Okay, Your Honor.  I just will flag

18   that it is likely to be some serious issues then.  There are

19   aspects of testimony, in particular very improper testimony

20   that Mr. Robins gave -- Doctor Robins gave that I anticipate

21   will be used and will be used in a way that's improper.  And I

22   have no way of policing that because I can't see the slides.

23   And so I think, given the extreme sort of flippance

24   [sic] of this trial, I think that the discretion is the better

25   part of valor and there should be an exchange -- we don't need

1    to exchange trial testimony.  That's just being pulled up.

2    But if they're making a demonstrative, I think that needs to

3    be shown.

4            THE COURT:  Well, let me just say this, Mr. Sheasby.

5    You and Mr. Cordell have been lead counsel throughout this

6    trial, you've been present for every witness, you've heard or

7    made every objection that's been made, and you've certainly

8    heard every ruling the Court's given.

9        As long as your closing demonstratives conform to the

10   Court's rulings and the admitted evidence, I don't anticipate

11   there should be any problems.  If somebody strays

12   intentionally across that line, I will view it as an

13   intentional act.

14       Both of you have tried multiple cases in this court

15   before me, you both know that the Court considers closing

16   arguments to be the most serious part of an entirely serious

17   process, and I don't want there to be objections to the other

18   one's closing unless there is absolutely no alternative.

19       And the safest way to avoid that is to make sure that

20   what you say and the demonstratives that you use comport with

21   the admitted evidence and the prior rulings of the Court

22   throughout the trial.  And both of you have firsthand personal

23   knowledge of that, so there's no reason why that can't and

24   shouldn't be done.

25           But I'm not barring an agreement between you.  I'm going

1    to follow the Court's traditional practice and not require

2    that you exchange demonstratives.

3              MR. SHEASBY:  I understand, Your Honor.

4              THE COURT:  All right.

5              MR. SHEASBY:  Your Honor, I used new exhibits with

6    Mr. Meyer today.  What's the procedure for us getting those

7    entered?  Should we do that this afternoon or tomorrow

8    morning?

9              THE COURT:  Well, you both need to make sure the

10   other one knows what you intend.  But before I bring the jury

11   in tomorrow morning, I'll have you read into the record those

12   items used during today's portion of the trial.

13             MR. SHEASBY:  Great.  Thank you, Your Honor.

14             THE COURT:  Anything further?

15             MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

16             MR. CORDELL:  Nothing from Defendants, Your Honor.

17   Thank you.

18             THE COURT:  All right.  We stand in recess until

19   12:30.

20                        (Recess.)

21             THE COURT:  Be seated, please.

22       All right, Counsel.  The Court's now going to proceed to

23   take up motions from either party pursuant to Rule 50(a) of

24   the Federal Rules of Civil Procedure.

25        For those of you not familiar with the Court's practice

1    in this area, what I would like to do is I'd like to have an

2    identification of each of the areas topically where either

3    party cares to move for judgment as a matter of law under Rule

4    50(a).  I do this because it is typically common to have

5    diametrically-opposed motions under the Rule that then lend

6    themselves to concurrent argument.

7         If Plaintiff moves for judgment as a matter of law on

8    infringement on all the asserted claims, the Plaintiff does,

9    and then Defendants moves for judgment as a matter of law of

10   no infringement on all asserted claims, then I can hear those

11   arguments at the same time.

12        So without going into the merits, I'd like somebody for

13   Plaintiff to go to the podium and identify for me

14   substantively the areas where Plaintiff seeks judgment as a

15   matter of law, and then I'll hear an identification of similar

16   areas for Defendant, and then we'll determine how to proceed

17   with actual argument.

18        So let me hear from Plaintiff first on this, please.

19             MR. TEZYAN:  Good afternoon, Your Honor.  Michael

20   Tezyan on behalf of Netlist.

21             THE COURT:  Good afternoon.  Identify the areas

22   where Netlist seeks judgment as a matter of law under Rule

23   50(a), please.

24             MR. TEZYAN:  Netlist is bringing Rule 50(a) motions

25   on four topics today:  infringement, willfulness, validity,

1    and damages.

2         THE COURT:  Infringement, willfulness, validity, and

3    damages.

4       All right.  Let me hear from Defendant Samsung on the

5    same general inquiry.

6         MS. DEGNAN:  Good afternoon, Your Honor.  Lauren

7    Degnan for Samsung.

8         THE COURT:  Yes.

9         MS. DEGNAN:  The first one is the foundry products

10   issue.  All sales of the accused products prior to July 15th,

11   2020 are licensed.

12      The second is non-infringement of all asserted claims of

13   all asserted patents, both literally and under the doctrine of

14   equivalents.

15      Third is invalidity under written description for the

16   '339, '918, and '054 Patents.

17      The fourth is no willful infringement.

18      The fifth is no damages.

19      And the sixth is no damages for the '054 Patent prior to

20   its issue date of January 25th, 2022.

21      And that is all.

22        THE COURT:  All right.  Just a minute.

23      All right.  Let's do this.  Let's begin with the

24   diametrically-opposed motions.  We'll start with Plaintiff's

25   motion for judgment as a matter of law on infringement, and

1    then we'll also hear concurrently Defendants' argument for

2    judgment as a matter of law of non-infringement.

3        Whoever's going to present Plaintiff's argument on this,

4    please go to the podium and begin.

5            MR. TEZYAN:  Plaintiff moves for judgment as a

6    matter of law that no reasonable jury could find that Samsung

7    has not infringed the patents-in-suit literally or under the

8    doctrine of equivalents.

9            THE COURT:  Let me stop you, Counsel.  You're

10   obviously reading a document to me.  Number one, that means

11   you're going to talk too fast for the court reporter, you're

12   going to talk too fast for me.

13       Number two, it means you're going to tell me a whole lot

14   of stuff other than what I really need to hear, having heard

15   all the evidence in the case.

16       Is there a way you can present this argument without

17   reading a pre-determined script so that we can get down to the

18   actual issue without going through all the background that

19   would be included in a motion if it were filed in written

20   form?

21           MR. TEZYAN:  Yes, Your Honor.  I'll try to keep my

22   presentation short.

23           THE COURT:  In other words, said in another way, can

24   we cut to the chase here?

25           MR. TEZYAN:  Yes, Your Honor, we can.

1    THE COURT:  Okay.  Let me hear your real reasons why

2    you think you're entitled to JMOL on infringement.

3    MR. TEZYAN:  So based on the testimony of Doctor

4    Jung Bae Lee, Doctor Indong Kim, Mr. Hun-Joo Lee, Mr. Bruce

5    Lo, Mr. Garrett Davey, Mr. Kyungsoo Park, Mr. Hyun Joong Kim,

6    and Mr. Sung Joo Park, Mr. Jung Mo Yang, Mr. Hyun Joong Kim,

7    Mr. Jihwan Kim, and Mr. Anton Tsui, as well as the admissions

8    of Defendants' experts, Mr. McAlexander and Doctor Robins'

9    cross -- I mean, Doctor Robins' testimony on

10   cross-examination, Netlist respectfully submits that no

11   reasonable jury can conclude that Samsung has not infringed

12   the patents-in-suit literally or under the doctrine of

13   equivalents.

14   THE COURT:  All right.

15   MR. TEZYAN:  And if I may jump into specific reasons

16   for each set of claims?

17   THE COURT:  All right.

18   MR. TEZYAN:  First, Samsung's argument with respect

19   to claims 1, 5, 13, 18, and 19 of the '918 Patent that the

20   converter circuits are different from LDO regulators fails as

21   a matter of law because it's contrary to the claim language.

22   The claims impose no structural limitation on the claimed

23   converter circuit.

24   Mr. McAlexander's testimony and the testimony of Samsung

25   and Renesas engineers establish that the LDOs in Samsung's

1   DDR5 DIMMs perform the function of converting an input voltage

2   to provide a fourth regulated voltage.  Mr. McAlexander's

3   testimony also establishes that the LDOs are circuits.

4       For the asserted claims of the '054 patent, Samsung's

5   argument that the DDR5 off state is not a second operable

6   state fails as a matter of law because it's contrary to the

7   parties' agreed-upon construction for second operable state

8   which refers to the state of the memory module, not the state

9   of the SDRAMs.

10      It is undisputed that when there is an overvoltage or

11  undervoltage condition, the SDRAMs on the accused DDR5 modules

12  are turned off while other components on the memory module

13  remain on.  For example, Mr. McAlexander conceded that when

14  the DRAMs are turned off, power is still supplied to the

15  on-module power management block on Samsung's accused

16  products.

17      For the '339 Patent, Samsung's argument that the data

18  buffers and its DDR4 LRDIMMs do not satisfy the drive

19  limitation fails as a matter of law because the data

20  buffers -- I'm sorry, I lost my place -- because that argument

21  is contrary to the Court's claim construction.

22      The Court considered but did not adopt Samsung's

23  fork-in-the-road construction, and the Court construed drive

24  to mean enabling only one of the data paths while the other

25  possible paths are disabled.  Netlist's infringement expert,

1    Doctor Mangione-Smith, identified several instances of

2    infringement, for example, byte-wise data paths comprising an

3    upper and lower nibble.

4        For the '060 and '160 Patents, Samsung's argument that

5    the core dies in the accused HBM products are not array dies

6    because they contain DRAM fails as a matter of law because it

7    is contrary to the Court's construction.

8        The Court's construction of array die refers to a DRAM

9    circuit, not DRAM.  It is undisputed that the only place the

10   term 'DRAM' appears in the intrinsic record is the Rajan prior

11   art reference that was the basis for the Court's construction.

12   Samsung's engineers and the president of its memory division,

13   Doctor Jung Bae Lee, confirm that the Rajan design does not

14   reflect the design of Samsung's accused HBM products.

15       Further, Doctor Robins admitted that the core dies in

16   Samsung's HBM products have components other than the alleged

17   DRAM circuits.

18       As to claims 1, 5, and 7 of the '060 Patent, Samsung's

19   argument that all of the array dies in the accused products

20   feature die interconnects that are in electrical communication

21   with all of the array dies fails as a matter of law.  The '060

22   specification makes clear that the data ports enable

23   electrical communication between the array dies and the die

24   interconnects.

25       Further testimony from Mr. Milton Doctor Brogioli, Doctor

1  Robins, and Mr. Jihwan Kim, have shown that the HBM products

2  practice the not in electrical communication limitation

3  because, for example, Doctor Robins agreed that where there is

4  no driver or receiver pair connected to the TSV, there's no

5  electrical communication -- I'm sorry, electrical connection

6  between the memory array and the TSV.

7          Finally, infringement of all of the claims I previously

8  mentioned is supported by claim-by-claim testimony of

9  Netlist's experts, Doctor Mangione-Smith and Doctor Brogioli.

10         Therefore, Plaintiff respectfully requests that the Court

11  enter judgment in its favor on the issue of infringement and

12  hold that Defendants have infringed the patents-in-suit.

13         THE COURT:  All right.  Thank you.

14  Let me hear from Plaintiff on the issue of

15  infringement/non-infringement.

16         MR. McKEON:  Good afternoon, Your Honor.  Mike

17  McKeon for Samsung.

18         So we basically have two different aspects.  We have a

19  sort of failure of proof aspect and then the traditional

20  missing limitation aspect.

21         On the failure of proof, as you know, for the '918 and

22  '054, the PMIC was, you know, the central infringement theory

23  in the case.  And as it turns out, we use -- Samsung uses

24  eight different PMICs in the accused products, and they only

25  put evidence on for three PMICs.  And their evidence consisted

1    of the data sheets for Samsung, and there was two different

2    PMICs for the Samsung PMICs, is JTX 11 and JTX 12.  And then

3    they also had a Renesas PMIC, which is JTX 30.

4         So, you know, with respect to that, they have the

5    evidence in the record.  But with respect to the other five,

6    they don't.  So we think there's failure of proof on that.  By

7    way of example, there's a voltage monitor circuit configured

8    to monitor as required of claim 1 of the claims.  And for that

9    particular one, they -- they said that it pointed to the JTX

10   11 PMIC, but -- and rely only on the JTX -- yeah.  So

11   basically they relied on the wrong data sheet for the

12   particular product that they pointed to, Your Honor.

13        And then for '339, it's similar.  We have two different

14   buffers that we acquire from vendors.  One is from Renesas,

15   and one is from Montage.  And we think there's a failure of

16   evidence in terms of which products use which buffer.

17        They relied on the JTX 20, which is the Renesas buffer

18   data sheet, but nothing from Montage.  And there really was no

19   representative product, you know, made -- or argument or

20   evidence relating to representative products.  So there's a

21   failure of proof on that.

22        With respect to the particular elements, and I'll just go

23   one by one through the claims, through the patents.

24        '339, as Your Honor knows, drive limitation was a big

25   dispute at the trial, and the requirement of the claim is to

1    enable only one data path while the other data paths are

2    disabled.  Mr. Mangione-Smith admitted on cross-examination

3    there was only a single path.  His response to that was to

4    point to two nibbles which are just four bits each.  So it's

5    two separate paths, but it's only four bits.  And the claims

6    very specifically require the byte-wise, byte-wise data path

7    which, of course, is eight bits.

8         So with the admission it's only a single path and what

9    the evidence they put on with the two different paths of four

10   bits only, we think that's -- we think the evidence doesn't

11   support what the claim construction requires.

12              THE COURT:  That was the famous half-banana

13   argument?

14              MR. McKEON:  That was half the banana, Your Honor.

15   Yes, it was.

16        So we think there should be a, you know, a finding -- a

17   directed verdict on the JMOL with lack of sufficient evidence

18   on that.

19        '918, you know, Your Honor, you know, converter circuit,

20   hotly contested in the case.  We think based on the fact

21   that -- well, let me just comment on something counsel said

22   which I thought was interesting.  He said there was -- the

23   claims impose no structural limitation on converter circuit.

24        Now, we know that can't be true, Your Honor, because it's

25   not a means -- it's not a means-plus-function claim.  And if

1    there's no structural limitation, this would be a

2    means-plus-function claim because, as Your Honor knows the law

3    on this, if it's just function in an apparatus, it's really a

4    means for.  And that's a whole different analysis then.  So if

5    they are saying now it's really a means-plus-function claim, I

6    think they have a bigger problem.

7        We think the claim does -- its converter circuit requires

8    a specific structure, and they put on a case with just

9    function.  So they didn't -- they didn't really prove up the

10   structure that's required.

11       They did, Your Honor, get into the evidence with a lot of

12   back and forth between the parties in sidebar of a switch.

13   But with the evidence they pointed to, it doesn't serve as a

14   switch.  It's really an amp hooked up to a transistor.  And

15   what the evidence shows, that that's a regulator.  It's not

16   serving as a switch.

17       So the one little nibble that they got in, if I can use

18   the word 'nibble' on this, it doesn't carry their burden on

19   that because that's not a -- that's not a switch at all.

20       So we think there's a -- given the record, that, you

21   know, there should be a finding of judgment as a matter of

22   law.

23       '054, Your Honor, as you know, the second operable state

24   was the big issue there.  And the debate was the DRAMs are all

25   turned off.  And our view, that was the DRAMs are turned off,

1  then the memory module is not in an operable state.  And

2  there's no dispute that in what they say is the second

3  operable state, the only thing working is some temperature

4  sensor, things of that nature.

5       But no dispute that the DRAM's are off, and because the

6  DRAMs are off, we don't think it satisfies the Court's

7  construction which, you know, admittedly is directed to the

8  module.  But with a module, the DRAMs being off in a memory

9  module, the whole purpose of the module is to, you know, store

10 data in the -- in these memory chips.  If the chips don't

11 work, then we think there's -- there's a problem in their

12 evidence, lack of evidence on that.

13      So we think JMOL should be entered in favor of Samsung on

14 that.

15      And I think that covers it, Your Honor.

16           THE COURT:  All right.  Thank you.

17      All right.  Let's move on and let me hear competing

18 argument from the parties.

19           MR. McKEON:  Oh, Your Honor, I'm sorry.  I didn't --

20 we got to put in the record of '060 and '160, and Mr. Colvin

21 is going to do that.

22           THE COURT:  All right.  I didn't understand you were

23 going to split your argument.

24      Go ahead, Mr. Colvin.

25           MR. COLVIN:  Thank you, Your Honor.

1    Your Honor, first we believe that JMOL is appropriate for

2    no doctrine of equivalents for the '060 and the '160 patents.

3    Netlist didn't present any evidence or any argument about

4    doctrine of equivalents, so we believe that should be out.

5    Also, there are two reasons why we believe there should

6    be JMOL in favor of Samsung that there's no infringement of

7    the '060 or '160 Patent.  The first is that Netlist hasn't

8    shown that the HBM products have an array die.  All of the

9    asserted claims require array dies, and the Court has

10   construed that to be array die that is different from a DRAM

11   circuit.

12   Doctor Brogioli, Netlist's expert, testified that if

13   Samsung uses DRAM circuits, then there is no infringement.  He

14   also testified, importantly, that if a memory die contains

15   DRAM, then that makes the memory die a DRAM circuit.  Netlist

16   did not even attempt to present evidence that the memory die

17   of the HBM products use anything other than DRAM.  In fact,

18   the evidence shows, the data sheets, et cetera, show that the

19   HBM products do use DRAM.  And based on that, Your Honor, we

20   believe -- that's the basis that there should not be

21   infringement.

22   Also, we have the die interconnect, not in electrical

23   communication with all die.  The evidence shows two things.

24   First, that the signal on each data path travels through each

25   memory die in the stack.  Second, that all of the structures

1    in that data path are on the die themselves.  And on that

2    basis, we would move for JMOL.

3                THE COURT:  All right.

4                MR. McKEON:  Your Honor, can I have one more comment

5    the other three patents real quick?

6                THE COURT:  Let's make it fast, Mr. McKeon.

7                MR. McKEON:  Yes.  I just wanted to just make a

8    record on that and make it clear my motion is also directed to

9    the doctrine of equivalents as well.

10               THE COURT:  All right.  Let's move on.  Let me hear

11   competing argument from the parties on the issue of

12   willfulness.  And we'll begin with the Plaintiff, and then

13   I'll hear argument then from the Defendants.

14               MR. TEZYAN:  So Plaintiff moves for judgment as a

15   matter of law that no reasonable jury could find that Samsung

16   has not willfully infringed the asserted claims of the

17   patents-in-suit.

18          Netlist introduced substantial evidence that Samsung

19   willfully infringed the patents, in particular based on the

20   testimony of Mr. Milton, Doctor Mangione-Smith, Doctor

21   Brogioli, Doctor Jung Bae Lee, Doctor Indong Kim, Mr. Hun-Joo

22   Lee, Mr. Kyungsoo Park, Mr. Sung Joo Park, Mr. Bruce Lo, Mr.

23   Garrett Davey, Mr. Hyun Joong Kim, Mr. Jihwan Kim, Mr. Anton

24   Tsui, Mr. Jung-Mo Yang, Mr. Joseph Calandra, and Mr. Hyun-Ki

25   Ji.

1    THE COURT:  Let me ask you this, Counsel.  You said

2    that Netlist had introduced substantial evidence.  Is

3    substantial evidence adequate to establish that no reasonable

4    jury could come to a different conclusion, especially in light

5    of the Supreme Court's guidance that this is an area where the

6    jury should consider the totality of the circumstances?

7    MR. TEZYAN:  Well, I was getting to that, Your

8    Honor.  I was going to say that the testimony establishes that

9    Samsung acted with reckless or callous disregard with

10    indifference to the rights of Netlist.

11    THE COURT:  All right.  Continue your argument.

12    MR. TEZYAN:  And so the evidence establishes that

13    Samsung has been aware of Netlist's patented technologies,

14    reached out to Netlist for technical collaboration regarding

15    those patented technologies, and acted with reckless disregard

16    of Netlist's patent rights by continuing to make, use, sell,

17    and offer to sell the infringing products in the United States

18    after Samsung's license to Netlist's patent rights were

19    terminated on July 15th, 2020.

20    As an example, with respect to the '918 and '054 Patents,

21    Netlist has shown evidence that in 2019, samsung engineers

22    reached out to Netlist for a technical discussion regarding

23    voltage regulation on-DIMM.  And that's PX 586.

24    With respect to the '060 and '160 Patents, Netlist

25    provided a list of its patents together with a chart

1  explaining coverage of Netlist's patent scope in November

2  2016.  And that chart explicitly lists the '060 Patent and

3  noted its coverage of HBM products.  And that's PX 0446.

4      With respect to the '339 Patent, Samsung previously

5  admitted in its own internal document that it is well-known in

6  the industry that Netlist created a system for LRDIMM

7  technology.  And that's PX 1756.

8      The testimony of Samsung's corporate representatives,

9  such as Mr. Jihwan Kim, Mr. Kyungsoo Park, and Mr. Hun-Joo

10  Lee, show Samsung failed to take any investigation to

11  determine whether it infringed Netlist's patents, despite

12  knowing the high risk of patent infringement.

13      Samsung cannot rely on any reasonable license defense

14  because it is on notice as early July 15th, 2020, that its

15  license to any of Netlist's patents had been terminated.

16      None of Samsung's witnesses testified to any basis for a

17  good faith belief in non-infringement or invalidity.  And,

18  therefore, Netlist respectfully requests that the Court enter

19  judgment in its favor on the issue of willfulness.

20          THE COURT:  Thank you.

21      Let me hear opposing argument, please.

22          MS. DEGNAN:  Thank you, Your Honor.

23      So I first want to address the issue with respect to

24  there's no willfulness during the period of the JDLA.  You may

25  recall there is a slight potential carve-out for foundry

1    products, and we'll get to the foundry products issue.

2            THE COURT:  We will.

3            MS. DEGNAN:  But I want to make this preservation

4    here under the willfulness umbrella that that period of time

5    also there's no willfulness because there's no evidence of

6    foundry products, A; and, B, there's been no evidence

7    whatsoever that there is an intent to sell foundry products in

8    an unlicensed way.  So I just want to state that first, that

9    the period of time that was -- left a little exception, we're

10   moving for JMOL on that.

11       With respect to willful infringement after the period of

12   the JDLA, after termination, first, there's no infringement.

13   If there's no infringement, there can be no willfulness.

14   Second, there's no evidence from which a jury could conclude

15   there is an intentional, deliberate intent to infringe.  And

16   let me -- let me break that down.

17       First, there's no evidence that Samsung knew of -- that

18   it infringed any of the specific patents-in-suit by the

19   specific products.  The evidence is undisputed that, first,

20   Netlist put on no proof that informed Samsung of the specific

21   patents and the specific products that infringe.

22       Mr. Hong admitted there is no such notification prior to

23   termination.  Netlist put on no evidence whatsoever after

24   termination of the -- any communication to Samsung informing

25   of infringement.  And Mr. Ji testified that Samsung

1    never -- was never told that it infringes any of Netlist's

2    patents.

3         So that is the context.  There's a license and there's no

4    communication of infringement of the specific patents in this

5    case.  In fact, there's no evidence that Samsung even knew of

6    the asserted patents in this case except for the '060, which

7    we heard about.  It was put in the patent list that was sent

8    to a colleague of Mr. Ji in 2019.  However, Mr. Ji testified

9    that at that time there was no allegation of infringement

10   whatsoever.  That testimony stands unrefuted.

11        What we have, instead, when we look at the other patents

12   in this case, is sort of the panel plea of innuendo that

13   because Samsung was told of family member patents during the

14   time it was licensed, was told of technology that they put on

15   no evidence whatsoever practices the patents.  So even had

16   Samsung been told of this technology, there is no nexus that

17   the technology practiced the patents.  It would be

18   insufficient.

19        So none of this material meets the legal test to show

20   knowledge of infringement that is necessary in order to meet

21   deliberate and intentional.

22        Let me quickly touch on good faith belief.  As you heard

23   throughout the evidence that we went over already,

24   infringement, non-infringement evidence, invalidity evidence,

25   all establishes a good faith belief under the law.

1    Willfulness requires more than garden variety sales after

2    being sued, and they did not put any evidence that would

3    undercut their good faith belief.

4    I do need to address both willful blindness and this idea

5    of reckless disregard.  Willful blindness is a test that -- we

6    think willful -- the test for willful blindness and the test

7    for willful infringement are incompatible and is mens rea.

8    The Federal Circuit has never applied it in this context.

9    But even if willful blindness were to apply, the test is

10   not met.  There is no evidence that Samsung intentionally

11   avoided learning of the alleged infringement.  In fact, the

12   context is exactly the opposite.  We were licensed, Samsung

13   was licensed for a long period of time.  Following the

14   termination of the license, again there's no evidence in the

15   record we were told otherwise that we were infringing.

16   And, in fact, three, three of the asserted patents had

17   not even issued when the license was terminated.  And so what

18   Netlist is trying to do is apply an incorrect legal test,

19   impose a duty, a duty to search for patents which is

20   not -- that is not in the law.  And even if willful blindness

21   were a concept that applied, it doesn't switch and impose a

22   duty to search for other patents that may issue.

23   What they're trying to do is impose a should-have-known

24   standard.  And you heard counsel reference reckless disregard.

25   That is a lower mens rea standard than willful blindness.  And

1    reckless disregard does not -- is not the same and cannot

2    qualify as a kind of deliberate intentional infringement.  A

3    should-have-known standard that they are trying to impose upon

4    this inquiry is legally wrong.

5         And all the evidence counsel pointed to and all the

6    evidence they put in, this panel plea or hodgepodge of

7    different emails during the license period about the

8    technology or discussion of family patents, that is all going

9    to show should have known, a should-of-known test that is

10   legally wrong.

11        The last thing I'll say on this point, Your Honor, is

12   Samsung is not a monolithic entity.  The test for willful,

13   intentional infringement requires a human being to make a

14   decision.  They have know about the patents, they have to know

15   about the infringement, and they have to decide to do it

16   anyway.  And there is no evidence in this record that there is

17   anyone at Samsung that met all those prongs and for good

18   reason--because Samsung is not a willful infringer.

19             THE COURT:  All right.  Thank you, Ms. Degnan.

20        All right.  Let's go next to the issue of

21   validity/invalidity.

22        Obviously there is an invalidity defense under §103 as to

23   the '339 Patent, and there are invalidity challenges as to the

24   '339, the '054, and the '918 under the written description

25   theory, and there are no invalidity challenges as to the '060

1    or the '160 Patents.

2        So with that context, let me hear the parties' competing

3    arguments on validity or invalidity as a matter of law.  Let's

4    begin with the Defendant on this one, and then I'll hear from

5    the Plaintiff.

6            DR. ALBERT:  Thank you, Your Honor.  Frank Albert

7    for Samsung.  May I proceed?

8            THE COURT:  You may proceed, Doctor Albert.

9            DR. ALBERT:  Samsung is moving for JMOL of no

10   written description for the '918 asserted claims as well as

11   the '054 asserted claims and the '339 asserted claims.

12       Samsung has shown by clear and convincing evidence that

13   all the asserted claims of the '918 Patent, the 1, 5, 13, 16,

14   18, 19, and claims 16 and 17, asserted claims there, are

15   invalid for failing to satisfy that written description

16   requirement, that there is no support for the invention, that

17   no support for what is claimed in the invention as described.

18       Big picture, there was -- we have these broad claims that

19   don't cover what the invention was actually about.  There is

20   no written description support for the full breadth of those

21   claims that recite DRAM memory modules with disparate

22   components that have no relation to the written descriptions,

23   teachings of a flash DRAM hybrid module supporting those

24   structures and components described as the invention in the

25   patent, including requiring that data transfer between the

1   flash and the DRAM, and backing up a flash to the DRAM.

2       The law is clear here that when you have a broad claim

3   that is not actually claiming what the invention is about,

4   those claims are invalid.  And that's exactly what we have

5   here.

6       We have the testimony of Mr. McAlexander that walked

7   through claim by claim and specific portions of the

8   specification and showed where there was nothing in the

9   specification that matched up with these claims.

10      Mr. McAlexander explained that the -- that the asserted

11  claims did not match up those -- the DRAM flash hybrid

12  structure or that data transfer or that back-up.

13      Doctor Mangione-Smith also admitted that the written

14  description did not support the full scope of the claims.  For

15  example, Doctor Mangione-Smith admitted that there was no

16  written description support for that LDO regulator that the

17  parties are -- are disputing that he's now claiming that is an

18  issue for infringement.

19      So here we have the -- the evidence, the '918, '054

20  Patents, which is the boundaries of what was actually

21  described as the invention.  That's JTX 3 and 4.  We've got

22  Doctor Mangione-Smith that admits that the full scope of the

23  claims aren't found in the -- in those patents.  We have Mr.

24  McAlexander's testimony where he went through a careful

25  analysis figure-by-figure portion-by-portion of the

1    specification showing what the patent was about, and we have

2    no rebuttal from the Plaintiff.

3              THE COURT:  What else?

4              DR. ALBERT:  For the '339 Patent, very similar, Your

5    Honor, claims 1, 8, and 9 lack written description based on

6    the single path versus multiple path argument here.

7         The Court's claim construction required multiple paths,

8    as we understand.  And, therefore, there's no infringement.

9    But to the extent that the single path idea is somehow found

10   in the claims, there's absolutely no written description

11   support for that.

12        Mr. McAlexander has gone through and analyzed each

13   portion of the '339 Patent, the JTX 2, and gone through and

14   shown what the invention was all about, that multiple path

15   embodiment, not the single path embodiment that they're

16   accusing of infringement, that their expert says is a single

17   path.  And so for that reason, the claims also lack written

18   description support.

19        On this we have, again, Mr. McAlexander's testimony where

20   he's gone through over and over again all through the

21   specification.  We have no rebuttal from the Plaintiff.

22             THE COURT:  All right.  Let me hear competing

23   argument from the Plaintiff, please.

24             MR. TEZYAN:  Your Honor, Plaintiffs would oppose

25   Defendants JMOL on the defenses of written description for the

1    '054, '918, and '339 Patents and obviousness as to the '339

2    Patent.  And also Plaintiffs would like to move for JMOL that

3    no reasonable jury could find that the claims of the '054,

4    '918, and '339 Patents are invalid for lack of written

5    description and obviousness as to the '339 Patents.

6         In addition, for those anticipation or obviousness

7    defenses that were not presented at trial, Plaintiff

8    respectfully moves for JMOL, and that's for the '918, '054,

9    '060, and '160 Patents.

10        I'll start off with the issue of obviousness for the '339

11   Patent.  And, Your Honor, we'd like to put particular emphasis

12   on this issue because there's a complete absence of evidence

13   on this.  So, for example, in Mr. McAlexander's presentation,

14   you heard nothing about the limitation that the byte-wise data

15   path has to be enabled for a first time period in accordance

16   with the latency parameter.  There was simply no explanation

17   about how QBM, Ellsberry, or the combination of QBM and

18   Ellsberry meets that limitation.

19        I looked for the word 'latency', I looked for the word

20   'delay' and similar words in the transcript, and found none in

21   Mr. McAlexander's presentation.

22        Further, Defendants provide no evidence on motivation to

23   combine or a reasonable expectation of success.  It's not a

24   case where the motivation to combine is just insufficient.

25   There was simply none identified.  And we have briefing on

1  this issue if the Court would like to see it.  But we simply

2  believe that just no evidence was presented to support the

3  obviousness arguments that Defendants are making with the '339

4  Patent.

5          THE COURT:  What's your position on the written

6  description arguments?

7          MR. TEZYAN:  So I'll start off with the '054 and

8  '918.  No reasonable jury could find that the claims are

9  invalid for lack of written description because the

10  specification discloses embodiments that are not limited to

11  memory modules with both flash and DRAM on the module.  So,

12  for example, the specification discloses an embodiment where

13  the host system writes data.

14          THE COURT:  Please, please, slow down if you're

15  going to read to me.

16          MR. TEZYAN:  My apologies, Your Honor.

17      So the specification discloses an embodiment where,

18  quote, the host system writes data to the volatile memory

19  subsystem 1030, which then writes the data to non-volatile

20  storage which is not part of the memory system 1010, i.e.,

21  it's not on the memory module.

22      And that's at column 27, lines 41 through 58.  And that

23  passage was discussed repeatedly by Mr. Milton and Doctor

24  Mangione-Smith.

25          Moreover, contrary to Defendants' argument, the claims

1  need not include every aspect of the invention described in

2  the specification.

3      For the '339 Patent, we believe the specification

4  discloses embodiments that are not limited to embodiments with

5  a so-called fork in the road in the data buffer.  And I

6  believe Mr. Milton testified about those.  For example, figure

7  3A.

8      As another example, let me point you to '339, column 9,

9  lines 44 through 52, which provides that the invention

10 described in figure 3A is compatible with two-rank

11 embodiments, and in such a two-rank embodiment, there need

12 only be one data path, i.e., a straight path with only ranks A

13 and C.

14     And I'd just like to add that written description has

15 further been shown by the Patent Office's determination that

16 the applications were supported by the original specification

17 and the testimony of Mr. Milton and Doctor Mangione-Smith.

18 Therefore, Plaintiff respectfully requests that the Court

19 enter judgment in its favor on the issue of infringement.

20     And for the '339, I'd also like to add that our

21 infringement argument included two or more paths.  So, for

22 example, you saw Doctor Mangione-Smith describe the two nibble

23 -- the two nibble-wide data paths as the byte-wise data paths

24 of the claims.

25         THE COURT:  All right.  Thank you.

1256

1      DR. ALBERT:  Your Honor, may I respond on the '339,

2  §103 analysis?

3      THE COURT:  Do you think it's absolutely necessary?

4      DR. ALBERT:  Not with that statement, Your Honor.

5  Thank you.

6      THE COURT:  Okay.  I'd like to take up next the

7  Defendants' motion for JMOL regarding no damages on the '054

8  Patent prior to January 25th, 2022.

9      I find it curious that the submission from the parties on

10  the proposed final jury instructions include language

11  submitted by the Defendants that provide the damages period

12  for the '054 Patent and a different date than the one covered

13  by this motion.

14      So let me hear from Defendants on this motion and why

15  they believe JMOL is appropriate here.

16      MS. DEGNAN:  Yes, Your Honor.

17      THE COURT:  And I'll note that submission came in at

18  3:00 --

19      MS. DEGNAN:  Right.

20      THE COURT:  -- yesterday.

21      MS. DEGNAN:  Okay.  So I can explain both, Your

22  Honor.  So --

23      THE COURT:  Please do.  That's why you're up there.

24      MS. DEGNAN:  You might recall in our summary

25  judgment motion for no pre-suit damages, you granted the

1    motion for the '054 Patent and had the date -- pegged the date

2    at the original complaint.  And so you said there's no suit --

3    no damages for the '054 Patent prior to the original

4    complaint, but there is an issue of fact with respect to after

5    the original complaint.  Just to set up the timeline, the

6    original complaint is December 2021.

7            THE COURT:  Right.

8            MS. DEGNAN:  The patent issued January 2022.  And so

9    this motion, this JMOL, is for that one-month period prior to

10   issuance.  We agree we're not seeking anything after the

11   patent issued.  We're saying for that one-month period before

12   it issued, we should get JMOL of no damages.  Okay?

13       In the jury instructions, we -- we respected Your Honor's

14   rulings and so we weren't going to assume we were going to win

15   our JMOL, we put IN the jury instructions the date of the

16   original complaint.  If we win this motion, then we'd want to

17   change that date in the jury instructions.  But, again, we're

18   not going to assume we're going to win a motion.

19       That, I hope, explains the discrepancy.

20           THE COURT:  All right.  It gives me more information

21   than I had.

22           MS. DEGNAN:  Understood.  So let me just go through

23   why -- so it's sort of black letter law, you can't get damages

24   until a patent issues.  So that's -- that's part one.

25       There is a new statute, § 154(d), that allows you to get

1  damages.  They don't call it damages in the statute.  They

2  call it a royalty in § 154(d), pre-issuance recovery of a

3  royalty.  So that's what we're talking about, because I think

4  that's -- there we've got no evidence in this record to meet

5  the test under § 154(d).

6      You have to show that Samsung or Netlist has to show that

7  Samsung, the test is had actual notice of the published patent

8  application when it made allegedly infringing sales.  So for

9  that one-month period, there has to be evidence in the record

10  that Samsung knew of the published patent application.

11      And the second prong in that test is that the published

12  patent application that Samsung knew about -- excuse me, the

13  second prong is we also have to know about the claims as

14  issued.  None of that evidence has come in.

15      The published patent application, it's not in the

16  evidence.  No witness testified about the published patent

17  application for the '054 Patent.  No witness talked about the

18  allowed claims during this one-month period.  No evidence at

19  all on this.  If it's sounding completely unfamiliar to you,

20  that is why.  There's nothing on this.

21      Certainly there's no evidence of Samsung's

22  intent -- excuse me, Samsung's knowledge of such activity.

23  And so for that reason, we would say this is a classic 50(a)

24  motion.  There's complete absence, the record's closed, none

25  of this is in the record.

1       Thank you.

2            THE COURT:  Thank you.

3       Does Plaintiff have a response?

4            MR. PAYNE:  Yes, Your Honor.  Stephen Payne for the

5  Plaintiff Netlist.

6            THE COURT:  Go ahead, Mr. Payne.

7            MR. PAYNE:  Your Honor, this -- this is the same

8  issue that was presented in summary judgment on which the

9  Court denied Defendants' summary judgment motion on.  And the

10  Court held that damages for the '054 that was a live issue of

11  fact as to whether damages for the '054 Patent could begin as

12  of the filing of the original complaint.

13       Under § 154(d) in that, that statute permits damages

14  where there is published patent application and actual notice.

15  And here there was actually notice because the claims and an

16  application were referenced in the original complaint.  That

17  is in evidence.  The publication date of the '054 Patent is

18  listed on the face of the patent, and that was admitted as JTX

19  4.

20       Further, the date of the complaint and the complaint

21  itself were testified to in the trial, including by Mr.

22  Kennedy and Doctor Robins.  So all of that was in evidence.

23       And, furthermore, this wasn't -- there wasn't any defense

24  of a limitation on damages presented.  Both parties' experts,

25  including Defendants' expert Mr. Meyer, actually presented --

1    calculated and presented damages for the '918, '054 family

2    from the December 2021 date.

3         There was no evidence presented by Defendants of damages

4    from a different date or a different calculation.  No argument

5    made in the testimony that damages should start from a

6    different date for that patent.

7         And, furthermore, Your Honor, it wasn't a live dispute

8    because both sides calculated damages for that family, the

9    '918 and '054, and there wasn't testimony from either side

10   about a different damages number for one patent in that family

11   versus the other.

12        So we believe that -- that the evidence is in the record

13   in terms of damages for that patent and, furthermore, there

14   wasn't any proper defense of limitation of damages presented

15   or put at issue in the case.

16            THE COURT:  So did Netlist put on evidence during

17   the trial that the application number was in the original

18   complaint?

19            MR. PAYNE:  Your Honor, my belief is that the

20   complaint was shown during the testimony of Doctor Robins, and

21   Mr. Kennedy also testified to the date of the complaint and

22   the calculation of damages from that date for the '054 Patent.

23            THE COURT:  All right.  Anything further?

24            MR. PAYNE:  Nothing further on that issue, Your

25   Honor.

1261

1    THE COURT:  All right.  Let's turn to the last

2  motion for judgment as a matter of law, which is Defendants'

3  motion for JMOL regarding foundry products under the JDLA.

4      Let me hear from the Defendant, please.

5      MS. DEGNAN:  Thank you, Your Honor.

6    So as you know, the outstanding issue on this -- on this

7  point from summary judgment was whether any of the accused HBM

8  products fell within the exception to the license of foundry

9  products.

10     And so we put on evidence with Mr. Calandra as well as

11  DTX 30, JTX -- which was the website, JTX 66, 67, and 68,

12  which were data sheets for the HBM products, all which is

13  evidence that would show that under the definition of foundry

14  products, the accused HBM products are not foundry products.

15     First, they are sold as Samsung's own products.

16     If it's helpful, Your Honor, I can read the definition of

17  foundry products into the record, but you may be familiar with

18  it?

19     THE COURT:  I'm familiar with it.  If you feel like

20  you need to read it, that's fine.

21     MS. DEGNAN:  I don't.  I don't feel like I need to

22  read it.

23     THE COURT:  All right.

24     MS. DEGNAN:  I was just giving you context.

25     THE COURT:  I know what they are.

1    MS. DEGNAN:  Okay.  So they are sold as Samsung's

2  own products.  That alone takes them out of definition of

3  foundry products.  Mr. Calandra testified that they are

4  designed by Samsung, so it takes out of the definition of

5  foundry products, the section that talks about being based on

6  designs or specifications of a third party.

7    All this evidence is undisputed.  There was no counter to

8  that evidence, Your Honor.  And so we have, again, I think a

9  classic case of JMOL in terms of this is an issue, we put

10 evidence in, and there's no evidence that the products that

11 are accused of infringement that were sold during the pendency

12 of the JDLA meet the definition of the exception, and so they

13 would be licensed.

14    And we just feel like this issue has been nothing but a

15 distraction that's been diverting resources from the core

16 issues, and we think this would be appropriate to enter JMOL

17 for them and let the jury focus on other things.

18    THE COURT:  All right.  Let me hear Plaintiff's

19 response.

20    MR. PAYNE:  Yes, Your Honor.

21    Our response is that there's no issue to grant judgment

22 as a matter of law on here because this is just a case of

23 claims not argued at trial and presented at trial.

24    Netlist has not made any damages claim or claim for

25 infringement of products before the termination of JDLA in

1    light of Your Honor's rulings about pre-suit damages not being

2    available.  It simply hasn't been an issue in the trial.  And

3    so consistent with --

4            THE COURT:  It was certainly an issue at pretrial.

5    It was argued about at length at pretrial.  The parties

6    submitted competing proposals to the Court for its preliminary

7    jury instructions about foundry products.  And then when we

8    got to the trial, I didn't hear the word 'foundry' until the

9    second or third day and then maybe only one time.

10        So are you conceding that you raised it in the lawsuit

11   and then abandoned it at the trial?

12           MR. PAYNE:  We did not abandon it at the trial.

13   I'll actually make a statement on the preliminary

14   instructions.  We did not propose an instruction on foundry

15   products.  Defendants did.

16           THE COURT:  I gave the parties an opportunity to

17   submit proposals.  Your side did not, the other side did, and

18   then I included my own instruction in the preliminary

19   instructions on the foundry product issue as well as the JDLA.

20           MR. PAYNE:  And -- understood, Your Honor.

21        And we did oppose that instruction before the trial

22   because we said the issue was irrelevant to the trial and it

23   wasn't going to be in the trial in that jury instruction

24   submission before the trial.  So we did note that before the

25   trial, Your Honor.

1    THE COURT:  I don't know how you did that because I

2  never shared my preliminary jury instructions with the parties

3  before I gave them to the jury.  I didn't give you what I was

4  going to tell the jury for you to object to.  I gave you an

5  opportunity to submit a proposal.  You didn't.  I gave the

6  Defendants an opportunity to submit a proposal.  They did.  I

7  crafted my own what I thought was balanced and fair proposal

8  on the JDLA and the termination of the JDLA and the foundry

9  products issue, and I included it in my preliminary

10  instructions to the jury before the evidence began, but I

11  didn't disclose it to the parties in advance of me giving it

12  to the jury, and I never heard any objections from either

13  party to something they didn't see before I gave them.  Do

14  you disagree with that?

15    MR. PAYNE:  Not with what you just said, Your Honor.

16  I was referring to the submission of proposed instructions the

17  parties made, not Your Honor's preliminary instructions.

18    THE COURT:  Okay.  You're referring to submissions

19  with regard to the final jury instructions?

20    MR. PAYNE:  I'm referring, Your Honor, to the

21  submission of preliminary instructions, the joint submission

22  of the preliminary instructions the parties made before trial.

23    THE COURT:  All right.

24    MR. PAYNE:  And so, Your Honor, our position is

25  that, consistent with the Court's practice on claims that are

1    not pursued at the trial, and -- that this is not an

2    appropriate subject for judgment as a matter of law because it

3    simply wasn't an issue in the trial and it's a claim not tried

4    in the trial, Your Honor.

5         THE COURT:  Okay.  Thank you, Mr. Payne.

6         All right.  With regard to the competing arguments from

7    the parties on the issue of infringement as urged by the

8    Plaintiff and non-infringement as urged by the Defendants, the

9    Court denies those motions in both directions.

10        With regard to the issue of willful infringement urged by

11   the Plaintiff and no willful infringement urged by the

12   Defendants, the Court denies those motions in both directions

13   from the competing parties.

14        With regard to the issue of damages where the Plaintiff

15   sought JMOL to establish damages and the Defendants sought

16   JMOL finding that no damages were warranted, the Court denies

17   both motions in opposite directions as submitted by the

18   competing parties.

19        With regard to the issue of validity as raised

20   affirmatively by the Plaintiffs and invalidity as raised

21   affirmatively by the Defendants, in particular as to

22   obviousness under § 103 for the '339 Patent, and lack of

23   written description as to the '339 Patent, the '054 Patent,

24   and the '918 Patent, the Court denies those motions in

25   opposite directions from both competing parties.

1    As to the issue of the starting date for damages for the

2  '054 Patent, the Court grants JMOL that the damages period for

3  the '054 Patent will not be prior to January the 25th, 2022.

4    With regard to the issue of foundry products, Plaintiff's

5  counsel is correct that where claims and defenses are

6  typically abandoned or jettisoned in advance of the trial, the

7  Court's practice is not to rule on those substantively, but in

8  this case the foundry products issue was litigated throughout

9  the pretrial process.  At the conclusion of the pretrial

10  process, it was made clear to the Court that the parties

11  intended it to be a part of the trial on the merits before the

12  jury.  It's that reason that the Court invited both sides to

13  submit suggested instructions for it to consider in its

14  preliminary jury instructions regarding the JDLA, its

15  termination date, and the issue of foundry products as being

16  excluded from the license provisions of the JDLA.

17    With regard to the foundry products issue under the JDLA,

18  notwithstanding what happened after the jury was impaneled and

19  the evidence began, this was a live issue that had not been

20  abandoned or narrowed through the impaneling of the jury and

21  the beginning of the trial.  Therefore, I am going to rule on

22  the foundry products issue and I'm going to grant JMOL that

23  there is no infringement prior to the July 15th, 2021, date

24  with the termination of the JDLA with regard to foundry

25  products or anything else prior to that time.  July 15th,

1   2020, being the termination date of the JDLA.

2        And those are the Court's rulings on motions argued under

3   Rule 50(a).

4        It's a quarter of 2:00, counsel.  At this juncture, I

5   would typically invite you into my office where we would have

6   an informal charge conference and review the current status of

7   the proposed final jury instructions and verdict form.  I

8   don't have room for everybody that's in here to be in my

9   office so, quite honestly, let's take a 15-minute recess and

10  then I will come back in the courtroom, you can stay where you

11  are, and we'll just conduct the informal charge conference in

12  the courtroom off the record.  The Courtroom Deputy and the

13  court reporter won't be present, and we'll informally discuss

14  what you most recently submitted where you have disputes and

15  where the Court has questions.

16       So we stand in recess for 15 minutes.

17            (The proceedings were concluded at 1:45 p.m.)

18

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts          04/20/2023

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25