IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

NETLIST, INC.,                    (  CAUSE NO. 2:21-CV-463-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,    (
et al.,                           )  MARSHALL, TEXAS
                                  (  APRIL 21, 2023
          Defendants.            )  8:00 A.M.
_____


VOLUME 6


_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                    A P P E A R A N C E S

 2        FOR THE PLAINTIFF:    IRELL & MANELLA, LLP -
                                LOS ANGELES
 3                              1800 AVENUE OF THE STARS
                                SUITE 900
 4                              LOS ANGELES, CA 90067-4276
                                (310) 203-7096
 5                              BY:  MR. JASON SHEASBY
                                     MS. LISA GLASSER
 6                                   MR. BEN MANZIN-MONNIN
                                     MR. MICHAEL TEZYAN
 7
                                IRELL & MANELLA -
 8                              NEWPORT BEACH
                                840 NEWPORT CENTER DRIVE
 9                              SUITE 400
                                NEWPORT BEACH, CA 92660
10                              (949) 760-0991
                                BY:  MR. STEPHEN PAYNE
11
                                McKOOL SMITH, P.C. - MARSHALL
12                              104 E. HOUSTON ST., SUITE 300
                                MARSHALL, TEXAS  75670
13                              (903) 923-9000
                                BY:  MR. SAM BAXTER
14                                   MS. JENNIFER TRUELOVE
                                     MR. KEVIN BURGESS
15
          FOR THE DEFENDANTS:   FISH & RICHARDSON, PC -
16                              WASHINGTON DC
                                1000 MAINE AVE. SW, SUITE 1000
17                              WASHINGTON, D.C.  20024
                                (202) 783-5070
18                              BY:  MR. RUFFIN CORDELL
                                     MR. MICHAEL McKEON
19                                   MS. LAUREN DEGNAN

20                              FISH & RICHARDSON, P.C. -
                                DALLAS
21                              1717 MAIN STREET, SUITE 5000
                                DALLAS, TEXAS  75201
22                              (214) 747-5070
                                BY:  MR. MATTHEW COLVIN
23                                   MR. THOMAS REGER

24

25
```

```
 1                                    GILLAM & SMITH, LLP
                                      303 SOUTH WASHINGTON AVENUE
 2                                    MARSHALL, TEXAS  75670
                                      (903) 934-8450
 3                                    BY:  MS. MELISSA SMITH

 4         OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                 100 E. HOUSTON STREET
 5                               MARSHALL, TEXAS  75670
                                 (903) 923-8546
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THE COURT:  Be seated, please.

2    Counsel, before the Court proceeds to conduct the formal

3    charge conference, I will ask if the parties have items from

4    the list of pre-admitted exhibits that were used during

5    yesterday's portion of the trial that need to be read into the

6    record.

7    MS. TRUELOVE:  Plaintiff does, Your Honor.

8    THE COURT:  All right.  Please proceed.

9    MS. TRUELOVE:  Thank you, Your Honor.

10    Your Honor, Plaintiff Netlist used two exhibits during

11    examinations yesterday, PX 1787 and PX 44.

12    THE COURT:  All right.  Is there objection to that

13    rendition from the Plaintiff by the Defendants?

14    MR. REGER:  Good morning, Your Honor.

15    THE COURT:  Good morning.

16    MR. REGER:  Your Honor, we do have an objection to

17    PX 44.  Mr. Sheasby went flying through a number of different

18    exhibits, didn't lay any foundation to many of them.  More

19    importantly, we never saw this exhibit being used.  We asked

20    the Plaintiff about where in the transcript they could point

21    to using this exhibit.  They gave us a cite to the transcript,

22    and in that cite there is a reference to a Netlist

23    presentation.  PX 44 is a Samsung presentation.

24    So we still don't know of any cite in the transcript that

25    supports entering this exhibit, Your Honor.

1    THE COURT:  Can you identify anywhere in the

2    transcript from yesterday, Ms. Truelove, where you believe

3    this exhibit was published and used before the jury?

4    MS. TRUELOVE:  Yes.  And we identified that to

5    opposing counsel last night.  It was during the cross of Mr.

6    Meyer.  The question was asked, "And we know that Samsung

7    subsequently adopted HBM with TSV technology.  Correct?"

8    And the answer was, "They have these products, that's

9    correct."  And that's when he had it on the --

10    THE COURT:  Can you show me the document?

11    MS. TRUELOVE:  I haven't --

12    MR. REGER:  Your Honor, may I approach?

13    THE COURT:  Put it on the document camera, if you

14    will.

15    MR. REGER:  Yes.  And, once again, if we look to the

16    top right --

17    MS. TRUELOVE:  He didn't -- he didn't show that --

18    MR. REGER:  Well, real quickly, if we may.

19    THE COURT:  Let's get it on there straight first

20    where it's not upside down and then zoom out so I can see the

21    entire page.  Okay.  That's fine.

22    MR. REGER:  Yes, Your Honor.  What I wanted to point

23    out is at the top right.  It says, Samsung secret, and it

24    became a Samsung document.  The Q and A before and after are

25    referencing a Netlist presentation.

1    So, again, we don't believe they've laid the foundation

2    or established that this is the document.

3         THE COURT:  What's your response, Ms. Truelove?

4         MS. TRUELOVE:  Well, he may have misspoke as to

5    where it came from, but he only showed one page of the -- of

6    the exhibit.  I don't even think he showed the cover page.  He

7    simply put this up.

8    And I don't know if that -- if the Court -- I think

9    that's the page -- if the Court recalls him showing it.  But

10   that goes along with the question he asked which -- to Mr.

11   Meyer, which was, "And we know that Samsung--" -- so he was

12   referring to Samsung -- "-- subsequently adopted HBM with TSV

13   technology."

14   This is the page, isn't it, Mr. Payne?

15        MR. PAYNE:  Yes.

16        MS. TRUELOVE:  Okay.  And the answer was, "They have

17   these products, that's correct."  And this was the only page

18   of that exhibit that he showed.

19        THE COURT:  And this exhibit is marked as PX 44?

20        MS. TRUELOVE:  That's correct, and it's

21   pre-admitted.

22        THE COURT:  All right.  Anything else from the

23   Defendants, Mr. Reger?

24        MR. REGER:  No, Your Honor.  But, again, he was

25   trying to establish evidence of copying.  And to do that, he

1  was showing the original Netlist presentation talking about

2  HBM products, HBM patents.  And I, you know, presented Mr.

3  Meyer yesterday, and there was a flurry of documents, but I

4  don't recall that one, Your Honor.

5          THE COURT:  Okay.  Well, I recall seeing the single

6  sheet that Ms. Truelove put on the document camera as part of

7  what was shown to the jury.  I'm going to pre-admit

8  that -- I'm going to consider that single page as PX 44, and

9  I'll consider it admitted.

10         MS. TRUELOVE:  Thank you, Your Honor.

11         MR. REGER:  Thank you, Your Honor.

12         THE COURT:  Is there any other rendition to offer?

13 Did Defendants offer anything from the list of pre-admitted

14 exhibits yesterday?

15         MR. REGER:  My apologies, Your Honor.  No.

16         THE COURT:  All right.

17         MR. REGER:  Thank you.

18         THE COURT:  Thank you, Counsel.

19    All right.  Let's proceed to take up the formal charge

20 conference.

21    Previously the Court met with counsel for the parties

22 last evening at length and reviewed with them the most current

23 iteration of the final jury instructions and verdict form.  We

24 had a lengthy and fulsome discussion in chambers.

25    The Court took into account the input from counsel for

1    the parties and the totality of that discussion and has

2    generated, subsequent to that time, what it believes to be the

3    appropriate and proper final jury instruction and verdict

4    form.  That's been furnished to the parties with an

5    opportunity to review it.

6        And the Court now intends to conduct a formal charge

7    conference where either party is able to lodge such objections

8    to either matters included or matters omitted from the final

9    jury instruction and verdict form that they believe rise to

10   the level of a necessary objection and is in the interest of

11   their respective clients.

12       Counsel, the way I traditionally do this, if you're

13   unaware, and the way I would want to do it this morning is

14   that we'll begin with the final jury instructions.  I'd like a

15   single spokesperson for each side to go to the podium and

16   remain at the podium.

17       I will walk through the documents page by page, beginning

18   with page 1 and then going to page 2 and et cetera.  And at

19   each point along the way, I will ask if there are any

20   objections.  And, again, if there's something included you

21   find should be objected to or if there's something omitted

22   that you find should be objected to, that will be the proper

23   time for you to lodge your formal objections on the record.

24       So, with that, whoever's going to speak for Plaintiff and

25   Defendants, if you'd go to the podium, we'll begin with the

```
1    final jury instructions on the cover sheet or page 1.  And

2    I'll ask if either party has any objections to the first page

3    of the final jury instructions.

4              MR. PAYNE:  No objection from Netlist, Your Honor.

5              MS. DEGNAN:  No objection.

6              THE COURT:  Turning then to page 2, is there

7    objection here from either party?

8              MR. PAYNE:  No objection.

9              MS. DEGNAN:  No objection.

10             THE COURT:  Page 3 of the final jury instructions,

11   is there objection here from either party?

12             MR. PAYNE:  No objection.

13             MS. DEGNAN:  No objection.

14             THE COURT:  Turning to page four, is there no

15   objection?

16             MR. PAYNE:  No objection.

17             MS. DEGNAN:  No objection.

18             THE COURT:  Turning to page 5, is there any

19   objection?

20             MR. PAYNE:  No objection.

21             MS. DEGNAN:  No objection.

22             THE COURT:  Turning then to page 6, is there any

23   objection?

24             MR. PAYNE:  No objection.

25             MS. DEGNAN:  No objection.
```

1    THE COURT:  Turning to page 7 next, is there any

2  objection?

3    MR. PAYNE:  Yes, Your Honor.  Netlist objects to the

4  instruction on the JDLA and submits that Netlist's proposed

5  instruction on the JDLA should be given for the same reasons

6  that were previously submitted to the Court.

7    THE COURT:  All right.  That objection is overruled.

8    Is there any objection from Samsung regarding page 7?

9    MS. DEGNAN:  Samsung also objects to the objection

10  regarding the JDLA and ask that the Court give Samsung's

11  instruction on that issue previously presented to the Court.

12    THE COURT:  All right.  That objection is overruled

13  as well.  Is there anything else from either party on page 7?

14    MR. PAYNE:  No, Your Honor.

15    MS. DEGNAN:  No.

16    THE COURT:  All right.  We'll turn then to page 8 of

17  the final jury instructions.  Is there any objection here from

18  either party?

19    MR. PAYNE:  No objection.

20    MS. DEGNAN:  The only objection we have, Your Honor,

21  is not to how it's written, but we preserve for the record our

22  objections to the claim constructions as previously submitted

23  in our objections to the claim construction order.

24    THE COURT:  All right.  That is noted, but it is not

25  lodged as a formal objection at this point.  So I won't rule

1    on it, but I'll note your preservation.

2            MS. DEGNAN:  Thank you, Your Honor.

3            THE COURT:  All right.  Then we'll turn to page 9 of

4    the final jury instructions.  Is there any objection here from

5    either party?

6            MR. PAYNE:  No objection.

7            MS. DEGNAN:  No objection.

8            THE COURT:  Turning next to page 10, is there any

9    objection here?

10           MR. PAYNE:  No objection.

11           MS. DEGNAN:  No objection, Your Honor.

12           THE COURT:  Turning to page 11, is there any

13   objection here from either party?

14           MR. PAYNE:  No objection.

15           MS. DEGNAN:  No objection.

16           THE COURT:  Turning then to page 12 of the final

17   jury instructions, is there any objection here from either

18   Plaintiff or Defendants?

19           MR. PAYNE:  No objection.

20           MS. DEGNAN:  No objections.

21           THE COURT:  Next is page 13.  Is there any

22   objection?

23           MR. PAYNE:  No objection.

24           MS. DEGNAN:  No, Your Honor.

25           THE COURT:  Next is page 14.  Is there any

1    objection?

2            MR. PAYNE:  No objection.

3            MS. DEGNAN:  Yes, Your Honor.  Samsung objects to

4    providing any instruction with respect to willful blindness on

5    the issue of willful infringement, and we would ask that you

6    strike the following two sentences:  "You may find that

7    Samsung's actions were deliberate or intentional if Samsung

8    was willfully blind to Netlist's patent rights.  You may find

9    that a Defendant is willfully blind when it is indifferent to

10   the rights of another or when it proceeds in disregard of a

11   high or excessive danger of infringement that is known to it

12   or would have been apparent to a reasonable person in its

13   position."

14           THE COURT:  All right.  That objection is overruled.

15   Anything further on page 14 from either party?

16           MR. PAYNE:  No, Your Honor.

17           THE COURT:  Anything further from Samsung on page

18   14?

19           MS. DEGNAN:  No, Your Honor.

20           THE COURT:  We'll turn then to page 15.  Is there

21   any objection here?

22           MR. PAYNE:  No objection.

23           MS. DEGNAN:  Your Honor, we would object and ask

24   that the following sentence be inserted in the first full

25   paragraph after the first sentence:  "Samsung was not required

1   to stop manufacturing or selling the accused products upon

2   learning of the asserted patents or upon Netlist's accusing

3   Samsung of infringement if Samsung had a reasonable belief

4   that it did not infringe, it was licensed, or that the

5   asserted patents were invalid."

6       We have no further objections on this page.

7           THE COURT:  All right.  That objection as lodged by

8   Defendants is overruled.

9       Let's turn then to page 16 of the final jury

10  instructions.  Is there any objection here from either party?

11          MR. PAYNE:  No objection.

12          MS. DEGNAN:  No objection.

13          THE COURT:  Turning to page 17, is there any

14  objection here from either party?

15          MR. PAYNE:  Yes, Your Honor.  Netlist objects to the

16  final paragraph on the page with the instruction on

17  obviousness and, in particular, the statement that "a person

18  of ordinary skill may be able to fit the teachings of multiple

19  pieces of prior art together like pieces of a puzzle"

20  as contrary to the legal standard for obviousness.

21          THE COURT:  All right.  That objection is overruled.

22  Anything further from either party on page 17?

23          MS. DEGNAN:  No, Your Honor.

24          MR. PAYNE:  No, Your Honor.

25          THE COURT:  Turning then to page 18 of the final

1   jury instructions, is there objection here from either party?

2           MR. PAYNE:  No objection.

3           MS. DEGNAN:  Yes, Your Honor.  On page 18, in the

4   sentence after the sentence that's numbered 6, after "you must

5   find that," we would strike the rest of that sentence and

6   insert the following:  "A person of ordinary skill in the art

7   would --"

8           THE COURT:  Just a minute, Ms. Degnan.  I'm not

9   following where you are on the page.  Can you orient me,

10  please?

11          MS. DEGNAN:  Yes, Your Honor.  Thank you.

12      So in the middle of the page, we've got six factors that

13  are enumerated.

14          THE COURT:  Right.

15          MS. DEGNAN:  Then the next sentence says, "To find

16  the invention obvious, you must find that," and then it goes

17  on to "prior art provided a person having ordinary skill in

18  the field a reasonable expectation of success."  We would

19  strike the language as follows:  "The prior art provided a

20  person having ordinary skill in the field a reasonable

21  expectation of success," and replace it with the following:

22  "A POSITA would have had a reasonable expectation of success

23  in combining the teachings of the prior art to result in the

24  claimed invention."

25          THE COURT:  All right.  That objection is overruled.

1    Anything further from either party on page 18?

2              MR. PAYNE:  No, Your Honor.

3              MS. DEGNAN:  No, Your Honor.

4              THE COURT:  Turning next then to page 19 of the

5    final jury instructions, is there objection here from either

6    party?

7              MR. PAYNE:  No objection.

8              MS. DEGNAN:  No objection.

9              THE COURT:  Next is page 20.  Is there objection

10   here?

11             MR. PAYNE:  Yes, Your Honor.  Netlist objects that

12   an additional instruction that Netlist proposed on written

13   description should be given, specifically that the patentee is

14   not required to claim all features and advantages described in

15   the specification, and that the question for written

16   description is whether the claims are disclosed in the

17   specification, not whether the claims include everything in

18   the specification, and for the reasons that we've also put in

19   the written submission, Your Honor.

20             THE COURT:  All right.  That objection's overruled.

21   Anything else from either party on page 20?

22             MS. DEGNAN:  Yes, Your Honor.  We have two sentences

23   we would like to add to the written description instruction.

24       The first would appear in the second paragraph before the

25   last sentence of that paragraph.  So before the sentence that

1    says, "if a patent claim lacks," we would insert the

2    following:  "A broad claim is invalid when the specification

3    clearly indicates that the invention is of a much narrower

4    scope."

5        Do you want to hear my second sentence or do you want to

6    rule on that first?

7                THE COURT:  Go ahead and offer your second sentence.

8                MS. DEGNAN:  In the last paragraph on that page

9    after the first sentence which ends with, "in the exact words

10   of the claim," we would insert, "However, if the specification

11   clearly shows that the invention as disclosed by the inventor

12   requires a feature that is not recited in a claim, then that

13   claim is invalid."

14               THE COURT:  All right.  Those objections are

15   overruled.

16       We'll turn next to page 21 of the final jury

17   instructions.  Is there any objection here from either party?

18               MR. PAYNE:  Not an objection, Your Honor, but there

19   is a typo in the middle paragraph of the page where it says

20   '010 Patent instead of '060 Patent.

21               THE COURT:  I see that.  Thank you.  I will make

22   that correction.

23               MR. PAYNE:  Otherwise, no objection from Netlist on

24   that.

25               THE COURT:  Any objection from Defendants here?

```
 1              MS. DEGNAN:  No objection with that correction as
 2    well, Your Honor.
 3              THE COURT:  All right.  Turning then to page 22, is
 4    there objection here from either party?
 5              MR. PAYNE:  No objection, Your Honor.
 6              MS. DEGNAN:  No, Your Honor.
 7              THE COURT:  Turning then to page 23, is there
 8    objection here from either party?
 9              MR. PAYNE:  No objection, Your Honor.
10              MS. DEGNAN:  No objection.
11              THE COURT:  Turning then to page 24, is there any
12    objection here?
13              MR. PAYNE:  Yes, Your Honor.  Netlist objects to the
14    instruction on non-infringing alternatives including the
15    instruction that Netlist has the burden to show that a
16    non-infringing alternative was available, as contrary to the
17    requirements of the Federal Circuit damages law for reasonable
18    royalty damages.
19              THE COURT:  All right.  That objection is overruled.
20         Let me ask you, Counsel, pages 23 and 24 contain all 15
21    of the *Georgia-Pacific* factors.  Does either party object to
22    the Court charging this jury in this case with all 15 of the
23    factors?
24              MR. PAYNE:  No, Your Honor.
25              MS. DEGNAN:  No, Your Honor.
```

1    THE COURT:  All right.  Then let's turn to page 25.

2  Is there objection here from either party?

3    MR. PAYNE:  No objection, Your Honor.

4    MS. DEGNAN:  No objection.

5    THE COURT:  Turning then to page 26, is there

6  objection from either party?

7    MR. PAYNE:  No objection, Your Honor.

8    MS. DEGNAN:  No objection.

9    THE COURT:  And the final page of the final jury

10  instructions being page 27, is there objection here from

11  either party?

12    MR. PAYNE:  No objection.

13    MS. DEGNAN:  No objection.

14    THE COURT:  All right.  Next let's turn to the

15  verdict form.  We'll follow the same approach.

16    Is there objection from either Plaintiff or Defendants to

17  anything on the first sheet or cover page of the verdict form?

18    MR. PAYNE:  No, Your Honor.

19    MS. DEGNAN:  No objection.

20    THE COURT:  Turning to page 2 of the verdict form

21  where certain definitions are put forward, is there objection

22  here from either party?

23    MR. PAYNE:  No objection.

24    MS. DEGNAN:  No objection.

25    THE COURT:  Turning to page 3 where certain written

1   instructions are included, is there objection here from either

2   party?

3            MR. PAYNE:  No objection.

4            MS. DEGNAN:  No objection.

5            THE COURT:  Turning to page 4 where questions

6   regarding infringement are listed, is there any objection from

7   either party?

8            MR. PAYNE:  Yes, Your Honor.  Just putting it on the

9   record Netlist objects to the order of the questions,

10  specifically that that order should track the presentation of

11  evidence and that the '918 and '054 Patent questions should be

12  first, 1A; that the '339 Patent question shown second, 1B; and

13  there's no objection to the placement of the third question.

14           THE COURT:  All right.  That objection is overruled.

15  Any objection here from Samsung?

16           MS. DEGNAN:  Yes, Your Honor.  So for the record, we

17  would not have minded reordering the patents as Netlist has

18  stated, but we do object in Question 1B and 1C to having a

19  single question for two patents.  So we would have one

20  question for the '918 Patent and a separate question for the

21  '054.  And then 1C, we would have one question for the '060

22  and a separate question for the '160 Patent.

23           THE COURT:  All right.  That objection is overruled

24  as well.

25           We'll turn to page 5 of the verdict form where Question 2

 1   regarding invalidity is located.  Is there objection here from

 2   either party?

 3              MR. PAYNE:  Yes, Your Honor.  Netlist objects to the

 4   order for the same reasons as stated on the infringement

 5   question.

 6              THE COURT:  That's overruled.  Any objection from

 7   Samsung?

 8              MS. DEGNAN:  No, Your Honor.

 9              THE COURT:  Then we'll turn to page 6 of the verdict

10   form where Questions 3A, B, and C are found.  Is there

11   objection here from either party?

12              MR. PAYNE:  Yes, Your Honor.  Same objection to the

13   order of the questions.

14              THE COURT:  Same ruling, overruled.

15              MS. DEGNAN:  We have an objection as well, Your

16   Honor.

17              THE COURT:  Please state your objection.

18              MS. DEGNAN:  Yes.  Excuse me.  We would have

19   separate questions for 3B--one for the '918 Patent, a second

20   for the '054 Patent.  And Question 3C, we would have one

21   question for the '060 Patent and a separate question for the

22   '160 Patent, Your Honor.

23              THE COURT:  That objection is overruled.

24        We'll turn to page 7 of the verdict form where Questions

25   4A, B, and C are located regarding damages.  Is there

1286

1    objection here from either party?

2         MR. PAYNE:  Yes, Your Honor.  Same objection to

3    order.

4         THE COURT:  Same ruling, overruled.  Anything from

5    Samsung here?

6         MS. DEGNAN:  No objection, Your Honor.

7         THE COURT:  Then we'll turn to page 8, which is the

8    final page of the verdict form.  Is there objection here from

9    either Plaintiff or Defendants?

10        MR. PAYNE:  No, Your Honor.

11        MS. DEGNAN:  No, Your Honor.

12        THE COURT:  All right.  That completes the formal

13   charge conference.

14       I will correct the one typographical error which was

15   caught, and I appreciate it being caught.  It will take me

16   some time to print the eight copies of the final jury

17   instructions so that each member of the jury will have their

18   own printed copy when they retire to deliberate.

19       But after that's done, I intend to -- assuming all the

20   jury is here because it's 8:30, when all the jury is here and

21   that's done, I intend to return to the bench, bring in the

22   jury, and proceed with the Court's final instructions,

23   followed by closing argument from counsel.

24       With that, the Court stands in recess.

25                    (Brief recess.)

1    THE COURT:  Be seated, please.

2    For those present, including our friends behind the bar,

3    I want to make it clear that I'm about to bring in the jury

4    and present the Court's final instructions to them, followed

5    by closing arguments by the attorneys for the parties.

6    The Court considers its final instructions to the jury

7    and counsel's closing arguments as the most serious part of a

8    very serious process.  Therefore, I do not want any

9    disruptions of any kind during my instructions to the jury or

10    during counsel's closing arguments.

11    If you have an electronic device on your person, make

12    sure it is not going to make any noise under any

13    circumstances.  If you have any doubt, get it out of this room

14    right now.

15    If you need to talk to somebody, if you need to pass

16    papers, if you need to lean over and whisper, do it now.

17    Don't do it after I bring the jury in.  I want everybody

18    still, quiet, and respectful.

19    I don't want people coming and going once I bring the

20    jury in.  So if you have colleagues who aren't here, they need

21    to get here or they need to stay outside of the courtroom.  I

22    want you as still and quiet and respectful as possible

23    throughout my final instructions and counsels' closing

24    arguments.

25    Counsel, is there anything that needs to be raised with

1    the Court before I bring in the jury and begin with the

2    Court's final instructions?

3              MR. SHEASBY:  Nothing for Plaintiff, Your Honor.

4              MR. CORDELL:  Nothing for Defendants, Your Honor.

5    Thank you.

6              THE COURT:  All right.  Let's bring in the jury,

7    please.

8              (Whereupon, the jury entered the courtroom.)

9              THE COURT:  Good morning, ladies and gentlemen of

10   the jury.  Welcome back.  Please have a seat.

11        Ladies and gentlemen of the jury, you've now heard all

12   the evidence in this case, and I'll now instruct you on the

13   law that you must apply.

14        I want you to each understand that these instructions I'm

15   about to give you orally have been reduced to writing, and I

16   will provide each of you with your own written copy of these

17   final jury instructions.  So you can make notes if you want

18   to, but you don't have to because you're going to have your

19   own printed copy of these instructions.

20        Quite honestly, I would prefer me that you give me your

21   undivided attention.  That's part of why I provide the written

22   copies to each member of the jury that you can refresh your

23   memory with and review during your deliberations.

24        It's your duty to follow the law as I give it to you.

25   And on the other hand, as I've said, you, the jury, are the

1    sole judges of the facts in this case.  Do not consider any

2    statement that I have made over the course of the trial or

3    make in the course of these instructions as an indication that

4    I have any opinion about the facts in this case.

5        You are about to hear closing arguments from the

6    attorneys for the competing parties.  Statements and arguments

7    of the attorneys, ladies and gentlemen, are not evidence, and

8    they are not instructions on the law.  They are intended only

9    to assist the jury in understanding the evidence and the

10   parties' competing contentions.

11       A verdict form has been prepared for you, and you will

12   take this verdict form with you to the jury room.  And when

13   you have reached a unanimous agreement as to the questions in

14   the verdict form, you will have your foreperson fill in the

15   blanks to those questions reflecting your unanimous answers,

16   then sign the verdict form and date it, and advise the Court

17   security officer you've reached a verdict.

18       Answer those questions in the verdict form from the facts

19   as you find them to be.  Do not decide who you think should

20   win this case and then answer those questions to reach that

21   result.  Your answers and your verdict, ladies and gentlemen,

22   I remind you, must be unanimous.

23       Now, in determining whether any fact has been proven in

24   this case, you may, unless otherwise instructed, consider the

25   testimony of all the witnesses, regardless of who may have

1  called them, and you may consider all the exhibits admitted

2  into evidence, regardless of who may have introduced those

3  exhibits.

4       You, the jury, are the sole judges of the credibility of

5  all the witnesses and the weight and effect to give to all of

6  the evidence.  In deciding the facts in this case, you may

7  have to decide which testimony to believe and which testimony

8  not to believe.  You alone are to determine the questions of

9  credibility or truthfulness of the witnesses.

10      In weighing the testimony of the witnesses, you may

11 consider a witness' manner and demeanor on the witness stand,

12 any feelings or interest they may have in the case, any

13 prejudice or bias about the case that the witness may have, as

14 well as the consistency or inconsistency of their testimony,

15 considered in the light of the circumstances.  Has a witness

16 been contradicted by other evidence?  Has he or she made

17 statements at other times and in other places contrary to what

18 they said on the witness stand?

19      You, ladies and gentlemen, must give the testimony of

20 each witness the amount of credibility and weight you think it

21 deserves.

22      You must also keep in mind that a simple mistakes does

23 not mean that a witness is not telling the truth.  You must

24 consider whether any misstatement was an intentional falsehood

25 or a simple lapse in memory and what significance should be

1   attached to that testimony.

2       As I've previously told you, the attorneys in this case

3   are acting as advocates for the competing parties, and they

4   have a duty to object when they believe evidence is offered

5   that should not be admitted under the rules of the Court.

6       When the Court sustained an objection to a question

7   addressed to a witness, you, the jury, must disregard that

8   question entirely, and you may draw no inference from its

9   wording or speculate about what the witness would have said if

10  the Court had permitted them to answer the question.

11      However, if the objection was overruled, then you must

12  treat the answer to that question just as you would treat any

13  other answer to any other question just as if the objection

14  had not been made.

15      By allowing the testimony or other evidence to be

16  introduced over the objection of an attorney, the Court did

17  not in so doing indicate to you any opinion about the weight

18  or effect of that evidence.  Again, that is up to you.

19      Now, at times during the trial it was necessary for the

20  Court to talk with the lawyers outside of your hearing, either

21  here at the bench or by calling a recess and talking to them

22  while you were outside of the courtroom.  This happens during

23  trials because there are things that arise that do not

24  directly involve the jury.  You should not speculate about

25  what was said during those discussions that took place outside

1    of your presence.

2         Now, there are two types of evidence that you may

3    consider in properly finding the truth as to the facts in this

4    case.  One is direct evidence, such as the testimony of an

5    eyewitness.  The other is indirect evidence, sometimes called

6    circumstantial evidence, that is, the proof of a chain of

7    circumstances that indicates the existence or non-existence of

8    certain other facts.

9         As a general rule, ladies and gentlemen, the law makes no

10   distinction between direct evidence or circumstantial

11   evidence, but simply requires that you find the facts based on

12   the evidence presented, both direct and indirect.

13        Now, certain testimony in this case has been presented to

14   you during this trial through what are called depositions.  A

15   deposition is the sworn, recorded answers to questions asked

16   of a witness in advance of the trial.  If the witness cannot

17   be present to testify in person, then the witness' sworn

18   testimony may be presented under oath in the form of a

19   deposition.

20        Before this trial began, the attorneys representing the

21   competing parties questioned these deposition witnesses under

22   oath.  At that time, a court reporter was present, they were

23   sworn, they were asked questions, and the questions and their

24   answers were recorded and taken down.

25        Deposition testimony is entitled to the same

1    consideration by you as the testimony given by a witness

2    in-person in open court from the witness stand.  And you

3    should judge the credibility and the importance of deposition

4    testimony to the best of your ability, just as if the witness

5    had testified before you in person in open court.

6         Now, while you should consider only the evidence in this

7    case, you are permitted, ladies and gentlemen, to make such

8    reasonable inferences from the testimony and exhibits that you

9    feel are justified in the light of common experience.  In

10   other words, you may make deductions and reach conclusions

11   that reason and common sense lead you to draw from the facts

12   that have been established by the testimony and the evidence

13   in this case.

14        However, you should not base your decision on any

15   evidence not presented by the parties during the trial,

16   including your own personal experience with any of the

17   products that might be at issue in this case.

18        Now, unless I instruct you otherwise, you may properly

19   determine that the testimony of a single witness may be

20   sufficient to prove any fact, even if a greater number of

21   witnesses may have testified to the contrary, if after

22   considering all the evidence, you believe that single witness.

23        When knowledge of a technical subject matter may be

24   helpful to the jury, a person who has special training or

25   experience in that technical field--we call them an expert

1    witness--is permitted to state or her opinions on those

2    technical matters.  However, ladies and gentlemen, you are not

3    required to accept any of those opinions.  As with any other

4    witness, it is solely up to you to decide who to rely upon and

5    who not to rely upon.

6        Other the course of the trial, certain exhibits were

7    shown to you in the form of illustrations.  We call these

8    demonstrative exhibits.  They're sometimes simply for short

9    called demonstratives.  Demonstrative exhibits are a party's

10   depiction, picture, or model to describe something involved in

11   the trial.  If your recollection of the evidence differs from

12   the demonstratives, you should rely on your recollection.

13   Demonstrative exhibits are sometimes called jury aids.

14       And demonstrative exhibits are not evidence, but the

15   witness' testimony concerning a demonstrative exhibit is

16   evidence.  Please note, demonstrative exhibits will not be

17   available for you to review during your deliberations.

18       Now, in any legal action, facts must be proven by a

19   required amount of evidence known as the burden of proof.  The

20   burden of proof in this case is on the Plaintiff Netlist for

21   some issues and on the Defendants, Samsung, for other issues.

22   And there are two burdens of proof that you will apply in this

23   case:  the preponderance of the evidence and clear and

24   convincing evidence.

25       The Plaintiff, Netlist, which you've heard referred to

1    throughout the trial as either Netlist or the Plaintiff, has

2    the burden of proving patent infringement by a preponderance

3    of the evidence.  Netlist also has the burden of proving

4    willful patent infringement by a preponderance of the

5    evidence.  Netlist also has the burden of proving damages for

6    any patent infringement by a preponderance of the evidence.

7         A preponderance of the evidence means evidence that

8    persuades you that a claim is more probably true than not

9    true.  Sometimes this is talked about as being the greater

10   weight and degree of credible testimony.

11        Now, the Defendants in this case are Samsung Electronics

12   Company, Ltd., Samsung Electronics America, Inc., and Samsung

13   Semiconductor, Inc., which you've heard referred to throughout

14   the trial collectively as either the Defendants or as Samsung.

15   Samsung has the burden of proving invalidity of Netlist's

16   patent claims by clear and convincing evidence.

17        Clear and convincing evidence, ladies and gentlemen,

18   means evidence that produces in your mind an abiding

19   conviction that the truth of the party's factual contentions

20   are highly probable.  Although proof to an absolute certainty

21   is not required, the clear and convincing evidence standard

22   requires a greater degree of persuasion than is necessary for

23   the preponderance of the evidence standard.  If proof

24   establishes in your mind an abiding conviction in the truth of

25   the matter, then the clear and convincing evidence standard

1   has been met.

2        Now, these two burdens of proof, ladies and gentlemen, as

3   I have previously told you, are not to be confused with a

4   third and altogether different burden of proof known as beyond

5   a reasonable doubt, which is the burden of proof applied in a

6   criminal case and which has absolutely no application in a

7   civil case such as this.  Beyond a reasonable doubt is a

8   higher standard of proof than the preponderance of the

9   evidence and it is a higher standard of proof than clear and

10  convincing evidence.

11       Now, as I did at the beginning of the case, I'm going to

12  give you a summary of each side's contentions, and I'll then

13  provide you with detailed instructions on what each side must

14  prove in order to win on each of its contentions.

15       As I've previously told you, this is an action for patent

16  infringement.  The Plaintiff, Netlist, Inc., contends that the

17  Samsung Defendants infringe certain claims of the

18  patents-in-suit.

19       Remember, there are five United States patents at issue

20  in this case.  To remind you, they are United States Patent

21  No. 10,949,339, which you've heard to referred to throughout

22  the trial as the '339 Patent; United States Patent No.

23  11,016,918, which you've heard referred to as the '918 Patent;

24  United States Patent No. 11,232,054, which you've heard

25  referred to throughout the trial as the '054 Patent; United

1    States Patent No. 8,787,060, which you've heard referred to as

2    the '060 Patent; and United States Patent No. 9,318,160, which

3    you've heard referred to as the '160 Patent throughout the

4    trial.

5        I may refer to these and you should understand that these

6    are the asserted patents in this case.  They are sometimes

7    referred to as the patents-in-suit.

8        Now, the Plaintiff, Netlist, contends that the Samsung

9    Defendants infringe the following claims of these

10   patents-in-suit:  Claims 1, 8, and 9 of the '339 Patent;

11   claims 1, 5, 13, 16, 18, and 19 of the '918 Patent; claims 16

12   and 17 of the '054 Patent; and claims 1, 5, and 7 of the '060

13   Patent, as well as claim 5 of the '160 Patent.  These are

14   called the asserted claims.

15       Netlist contends that the Samsung Defendants infringe the

16   asserted claims by making, using, selling, importing, or

17   offering for sale the DDR4 LRDIMMs, the DDR5 DIMMs, and the

18   HBM products, and I'll refer to these as the accused products.

19       The Plaintiff, Netlist, further alleges that Samsung's

20   infringement of the asserted patents was willful.  Netlist

21   contends that it's entitled to money damages in the form of a

22   reasonable royalty for Samsung's infringement.  Netlist has

23   the burden to prove these issues to you, the jury, by a

24   preponderance of the evidence.

25       The Samsung Defendants deny that they infringe any of the

1    asserted claims.  Samsung denies that its makes, uses, offers

2    for sale, sells, or imports any accused product that infringes

3    any of the asserted claims.  Samsung denies that any

4    infringement has been willful.  Samsung also denies that it

5    owes Netlist any money damages.

6        Further, Samsung contends that certain of the asserted

7    claims of the patents-in-suit are invalid as being obvious and

8    are invalid for lacking a written description -- an adequate

9    written description.  Samsung has the burden to prove

10   invalidity by clear and convincing evidence.

11       Also, ladies and gentlemen, I'd like to remind you that

12   prior to this case, Netlist and Samsung entered into a written

13   agreement, which they called the joint development and license

14   agreement, which you've heard referred to throughout the trial

15   as the JDLA.  You have seen the JDLA, and you have heard about

16   it as a part of the evidence in this trial.

17       The JDLA provided each party would have a license to use

18   the other party's patents during the existence of the JDLA.

19   This license within the JDLA applied to all of each party's

20   products.

21       After the JDLA had been in effect between Netlist and

22   Samsung for some period of time, a dispute developed between

23   them concerning the JDLA and what it required.  This dispute

24   has already been addressed by another court, and that court

25   has determined that Samsung no longer had a license to

1    Netlist's patents, including the patents asserted in this

2    case, as of the termination of the JDLA, which occurred on

3    July the 15th, 2020.  In other words, Samsung was licensed to

4    Netlist's patents under the JDLA until July the 15th, 2020.

5        Also, ladies and gentlemen, you should know that

6    invalidity and infringement are separate and distinct issues,

7    and your job is to decide whether Samsung has infringed the

8    asserted claims and whether that infringement, if you find it,

9    was willful, and whether certain of the asserted claims are

10   invalid.

11       If you decide that any asserted claim has been infringed

12   and is not invalid, then you'll need to decide what amount of

13   money damages, if any, should be awarded to Netlist to

14   compensate it for that infringement.  If you decide that there

15   was any infringement and it was willful, that decision should

16   not affect any damages award that you might make.  The Court

17   will take willfulness into account later if you find it.

18       Now, before you can decide many of the issues in this

19   case, you will need to understand the role of the patent

20   claims.  The patent claims are those numbered sentences at the

21   end of each patent.  And I remind you, you have a complete

22   copy of each of the five patents-in-suit in your juror

23   notebooks, and you may refer to the items in your juror

24   notebooks during your deliberations.

25       The claims, ladies and gentlemen, are important because

1    it's the words of the claims that define what a patent covers.

2    The figures and the text and the rest of the patent provide a

3    description and/or examples of the invention, and they provide

4    a context for the claims, but it is the claims themselves that

5    define the breadth of the patent's coverage.

6        Each claim is effectively treated as if it were a

7    separate patent, and each claim may cover more or less than

8    another claim.  Therefore, what a patent covers depends, in

9    turn, upon what each of its claims covers.  You will first

10   need to understand what each claim covers in order to decide

11   whether or not there is infringement of the claim and to

12   decide whether or not that claim is invalid.

13       Now, the law says that it is my role to define the terms

14   of the claims and it's your role to accept and apply my

15   definitions to the issues that you're asked to decide in this

16   case.  Therefore, as I explained to you at the beginning of

17   the case, I have already determined the meaning of certain

18   language from the asserted claims and I have provided you with

19   my definitions or constructions of this language in your juror

20   notebooks.

21       You must accept my definitions of these words from the

22   claims as being correct.  It's your job to take these

23   definitions and apply them to the issues that you are asked to

24   decide, including the issues of infringement and the issues of

25   invalidity.

1    And you should disregard any evidence presented at the

2    trial that contradicts or is inconsistent with the

3    constructions and the definitions that the Court has given

4    you.  For any language from the claims that I have not

5    construed--that is, limitations or elements that I have not

6    interpreted or defined--you are to use the plain and ordinary

7    meaning of the limitations as understood by one of ordinary

8    skill in the art, which is to say, in the field of the

9    technology of the patent, at the time of the alleged

10   invention.

11       The meaning of the words of the patent claims must be the

12   same when deciding issues of infringement and issues of

13   invalidity.  And as I've noted, you've been provided with

14   copies of each of the five asserted patents inside your

15   notebooks and you may refer to everything in your notebooks

16   during your deliberations.

17       Now, several times in these instructions, ladies and

18   gentlemen, I have or will refer to a person of ordinary skill

19   in the invention, or a person of ordinary skill in the art.

20   In deciding the level of ordinary skill in the field, you

21   should consider all the evidence introduced at trial,

22   including but not limited to:  (1) the levels of education and

23   experience of the inventor or other persons actively working

24   in the field; (2) the types of problems encountered in the

25   field; (3) previous solutions to those problems; (4) the

1    rapidity with which innovations are made; and (5) the

2    sophistication of the technology.

3         The claims are intended to define in words the boundaries

4    of the inventor's rights.  Only the claims of a patent can be

5    infringed.  Neither the written description nor the figures or

6    drawings of a patent can be infringed.  Each of the claims

7    must be considered individually.

8         I will now explain how a claim defines what it covers.

9         A claim sets forth, in words, a set of requirements.

10   Each claim sets forth its requirements in a single sentence.

11   If a product satisfies each of these requirements, then it is

12   covered by the claim, and there can be several claims in a

13   patent.  Each claim may be narrower or broader than another

14   claim by setting forth more or fewer requirements.

15        The coverage of a patent is assessed on a claim-by-claim

16   basis.  And in patent law, the requirements of the claim are

17   often referred to as the claim elements or they're called

18   sometimes the claim limitations.  When a product meets all the

19   requirements of a claim, the claim is said to cover that

20   product, and that product is said to fall within the scope of

21   that claim.

22        In other words, ladies and gentlemen, a claim covers a

23   product where each of the claim elements or limitations is

24   present in that product.  If the product is missing even one

25   limitation or element of a claim, the product is not covered

1    by the claim, and if the product is not covered by the claim,

2    the product cannot infringe that claim.

3        Now, the beginning portion or preamble of a claim often

4    uses the word 'comprising'.  The word 'comprising' when used

5    in the preamble of a claim means including but not limited to,

6    or containing but not limited to.  When 'comprising' is used

7    in the preamble, if you decide that an accused product

8    includes all the requirements of that claim, the claim is

9    infringed.  This is true even if the accused product contains

10   additional elements.

11       For example, as I've previously told you, a claim to a

12   table comprising a tabletop, legs, and glue, would be

13   infringed by any table that includes a tabletop, legs, and

14   glue, even if the table also contains other structures such as

15   leaves to expand the size of the tabletop or wheels to go on

16   the ends of the legs.

17       Now, this case involves two types of patent

18   claims--independent claims and dependent claims.  An

19   independent patent claim does not refer to any other claim in

20   the patent.  An independent claim sets forth all the

21   requirements that must be met in order to be covered by the

22   claim.  It's not necessary to look to any other claim to

23   determine what an independent claim covers.

24       On the other hand, a dependent claim does not itself

25   recite all the requirements of the claim but refers to another

claim for some of its requirements.  In this way the claim depends from another claim.  A dependent claim incorporates all the requirements of the claim to which it refers or, as we say, from which it depends.  A dependent claim then adds its own additional requirements --

So to determine what a dependent claim covers, it's necessary to look at both the dependent claim itself and any other claim to which it refers or from which it depends.  A product that meets all the requirements of both the dependent claim and any claim to which it refers is covered by that dependent claim.

For the '399 [sic] Patent, claim 1 is an independent claim, claim 8 is a dependent claim that depends from claim 1, and claim 9 is a dependent claim that depends from claim 8, which, in turn, depends from claim 1.

For the '918 Patent, claim 1 is an independent claim. Claims 5 and 13 are dependent claims that depend from independent claim 1.  In addition, claim 16 is an independent claim, and claims 18 and 19 are dependent claims that depend from independent claim 16.

For the '054 Patent, claim 16 is an independent claim, and claim 17 is a dependent claim which depends from independent claim 16.

For the '060 Patent, claim 1 is an independent claim, and claims 5 and 7 are dependent claims that depend from

1    independent claim 1.

2        For the '160 Patent, claim 5 is a dependent claim that

3    depends from unasserted claim 1.

4        An independent claim sets forth all the requirements that

5    must be met in order to be covered by that claim.  It's not

6    necessary to look to any other claim to determine what an

7    independent claim covers.

8        I'll now instruct you on infringement in more detail.  If

9    a person or a corporation makes, uses, sells, or offers to

10   sell within the United States, or imports into the United

11   States what is covered by a patent claim without the patent

12   owner's permission, that person or corporation is said to

13   infringe the patent.

14       In reaching your decision on infringement, keep in mind,

15   ladies and gentlemen, that only the claims of a patent can be

16   infringed, and you must compare the asserted claims, as I have

17   construed them for you, to the accused products to determine

18   whether or not there is infringement.  This is the only

19   correct comparison.

20       You should not compare the accused products with any

21   specific examples set out in the patent, with the prior art,

22   or with Netlist's own products in reaching your decision on

23   infringement.  In deciding infringement, the only correct

24   comparison is between the accused products and the limitation

25   of the claims as the Court has construed them.

1   You must reach your decision as to each assertion of

2   infringement based on my instructions about the meaning and

3   scope of the claims, the legal requirements for infringement,

4   and the evidence presented to you by both of the competing

5   parties over the course of the trial.

6   I'll now instruct you about the specific rules you must

7   follow to determine whether Netlist has proven that Samsung

8   has directly infringed one or more of the asserted claims

9   involved in this case.

10   A patent can be directly infringed even if the alleged

11   direct infringer did not have knowledge of the patent and

12   without the direct infringer knowing that what it did was

13   infringement of the claim.  A patent may also be directly

14   infringed even though the accused direct infringer believed in

15   good faith that what it was doing was not infringement of the

16   patent.  Infringement does not require proof that a party

17   copied its product from the asserted claims.

18   Now, you must determine, separately for each asserted

19   claim, whether or not there is infringement.  However, if you

20   find that an independent claim on which other claims depend is

21   not infringed, there cannot be infringement of any dependent

22   claim that refers directly or indirectly to that independent

23   claim.

24   But on the other hand, if you find that an independent

25   claim has been infringed, then you must still decide,

1    separately, whether the product meets the additional

2    requirements of any of the claims that depend from that

3    independent claim; that is, whether those claims have also

4    been infringed.

5        A dependent claim includes all the requirements of any of

6    the claims to which it refers plus the additional requirements

7    of its own.

8        Now, in order to prove direct infringement of an asserted

9    claim, Netlist, the Plaintiff, must show by a preponderance of

10   the evidence that the accused products include each and every

11   limitation of the asserted claim, either directly or under the

12   doctrine of equivalents.

13       In determining whether the accused products directly

14   infringe a patent claim in this case, you must compare the

15   accused products with each and every one of the requirements

16   or limitations of that claim to determine whether the accused

17   product contains each and every requirement or limitation

18   recited in that claim.  An accused product infringes a claim

19   if it satisfies the claim elements, even though it may be

20   capable of non-infringing modes of operation.

21       A claim requirement is literally present if it exists in

22   an accused product just as it is described in the claim

23   language, either as I have explained that language to you or,

24   if I did not explain it, as would be understood by its plain

25   and ordinary meaning by one of ordinary skill in the art.  If

1    an accused product omits any element recited in a claim, then

2    you must find that that product in question does not literally

3    infringe that claim.

4        So long as an accused product has each and every one of

5    the claim limitations, infringement in that claim is shown

6    even if the product contains additional features or elements

7    not required by the claim.

8        If you do not find that each limitation of a claim is

9    literally met, then you may still find infringement if you

10   find each element is met under the doctrine of equivalents.

11   If a person makes, uses, sells, or offers to sell within the

12   United States, or imports into the United States a product

13   that does not meet all of the elements or limitations of a

14   claim and, thus, does not literally infringe that claim, there

15   can still be direct infringement if that product or method

16   satisfies the claim under the doctrine of equivalents.

17       Under the doctrine of equivalents, an accused product

18   infringes a claim if it contains elements or limitations

19   corresponding with each and every element or limitation of the

20   claim that it is equivalent to, even though not literally met

21   by, the accused product.

22       You may find that an accused product is equivalent to an

23   element or limitation of a claim that is not literally met if

24   a person having ordinary skill in the field of the technology

25   of the patent would have considered the differences between

1  them to be insubstantial or would have found that the accused

2  product performs substantially the same function in

3  substantially the same way to achieve substantially the same

4  result as the element or limitation of the claim.

5       Known interchangeability of the claim element and the

6  proposed equivalent is a factor that can support a finding of

7  infringement under the doctrine of equivalents.  In order for

8  the structure or action to be considered interchangeable, the

9  structure or action must have been known at the time of the

10  alleged infringement to a person having ordinary skill in the

11  field of the technology of the patent.  Interchangeability at

12  the present time is not sufficient.

13       Now, in order to prove direct infringement under the

14  doctrine of equivalents, the Plaintiff, Netlist, must prove by

15  a preponderance of the evidence that for each claim element or

16  limitation not literally present in the accused product, the

17  equivalent of that claim or limitation is present in that

18  accused product.

19       Netlist, the Plaintiff, also contends that Samsung has

20  willfully infringed the patents-in-suit.  If you decide that

21  the Samsung Defendants have infringed, then you must go on to

22  address the issue of whether or not that infringement was

23  willful.

24       Netlist, the Plaintiff, has the burden of proving willful

25  infringement by a preponderance of the evidence.  You may not

1    determine that the infringement was willful just because

2    Samsung knew of the asserted patents and infringed them.  You

3    may find that Samsung willfully infringed if you find that

4    Samsung deliberately or intentionally infringed the asserted

5    patents.

6        To determine whether Samsung acted willfully, consider

7    all the facts and assess Samsung's knowledge at the time of

8    the challenged conduct.  Facts that may be considered include

9    whether or not Samsung reasonably believed that it did not

10   infringe or that the asserted patents were invalid.

11       You may find that Samsung's actions were deliberate or

12   intentional if Samsung was willfully blind to Netlist's patent

13   rights.  You may find that a defendant is willfully blind when

14   it is indifferent to the rights of another or when it proceeds

15   in disregard of a high or excessive danger of infringement

16   that is known to it or would have been apparent to a

17   reasonable person in its position.

18       Your determination, ladies and gentlemen, of willfulness

19   should incorporate the totality of the circumstances based on

20   the evidence presented during this trial.  Willfulness can be

21   established by circumstantial evidence.  If you decide that

22   any infringement was willful, that decision should not affect

23   any damages award that you might give.  As I've told you, the

24   Court will take willfulness into account later if you find it.

25       I'll now instruct you about the rules you must follow in

1    deciding whether or not Samsung has proven that any of the

2    asserted claims of the asserted patents are invalid.  An

3    issued United States patent is accorded a presumption of

4    validity based on the presumption that the United States

5    Patent and Trademark Office, which you've heard referred to

6    throughout the trial as the PTO or as the Patent Office, acted

7    correctly in issuing the patent.  This presumption of validity

8    extends to all issued United States patents.

9        In order to overcome this presumption, Samsung must

10   establish by clear and convincing evidence that a claim is

11   invalid.  Like infringement, invalidity is determined on a

12   claim-by-claim basis, and you must determine separately for

13   each claim whether the claim is invalid.  If one claim of a

14   patent is invalid, this does not necessarily mean that any

15   other claim is invalid.

16       Claims are construed in the same way for determining

17   infringement as for determining invalidity, and you must apply

18   the claim language consistently and in the same manner for the

19   issues of infringement and for the issues of invalidity.  In

20   making your determination as to invalidity, you must consider

21   each claim separately.

22       In this case, Samsung contends that the asserted claims

23   of the '339 Patent are obvious -- excuse me.  Samsung contends

24   that the asserted claims of the '339 Patent are invalid on two

25   grounds.  First, that the claims are obvious in view of prior

1    art; and, second, that the claims fail to comply with the

2    written description requirement.

3         Samsung also contends that the asserted claims of the

4    '918 and the '054 Patent are invalid on the grounds that they

5    fail to comply with the written description requirement.

6    Samsung does not contend in this case that the claims of the

7    '060 and the '160 Patents are invalid.

8         A previous device, system, method, publication, or patent

9    that predates the claimed invention is generally called prior

10   art, and may include items that were publicly known or that

11   had been used or offered for sale, or references, such as

12   publications or patents, that disclose the claimed invention

13   or elements of the claimed invention.  Prior art may be

14   authored or created by anyone.

15        In evaluating the prior art to determine whether an

16   invalidity defense has been proven by clear and convincing

17   evidence, you may consider whether the prior art was or was

18   not before the PTO.

19        In this case, Samsung contends that the asserted claims,

20   being claims 1, 8, and 9 of the '339 Patent, are obvious in

21   the light of two prior art references.  These are the quad

22   band memory system, which you've heard referred to as QBM, in

23   combination with United States Patent No. 2006/0277355, which

24   you've heard referred to as the Ellsberry reference.

25        If you find that an independent claim is invalid, you

1    must separately consider whether any independent claim or

2    claims that depend from it are also invalid.  However, when

3    considering obviousness, if you find that an independent claim

4    is not obvious, you cannot find that its dependent claims are

5    obvious.  And, again, as I've explained before, claim 1 of the

6    '339 Patent is an independent claim, and claim 8 depends from

7    it.  Claim 9, in turn, depends from claim 8.  The '339 Patent

8    is the only patent that Samsung contends is obvious in this

9    case.

10       I'll now instruct you on how to determine whether any of

11   the asserted claims of the '339 Patent that were challenged on

12   prior art grounds are invalid as being obvious.

13       Even though an invention may not have been literally

14   disclosed or identically described in a single prior art

15   reference before it was made by an inventor, in order to be

16   patentable, the invention must also not have been obvious to a

17   person of ordinary skill in the field of the technology of the

18   patent at the time the invention was made.

19       The Samsung Defendants have the burden of establishing

20   obviousness by showing by clear and convincing evidence that

21   the claimed invention would have been obvious to persons

22   having ordinary skill in the art at the time the invention was

23   made and in the field of the technology of the patent.

24       In determining whether a claimed invention is obvious,

25   you must consider the level of ordinary skill in the field

1    that someone would have had at the time the invention was

2    made, the scope and content of the prior art, and any

3    differences between the prior art and the claimed invention.

4        Keep in mind, ladies and gentlemen, that the existence of

5    each and every element of the claimed invention in the prior

6    art does not necessarily prove obviousness.  Most, if not all,

7    inventions rely on the building blocks of prior art.  The

8    skill of the actual inventor is not necessarily relevant

9    because inventors may possess something that distinguishes

10   them from persons having ordinary skill in the art.

11       So in considering whether the claimed invention was

12   obvious, you must first determine the scope and content of the

13   prior art.  The scope and content of the prior art for

14   deciding whether the invention was obvious includes at least

15   prior art in the same field as the claimed invention.  It also

16   includes prior art from different fields that a person of

17   ordinary skill in the art would have considered when trying to

18   solve the problem that is addressed by the invention.

19       Further, teachings, suggestions, and motivations may also

20   be found within the knowledge of a person of ordinary skill in

21   the art, including inferences and creative steps that a person

22   of ordinary skill in the art would employ.  A person of

23   ordinary skill may be able to fit the teachings of multiple

24   pieces of prior art together like pieces of a puzzle.  The

25   person of ordinary skill in the art would have the capability

1  of understanding the scientific and engineering principles

2  applicable to the pertinent art.

3       In considering whether a claimed invention is obvious,

4  you may but are not required to find obviousness if you find

5  that at the time of the claimed invention there was a reason

6  that would have prompted a person having ordinary skill in the

7  field to combine the known elements in a way that the claimed

8  invention does, taking into account such factors as:

9       1.   Whether the claimed invention was merely the

10 predictable result of using prior art elements according to

11 their known function;

12      2.   Whether the claimed invention provides an obvious

13 solution to a known problem in the relevant field;

14      3.   Whether the prior art teaches or suggests the

15 desirability of combining elements in the claimed invention;

16      4.   Whether the prior art teaches away from combining

17 elements in the claimed invention;

18      5.   Whether it would have been obvious to try the

19 combination of elements in the claimed invention, such as

20 where there is a design need or market pressure to solve a

21 problem and there are a finite number of identified

22 predictable solutions; and

23      6.   Whether the change resulted more from design

24 incentives or other market forces.

25      To find the invention is obvious, you must find that the

1  prior art provided a person having ordinary skill in the field

2  a reasonable expectation of success.

3      In determining whether the claimed invention was obvious,

4  consider each claim separately.  Do not use hindsight;

5  consider only what was known at the time of the invention.  In

6  other words, you should not consider what a person of ordinary

7  skill in the art would know now or what has been learned from

8  the teachings of the '339 Patent.

9      In making these assessments, ladies and gentlemen, you

10  should take into account any objective evidence, sometimes

11  called secondary considerations, that may have existed at the

12  time of the invention, and afterwards, that may shed light on

13  the obviousness or not of the claimed invention.  The

14  following are possible secondary considerations, but it is up

15  to you to decide whether secondary considerations of

16  non-obviousness exist at all.  These are:

17      1.  Whether the invention was commercially successful as

18  a result of the merits of the claimed invention rather than

19  the result of design needs or market pressure, advertising, or

20  similar activities;

21      2.  Whether the invention satisfied a long-felt need;

22      3.  Whether the inventor proceeded contrary to accepted

23  wisdom in the field;

24      4.  Whether others tried but failed to solve the problem

25  solved by the claimed invention;

1    5.   Whether others invented the invention at roughly the

2  same time;

3    6.   Whether others copied the claimed invention;

4    7.   Whether others accepted licenses under the

5  patents-in-suit because of the merits of the claimed

6  invention;

7    8.   Whether the claimed invention achieved unexpected

8  results;

9    9.   Whether others in the field praised the claimed

10  invention;

11    10.  Whether there were changes or related technologies

12  or market needs contemporaneous with the invention; and

13    11.  Whether persons having ordinary skill in the art at

14  the time of the invention expressed surprise or disbelief

15  regarding the invention.

16    These factors are relevant only if there is a connection

17  or nexus between the factors and what differentiates the

18  claimed invention from the prior art.  Netlist has the burden

19  of establishing this connection or nexus.

20    Moreover, even if you conclude that some of the above

21  indicators of objective evidence has been established, those

22  factors should be considered along with all the other evidence

23  in this case in determining whether Samsung has proven that

24  the claimed invention would have been obvious.

25    Now, Samsung also contends that the asserted claims of

1   the '339, the '918, and the '054 Patents are invalid for

2   failure to satisfy the written description requirement.  As I

3   previously explained, to obtain a patent, one must first file

4   an application with the United States Patent and Trademark

5   Office, or the PTO.  The process of obtaining a patent is

6   called patent prosecution.  The application submitted to the

7   PTO contains within it what is called a specification.

8       The specification, ladies and gentlemen, is required to

9   contain a written description of the claimed invention telling

10  what the invention is, how it works, how to make it, and how

11  to use it.  The written description requirement is designed to

12  ensure that the inventor was in possession of the full scope

13  of the claimed invention as of the patent's priority date.

14      To succeed on its claims of lack of adequate written

15  description as to the '339, the '918, and the '054 Patents,

16  Samsung must show by clear and convincing evidence that a

17  person having ordinary skill in the field reading the patent

18  specification as of the priority date of that patent would not

19  have understood that the specification describes the full

20  scope of the invention as it is claimed in the claims of the

21  patent.  If a patent claim lacks adequate written description,

22  it is invalid.

23      In deciding whether the '339, the '918, and the '054

24  Patents satisfy this written description requirement, you must

25  consider the description from the viewpoint of a person having

1  ordinary skill in the field of the technology of the patent as

2  of the filing date of the patents.  This specification must

3  describe the full scope of the claimed invention, including

4  each element therefore -- thereof, either expressly or

5  inherently.  A claimed invention is disclosed inherently if a

6  person having ordinary skill in the field as of the priority

7  date would have understood that the element is necessarily

8  present in what the specification discloses.

9      The written description does not have to be in the exact

10  words of the claim.  The requirement may be satisfied by any

11  combination of words, structures, figures, diagrams, formulas,

12  et cetera, contained in the patent specification.  Adequate

13  written description does not require either examples or an

14  actual reduction to practice of the claimed invention.

15      However, a mere wish or plan for obtaining the claimed

16  invention is not adequate written description.  Rather, the

17  level of the disclosure required depends on a variety of

18  factors, such as the existing knowledge in the particular

19  field, the scope and content of the prior art, the maturity of

20  the science or technology, and other considerations

21  appropriate to the subject matter.  The issue of written

22  description is decided on a claim-by-claim basis, not as to

23  the entire patent or group of claims.

24      Now, I will instruct you as to the measure of damages,

25  but by instructing you on damages, ladies and gentlemen, I am

1  not suggesting which party should win this case on any issue.

2  If you find that Samsung has not infringed any valid asserted

3  claim, then Netlist is not entitled to any damages.  However,

4  if you find that Samsung has infringed any valid asserted

5  claim, you must then consider what amount of damages, if any,

6  to award to Netlist.

7      The damages period for any infringement of the '339 and

8  the '918 Patents in this case begins December the 20th, 2021,

9  and runs through March of 2023.  The damages period for any

10  infringement of the '054 Patent begins on January the 25th,

11  2022, and runs through March of 2023.  The damages period for

12  any infringement of the '060 and the '160 Patents in this case

13  begins on May the 3rd, 2022, and runs through March of 2023.

14  If you award damages, the amount you award must reflect the

15  damages for acts of infringement during these periods of time

16  only.

17      Netlist has the burden to establish the amount of its

18  damages by a preponderance of the evidence.  In other words,

19  you should award only those damages that Netlist establishes

20  that it more likely than not suffered as a result of Samsung's

21  infringement, if any.  While Netlist is not required to prove

22  the amount of its damages with mathematical precision, it must

23  prove them with reasonable certainty.  Netlist is not entitled

24  to damages that are remote or that are only speculative.

25      The damages that you award, if any, must be adequate to

1    compensate Netlist for any infringement that you may find.

2    You must not award Netlist more damages than are adequate to

3    compensate it for the infringement.  You also must not include

4    any additional amount in any damages award you might make for

5    the purpose of punishing Samsung or for setting an example.

6        I'll now instruct you on how to calculate reasonable

7    royalty damages.

8        A royalty, ladies and gentlemen, is a payment made to a

9    patent holder in exchange for the right to make, use, or sell

10   the claimed invention.  A reasonable royalty is the amount of

11   royalty payment that the patent holder and the alleged

12   infringer would have agreed to in a hypothetical negotiation

13   taking place at a time prior to when the infringement first

14   began.

15       In considering this hypothetical negotiation, you should

16   focus on what the expectations of the patent holder and the

17   alleged infringer would have been had they entered into an

18   agreement at that time, and had they acted reasonably in their

19   negotiations.  In determining this, you must assume that both

20   parties believed the patent was valid and infringed and that

21   both parties were willing to enter into an agreement.

22   The reasonable royalty you determine must be a royalty that

23   would have resulted from the hypothetical negotiation and not

24   simply a royalty that either party would have preferred.

25   Evidence of things that happened after infringement first

1    began can be considered in evaluating the reasonable royalty,

2    but only to the extent that the evidence aids in assessing

3    what the royalty would have resulted from a hypothetical

4    negotiation.

5         The law, ladies and gentlemen, requires that any royalty

6    awarded to Netlist correspond to the value of the alleged

7    inventions within the accused products, as distinct from other

8    unpatented features of the accused products.  This is

9    particularly true where the accused products have multiple

10   features and multiple components not covered by the patent or

11   where the accused products work in conjunction with other

12   non-patented items.

13        The amount you find as damages must be based on the value

14   attributable to the patented technology.  If unpatented

15   features contribute to the accused products, you must

16   apportion that value to exclude any value attributable to

17   unpatented features.  You must determine the appropriate

18   royalty rate and an appropriate royalty base that reflect the

19   value attributable to the patented invention alone.  Netlist,

20   the Plaintiff, bears the burden to establish the amounts

21   attributable to the patented features.

22        In determining the reasonable royalty, you should

23   consider all the facts known and available to the parties at

24   the time the infringement began.

25        Some of the factors that you may consider in making your

determination are:

1.  The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty;

2.  The rates paid by the licensee for the use of other patents comparable to the patents-in-suit.  Comparable license agreements include covering the use of the claimed invention or similar technology;

3.  The nature and scope of the license, as exclusive or non-exclusive or as restricted or non-restricted in terms of territory, or with respect to whom the manufactured product may be sold;

4.  The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.  The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business;

6.  The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7.  The duration of the patent and the term of the

1  license;

2      8.  The established profitability of the product made

3  under the patents, its commercial success, and its current

4  popularity;

5      9.  The utility and advantages of the patented property

6  over the old modes or devices, if any, that had been used for

7  working out similar results;

8      10.  The nature of the patented invention, the character

9  of its commercial embodiment as owned and produced by the

10  licensor, and the benefits to those who have used the

11  invention;

12      11.  The extent to which the infringer has made use of

13  the invention and any evidence probative of the value of that

14  use;

15      12.  The portion of the profit or the selling price that

16  may be customary in the particular business or comparable

17  businesses to allow for the use of the invention or analogous

18  inventions;

19      13.  The portion of the realizable profits that should be

20  credited to the invention as distinguished from non-patented

21  elements, the manufacturing process, business risks, or

22  significant features or improvements added by the infringer;

23      14.  The opinion and testimony of qualified experts; and

24      15.  The amount that a licensor (such as the patentee)

25  and a licensee (such as the infringer) would have agreed upon

1   at the time the infringement began if both had been trying

2   reasonably and voluntarily to reach an agreement; that is, the

3   amount which a prudent licensee--who desired as a business

4   proposition, to obtain a license to the patented

5   invention--would have been willing to pay as a royalty and yet

6   be able to make a reasonable profit and which amount would

7   have been acceptable to a licensed patentee who was willing to

8   grant a license.

9        You may have heard these factors referred to throughout

10   the trial as the *Georgia-Pacific* factors.  No one of these

11   factors is dispositive, and you can and you should consider

12   the evidence that's been presented to you in this case on each

13   of these factors.

14        You may also, ladies and gentlemen, consider any other

15   factors which, in your mind, would have increased or decreased

16   the royalty the alleged infringer would have been willing to

17   pay, and the patentee owner would have been willing to accept,

18   acting as normally prudent business people.

19        In determining a reasonable royalty, you may also

20   consider evidence concerning the availability or lack thereof

21   of acceptable non-infringing substitutes or alternatives to

22   the patented invention.  To be an acceptable non-infringing

23   substitute, a product must have the advantages of the patented

24   invention that were important to the people who purchased an

25   alleged infringer's product.

1    You may compare the patented invention to non-infringing

2  alternatives to determine the value of the patented invention,

3  including the utility and advantages of the patent over the

4  old modes or devices, if any, that had been used to achieve

5  similar results.

6    The party asserting that there is a non-infringing

7  alternative, here Netlist, has the burden to show by a

8  preponderance of the evidence that a proposed non-infringing

9  alternative was available at the time of the hypothetical

10  negotiation and during the damages period.  You should not

11  consider for damages purposes any alternatives that Netlist

12  has not shown were available at the time of the hypothetical

13  negotiation.

14    Now, with these instructions, ladies and gentlemen, we're

15  ready at this time to hear closing arguments for the attorneys

16  for the competing parties in this case.

17    The Plaintiff may now present its first closing argument

18  to the jury.

19    Would you like a warning on your time, Mr. Sheasby?

20    MR. SHEASBY:  I would, Your Honor.  Could I have a

21  warning when I've used 10 minutes and when I've used 19

22  minutes.

23    THE COURT:  I'll warn you when you have used 10

24  minutes and when you have used 19 minutes.  You may proceed

25  with your first closing argument.

1     MR. SHEASBY:  May it please this Honorable Court.

2     Good morning, ladies and gentlemen of this jury.  I want

3  to thank you again for your service.  I am acutely aware that

4  it is a financial and personal sacrifice to do what you have

5  done, but I hope that you can understand how incredibly

6  important, incredibly important, this case is to Netlist.

7     Netlist was founded in 2000 in Orange County, and the

8  goal and vision of Netlist was to create American innovation

9  in the memory module space.  And today there are 120 employees

10  who are dedicated to that goal.

11     Samsung Electronics, you heard from Samsung's corporate

12  representative, is the largest memory company in the world.

13  He spoke about $19 billion in research and development they

14  spend each year.  He spoke about 12,000 patents they hold.

15  And yet they came to Netlist, a small company in Orange County

16  in California and asked for a technical collaboration.

17     And they did this, and it was candidly admitted under

18  oath, because they wanted to access our patents and because

19  they wanted our skill in joint development.

20     The reason why they wanted to access our patents is that,

21  although Samsung is innovative in many, many spaces, as it

22  relates to these particular products, the innovation was

23  created by Netlist.

24     These are not my words; these are the admissions of

25  Samsung's corporate representatives.  For DDR4, for DDR5, for

1   HBM, not a single Samsung patent covers the products at issue

2   here.  And the reason for that is because the patents that are

3   used in these products are Netlist patents.

4        And as the Court said, Samsung no longer has a license,

5   no longer has a right to use the patents in this case, and

6   it's in this forum, a federal court, that the consequences of

7   its actions will be determined.

8        The first issue you'll be asked to decide is

9   infringement.  Infringement is an issue on which Netlist bears

10  the burden, and it's preponderance of the evidence.  And what

11  that means is that if one pebble, just one pebble more weighs

12  in favor of Netlist, you're required by law to find that

13  Samsung infringes.  That's what preponderance of the evidence

14  means.

15       The first family of patents is the '918 and the '054

16  Patents, and Doctor Mangione-Smith spoke about those.

17       Doctor Mangione-Smith, could you please stand and be

18  acknowledged?  Thank you very much, sir.

19       The products that accuse the '918 and '054 Patents are

20  called the DDR5 products with on-module power management.

21       I am putting in the corners of each of the exhibits the

22  exhibit numbers.  You can ask for exhibit numbers in your

23  deliberations.  And so if someone has a question or you have a

24  question, you'll be able to respond to them and say, we can

25  look at this exhibit.

1    This is PX 621 in which we disclose to Samsung in 2014

2    our innovations in on-module power management.  Samsung's

3    president admitted under oath they implemented on-module power

4    management.  This was a document that was found in Samsung's

5    records all these years later.  It is not a coincidence that

6    that document was found in Samsung's records.  It's not a

7    coincidence that the president of Samsung admitted they use

8    that technology.

9    All the limitations in the claims are met based on Doctor

10   Mangione-Smith's careful analysis, and he took you through

11   each limitation by limitation.  He didn't skip any and he

12   showed you the actual technical documents, he showed you the

13   code.  He didn't just say, take my word for it; he showed you

14   the evidence.

15   One of the promises that was made in opening statement

16   was that we're going to show you that a converter circuit and

17   LDO are completely different.  That's what Samsung's counsel

18   said.  And I don't point that out to be petty; I point that

19   out for very particular reason.  What we say, what I say, what

20   Defense counsel says is not evidence.  It's not.

21   What is evidence is what is on the right-hand side of

22   this slide.  It's from Bruce Lo, a design engineer who

23   actually designs the small power management chips that are

24   used in these DDR5 products, who admitted under oath that an

25   LDO is a converter.  He had no interest in this case other

1    than to tell you the accurate information based on the

2    detailed specifications of the actual products used.

3        And Mr. McAlexander conceded that a converter is a type

4    of circuit.  The claim requires a converter circuit, and Bruce

5    Lo said the LDO is a converter.

6        In fact, it wasn't just Bruce Lo who said it.  A

7    corporate representative from Samsung, Hun-Joo Lee, he wasn't

8    some junior engineer.  I think there was some discussion in

9    opening about only junior engineers who don't know anything

10   were going to come and speak to you.  These are the most

11   senior and elite engineers at Samsung who admitted as well

12   that the LDO is a converter.

13       Now, there is only a subset of the patents in the case

14   that make reference to converters.  It is not a defense to

15   infringement of all the '918 and '054 Patents.  Only a part.

16   Because of that, another strategy was presented.  For another

17   set of patents, Samsung says that it lacks a second operable

18   state.  This is the '054 Patent.

19       The second operable state has been construed by the Court

20   as saying the memory module is operated after a transition.

21   It doesn't say the DRAM on the memory module is operated as

22   transition.  It says the memory module.

23       And why is that important?  Well, Mr. Milton spoke about

24   that, and Mr. Milton spoke about how important it was for them

25   to create a system so that when the computer crashed, when the

1   voltage was interrupted, they would be able to resurrect the

2   module.  And to do that, the module never turns off

3   completely.  It has a state in which the control circuits are

4   still powered, and that's what allows the module to be

5   protected and for it to be resurrected.

6        Mr. McAlexander admitted under oath that there was a

7   second state in which power is still supplied to that area

8   right there, and he said that's a state in which the power

9   management module, which is one of the primary focuses of this

10  invention, is still operating.  Those are the words of

11  Samsung's own expert.

12       There is what I would respectfully submit to the ladies

13  and gentlemen of the jury, a significant confusion that was

14  presented by Defendants in this case.  The suggestion that

15  every claim in the '054 and '918 Patent requires flash or

16  DRAM.  It does not.  The insight behind these particular

17  claims is on-module power management.  But there are claims --

18  there is one claim that does require on-module power

19  management, and that's claim 19.

20       And Mr. McAlexander admitted under oath that the United

21  States Patent and Trademark Office has granted us a number of

22  patents, and none of those require non-volatile memory except

23  for one that's presented in this case, which is claim 19.

24  This discussion of where is the flash, where is the

25  non-volatile memory, that was a distraction.  It was a

1  distraction designed to focus on not the issues that are

2  presented in this case.

3       And I say that not just by my own words but under the

4  words of Samsung's expert, Mr. McAlexander.  And what he

5  testified to is that the modules contain flash.  Flash is a

6  non-volatile memory, and every single DDR5 module that Samsung

7  sells includes non-volatile memory.

8       This is another example where I'm asking you, do not take

9  my word for it.  JTX 12 at page 16, JTX 12 at 16, it will say

10 in clear English, a Samsung confidential document,

11 non-volatile memory.

12      The second family of patents that are at issue in this

13 case is the '339 Patents.  And Doctor Mangione-Smith will

14 speak -- spoke about those as well.  These relate to

15 load-reduced dual in-line memory modules.

16      This is a patent family that I struggle with how to start

17 to explain to you.  And the reason for that is because the

18 idea that this patent family is not infringed absolutely

19 contradicts everything Samsung said in its internal documents

20 in 2019.  PX 1756, a candid 2019 email from Samsung itself, a

21 formal document, and they say Netlist created LRDIMM, and yet

22 today when they face the consequences of their action, they

23 deny using our technology, the exact opposite of what they

24 said in 2019.

25      And it wasn't just once.  They said it again and again

1    and again that they wanted our LRDIMM patents.  This is, once

2    again, 1756.  Why did they say that?  Why is there this

3    dramatic change between 2019 and today?  It's the last

4    sentence.  The last sentence tells it all.  They wanted our

5    technology, and they did not want to compensate for it.  And

6    this lawsuit exist because they took the technology and they

7    did not want to compensate us for it.  And it's in plain

8    written English in a document from 2019 that you can access.

9         The limitation at issue in this case is, once again, all

10   but one element is conceded infringed, and the element that's

11   not infringed is this reference to a drive.  Driving.  And

12   driving means enabling only one of the data paths while the

13   other possible data paths are disabled.

14        Now, Doctor Mangione-Smith pointed out to you and

15   specifically pointed out that because the buffers have an

16   upper nibble and a lower nibble, there are two paths, path one

17   and path two, and the data, as it comes in, can make a choice

18   as to what path it goes on.  And he spoke about the fact that

19   those are different transmissions, two paths, the upper half

20   byte and the lower half byte.

21        Now, one of the things that I think is particularly

22   concerning, and I'd ask that you be very careful with this, is

23   that the ability to cherry-pick small isolated passages from

24   transcripts in a deposition or at trial often veils the truth.

25   In any one point in time, there is only one path for a

1   transmission, and the reason for that is when the transmission

2   comes down here, it either goes that way or it goes that way.

3   There is only one path for any one given transmission.  And

4   the reason for that is because the fork in the road.

5          THE COURT:  Mr. Sheasby, you've used 12 minutes.

6   I'm sorry I didn't tell you at 10.

7          MR. SHEASBY:  No problem, Your Honor.  Thank you so

8   much.

9       The next family of patents is the '060 and the '160

10  Patents, and those patents were discussed by Doctor Brogioli.

11      Doctor Brogioli has taken ill.  We've asked him for

12  safety to not come into the courtroom.  He was here all week.

13      But the patents at issue in this case are reading on the

14  HBM products.  Once again, in 2015, before Samsung entered a

15  license with us, they asked us to present the information on

16  this exact patents, the '060 Patent, which relates to TSVs and

17  using TSVs.

18      Px 1778, this is what we presented to them.  And what did

19  they do?  They signed the joint development agreement with us,

20  and yet today when they face the consequences of using that

21  technology, they deny ever using it.

22      There are two elements that are at issue in this case.

23  One is stacked array dies.  I'll deal with that first.

24  Stacked array dies are a very unique design.  What they have

25  is they have data ports and they have interconnects, and those

1335

1    data ports and interconnects allow them to be connected

2    together very high and to pass data internally.  That is not

3    in dispute.

4         Doctor Robins on cross-examination was forced to admit

5    that Samsung has something called core dies, and that those

6    have data ports and they have interconnects.  The testimony of

7    Samsung's own witnesses concedes infringement.

8         Now, what Samsung has done is they've taken the Court's

9    claim construction and altered it.  The Court's claim

10   construction is that an array die is different from a DRAM

11   circuit.  But if you listen and -- and what they say is a DRAM

12   is this.  That's what Mr. -- Doctor Robins said on direct.  He

13   said that object on the right is a DRAM circuit.

14        But if you listen carefully in his direct examination,

15   there was a sleight of hand.  If Samsung products contain DRAM

16   circuits, they can't be array die.  That was not Judge

17   Gilstrap's construction.  Judge Gilstrap's construction was

18   that array die is different from a DRAM circuit.  Doctor

19   Robins changed Judge Gilstrap's construction.  That is

20   forbidden under the law.  It is not whether it contains DRAM

21   circuits; it's whether an array die is different from a DRAM

22   circuit.

23        Analogies oftentimes are inappropriate, and they can be

24   used to not give due respect to important technology, but in

25   this case I think analogies are very apt.  A DRAM circuit is

1   cheese.  A grilled cheese is made up -- sandwich is made up of

2   cheese.  But it is not cheese.  It is different from cheese.

3   Gas goes in a gas tank.  A gas tank is different from gas.

4       This is not a trivial analogy.  It applies to technology

5   as well.  A CD ROM which is memory, a DRAM circuit can assist

6   in creating memory, is different from the CD ROM player.

7   Whether you have something is different from whether you are

8   something.  And that is the word game that was being played by

9   Samsung.

10      There is technology behind this.  JTX 15, go and look at

11  it in deliberations.  What you will see is that the core dies

12  in Samsung's designs are dramatically different from that

13  circuit that Doctor Robins showed you.  They have transceivers

14  and receivers, they have TSVs and bypass, they have testing

15  equipment.  They have additional features, all of which are

16  critical.  And a core die in Samsung's designs is not a DRAM

17  circuit.  And you can see that as plain as day in these two

18  comparisons.

19      The next issue is a first interconnect and a second

20  interconnect not in electrical communication.  And Mr. Milton

21  talked about this.  He talked about how sometimes you have

22  data ports on a TSV and sometimes you have bypasses.  When you

23  have a bypass, there's no electrical communication.  Where you

24  have a data port, there is.  And he teached in his application

25  expressly what to do.  Data ports enable electrical

1    communication.  That's what they do.

2         And in Samsung's design -- and you can write this down

3    and check.  If anyone has a question about this, JTX 16 at 7,

4    JTX 15 at 2, you can write and you can look and you can see

5    that Samsung has the exact same design as the patent in which

6    there are bypasses and in which there are receivers.

7         The end result of this is that there are two groups of

8    dies.  Those that are connected in red all have the

9    receiver -- the -- the data port connected to them, and then

10   those connected in blue, the alternatives, have a different

11   set of data ports connecting to them.  Look in the documents

12   and you will see the exact design that Netlist presented in

13   the figures.

14        The next issue you will be discussing is validity.

15   Validity is an issue on which Defendants bear the burden by

16   clear and convincing evidence.  That is a dramatically higher

17   standard than preponderance of the evidence.

18        And you may ask, if they have the burden, why am I

19   speaking about it?  I'm speaking about it because it's an

20   issue of credibility and common sense.

21        Samsung claims the only thing we created is a memory

22   module with massive amounts of flash on it.  We didn't create

23   an on-module power management system.  PTX 1816 at 120, if

24   anyone thinks that's a credible argument, look at that page.

25              THE COURT:  19 minutes have been used.

1338

1        MR. SHEASBY:  The United States Patent and Trademark

2   Office has made clear that we have our own invention.

3        The next issue is willful infringement.  We heard from a

4   number of Samsung witnesses, a number of them.  Not a -- not a

5   single one of them was able to testify under oath with an

6   explanation as to why they do not infringe.

7        Mr. Calandra, who is a very nice man, just started at

8   Samsung, and they put him on the stand to say, we don't

9   infringe, and he could not explain why.  The people who could

10  have defended Samsung were deposed, and they had no

11  explanation, either.

12       I want to speak again about credibility.  Samsung in

13  opening says there's no evidence, there is zero evidence, that

14  we needed Netlist technology.  That was the representation

15  made to you in opening.  And when you hear the closing of

16  my -- Defendants' counsel, I want you to think about the type

17  of statements he made in opening and compare them to 1756

18  where they candidly admit our unique technology.

19       The last issue you'll be asked to decide is damages.  The

20  damages period is clear.  It is only for the period after

21  December 20, 2021.  Any use of our technology before that

22  point, that is Samsung's, we do not claim any damages for it.

23  We claim damages only for the period beginning on December 20,

24  2021.  And those damages are $404.2 million.

25       Mr. Kennedy has analyzed that, and he has spoken about

1   the profound benefit that has been achieved by these patents.

2       Ladies and gentlemen of the jury, I'll have one other

3   opportunity to speak with you.  I thank you for your attention

4   and your time.

5       Thank you.

6           THE COURT:  Defendants may now present their closing

7   argument to the jury.

8       Would you like a warning on your time, Mr. Cordell?

9           MR. CORDELL:  I would, Your Honor, please.  Could I

10  have a warning at 20 minutes and at 30 and then at 35?

11          THE COURT:  20, 30, and 35.

12          MR. CORDELL:  I apologize for the multiple.

13          THE COURT:  You may proceed with Defendants' closing

14  argument.

15          MR. CORDELL:  Thank you, Your Honor.

16      Good morning, ladies and gentlemen.  Again, I'm Ruffin

17  Cordell, and I'm proud to stand before you on behalf of

18  Samsung.

19      And I'd like to echo what Mr. Sheasby said.  We really do

20  thank you for your time and your service.  We know you had

21  other plans for this week and it has been a hardship, but

22  we -- we at Samsung really do appreciate it.

23      And you know, before I begin, you know, we talked about

24  what we -- what we all do personally and whatnot.  And -- and,

25  you know, the fact is I actually always wanted to be a patent

1  lawyer, which is kind of a sad and pathetic admission.  Right?

2  I mean, you'd think as a little kid you'd want to be a fireman

3  or Superman or something else.  I wanted to be a patent

4  lawyer.

5      And the fact is, I really do like my job.  I -- I love

6  getting to learn new things and exploring new technology.  But

7  one of the favorite parts of my job is when I get to meet

8  inventors and I hear their invention story.  You know, it

9  makes me think about Alexander Graham Bell or Thomas Edison.

10     And early in my career, I got to meet the guy who the

11 movie was made about, Robert Kearns, Bob Kearns, the "Flash of

12 Genius" guy who did the intermittent windshield wiper.  And

13 his story was really interesting because he -- he at his

14 wedding went to open a bottle of champagne, and the cork hit

15 him in the eye and he lost an eye.  It was terrible, at his

16 wedding.

17     But then years later, as he's driving around, he -- it

18 was hard.  It was hard for him, when the windshield wipers

19 were on, to kind of be able to see because he only had one

20 eye.  And after struggling with that for years, it came to

21 him -- the idea came to him that he could make the windshield

22 wipers not move all the time but they could only move when

23 they were needed.  And that intermittent windshield wiper

24 invention was his flash of genius.  That's what the movie was

25 called.

1   And I was really fascinated about that and -- and Mr.

2   Kearns is gone now, but he would bend your ear about that for

3   hours if you let him.

4   And when we approach the evidence in this case, you know,

5   the thing that struck me is, where is that story from Netlist?

6   Where -- where is that -- that flash of genius?  Where did

7   they sit down and, after years of hard work writing in their

8   notebooks and doing research, come up with an idea?

9   Where's -- where's that big problem that they went out to

10  solve?  You know, where's the -- where's the -- where's the

11  story that we should have heard from these inventors?

12  You know, like Mr. Milton, who counsel said he was an

13  inventor on the '060.  I don't think that's quite right.  He's

14  an inventor on the -- on the first three patents, but not

15  on -- not on the '060 and the '160.  Where is that story,

16  ladies and gentlemen?

17  And the answer is, it just wasn't there, we didn't hear

18  it.

19  They put -- they put Doctor Hyun Lee on the stand to talk

20  about '060, the '160.  He didn't say a word about it.

21  But Mr. Milton talked about all kinds of things, and I'm

22  going to get to that.  He talked a lot about what happened

23  over at Samsung where he wasn't present, but he never told us

24  what it was that -- that led him to this idea.

25  So with that, let me -- let me jump into my slides

1   because I do have a quite a bit to say.

2        So let me start with Doctor Lee.  I think the answer to

3   why we didn't get an invention story, why we didn't have the

4   flash of genius, is because it really wasn't the inventors who

5   were doing this.  It was Netlist and its attorneys that were

6   doing this; that they took, you know, what may have been a --

7   an idea or something on something else way, way, way back

8   when, back in 2007.  They filed at the Patent Office, and then

9   the attorneys kept pushing and pushing and pushing and

10  stretching those claims.

11       And, ultimately, it was unrecognizable to the inventors.

12  Look at what Doctor Lee tells us.  He says, You know, I don't

13  know.  After writing specifications, then I hand it over to a

14  patent attorney and the patent agent.  I'm not so much

15  interested in the patents themselves as to what they claim and

16  how.  As I'm not quite interested in that, I don't no how

17  things worked.

18       So he -- he wasn't involved in an invention; he was

19  involved in writing something up and handing it to the lawyers

20  and off they went.

21       What did Mr. Milton say?  Mr. Milton -- I echo what Mr.

22  Sheasby said, these witnesses all seem like nice people.  But

23  he was pretty candid that he didn't write these claims, he

24  didn't -- he didn't write the specification, he didn't draft

25  the figures.  He didn't even review it before it went into the

1   Patent Office.

2        So what evidence do we have as to what was going on?

3   Well, we have Mr. Chuck Hong.  Now, he was the CEO of Netlist.

4   You may remember that he testified by deposition.  And when he

5   testified, he -- he told us that he was -- that -- that they

6   filed continuations.  And why do they file continuations?

7   They filed continuations because they wanted to constantly

8   improve the invention.

9        Well, ladies and gentlemen, what do you know?  What do

10  you know?  You know the inventions are supposed to come from

11  the inventors, not from the lawyers, not from Mr. Hong, the

12  CEO.  They're supposed to come from the inventors.  And if you

13  don't write it down in your patent application, you can't

14  claim it at the Patent Office.  And, fundamentally, that's the

15  problem we have in this case.

16       So we're going to -- I'm going to try to take you through

17  the -- the evidence that you've seen and give you a little

18  summary and try to help you put it in the right slots for the

19  issues you have to decide.  And I'm going to talk about the --

20  the patents in these groups, the '918, '054, the '339, the

21  '060, and the '160, and then I'm going to talk to you on

22  damages.

23       But before I do that, I'm going to ask a favor.  I'm

24  going to ask you to focus on the issues His Honor just

25  instructed you--infringement, validity, and damages--and stay

1    away from distractions.  Mr. Sheasby mentioned distractions.

2    I agree with him a hundred percent.  You got to stay focused

3    on what really matters.

4        But we've just heard a whole bunch in Mr. Sheasby's

5    opening close.  So, for example, we saw this presentation in

6    his -- in his materials, and it's this -- this TSV

7    presentation referencing the '060.

8        Well, ladies and gentlemen, they put Mr. Milton on the

9    stand to testify about that.  And he testified that this

10   presentation was given to Samsung.  But, ladies and gentlemen,

11   he wasn't there.  He doesn't know.  And so we looked into it.

12       And what we find is that, first of all, this doesn't say

13   anything about infringement or validity.  This happened a long

14   time ago when -- remember when the parties were talking about

15   a joint venture.  And we'll talk about that some more.

16       But, more than that, when we looked into this, when you

17   look at the cover email, and Mr. Sheasby actually showed you

18   this, although he did it really quickly, when you look at the

19   cover email, what you see is this was not something sent to

20   Samsung.  Instead, it was something from someone at Netlist to

21   Mr. Hong at Netlist, Doctor Lee at Netlist, J.B. Kim at

22   Netlist.  It's Netlist, Netlist.

23       So you got to be real careful -- before you take that

24   stand and raise your hand and swear to tell the truth, you

25   have to be sure of the facts that you're offering.  This,

1    ladies and gentlemen, is a distraction.

2        We also had this in the opening.  We had -- we had --

3    we've seen this a bunch of times, and counsel just invited you

4    to write down the PX number.  That would -- that would be fine

5    with me, because they said, we found this in Samsung's files,

6    this -- this particular slide.

7        Well, ladies and gentlemen, again, we got to look at it

8    because it's the wrong product.  They're distracting you.

9    This has to do with the non-volatile flash DRAM hybrid

10   technology that we talked so much about.  It has nothing to do

11   with the products in this case.

12       And more than that, we know from Mr. Milton that this --

13   this was Netlist's specialty.  So when they talk about the

14   collaboration, when they talk about wanting to share

15   technology, that's what we're talking about.  We need to stay

16   focused on what's accurate and not just try to throw mud back

17   and forth.

18       There's also the notion that they -- he tells us, well,

19   they cited patents.  And they did, ladies and gentlemen, but

20   you got to be focused, because it's the wrong patents.  They

21   tell us about this '833 Patent.  And I know this is really

22   small here in yellow, but that '833 Patent, you haven't heard

23   a word about that being infringed in this case.  Why?  Because

24   it's that hybrid flash DRAM product Samsung doesn't make.

25       We also hear that there's some intelligent on-power

1  distribution--there's a typo there--and they say there's a

2  patent pending.  But we looked and looked and the only patent

3  we've seen in this case is that '831 Patent that issued

4  shortly after.  But it doesn't say anything about -- about the

5  products in this case, and you haven't heard them asserted in

6  this case.

7      So when they show you this, and they say, aha, look, this

8  was in Samsung's files, they got to be honest about what it

9  really shows, the patents that it talks about and the products

10  that it talks about.

11      We also heard from Mr. Sheasby, and I give him credit, he

12  said, you know, the infringement in this case does not relate

13  to any of the behavior that -- that happened before the

14  termination.  So he's basically saying that we have to look at

15  everything after the -- the July 15, 2020 date.  And we agree

16  with that.

17      But then ask yourself, ladies and gentlemen, why is it

18  time and again he keeps going back to these documents?  All

19  the documents he just showed you, look at the dates on every

20  single one of them because it turns out they all came out

21  during that period when the parties were working together.

22  Don't be distracted.  Don't be distracted.

23      This is one of the documents, PX 756, and they say, aha,

24  look, you know, they are -- they are talking about resolving

25  the risk of patent infringement.  Well, that's true.  That is

1  true, and you heard that from our witnesses, that Samsung

2  wanted to avoid being sued. Samsung is a big company. They

3  try to avoid being sued. Well, they -- they don't -- don't

4  like us lawyers too much. They'd rather avoid it like anybody

5  would.

6      And the reality is that they wanted to work with Netlist,

7  but they wanted to work with Netlist on the NVDIMM and

8  HybriDIMM technologies. That hybrid flash DRAM technology,

9  turns out, didn't work out so Samsung doesn't sell one of

10  those products. But that's -- we got to be honest about what

11  this is all about.

12      We also had a mistaken identity in -- in these -- in

13  these documents. So remember the June 16 exchanges where --

14  where Mr. Ji had -- had dinner with Jibum Kim of -- Mr. Jibum

15  Kim of Netlist back in June, and they talked about some

16  requested info. And he said, attached is a chart of Netlist's

17  products.

18      Well, when we look into it, ladies and gentlemen, it

19  turns out they were talking about a different company. It was

20  hynix. It wasn't Samsung. And, importantly, importantly,

21  they point to this as some outrageous thing, and yet Mr. Ji

22  flew 6,000 miles here to make sure that we understood this,

23  that in fact there was never a patent assertion from Netlist.

24  Never. They never accused Samsung of infringement. And he

25  said he wouldn't have taken him to dinner if he'd accused him

1    of infringement.  That seems reasonable to me.

2         Now, the evidence is -- from Mr. Hong was that there was

3    no assertion of patent infringement during the time they

4    worked together.  Just none at all.  And then Mr. Ji, of

5    course, flew all the way over here and told us that he had

6    never, before this lawsuit, heard of anything from Netlist

7    saying that Samsung was using their patents.

8         Now, all of the documents that Mr. Sheasby showed you,

9    and he's going to continue to show you, I'm sure, you have to

10   look at very carefully.  You have to look at exactly what

11   dates we are talking about.  You have to look exactly what

12   products we're talking about.  But what you know is that they

13   never, never, pointed to any of this and said, Samsung, you're

14   using our technology.

15        So you know a lot about Samsung now so I won't spend much

16   time on this, but the -- the three products at issue here are

17   DDR4 memory, DDR5 memory, and HBM memory.

18        You know from Mr. Calandra that Samsung is an enormously

19   innovative company.  They have 132,000 patents, and 12,000 of

20   those are related to memory.  And Mr. Sheasby just said, you

21   know, they -- they -- they had all these engineers, they could

22   have pointed to patents.

23        But, ladies and gentlemen, I'll say two things about

24   that.  Number one, Samsung's patents are not in this trial.

25   It's Netlist's patents.  And the way we work these is Netlist

1    asserts its patents, and whether Samsung has a patent or not

2    doesn't affect whether Netlist's patents are infringed.

3    That's just the law.

4        And then, secondly, it's not an engineer's job to go off

5    to the patent department and ask about whether there are

6    patents or not.  Mr. Calandra told you there are 12,000

7    Samsung patents in the memory space.  So to the extent that's

8    relevant, you can rest assured that there were plenty of

9    Samsung patents that covered these devices.

10       And we also heard from Mr. Ji.  You know, I asked him a

11   very clear question.  He did his best.  It was a translated

12   piece of testimony.  But I asked him, because I wanted

13   everybody to hear it very clearly, does Samsung develop its

14   own technology, and he said yes.  And then what happened?  Mr.

15   Sheasby got up to cross-examine him, and he didn't ask him a

16   single question about challenging that statement.  And I think

17   you can -- you can use that evidence.

18       Okay.  So let's get into the -- let's get into the

19   patents themselves.  So starting with the '918 and '054, the

20   law says Netlist can't claim an invention it didn't write

21   down.  So that's the rules.  If you want a patent, you write

22   down your -- your idea, you give it to the U.S. Patent Office.

23   As of this date, you're going to have a record that you

24   submitted it on this date.  You can't come back six years

25   later and say, you know, maybe I had a different idea and I'm

1  going to just change it and ignore what I filed six years ago.

2  That's not the way the law works.

3      And we know that they filed continuation after

4  continuation.  And there's nothing wrong with continuation

5  practice.  I tried to make that clear in my opening that

6  that's allowed under the rules.  What you can't do, what you

7  can't do, is keep filing these continuations and take the

8  patent further and further and further away from what you

9  actually told the Patent Office, that you wrote down in your

10  written description.  Because when you do that, ladies and

11  gentlemen, the patent is invalid.

12      And here we see there was over 13, almost 14 years

13  between the time that they filed that initial disclosure and

14  the -- the first -- the '918 Patent issued.

15      You now all know very well what this -- these patents are

16  really about.  They are about when somebody kicks the cord on

17  your computer and it's about to die and your DRAM gets

18  transferred over into -- into flash or some permanent storage,

19  that's what these patents are all about.  And you could see it

20  in column after column, figure after figure, with the patent.

21      It's this controller that uses its little capacitor

22  circuit to power that up so you can have time and have the

23  juice that you need to take that data out of the DRAM which is

24  going to disappear and put it into the flash.

25      And it's not some little piece of flash, and I'll talk

1    about that in a few moments.  Mr. Sheasby said, aha, look,

2    there's -- there's some permanent memory buried deep in the

3    controller.

4         Well, ladies and gentlemen, yes, but those are registers.

5    If you'd looked at the document he put up on the screen, and I

6    wrote it down, it's JTX 12, it said register.  That's means

7    it's like 16 bits long, maybe 64 bits long if you're lucky.

8    You're not going to store a picture in that.  You're not going

9    to put any music files in it.  You're not going to store

10   anything in that.  That's control information for the part.

11        The patent is simply filled -- the '198 and '054 Patents

12   are just filled with these figures that talk about

13   transferring that -- that information from the DRAM to the

14   flash because somebody kicked the cord out and the computer is

15   about to die.

16        They -- Mr. Sheasby just said, well, you know, Mr. Milton

17   took the stand and he talked about this.  But, ladies and

18   gentlemen, what did he tell us?  He told us that, you know,

19   he's not qualified to assess those claims.  He's not -- he's

20   not -- he doesn't have the -- the legal training, if you want

21   to call it that, to look at the claims and tell us anything

22   about them.

23        And, specifically, he was asked for the '918 and '054

24   Patents.  And he admitted, yes, that's correct.  But he signed

25   them.  He signed them back in 2008, that in fact he had

1  reviewed and signed.  But remember what he was looking at

2  then, although, you know, I showed you the testimony that said

3  he didn't actually, you know, review it very closely.  But

4  what he reviewed back then was what they filed in 2007.  That

5  was the flash DRAM hybrid product.  It wasn't these claims,

6  ladies and gentlemen.

7      And what we know is that early in the process in these

8  continuations that they were filing, they kind of remained

9  true to their -- to what they wrote down.  They -- they

10 remained faithful to this combination flash DRAM hybrid.  We

11 had flash and we had DRAM, and then we had a controller to

12 move it through when the power dropped.

13     So this is a patent that issued in 2014.  This is that

14 '831 Patent that we mentioned a few minutes ago.  They didn't

15 assert that in this case.  Why?  Because it applies to

16 something Samsung doesn't make.

17     The '054 Patent is the same way.  Well, when the '054

18 Patent issued, what we find is something completely different.

19 So in 2014, we had the flash DRAM hybrid.  In 2022, we had

20 none of it, none of it, ladies and gentlemen.  There's

21 only -- the only mention of memory at all is SDRAM.  It's a

22 form of DRAM.  There's no mention of non-volatile whatsoever.

23 They abandoned the -- they abandoned the invention that the

24 inventors had written down, and by doing that, they can't --

25 they can't claim the patent.

1      Now, what didn't Netlist talk about?  Well, you know,

2   they -- they -- they pointed at one point during this -- this

3   case to these acronyms, SODIMM, UDIMM, RDIMM.  We got a lot of

4   DIMMs.  And they said, aha, look, some of that same memory

5   shows up in this case, the LRDIMM, for example.

6      But, ladies and gentlemen, don't be fooled.  This was

7   simply talking about sort of the packaging that you put them

8   in.  This comes out of column 12 -- I'm sorry, column 21,

9   figure 12, and figure 12 specifically is talking about this

10  non-volatile -- this volatile memory, this -- this -- these

11  various forms of -- of DIMMs and RAM as part of an overall

12  system that has DRAM but also has non-volatile memory in it.

13     So, yes, the patent talks about DRAM because that's what

14  the patent is all about.  Remember, you got to take the data

15  out of the DRAM and put it in the flash.  So that's not a

16  surprise.

17     The reality is nothing in their written description, none

18  of what they put in the Patent Office, what they wrote down,

19  says they're going to do an invention that has DRAM only.  It

20  just -- it isn't there.  You can read the entire patents cover

21  to cover.  You're just not going to find it.  And,

22  importantly, you didn't hear Netlist's expert identify

23  anything, anything.

24     Mr. McAlexander on cross, Mr. Sheasby just showed you

25  this, he said, Aha, look, there is a register in here--and I

1  talked about this a moment ago; this is JTX 12 he pointed

2  out--and that register has some non-volatile memory.

3       Well, yes, it can store some codes.  But, ladies and

4  gentlemen, again, that's not data.  That will never store your

5  video, it will never store your -- your documents.

6            THE COURT:  Twenty minutes have been used.

7            MR. CORDELL:  Thank you, Your Honor.

8       And so the -- the -- that -- that little bitty register

9  is not the non-volatile memory that these patents are talking

10  about, and there's been no evidence to the contrary.

11       So the written description requirement at the end of the

12  day, ladies and gentlemen -- this is what Judge Gilstrap just

13  read to you, His Honor just read to you, and it specifically

14  makes reference to the fact that the specification is required

15  to contain a written description of the claimed invention

16  telling what the invention is, how it works, how to make it,

17  and how to use it.

18       The written description requirement is designed to ensure

19  that the inventor was in possession, meaning he had the idea

20  and he had wrote it down, of the full scope of the claimed

21  invention as of the patent's priority date.

22       They can't show that to you, ladies and gentlemen.  And

23  as a result, all of the asserted claims of the '918 and the

24  '054 patents are invalid.

25       So let's talk about infringement.  So we start with the

1   '918, and we have to talk about the converter circuit.  And I

2   know this is a lot of technology, but it actually turns out to

3   be pretty simple because the claims say you have to have a

4   converter circuit.  And the only thing that Netlist's experts

5   can point to is this LDO, this linear drop-out regulator.

6       We challenged Doctor Mangione-Smith and we said, you

7   know, find -- find us some place in all the information you

8   have, he talked about all the documents he read and the

9   depositions he studied, show us some place where the Samsung

10  devices are using a converter circuit.

11      And he said, well, you know, I find the LDO.

12      But then we said, well, tell us where it says that the

13  LDO is a converter circuit.  And he couldn't -- couldn't

14  recall, couldn't find it.

15      But more than that, ladies and gentlemen, it's been clear

16  from the evidence when you talk to Mr. Lo, who is a designer

17  for Renesas, he was asked very directly, is an LDO a linear

18  converter or is it a linear regulator?  And he said, It's a

19  regulator.

20      And this is fish or fowl different, because it turns out

21  that linear regulators are a fundamentally different structure

22  from a converter.  That's the evidence.  That's the evidence

23  that we all have to live with.

24      So they say, well, you know, okay, maybe it's close

25  enough, like horse shoes.  You know, maybe you got us, we

1  don't have a converter circuit, but maybe there is a, you

2  know, a linear something that might be -- might do the same

3  thing in the same way to achieve the same result.

4      But, ladies and gentlemen, that's not what the claim

5  says.  The claim says converter circuit.

6      And I saw a couple of Mr. Sheasby's references that he

7  just showed you, and he kept referring to kind of the function

8  of a converter.  But this isn't a function.  This isn't

9  attaching two boards together.  This is a nail or glue or a

10  screw, and those have -- those have different attributes.

11      And in this case it turns out it's kind of a big deal,

12  because remember what the evidence was.  The evidence was that

13  a linear regulator just kind of burns off electricity.  It

14  just generates heat.  Doesn't try to recover it, doesn't try

15  to use it for other reasons.  It's like putting your foot on

16  the brakes, your brakes will heat up.  That can be a problem

17  for some people.

18      Whereas this -- this converter circuit is much more

19  sophisticated.  It's got switching elements.  One of the

20  inventors talked -- one of the engineers talked about it

21  having it inductors and these other kinds of components in it.

22  And so instead of just throwing away the energy, it actually

23  chops off a piece of the signal and lowers the voltage that

24  way.

25      And why is that a big deal?  Well, you heard Mr. Milton

1    and you heard Doctor Mangione-Smith take that witness stand

2    and tell you that one of the biggest problems we have in these

3    memory systems is heat, that you can't let them heat up.  And

4    if they heat up, it's a big problem.

5        And so this difference isn't just trivial.  It's not

6    just, oh, well, one gets a little hot and the other -- this is

7    a big deal.  So by using this linear regulator, Samsung is

8    heating this up, which they told us you're not supposed to do.

9    Whereas if you use a converter circuit, you don't have that

10   heating problem and it's much more efficient.  And that's a

11   fish or fowl difference, ladies and gentlemen.

12       So we're going to ask that you find no infringement of

13   the -- of the '918 Patent.

14       And now let's go on to the '054.  And we have to talk

15   about this second operable state.  Remember that the whole

16   purpose of these patents is when somebody kicks the cord out,

17   the system doesn't just keep working.  Right?  It says, oh, my

18   God, somebody kicked the cord out, we got to go into our

19   second operable state.  We got to grab that memory out of DRAM

20   or that data out of DRAM and move it into flash because the

21   power's about to go down.

22       And the Court gave us some definitions about this.  Judge

23   Gilstrap gave us some definitions, and he said, you have to

24   have a first operable state.  That's the normal working state.

25   And then you got a second one which is a different state, but

1    the memory module has to keep working.  That's what he said.

2        And what they point to is they point to the fact that you

3    can turn Samsung's memory modules off and they say, aha, there

4    is your second operable state.

5        Ladies and gentlemen, that doesn't do it, because the

6    fact that you might have, you know, a few elements in the --

7    in the -- the PMIC chip that are still -- they still have some

8    power to them before they die, says nothing about the memory

9    module.  It's got to be a memory module.

10       And they concede, they admit, that in this second state,

11   it's not operable, you can't store any memory in it, you can't

12   take it out and put it in the flash.  You can't do anything.

13   It is dead as a door nail.  Whatever you had stored in these

14   memory modules, it's gone.  So if you didn't save that

15   document, it's gone.  There's nothing you can do about it.

16       And, you know, they kind of retreat to the point where

17   they say, well, you know, this is really all about just

18   putting power management on the board.  Well, ladies and

19   gentlemen, that's not true, first of all, because we know that

20   that was done before.  But, more importantly, they can't claim

21   credit for that.  They can't say that these are valuable

22   patents because they put the memory power management on the

23   board because we know that people have done that before.

24       So when they say, well, you know, power efficiency has

25   gone up 30 percent, can't take credit for something you didn't

1  invent.  You don't reap where you didn't sow.  So they have to

2  acknowledge, they've got to be realistic about what they

3  actually invented.  They invented this moving, you know, the

4  data from the -- the DRAM to the flash, but don't come in here

5  and claim that you're responsible for this -- this great power

6  savings because you put the memory -- the power module on

7  the -- on the memory card.  That was simply done before.

8      We also know that they went to the industry and said,

9  Don't do that; this is a bad idea.  And you heard that

10  evidence.  So, again, when they -- when they stand up and say

11  this is some -- some very valuable invention, they've got to

12  answer for this.

13      So let me -- let me go to the '339.  So the '339,

14  remember, requires you to have this fork in the road.  There

15  have to be these two byte-wise pathways through a buffer.

16  What we're talking about is DDR4 memory, and it's these

17  buffers down at the bottom.  And what we have to find is two

18  pathways.  And it can't be any pathways; they got to be

19  byte-wise.  They got to be eight bits wide.  Everybody agrees

20  about that.

21      And when we asked Doctor Mangione about -- about this,

22  Mangione-Smith, he agreed that they have to be two write

23  paths.  And that will come up a little later, but I want you

24  to keep that in mind they have to be write, W-R-I-T-E, not --

25  not right but write.

1    Mr. McAlexander showed us in fact in the Samsung parts

2    there is only one path, and it goes right up through here.

3    And it's eight bits wide, just like it's supposed to be but

4    there's only one.  And what we all know is you can't infringe

5    if you only have one.  You got to have two.

6    Doctor Mangione-Smith originally said, yeah, okay,

7    there's one eight-bit path through there, and he agreed with

8    us.  But then at trial he kind of said -- did something

9    different.  And he said, you know, I'm going to divide it up.

10    I'm going to divide it up into two four-bit paths.  I'm going

11    to take my banana, and I'm going to slice it in half.

12    But, ladies and gentlemen, that's not what the claim

13    says.  The claims don't say, I need two paths of any kind.  It

14    says, I need a byte-wise data path.  I need two byte-wise data

15    paths.  I can't look at I-20 and say, well, that's like -- you

16    know, as I'm going east, that's like two highways because it's

17    got two lanes.

18    Well, that's not the way that works.  It's one highway

19    because I need -- for an interstate, I got to have two lanes.

20    And here the patent says, I've got to have eight bits wide.

21    So cutting the banana in half and doing four and four doesn't

22    do it.  That's still one eight-bit pathway through the system.

23    They got to show you a separate one.

24    Now, you know -- and he acknowledges this.  Doctor

25    Mangione-Smith acknowledges that it's got to be to an

1    eight-bit wide path, and they can only show you one.

2        There was one other thing that came up during

3    cross-examination and counsel seemed to suggest, and I hope

4    they don't argue this because it would be really wrong, but

5    seemed to suggest, well, wait a minute, there's another path

6    that I've shown here in red.

7        Well, ladies and gentlemen, that's the read direction,

8    not write.  So the fact that you have one that's writing, that

9    is, you got to write to memory, but then you also got to read

10   from memory, that doesn't count.  There have to be two

11   eight-bid wide write paths, and they can't show that here.

12   And Doctor Mangione-Smith agrees that the read direction is

13   irrelevant, and so does Mr. McAlexander.

14       And then, finally, Doctor Mangione-Smith kind of

15   suggested that, well, wait a minute, if I had more than one

16   card, maybe there's more than one path.  But, ladies and

17   gentlemen, they have to be within the buffer.

18           THE COURT:  Thirty minutes have been used.

19           MR. CORDELL:  Thank you, Your Honor.

20       So we're going to ask that you find that there's no

21   infringement of the '339.

22       We also are going to ask that you find no written

23   description with the '339 for the same reasons I covered with

24   the '918.  So I won't go back through that completely.

25       And then, briefly, there is a -- there's a piece of prior

1    art in this case where the invention of the -- of the '339

2    Patent was done before and almost in exactly the same way.  So

3    what we say is that any differences would be obvious, and that

4    makes it invalid.  And it's this QBM alliance.  We know that

5    Netlist cooperated with QBM to get -- to get this -- this

6    product out in the marketplace.

7        And Mr. McAlexander took you through -- who's here with

8    us, took you through every element of these claims and showed

9    you that the -- the buffers are there, the memory is there,

10   the -- the -- the dual path is there.  He showed you every

11   element of these claims in the QBM device.

12       He also showed you the Ellsberry patent to fill in

13   details to the extent that -- that Netlist contests it.  But

14   he checked off every element and showed you exactly where they

15   are.

16       And, importantly, ladies and gentlemen, Mr. McAlexander's

17   opinion that those claims are invalid was left unrebutted.

18   They did not re-present -- didn't recall their experts to say

19   one word in rebuttal.  So they didn't say that the '339 Patent

20   was valid over the prior art and they didn't say that the

21   written description requirement was met.  They just chose not

22   to call their experts.

23       So let me go to the '060 and '160.  Fortunately, I think

24   this is pretty -- this is pretty simple.  We all know that

25   these patents can't cover DRAM circuits.  They went to the

1    Patent Office and they cut a deal with the Patent Office and

2    it resulted in the claim construction that the Court gave us,

3    that the array die has to be different from a DRAM circuit.

4        They told -- they promised the Patent Office that it

5    wouldn't cover DRAM circuits, just like in my example it said

6    that we wouldn't cover diesel engines.  And now they're going

7    back on that, ladies and gentlemen.  They know that these

8    orange boxes are those same DRAM dies that Samsung is using

9    and they told the Patent Office that they would not cover.

10        I then asked Doctor Brogioli -- and I'm sorry he's ill

11   and couldn't be here, but I asked him over and over again to

12   tell us about DRAM circuits, give us your opinion of DRAM

13   circuits, and he couldn't identify them, ladies and gentlemen.

14   So I had to show him over and over and over again how widely

15   this is known.  This is not something that anything that a

16   second-year engineering student wouldn't know.  And yet he

17   wouldn't do it.

18        He would not give us his opinion of what a DRAM circuit

19   was until, ladies and gentlemen, we then showed him the

20   inventor, and we said, wait a minute, Doctor Lee knows what a

21   DRAM circuit is, it's really just any DRAM.  That's a class of

22   memory that had that circuit structure we're talking about.

23   That's a DRAM.

24        Mr. Milton told us he knows what a DRAM circuit is.

25   It's -- the DRAM has circuits in it.  He was pretty clear

1     about that.

2          We know that Rajan, the prior art reference that they

3     were arguing about at the Patent Office, the one they said

4     they wouldn't cover, was filled with DRAM.  It talks about all

5     kinds of DRAM.

6          And then something very profound happened, ladies and

7     gentlemen.  Doctor Brogioli got caught telling the truth,

8     because his counsel got up and asked him a question, Does the

9     fact that a memory die contains DRAM make that memory die a

10    DRAM circuit?  And he said, "Yes."

11         And his lawyer said, well, wait a minute, wait, wait,

12    wait, and he kind of retrenched and said, well, does the mere

13    fact that it contains one of these -- these array dies

14    contains DRAM, does that really turn it into a DRAM circuit?

15    And he said, oh, well, and he kind of -- kind of retrenched.

16         But, ladies and gentlemen, he told the truth.  He knows

17    that these products are made of DRAM.  He knows that it's the

18    only thing that goes into the Samsung HBM products.  There's

19    no doubt about that.  Every generation of the HBM products are

20    made of DRAM.  And, importantly, ladies and gentlemen, at the

21    outset of this case before Judge Gilstrap gave us this

22    definition, they said -- they said the Samsung products were

23    made from these DRAM dies.

24         So I really don't think there's a close call, and I don't

25    think there's infringement.  And I think Doctor Brogioli

1    ultimately agreed with me on that.

2         There's also this notion that there can't be electrical

3    connection between the bottom die and all of the -- all of the

4    die as you go up the stack, the stairway can't go through

5    every floor.  I don't think there's a dispute on this, either.

6    Doctor Brogioli admitted that, in fact, the interconnect that

7    is shown here in blue goes through every single one of the

8    floors, every single one, exactly what they told us it

9    shouldn't do.

10        And for the other flavor of HBM that has the zigzag back

11   and forth, we also see that it visits every single floor.

12             THE COURT:  Thirty-five minutes have been used.

13             MR. CORDELL:  Thank you, Your Honor.

14        So, with that, and let me just touch quickly the -- the

15   idea that they invented TSVs, which is those through-silicon

16   vias, that's absurd, ladies and gentlemen.  You've seen it

17   over and over again.  We showed you a whole bunch of different

18   people that had come up with this years and years before they

19   did.

20        Now let me turn to damages quickly.  It is our opinion,

21   plain and simple, no questions asked, that the proper amount

22   of damages in this case are zero.  In this country, we don't

23   give people money just for filing lawsuits.  You've got to

24   prove that someone is using your patents or has taken your

25   property or something else happens.  And if patents are not

1366

1    infringed or invalid, there is zero damages.  So I don't want

2    to be misunderstood.

3         What's supposed to happen here is Mr. Samsung and Mr.

4    Netlist are supposed to sit across the table from each other

5    and come to an agreement.  But Mr. Samsung knows he's got

6    to -- he's got to build factories, he's got to pay people,

7    he's got to buy materials, he's got to pay people to sell this

8    stuff.  He can't give away all his revenue.  That would be

9    crazy.

10        We know that -- that Samsung has a bunch of its own

11   patents and does its own research.  But what did Mr. Kennedy

12   do?  He said, well, I'm going to take all of the revenue

13   between what Samsung is making now and what they could make,

14   not a real product but a hypothetical product, and I'm going

15   to -- I'm going to give that all to Netlist.  Well, that

16   doesn't make sense, ladies and gentlemen.  That's not the way

17   the real world works.

18        My example of a -- of a Lexus compared to a Corolla, you

19   would not say that because this piston in the Lexus is

20   patented, we're going to take the entire amount of money that

21   that Lexus sells for above the Corolla and hand it to Netlist.

22   That would be crazy.

23        What we're supposed to do is to look at comparables.

24   We're supposed to look at other agreements that are kind of

25   the same.  And in this case we have -- we have two very

1    important ones, and that is the JDLA and the license to hynix.

2    And in both of those agreements, we know from Mr. Kennedy that

3    Netlist licensed every patent they own.

4        He also touched on the Rambus agreement, ladies and

5    gentlemen.  And this one we can just set aside.  He admits you

6    can set it aside, but it is kind of crazy.  It's over 2000

7    patents and spanned 13 years.  It's just not the same.

8        These two are exactly the same.  We know the SK hynix

9    agreement was for $40 million for 120 patents.  We know that

10   it was -- it was -- SK hynix and Samsung are very similar in

11   the marketplace.  They do the same kinds of things.  They sell

12   the same kinds of products.

13       Netlist told the government that $40 million was a

14   license fee, it wasn't a royalty.  So if they get up and say,

15   well, this had some supply agreement stuff in it, that's not

16   what they told the government.  But we know that there's a

17   most favored licensee clause that says, don't look at the

18   supply agreement, a most favored licensee clause that Mr.

19   Kennedy did not look at.  And it tells you, exclude product

20   supply and joint development terms.  You just look at the

21   money.

22       So what you do, if you do the analysis, is you end up

23   with $1.10 a unit and that, again, I don't think is -- is

24   there, but it's useful in this sense, ladies and gentlemen.

25   If you find that only DDR4 infringes, you multiply $1.10 times

1    the number of units and that's your damages.  Again, I don't

2    think any of it infringes, but if you do, that's the way this

3    works.

4         We also have the JDLA, which is $8 million, $8 million

5    for all patents, everything that was being made.  We have this

6    dispute over whether that $8 million was a license fee or NRE.

7    But, ladies and gentlemen, remember the testimony:  this came

8    from Netlist.  Chuck Hong wouldn't answer the question as to

9    who came up with the idea to cloak it as NRE.  But Mr. Ji sat

10   in that witness stand, he looked you in the eye, he flew 6,000

11   miles to tell you that this was a license fee, plain and

12   simple.

13        So here's the problem.  We're paying $8 million and we're

14   only getting five patents.  So it's like we're subleasing some

15   of Mr. Kennedy's 2,000 acres, we're just getting a hundred

16   acres, and yet they're asking us to pay the full $8 million.

17   So, in reality, that should come way, way down.

18        So with that, ladies and gentlemen, you have a choice,

19   and I leave it to you.  Damages is something that's really up

20   to the jury.  If you find that there is infringement, it's

21   either $1.10 a unit or $8 million for all the patents and that

22   saves you some time.  But, again, the damages should be zero.

23        I'm going to thank you for your time and attention.  I

24   really appreciate everything you've done.

25        When Mr. Sheasby gets back up here, I won't get -- I

1    won't be able to get back up again.  So I'm going to ask you

2    to -- to listen carefully to what he has to say.  And what I

3    hope he does is to respond to what I've said.  But if he says

4    something new, a little bell should go off:  Why -- why didn't

5    he say that the first time?

6         The verdict form you have is pretty -- pretty

7    straightforward.  But obviously we want you to find that the

8    patents in this case are not infringed, we want you to find

9    that the '918 and the '354 invalid, and that the '339 is also

10   invalid.  And if you assess damages, we ask that you be

11   reasonable.

12        With that, again, thank you and we look forward to your

13   verdict.

14             THE COURT:  Plaintiff may now present its final

15   closing argument to the jury.  You have 19 minutes and three

16   seconds left, Mr. Sheasby.  Would you like a warning on your

17   final argument?

18             MR. SHEASBY:  Yes, Your Honor.  Could I have a

19   warning when I've used 10 minutes -- a warning when I have 10

20   minutes left, a warning when I have five minutes left, and a

21   warning when I have one minute left, if you would.

22             THE COURT:  I'll do my best.

23             MR. SHEASBY:  Thank you so much, Your Honor.

24             THE COURT:  You may proceed with your final closing

25   argument.

1    MR. SHEASBY:  Can I have slide 1.132, please?

2    Counsel for Defendants asked where the invention story

3  was, that Netlist is nothing, that these are faked patents

4  created by patent attorneys.

5    The invention story is in Samsung's own documents.  In

6  2019, 1756, a unique proprietary know-how that they wanted to

7  access.  Two years before they launched their infringing DDR5,

8  they came to us and asked us how to design DDR5 on-module

9  power management.  This is PX 586.  They conceded that we're

10  the company that created the LRDIMM technology.  Where is the

11  invention story?  The invention story is admitted in Samsung's

12  own documents.

13    We're here for one reason and one reason only, and it's

14  admitted in the last line of 1756, because Samsung refuses to

15  and will not pay for its use and infringement of these

16  patents.

17    Patents are not pathetic.  Mr. Milton is not a liar.

18  What was created here was coveted by Samsung.

19    Let's go to 1.7.

20    We are here because Samsung is violating the law.  They

21  spoke about flying 7,000 miles or 6,000 miles.  He flew 6,000

22  miles to tell us that they needed access to our patents and to

23  not say one explanation for why they don't infringe.  It

24  doesn't matter what country you are from; in this country, you

25  follow the law.

1371

1        The first issue I will discuss is infringement.

2        If I could have slide 16.

3        The idea that there is a debate about whether a converter

4    circuit exists in Samsung products was answered by Mr.

5    McAlexander on cross-examination.  I said, Do these PMICs have

6    LDO converters?  And he said, Yes.  The idea that an LDO

7    circuit is not a converter circuit is a fiction of Samsung's

8    counsel.  Mr. McAlexander admitted that a converter is a type

9    of circuit, and Mr. Lo admitted that an LDO is a converter

10   circuit.  So did Samsung's engineers.

11       Now, you might ask yourself this question.  Mr.

12   McAlexander is a fine engineer, and he's incredibly qualified.

13   How can Doctor Mangione-Smith and Mr. McAlexander disagree on

14   these issues that they do on which relates to the '506 [sic],

15   the -- the '918, and '054 and is the '339?

16       And there was actually an exchange, and it was late in

17   the day and you may have missed it, but I believe it's one of

18   the most crucial exchanges in the case.

19       Doctor Mangione-Smith looked at all the detailed source

20   code for the '918 and '054.  Mr. McAlexander admitted under

21   oath that Samsung's attorneys did not give him the source

22   code.  The source code in schematics are the critical issues

23   that define the operation of these chips.

24       This is not a referendum on Mr. McAlexander.  He is a

25   fine engineer.  This is a referendum on Samsung who has hired

1372

1    this man 12 times, and for reasons that are unclear, this time

2    did not show him the source code, and it infects his analysis

3    of every single patent.  Out of timber so crooked nothing

4    straight can come.

5         Can we have -- and, by the way, this is Bruce Lo making

6    clear whether you call something a regulator or a converter,

7    it does the same thing, it converts.

8         Can we have slide 23?

9         The second operable state says nothing about DRAM

10   operating.  Don't take my word for it.  Ask Mr. McAlexander.

11   He admitted under oath that Judge Gilstrap did not say the

12   second operable state must have operable DRAM.  They are

13   changing Judge Gilstrap's construction.  And he admitted in

14   this operable state, second operable state, the power

15   management is still operating to protect the invention.

16        And Bruce Lo, who actually had access to the source code

17   that Samsung did not give to its own expert, testified that

18   there is a second operable state.

19        The second issue I will discuss is the '339 Patent.

20        If we could have slide 44.

21        These are the two paths.  Doctor Mangione-Smith showed

22   them clear as day.  Why does Doctor Mangione-Smith and Mr.

23   McAlexander say different things?  Why does Mr. McAlexander

24   say there's only one path and why does Doctor Mangione-Smith

25   say there's two paths?

 1          The answer is in front of you.  Out of timber so crooked,

 2     nothing straight can come.  A relationship that spanned 12

 3     cases and yet they didn't even have the courtesy to provide

 4     him with the source code that would establish definitively

 5     that what they're having him say was incorrect.

 6          If we can go to slide -- oh, I'll go back.

 7          There was another word game that was played by counsel.

 8     It says, Enabling one of the data paths.  But he said that had

 9     to be a write data path.  Do you remember that?  He said it

10     had to be a write data path.

11          You're going to get the Court's claim construction in

12     your binders.  And if anyone tells you the data path has to be

13     only a write data path, point them to Judge Gilstrap's

14     construction, not the spin that was put on it by Samsung.  And

15     the reason why that spin was put on Samsung -- that Samsung

16     put that spin on is very clear:  They were trying to get out

17     in front of a damaging admission that Mr. McAlexander gave.

18          Go to JTX 20 at page 1.  Go to JTX 20 at page 1.  You

19     will see two paths on the right-hand side, upper and lower

20     nibble, two paths, and look at that claim construction and see

21     if it mentions the words "not read".  It does not.

22          I'd now like to go to the HBM patent.

23          If we can have slide 67.

24          There was a refusal of counsel to engage the basic defect

25     in the analysis that was presented.  Judge Gilstrap does not

1    say an array die cannot contain DRAM circuits.  He said an

2    array die is different from a DRAM circuit.  The analogy which

3    I believe is powerful and dispositive was ignored.  And the

4    data was ignored.  You can go to their data sheets, JTX 0065.

5    If someone says there's a DRAM circuit in these chips, go to

6    JTX 0065.  You can read it all day.  They discuss circuits

7    multiple times, and not once do they say these designs have a

8    DRAM circuit.  If someone says there's a DRAM circuit, have

9    them read the document, have them point out the phrase "DRAM

10   circuit".  It does not exist.

11            THE COURT:  Ten minutes remaining.

12            MR. SHEASBY:  Mr. McAlexander, who actually designed

13   DRAM, admitted under oath there were lots of objections about

14   this.  And you may ask yourself why were there so many

15   objections about this testimony?  And the reason is because it

16   is fatal to their position.

17        You can use a DRAM circuit like that on the left-hand

18   side, but that is not equivalent to TSVs, which is what

19   Samsung uses.  And remember our patent says TSV.

20        The representation -- oh, by the way, it wasn't just him

21   who said it.  It was also Jihwan Kim, the senior engineer at

22   Samsung who designed these products.

23        It was Johnny Kim, another senior engineer, who said the

24   exact opposite of what Doctor Robins said, that DRAM dies and

25   HBMs are not interchangeable.

1        They said and accused us of lying to the Patent Office,

2   of going back on our agreement with the Patent Office.  Do you

3   think Judge Gilstrap would let us break our agreement with the

4   Patent Office?

5        This is what we said in the Patent Office.  This design

6   on the right-hand side is not our invention.  The evidence in

7   this case from the corporate representative and senior

8   engineer is that design on the right, that DRAM circuit, is

9   not used in Samsung's products.  In fact, the president of the

10  company said it as well.

11       The reality is that, other than Samsung's lawyers,

12  there's only one witness in this case who says cheese is the

13  same as a grilled cheese sandwich.  One of the most powerful

14  tools you have is common sense.

15       85.

16       The suggestion that there is electrical communication is,

17  once again, something only Samsung's attorneys could support.

18  Where there's no driver or receiver pair, there is no

19  electrical connection or communication.

20       And what did he admit?  This is the only place there is

21  an electrical connection with a driver, and this is the only

22  place where data will be passed.  All these other locations

23  are just flow-through.  There is no data.  This is JTX 0015 at

24  15.

25       I'd now like to turn to validity.

1    102, please.

2    Clear and convincing evidence is the standard.  There's a

3   presumption because the Patent Office carefully examined these

4   patents.  The law applies to everyone the same whether you're

5   120-person company or whether you're the largest semiconductor

6   manufacturer in the world and you spend $19 billion and yet

7   need to come to us for help.

8    Samsung follows the law in using the continuation

9   process.  They file continuation after continuation after

10  continuation in areas where they do innovate, which is cell

11  phones.  And the suggestion that Mr. Milton acted

12  inappropriately, the suggestion that what was being done was

13  anything other than following the law, is outrageous.  There

14  is one company in this courtroom today who has not followed

15  the law, and I will represent to you, ladies and gentlemen of

16  the jury, it is not Netlist.

17    The written description doesn't require there to be exact

18  words or figures.  It requires any combination of information.

19  And written description in this case is clear.  What we

20  created was an on-module power management system in which

21  there is flash so that it can stay alive and stay awake to

22  resurrect the memory module.

23    And he admitted--Mr. McAlexander--that that is exactly

24  what is disclosed in our patent at column 23, lines 1 through

25  27.  If someone says, I don't know if this design of on-module

power management exists in the specification, read column 23,

lines 1 through 27, of the '918 Patent, and you will find it.

      The idea that there is not -- that all of the flash needs

to be on the memory module itself contradicts column 27 at 41

through 58.  Scott Milton admitted it.  The non-volatile

storage, the flash, can be off module in some of our

embodiments.  That's what we patented here.

      Doctor Mangione-Smith testified to the same thing, and

Mr. McAlexander testified to the same thing.  If someone says,

I don't know, I think all the flash has to be on-module, you

tell them to read 27:41 through 58 of the '918 Patent.

            THE COURT:  Five minutes remaining.

            MR. SHEASBY:  143.

      The last issue I will discuss is damages.  Why was

Samsung's behavior this way?  Why did Samsung never request a

license to our patents?  They didn't want to pay a reasonable

royalty, but they needed to use the technology.  They were

desperate for it.  And you know why.  Because they dominate

the market and they need to keep dominating the market.

      The DDR5 patents have a 30-percent power benefit.  And

the suggestion that speed doesn't matter, which was made by

Mr. Calandra, their corporate representative, if someone said

speed is not that big of a deal, you take them to JTX 41.

Take them to JTX 41.  Speed is how they market these products,

and it's essential.

1    For the '339 Patent, Doctor Mangione-Smith said that they

2    would be able to sell half as few modules of LRDIMMs if they

3    didn't have our technology, a dramatic hit to their market

4    share.

5    As to HBM stacks, people say stacking is not important?

6    Go to JTX 27.  Take them there, and you will read that higher

7    stacks are essential and crucial to the success of this

8    company.  Why did they take our HBM technology?  They were

9    behind SK hynix and they were desperate to catch up.

10    You will hear in the jury instructions that there is a

11    question about whether there is any non-infringing

12    alternatives that can be used.  If I was a company that was

13    facing a verdict of $400 million, I would bring someone who

14    would explain that there are non-infringing alternatives in

15    our technology is not that important.  I just wouldn't rely on

16    my lawyer to say that.

17    Well, they did bring two experts, and neither of those

18    experts were able to identify a single non-infringing

19    alternative to our technology.

20    Why are Samsung's silent patents important?  Samsung

21    doesn't have patents that are alternatives to our technology.

22    And if they did, they would present them.  And that is why our

23    technology is so valuable.

24    Samsung's 12,000 patents tells you the incredible value

25    of this technology, $19 billion a year and yet no alternative.

1    If we can go to slide --

2    The second factor that you consider is the Rambus

3    agreement.  The offhanded show that the Rambus agreement is

4    irrelevant, the Rambus agreement is essentially identical to

5    the dispute in this case.  A business agreement that was

6    terminated, Samsung lost its rights, Rambus asserted patents

7    against Samsung, Netlist asserted patents against Samsung, and

8    you see that Netlist's damages are lower than Rambus received.

9    It's a powerful tool that suggests the consistency of our

10   position.

11   Credibility is important.  At the beginning of this case

12   Samsung said we're going to say -- we're going to tell you

13   that one thing is clear, it will be less than 8 million.  Then

14   the evidence came in, and Mr. Meyer said, oh, well, maybe it's

15   $19.3 million.  The fact that they can't even get their story

16   straight, the fact that their expert is so malleable that it

17   will change positions for some strategic reason, tells you

18   about the credibility of his testimony.

19   If we can go to slide 152.

20   The SK hynix agreement.  The SK hynix agreement was

21   signed after we were no longer able to obtain supply pursuant

22   to the supply agreement with Samsung, and that agreement has

23   been a lifeline for this company.  It's going to net us over

24   $450 million in revenue.  Samsung says SK hynix is a

25   comparable agreement?  It's going to net us $450 million in

1  revenue.  And Mr. Meyer had the temerity to say we are a

2  failing company, he doesn't know how our business model will

3  work?

4           THE COURT:  One minute remaining.

5           MR. SHEASBY:  Our business model will not work if

6  people take our technology.  These are the damages that should

7  be awarded, not out of punitiveness but because they are the

8  actual amount owed for the '918 and '054 Patent, $196,300,000.

9       You will need to write the number down in the verdict

10  form.  It is critical that you be able to write the number

11  down in the verdict form.  It's $196,300,000.

12      For the DDR4 patents, it is $44,200,000.  And for the HBM

13  patents, it is $163,700,000.  You must write down the numbers.

14      I spoke at the beginning of this case about how the

15  future of our company depends on this proceeding.  Ladies and

16  gentlemen of the jury, Netlist, Mr. Milton, we are solely in

17  your hands.

18      Thank you.

19           THE COURT:  All right, ladies and gentlemen.  I'd

20  like to give you a few final instructions before you begin

21  your deliberations.

22      You must perform your duties as jurors without bias or

23  prejudice as to either party.  The law does not permit you to

24  be controlled by sympathy, prejudice, or public opinion.  All

25  parties expect that you will carefully and impartially

1    consider all the evidence, follow the law as the Court has

2    given it to you, and reach a just verdict regardless of the

3    consequences.

4         Answer each question in the verdict form from the facts

5    as you find them to be.  Again, do not decide who you think

6    should win this case and answer the questions to reach that

7    result.  Once again, let me remind you, your answers to the

8    questions in the verdict form must be unanimous.

9         You should consider and decide this case as a dispute

10   between persons of equal standing in the community, equal

11   worth, and holding the same or similar stations in life.  This

12   is true in patent cases between corporations, partnerships, or

13   individuals.

14        A patent owner is entitled to protect its rights under

15   the laws of the, and this includes bringing a suit in a United

16   States District Court for damages for infringement.  The same

17   guarantees allow alleged infringers to vigorously defend

18   against assertions of infringement and allow an accused party

19   to assert that patent claims are invalid.

20        The law recognizes no distinction between the parties.

21   All corporations, partnerships, or other organizations stand

22   equal before the law, regardless of their size, and they are

23   to be treated as equals.

24        When you retire to the jury room in a few minutes, you're

25   going to each have a copy of these final jury instructions

1  that I have given you today.  If you desire to review any of

2  the exhibits that have been admitted into evidence by the

3  Court over the course of the trial, you should advise me by a

4  written note delivered to the Court Security Officer and

5  signed by your foreperson requesting one or more exhibits, and

6  I will then send those exhibits to you.

7      Once you retire, you should first select your foreperson

8  and then begin your deliberations.  If you recess during your

9  deliberations for any reason, follow all the instructions the

10  Court has given you about your conduct during the trial.

11      After you have reached a verdict, your foreperson is to

12  fill in the verdict form reflecting your unanimous answers,

13  sign it, date it, and advise the Court Security Officer that

14  you've reached a verdict.  Do not reveal your answers until

15  such time as you are discharged, unless directed otherwise by

16  me.  And you must never disclose to anyone, not even to me,

17  your numerical division on any question.

18      Any notes that you have taken over the course of the

19  trial are aids to your memory only.  If your memory should

20  differ from your notes, rely on your memory and not your

21  notes.  The notes are not evidence.

22      And a juror who has not taken notes should rely on his or

23  her own independent recollection of the evidence and not be

24  unduly influenced by the notes of other jurors.  Notes are not

25  entitled to any greater weight than the recollection or

1    impression that each juror had of the testimony.

2        If you want to communicate with me at any time during

3    your deliberations, you should give a message or a question in

4    writing to your foreperson -- excuse me, signed by your

5    foreperson to the Court Security Officer who will bring it to

6    me, and I'll then respond as promptly as possible, either in

7    writing or by having you brought back into the courtroom where

8    I can address you orally.  And I will always advise the

9    attorneys in the case of my response before I respond to any

10   question you might send me.

11       After you've reached a verdict and I have discharged you

12   from your position as jurors, you're not required to talk with

13   anyone about your service in this case.  By the same token, at

14   that point you are completely free to talk to anyone about

15   your service in the case.  The decision, ladies and gentlemen,

16   in that regard is yours and yours alone.

17       I'm now going to hand eight printed copies of these final

18   jury instructions and one clean copy of the verdict form to

19   the Court Security Officer to deliver to the jury in the jury

20   room.

21                  (Pause in proceedings.)

22       THE COURT:  Ladies and gentlemen of the jury, you

23   may now retire to deliberate on your verdict.  We await your

24   decision.

25                  (Whereupon, the jury left the courtroom.)

1    THE COURT:  Awaiting either a note from the jury or

2    a return of their verdict, the Court stands in recess.

3                        (Jury deliberates.)

4        THE COURT:  Be seated, please.

5    Counsel, I've received the following from the jury:  "We

6    have reached a verdict."  And it's signed by William Stewart

7    as foreman or foreperson.  That would be Juror No. 3.

8        I'm going to mark this note with a '1' in the upper

9    right-hand corner for identification, and I'll hand it to the

10   Courtroom Deputy.

11       I'm about to bring in the jury to receive the verdict.

12   Is there anything from either Plaintiff or Defendant before I

13   do that?

14           MR. SHEASBY:  Nothing for Plaintiff, Your Honor.

15           MR. CORDELL:  Nothing for Defendant, Your Honor.

16   Thank you.

17           THE COURT:  Let's bring in the jury, Mr. Turner.

18           (Whereupon, the jury entered the courtroom.)

19           THE COURT:  Please be seated, ladies and gentlemen.

20       Mr. Stewart, I understand that you're the foreperson of

21   the jury.  Is that correct?

22           THE PRESIDING OFFICER:  Yes, sir.

23           THE COURT:  Has the jury reached a verdict?

24           THE PRESIDING OFFICER:  We have, sir, Your Honor.

25           THE COURT:  Would you hand the verdict form to the

1    Court Security Officer who will bring it to me, please?

2         Ladies and gentlemen of the jury, I'm going to announce

3    the verdict into the record at this time.  I'd like to ask

4    each of you to listen very carefully as I do this, because

5    once I've announced the verdict into the record, I'm going to

6    poll the members of the jury to confirm that this is, in fact,

7    the unanimous verdict of all eight members of the jury.

8         Turning to the verdict form and beginning on page 4 where

9    Question 1A is found, Question No. 1A:  Did Netlist prove by a

10   preponderance of the evidence that Samsung infringed any of

11   the asserted claims of the '339 Patent?

12        The jury's answer is, "Yes."

13        Question No. 1B, Did Netlist prove by a preponderance of

14   the evidence that Samsung infringed any of the asserted claims

15   of the '918 and the '054 Patents?

16        The jury's answer is, "Yes."

17        Question 1C:  Did Netlist prove by a preponderance of the

18   evidence that Samsung infringed any of the asserted claims of

19   the '060 and the '160 Patents?

20        The jury's answer is, "Yes."

21        Turning to Question 2 on page 5 of the verdict form, Did

22   Samsung prove by clear and convincing evidence that any of the

23   following asserted claims are invalid?

24        The jury's answer for each of the enumerated claims from

25   each of the three challenged patents regarding invalidity is,

1    "No."

2        Just for clarity in the record, that's "no" to claims 1,

3    8, and 9 of the '339 Patent, "no" to claims 1, 5, 13, 16, 18,

4    and 19 of the '918 Patent, and "No" to claims 16 and 17 of the

5    '054 Patent.

6        Turning then to page 6 of the verdict form where Question

7    3A is found, Did Netlist prove by a preponderance of the

8    evidence that Samsung willfully infringed any of the asserted

9    claims of the '339 Patent that you found were infringed?

10       The jury's answer is, "Yes."

11       Question 3B.  Did Netlist prove by a preponderance of the

12   evidence that Samsung willfully infringed any of the asserted

13   claims of the '918 and the '054 Patents that you found were

14   infringed?

15       The jury's answer is, "Yes."

16       Question 3C.  Did Netlist prove by a preponderance of the

17   evidence that Samsung willfully infringed any of the asserted

18   claims of the '060 and the '160 Patents that you found were

19   infringed?

20       The jury's answer is, "Yes."

21       Turning then to page 7 of the verdict form where Question

22   4A is found, What sum of money, if now paid in cash, has

23   Netlist proven by a preponderance of the evidence would

24   compensate it for the infringement of the '339 Patent?

25       The jury's answer is, "$33,150,000."

1387

1    Question 4B.  What sum of money, if paid now in cash, has

2  Netlist proven by a preponderance of the evidence would

3  compensate it for the infringement of the '918 and the '054

4  Patents?

5    The jury's answer is, "$147,225,000."

6    Turning to Question 4C, what sum of money, if now paid in

7  cash, has Netlist proven by a preponderance of the evidence

8  would compensate it for the infringement of the '060 and the

9  '160 Patents?

10    The jury's answer is, "$122,775,000."

11    Turning to page 8, which is the final page of the verdict

12  form, I find it is dated with today's date and it is signed by

13  Mr. Stewart, as foreperson of the jury.

14    Ladies and gentlemen of the jury, let me poll you to make

15  sure that this is, in fact, the unanimous verdict of all eight

16  members of the jury.

17    If this is your verdict as I have read it, would you

18  stand up?

19    Thank you.  Please be seated.

20    Let the record reflect that all eight members of the jury

21  immediately rose and stood in response to the Court's question

22  to poll the jury.

23    This confirms on the record that this is the unanimous

24  verdict of all eight members of the jury.  The Court accepts

25  the jury's verdict, and I will hand the original verdict form

1    to the Courtroom Deputy at this time.

2         Ladies and gentlemen, this now completes the trial of

3    this case.  From the very beginning, I've instructed you time

4    and time again about all the responsibilities you have as

5    jurors.  I am releasing you as jurors in this case.  I'm

6    releasing you from each of those responsibilities and

7    obligations.

8         That means, ladies and gentlemen, you're perfectly free

9    to discuss your service as jurors in this case with anyone of

10   your choosing.  You are also perfectly free to refrain from

11   discussing it with anyone of your choosing.  It's your choice,

12   100 percent your choice.

13        I do want to make you aware of one thing, and this is the

14   custom and practice in this court and has been since I began

15   practicing in this area a long time ago.  There's one way in

16   and one way out of this building, and that's down the front

17   steps.  The lawyers and the parties and the witnesses in this

18   case cannot initiate and start a conversation with you about

19   your service as jurors.  However, if you wish to initiate and

20   start and undertake conversation with any of them about your

21   service as jurors, you're perfectly free to.

22        And as a practical matter what that means is there's a

23   very high likelihood that when you leave the building and go

24   down the front steps, you're going to find a lot of lawyers

25   standing on the sidewalk at the bottom of the steps to make it

1    easy and convenient for you to stop and initiate a

2    conversation with them if you want to.

3         If you want to, they will certainly talk to you as long

4    as you want to talk to any of them, I'm sure.  If you don't

5    want to, you're under absolutely no obligation to, and you

6    don't have to feel any obligation or responsibility to the

7    stop and have a conversation, and you can simply walk right

8    by, go to your vehicle, go about your business, do whatever

9    you want to do.  It is up to you 100 percent.

10        No one is going to stop you, no one is going to try to

11   force you to have a conversation, no one's going to block you

12   until you talk to them.  They're just going to be conveniently

13   positioned so that if you want to stop and start a

14   conversation, they'll be there to do that.

15        That's the way it's always been in the Marshall Division

16   of the Eastern District of Texas that I can remember, and I've

17   been around a long time, so you can expect that.

18        Now, there is one other thing I would like to ask of you,

19   and this is -- this is a personal favor I would like to ask of

20   each of you.  Now that you've returned a verdict, I've

21   confirmed it's unanimous, the Court's accepted it, and I've

22   released you as jurors, before you leave the building and when

23   you get up to leave those seats in the jury box in just a few

24   minutes, I'd like you to go back into the jury room and I'd

25   like you to give me an opportunity to come into the jury room

1    because I would like to shake each one of your hands, I'd like

2    to look each one of you in the eye and tell you personally how

3    much the Court appreciates your service as jurors.

4        What you have done is very real and important public

5    service, and it warrants that kind of personal thanks and

6    personal attention.  And I know it's Friday and I know it's

7    afternoon and you've been very patient and very diligent

8    throughout your time as jurors and I will not hold you, but if

9    you would give me just a minute or two to come in and thank

10   you personally before you leave, I would certainly consider it

11   an honor.

12       With that, ladies and gentlemen, that completes the trial

13   of the case, the Court has accepted the jury's unanimous

14   verdict, I have released you as jurors, and the jury is

15   excused.

16           (Whereupon, the jury left the courtroom.)

17           THE COURT:  Counsel, that completes the trial of

18   this case.  You are excused.

19           (The proceedings were concluded at 2:45 p.m.)

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9                   S/Shawn McRoberts         04/21/2023

10   _____DATE_____.
                    SHAWN McROBERTS, RMR, CRR
11                  FEDERAL OFFICIAL COURT REPORTER

12

13        .

14

15

16

17

18

19

20

21

22

23

24

25