UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC, <br><br> Plaintiff, <br><br> vs. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SEMICONDUCTOR, INC., <br><br> Defendants. | Civil Action No. 2:21-CV-463-JRG <br><br> JURY TRIAL DEMANDED |

**PLAINTIFF NETLIST INC.'S MOTION FOR AN ONGOING ROYALTY**

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...........................................................................................................1

II.  NETLIST IS ENTITLED TO AN ONGOING ROYALTY .......................................1

III. SAMSUNG REFUSED TO NEGOTIATE AN ONGOING ROYALTY..................2

IV.  THE COURT SHOULD AWARD ONGOING ROYALTY RATES
     EQUAL TO THE JURY'S IMPLIED ROYALTY RATES.........................................2

     A.   The Jury's Implied Royalty Rates ............................................................3

     B.   The Trial Record Supports A Higher Per-Unit Royalty .......................6

V.   CONCLUSION.............................................................................................................13

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
 694 F.3d 1312 (Fed. Cir. 2012) ....................................................................................................7

*Affinity Labs of Texas, LLC v. BMW North Am., LLC*,
 783 F. Supp. 2d 891 (E.D. Tex. Mar. 28, 2011) ................................................................. 6, 8, 11

*Amado v. Microsoft Corp.*,
 517 F.3d 1353 (Fed. Cir. 2008) ............................................................................................ 2, 3, 7

*Apple, Inc. v. Samsung Elecs. Co.*,
 2014 WL 6687122 (N.D. Cal. Nov. 25, 2014) ..............................................................................6

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
 876 F.3d 1350 (Fed. Cir. 2017) ....................................................................................................6

*Barry v. Medtronic, Inc.*,
 250 F. Supp. 3d 107 (E.D. Tex. 2017) ........................................................................................11

*Cioffi v. Google, Inc.*,
 2017 WL 4011143 (E.D. Tex. Sept. 12, 2017) .............................................................................2

*Datatreasury Corp. v. Samsung & Co.*,
 2011 WL 8810604 (E.D. Tex. Aug. 2, 2011) ............................................................................6, 8

*Erfindergemeinschaft UroPep GbR v. Eli Lilly and Co.*,
 2017 WL 3034655 (E.D. Tex. July 18, 2017) (J. Bryson) ................................................... 1, 2, 6

*Fractus S.A. v. Samsung Elecs. Co. Ltd.*,
 Nos. 6:09-CV-203, 6:12-CV-421, 2013 WL 1136964 (E.D. Tex. Mar. 15,
 2013) .............................................................................................................................................6

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
 582 F.3d 1288 (Fed. Cir. 2009) ....................................................................................................1

*Mondis Tech. Ltd. v. Chimei Innolux Corp.*,
 822 F. Supp. 2d 639 (E.D. Tex. 2011) ............................................................................... 3, 6, 8

*Mondis Tech. Ltd. v. Innolux Corp.*,
 530 F. App'x. 959 (Fed. Cir. 2013) ..............................................................................................3

*Paice LLC v. Toyota Motor Corp.*,
 504 F.3d 1292 (Fed. Cir. 2007) ....................................................................................................7

*Paice LLC v. Toyota Motor Corp.*,
 609 F. Supp. 2d 620 (E.D. Tex. 2009) .........................................................................................6

**Page(s)**

*Read Corp. Read Corp. v. Portec, Inc.*,
   970 F.2d 816 (Fed. Cir. 1992) .................................................................................................. 8

*VirnetX Inc. v. Apple Inc.*,
   2014 WL 12672822 (E.D. Tex. 2014) ............................................................................. 8, 10, 11

## I. INTRODUCTION

Netlist, Inc. ("Netlist") respectfully requests that the Court set an ongoing royalty for Samsung's continuing infringement of the asserted claims of the patents-in-suit. On April 21, 2023, the jury found that Samsung infringed Netlist's patents and did so willfully, and awarded $303.15 million for Samsung's past infringement. Dkt. 479. Case law and the facts strongly support awarding an enhanced ongoing royalty. Samsung continues to infringe Netlist's patents, rendering an ongoing royalty appropriate. Under the modified *Georgia-Pacific* analysis that governs determination of an ongoing royalty, the facts presented to the jury at trial support a materially higher ongoing royalty rate than the one awarded by the jury on a per-family, per-unit basis. For example, the undisputed evidence at trial showed that Samsung needs Netlist's technology to remain competitive in the market, and Samsung's witnesses repeatedly testified that Samsung has no alternatives to Netlist's technology. The jury also found Samsung's infringement to be willful, and Samsung's infringement will only become more willful given it is now an adjudicated infringer. Despite there being substantial justification for enhancement, Netlist only seeks an ongoing royalty equal to the implied royalty rates set by the jury.

## II. NETLIST IS ENTITLED TO AN ONGOING ROYALTY

Where a jury's verdict only compensates the patentee for pre-suit infringement, the patentee is "entitled to be compensated for infringement occurring between the cut-off date for its calculation of damages…and the expiration date of the [patents]." *Erfindergemeinschaft UroPep GbR v. Eli Lilly and Co.*, 2017 WL 3034655, at *1 (E.D. Tex. July 18, 2017) (J. Bryson) ("*UroPep*"); *see also Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009) ("A damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales."). "[W]hether the jury award compensates the patentee for future infringement is important because without some form of prospective relief, the patent owner is effectively forced to 'resort to serial litigation' to receive compensation for

future infringement." *Cioffi v. Google, Inc.*, 2017 WL 4011143, at *2 (E.D. Tex. Sept. 12, 2017) (quoting *UroPep*, 2017 WL 3034655, at *2) (J. Gilstrap).

Here, the Court's instructions to the jury clearly stated that the reasonable royalty covered only past infringement. Trial Tr. at 1320:7-13 ("The damages period for any infringement of the '339 and the '918 Patents in this case begins December the 20th, 2021, and runs through March of 2023. The damages period for any infringement of the '054 Patent begins on January the 25th, 2022, and runs through March of 2023. The damages period for any infringement of the '060 and the '160 Patents in this case begins on May the 3rd, 2022, and runs through March of 2023."). Netlist also expressly identified that it is entitled to an ongoing royalty in the pretrial order. Dkt. 398 at 13 ("Netlist contends that it is entitled to supplemental and ongoing royalties."); *id.* at 27 (identifying in "Netlist's Statement of Contested Issues of Fact and Law" "10. Whether Netlist is entitled to a post-trial award of ongoing royalties."). Thus, Netlist is entitled to an ongoing royalty in this case. *See UroPep*, 2017 WL 3034655, at *2 ("[I]t would be improper for the Court first to conclude that the damages awarded by the jury do not cover the post-verdict period, but then to rule that [the plaintiff] is not entitled to any relief for that period.").

## III. SAMSUNG REFUSED TO NEGOTIATE AN ONGOING ROYALTY

Counsel for the parties met and conferred regarding this motion. Counsel for Samsung stated that Samsung opposes an award of an ongoing royalty.

## IV. THE COURT SHOULD AWARD ONGOING ROYALTY RATES EQUAL TO THE JURY'S IMPLIED ROYALTY RATES

As an equitable determination, the calculation of an ongoing royalty rate is "a matter committed to the sound discretion of the district court." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 n.2 (Fed. Cir. 2008). Courts routinely use the royalty rate implied by the jury's verdict as the starting point in determining a forward-looking royalty. *UroPep*, 2017 WL 3034655, at *7 ("Recognizing the importance of the jury's verdict, courts have uniformly held that the starting

point for the *Amado* analysis of the ongoing royalty rate is the royalty rate found by the jury for the pre-verdict infringement period."). Specifically, "the Court will proceed by first determining a post-judgment reasonable (ongoing) royalty rate under *Georgia–Pacific* and will use the jury's verdict in this case as a starting point and determine how the circumstances may have changed. Then the Court will consider whether the ongoing infringement will be willful. If so, the Court will consider how much to enhance the damages in light of this willful infringement." *Mondis Tech. Ltd. v. Chimei Innolux Corp.,* 822 F. Supp. 2d 639, 647 (E.D. Tex. 2011), aff'd sub nom. *Mondis Tech. Ltd. v. Innolux Corp.*, 530 F. App'x. 959 (Fed. Cir. 2013).

### A. The Jury's Implied Royalty Rates

The royalty rate implied by the jury's verdict is $54.34 per DDR4 LRDIMM sold for the '339 Patent, $15.77 per DDR5 DIMM sold for the '918 and '054 Patents, and $16.08 per HBM2, HBM2E, or HBM3 sold for the '060 and '160 Patents. This royalty rate is determined by dividing the total damages award for each patent family by the royalty base—the total number of accused products sold.

The total damages awards, $33.15 million for the '339 Patent, $147.225 million for the '918 and '054 Patents, and $122.775 million for the '060 and '160 Patents, reflect 75% of the amount Mr. Kennedy requested from the jury. Trial Tr. (Kennedy Direct) at 715:14-17 ("For the DDR5 patents, the '918 and the '050 [sic], that's $196.3 million. For the DDR4 patent, the '339, it's $44.2 million. For the HBM patents, the '060 and the '160, it's $163.7 million.").

| Reasonable Royalty | | |
|---|---|---|
| DDR5 Patents '918 / '054 Patents | DDR4 Patent '339 Patent | HBM Patents '060 / '160 Patents |
| $196,300,000 | $44,200,000 | $163,700,000 |

Total: $404,200,000

PDX6.50

To reach these damages, Mr. Kennedy presented to the jury an apportionment analysis based on the technical benefits of the patents-in-suit. Samsung moved to strike this approach at the *Daubert* stage, and the Court fully rejected Samsung's arguments. Dkt. 205 (Samsung's Motion to Strike) at 3 ("The Court Should Exclude Mr. Kennedy's Alleged Revenue Damages for Failing To Apportion"); PTC Day 1 Transcript at 218:5-6 ("The balance of the motion, I'm going to deny. And that will be the ruling on Document 205.").

Mr. Kennedy's damages opinions are based on the incremental benefits of the patents-in-suit, which were determined from Drs. Mangione-Smith and Brogioli, by comparing the accused products with the next-best non-infringing alternatives. Trial Tr. (Kennedy Direct) at 693:23-25 ("And they would also know, as we heard earlier from Doctor Mangione-Smith, that Samsung needed a 30 percent increase in power efficiency to make those sales."); 700:13-17 ("And they would also know, as we heard from Doctor Mangione, that without Netlist technology, the product sold wouldn't be usable in this two DIMMs per channel configuration and that the next best alternative would be to try to sell a bigger DPC LRDIMM at a lower price."); 701:18-21 ("So as we heard from Doctor Brogioli, that Netlist technology allows Samsung to sell eight high or higher DIMMs, and they wouldn't be able to do that without Netlist technology.").

The total number of accused products Samsung sells is an appropriate royalty base upon which to set the ongoing rate, as confirmed by Samsung's damages expert at trial. Trial Tr. (Meyer Direct) at 1163:5-16 ("Q. Mr. Meyer, I put up on the easel DDR4, .61 million; DDR5, 9.33 million; and HBM, 7.63 million. Does everyone agree that these are the sales numbers for the Samsung products in this case? A. Yes. These are the accused sales, and those are in millions. That .61 is 610,000 units. So those are units. But that's by the accused products, and everybody agrees. Mr. Kennedy and I do not dispute the number of units as agreed upon. Q. So the number of sales for DDR4 for the period of time we're talking about is 610,000. Is that correct? A. That's correct."). And both parties' experts used those unit sales to present a damages request to the jury. *See, e.g.*, Trial. Tr. (Meyer Direct) at 1173:9-25 ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ Trial. Tr. (Kennedy Cross) at 764:15-17 ██

████████████████████████████████████████

████████████████████

The implied royalty rate calculation for each family is set out below:

'339 Patent (DDR4 LRDIMMs): $33,150,000 ÷ 610,000 = **$54.34 per unit**
'918 and '054 Patents (DDR5 DIMMs): $147,225,000 ÷ 9,334,000 = **$15.77 per unit**
'060 and '160 Patents (HBMs): $122,775,000 ÷ 7,633,000 = **$16.08 per unit**

### B. The Trial Record Supports A Higher Per-Unit Royalty

Netlist only seeks an ongoing royalty equal to the jury's implied rate. Nevertheless, courts in this district routinely set ongoing royalty rates higher than the implied rate found by the jury. *See e.g., UroPep*, 2017 3034655, at *1 (applying twice the jury's implied royalty rate to post-verdict infringing sales); *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009) ("*Paice II*") (setting ongoing royalty of $98 per vehicle as compared to jury verdict implied rate of $25 per vehicle); *Mondis*, 822 F. Supp. 2d 639, 653 (setting ongoing royalty of 3x the jury verdict rate); *Fractus S.A. v. Samsung Elecs. Co. Ltd.*, Nos. 6:09-CV-203, 6:12-CV-421, 2013 WL 1136964, at *3 (E.D. Tex. Mar. 15, 2013) (setting ongoing royalty of 1.69x the implied rate found by the jury); *Affinity Labs of Texas, LLC v. BMW North Am., LLC*, 783 F. Supp. 2d 891, 905 (E.D. Tex. Mar. 28, 2011) (setting ongoing royalty of 1.33x the jury rate); *Datatreasury Corp. v. Samsung & Co.*, 2011 WL 8810604, at *19 (E.D. Tex. Aug. 2, 2011) (setting ongoing royalty of 2.5x the implied rate found by the jury). The Federal Circuit routinely upholds ongoing royalty rates higher than the implied rate found by the jury. *See, e.g., Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017) (affirming district court's ongoing royalty rate of double the rate determined by the jury).

Using the jury's implied royalty rate as a starting point, courts conduct a renewed analysis of a reasonable royalty based on a post-verdict hypothetical negotiation. *UroPep*, 2017 WL 3034655 at *8; *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 6687122, at *13 (N.D. Cal. Nov. 25, 2014). "Once a judgment of validity and infringement has been entered … the calculus is markedly different because different economic factors are involved." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017), cert. denied, 139 S. Ct. 143, 202 L. Ed. 2d 34 (2018); *Datatreasury Corp.*, 2011 WL 8810604 at *18-19 (reasoning that the "jury verdict [is] a valuable guide" and increasing the royalty based on the defendant's "status as an adjudicated infringer.").

Although Netlist is not seeking an enhanced ongoing royalty rate, there are three principal reasons why the implied royalty rate awarded by the jury could be increased under a post-verdict *Georgia-Pacific* analysis. The weight of these factors in Netlist's favor serve to further justify its request for an ongoing royalty set at the implied rate calculated above.

**First**, the Federal Circuit recognizes the impact of a jury verdict on a *Georgia-Pacific* hypothetical negotiation. The *Amado* court explained that "[p]rior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved." 517 F.3d at 1362; *see also Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1292, 1317 (Fed. Cir. 2007) *("Paice I")* ("[P]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors.") (Judge Rader, concurring). The Federal Circuit noted that a judgment of infringement and no invalidity results in a "substantial shift in the bargaining power of the parties" and supports a district court's award of an ongoing royalty exceeding the royalty awarded for past infringement:

> While it is likely true that Verizon would not have agreed to that amount prior to litigation, Verizon has been adjudicated to infringe and the patent has been held not invalid after a substantial challenge by Verizon… The district court is correct; there has been a substantial shift in the bargaining position of the parties.

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1342 (Fed. Cir. 2012).

**Second**, Netlist's technology is critically important to Samsung's ongoing and future success. For example, the evidence at trial showed that Samsung expects the memory markets, especially the HBM markets, to grow substantially. Trial Tr. (Kennedy Direct) at 707:2-8 ("Q. What is Samsung's view on the HBM3 market growth going forward and does that impact the royalty? A. It does. When you're negotiating and you know that the other party is predicting the market's going to experience huge growth, that does influence the negotiations. **Here we see**

***from Samsung that they're expecting a 40 percent compound annual growth rate in this marketplace.***") (emphasis added).  As discussed above, the unrebutted evidence showed that Samsung needs Netlist's technology to create its products. *See, e.g.*, *id.* at 693:23-25, 700:13-17, 701:18-21.  And the unrebutted evidence also showed that the memory market is intensely competitive, so Samsung needs Netlist's technology to maintain the market share that it has developed through its infringement to date. *Id.* at 709:22-710:2 ("Well, in the marketplace, there's three big players that dominate it, 95 percent of the market. And it's very competitive between these three players. And if one of the companies is going to offer a product that's not as good or is not using the Netlist technology, they're going to probably just lose those sales altogether.").

**Third**, Samsung's ongoing infringement can only be considered willful. Courts have consistently found post-judgment infringement by a defendant to be willful. *See, e.g., Affinity Labs*, 783 F. Supp. 2d at 899 ("Following a jury verdict and entry of judgment of infringement and no invalidity, a defendant's continued infringement will be willful absent very unusual circumstances."); *Datatreasury*, 2011 WL 8810604 at *8-9 (finding ongoing infringement to be willful); *Mondis*, 822 F. Supp. 2d at 649 (same).  Those cases left open the possibility that a defendant's ongoing infringement could be not willful in certain circumstances, but none of those cases dealt with defendants who had already been adjudged a willful infringer by the jury.  Here, there is no question that Samsung's infringement going forward is willful, as the jury found that Samsung's pre-verdict infringement was willful.

To determine whether to enhance an ongoing royalty on the basis of willfulness, courts look to the enhanced damages set out by the Federal Circuit in *Read Corp*.  *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992); *VirnetX Inc. v. Apple Inc.*, 2014 WL 12672822, at *4 (E.D. Tex. 2014) (enhancing implied royalty rate due to willfulness).  Each of the *Read* factors supports the enhancement of damages.

Factors 1, 2, 4, 5, 7, and 8 are particularly strong in Netlist's favor. As to the **Factor 1**, Samsung's copying, there is substantial evidence that Samsung copied Netlist's technology. Samsung requested, and Netlist provided, information regarding Netlist's patents and the products they cover. PX446; Trial Tr. (Milton Direct) at 222:7-24. Samsung confidential records contained a Netlist presentation disclosing intelligent "on-module power distribution," which is the claimed technology in the '918 and '054 patents. PX621 at 29; Trial Tr. (Milton Direct) at 205:24-206:7 ("Q. Now, did Samsung have to search to find out if Netlist was seeking patents on on-module power management? A. They did not. We provided that information to them. Q. And I want to show you this. Is this an example of how you provided that information? A. Yes. Yes, sir. Q. So this is PX 621. And what does it say? A. Well, it says that one of the items is intelligent on-module power management -- or power distribution."). Samsung sought that on-module power management technology from Netlist. The evidence before the jury showed that Samsung reached out to Netlist to request a visit to discuss that exact technology. PX586 ("Our SLSI team would like to visit next week to discuss VRoD stands for voltage regulator on DIMM – power management IC for DDR5 DIMM."); Trial Tr. (Milton Direct) at 200:16-19 ("Q. What is PX 586? A. So this is an email that was sent from Samsung to Netlist requesting a meeting with our technical team to talk about specifically power management IC for DDR5 DIMM.").

There is evidence of Samsung's copying of Netlist's other technologies at issue in this case as well. For example, an internal Samsung memorandum from 2016 shows that Samsung knew Netlist had patents on HBMs and LRDIMMs, and that Samsung planned on obtaining more information regarding Netlist's patents. PX1662 at 2 ("During dinner with EVP Jibum Kim of Company N (June 8), he expressed an opinion that Company N's patent is applicable to RDIMM, HBM, and Enterprise SSD as well in addition to LRDIMM, so we plan to obtain relevant information and review it (with Product Planning)."). In 2019, Samsung shared with Netlist two submissions it prepared for the Korean Tax Authority. *See* PX1663 and PX1756. In

those statements, Samsung admitted that it knew Netlist had important NVDIMM and LRDIMM technology, that it sought a license with Netlist for the purposes of receiving access to that technology, and that Netlist invented LRDIMM technology:

- "We moved ahead to enter into an agreement for *technical collaboration (including licensing) to resolve the patent risk related to LRDIMM and NVDIMM*" (PX1663 at 3).
- "Our company entered into the technical collaboration agreement, including cross-licensing, *to resolve the patent risk related to LRDIMM and NVDIMM* and paid Netlist, Inc." (*Id.* at 5).
- "However, we concluded that the *patents related to memory modules (RDIMM and LRDIMM), already held by Company N, would be helpful for our development* of NVDIMM-P or helpful in resolving the risk of patent claims that could happen going forward. So, we entered into the agreement including a cross-licensing clause." (*Id.* at 7).
- "We understand that *Netlist, Inc. is a technology company (focused on research) holding multiple patents* in the areas of DRAM and modules, and, notably, it is *well known in the industry as a company that created a system for LRDIMM technology*." (PX1756 at 4).
- "Accordingly, *Samsung Electronics Co., Ltd. came to resolve the risk of patent infringement* for the period before and after JDLA and use their patents without entering into a separate royalty agreement or payment." (*Id.*).

Netlist also shared detailed information regarding its HBM patents. In 2015, Netlist expressly disclosed the '060 patent to Samsung and identified it as relating to TSVs, which Samsung's accused HBM products use. Trial Tr. (Milton Direct) at 220:17-221:1 ("Q. What is PX 1778? A. So this document is a description of the '060 Patent that was provided to Samsung. Q. And was the actual document provided to Samsung or was a presentation given? A. A presentation was given. Q. And I want to show you -- so this describes the '060 Patent as relating to TSVs. Is that correct? A. That is correct."); Trial Tr. (Brogioli Direct) at 509:13-15 ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Factors 2** (Samsung's lack of a good-faith belief in non-infringement or invalidity) **and 5** (the closeness of the case) "strongly favor enhancement." *VirnetX,* 2014 WL 12672822, at *4. Samsung did not have a good-faith belief in non-infringement or invalidity pre-verdict, and the case was not close. As discussed directly above, Samsung admitted that it entered into the JDLA to avoid the infringement risk associated with LRDIMM and NVDIMM. Moreover, Samsung is now an adjudged willful infringer, and the '339, '918, and '054 were found to be not invalid. Samsung did not even attempt to argue that the '060 and '160 patents were invalid. Under these circumstances, Samsung cannot simply assert a good-faith belief of non-infringement or invalidity. *Id.*

**Factor 4** (Samsung's size and condition) likewise favors enhancing the ongoing royalty rate. Samsung Electronics Co., Ltd.'s latest annual Audited Financial Statement demonstrates that in 2022, Samsung had a net comprehensive income of $46.2 billion, on revenue of $234.1 billion. Ex. 1 (Samsung Audited Financial Statement) at 8-9. Where a large company makes substantial profits, enhancing an ongoing royalty rate by up to three times "would not be a *per se* unreasonable amount for ongoing acts of willful infringement." *Affinity Labs*, 783 F. Supp. 2d at 903.

**Factor 7** (Samsung has taken no remedial action) is also strong. Samsung has not suggested it has a non-infringing alternative, and has presented no evidence that it has ever investigated how to create one. Despite a $303.15 million verdict, Samsung still infringes Netlist's patents to this day. *See Barry v. Medtronic, Inc.,* 250 F. Supp. 3d 107, 116 (E.D. Tex. 2017) (finding "no evidence" of "remedial action" where defendant did not "discontinue[] distribution or otherwise curb[] use of potentially infringing devices as a remedial measure or in response to that potential (now proven) infringement.").

**Factor 8** (Samsung's motivation to harm) also supports enhancement. Samsung openly acknowledged that it was behind its competition. JTX0026 at 5 ("Samsung D1y is behind of

competitor's schedule and partial DDR5-BF support"); Trial Tr. (Kennedy Direct) at 694:12-15 ("So this is a Samsung internal document that we get access to as part of the hypothetical negotiation, and you see that Samsung on the top line there is recognizing that they're behind their competitor's schedule already with DDR5."); Trial Tr. (Milton Direct) at 221:23-222:1 ("Q. What was Samsung's position in the market when they asked for a presentation on your technology in April 2015? A. In 2015, Samsung was behind their biggest competitor SK hynix in this product space."). Samsung's confidential documents also show that Samsung felt the "pressure of fast HBM tech transition" and the "minimum number of stack is getting higher as new generation introduced." JTX0027 at 5. Indeed, the competition for HBM products is so intense that Samsung was unable to even offer an HBM1 product after being shut out of the market by SK Hynix. Trial Tr. (Kennedy Direct) at 706:18-23 ("He identified that or said that -- testified that SK hynix had launched an HBM1 product commercially before Samsung, and that led to Samsung being cut out of that marketplace and they could not sell anything in the market for HBM1. And that was confirmed by Mr. Kim's testimony saying they didn't end up even making an HBM1 product."). In addition, the jury heard Netlist's CEO Mr. Hong testify that Samsung's infringement makes it a competitor to Netlist. Trial Tr. (Hong Depo.) at 1124:23-1125:3 ("Q. Okay. And so you wouldn't consider Samsung a competitor. Is that right? A. Samsung becomes a competitor when they take our high-end technology and water it down into a commodity product. And when they do that, it makes it difficult for us to sell our proprietary solutions."). This testimony was unrebutted.

The jury also heard Samsung's witnesses testify that they were not aware of a single Samsung patent that covered any of the accused products. E.g., Trial Tr. (Kim Depo.) at 650:18-24 ("Q. Can you identify for me the numbers of any Samsung patents that cover HBM2, HBM2-E, or HBM3 products? A. I don't know. Q. You're Samsung's corporate representative on the HBM products that are accused of infringement in this case. Correct? A. Yes."); Trial Tr.

(Kyungsoo Park Depo.) at 642:18-20 ("Q. Does Samsung have any patents that you are aware on that covers its DDR5 DIMMs? A. I do not know about any patent in regard to DIMMs."); Trial Tr. (Sung Joo Park Depo.) at 674:9-12 ("Q. As Samsung's corporate representative, can you identify any Samsung patents that cover its LRDIMM DDR4s that it sells? Yes or no?  A. No, I don't recall any right now."). Factor 8 thus also favors enhancement.

**V.      CONCLUSION**

Based on the foregoing, Netlist respectfully requests ongoing royalty rates be set against Samsung as follows for the ongoing sale of its infringing products: $54.34 per unit of DDR4 LRDIMMs sold for the '339 patent, $15.77 per unit of DDR5 DIMMs for the '918 and '054 patents, and $16.08 per unit of HBMs for the '060 and '160 patents.

| | |
|---|---|
| Dated: September 8, 2023 | Respectfully submitted,<br><br>*/s/ Jason Sheasby*<br><br>Samuel F. Baxter<br>Texas State Bar No. 01938000<br>sbaxter@mckoolsmith.com<br>Jennifer L. Truelove<br>Texas State Bar No. 24012906<br>jtruelove@mckoolsmith.com<br>**MCKOOL SMITH, P.C.**<br>104 East Houston Street Suite 300<br>Marshall, TX 75670<br>Telephone: (903) 923-9000<br>Facsimile: (903) 923-9099<br><br>Jason Sheasby (*pro hac vice*)<br>jsheasby@irell.com<br>Annita Zhong, PhD (*pro hac vice*)<br>hzhong@irell.com<br>Thomas C. Werner (*pro hac vice*)<br>twerner@irell.com<br>Andrew Strabone (*pro hac vice*)<br>astrabone@irell.com<br>Yanan Zhao (*pro hac vice*)<br>yzhao@irell.com<br>Michael W. Tezyan (*pro hac vice*)<br>mtezyan@irell.com<br>**IRELL & MANELLA LLP**<br>1800 Avenue of the Stars, Suite 900<br>Los Angeles, CA 90067<br>Tel. (310) 277-1010<br>Fax (310) 203-7199<br><br>Rebecca Carson (*pro hac vice*)<br>rcarson@irell.com<br>**IRELL & MANELLA LLP**<br>840 Newport Center Drive, Suite 400<br>Newport Beach, CA 92660<br><br>**Attorneys for Plaintiff Netlist, Inc.** |

## CERTIFICATE OF SERVICE

I hereby certify that, on September 8, 2023, a copy of the foregoing was served to all counsel of record.

*/s/ Jason Sheasby*
Jason Sheasby

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for the parties met and conferred, and Samsung stated that it opposes Netlist's Motion for an Ongoing Royalty.

*/s/ Jason Sheasby*
Jason Sheasby

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that the foregoing document and exhibits attached hereto are authorized to be filed under seal pursuant to the Protective Order entered in this Case.

*/s/ Jason Sheasby*
Jason Sheasby